# EXHIBIT A

<table>
<tr><td>1</td><td>Michael P. Lehmann (State Bar No. 77152)<br>Bonny E. Sweeney (State Bar No. 176174)</td></tr>
<tr><td>2</td><td>Christopher L. Lebsock (State Bar No. 184546)</td></tr>
<tr><td>3</td><td>HAUSFELD LLP<br>600 Montgomery St., Suite 3200</td></tr>
<tr><td>4</td><td>San Francisco, CA 94111<br>Telephone: (415) 633-1908</td></tr>
<tr><td>5</td><td>Facsimile: (415) 358-4980<br>mlehmann@hausfeld.com</td></tr>
<tr><td>6</td><td>bsweeney@hausfeld.com<br>clebsock@hausfeld.com</td></tr>
<tr><td>7</td><td></td></tr>
<tr><td>8</td><td>James J. Pizzirusso (<em>pro hac vice</em> to be filed)<br>Swathi Bojedla (<em>pro hac vice</em> to be filed)</td></tr>
<tr><td>9</td><td>HAUSFELD LLP<br>1700 K St. NW, Suite 650</td></tr>
<tr><td>10</td><td>Washington, DC 20006<br>Telephone: 202-540-7200</td></tr>
<tr><td>11</td><td>Facsimile: 202-540-7201<br>jpizzirusso@hausfeld.com</td></tr>
<tr><td>12</td><td>sbojedla@hausfeld.com</td></tr>
<tr><td>13</td><td><em>Attorneys for Plaintiff</em></td></tr>
</table>

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROSALYNN C. KRISSMAN, | Case No. 5:15-cv-02741 |
| Plaintiff, | CLASS ACTION |
| vs. | JURY TRIAL DEMANDED |
| ANTHEM, INC., and BLUE CROSS OF CALIFORNIA, | COMPLAINT FOR: |
| Defendants. | 1) **BREACH OF CONTRACT;** |
| | 2) **BREACH OF IMPLIED CONTRACT;** |
| | 3) **VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT;** |
| | 4) **VIOLATION OF CALIFORNIA DATA BREACH ACT;** |

5) **VIOLATION OF CALIFORNIA UCL;**

6) **NEGLIGENCE;**

7) **BAILMENT;**

8) **UNJUST ENRICHMENT; and**

9) **VIOLATION OF INDIANA STATUTORY LAW**

Plaintiff Rosalynn C. Krissman, on behalf of herself and all others similarly situated, hereby alleges as follows:

## NATURE OF THE CASE

1. In this Complaint, unless the context signifies otherwise, Defendants Anthem, Inc. and Blue Cross of California will be referred to collectively as "Anthem" or "Defendants."

2. Defendants were the subject of one of the largest data breaches in history (the "Anthem data breach"), when hackers, believed to be based in China, stole the personal, medical, and financial information of up to 78.8 million Anthem customers and insureds, including 13.5 million Californians. The personal medical, and financial information obtained by the hackers included names, birthdates, Social Security numbers ("SSNs"), medical I.D. numbers, street and e-mail addresses, and employee data, including income.

3. Anthem has suffered data breaches in the past, but apparently learned nothing from them, judging from the inaction that led to this most recent Anthem data breach, which is by far the largest in the healthcare industry. Despite a slew of governmental reports warning about cybersecurity in general and the risks facing healthcare companies in particular, Anthem failed to take adequate steps to protect its customers' confidential information, while at the same time publicly deceiving them into believing that it had done so. It continued to use SSNs as identifiers for subscribers, even though other healthcare companies had dropped that approach and multiple government agencies warned against it. Although publicly available signs of an imminent attack on Anthem's data system were available in April of 2014, Anthem did not discover the breach until January 29, 2015, after it had been ongoing for well over a month. Even then, it waited until February 4 to make a public announcement. It should have immediately followed up that announcement with written communications to all customers. Instead, it was inexcusably dilatory in doing so, causing the Attorneys General ("AGs") of 11 states and members of the United States Senate to criticize Anthem for failing to promptly send written notification to all subscribers affected by Anthem's data breach. To this day, it appears that all of the persons affected by the Anthem data breach may not have been notified in writing.

4.      As a result of the Anthem data breach, 78.8 million Anthem customers and insureds have lost control of their confidential information. The injuries suffered by the proposed Class as a direct and proximate result of the Anthem data breach include: (a) theft of their personal, medical and financial information; (b) the payment of costs associated with the detection and prevention of identity theft and unauthorized use of their financial information; (c) the opportunity costs associated with addressing and attempting to ameliorate, mitigate, and deal with the actual and future consequences of the Anthem data breach, including monitoring financial accounts for fraudulent charges, canceling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the Anthem data breach; (d) the imminent and impending injury flowing from potential fraud and identity theft posed by their personal medical and financial information being placed in the hands of hackers; (e) damages to and the diminution in value of their personal and financial information entrusted to Anthem for the sole purpose of obtaining health insurance from Anthem and with the mutual understanding that Anthem would safeguard Plaintiff's and the Class members' data against theft and not allow access and misuse of their data by others; (f) overpayments paid to Anthem for health insurance purchased during the Anthem data breach in that a portion of the price for insurance paid by Plaintiff and the Class to Anthem was for the costs of Anthem providing reasonable and adequate safeguards and security measures to protect customers' and insureds' financial and personal data, which Anthem failed to do, and as a result, Plaintiffs and the members of the Class did not receive what they paid for and were overcharged by Anthem; and (g) continued risk to their financial and personal information, which remains in the possession of Anthem and which is subject to further breaches so long as Anthem fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' data in its possession.

5.      Plaintiff, on behalf of herself and all similarly situated consumers whose personal, medical, and financial information was stolen as a result of the Anthem data breach, seek to remedy these harms, and prevent their future occurrence.   Plaintiff asserts claims against Anthem for violations of California's medical confidentiality, data protection and unfair competition laws on behalf of a California subclass, and negligence, breach of implied contract, breach of Anthem's Health

Insurance Portability and Accessibility Act ("HIPAA") Notice of Privacy Practices handbook, bailment, unjust enrichment, and violation of Indiana's deceptive practices statute on behalf of a nationwide class.  On behalf of themselves and all other similarly situated consumers, Plaintiffs seek to recover damages, including actual and statutory damages, and equitable relief, restitution, disgorgement, costs and reasonable attorneys' fees.

**PARTIES**

6.    Plaintiff Rosalynn C. Krissman resides in Beverly Hills, California.  She is a current Anthem health insurance customer. Her personal health and financial information were compromised as a direct and proximate result of the Anthem data breach.  Plaintiff was harmed by having financial, health and personal information compromised.

7.    Plaintiff suffered actual injury from having her financial, health and personal information compromised and stolen in and as a result of the Anthem data breach.

8.    Plaintiff was deceived by Anthem into believing that it was providing adequate remediation to those affected by the Anthem data breach when in fact it was not.

9.    Defendant Anthem, Inc. is the second largest health insurer in the United States. According to its website, one in nine Americans receive coverage for their medical care through Anthem, Inc. Anthem, Inc. was created in 2004 through the merger of the Anthem, Inc. and WellPoint, Health Network, Inc. and operated as "WellPoint" until 2014. Anthem, Inc. is headquartered at 120 Monument Circle, Indianapolis, IN 46204.

10.    Defendant Blue Cross of California, doing business under the trade name Anthem Blue Cross ("Anthem Blue Cross"), is a California corporation with its principal place of business at Anthem, Inc.'s address in Indiana listed in the preceding paragraph. Anthem Blue Cross sells health insurance to California residents, maintains offices in California, employs workers in California, and advertises in California.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (a) this is a class action in which the matter in controversy exceeds $5 million, exclusive of interests and costs; (b) there are more than one hundred class members; and (c)

Plaintiffs and the class are citizens of different states than at least one defendant, satisfying the minimal diversity requirement.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants regularly transact business in this judicial District, and because some of the Class members reside within this judicial District. The claims for relief asserted by the putative Class members also arose, in whole or in part, within this judicial District.

## INTRADISTRICT ASSIGNMENT

13.     Pursuant to Civil L.R. 3-2(c) and 3-5(b), assignment to the San Jose Division of the Northern District of California (the "Division") is proper, because a substantial part of the events or omissions which give rise to the claims occurred in this Division. Defendants sell health insurance plans in this Division, maintain offices in this Division, employ workers in this Division, and advertise in this Division. Assignment to the San Jose Division is also proper because cases relating to the Anthem data breach have been centralized before the Honorable Lucy Koh by the Judicial Panel on Multidistrict Litigation as *In re Anthem, Inc. Customer Data Breach Security Litig.*, No. 5:15-md-02617-LHK (N.D. Cal.).

## CLASS ACTION ALLEGATIONS

1.     Plaintiff brings all claims as class claims under Rule 23 of the Federal Rules of Civil Procedure.  The requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied with respect to the Class as defined below.

2.     The Plaintiff Class consists of all persons whose personal financial and/or health information was compromised by the data breach first disclosed by Anthem in February 4, 2015. Within this Class is a Subclass consisting of all such persons who reside in the State of California.

3.     Plaintiff is a member of the proposed Class and Subclass.

4.     The Class is so numerous that joinder of all members is impracticable. The Class includes approximately 78.8 million individuals whose personal, financial and/or health information was compromised by the Anthem data breach. The Subclass is estimated to include 13.5 million persons.

Case 5:15-cv-02741  Document 1  Filed 06/18/15  Page 7 of 41

5.      There are numerous questions of law and fact common to Plaintiff and the Class, including the following:

- whether Anthem engaged in the wrongful conduct alleged herein;

- whether Anthem's conduct was deceptive, unfair, unconscionable and/or unlawful;

- whether Anthem owed duties to Plaintiff and the Class and Subclass members to adequately protect their personal health and/or financial information and to provide timely and accurate notification of security breaches and whether Anthem breached its duties to provide timely and accurate notice to Plaintiff and members of the Class and Subclass;

- whether Anthem knew or should have known that its computer systems were vulnerable to attack;

- whether Anthem's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of millions of consumers' personal, health and/or financial data;

- whether Anthem unlawfully failed to inform Plaintiff and members of the Class that it did not maintain computers and security practices adequate to reasonably safeguard customers' financial, health and personal data, and whether Anthem failed to inform Plaintiffs and members of the Class and Subclass of the data breach in a timely and accurate manner;

- whether Anthem's remediation efforts are sufficient;

- whether Plaintiff and members of the Class and Subclass suffered injury, including ascertainable losses, as a proximate result of Anthem's conduct or failure to act;

- whether Plaintiff and the members of the Class and Subclass are entitled to recover damages; and

• whether Plaintiff and the members of the Class and Subclass are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or other equitable relief.

6.     Plaintiff's claims are typical of the claims of the Class in that the representative Plaintiff, like all Class and Subclass members, had health insurance provided by Anthem and had their personal, medical and/or financial information compromised in the Anthem data breach.

7.     Plaintiff will fairly and adequately protect the interests of the Class and Subclass. Plaintiffs have retained counsel who are experienced in class action and complex litigation.   Plaintiffs have no interests that are adverse to, or in conflict with, the interests of other members of the Class and Subclass.

8.     The questions of law and fact common to the Class and Subclass Members predominate over any purely individual questions affecting some or all of the Class and Subclass Members.

9.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.  Moreover, absent a class action, most Class and Subclass Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy.

10.     The prosecution of separate actions by the individual Class and Subclass members would create a risk of inconsistent or varying adjudications from individual to individual Class member, and would establish incompatible standards of conduct for Anthem. By contrast, conducting this litigation as a class action would present far fewer management difficulties, would conserve judicial resources, would promote the most efficient usage and expenditure of the parties' resources, and would protect the rights of each Class and Subclass member.

## FACTS

## I.     The Healthcare Industry Was Put on Notice of the Danger of Cyberattacks.

11.     The risks of data breaches in the health care industry have been known for a long while and those risks are increased exponentially when a company uses SSNs as customer identifiers. As the federal Government Accounting Office ("GAO") noted in a 2005 report:

Since its creation, the SSN has evolved beyond its original intended purpose. This is significant, because these numbers, along with a name and birth date, are the three pieces of information most often sought by identity thieves. Once a SSN is obtained fraudulently, it can then be used as "breeder" information to create additional false identification documents, such as driver's licenses. As shown in figure 1, reported cases of identity theft are on the rise. In addition, the reported incidents of identity theft in New York have also risen, in an increase similar to the overall rise reported in the United States. (Footnote omitted)

12.     In September of 2013, the Ponemon Institute ("Ponemon") issued a report entitled "2013 Report on Medical Identity Theft." Among the key findings of the report were the following:

**The number of medical identity theft victims increased**. The number of new cases over the past year is estimated at 313,000. This estimated increase in the base rate of identity theft victims climbed from .0068 to .0082, which represents a 19 percent increase over one year.

**Medical identity theft can put victims' lives at risk**. The individuals in this study understand what medical identity theft is and have had personal experience with this crime either directly or through an immediate family member. However, 50 percent are not aware that medical identity theft can create inaccuracies in their permanent medical records.

**Most medical identity theft victims lose trust and confidence in their healthcare provider following the loss of their medical credentials**. The most frequent medical consequence of a medical identity theft is that respondents lost trust and confidence in their healthcare provider (56 percent). This is an increase from 51 percent in last year's study.

13.     In February of 2014, the SANS Institute ("SANS") issued a "Healthcare Cyberthreat Report" in which it stated:

Some 94 percent of medical institutions said their organizations have been victims of a cyber attack, according to the Ponemon Institute. Now, with the push to digitize all health care records, the emergence of HealthCare.gov and an outpouring of electronic protected health information (ePHI) being exchanged online, even more attack surfaces are being exposed in the health care field.

A SANS examination of cyberthreat intelligence provided by Norse supports these statistics and conclusions, revealing exploited medical devices, conferencing systems, web servers, printers and edge security technologies all sending out malicious traffic from medical organizations. Some of these devices and applications were openly

exploitable (such as default admin passwords) for many months before the breached organization recognized or repaired the breach.

The intelligence data that SANS examined for development of this report was specific to the health care sector and was collected between September 2012 and October 2013. The data analyzed was alarming. It not only confirmed how vulnerable the industry had become, it also revealed how far behind industry-related cybersecurity strategies and controls have fallen.

14.      The Federal Bureau of Investigation's ("FBI") CyberDivision issued a "Private Industry Notification" on April 8, 2014 that cited the SANS report and the Ponemon report and concluded that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs). The health care industry is not as resilient to cyber intrusions compared to the financial and retail sectors, therefore the possibility of increased cyber intrusions is likely." The FBI stated further that:

Health care security strategies and practices are poorly protected and ill-equipped to handle new cyber threats exposing patient medical records, billing and payment organizations, and intellectual property. ... The biggest vulnerability was the perception of IT health care professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise.

15.      Likewise, the California Attorney General issued a "Data Breach Report" in October of 2014. It observed as follows:

In the health care sector, breaches affected more records than in other industry sectors, with the exception of retail since the two mega breaches of 2013.  Many of the health care breaches reported to us are of a type that could be prevented by the strategic use of encryption. Unlike other industry sectors, where computer intrusions caused the majority of breaches, in health care 70 percent of breaches reported in the past two years were the result of stolen or lost hardware or digital media containing unencrypted personal information.

A recent study by the Ponemon Institute reports that criminal attacks targeting the health care system are growing and that employees' use of unsecured portable devices is also increasing the risk of breach. The need to use encryption is a lesson that must be learned by the health care industry and we recommend that it be applied not only to laptops and portable media, but also to many computers in offices.

The report went on to note that one in three data breach victims in 2013 became identity theft victims in that same year, an increase from one in four in 2012.

16.     By early 2014, computer breaches had become rampant in the healthcare industry, a fact widely disseminated inside and outside the healthcare sector. For example:

- According to the Ponemon report, 63% of the healthcare organizations surveyed reported a data breach during the previous two years.  The majority of these breaches resulted in the theft of data.  In a March 2014 report, the institute stated that criminal attacks on healthcare companies have increased 100% since 2010.

- An EMC2/RSA White Paper published in 2013 indicated that during the first half of 2013, more than two million healthcare records were compromised, constituting 31% of all reported data breaches.

- According to the Identity Theft Resource Center, nearly half of all data breaches so far in 2014 have taken place in the healthcare sector.

- According to a recent analysis of data from the United States Department of Health & Human Services ("HHS") by the *Washington Post*'s "Wonkblog," the personal data of about 30.1 million people has been affected by 944 recorded "major" health data breaches (defined by HHS as one affecting at least 500 people) since federal reporting requirements under the 2009 economic stimulus package went into effect. This analysis did not include the CHS breach.

17.     Several other studies have shown the healthcare industry to be one of the most affected by and least prepared to deal with hacking attempts.   Despite the growing threat, the healthcare industry has been slow to implement improved security measures--slower than other industries handling sensitive information, such as the retail and financial sectors.  For instance, the typical healthcare entity allocates only about two or three percent of its operating budget to its IT department, while retail and financial businesses devote more than 20 percent to IT. According to an annual security assessment conducted by the Healthcare Information and Management Systems Society, almost half of surveyed health systems said they spent three percent or less of their IT budgets on security.

18.     The United States Food & Drug Administration was sufficiently concerned to convene a two-day conference on October 21-22, 2014 on ``Collaborative Approaches for Medical Device and Healthcare Cybersecurity.''

19.     Anthem was all too well aware of these problems. From 2006-12 (when it operated under the WellPoint name), it suffered repeated data breaches and entered into multiple settlements with federal and state regulatory authorities. In 2006, tapes containing SSNs and other data regarding 196,000 Anthem Blue Cross Blue Shield customers were stolen from a lockbox held by one of the company's contractors in Massachusetts. Two years later, personal information for 128,000 WellPoint customers in several states was exposed online. WellPoint experienced another data breach when it upgraded its web servers in 2009, but failed to transfer security protocols to the upgraded equipment, resulting in the exposure of the confidential information of about 612,000 customers from October of 2009 to March of 2010. A Health Insurances Portability and Accessibility Act ("HIPAA") investigation was conducted by HHS' Office of Human Rights ("HHS OCR"), which resulted in a "resolution agreement" whereby WellPoint paid a $1.7 million fine. According to one article,

> The Resolution Agreement reached between Wellpoint, Inc. and HHS OCR stated several findings from the HHS investigation following the HIPAA violation. According to the report, Wellpoint, Inc. failed to implement appropriate security procedures and policies prior to allowing access to ePHI [electronic Personal Health Information], therefore violating HIPAA security policies. The company also failed to perform technical evaluations of system security following software upgrade and failed to utilize adequate technology to identify users seeking access to sensitive information. These findings indicated inadequacies in the Wellpoint, Inc. system and clear violations of HIPAA regulations, but were not an admission of liability by the company. The Resolution Agreement ultimately determined the penalty due to HHS OCR for HIPAA violations, but did not include monies payable to individual clients who filed lawsuits following data compromise.

The same incident led to a $100,000 settlement with the AG for the State of Indiana and to civil lawsuits by California subscribers and a settlement in California Superior Court. *Blue Cross of Calif. Website Security Cases*, No. JCCP 4647 (Orange Cty. Sup. Ct.).  And in 2012, the California AG sued Blue Cross of California for printing SSNs on letters it mailed to 33,000 customers from April of 2011 to March of 2012. The suit was settled with a payment of $150,000 and a directive to "implement new

technical safeguards for its data management system, restrict employee access to members' Social Security numbers and provide enhanced data security training for all of its associates."

20.     Even after these incidents, Anthem's security protocols were lax. It repeatedly refused requests by the federal government to audit the vulnerability of its electronic databases. As reported in A March 10, 2015 article on eSecurityPlanet.com:

> Following a recent data breach that may have exposed the personal information of as many as 80 million current and former customers and employees, health insurance provider Anthem has refused to allow the federal Office of Personnel Management's Office of the Inspector General (OIG) to conduct vulnerability scans of its systems, GovInfoSecurity reports.
>
> Anthem also refused to allow the OIG to conduct similar vulnerability scans in 2013.
>
> The OIG told GovInfoSecurity that Anthem refused to permit it to conduct "standard vulnerability scans and configuration compliance tests."
>
> "What we had attempted to schedule for the summer of 2015 was a sort of 'partial audit' -- what we call a 'limited scope audit' -- that would have consisted only of the work we were prevented from conducting in 2013," a OIG spokeswoman told GovInfoSecurity. "So this is the second time that Anthem has refused to permit us to perform our standard vulnerability scans and configuration compliance tests."
>
> ******
>
> "We have conducted vulnerability scans and configuration compliance tests at numerous health insurance carriers without incident," the OIG added. "We do not know why Anthem refuses to cooperate with the OIG."
>
> Notably, when Anthem refused to allow OIG's audit in 2013, "we were informed that a corporate policy prohibited external entities from connecting to the Anthem network," the OIG stated.
>
> "In an effort to meet our audit objective, we attempted to obtain additional information about Anthem's own internal practices for performing this type of work," the OIG added. "However, Anthem provided us with conflicting statements about its procedures, and ultimately was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers."
>
> In 2013, the OIG said, "our final audit report stated that we were unable to independently attest that Anthem's computer servers maintain a secure configuration."

21.     Despite these many lapses and despite its inexplicable refusal to submit its databases to testing by federal inspectors, Anthem assured its customers that their confidential information was safe. Its privacy website states that "Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions. Anthem Blue Cross and Blue Shield is committed to protecting information about its customers and associates, especially the confidential nature of their personal information (PI)."

22.     Likewise, the Anthem Blue Cross and Blue Shield privacy practices brochure linked on that webpage states as follows:

> We are dedicated to protecting your PHI [Protected Health Information], and have set up a number of policies and practices to help make sure your PHI is kept secure.
>
> We have to keep your PHI private. If we believe your PHI has been breached, we must let you know.
>
> We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards follow federal and state laws. Some of the ways we keep your PHI safe include securing offices that hold PHI, password-protecting computers, and locking storage areas and filing cabinets. We require our employees to protect PHI through written policies and procedures. These policies limit access to PHI to only those employees who need the data to do their job. Employees are also required to wear ID badges to help keep people who do not belong out of areas where sensitive data is kept. Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business. They are not allowed to give PHI to others without your written OK, except as allowed by law and outlined in this notice.[1]

---

[1] Two key terms of HIPAA are "individually identifiable health information" ("IIHI") and "protected health information" ("PHI"). See 42 C.F.R. §160.03. The former is defined in HHS regulations as follows:

> "Individually identifiable health information is information that is a subset of health information, including demographic information collected from an individual, and
>
> is created, or received by a health care provider, health plan, or health care clearing house; and

## II.    The Anthem Data Breach.

23.    The seeds of the Anthem data breach were planted in April of 2014, as reflected in publicly-available information posted by Brian Krebs, who blogs at KrebsOnSecurity. As summarized in a June 10, 2015 article on Business.com:

> On April 21, 2014, the IP address 198.200.45.112 became home to a new domain called we11point.com. Additional subdomains, including myhr.we11point.com, hrsolutions.we11point.com, and excitrix.we11point.com were added. Security researchers discovered that the subdomains looked like the components of the Wellpoint corporate network. Wellpoint, until late 2014, was Anthem's corporate name.

> The last subdomain, excitrix.we11point.com, is associated with a piece of backdoor malware that masquerades as Citrix's VPN software. The malware had a security certificate signed by DTOPTOOLZ.COM, which is a known signature for a large Chinese cyber-espionage group called Deep Panda. In May 2014, Deep Panda targeted a series of phishing emails toward Wellpoint employees, trying to obtain their login credentials.

24.    This effort by the Deep Panda group was a matter of public record. ThreatConnect published an article on the web explaining that it had concerns that it publicly aired back in November of 2014:

> in mid-November we discovered another implant that was digitally signed with the DTOPTOOLZ signature. This implant, MD5: 98721c78dfbf8a45d152a888c804427c, was from the "Sakula" (aka. Sakurel) family of malware, a known variant of the Derusbi backdoor, and was configured to communicate with the malicious command and control (C2) domains extcitrix.we11point[.]com and www.we11point[.]com. Through our Farsight Security passive DNS integration, we uncovered that this malicious infrastructure was likely named in such a way to impersonate the legitimate Wellpoint IT infrastructure.

---

> relates to past, present, or future physical or mental health conditions of an individual; the provision of health care to the individual; or past, present, or future payment for health care to an individual, and

> that identifies the individual; or

> with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

PHI is defined as IIHI that is, *inter alia*, "maintained in electronic media." The data obtained through the Anthem data breach constitute both IIHI and PHI.

Passive DNS and historic DomainTools Whois data also provided insights that helped establish an initial timeline dating back to April 2014, when the faux domains came into existence and were later operationalized by the attackers. A Threat Intelligence Platform should allow for analysts to easily put together and organize such insights, collaborate around relevant analysis internally, and share the finished analysis with external industry groups and organizations. In the hopes that our community members could benefit from or provide further insight into this suspicious incident, we immediately shared our threat intelligence including indicators, signatures and analytical context to the ThreatConnect Medical and Health Community on November 13, 2014. This included sending out a notification to all stakeholders as well as our followers on Twitter.

25.      The attack on Anthem actually commenced sometime in the latter part of 2014. A January 10, 2015 article in the *Insurance Journal* describes what happened:

Anthem said this week that hackers stole names, Social Security numbers and other sensitive information for up to 80 million Anthem customers, in a breach that was first detected on Jan. 27. That's when an Anthem computer system administrator discovered outsiders were using his own security credentials to log into the company system and steal data.

Investigators now believe the hackers somehow compromised the credentials of five different tech workers, possibly through some kind of "phishing" scheme that could have tricked a worker into unknowingly revealing a password or downloading malicious software.

The company also confirmed Friday that it found that unauthorized data queries with similar hallmarks started as early as Dec. 10 and continued sporadically until Jan. 27. Attempts may also have been made earlier in 2014, said Kristin Binns, a spokeswoman for Indianapolis-based Anthem, the nation's second-largest health insurer.

Those earlier attempts, including the one on Dec. 10, were deflected by the company's network security defenses, Binns said. Like most companies, Anthem routinely deflects a variety of attempts to make unauthorized access to its systems, she added.

The hackers succeeded in penetrating the system and stealing customer data sometime after Dec. 10 and before Jan. 27, Binns said. She declined to be more specific, saying the matter is still under investigation. Binns was confirming details of an Anthem corporate email that was first made public by an industry blog, CSO Online.

26.      Notwithstanding the publicly available information about the phishing expedition that commenced in April of 2014 to obtain the credentials of Anthem personnel, notwithstanding repeated efforts to access the confidential information that may have commenced before December of 2014, and notwithstanding the success of those efforts commencing shortly after December 10, 2014, it was

not until late January of 2015 that Anthem became suspicious that its database was being hacked.

According to a timeline prepared by the Department of Professional & Financial Regulation for the

State of Maine on January 27, 2015, an Anthem associate noticed suspicious activity on the database

and sought to secure it. Anthem conducted an internal investigation that uncovered the cyberattack on

January 29. A day later, Anthem retained Mandiant, a global company specializing in the investigation

and resolution of cyberattacks to conduct a forensic IT investigation to determine the scope of the

attack, the information accessed and those impacted. That investigation is apparently still ongoing.

Anthem first publicly disclosed the attack on February 4 and on February 13, it began offering

information on how to enroll for the remediation services that it was providing.

     27.     The February 4 announcement from Anthem's CEO that was posted on Anthem's

website was as follows:

> Anthem was the target of a very sophisticated external cyber attack.
> These attackers gained unauthorized access to Anthem's IT system and
> have obtained personal information from our current and former
> members such as their names, birthdays, medical IDs/social security
> numbers, street addresses, e-mail addresses and employment
> information, including income data.
>
>               \*\*\*\*\*
>
> Anthem's own associates' personal information - including my own -
> was accessed during this security breach. We join you in your concern
> and frustration, and I assure you that we are working around the clock
> to do everything we can to further secure your data.
>
> Anthem will individually notify current and former members whose
> information has been accessed....
>
> I want to personally apologize to each of you for what has happened, as
> I know you expect us to protect your information. We will continue to
> do everything in our power to make our systems and security processes
> better and more secure, and hope that we can earn back your trust and
> confidence in Anthem.

     28.     The Anthem data breach encompasses not only customers of Anthem (including many

children), but also customers of other entities for whom Anthem maintained information. As explained

on Anthem's FAQ webpage:

> This includes customers of Anthem, Inc. companies Amerigroup,
> Anthem and Empire Blue Cross Blue Shield companies, Caremore, and

Unicare, and some employees of self-insured employer groups where Anthem received information about non-Anthem members to provide analytics and administrative services. Additionally customers of Blue Cross and Blue Shield companies who used their Blue Cross and Blue Shield insurance in one of fourteen states where Anthem, Inc. operates may be impacted and are also eligible: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

The Anthem FAQ webpage explains further that:

BlueCard members are impacted. The Blue Cross and Blue Shield Association's BlueCard is a national program that enables members of one Blue Cross and Blue Shield Plan to obtain healthcare services while traveling or living in another Blue Cross and Blue Shield Plan's service area. The program links participating healthcare providers with the independent Blue Cross and Blue Shield Plans across the country and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement.

The independent Blue Cross and Blue Shield plans affected include some members of Arkansas BCBS, BCBS of Alabama, BCBS of Arizona, BCBS of Hawaii, BCBS of Kansas, BCBS of Kansas City, BCBS of Louisiana, BCBS of Massachusetts, BCBS of Michigan, BCBS of Minnesota, BCBS of Mississippi, BCBS of Nebraska, BCBS of North Carolina, BCBS of North Dakota, BCBS of Rhode Island, BCBS of South Carolina, BCBS of Tennessee, BCBS of Vermont, BCBS of Wyoming, Blue Cross of Idaho, Blue Shield of California, Capital Blue Cross, CareFirst BCBS, BCBS of Florida, GeoBlue, HealthNow New York, Highmark BCBS, Horizon BCBS, Hospital Service Association of Northeastern PA, Independence Blue Cross, La Cruz Azul, Lifetime Healthcare, Inc., Premera BCBS, Wellmark BCBS, BlueCross BlueShield of Illinois, BlueCross BlueShield of Texas, BlueCross BlueShield of Oklahoma, BlueCross BlueShield of New Mexico, BlueCross BlueShield of Montana, Regence BlueCross BlueShield (in Oregon & Utah) and Regence BlueShield (in Idaho and portions of Washington state).

Anthem further explained that "[a]t this point in the investigation, it appears that all product lines are impacted except for those current or former Anthem members who only had coverage for workers compensation, life or disability insurance only."

29.     The *New York Times* reported that the Anthem data breach "could be the largest breach of a health care company to date, and one of the largest ever of customer information."

30.     Anthem also admitted that the information involved was not encrypted in its database, which, as the *Los Angeles Times* noted, "drew immediate fire from some security experts" because "it is irresponsible for businesses not to encrypt the data." According to an article in the *Wall Street*

*Journal* that appeared shortly after the public announcement, Kristin Binns ("Binns"), a spokeswoman for the company, stated that Anthem "encrypts personal data when it moves in or out of the database but not when it is stored….We use other measures, including elevated user credentials, to limit access to the data when it is residing in the database." These appear to be the very types of credentials that Deep Panda was able to improperly access; Binns indicated that the hacker had a system administrator's ID and password, as is also reflected in the above-quoted article in the *Insurance Journal*. She also said that encryption would not have helped because of this fact. But the experts disagree. As noted in a February 7, 2015 article in the *Huffington Post*:

> "Any identifying information relevant to a patient ... should be encrypted," said [David] Kibbe [CEO of DirecTrust, a nonprofit working to create a national framework for the direct exchange of personal health information]. It should make no difference, he says, whether that information is being transmitted on the Internet or sitting in a company database, as was the case with Anthem.
>
> ****
>
> [S]ome security experts said a stolen credential by itself shouldn't be an all-access pass to encrypted data.
>
> Martin Walter, senior director at RedSeal Networks, a Silicon Valley cybersecurity firm, said encryption can be tuned to limit the data that even authorized users can view at one time. That makes it harder for an outsider to copy a whole stockpile of records.

Thus, Anthem made a business choice to forego the protection of encryption of data in storage in order to serve its own cost goals, with the knowledge and intent that its customers would unknowingly bear the risk of decreased security for their confidential personal and health information.

31.     Anthem's FAQ webpage indicates that the stolen confidential "data was uploaded to an external file sharing service." This admission is significant. Such sharing services are often found on the so-called "Dark Web." As explained in an article on ZDNet.com, "[t]he Dark Web is one place where stolen information is offered for sale. Accessible through the Tor network, the underground comprises of stores and websites entrenched in illegal activities ranging from the sale of data to hacking tools to drugs and weaponry. However, websites hosted on the network also offer free downloads of data, which is posted anonymously." The article notes an experiment conducted by the

security team at a company called Bitglass, which made available on the Dark Web a faked piece of

confidential information:

> The security team decided to track data offered up in the Dark Web.
> After creating an excel spreadsheet of 1,568 fake employee credentials,
> the team placed the file on anonymous file-sharing websites in the Dark
> Web, as well as Dropbox. The data was then tracked through Bitglass'
> tracking technology, which embedded the file with an invisible
> watermark that "pings" the Bitglass portal whenever the document is
> opened. After being pinged, the portal displays information including
> geographic location, IP address and device type.

> The company says that even if the watermarked document is copied and
> pasted elsewhere or corrupted, the watermark persists and remains
> trackable.

> Bitglass found that within only a few days, the fake credentials had been
> downloaded in over five countries, three continents and was viewed over
> 200 times. By day 12, the file had received over 1,080 clicks and had
> spread to 22 countries on five continents.

> "By the end of the experiment the fake document of employee data had
> made its way to North America, South America, Asia, Europe, and
> Africa. Countries frequently associated with cyber criminal activity,
> including Russia, China and Brazil, were the most common access points
> for the identity data.

> "Additionally, time, location, and IP address analysis uncovered a high
> rate of activity amongst two groups of similar viewers, indicating the
> possibility of two cyber crime syndicates, one operating within Nigeria
> and the other in Russia," the team's report states ….

> While this is a small experiment, it does highlight how quickly data can
> spread online. A small set of fake staff credentials is one thing, but files
> related to well-known brands -- such as Target or Morgan Stanley -- are
> another matter altogether, and more likely to be downloaded and
> potentially exploited.

32.      Soon after public announcement of the Anthem data breach, it was reported that a large

number of phishing emails relating to the attack began to be sent to Anthem's customers. It was also

reported in SCMagazine.com on February 6, 2015 that

> Not long after managed health care company Anthem announced its
> massive breach late on Wednesday, buyers took to underground forums
> and marketplaces to request the data that was accessed in the attack,
> according to cyber intelligence firm IntelCrawler.

> In a Friday email correspondence, Andrew Komarov, CEO of
> IntelCrawler, told SCMagazine.com that the company found posts on
> forums and marketplaces on the Tor network and several other private

underground communities – all requesting some or all of the Anthem data.

"We see that [the] illegal pharmacy community and serious spammers are very interested in this data, which can be easily commercialized by them and underground affiliate networks," Komarov said, going on to add that individuals may also "trade this information for healthcare fraud."

Given the Bitglass experiment posting faked data on the Tor network, it is reasonable to infer that the data compromised in the Anthem data breach was susceptible to being disseminated across the world to various cybercrime syndicates.

33.     The state AGs were seriously concerned that Anthem engaged in foot-dragging in warning customers about what was going on. George Jepsen, the Connecticut AG, wrote to Anthem on February 10 criticizing it for the "unreasonable" and "unnecessary" delay in communicating with breach victims. The AGs of nine other states joined in the letter.

34.     Once Anthem did begin communicating in writing with customers about the breach, it did so very slowly. On March 18, 2015, Senators Lamar Alexander and Patty Murray of the United States Senate Committee on Health, Education, Labor & Pensions wrote to Anthem about this delay:

More than a month after discovery of the breach, the vast majority of Americans affected by this attack – more than 50 million in fact – have yet to receive notice directly from Anthem that their personal information has been compromised, or information about the services that are available to them to protect themselves and their loved ones from resulting security threats like identity theft.

****

This slow pace is of particular concern given that many of the individuals whose information has been compromised are not Anthem customers and may still be unaware that their information was contained in the attacked database.   For example, Anthem does not issue insurance policies in either of our states, yet according to Anthem's own analysis nearly 800,000 Tennesseans and nearly 450,000 Washingtonians have experienced the theft of personal information as a result of this security breach. Additionally, your own reports indicate approximately one quarter of those affected in our states – including more than 100,000 children in Tennessee and more than 26,000 children in Washington State --are Medicare or Medicaid patients serviced by Anthem.

35.     To this day, it appear that Anthem has not communicated in writing with all persons affected by the Anthem data breach. A May 2, 2015 article in New Hampshire's *Concord Monitor*

noted that "[a]s of yesterday, the company couldn't provide a more specific update on the number of New Hampshire residents who had their information stolen in the breach, according to Anthem Blue Cross Blue Shield New Hampshire spokesman Colin Manning." Anthem's own FAQ web page states that "[m]any letters have already been sent, but we continue working to identify the individuals who are impacted." Thus, the company's notification program may still be far from complete.

36.     Daniel Diermeier, Dean of the Harris School of Public Policy at the University of Chicag, was quoted in a March 2, 2015 *Wall Street Journal* article as follows:

> "Anthem's message from the CEO was appropriate and personal, but various questions–whether customers were notified sufficiently quickly, and some confusion on whether customers need to sign up for identity protection or if it is provided automatically–led to some doubts about the company's competent handling of the crisis.

> "Customers will not be forgiving in cases of lapses or missteps."

37.     In the same article, Richard Levick, CEO of the Levick public relations firm, stated:

> "On day one, it was apparent that the Anthem forensic teams had not been able to provide a more complete picture of the damage to include in the initial communication. In particular, the announcement only vaguely alluded to the size of the affected population as in the 'tens of millions' of customers. There was a further full-day delay before it was revealed that critical data was not encrypted.

> "Most critically, Anthem neglected to separately contact stakeholder companies, prompting perhaps millions of people to flood their own human resources departments for information. This customer communication is key. One official at a client company told us he first learned of the breach by reading about it in The Wall Street Journal. While such important business relationships may not now be directly threatened, it is clear to us from a few confidential conversations that more was expected from one of the nation's largest insurers. For the industry as a whole, the imputed lapses create anxiety about how effectively other companies may handle data crises in the future."

38.     The Anthem data breach may be implicated in potential identity thefts. Fox 59 in Indiana reported that "[m]ore than 100 Ball State University employees are having trouble getting their tax returns this year after falling victim to identity theft. It's a breach school officials say may be tied to a massive Anthem Insurance hack earlier this year. No one knows how the information was stolen, but there are concerns among officials at the Attorney General's Office that this is becoming a

trend on college campuses." Likewise, a webpage on the website of Western Kentucky University reported that "[w]e continue to have several employees reporting to us that their tax returns have been filed fraudulently. HR has been passing along this information along to Anthem and in some instances Anthem has contacted affected individuals." Similarly, Connecticut's *New Haven Register* reported in an April 16, 2015 article that:

> A spike in the number of fraudulent state income tax returns filed in Connecticut has led some Anthem Blue Cross and Blue Shield customers to believe that it is the result of the massive data breach the insurer revealed in early February.
>
> Officials with state Attorney General George Jepsen's office acknowledge they have seen an increase in the number of people who are Anthem customers now reporting that fraudulent tax returns have been filed using their names and other personal information. The Anthem customers believe the fraudulent tax returns are a direct result of the personal information that was taken via the data breach.

And the *New Hampshire Union Leader* reported in a February 28, 2015 article that James Boffetti, a Senior Assistant Attorney General for the State of New Hampshire, "who as a state employee is an Anthem subscriber, said he's noticed an 'uptick' in scam calls and emails in his own personal accounts in recent weeks."

### III. Anthem's Data Protection Efforts Were Thoroughly Inadequate.

39. It is clear that Anthem's efforts to protect the health and financial information of the persons included in its breached database were grossly negligent or willfully culpable.

40. Thus, it did not heed the advice imparted by the FBI, SANS, Ponemon, the GAO or the California AG about undertaking heightened cybersecurity measures. Nor did it appear to learn any lasting lessons from its own prior data breach experiences.

41. It unnecessarily heightened the risk of identity theft by using SSNs as customer identifiers. Indeed, one of its competitors, Highmark, noted in a 2015 letter to its customers that, unlike Anthem, "since 2003, we have moved away from using Social Security numbers. Instead, we use something called 'Unique Member Identifiers.' "

42. Anthem further heightened the risk to individuals whose confidential information was contained in its breached database by failing to encrypt customer information that was stored in that database, thus allowing anyone with stolen credentials and a password to access it.

43.     It did not heed public warnings about Deep Panda's efforts in the first part of 2014 to obtain Wellpoint access codes.

44.     And it did not properly test the vulnerability of its database, despite the repeated requests of the OIG of HHS to do so.

45.     Once the Anthem data breach occurred, Anthem was slow to react. The breach commenced with repeated attacks that apparently started before December of 2014 and began being successful after December 10. Nonetheless, Anthem only became aware by January 29, 2015. It made no public disclosure until February 4. Only thereafter did it start communicating in writing to affected consumers and that effort proceeded slowly as well, to the point where it was roundly criticized by politicians. To this day, it appears that Anthem has not contacted all affected persons.

### IV.  The Inadequacy of Anthem's Remediation Efforts.

46.     Anthem's efforts at remediation have also been far less than what is necessary. As outlined in a letter from Anthem's CEO to the Attorney General of Connecticut on February 11, 2015, the remediation effort consists principally of: (a) two years of credit monitoring "from a national credit bureau" (TransUnion) for affected customers who register, (b) the ability to request identity theft protection from AllCear ID, Inc., a Texas company retained by Anthem for those who believe they are the victim of identity theft;  (c) a protection plan for minors whose SSN is determined to have a credit record on file, which involves putting the minor's identity information in a special database maintain by the TransUnion credit reporting company, and (d) identity theft insurance up to $1 million, for those who register.

47.     The credit monitoring service is thoroughly inadequate, since it involves only TransUnion. As explained in a March 25, 2015 article in *The Orange County Register*:

> When cyber criminals hacked into Anthem Inc. last December and stole the personal data of 78.8 million Americans, including 13.5 million Californians, the giant healthcare insurer notified victims it would "protect your identity for two years at no cost to you."
>
> What Anthem neglected to tell them is that the credit monitoring it offers is far from sufficient to counter the theft of Social Security numbers and medical IDs.
>
> The service, purchased from Texas-based AllClear ID Inc., only monitors a victim's credit at one of the three major credit bureaus:

TransUnion. It does not monitor credit lines at the other two: Equifax and Experian.

And no credit monitoring, regardless of the number of bureaus, will stop a criminal from using your Social Security number and other stolen data to file a tax return before you do, and collect your refund. Nor does it bar a criminal from racking up surgery bills using your medical ID number.

However, when thieves use Social Security numbers to open fraudulent credit lines, consumers get an alert. Experts say fraud can be missed unless the three major credit bureaus are monitored.

"Single credit bureau monitoring is not an appropriate remedy for a breach of this magnitude," said Paul Stephens, policy director for Privacy Rights Clearinghouse, a San Diego-based nonprofit. "Anthem's breach is catastrophic because it involves Social Security numbers along with dates of birth, medical ID numbers and other personal information."

Consumers Union, the New York-based nonprofit that publishes Consumer Reports magazine, calls one-bureau protection "second-rate credit-monitoring," adding that, "industry best practices recommend three-bureau monitoring when Social Security numbers have been stolen, because those are the golden key to new credit."

****

"So in the case of Anthem, unless the initial credit inquiry is made at TransUnion, the consumer may not know for a while that fraud occurred," Stephens said. "If all three bureaus are monitored, you find out right away."

48. Thus, Anthem not only has provided second-rate monitoring services to its customers impacted by the data breach, but has also actively misled them into thinking they were being fully protected.

49. Having only two years of free credit monitoring services is also thoroughly inadequate. The Anthem data breach is unlike many other data breaches because it involves the names, addresses and SSNs of customers. Having all three of these types of information unlawfully accessed puts the customer at risk for identity theft throughout his or her lifetime. This point was explained in a February 28, 2015 article in the *New Hampshire Union Leader*:

The nearly 668,000 current and former Anthem subscribers across New Hampshire whose personal information was part of a massive data breach have been offered free identity protection services for two years.

But federal and state experts say the threat of identity theft will shadow those folks for the rest of their lives.

That's because the cyber-thieves who gained access to the Anthem's IT system gleaned the names, birth dates and Social Security numbers of consumers who sought medical services over the past 10 years.

When someone steals your credit card, you can get a new card and limit the damage. But you can't change your birth date or Social Security number (SSN).

"Once your Social Security number is out there, you're at risk of identity theft forever," said Lisa Schifferle, an attorney for the Federal Trade Commission.

Schifferle called SSNs the "linchpins" of identity theft. "They're the keys to the kingdom."

The FTC keeps a database of consumer identity theft and fraud complaints. And identity theft topped the national ranking of consumer complaints in 2014 for the 15th consecutive year, according to a report released Friday, with 332,646 such complaints nationwide.

In New Hampshire, 726 victims reported identity theft in 2014; that's up from 687 in 2013, according to the FTC. About a quarter of victims here reported identity theft involving government documents or benefits, a category that includes tax refund fraud. (See related story.)

Schifferle said it's too soon to assess the full effects of the Anthem data breach. But she said, "It is huge when large numbers of Social Security numbers are exposed."

Those numbers can be used to fraudulently open bank accounts, get medical treatment or apply for credit. And if someone uses the SSN of a child to open credit or bank accounts, she said, "Sometimes it can go undetected for years."

50.     The registration procedures for the meager benefits that Anthem is providing are also unduly onerous and are designed to deter people from registering.

51.     The remediation put in place by Anthem was limited in other ways as well. As the *Cleveland Plain Dealer* noted in a February 13, 2015 article, "Anthem's credit monitoring/ID theft protection offer is take it or leave it. According to Anthem spokeswoman Kim Ashley, 'Anything that a consumer chooses to do outside of those services is at his/her own expense.' Additionally, Anthem told employers that if they independently offer their employees credit monitoring or other services, Anthem will not reimburse them." Anthem's own FAQ webpage confirms these limitations; Anthem flatly states that it "will not reimburse for services that you may have independently purchased."

52.     One remedy that Anthem does not provide is a "credit freeze." As a webpage on the Federal Trade Commission's ("FTC") website notes, "[i]f you're concerned about identity theft, those reported mega-data breaches, or someone gaining access to your credit report without your permission, you might consider placing a credit freeze on your report." The same webpage explains that "[a]lso known as a security freeze, this tool lets you restrict access to your credit report, which in turn makes it more difficult for identity thieves to open new accounts in your name. That's because most creditors need to see your credit report before they approve a new account. If they can't see your file, they may not extend the credit." Anthem's remediation efforts do not include this basic prophylactic tool, the cost of which, according to the FTC, ranges from $5 to $10.

53.     In addition, Anthem's remediation efforts are wholly inadequate to deal with the issue of medical identity fraud. This point is well summarized in an article in the *San Jose Mercury News*:

> Virtually all data breaches put consumers at risk for some version of identity theft, which can lead to bank account fraud, credit card fraud, tax fraud and other financial impacts. But only breaches involving medical identity information can truly put your life or health at risk.
>
> In the Anthem breach, the compromised data included both health insurance identities and social security numbers, which means the major risk is medical identity theft. This can happen a number of different ways, but the two most common are: 1) someone uses your medical identity to obtain medical goods, services and prescriptions pretending to be you, or 2) a devious individual (often involved in organized crime) uses your medical identity to bill your insurance, Medicare or Medicaid for all kinds of medical goods, services and prescriptions without your knowledge.
>
> The huge problem here is everything that is done by the fraudulent person goes on your personal medical record as if you did it.
>
> The next time you go to a doctor or emergency room, they will pull up your electronic health record and most of the things on there are not you. Your preexisting conditions, your allergies, your drug interactions, possibly even your blood type may be wrong or conflicting. In the future, that could lead to a misdiagnosis based on a condition you don't have, a prescription mistake with a medication to which you're allergic, and other dangerous or inappropriate medical treatment. It is not an exaggeration to say that medical identity fraud can literally kill you.
>
> For the 13.5 million Californians who have fallen victim to this breach, the company says it will be providing "free credit monitoring services." Unfortunately, this is the same financial industry service that doesn't

> go beyond financial accounts to provide visibility into a consumer's
> actual healthcare transactions and medical identity.
>
> A new study released this week by the Medical Industry Fraud
> Alliance showed medical identity theft to be the fastest-growing
> identity crime in the country, affecting more than 2.3 million
> Americans. In the five years MIFA has been studying the issue, the
> occurrence of medical identity theft incidents has doubled, while the
> number of victims having to pay out-of-pocket costs rose significantly
> as well.

The FTC and the OIG of HHS have portions of their respective websites devoted to this serious

problem, but Anthem's feeble effort at credit monitoring fails to address it. Nor has it sought to replace

any of the health ID numbers that were compromised.

## CLAIMS FOR RELIEF

## FIRST CLAIM—VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT

54.     Plaintiff, individually and on behalf of the California Subclass, incorporate by reference

all of the allegations contained in the preceding paragraphs of this Complaint.

55.     Section 56.101(a) of the California Civil Code, which is part of the California

Confidentiality of Medical Information Act, states as follows:

> (a) Every provider of health care, health care service plan,
> pharmaceutical company, or contractor who creates, maintains,
> preserves, stores, abandons, destroys, or disposes of medical
> information shall do so in a manner that preserves the confidentiality of
> the information contained therein. Any provider of health care, health
> care service plan, pharmaceutical company, or contractor who creates,
> maintains, preserves, stores, abandons, destroys, or disposes of medical
> information shall be subject to the remedies and penalties provided
> under subdivisions (b) and (c) of Section 56.36.

Section 56.101(b) goes on to state that an electronic health record system or electronic medical

record system shall "[p]rotect and preserve the integrity of the electronic medical information."

Section 56.101(c) states that "[t]his section shall apply to an 'electronic medical record' or

'electronic health record' that meets the definition of 'electronic health record', as that term is

defined in Section 17921(5) of Tile 42 of the United States Code." That section defines an

"electronic health record" as follows: "The term 'electronic health record' means an electronic record

of health-related information on an individual that is created, gathered, managed, and consulted by

authorized health care clinicians and staff." This would plainly include health plan ID numbers and SSNs used as identifiers for individual health plan subscribers.

56.     Anthem is subject to the requirements of the California Confidentiality of Medical Information Act and its database that was breached is subject to the provisions of Section 56.101. Through its actions described above, it failed to protect and preserve the integrity of the electronic medical information contained on that database.

57.     Civil Code Section 56.36(b) reads as follows:

> In addition to any other remedies available at law, any individual may bring an action against any person or entity who has released confidential information or records concerning him or her in violation of this part, for either or both of the following:
>
> (1) Except as provided in subdivision (e) [dealing with various affirmative defenses], nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages.
>
> (2) The amount of actual damages, if any, sustained by the patient.

The aforementioned affirmative defenses are not satisfied here and Anthem is therefore liable under this provision for the Anthem data breach. At a minimum, each of the 13.5 million Californians affected by the breach is entitled to nominal damages of $1,000.

58.     Plaintiff also seeks costs and attorneys' fees.

## SECOND CLAIM—VIOLATION OF CALIFORNIA DATA BREACH ACT

59.     Plaintiff, individually and on behalf of the California Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

60.     California Civil Code Section 1798.82 provides, in pertinent part:

> (a) Any person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in

subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

(b) Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

(c) The notification required by this section may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation. The notification required by this section shall be made after the law enforcement agency determines that it will not compromise the investigation.

61.     The Anthem data breach constituted a breach of its security system. Plaintiff's and Subclass members' names, addresses, emails, birthdates, medical ID numbers, SSNs, employment data, and income information constitute "personal information."

62.     Anthem unreasonably delayed informing Plaintiff and the Subclass about the breach of security of their personal information after Anthem knew that the breach had occurred.

63.     Anthem failed to disclose to Plaintiff and the Subclass, without unreasonable delay and in the most expedient manner possible, the breach of security of their personal information when Anthem knew or reasonably believed such information had been compromised.

64.     Upon information and belief, no law enforcement agency instructed Anthem that notification to Class Members would impede an investigation.

65.     Pursuant to Cal. Civil Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined."

66.     Plaintiff and the Subclass seek damages, equitable relief, and any applicable statutory damages under Cal. Civil Code §§ 1798.80 *et seq.*

## **THIRD CLAIM—VIOLATION OF CALIFORNIA UCL**

67.     Plaintiff, individually and on behalf of the California Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

68.     Plaintiff has standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above. All Subclass Members overpaid Anthem for the price of their health insurance coverage. In addition, all Subclass Members have been injured by the significant costs of protecting themselves from identity theft.

69.     Defendants' actions as alleged in this Complaint constitute an "unlawful" practice as encompassed by the California Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) because Defendants' actions violated the California Data Breach Act (Cal. Civil Code §§ 1798.80 *et seq*.), because they violated the California Confidentiality of Medical Information Act (Cal. Civil Code §56.01 *et seq*.) because they constituted negligence, because they violated Anthem's implied contract to adequately protect its customers' data, and because they violated federal law (including the Gramm-Leach-Bliley Act (15 U.S.C. § 6801)) and HIPAA Security and Privacy Rules (42 C.F.R. Parts 160 and 164).

70.     Defendants' actions as alleged in this Complaint constitute a "fraudulent" practice, because Anthem's failure to adequately disclose its lax security practices was likely to deceive consumers, including Plaintiff and the Subclass. A reasonable consumer who provides extraordinarily sensitive personal information to a health-insurance company would expect that company to provide adequate, industry-standard security to protect the information. Anthem's failure to disclose these inadequate security practices, especially in light of its commitments to safeguard user data contained in its privacy policy, constitutes a material omission in violation of the UCL.

71.     Defendants' failure to adequately disclose the sufficiency of their remediation measures also constitutes a material omission in violation of the UCL.

72.     Defendants' actions as alleged in this Complaint constitute an "unfair" practice, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Anthem's customers. The harm caused by Anthem's wrongful conduct outweighs any utility of such conduct and has cause--and will continue to cause--substantial injury to the Subclass. There were ample reasonably available alternatives that would have furthered Anthem's legitimate business practices, including using industry-standard technologies to protect its customer data (*e.g.*, two-factor authentication, encryption, and the purging of data on former customers).

Additionally, Defendants' conduct was "unfair," because it violated the legislatively declared policies reflected by California's strong data-breach, online privacy, and medical-privacy laws, including the California Data Breach Act (Cal. Civil Code §§ 1798 *et. seq.*), the California Confidentiality of Medical Information Act (Cal. Civil Code §§ 56 *et seq.*), the California Online Privacy Protection Act (Cal. Bus. & Prof. Code § 22575 *et seq.*) and the California constitutional right to privacy (Cal. Const. art. 1, § 1).

73. As a result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff and the Subclass were damaged. Subclass Members overpaid Anthem for the price of their health insurance coverage, have been injured by the significant costs of protecting themselves from identity theft, and face ongoing and impending damages related to theft of their personal information.

74. Defendants' wrongful business practices constitute a continuing course of unfair competition because, on information and belief, Anthem has failed to remedy the lax security practices or even fully notify all affected Subclass Members. Plaintiff and the Subclass seek equitable relief to end Anthem's wrongful practices and require it to maintain adequate and reasonable security measures to protect the personal information of Plaintiff and the Subclass.

75. Plaintiff and the Subclass also seek an order requiring Defendants to make full restitution of all monies they have wrongfully obtained from Subclass Members, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## FOURTH CLAIM--NEGLIGENCE

76. Plaintiff, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

77. Anthem owed a duty to Plaintiff and the Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their personal, health and financial information in its possession from being compromised, lost, stolen, accessed and misused by unauthorized persons. This duty included, among other things, designing, maintaining and testing Anthem's security systems to ensure that Plaintiff's and Class members' personal, health and financial information in Anthem's possession was adequately secured and protected. Anthem owed a further

1  duty to Plaintiff and the Class members to implement processes that would detect a breach of its

2  security system in a timely manner and to timely act upon warnings and alerts.

3      78.    Anthem owed a duty, as articulated in Anthem's HIPAA Notice of Privacy Practices

4  handbook, to protect its customers' sensitive financial, health and personal information.

5      79.    Anthem owed a duty to timely disclose the material fact that Anthem's computer

6  systems and data security practices were inadequate to safeguard customers' personal, health and

7  financial data from theft.

8      80.    Anthem breached these duties by the conduct alleged in this Complaint and by other

9  actions including, without limitation, failing to: (a) protect its customers' personal financial and health

10 information; (b) maintain adequate computer systems and data security practices to safeguard

11 customers' personal, health and financial information; (c) disclose the material fact that Anthem's

12 computer systems and data security practices were inadequate to safeguard customers' personal health

13 and financial data from theft; (d) disclose in a timely and accurate manner to Plaintiff and the members

14 of the Class the material fact of the Anthem data breach; and (e) disclose the inadequate nature of

15 several aspects of the remediation it is offering.

16     81.    The conduct alleged in this Complaint caused Plaintiff and the Class members to be

17 exposed to fraud and to be harmed.  The injuries suffered by Plaintiff and/or the members of the

18 proposed Class as a direct and proximate result of the Anthem data breach include: (a) theft of their

19 personal, health and financial information; (b) costs associated with the detection and prevention of

20 identity theft and unauthorized use of their financial accounts; (c) costs associated with time spent and

21 the loss of productivity, from taking time to address and attempt to ameliorate, mitigate, and deal with

22 the actual and future consequences of the data breach, including finding fraudulent charges, cancelling

23 and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of

24 withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of

25 dealing with all issues resulting from the Anthem data breach; (d) the imminent and impending injury

26 flowing from potential fraud and identity theft posed by their personal, health and financial

27 information being placed in the hands of hackers; (e) damages from the unconsented exposure of their

28 personal, health and financial information that they entrusted to Anthem for the sole purpose of

obtaining health insurance from Anthem and with the mutual understanding that Anthem would safeguard Plaintiff's and the Class members' data against theft and now allow access and misuse of their data by others; (f) overpayments paid to Anthem for health insurance purchased during the Anthem data breach in that a portion of the premiums for insurance paid by Plaintiff and the Class members to Anthem was for the costs of Anthem providing reasonable and adequate safeguards and security measures to protect customers' financial, health and personal data, which Anthem failed to do, and as a result, Plaintiff and the Class members did not receive what they paid for and were overcharged by Anthem; and (g) continued risk to their financial, health and personal information, which remains in the possession of Anthem and which is subject to further breaches so long as Anthem fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' data in its possession.

## FIFTH CLAIM--BREACH OF IMPLIED CONTRACT

82. Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

83. When Plaintiff and the Class members provided their financial, health and personal information to Anthem in order to purchase health insurance from Anthem, Plaintiff and the Class members entered into implied contracts with Anthem pursuant to which Anthem agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and the Class members in the event the security of their data were breached and compromised.

84. Plaintiff and the Class members fully performed their obligations under the implied contracts with Anthem.

85. Anthem breached the implied contracts into which it entered with Plaintiff and the Class members by failing to safeguard and protect the personal, medical and financial information of Plaintiff and the Class members and by failing to provide timely and accurate notice to them that their personal, medical, and financial information was compromised in and as a result of the Anthem data breach.

86.     The losses and damages sustained by Plaintiff and the Class members as described herein were the direct and proximate result of Anthem's breaches of the implied contracts between Anthem and Plaintiff and the members of the Class.

## SIXTH CLAIM--BREACH OF CONTRACT

87.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

88.     Anthem has the contractual obligation to maintain the security of its customers' personal, health and financial information, which Anthem itself recognizes in its HIPAA Notice of Privacy Practices handbook where it addresses the consumers' "protected health information" or "PHI":

> We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules.
>
> \*       \*       \*
>
> We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure. We keep your oral, written and electronic PHI safe using physical, electronic and procedural means.  These safeguards follow federal and state laws.  Some of the ways we keep your PHI safe include securing offices that hold PHI, password protecting computers, and locking storage areas and filing cabinets. ...

89.     Anthem breached its contractual obligations to Plaintiff and the members of the Class by failing to safeguard and protect the personal, health and financial information of the Plaintiff and the Class members and by failing to provide timely and accurate notice to them that their personal, medical, and financial information was compromised in and as a result of the Anthem data breach.

90.     The losses and damages sustained by Plaintiff and the Class members as described herein were the direct and proximate result of Anthem's breaches of the contracts between Anthem and Plaintiff and the members of the Class.

## SEVENTH CLAIM--BAILMENT

91.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

92.     Plaintiff and the Class members delivered their personal, medical, and financial information to Anthem for the exclusive purpose of obtaining health insurance from through Anthem's provider network.

93.     By delivering their personal, health and financial information to Anthem, Plaintiff and the Class members intended and understood that Anthem would adequately safeguard their personal, health and financial information from being accessed by or disclosed to unauthorized persons.

94.     Anthem accepted possession of Plaintiff's and the Class members' personal, health and financial information.

95.     By accepting possession of Plaintiff's and the Class members' personal, health and financial information, Anthem understood that Plaintiff and the Class members expected Anthem to adequately safeguard their personal, health and financial information.  Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

96.     During the bailment (or deposit), Anthem owed a duty to Plaintiff and the Class members to exercise reasonable care, diligence and prudence in protecting their personal, health and financial information.

97.     Anthem breached its bailment (or deposit) and its duty of care as bailee by failing to take appropriate measures to safeguard and protect Plaintiff's and the Class members' personal, health and financial information, resulting in the unlawful and unauthorized access to and misuse of Plaintiffs' and the Class members' personal, health and financial information.

98.     Anthem further breached its bailment (or deposit) and its duty to safeguard Plaintiff's and the Class members' personal, medical, and financial information by failing to timely and accurately notice them that their private information had been compromised as a result of the Anthem data breach.

## EIGHTH CLAIM--UNJUST ENRICHMENT

99.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

100.     Plaintiff and the Class members conferred a monetary benefit on Anthem in the form of monies paid for access to Anthem's provider network during the period of the Anthem data breach.

101.    The monies paid by the Plaintiff and the Class members were supposed to be used by Anthem, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and the Class members.

102.    Anthem failed to provide reasonable security, safeguards and protections for the personal, health and financial information of Plaintiff and the Class members, and as a result Plaintiffs and the Class members overpaid for the services provided by Anthem.

103.    Under principles of equity and good conscience, Anthem should not be permitted to retain the money paid by Plaintiff and the Class members because Anthem failed to provide the adequate safeguards and security measures to protect Plaintiffs' and the Class members' personal, health and financial information they paid for but did not receive.

104.    Anthem wrongfully accepted and retained these financial benefits to the detriment of Plaintiff and the Class members.

105.    Anthem's enrichment at the expense of Plaintiff and the Class members is and was unjust.

106.    As a direct and proximate result of Anthem's wrongful conduct, as alleged above, Plaintiff and the Class members are entitled to restitution and disgorgement of profits, benefits and other compensation obtained by Anthem, together with their attorneys' fees, costs and interest thereon.

### NINTH CLAIM—VIOLATION OF INDIANA STATUTORY LAW

107.    Plaintiff, individually and on behalf of the Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

108.    As a citizen of Indiana, Anthem is subject to Indiana law in its dealings throughout the United States.

109.    Indiana prohibits a person from engaging in deceptive acts, which are specifically defined in relevant part as representations:

> (1) That such subject of a consumer transaction has . . . characteristics . . .it does not have which the supplier knows or should reasonably know it does not have.

> (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and the supplier knows or should reasonably know that it is not….

Ind. Code § 24-5-0.5-3(a). A "consumer transaction" includes the sale of personal property for purposes that are primarily personal. Ind. Code § 24-5-0.5-2(1). "Person" includes a corporation. Ind. Code § 24-5-0.5-2(2). "Supplier" is a seller or other person who regularly engages in or solicits consumer transactions and includes a manufacturer "whether or not the person deals directly with the consumer." Ind. Code § 24-5-0.5-2(a)(3).

110.     The statute is to be liberally construed and applied to promote its purposes, which are to "(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and (3) encourage the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1(a), (b). 101. For the reasons discussed above, Anthem violated (and, on information and belief, continues to violate) § 24-5-0.5 by engaging in the above-described and prohibited unlawful, unfair, fraudulent, deceptive, untrue, and misleading acts and practices. These practices were willful incurable deceptive acts done with an intent to mislead the victims of the Anthem data breach. As noted above, the disclosure of individuals' names, addresses and SSNs is something that will haunt them for the rest of their lives. Similarly, the disclosure of health ID numbers exposes such persons on an ongoing basis to the grievous risks of medical identity fraud discussed previously.

111.     Anthem violated Ind. Code § 24-5-0.5 by accepting and storing Plaintiff's and the Class members' personal and financial information but failing to take reasonable steps to protect it. In violation of industry standards and best practices, Anthem also violated consumer expectations to safeguard personal and financial information and failed to tell consumers that it did not have reasonable and best practices, safeguards and data security in place.

112.     Anthem also violated Ind. Code § 24-5-0.5 by failing to immediately notify Plaintiff and the Class of the Anthem data breach. If Plaintiff and the Class had been notified in an appropriate fashion, they could have taken precautions to better safeguard their personal and financial information.

113.     "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." Ind. Code § 24-5-0.5-4(a). An "incurable deceptive act" is one "done by

a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.52(a)(8). If the defendant is found to have acted willfully, the Court may treble the damages or award $1,000, whichever is greater. Ind. Code § 24-5-0.5-4(a).

114. On information and belief, Anthem's incurable deceptive acts and practices, except as otherwise indicated herein, continue to this day and are ongoing. As a direct and/or proximate result of Anthem's unlawful, unfair, and fraudulent practices, Plaintiff and the Class have suffered injury in fact and lost money in connection with the Anthem data breach, for which they are entitled to compensation – as well as restitution, disgorgement, and/or other equitable relief. Plaintiffs' and/or the Class members' injuries include: (a) theft of their personal, health and financial information; (b) costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts; (c) costs associated with time spent and the loss of productivity, from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including monitoring for fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance resulting from the Anthem data breach; (d) the imminent and impending injury flowing from potential fraud and identity theft posed by their personal, medical, and financial information being placed in the hands of hackers; (e) damages from the unconsented exposure of their personal, health and financial information that they entrusted to Anthem for the sole purpose of obtaining health insurance from Anthem and with the mutual understanding that Anthem would safeguard Plaintiff's and the Class members' data against theft and now allow access and misuse of their data by others; (f) overpayments paid to Anthem for health insurance purchased during the Anthem data breach in that a portion of the premiums for insurance paid by Plaintiff and the Class members to Anthem was for the costs of Anthem providing reasonable and adequate safeguards and security measures to protect customers' financial, health and personal data, which Anthem failed to do, and as a result, Plaintiff and the Class members did not receive what they paid for and were overcharged by Anthem; and (g) continued risk to their financial, health and personal information, which remains in the possession of Anthem and which is subject to further

breaches so long as Anthem fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data in its possession.

## RELIEF REQUESTED

Plaintiff, on behalf of herself and all others similarly situated, request that the Court enter judgment against Defendants as follows:

1.      An award to Plaintiff and the Class members of compensatory, direct, consequential, statutory, punitive, and incidental damages;

2.      An order that Defendants be permanently enjoined from their improper conduct;

3.      A judgment awarding Plaintiff and the Class restitution and disgorgement of all compensation obtained by Defendants from their wrongful conduct;

4.      An award of pre-judgment and post-judgment interest, as provided by law or equity;

5.      An award of attorneys' fees, costs and expenses, as provided by law or equity, or as otherwise available; and

6.      Such other and further relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, on all issues so triable.


Dated: June 18, 2015                      HAUSFELD LLP

                                          By:   /s/  *Bonny E. Sweeney*
                                          Michael P. Lehmann (State Bar No. 77152)
                                          Bonny E. Sweeney (State Bar No. 176174)
                                          Christopher L. Lebsock (State Bar No. 184546)
                                          HAUSFELD LLP
                                          600 Montgomery St., Suite 3200
                                          San Francisco, CA  94111
                                          Telephone:  (415) 633-1908
                                          Facsimile:   (415) 358-4980
                                          mlehmann@hausfeld.com
                                          bsweeney@hausfeld.com
                                          clebsock@hausfeld.com

                                          James J. Pizzirusso (*pro hac vice* to be filed)
                                          Swathi Bojedla (*pro hac vice* to be filed)
                                          HAUSFELD LLP

1700 K St. NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7200
Facsimile:  202-540-7201
jpizzirusso@hausfeld.com
sbojedla@hausfeld.com

*Attorneys for Plaintiff*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ROSALYNN C. KRISSMAN

**DEFENDANTS**
ANTHEM, INC., and BLUE CROSS OF CALIFORNIA

(b)  County of Residence of First Listed Plaintiff    Los Angeles County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

(c)  Attorneys *(Firm Name, Address, and Telephone Number)*
Michael P. Lehmann, Bonny E. Sweeney, Christopher Lebsock
Hausfeld LLP, 600 Montgomery St., Ste 3200, San Francisco, CA 94111

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Class Action Fairness Act of 2005, 28 U.S.C. § 1332
Brief description of cause:
Claim for unlawful breach and disclosure of confidential data.

## VII. REQUESTED IN
## COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
## IF ANY
*(See instructions):*
In re Anthem, Inc. Customer Data Security Breach Litig.

JUDGE  Hon. Lucy H. Koh

DOCKET NUMBER  5:15-md-02617-LHK

DATE
06/18/2015

SIGNATURE OF ATTORNEY OF RECORD
/s/ Bonny E. Sweeney

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)

(Place an "X" in One Box Only)

☐ SAN FRANCISCO/OAKLAND     ☑ SAN JOSE     ☐ EUREKA