```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

    IN RE ANTHEM, INC. DATA BREACH    )  15-MD-02617 LHK
 6  LITIGATION.                       )
                                      )  SAN JOSE, CALIFORNIA
 7                                    )
                                      )  SEPTEMBER 10, 2015
 8                                    )
    _____  )  PAGES 1-123
 9

10               TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE LUCY H. KOH
11               UNITED STATES DISTRICT JUDGE

12

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFFS     COHEN MILSTEIN
                           BY:  ANDREW N. FRIEDMAN
15                         1100 NEW YORK AVENUE, N.W.
                           SUITE 500, WEST TOWER
16                         WASHINGTON, D.C.  20005

17                         ALTSHULER BERZON
                           BY:  EVE H. CERVANTEZ
18                         177 POST STREET, SUITE 300
                           SAN FRANCISCO, CALIFORNIA  94108
19

20

21              APPEARANCES CONTINUED ON NEXT PAGE

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1    APPEARANCES (CONTINUED)

2    FOR THE PLAINTIFFS:    BARRACK, RODOES & BACINE
                            BY:  STEPHEN R. BASSER
3                           600 WEST BROADWAY, SUITE 900
                            SAN DIEGO, CALIFORNIA  92101
4
                            BRANSTETTER, STRANCH & JENNINGS
5                           BY:  J. GERARD STRANCH, IV
                            227 SECOND AVENUE NORTH, FOURTH FLOOR
6                           NASHVILLE, TENNESSEE  37201

7                           COHEN AND MALAD
                            BY:  LYNN A. TOOPS
8                           ONE INDIANA SQUARE, SUITE 1400
                            INDIANAPOLIS, INDIANA  46204
9
                            GIRARD GIBBS
10                          ERIC H. GIBBS
                            601 CALIFORNIA STREET, 14TH FLOOR
11                          SAN FRANCISCO, CALIFORNIA  94108

12                          STUEVE, SIEGEL & HANSON
                            BY:  NORMAN E. SIEGEL
13                          460 NICHOLS ROAD, SUITE 200
                            KANSAS CITY, MISSOURI  64112
14
                            LIEFF, CABRASER, HEIMANN & BERNSTEIN
15                          BY:  MICHAEL W. SOBOL
                            275 BATTERY STREET, 29TH FLOOR
16                          SAN FRANCISCO, CALIFORNIA  94111

17                          GRANT & EISENHOFER
                            BY:  ADAM J. LEVITT
18                          30 NORTH LASALLE STREET, SUITE 1200
                            CHICAGO, ILLINOIS  60602
19
                            EDELSON PC
20                          BY: JAY EDELSON
                            350 NORTH LASALLE STREET, SUITE 1300
21                          CHICAGO, ILLINOIS  60654

22                          ROBINSON, CALCAGNIE, ROBINSON,
                            SHAPIRO & DAVIS
23                          BY:  DANIEL S. ROBINSON
                            19 CORPORATE PLAZA DRIVE
24                          NEWPORT BEACH, CALIFORNIA  92660

25                     APPEARANCES CONTINUED ON NEXT PAGE
```

```
1      APPEARANCES (CONTINUED)

2      FOR THE PLAINTIFFS:      ADHOOT & WOLFSON
                                BY:  TINA WOLFSON
3                               1016 PALM AVENUE
                                WEST HOLLYWOOD, CALIFORNIA  90069
4
                                BERGER & MONTAGUE
5                               BY:  SHERRIE R. SAVETT
                                1622 LOCUST STREET
6                               PHILADELPHIA, PENNSYLVANIA  19103

7                               MORGAN & MORGAN
                                BY:  JOHN YANCHUNIS
8                               ONE TAMPA CITY CENTER
                                201 NORTH FRANKLIN STREET, 7TH FLOOR
9                               TAMPA, FLORIDA  33602

10                              BOUCHER LLP
                                BY:  SHEHNAZ M. BHUJWALA
11                              21600 OXNARD STREET, SUITE 600
                                WOODLAND HILLS, CALIFORNIA  91367
12
                                THE SKEPNEK LAW FIRM
13                              BY:  WILLIAM J. SKEPNEK
                                ONE WESTWOOD ROAD
14                              LAWRENCE, KANSAS  66044

15                              HAUSFELD
                                BY:  CHRISTOPHER L. LEBSOCK
16                              600 MONTGOMERY STREET, SUITE 3200
                                SAN FRANCISCO, CALIFORNIA  94111
17
                                LOCKRIDGE, GRINDAL & NAUEN
18                              BY:  KAREN HANSON RIEBEL
                                100 WASHINGTON AVENUE SOUTH, SUITE 2200
19                              MINNEAPOLIS, MINNESOTA  55401

20                              KELLER ROHRBACK
                                BY:  GRETCHEN FREEMAN CAPPIO
21                              1201 THIRD AVENUE, SUITE 3200
                                SEATTLE, WASHINGTON  98101
22
                                CARLSON, LYNCH, SWEET & KILPELA
23                              BY:  GARY F. LYNCH
                                1133 PENN AVENUE, 5TH FLOOR
24                              PITTSBURGH, PENNSYLVANIA  15222

25                      APPEARANCES CONTINUED ON NEXT PAGE
```

```
1    APPEARANCES (CONTINUED)

2    FOR THE PLAINTIFFS:    CHESTNUT CAMBRONNE
                            BY:  BRYAN L. BLEICHNER
3                           17 WASHINGTON AVENUE NORTH, SUITE 300
                            MINNEAPOLIS, MINNESOTA  55401
4
                            SCOTT + SCOTT
5                           BY:  THOMAS KAY BOARDMAN
                            THE CHRYSLER BUILDING
6                           405 LEXINGTON AVENUE, 40TH FLOOR
                            NEW YORK, NEW YORK  10174
7
                            COTCHETT, PITRE & MCCARTHY
8                           BY:  JOSEPH W. COTCHETT
                            840 MALCOMB ROAD
9                           BURLINGAME, CALIFORNIA  94010

10                          ROBBINS, GELLER, RUDMAN & DOWD
                            BY:  PAUL GELLER
11                          120 EAST PALMETTO PARK ROAD, SUITE 500
                            BOCA RATON, FLORIDA  33432
12
                            BY:  SHAWN A. WILLIAMS
13                          ONE MONTGOMERY STREET, SUITE 1800
                            SAN FRANCISCO, CALIFORNIA  94104
14
                            KAPLAN, FOX & KILSHEIMER
15                          BY:  LAURENCE D. KING
                            350 SANSOME STREET, SUITE 400
16                          SAN FRANCISCO, CALIFORNIA  94104

17                          WEITZ & LUXENBERG
                            BY:  ROBIN L. GREENWALD
18                          700 BROADWAY
                            NEW YORK, NEW YORK  10003
19
                            BARNOW & ASSOCIATES
20                          BY:  BEN BARNOW
                            ONE NORTH LASALLE STREET, SUITE 4600
21                          CHICAGO, ILLINOIS  60602

22

23              APPEARANCES CONTINUED ON NEXT PAGE

24

25
```

```
 1       APPEARANCES (CONTINUED)

 2


 3       FOR THE DEFENDANTS:      HOGAN LOVELLS
                                  BY:  CRAIG A. HOOVER
 4                                555 THIRTEENTH STREET, NW
                                  WASHINGTON, D.C.  20004
 5
                                  BY:  MICHAEL M. MADDIGAN
 6                                1999 AVENUE OF THE STARS, SUITE 1400
                                  LOS ANGELES, CALIFORNIA  90067
 7
                                  BY:  MAREN J. CLOUSE
 8                                4085 CAMPBELL AVENUE, SUITE 100
                                  MENLO PARK, CALIFORNIA  94025
 9
                                  TROUTMAN SANDERS
10                                BY:  CHAD R. FULLER
                                  11682 EL CAMINO REAL, SUITE 400
11                                SAN DIEGO, CALIFORNIA  92130

12


13       ATTORNEYS ALSO PRESENT IN COURTROOM AND TELEPHONICALLY AS
         LISTED BY THE CLERK ON THE DOCKET.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1        SAN JOSE, CALIFORNIA                    SEPTEMBER 10, 2015

2                     P R O C E E D I N G S

3        (COURT CONVENED AT 1:42 P.M.)

4              THE COURT:  GOOD AFTERNOON AND WELCOME.

5              THE CLERK:  YOU CAN ALL GO AHEAD AND BE SEATED.

6         WOULD THE PARTIES WHO ARE SEEKING APPOINTMENT AS LEAD

7     COUNSEL, WOULD THEY PLEASE JUST STAND AND ANNOUNCE THEMSELVES

8     TO THE COURT?

9              MR. FRIEDMAN:  GOOD AFTERNOON, YOUR HONOR.

10     ANDREW FRIEDMAN WITH COHEN, MILSTEIN, SELLERS & TOLL.

11             MS. CERVANTEZ:  GOOD AFTERNOON, YOUR HONOR.

12     EVE CERVANTEZ WITH ALTSHULER BERZON.

13         AND ALSO WITH US IS STEPHEN BASSER.

14             MR. BASSER:  GOOD AFTERNOON, YOUR HONOR.

15             MS. CERVANTEZ:  GERARD STRANCH.

16             MR. STRANCH:  GOOD AFTERNOON, YOUR HONOR.

17             MS. CERVANTEZ:  LYNN TOOPS.

18             MS. TOOPS:  GOOD AFTERNOON, YOUR HONOR.

19             MS. CERVANTEZ:  NORMAN SIEGEL.

20             MR. SIEGEL:  GOOD AFTERNOON, YOUR HONOR.

21             MS. CERVANTEZ:  ERIC GIBBS.

22             MR. GIBBS:  GOOD AFTERNOON, YOUR HONOR.

23             MS. CERVANTEZ:  AND MICHAEL SOBOL.

24             MR. SOBOL:  GOOD AFTERNOON, YOUR HONOR.

25             MR. LEVITT:  GOOD AFTERNOON, YOUR HONOR.  ADAM LEVITT
```

```
 1      OF GRANT & EISENHOFER ON BEHALF OF WENDY ROSS AND THE PROPOSED

 2      SEPARATE BCBSA TRACK.

 3                THE COURT:  OKAY.  GOOD AFTERNOON.

 4                MR. EDELSON:  GOOD AFTERNOON, YOUR HONOR.

 5      JAY EDELSON, ALSO ON BEHALF OF PLAINTIFF ROSS.

 6                THE COURT:  OKAY.  GOOD AFTERNOON.

 7                MR. ROBINSON:  GOOD AFTERNOON, YOUR HONOR.

 8      DAN ROBINSON.

 9                MS. WOLFSON:  GOOD AFTERNOON, YOUR HONOR.

10      TINA WOLFSON OF AHDOOT & WOLFSON.

11                MS. SAVETT:  GOOD AFTERNOON, YOUR HONOR.

12      SHERRIE SAVETT OF BERGER & MONTAGUE.

13                MR. YANCHUNIS:  GOOD AFTERNOON.  MY NAME IS

14      JOHN YANCHUNIS WITH THE LAW FIRM OF MORGAN AND MORGAN.

15                MS. BHUJWALA:  GOOD AFTERNOON, YOUR HONOR.

16      SHEHNAZ BHUJWALA WITH BOUCHER LLP ON BEHALF OF PLAINTIFFS.

17                THE COURT:  OKAY.  GOOD AFTERNOON.

18                MR. SKEPNEK:  GOOD AFTERNOON, YOUR HONOR.

19      WILLIAM SKEPNEK FOR THE STANTURF AND NOBLE CASES IN KANSAS AND

20      MISSOURI.

21                MR. LEBSOCK:  GOOD AFTERNOON, YOUR HONOR.

22      CHRIS LEBSOCK FROM THE HAUSFELD FIRM.

23                MS. HANSON RIEBEL:  GOOD AFTERNOON, YOUR HONOR.

24      KAREN HANSON RIEBEL FROM LOCKRIDGE, GRINDAL, NAUEN IN

25      MINNEAPOLIS.
```

```
 1                    THE COURT:  OKAY.  GOOD AFTERNOON.

 2                    MS.  CAPPIO:  GOOD AFTERNOON, YOUR HONOR.

 3         GRETCHEN FREEMAN CAPPIO FROM KELLER ROHRBACK.  AND WE'RE WITH

 4         THE KELLER/LOCKRIDGE GROUP.  I'LL LET THE REST OF OUR GROUP

 5         INTRODUCE THEMSELVES.

 6                    THE COURT:  OKAY.  THANK YOU.

 7                    MR. LYNCH:  GOOD AFTERNOON, YOUR HONOR.  GARY LYNCH,

 8         PART OF THE KELLER GROUP.

 9                    MR. BLEICHNER:  GOOD AFTERNOON, YOUR HONOR.

10         BRYAN BLEICHNER FROM CHESTNUT CAMBRONNE IN MINNEAPOLIS.

11                    MR. BOARDMAN:  THOMAS BOARDMAN, SCOTT + SCOTT, FROM

12         NEW YORK.

13                    MR. ESADES:  GOOD AFTERNOON, YOUR HONOR.

14         VINCENT ESADES FROM HEINS, MILLS & OLSON IN MINNEAPOLIS.

15                    MR. COTCHETT:  GOOD AFTERNOON, YOUR HONOR.

16         JOSEPH COTCHETT, COTCHETT, PITRE & MCCARTHY WITH MEMBERS OF MY

17         FIRM THAT ARE HERE.

18                    THE COURT:  OKAY.  GOOD AFTERNOON.

19                    MR. GELLER:  GOOD AFTERNOON, YOUR HONOR.  PAUL GELLER

20         FROM THE LAW OFFICE OF GELLER, RUDMAN & DOWD.

21                    MR. WILLIAMS:  GOOD AFTERNOON, YOUR HONOR.

22         SHAWN WILLIAMS FROM ROBBINS, GELLER, RUDMAN.

23                    MR. KING:  GOOD AFTERNOON, YOUR HONOR.  LAURENCE KING

24         AND MATTHEW GEORGE, KAPLAN, FOX & KILSHEIMER.

25                    MS. TADLER:  GOOD AFTERNOON, YOUR HONOR.
```

```
1        ARIANA TADLER FROM MILBERG LLP.

2              MS. GREENWALD:  GOOD AFTERNOON, YOUR HONOR.

3        ROBIN GREENWALD FROM WEITZ & LUXENBERG.

4              MR. BARNOW:  GOOD AFTERNOON, YOUR HONOR.  BEN BARNOW,

5        BARNOW & ASSOCIATES, FROM CHICAGO, ILLINOIS.

6              THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME TO

7        EVERYONE.

8          I WAS GOING TO PROPOSE THAT WE HANDLE THE CMC PORTION

9        FIRST AND DO THE HEARING ON APPOINTMENT OF LEAD PLAINTIFFS'

10       COUNSEL SECOND, BUT IF YOU HAVE A SUGGESTION OTHERWISE, I'M

11       OPEN TO HEARING IT.

12          NO?  OKAY.

13          LET'S GO AHEAD WITH THE CASE MANAGEMENT FIRST, AND THAT

14       ACTUALLY I THINK COULD HELP INFORM THE APPOINTMENT OF LEAD

15       PLAINTIFFS' COUNSEL.

16          SO --

17              MR. GLOVSKY:  I APOLOGIZE FOR --

18              THE CLERK:  WHOEVER WAS ON THE PHONE, DO YOU MIND

19       REPEATING THAT?  AND PLEASE STATE YOUR NAME.

20              MR. GLOVSKY:  SCOTT GLOVSKY.

21              THE CLERK:  I'M SORRY?

22              MR. GLOVSKY:  SCOTT GLOVSKY, THAT'S G-L-O-V, AS IN

23       VICTOR, S-K-Y.

24              THE CLERK:  OKAY.  AND DO YOU HAVE AN APPOINTMENT OF

25       A MOTION FOR APPOINTMENT AS LEAD COUNSEL, SIR?
```

```
 1              MR. GLOVSKY:  NO, WE DID NOT FILE A MOTION.

 2              THE CLERK:  OKAY.  THANK YOU.  I HAVE YOUR

 3      APPEARANCES FOR PEOPLE WHO ARE APPEARING BY PHONE.

 4          I WAS JUST HAVING PEOPLE CHECK IN WITH THE JUDGE WHO ARE

 5      SEEKING APPOINTMENT AS LEAD COUNSEL FOR RIGHT NOW.

 6              THE COURT:  SO WE'LL DO THE SAME THING THAT WE DID AT

 7      THE PREVIOUS CMC.  WE WILL FILE A COMPLETE LIST OF ALL

 8      ATTENDEES WHO ARE PARTICIPATING IN PERSON AND BY PHONE ON THE

 9      DOCKET, SO EVERYONE'S APPEARANCES WILL BE RECORDED.

10          BUT FOR PURPOSES OF TODAY, WE'LL JUST GO AHEAD NOW WITH

11      THE CMC AND THE HEARING, AND I HAVE A LIST OF ALL THE ATTORNEYS

12      WHO ARE PRESENT.

13          I GUESS I SHOULD ASK MS. SAKAMOTO, IS THERE ANYONE WHO

14      DIDN'T APPEAR WHO WAS ON OUR LIST?

15              THE CLERK:  ON THE VERY LONG LIST?

16              THE COURT:  UM-HUM.

17              THE CLERK:  I CAN GO THROUGH IT.

18              THE COURT:  HOW MANY ARE THERE WHO HAVE NOT APPEARED?

19              THE CLERK:  LET'S SEE.

20          (PAUSE IN PROCEEDINGS.)

21              THE CLERK:  THERE'S OVER TEN, JUDGE.

22              THE COURT:  OKAY.

23              THE CLERK:  I WAS JUST GOING TO DO IT AFTER.

24              THE COURT:  WHY DON'T YOU JUST CALL THEIR NAMES NOW,

25      SEE IF THEY'VE JOINED, AND IF THEY HAVEN'T JOINED BY NOW, WE'LL
```

```
 1        DELETE THEM FROM THE LIST THAT WE FILE ON THE DOCKET.

 2                  THE CLERK:  OKAY.

 3                  THE COURT:  OKAY?

 4                  THE CLERK:  OKAY.  DO WE HAVE ERIC DIRKS?

 5                  THE COURT:  ARE YOU MR. DIRKS?

 6                  MR. DAMERON:  NO.  MR. DIRKS IS MY LAW PARTNER.  MY

 7        NAME IS MATT DAMERON WITH WILLIAMS, DIRKS, DAMERON.

 8                  THE CLERK:  RIGHT.  I'M JUST LOOKING FOR THE ACTUAL

 9        ATTORNEY.  I STILL HAVE YOUR APPEARANCE DOWN.  I'M JUST LOOKING

10        FOR CERTAIN ATTORNEYS.

11                  MR. DAMERON:  THANK YOU.

12                  THE CLERK:  THANK YOU.

13            GORDON FAUTH, F-A-U-T-H?

14            ROSANNA MAH, M-A-H?

15            THEODORE MAYA?

16            WESLEY POLISCHUK?  THAT'S P-O-L-I-S-C-H-U-K.

17            FRANCIS RODINI?

18            SUNNY SARKIS?

19            DAVID SENOFF, S-E-N-O-F-F?

20            BONNY SWEENEY?

21            BARRETT VAHLE?

22            AND ACTUALLY, THAT'S IT, JUDGE.

23                  THE COURT:  OKAY, GREAT.  SO WE'LL GO AHEAD AND FILE

24        OUR LIST OF ATTENDEES --

25                  THE CLERK:  CORRECT.
```

1        THE COURT:  -- SO THERE'S A RECORD OF WHO ATTENDED.

2        THE CLERK:  YES, JUDGE.

3        THE COURT:  ALL RIGHT.  AND I ASSUME THAT ALL THE

4    PARTIES RECEIVED YESTERDAY THE ORDERS ON THE TWO MOTIONS TO

5    REMAND GRANTING THE SABATINO MOTION TO REMAND AND DENYING THE

6    NOBLE MOTION TO REMAND.

7        WE ALSO, ON TUESDAY, RELATED THE MACAUSLAND CASE, SO THOSE

8    ARE NOW COMPLETED, I GUESS FOR NOW.

9        DO YOU INTEND TO APPEAL THE RULING ON SABATINO?

10        MR. HOOVER:  YOUR HONOR, CRAIG HOOVER FOR ANTHEM.

11        WE ARE IN THE PROCESS OF CONSULTING WITH OUR CLIENT AND

12    MAKING A DECISION ON THAT.

13        THE COURT:  OKAY.  ALL RIGHT.  DO YOU HAVE ANY

14    UPDATES ON THE APPEALS OF OTHER CASES THAT HAVE BEEN REMANDED?

15        MR. HOOVER:  YOUR HONOR, I CAN UPDATE YOU BY SAYING

16    THAT THE PETITION FILED ON JULY 24TH IN THE WICKENS CASE HAS

17    NOT YET BEEN RULED ON BY THE NINTH CIRCUIT; AND THE PETITION

18    FILED ON AUGUST 24TH IN THE SMILOW CASE, THAT WOULD BE THE

19    CALIFORNIA SMILOW CASE, HAS NOT BEEN RULED ON YET.  SO THOSE

20    ARE BOTH PENDING.

21        THE COURT:  OKAY.  THANK YOU.

22        AND I DID FOLLOW UP, AS THE PARTIES REQUESTED, WITH THE

23    JUDGE DOWN IN SAN DIEGO ON THE SUPERIOR COURT AND I HAVE

24    PROMISED THAT I WILL E-MAIL HIM OUR CASE MANAGEMENT ORDER AFTER

25    TODAY'S CMC.  THAT WAS JUDGE MAAS DOWN IN SUPERIOR COURT.

1        IS THERE ANY OTHER JUDGE NOW THAT YOU WANT ME TO

2    COORDINATE WITH BASED ON THE PROLIFERATION OF THE FEW CASES

3    THAT ARE NOW GOING TO OTHER COURTS?

4        MR. HOOVER:  YOUR HONOR, IN THE SMILOW CALIFORNIA

5    CASE, THE JUDGE IS JUDGE AMY HOGUE ON THE COMPLEX DOCKET IN

6    LOS ANGELES SUPERIOR COURT.  THAT CASE, PURSUANT TO THE COMPLEX

7    RULES, IS STAYED AT THE MOMENT AND -- BUT I THINK THERE'S A

8    CONFERENCE COMING UP IN OCTOBER ON THAT CASE.

9        MY PARTNER, MR. MADDIGAN, WHO IS HANDLING THAT CASE, IS

10   HERE WITH ME.  SO THAT WOULD BE ANOTHER CASE THAT WOULD NEED TO

11   BE COORDINATED, WE'D LIKE TO BE COORDINATED WITH YOUR HONOR.

12       THE COURT:  AND HOW LONG IS IT STAYED, OR FOR WHAT

13   PURPOSE IS IT STAYED?

14       MR. MADDIGAN:  MICHAEL MADDIGAN.

15       YOUR HONOR, PURSUANT TO THE COMPLEX RULES OF THE

16   LOS ANGELES SUPERIOR COURT, A STAY IS AUTOMATICALLY PUT IN

17   PLACE UPON THE FILING OF A CASE UNTIL THE FIRST CASE MANAGEMENT

18   CONFERENCE ESSENTIALLY.  THAT WAS SET AND HAS BEEN MOVED, AND

19   SO IT WILL BE IN PLACE AT LEAST UNTIL THAT TIME.

20       SOMETIMES JUDGES THEN DECIDE TO ENTERTAIN PRELIMINARY

21   ISSUES BEFORE THEY OPEN UP GENERAL DISCOVERY AND LIFT THE STAY

22   ONLY FOR LIMITED PURPOSES.

23       THE COURT:  AND DO YOU HAVE A SPECIFIC DATE FOR THE

24   CMC?

25       MR. MADDIGAN:  NO.

```
1          THE COURT:  OKAY.  SO IT'S JUST SOME TIME IN OCTOBER

2     2015?

3          MR. MADDIGAN:  THAT'S WHAT WE EXPECT, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  AND IS THE LAST NAME SPELLED

5     H-O-G-U-E?

6          MR. HOOVER:  THAT'S CORRECT.

7          THE COURT:  IS THAT CORRECT?

8          OKAY.  ALL RIGHT.  ANYONE ELSE THAT YOU WOULD LIKE ME TO

9     COORDINATE WITH?  WHAT ABOUT SMILOW IN THE EASTERN DISTRICT

10    OF -- OH, I GUESS THAT'S STILL PENDING WITH THE JPML.

11         MR. HOOVER:  THAT'S CORRECT.  THAT'S PENDING.

12         THE REMAND MOTION -- THERE'S A REMAND MOTION PENDING IN

13    THAT CASE, AND THE CTO OBJECTION IS ALSO PENDING.

14         THE COURT:  OKAY.  SO THAT'S PREMATURE.

15         MR. HOOVER:  BUT POTENTIALLY, DEPENDING ON WHERE

16    THINGS GO WITH SABATINO, THAT WOULD BE ANOTHER POTENTIAL

17    COORDINATION ISSUE.

18         THE COURT:  DO YOU KNOW IF THE ERISA PREEMPTION ISSUE

19    IS PRESENT IN THAT CASE, IN SMILOW IN THE EASTERN DISTRICT OF

20    NEW YORK?

21         MR. HOOVER:  I BELIEVE IT -- I BELIEVE IT IS.

22         THE COURT:  OKAY.

23         MR. HOOVER:  I CAN DOUBLE-CHECK THAT.

24         THE COURT:  OKAY.

25         MR. HOOVER:  YEAH, I'M INFORMED THAT IT IS PRESENT IN
```

```
1      THAT CASE.
2              THE COURT:  IT IS.  OKAY.  I'M NOT PRE-JUDGING, BUT
3      IF IT HAS SIMILAR ISSUES TO SABATINO OR NOBLE, I ASSUME IT
4      WOULD BE A SOMEWHAT SIMILAR ANALYSIS.
5          WHAT'S THE STATUS ON MERTLICH IN WASHINGTON STATE?
6              MR. HOOVER:  YOUR HONOR, TO OUR KNOWLEDGE, THAT HAS
7      NOT BEEN SERVED YET.  THAT CASE HAS NOT BEEN SERVED YET.
8              THE COURT:  I SEE.  THE DEFENDANTS DON'T HAVE --
9              MR. HOOVER:  CORRECT.
10             THE COURT:  -- SERVICE.  OKAY.
11         ARE YOU AWARE OF ANY OTHERS THAT ARE GOING TO BE FILED?
12             MR. HOOVER:  I AM NOT, YOUR HONOR.
13             THE COURT:  OKAY.  ARE THE PLAINTIFFS AWARE OF ANY
14     OTHER CASES THAT ARE GOING TO BE FILED?
15             MR. FRIEDMAN:  WE ARE NOT, YOUR HONOR.
16             THE COURT:  OKAY.
17         ALL RIGHT.  LET'S GO AHEAD AND TALK ABOUT A CASE SCHEDULE.
18         SO AT THE LAST CMC, MR. HOOVER, YOU MENTIONED THAT YOU MAY
19     WANT TO FILE A SUMMARY JUDGMENT MOTION BEFORE CLASS CERT, BUT I
20     NOTICED IN THE SCHEDULE THAT THE PARTIES HAVE PROPOSED, YOU
21     JUST SET A SCHEDULE THROUGH CLASS CERT.
22         HAVE YOU --
23             MR. HOOVER:  THAT'S CORRECT, YOUR HONOR.  I DON'T --
24     THERE HASN'T BEEN A DECISION.  I WAS -- I WAS RAISING THE
25     POSSIBILITY --
```

```
 1              THE COURT:  OKAY.

 2              MR. HOOVER:  -- OF IT.  I WAS NOT SAYING WE WERE

 3      PLANNING TO FILE ONE, AND I AM COGNIZANT OF YOUR CAUTION THAT

 4      THERE WOULD BE ONE SUMMARY JUDGMENT MOTION.

 5              THE COURT:  OKAY.  ALL RIGHT.  SO WE WON'T WORRY

 6      ABOUT PUTTING THAT IN OUR CASE SCHEDULE TODAY.

 7          THAT'S FINE IF YOU WANT TO FILE INITIAL DISCLOSURES, OR

 8      SERVE, EXCUSE ME, INITIAL DISCLOSURES WITHIN 14 DAYS OF FILING

 9      THE CONSOLIDATED AMENDED COMPLAINT.  I THINK THAT MAKES SENSE,

10      SO THAT'S FINE.

11          I DON'T INTEND TO STAY ANY DISCOVERY AGAINST THE

12      NON-ANTHEM DEFENDANTS, SO THAT REQUEST IS DENIED.

13          WHAT'S YOUR PROTECTIVE ORDER STATUS?

14              MS. CERVANTEZ:  YOUR HONOR, WE HAVE PROVIDED A DRAFT

15      PROTECTIVE ORDER TO DEFENDANTS AND WE'VE ATTACHED IT HERE TO

16      THE CASE MANAGEMENT CONFERENCE STATEMENT.

17          THEY REQUESTED A LITTLE MORE TIME TO REVIEW IT AND GET

18      BACK TO US, AND MR. HOOVER HAS TOLD US THAT HE WILL GET BACK TO

19      US BY MONDAY.

20          SO WE BELIEVE THAT WE SHOULD BE ABLE TO MEET AND CONFER

21      AND HAVE A PROTECTIVE ORDER IN PLACE WELL BEFORE ANY DISCOVERY

22      WOULD BE DUE.

23              THE COURT:  CAN WE SET A DATE BY WHICH YOU'LL AGREE

24      UPON THE PROTECTIVE ORDER?  AND IF YOU CAN'T AGREE, YOU'LL FILE

25      A MOTION WITH JUDGE COUSINS WHERE YOU SET FORTH WHATEVER
```

1    DISPUTES THERE ARE AND FOLLOW HIS PROCEDURES THAT HE HAS FOR

2    FILING A MOTION?

3              MS. CERVANTEZ:  YES.  I WOULD SUGGEST MAYBE SEVEN

4    DAYS AFTER APPOINTMENT OF LEAD COUNSEL SO THAT LEAD COUNSEL

5    IS --

6              MR. HOOVER:  THAT WILL BE FINE, YOUR HONOR.

7              THE COURT:  OKAY.  AND YOUR AGREEMENT THAT DISCOVERY

8    WILL BEGIN TEN DAYS AFTER LEAD PLAINTIFFS' COUNSEL APPOINTMENT

9    IS FINE.

10        NOW, HOW EXTENSIVE AND HOW LONG WOULD IT TAKE THE

11   DEFENDANTS TO PRODUCE ANY OF THEIR OWN INTERNAL INVESTIGATIONS

12   INTO THE DATA BREACH?

13             MR. HOOVER:  YOUR HONOR, WHAT WE WOULD PROPOSE, SINCE

14   DISCOVERY IS OFF AND RUNNING TEN DAYS AFTER THE APPOINTMENT OF

15   LEAD COUNSEL, IS TO -- IS TO PRIORITIZE DOCUMENTS SUCH AS THAT,

16   BUT AS PART OF THE REST OF DISCOVERY.

17        I THINK TO HAVE A WHOLE OTHER PROCESS EVEN QUICKER THAN

18   TEN DAYS FROM APPOINTMENT OF LEAD COUNSEL WHEN THE REQUEST WILL

19   BE SERVED IS GOING TO COMPLICATE THINGS AND IT WOULD BE GOOD TO

20   HAVE THE REQUESTS, KNOW EXACTLY WHAT REPORTS ARE BEING ASKED

21   FOR, AND HAVE A CHANCE TO MEET AND CONFER WITH THE PLAINTIFFS

22   ABOUT THAT.

23        AND SO THAT -- WE WOULD PROPOSE THAT WE PRIORITIZE THOSE

24   REPORTS ON THE VERY FRONT END OF DISCOVERY, BUT NOT SEPARATE IT

25   FROM A PROCESS THAT'S GOING TO BEGIN WITHIN 10 OR 14 DAYS

```
1    ANYWAY.
2         AND THAT WAY THERE'S A FORMAL RECORD OF A REQUEST, A
3    RESPONSE, IF THERE ARE ANY PRIVILEGE ISSUES, WHATEVER THE CASE
4    MAY BE, AND THAT'S ALL THERE IN CASE THERE IS A DISPUTE, AS
5    OPPOSED TO HAVING A SEPARATE, MORE INFORMAL PROCESS FOR THOSE
6    REPORTS.
7         AND IT WON'T DELAY THE PROCESS BECAUSE WE'RE STARTING
8    DISCOVERY IN TEN DAYS ANYWAY.
9              MS. CERVANTEZ:  YOUR HONOR, MR. HOOVER DIDN'T
10   ACTUALLY ANSWER YOUR QUESTION, WHICH IS, HOW HARD WOULD IT BE
11   TO GET THESE REPORTS TO US?
12        WE'D BE VERY INTERESTED IN HEARING YOUR ANSWER TO THAT.
13             MR. HOOVER:  WELL, YOUR HONOR, I DON'T -- THERE IS A
14   FORENSIC REPORT THAT'S OUT THERE AND -- BUT THE PLAINTIFFS HAVE
15   ASKED -- HAVE WORDED THINGS IN A BROADER WAY.
16             THE COURT:  UM-HUM.
17             MR. HOOVER:  I DON'T KNOW EXACTLY WHAT THE SCOPE OF
18   WHAT THEY'RE REQUESTING IS GOING TO BE, AND SO WITHOUT KNOWING
19   THAT -- I MEAN, THIS IS ONE OF THE THINGS THAT WE TYPICALLY
20   WOULD DO AT THE VERY BEGINNING OF A MEET AND CONFER PROCESS IN
21   DISCOVERY.
22        AND, AGAIN, THIS WOULD BE DIFFERENT IF DISCOVERY WERE
23   BEING STAYED AS TO OTHER DOCUMENTS.  DISCOVERY IS NOT BEING
24   STAYED AT ALL UNDER YOUR HONOR'S ORDER.
25             AND I THINK WE SHOULD HAVE REQUESTS -- I'M SURE THERE WILL
```

1    BE A DOCUMENT REQUEST FOR REPORTS, HOWEVER YOU WANT TO --

2    HOWEVER PLAINTIFFS WANT TO PHRASE IT, AND WE WOULD FRONT LOAD

3    THAT IN THE PROCESS.

4            THE COURT:  SO WHAT IS IT THAT YOU HAVE?  YOU HAVE

5    ONE FORENSIC REPORT?

6            MR. HOGAN:  THERE IS A FORENSIC REPORT THAT WAS

7    PERFORMED BY MANDIANT, WHICH IS ONE OF THE LEADING FIRMS DOING

8    THAT KIND OF REPORT, AND THAT WOULD BE SOMETHING THAT DOES

9    EXIST.  IT IS IN FINAL FORM AND THAT IS SOMETHING THAT

10   CERTAINLY WOULD BE ON THE FRONT END OF THINGS THAT WOULD BE

11   TURNED OVER.

12           THE COURT:  SURE.  DID THE DEFENDANTS HAVE TO PRODUCE

13   ANY INFORMATION TO THE GOVERNMENT?

14           MR. HOOVER:  YOUR HONOR, THERE WAS A LONG PROCESS OF

15   COOPERATION WITH THE FBI, FOR EXAMPLE, AS IS THE CASE IN THESE

16   BREACHES.

17       AND SO THAT SHOULD -- THAT'S JUST AN EXAMPLE OF THE TYPE

18   OF DOCUMENTS THAT THE COMPANY FURNISHED COOPERATIVELY TO THE

19   FBI.

20       THAT'S CERTAINLY SOMETHING WHERE WE WOULD WANT TO INFORM

21   THE FBI OF WHAT'S BEING REQUESTED AND WHAT WE'RE DOING.  IT IS

22   A CRIMINAL INVESTIGATION.

23       AND SO THAT CERTAINLY IS GOING TO BE IN THE MIX OF

24   DOCUMENTS THAT WOULD FALL WITHIN DOCUMENTS FURNISHED TO A

25   GOVERNMENTAL ENTITY.

```
1              THE COURT:  THERE ARE DOCUMENTS THAT DEFENDANTS

2     PROVIDED TO THE FBI.  ARE THERE ALSO DOCUMENTS -- DID THE FBI

3     DO A REPORT?  IS THERE SOME FORENSIC ANALYSIS SIMILAR TO THE

4     MANDIANT ANALYSIS?

5              MR. HOOVER:  THE FBI HAS NOT ISSUED A REPORT.

6              THE COURT:  OKAY.

7              MR. HOOVER:  THE FBI INVESTIGATES, AND I'M NOT PRIVY

8     TO EVERYTHING THAT THE FBI HAS AS PART OF THAT CRIMINAL

9     INVESTIGATION.

10             THE COURT:  OKAY.  WHAT ELSE EXISTS OTHER THAN THE

11    MANDIANT FORENSIC REPORT?  ANY INFORMATION PROVIDED TO THE FBI

12    AS PART OF THE INVESTIGATION BY THAT AGENCY?  WHAT ELSE EXISTS?

13             MR. HOOVER:  THERE -- THERE WAS AN NAIC, NATIONAL

14    ASSOCIATION OF INSURANCE COMMISSIONERS, INVESTIGATION

15    PERFORMED, AND CERTAINLY THAT, THAT HAS BEEN AN ONGOING

16    PROCESS.

17             THE COURT:  BUT A REPORT WAS ISSUED BY THAT AGENCY?

18             MR. HOOVER:  THERE HAS NOT BEEN A FINAL REPORT ISSUED

19    BY THAT AGENCY.

20             THE COURT:  OKAY.  SO JUST COMMUNICATIONS?

21             MR. HOOVER:  YEAH, COMMUNICATIONS, AND THEY MAY WELL

22    ISSUE A REPORT, A FINAL REPORT SOON.

23             THE COURT:  DOES ANYTHING ELSE EXIST?

24             MR. HOOVER:  I'M NOT AWARE OF ANY OTHER GOVERNMENTAL

25    REPORTS --
```

1          THE COURT:  OKAY.

2          MR. HOOVER:  -- THAT ARE OUT THERE.

3          THE COURT:  OR ANY OTHER REPORTS, WHETHER BY PRIVATE

4     ENTITY OR INTERNALLY?

5          MR. HOOVER:  IN TERMS OF A FORMAL REPORT, YOUR HONOR,

6     I WOULD HAVE TO CHECK AND GET BACK TO THE COURT ON THAT, AND

7     THAT'S CERTAINLY SOMETHING WE CAN MEET AND CONFER WITH THE

8     PLAINTIFFS ABOUT.

9          THE COURT:  WELL, FORMAL OR INFORMAL.  IT DOESN'T

10    HAVE TO BE FORMAL OR OFFICIAL.

11         MR. HOOVER:  I WOULD SAY THE MANDIANT REPORT IS -- IF

12    YOU WANT TO TALK ABOUT SOMETHING THAT IS COMPREHENSIVE AND

13    DEFINITIVE, THE MANDIANT REPORT, IT'S THE -- THE COMPANY DIDN'T

14    TRY TO REPLICATE WHAT MANDIANT DID, SO THAT IS GOING TO BE THE

15    FORENSIC REPORT THAT IS -- THAT CERTAINLY WAS FORMALLY ISSUED.

16         THE COURT:  OKAY.  SO I -- I WILL ORDER THE

17    PRODUCTION OF THE MANDIANT FORENSIC REPORT 14 DAYS AFTER

18    APPOINTMENT OF LEAD COUNSEL, SUBJECT TO ANY PRIVILEGES.

19         BUT FOR THE OTHER DOCUMENTS, COMMUNICATIONS WITH THE FBI

20    OR THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS OR

21    ANYTHING ELSE, THAT WILL JUST GO BY WAY OF A DOCUMENT REQUEST

22    AND YOU'LL HAVE 30 DAYS TO RESPOND.  OKAY?

23         MR. HOOVER:  THANK YOU.

24         THE COURT:  SO AT LEAST THE MANDIANT -- NOW, DOES

25    THAT HAVE A LOT OF EXHIBITS AND PARTS?  WHAT'S THE --

```
 1                MR. HOOVER:  YES, IT DOES.

 2                THE COURT:  OKAY.  WHAT'S THE SIZE OR THE VOLUME?

 3                MR. HOOVER:  IT'S A LARGE -- IT'S A LARGE

 4     CONFIDENTIAL REPORT.  A FEW HUNDRED PAGES.

 5                THE COURT:  OKAY.

 6                MS. CERVANTEZ:  YOUR HONOR?

 7                THE COURT:  YES?

 8                MS. CERVANTEZ:  ONE THING WITH RESPECT TO THESE --

 9     THE OTHER DOCUMENTS THAT WE'RE GOING TO BE REQUESTING IS WE

10     WOULD REQUEST THAT SINCE DEFENDANTS ALREADY KNOW ABOUT THEM,

11     THEY'RE AWARE OF THIS REQUEST, THAT WHEN WE -- WE HAVE TO WAIT

12     10 DAYS, SERVE THE REQUEST, THEN WE HAVE TO WAIT 30 DAYS, BUT

13     THAT WE ACTUALLY GET THE DOCUMENTS IN 30 DAYS, TO THE EXTENT

14     THEY DON'T HAVE OBJECTIONS OR PRIVILEGE, AS OPPOSED TO JUST

15     GETTING RESPONSES IN 30 DAYS AND IT'S A ROLLING PRODUCTION AND

16     WE DON'T GET THESE OTHER DOCUMENTS THAT THEY ALREADY KNOW THAT

17     WE NEED, YOU KNOW, FOR ANOTHER 60 DAYS OR 90 DAYS.

18                THE COURT:  I HOPE THERE WON'T BE JUST BOILERPLATE

19     OBJECTIONS SERVED IN THE DISCOVERY RESPONSE.

20                MR. HOOVER:  RIGHT.  WE UNDERSTAND WHAT OUR DUTIES

21     ARE UNDER THE RULES AND WE WILL -- WE KNOW THAT THIS IS GOING

22     TO MOVE QUICKLY AND SO WE WON'T BE HOLDING THINGS UP, YOUR

23     HONOR.

24                THE COURT:  ALL RIGHT.  THANK YOU.

25                ON THE DISCOVERY LIMITS, I DON'T THINK THAT'S RIPE, SO WE
```

1    DON'T NEED TO TALK ABOUT THAT TODAY.

2        I'VE ALREADY SAID I WON'T HAVE TWO TRACKS FOR DISCOVERY,

3    SO THAT'S NOT AN ISSUE.

4        OKAY.  LET'S KEEP GOING.

5        ALL RIGHT.  SO THIS IS WHAT I'D LIKE TO DO FOR THE CASE

6    SCHEDULE:  I WOULD LIKE TO HAVE THE FIRST ROUND MOTION TO

7    DISMISS HEARING ON FEBRUARY 4TH OF 2016, AND IF WE NEED A

8    SECOND ROUND MOTION TO DISMISS, ASSUMING LEAVE TO AMEND IS

9    GRANTED, THEN I'D LIKE TO HAVE A HEARING ON THE SECOND ROUND

10   MOTION TO DISMISS BY MAY 26TH.

11       NOW, I'D LIKE TO ASK, IS MR. VINCENT ESADES HERE OF

12   HEINS, MILLS & OLSON?

13           MR. ESADES:  YES, YOUR HONOR.

14           THE COURT:  OKAY.  YOU HAD A FOOTNOTE SAYING YOU

15   DIDN'T THINK 30 DAYS IS ENOUGH TO FILE A CONSOLIDATED AMENDED

16   COMPLAINT.

17       HOW MUCH DO YOU THINK IS ENOUGH TIME?

18           MR. ESADES:  I THINK THE ISSUE, AND IT'S IDENTIFIED

19   IN THE PRELIMINARY STATEMENT, GOES TOWARDS THE PLAINTIFFS.

20   WHEN YOU'RE TALKING ABOUT THE NUMBER OF PLAINTIFFS THAT NEED TO

21   BE VETTED, TO GET THE PARTIES RIGHT, I DON'T THINK 30 DAYS IS

22   GOING TO BE ENOUGH TO GET THE PARTIES RIGHT.

23       TO GET THE LAW AND THE LEGAL CLAIMS DONE, I THINK 30 DAYS

24   IS SUFFICIENT.

25           BUT I HONESTLY BELIEVE WHEN YOU'RE TALKING ABOUT

1    INTERVIEWING, VETTING, DETERMINING WHICH PLAINTIFFS IN WHICH

2    STATES YOU'RE GOING TO COME FORWARD WITH, THERE'S SO MUCH OUT

3    OF THE HANDS OF THE LAWYERS, YOU'RE JUST GOING TO NEED MORE

4    TIME.

5         NOW, THAT'S JUST THE PARTIES.  SO IF THE COURT WERE TO

6    EXTEND THE DATE BY WHICH PLAINTIFFS COULD BE ADDED, JUST THAT

7    PORTION, THEN THE 30 DAYS WOULD BE FINE FOR LEGAL CLAIMS, JUST

8    NOT ALL THE PLAINTIFFS LISTED IN THE COMPLAINT.

9         THE COURT:  OKAY.  MR. HOOVER, WHAT'S THE DEFENDANTS'

10   VIEW ON HAVING A DIFFERENT DEADLINE FOR ADDING NAMED

11   PLAINTIFFS?

12        MR. HOOVER:  OUR VIEW IS THAT THIS INCIDENT HAS BEEN

13   PUBLIC SINCE JANUARY, AND THE PARTIES ARE BEING HELD TO VERY

14   TIGHT DEADLINES IN THIS CASE, THAT THERE'S BEEN PLENTY OF TIME

15   TO FIND PLAINTIFFS, IDENTIFY PLAINTIFFS, AND I THINK

16   BIFURCATING THAT WOULD BE HIGHLY UNUSUAL, FRANKLY, FOR AN MDL,

17   AND I DON'T THINK NECESSARY.

18        THE COURT:  SO WHAT DO YOU THINK IS THE RIGHT AMOUNT

19   OF TIME IF THERE'S NO DIFFERENT DEADLINE FOR NAMING THE

20   PLAINTIFFS?

21        MR. ESADES:  I THINK 60 DAYS WOULD BE SUFFICIENT TO

22   GET THE PLAINTIFFS VETTED.  WE HAVE A LOT OF LAWYERS, A LOT OF

23   DIFFERENT PLAINTIFFS, AND A LOT OF PLAINTIFFS HAVE CONTACTED

24   LAWYERS, BUT NOTHING HAS BEEN DONE BECAUSE PEOPLE ARE WAITING

25   TO HEAR HOW THE CASE IS GOING TO PROCEED.  PEOPLE AREN'T GOING

1    TO WANT TO START GRINDING UP A BUNCH OF TIME AND REVIEWING A

2    BUNCH OF PLAINTIFFS WHO MIGHT BE DUPLICATIVE OF OTHER

3    PLAINTIFFS.  THERE'S A LOT OF REASONS THE LAWYERS IN THIS ROOM

4    ON THE PLAINTIFFS' SIDE HAVE SAT IN ABEYANCE AND NOT GONE

5    THROUGH THE WHOLE PROCESS.

6              MR. HOOVER:  YOUR HONOR, WITH ALL DUE RESPECT TO

7    COUNSEL, THE DEFENDANTS ARE BEING HELD TO AN INCREDIBLY TIGHT

8    SCHEDULE HERE.  WE'RE STARTING DISCOVERY.

9         IF IT'S 60 DAYS BEFORE WE EVEN SEE WHAT'S IN AND OUT OF

10   THE CASE, THAT THROWS OFF THE DISCOVERY PROCESS, THE

11   NEGOTIATIONS OVER WHAT'S RELEVANT AND WHAT'S NOT.

12        AND WE WERE HERE IN JULY.  I MEAN, THERE HAS BEEN TIME TO

13   BE WORKING ON THESE ISSUES WHILE WE'VE BEEN GOING FORWARD.

14        AND AS FAR AS I KNOW, INTERIM LEAD COUNSEL THOUGHT THAT

15   30 DAYS WOULD BE SUFFICIENT AND I THINK THAT SHOULD BE THE

16   DEADLINE.  IF IT GOES TO 60 DAYS, A LOT OF THE DISCOVERY

17   INTERACTION THAT WE'RE HAVING IS GOING TO BE DISRUPTED.

18             THE COURT:  WELL, LET ME ASK ANOTHER QUESTION.  I'M

19   FINE WITH THE CONSOLIDATED AMENDED COMPLAINT BEING AN OMNIBUS,

20   INCLUDE AS MANY PLAINTIFFS, AS MANY STATES AS YOU WANT, BE AS

21   COMPREHENSIVE AND INCLUSIVE AS YOU WANT.

22        BUT I WOULD LIKE A NARROWER CASE, CALL IT BELLWETHER, CALL

23   IT WHATEVER YOU WANT, TO BE GOING THROUGH MOTIONS TO DISMISS,

24   CLASS CERT AND THE OTHER MOTION PRACTICE.

25        I AM NOT GOING TO BE ABLE TO DO -- LET'S SAY YOU SHOW -- I

```
1     READ SOMEWHERE, WHAT, 25 STATES IS WHAT IS BEING CONTEMPLATED

2     POTENTIALLY.  I CAN'T GO THROUGH MULTIPLE CAUSES OF ACTION AND

3     25 STATES IN ONE MOTION.  THAT'S GOING TO BOG IT DOWN AND IT'S

4     GOING TO SLOW DOWN THE CASE.

5          SO I WOULD LIKE A MORE NARROW CASE TO ACTUALLY GO THROUGH

6     MOTIONS TO DISMISS AND CLASS CERT AND THEN WE CAN SEE WHERE WE

7     ARE AFTER THAT.

8          PROBABLY IF IT'S STILL BEING LITIGATED, MAYBE GO TO

9     SUMMARY JUDGMENT; AND THEN I'M NOT MAKING ANY PROMISES, BUT AT

10    THE END OF THAT PROCESS, IF THERE'S STILL NO RESOLUTION, THEN

11    WE CAN DECIDE IF IT MAKES SENSE TO DO FURTHER CAUSES OF ACTION.

12         LET ME HEAR, HOW MANY CAUSES OF ACTION YOU THINK IS THE

13    RIGHT NUMBER TO GO THROUGH?  I MEAN, I'M WILLING TO DO A CASE

14    FAST, BUT IT HAS TO BE A NARROW, FOCUSSED CASE.

15              MR. FRIEDMAN:  YOUR HONOR, I WAS ACTUALLY GOING TO

16    ASK YOU THAT.  I DON'T KNOW PRECISELY WHAT YOU ARE

17    ANTICIPATING.  IF YOU WANT TO NARROW THE CASE, WE CAN DO THAT.

18         ARE YOU LOOKING AT NARROWING THE CASE STATEWIDE SO THAT

19    INSTEAD OF 25 STATES, YOU HAVE FIVE STATES?  IS THAT SOMETHING

20    YOUR HONOR WOULD BE CONTEMPLATING?

21              THE COURT:  WELL, HOW MANY CAUSE OF ACTIONS WOULD

22    THERE BE FROM EACH STATE?

23              MR. FRIEDMAN:  AT THIS POINT WE DON'T KNOW, YOUR

24    HONOR.  WE CAN SEE WHAT'S OUT THERE.  THERE'S USUALLY -- IN

25    SOME STATES, THERE'S A STATUTORY REQUEST FOR CAUSE OF ACTION.
```

1       THERE'S ALSO A COMMON LAW REQUEST.  YOU HAVE NEGLIGENCE.

2           IT DEPENDS ON THE STATE.  IT WILL CHANGE FROM STATE TO

3       STATE, SO I CAN'T TELL YOU A PRECISE NUMBER AT THIS POINT IN

4       THE ABSTRACT.

5               THE COURT:  UM-HUM.

6           LET ME ASK, MR. HOOVER, WHAT'S YOUR -- WHAT'S YOUR VIEW?

7       I WOULD LIKE THE PLAINTIFFS TO PICK THEIR BEST CASE AND FOCUS

8       ON A VERY NARROW CASE, MAYBE SIX CLAIMS AT THE MOST, HAVE THAT

9       LITIGATED UNTIL THE END IF NECESSARY, GO TO TRIAL ON THOSE FIVE

10      OR SIX CLAIMS, AND THEN WE'LL SEE WHERE WE ARE AFTER THAT.

11              MR. HOOVER:  YOUR HONOR, THIS IS SORT OF A HOT ISSUE

12      IN THE MDL AREA RIGHT NOW.

13              THE COURT:  UM-HUM.

14              MR. HOOVER:  AND I GUESS WHAT I WOULD SAY IS IF YOUR

15      HONOR'S PROPOSING TO -- I DON'T KNOW WHETHER THEY'RE GOING TO

16      GO (B)(2), (B)(3), HOW THAT'S GOING TO WORK.

17              THE COURT:  UM-HUM.

18              MR. HOOVER:  BUT TYPICALLY THE WAY MDL'S HAVE WORKED

19      TRADITIONALLY IS THEY DO DISCOVERY AND THEN THEY DECIDE WHAT

20      CLASSES THEY REALLY THINK THEY WANT TO MOVE FOR.

21              THE COURT:  UM-HUM.

22              MR. HOOVER:  AND IF IT'S A (B)(2) OR IT'S A (B)(3),

23      THOSE ARE DONE AT THE SAME TIME SO YOU'RE NOT HEARING FROM

24      EXPERTS AT DIFFERENT TIMES ON INJUNCTIVE VERSUS DAMAGES.

25          THE DIFFICULTY WITH TAKING A CASE ALL THE WAY THROUGH IN

1    TERMS OF BELLWETHER IS IF PART OF WHAT'S GOING THROUGH IS

2    INJUNCTIVE RELIEF, THEN YOU HAVE POTENTIAL SEVENTH AMENDMENT

3    ISSUES IF IT'S NOT BEING TRIED WITH THE (B)(3).

4         THERE'S ALSO THE ISSUE OF WHAT'S TRULY REPRESENTATIVE AND

5    WHAT'S GOING TO HAPPEN TO THE OTHER CASES AND THE MDL OVERALL

6    WHILE THIS IS HAPPENING.

7         I THINK THAT IT'S TEMPTING TO SAY LET'S NARROW IT, LET'S

8    DO A SPECIFIC CASE.

9         WHAT OFTEN HAPPENS THEN IS THE REST OF THE MDL, THE LIFE

10   OF THE MDL IS EXTENDED MUCH LONGER THAN IT WOULD BE IF THE

11   COURT LOOKED AT PLAINTIFFS, "BRING YOUR BEST CLASS CERT

12   ARGUMENTS ACROSS THE BOARD," YOUR EXPERTS ARE GOING TO BE

13   SIMILAR, YOUR EXPERTS ON YOUR MODEL AREN'T GOING TO DIFFER FROM

14   STATE TO STATE, AND THEN YOU'RE NOT FACING A SITUATION WHERE

15   YOU RULE, THE LOSING PARTY TAKES 23(F), WHETHER IT BE

16   PLAINTIFFS OR DEFENDANTS, THE REST OF THE MDL SITS OUT THERE

17   POTENTIALLY FOR A VERY LONG TIME, AND THOSE CASES AREN'T BEING

18   READIED THEN TO GO BACK FOR TRIAL UNDER LEXICON.

19        AND SO I GUESS I THINK A LOT OF JUDGES END UP DECIDING

20   THAT THE BEST WAY TO PROCEED IS SIMPLY TO SET A DEADLINE FOR

21   CLASS CERT, PUT PLAINTIFFS TO THEIR GROUP, GIVE THEM A CAUTION

22   THAT THEY SHOULDN'T BRING EVERY CLASS IN THE WORLD, BRING ME

23   THE CLASSES THAT YOU THINK ARE APPROPRIATE.

24        DO THAT AT ONCE, DO ALL THE EXPERT WORK AT ONCE, AND THEN

25   THERE IS AN ABILITY TO SEND THINGS BACK FROM WHERE THEY CAME AT

```
1    THAT POINT AND THEY WILL ALL BE READY FOR THE JUDGE IN THE

2    OTHER DISTRICT TO TRY THEM IF NECESSARY.

3         SO THAT -- OUR VIEW WOULD BE THAT WE CAN GET IT DONE, THE

4    SAME DISCOVERY IS GOING TO LIKELY APPLY IN ALL OF THESE CASES,

5    AND THE PLAINTIFFS SHOULD JUST BRING WHATEVER CLASSES THEY

6    THINK ARE APPROPRIATE, WE LITIGATE IT, WE GO THROUGH DAUBERT,

7    WE GO THROUGH CLASS CERT.

8         THEN IF THE NINTH CIRCUIT HAS TO LOOK AT IT, THE NINTH

9    CIRCUIT HAS IN FRONT OF IT THE WHOLE PICTURE, NOT JUST A SLICE

10   THAT THEN COULD COME BACK WITH OTHER CASES SITTING OUT THERE

11   INDEFINITELY.

12        SO THAT WOULD BE OUR VIEW, YOUR HONOR.

13            THE COURT:  WELL, YOU JUMPED TO CLASS CERT.  WHAT'S

14   YOUR THINKING ON MOTIONS TO DISMISS?  YOU WANT ME TO SLOG

15   THROUGH 100 CAUSES OF ACTION, 25 STATES, FIVE CAUSES OF ACTION

16   EACH?  125 -- I MEAN, WHAT IS YOUR THOUGHT ON THAT?

17            MR. HOOVER:  I GUESS I DON'T KNOW --

18            THE COURT:  BECAUSE I'M NOT GOING TO DO THAT.  I'M

19   JUST TELLING YOU.

20        (LAUGHTER.)

21            THE COURT:  THAT'S NOT HAPPENING.  SO, I MEAN --

22            MR. HOOVER:  I DON'T KNOW WHAT THE --

23            THE COURT:  YOU KNOW --

24            MR. HOOVER:  FIRST OF ALL, I DON'T KNOW WHAT THE

25   CONSOLIDATED AMENDED COMPLAINT IS GOING TO SAY.
```

```
 1              WE CERTAINLY ARE WILLING TO TRY TO WORK WITH THE COURT TO

 2     COME UP WITH AN EFFICIENT WAY TO LOOK AT THE 12, RULE 12 ISSUES

 3     THAT ARE OUT THERE.  I'M NOT GOING TO ARGUE WITH YOU AND TELL

 4     YOU THAT YOU HAVE TO DO SOMETHING THAT OBVIOUSLY YOU'VE

 5     DETERMINED IT WOULD NOT BE A PRODUCTIVE USE OF YOUR TIME TO DO

 6     IN TERMS OF GOING THROUGH ALL THOSE.

 7              THE COURT:  BUT LET ME INTERRUPT YOU.

 8          WERE YOU THINKING, WHEN YOU WERE SPEAKING ABOUT CLASS

 9     CERT, THAT YOU WOULD WANT EVERYTHING TO GO THROUGH THE MEAT

10     GRINDER OF ONE OR TWO MOTIONS TO DISMISS?

11              MR. HOOVER:  YOUR HONOR, I -- IT'S -- I WAS TALKING

12     ABOUT A CLASS CERT -- I WAS LOOKING AT THE MANAGEMENT, THE

13     OVERALL MANAGEMENT OF THE MDL, FOCUSSING ON CLASS CERT.

14              THE COURT:  OKAY.

15              MR. HOOVER:  SOME CLAIMS WILL COME OUT, SOME CLAIMS

16     MAY WELL SURVIVE, THE ONES THAT SURVIVE WILL GO TO CLASS CERT.

17          I WASN'T ANSWERING WITH THE MOTION TO DISMISS IN MIND WHEN

18     I GAVE THE ANSWER I GAVE.

19              THE COURT:  OKAY.

20              MR. HOOVER:  IT WAS MORE, HERE ARE THE DIFFICULTIES

21     IF YOU PARK A BUNCH OF, YOU KNOW, PROPOSED CLASSES WHILE ONE

22     GOES FORWARD.  THAT'S REALLY WHAT I WAS SPEAKING TO.

23          I WASN'T REALLY SPEAKING AS MUCH TO THE MOTION TO DISMISS,

24     AND I WOULD -- WE WOULD BE WILLING, ONCE THE CONSOLIDATED

25     AMENDED COMPLAINT IS FILED, TO TRY TO FIND AN EFFICIENT WAY TO
```

1    PRESENT THE MOTION TO DISMISS ISSUES.

2              MR. LEVITT:  ADAM LEVITT, YOUR HONOR.

3          GOOD AFTERNOON, YOUR HONOR.  ADAM LEVITT FOR THE ROSS

4     PLAINTIFF.

5          AS I THINK THE ONE LAWYER IN THIS ROOM WHO'S ACTUALLY HAD

6     FIRST-HAND EXPERIENCE WITH YOUR HONOR ON THIS ACTUAL ISSUE IN

7     THE FORD EPAS LITIGATION, I THINK, IF I COULD POSSIBLY SAY ONE

8     THING, IT SEEMS THAT COUNSEL FOR THE DEFENDANT IS TALKING PAST

9     YOUR HONOR.

10         I BELIEVE WHAT YOUR HONOR IS LOOKING FOR -- YOU CAN

11    CORRECT ME IF I'M WRONG -- IS LOOKING FOR A NUMBER OF STATES TO

12    GO FORWARD, NOT A NUMBER OF CLAIMS TO GO FORWARD, BECAUSE IF

13    IT'S A NUMBER OF CLAIMS GOING FORWARD OR A CERTAIN CLASS GOING

14    FORWARD, THAT'S GOING TO FORCE YOUR HONOR TO DEAL WITH THE

15    CLAIMS UNDER EACH STATE'S LAWS.

16         AND I KNOW FROM, AGAIN, THE BACK AND FORTH THAT YOUR HONOR

17    AND I HAVE HAD IN THE EPAS CASE, THAT'S NOT WHAT YOUR HONOR IS

18    LOOKING FOR.

19         WHAT I -- WHAT IT WOULD SEEM LIKE, BECAUSE THE ECONOMIC

20    ISSUES, WHETHER ON THE ANTHEM CASE OR THE BCBSA TRACK, WHICH WE

21    SET FORTH IN OUR PAPERS AND I'M SURE WE'LL BE TALKING ABOUT

22    AFTER, IN EITHER TRACK, WHICH IS SPEAKING ABOUT THE CASE IN

23    GENERAL, OR IN ANY CLASS CASE, THE ECONOMIC EXPERTS ARE GOING

24    TO COME IN THE SAME WHETHER IT'S ONE STATE OR ALL THE STATES.

25    LARGELY THE FACTS ARE GOING TO BE THE SAME.

1          SO IT SEEMS LIKE WHAT WE'RE REALLY TALKING ABOUT HERE IS

2     IF THERE'S A WAY TO CUT DOWN THE NUMBER OF STATES IN QUESTION

3     GOING FORWARD AT FIRST, AND PERHAPS STAYING OR TOLLING THE

4     OTHER STATES SO THAT YOUR HONOR HAS A MANAGEABLE SIZED AND A

5     MANAGEABLE NUMBER OF CLAIMS IN FRONT OF YOUR HONOR IN THE FIRST

6     INSTANCE, AND YOU AREN'T GOING THROUGH 100 CLAIMS AND 30 STATES

7     OR WHATEVER IT IS.

8          SO I JUST THOUGHT IT WAS WORTH STANDING UP AND JUST

9     SPEAKING, HAVING EXPERIENCE WITH YOUR HONOR, AS TO WHAT I THINK

10    THE ANSWER YOUR HONOR IS LOOKING FOR IS TO FIGURE OUT A WAY TO

11    HAVE A SMALLER NUMBER OF STATES, STAYING OR TOLLING EVERYTHING

12    ELSE, BECAUSE AS YOUR HONOR HAS PREVIOUSLY POINTED OUT, ONCE

13    CLASS CERTIFICATION IS RULED ON ON THE FUNDAMENTAL ECONOMICS,

14    SO TO SPEAK, THE FUNDAMENTAL FACTS ON EITHER TRACK OR ANYTHING

15    ELSE, IT'S GOING TO LARGELY INFORM WHAT HAPPENS IN THE REST OF

16    THE CASES, THE OTHER STATES, SO TO SPEAK.

17         SO FOR THAT REASON, I THINK IT MAKES ALL THE SENSE IN THE

18    WORLD TO TRY TO FIGURE OUT A WAY TO PICK A SMALL NUMBER OF

19    BELLWETHER STATES AND TAKE THOSE THROUGH, STAYING ALL THE OTHER

20    ONES, BECAUSE I THINK THAT IS CONSISTENT WITH WHAT YOUR HONOR

21    IS LOOKING FOR.

22         AND IF IT'S NOT WHAT YOUR HONOR IS LOOKING FOR, I

23    APOLOGIZE.

24              THE COURT:  NO, NO.  THAT'S HELPFUL.  BUT I -- OKAY.

25    LET'S JUST ASSUME THERE'S A BREACH OF CONTRACT CLAIM, IMPLIED

1    AND/OR EXPRESS.  LET'S ASSUME THERE'S A NEGLIGENCE CLAIM, OKAY?

2    LET'S ASSUME THERE IS SOME DATA PRIVACY UNDER STATE LAW CLAIM,

3    OKAY, SO IT'S A DATA BREACH CLAIM.

4        WHAT ELSE DO YOU THINK THERE'S LIKELY TO BE?  SOME TYPE OF

5    UCL EQUIVALENT?

6            MR. FRIEDMAN:  RIGHT.  CORRECT.

7            THE COURT:  WHAT ELSE IS THERE GOING TO BE?  UNJUST

8    ENRICHMENT?  I KNOW THERE'S A LOT OF LAW ON WHETHER THAT'S A

9    SEPARATE CAUSE OF ACTION OR NOT.  BUT WHAT ELSE?  BREACH OF

10   CONTRACT, IMPLIED AND EXPRESS; I THINK NEGLIGENCE; I THINK SOME

11   KIND OF DATA BREACH, LACK OF PRIVACY --

12           MR. FRIEDMAN:  SOME KIND OF STATUTORY THING.

13           THE COURT:  -- SOME KIND OF STATE STATUTORY THING.

14   WHAT ELSE?  SOME KIND OF UNFAIR COMPETITION?

15           MR. FRIEDMAN:  RIGHT, AN OFFSHOOT OF A UCL CLAIM.

16           THE COURT:  OKAY.  I ASSUME THOSE FIVE, RIGHT?  WHY

17   DON'T YOU PICK WHATEVER STATE YOU THINK HAS THE VERY BEST

18   BREACH OF CONTRACT LAW FOR YOU, LET'S LITIGATE THAT ONE.

19   LET'S -- YOU KNOW, PROBABLY UCL IS PROBABLY YOUR STRONGEST

20   CLAIM ON THAT ISSUE, THEN BRING A CALIFORNIA UCL CLAIM.  BRING

21   WHATEVER YOU THINK IS THE BEST NEGLIGENCE CLAIM FOR YOU.

22       I MEAN, I JUST DON'T -- YOU KNOW, THIS IS NOT ONE WHERE WE

23   HAVE A PERSONAL INJURY CLASS, AN ECONOMIC DAMAGES CLASS.  THIS

24   IS A LITTLE BIT MORE LIMITED IN SCOPE.  I FEEL LIKE THERE ARE

25   FIVE OR SIX CLAIMS HERE THAT WE ALL THINK ARE USUAL SUSPECTS IN

```
1    THIS KIND OF CASE, SO WHY CAN'T WE JUST GO TO THE MAT ON THOSE
2    AND IF YOU DON'T SETTLE OR YOU DON'T WHATEVER, THEN WE CAN
3    DECIDE WHETHER WE WANT TO GO BACK AND NOW HIT THE OTHER 49
4    NEGLIGENT STATES, NEGLIGENCE LAWS, WHICH I'M NOT GOING TO DO.
5         SO I DON'T KNOW -- I DON'T HAVE GOOD ADVICE.  BUT I MIGHT
6    BE WILLING TO DO A MORE NARROW SECOND SET IF THAT BECAME
7    NECESSARY.  BUT I'M NOT GOING TO SLOG THROUGH 25 STATES' LAWS
8    ON SIX DIFFERENT CAUSES OF ACTION.
9         I THINK IT'S NOT GOOD FOR YOU, EITHER, BECAUSE THIS CASE
10   WILL GET TOTALLY BOGGED DOWN.
11        SO IF YOU WANT A FAST, CLEAN, STREAMLINED CASE, TELL ME,
12   HOW DO WE IDENTIFY WHAT THAT IS?
13        MR. FRIEDMAN:  YOUR HONOR, I AGREE WITH YOUR, YOUR
14   IMPRESSIONS ABOUT EFFICIENCY AND I THINK THAT'S THE WAY TO GO
15   AND THAT'S THE WAY THE MDL'S ARE GOING NOW.
16        THE LUMBER LIQUIDATORS CASE, FOR EXAMPLE, IS DOING EXACTLY
17   WHAT YOUR HONOR JUST PROPOSED, WITH ONE CAVEAT, AND THAT IS
18   YOU'RE PICKING FOUR TO SIX CLAIMS, BUT NARROWING IT TO FOUR OR
19   FIVE STATES.
20        THE COURT:  TAKE YOUR BEST SHOT.
21        MR. FRIEDMAN:  BUT FOUR OR FIVE STATES, BECAUSE STATE
22   LAWS DO DIFFER, AND THAT WOULD EASE THE BURDEN ON YOUR HONOR,
23   IT WOULD EASE THE BURDEN ON ALL THE LITIGANTS, ALL THE OTHER
24   CASES WOULD BE STAYED, AND IN THE MEANTIME, YOU COULD CARVE
25   THROUGH THE LIABILITY ISSUES AND THE CLASS CERTIFICATION
```

```
 1      ISSUES.
 2              THE COURT:  WAIT.  BUT YOU'RE SAYING FOUR OR FIVE
 3      STATE LAWS FOR EACH OF THESE CAUSES OF ACTION?  SO IT'S --
 4              MR. FRIEDMAN:  FOUR OR FIVE STATES.
 5              THE COURT:  SO IT'S, LIKE, 25 CAUSES OF ACTION.  I
 6      JUST WILL NOT BE ABLE TO HANDLE THAT ON A MOTION TO DISMISS.  I
 7      LIKE TO TRY TO GET MY ORDERS OUT PRETTY QUICKLY AND THAT'S NOT
 8      MANAGEABLE.  I CAN'T DO A 25 CAUSE OF ACTION MOTION TO DISMISS.
 9      IT'S JUST NOT GOING TO HAPPEN.
10              MR. FRIEDMAN:  IT WOULD BE ONE MOTION TO DISMISS, AND
11      IT'S DONE QUITE OFTEN WHERE, YOU KNOW, SOME OF THEM ARE SORT OF
12      PIGGYBACKED ON OTHERS SO WHAT YOU DECIDE IN ONE STATE MAY LOOK
13      THE SAME ON THE NEGLIGENT CLAIM, IT MAY LOOK A LITTLE DIFFERENT
14      ON THE UCL CLAIM.  SO IT'S NOT GOING TO BE 25 SEPARATE --
15              THE COURT:  WELL, IF IT'S ALL THE SAME, THEN YOU
16      DON'T NEED A SEPARATE RULING.  YOU CAN EXTRAPOLATE FROM MY ONE
17      RULING HOW IT'S GOING TO PLAY OUT UNDER OTHER STATES' LAWS.
18              MR. FRIEDMAN:  AND YET IN SOME STATES, NEGLIGENCE MAY
19      BE A HURDLE.  THERE MAY BE CERTAIN DEFENSES TO THAT.  THERE'S A
20      STATUTORY CLAIM, A UDAP CLAIM WOULD BE BETTER SERVED FOR THE
21      CLASS.
22              THE COURT:  WELL, OKAY.  I WILL JUST TELL YOU THEN,
23      IF THIS IS GOING TO BE A MONSTER CASE, I'M NOT GOING TO TRACK
24      IT AS FAST AS I SUGGESTED.
25          BUT --
```

1          MR. FRIEDMAN:  I AGREE WITH YOU, YOUR HONOR, AND I

2      THINK THAT'S THE WAY THE MDL COURTS ARE NOW DOING THEM.

3      THEY'RE FOCUSSING ON A SMALLER SET, A BELLWETHER SET OF CASES,

4      AND THOSE CASES WOULD BE, INSTEAD OF 25 STATES OR 30 STATES, OR

5      IN SOME CASES YOU'LL SEE 50 STATES, YOU NARROW IT DOWN TO A

6      DOABLE BUNCH, WHICH IS MAYBE FOUR OR FIVE STATES AND WHATEVER

7      THE CLAIMS ARE WITHIN EACH.

8          AND THERE MAY NOT BE FIVE CLAIMS IN EACH.  THERE MAY BE

9      ONLY TWO CAUSES OF ACTION IN EACH.  SO YOU'RE NOT TALKING ABOUT

10      AN INORDINATE NUMBER OF CLAIMS.

11          MR. ESADES:  YOUR HONOR, THAT ALLEVIATES -- IF THAT'S

12      THE PLAN, THAT ALLEVIATES MY CONCERN ABOUT THE 30 DAYS.

13          MR. HOOVER:  YOUR HONOR, I'D LIKE TO BE HEARD ON THIS

14      BECAUSE I THINK WHAT WE'RE TRYING TO DO IS DECIDE HOW TO MANAGE

15      THE CASE BEFORE WE'VE SEEN WHAT THE CASE LOOKS LIKE IN TERMS OF

16      THE CONSOLIDATED AMENDED COMPLAINT.

17          THIS IS TOO IMPORTANT OF A CASE AND AN MDL TO MAKE A

18      DECISION NOW ABOUT SLICING AND DICING HOW THIS IS GOING TO

19      WORK.  YOU KNOW, WHAT I WOULD PROPOSE IS THAT WE GET THE

20      COMPLAINT WITHIN 30 DAYS AND EACH SIDE CAN MAKE A -- SUBMIT

21      SOMETHING TO YOU IN TERMS OF HOW THEY THINK IT SHOULD BE

22      HANDLED.

23          IT'S EASY TO SAY, WELL, LET'S TAKE A COUPLE STATES HERE

24      AND LET'S DO THAT.

25          WELL, TAKING A STATE IS TAKING CLAIMS AND CLAIMS ARE WHAT

1    CLASSES ARE CERTIFIED AROUND, AND THERE ARE COURTS THAT HAVE TO

2    GO THROUGH VARIOUS STATE LAWS AS PART OF AN MDL AND THAT'S WHY

3    MDL'S TEND TO TAKE A LITTLE BIT LONGER THAN A BASIC CASE.

4        BUT THAT'S THE PROCESS OF READYING THESE VARIOUS CASES TO

5    GO BACK FOR TRIAL IF THERE IS NO SETTLEMENT OR THERE IS NO

6    MOTION TO DISMISS GRANTED.

7            THE COURT:  UM-HUM.

8            MR. HOOVER:  OR IF THERE IS NO DENIAL OF CLASS CERT.

9        THERE ARE VARIOUS STATIONS ALONG THE WAY WHERE THE CASE

10   DOES GET NATURALLY NARROWED AND IF, FOR EXAMPLE, YOUR HONOR

11   ISSUES A MOTION TO DISMISS RULING, PLAINTIFFS WILL LOOK AT THAT

12   AND SAY, WELL, "OUR AMENDED COMPLAINT SHOULDN'T BRING BACK

13   THESE CLAIMS IN THESE STATES WHERE YOUR HONOR HAS RULED THAT

14   THEY SHOULDN'T BE BROUGHT."

15       SO I THINK -- I THINK TRYING TO DECIDE THINGS TODAY,

16   BEFORE WE'VE SEEN WHAT THE PLAINTIFFS BRING, ACTUALLY BRING IN

17   TERMS OF CLAIMS IS DOING IT WITHOUT FULL INFORMATION.

18       AND WE'RE GOING TO SEE THOSE WITHIN, I'M GUESSING, A

19   FAIRLY SHORT TIME.  IF YOUR HONOR RULES ON LEAD COUNSEL IN THE

20   NEXT FEW WEEKS, WITHIN 30 DAYS, WE'LL GET A CONSOLIDATED

21   AMENDED COMPLAINT, AND AT THAT POINT YOU CAN SEE WHAT'S IN

22   FRONT OF YOU AND WHAT'S NOT IN FRONT OF YOU.

23           THE COURT:  WELL, THE NEXT QUESTION I WAS GOING TO

24   ASK IS TIMING, SO -- AND HOW DO YOU WANT TO HAVE IT SELECTED?

25   DO WE JUST GIVE A NUMERICAL LIMIT TO THE PLAINTIFFS AND THEN

1       THEY GET TO PICK THEIR BEST TEN?  DO DEFENDANTS WANT TO PICK

2       ONE OR TWO YOURSELVES?  WHAT'S THE PROCESS?

3            I MEAN, I AGREE THAT THIS DOESN'T HAVE TO BE DECIDED

4       TODAY, BUT I STILL THINK IT'S HELPFUL TO THINK ABOUT IT AND

5       START THE DISCUSSION.

6            MR. HOOVER:  I THINK IT'S HELPFUL TO DO THAT AS WELL,

7       AND WE WILL HAVE THAT DISCUSSION.

8            AND I THINK THE -- THE DIFFICULTY WITH TRYING TO SAY,

9       OKAY, WHAT'S A REPRESENTATIVE CASE IS YOU'VE GOT THESE OTHER

10      CASES OUT THERE AND PEOPLE OFTEN SAY, "WELL, THAT WAS YOUR

11      CASE, NOT MY CASE.  I WANT TO PURSUE MY CASE."

12           AND SO THEN THE DEFENDANT IS IN A POSITION OF WE GO ALL

13      THE WAY THROUGH ALL THIS EXPERT ANALYSIS, WE DO ALL -- IT'S A

14      TREMENDOUS EXPENSE ON BOTH SIDES TO DO THIS, AND THEN THERE IS

15      THREE-QUARTERS OF THE CASE SITTING OUT THERE AND YOU'VE GOT TO

16      DO IT AGAIN.

17           AND THAT'S -- YOU KNOW, THAT IS THE DIFFICULTY WITH TRYING

18      TO DESIGN SOMETHING BEFORE WE CAN SEE REALLY WHAT'S THERE.

19           SO I WOULD BE -- WE WOULD BE PREPARED TO SUBMIT BRIEFS TO

20      YOUR HONOR ON THIS ISSUE ONCE THE CONSOLIDATED AMENDED

21      COMPLAINT HAS BEEN FILED, TO COME BACK AND TALK WITH YOU ABOUT

22      IT, AND WE WILL TAKE YOUR DIRECTIVE AND BEGIN THINKING ABOUT

23      THIS.

24           MR. LEVITT:  ONE MORE SUGGESTION, YOUR HONOR?

25      ADAM LEVITT ONCE AGAIN.

1    AGAIN, IT SOUNDS LIKE WHAT MR. HOOVER IS PROPOSING ISN'T

2    GETTING WHERE YOUR HONOR WANTS TO ACTUALLY GO, BECAUSE WHAT

3    MR. HOOVER, WHO IS SPEAKING ON BEHALF OF ALL THE DEFENDANTS,

4    BOTH THE ANTHEM DEFENDANTS AND THE NON-ANTHEM ONES, IS

5    PROPOSING THE EXACT FORM OF COMPLAINT THAT MR. ESADES HAS SAID

6    WOULD BE A PROBLEM SIGNING UP -- GOING THROUGH THE APPROPRIATE

7    PLAINTIFFS FOR IN 30 DAYS.

8    MOREOVER, IT WILL HAVE YOUR HONOR FACING ONE OR MORE

9    300-PAGE COMPLAINTS WITH HUNDREDS OF CLAIMS, WHICH I KNOW IS

10   WHAT YOUR HONOR DOESN'T WANT.

11   SO IF THE ISSUE IS SIMPLY TRYING TO, AGAIN, DRILL DOWN TO

12   ONE, TWO, THREE POSSIBLE BELLWETHER STATES, WHICH IS A SMALLER

13   NUMBER OF CLAIMS, TO ACTUALLY ANSWER YOUR HONOR'S QUESTION TO

14   MR. HOOVER HOW THAT WOULD WORK, I'D PROPOSE THAT IT WOULD BE A

15   THREE STATE PROPOSAL, ONE OF THEM IS CALIFORNIA BECAUSE WE'RE

16   HERE; THAT PLAINTIFFS' LEADERSHIP PICKS ONE STATE; AND THEN

17   DEFENDANTS PICK ONE STATE, WHICH IS ACTUALLY EXACTLY WHAT WE'RE

18   DOING IN ANOTHER CASE RIGHT NOW IN JUDGE SEEBORG'S COURTROOM IN

19   SAN FRANCISCO, AND THAT ACTUALLY STREAMLINED THE CLASS PROCESS.

20   AND ALL OF THE ISSUES AT PLAY CERTAINLY, AGAIN, WITH

21   RESPECT TO THE UNDERLYING FACTS AND THE ECONOMICS AND OTHER

22   EXPERTS ARE ALL GOING TO BE WRAPPED UP IN THE BELLWETHER

23   PROCESS.

24   AND THEN AFTER THAT, IT WILL INFORM EVERYTHING ELSE.

25   BUT I THINK THE ONE THING THAT ISN'T BEING SAID RIGHT NOW,

1    YOUR HONOR, IS IF THE DEFENDANTS ARE PREPARED TO AGREE TO STAY

2    OR TOLL THE OTHER 47 STATES' CLAIMS IN THEIR ENTIRETY, SO

3    THERE'S NO WORRY ABOUT ARE THERE ANY CLAIMS OUT THERE THAT ARE

4    AT RISK OF A STATUTE RUNNING OR ANYTHING ELSE, I THINK THAT'S

5    ONE OF THE OPERATIVE THINGS HERE, YOUR HONOR.

6        AND I THINK IF WE CAN GET EITHER YOUR HONOR'S ORDER ON

7    THAT OR THE DEFENDANTS' STIPULATION ON THAT, IT WOULD ACTUALLY

8    STREAMLINE EVERYTHING AND I THINK WE GET YOUR HONOR EXACTLY

9    WHAT YOU WANT.

10       THE COURT:  OKAY.

11       MR. FRIEDMAN:  YOUR HONOR, I'D HAVE TO AGREE WITH

12   PART OF THAT, WHICH IS THAT'S PRECISELY WHAT A BELLWETHER DOES.

13   WHEN YOU DO A BELLWETHER, YOU BASICALLY CUT THROUGH ALL THIS

14   AND YOU DON'T HAVE 50 STATES.  YOU DON'T HAVE TO DO THAT AMOUNT

15   OF WORK AND THAT WON'T BE THAT AMOUNT OF WORK FOR YOUR HONOR.

16       BUT AT THE SAME TIME, YOU COULD PICK, OR WE COULD PICK, A

17   FEW STATES, BRING THE CAUSES OF ACTION UNDER THERE AND GO

18   FORWARD ON THOSE, TOLL THE OTHER CLAIMS, AND THEN WHAT

19   MR. HOOVER'S PROPOSING IS FOR US TO GO THROUGH THE -- IT'S

20   ALMOST A WASTE OF TIME TO COME THROUGH WITH A CONSOLIDATED

21   AMENDED COMPLAINT BASED ON PERHAPS 30, 35, 40, 50 STATES ONLY

22   TO LIE FALLOW.

23       IT'S NOT GOING TO BE DONE THAT WAY.  WE HEAR YOUR HONOR

24   LOUD AND CLEAR.  THAT'S PRECISELY WHAT THE BELLWETHER IS ALL

25   ABOUT AND I THINK IT'S A TERRIFIC IDEA AND I THINK IT'S A WAY

1    TO STREAMLINE THE CASE.

2              MR. HOOVER:  YOUR HONOR, I DIDN'T HEAR YOU SAYING YOU

3    DON'T WANT A CONSOLIDATED AMENDED COMPLAINT.  THIS ISN'T A

4    PROPER MDL IF THERE'S NOT A CONSOLIDATED AMENDED COMPLAINT THAT

5    SHOWS WHAT THE UNIVERSE OF CLAIMS ARE OUT THERE.

6         WE'VE GOT 118 CASES.  I HAVEN'T BEEN IN AN MDL WHERE

7    THERE'S NOT A CONSOLIDATED AMENDED COMPLAINT FILED.  THAT WOULD

8    NOT BE EXERCISING THE DISCRETION THAT'S EXERCISED IN MDL.

9              ONCE -- WHEN THERE'S A CONSOLIDATED AMENDED COMPLAINT, WE

10   THEN KNOW WHAT THE UNIVERSE IS, HOW MANY STATES ARE WE TALKING

11   ABOUT WHERE THERE ARE CLAIMS?

12        I MEAN, THE NOTION OF BELLWETHERING THIS BEFORE THERE'S

13   EVEN A COMPLAINT THAT INCORPORATES ALL THE ALLEGATIONS AGAINST

14   THE DEFENDANTS IS -- I CERTAINLY THINK IT WOULD BE ABSOLUTELY

15   THE WRONG WAY TO GO.

16             MR. FRIEDMAN:  AND, YOUR HONOR, I'D BE HAPPY TO SHOW

17   YOU THE PAPERS -- I DON'T HAVE THEM WITH ME -- BUT THAT'S

18   PRECISELY WHAT WE'RE DOING IN LUMBER LIQUIDATORS.  THE JUDGE

19   DIDN'T WANT TO HEAR 50 STATES AND, BELIEVE ME, THERE WERE 50

20   STATES' PLAINTIFFS LINED UP TO GO.

21        BUT THE JUDGE SAID EXACTLY WHAT YOU'RE SAYING.  WHY DO I

22   HAVE TO GO THROUGH THAT?  WHY DON'T YOU PICK YOUR BEST?  TAKE

23   YOUR BEST SHOT, AS YOU SAID.

24        AND SO THE JUDGE CHOSE, OR ALLOWED US TO CHOOSE, I BELIEVE

25   IT WAS FIVE STATES, BROUGHT THE CLAIMS THERE, AND THERE ARE

```
1     FIVE -- EITHER ONE CONSOLIDATED COMPLAINT WITH FIVE STATES OR

2     FIVE INDIVIDUAL COMPLAINTS.  IT DOESN'T MATTER.  THAT'S WHAT

3     THE BELLWETHER IS ALL ABOUT.

4          THE COURT:  OKAY.  WELL, I THINK I AGREE WITH

5     MR. HOOVER ON THE CONSOLIDATED AMENDED COMPLAINT.  I THINK IT

6     SHOULD INCLUDE EVERYTHING, AND I THINK THAT WILL ALSO LIMIT THE

7     FILING OF ANY ADDITIONAL CASES OR FURTHER LITIGATION IN OTHER

8     CASES.  IF IT'S GLOBAL AND NATIONAL, THIS WILL THEN DO WHAT AN

9     MDL IS SUPPOSED TO DO.

10         NOW, I DO LIKE MR. LEVITT'S SUGGESTION THAT LET'S JUST GO

11    ON THREE STATES.  CALIFORNIA HAS VERY PRO CONSUMER LAWS,

12    PERHAPS THE MOST PRO CONSUMER LAWS IN THE STATES, SO I'M

13    ASSUMING YOU'RE GOING TO WANT CALIFORNIA.

14         MR. FRIEDMAN:  YES, YOUR HONOR.

15         THE COURT:  SO THEN LET PLAINTIFFS PICK ONE AND LET

16    THE DEFENDANTS PICK ONE, AND IF YOU DON'T WANT TO PICK ONE,

17    I'LL LET THE PLAINTIFFS PICK TWO.

18         (LAUGHTER.)

19         MR. HOOVER:  YOUR HONOR, WE'D LIKE THE OPPORTUNITY TO

20    SUBMIT SOME, SOME -- WE'D LIKE TO SUBMIT A BRIEF ON HOW THIS

21    SHOULD PROCEED OR NOT PROCEED, AND I'D LIKE TO KNOW HOW

22    PLAINTIFFS ARE PROPOSING IT WOULD PROCEED.

23         AGAIN, THIS -- WE NEED TO SEE A CONSOLIDATED AMENDED

24    COMPLAINT AND THEN WE CAN GO FROM THERE IN TERMS OF HOW THE

25    CASE PROCEEDS.
```

```
 1          BUT THE DIFFICULTY WITH LEAVING 99-100THS OF THE CASE OUT
 2    THERE INDEFINITELY IS THAT --
 3              THE COURT:  I MEAN, IT'S NOT LIKELY THAT WE'RE GOING
 4    TO SLOG THROUGH 99 PERCENT OF THE CASE, RIGHT?  AT SOME POINT
 5    YOU ALL ARE GOING TO GET A GLOBAL RESOLUTION AND IT'LL ALL BE
 6    DONE AND WE WILL NOT HAVE TO GO THROUGH THE OTHER 22 STATES'
 7    CAUSES OF ACTION.  I'M JUST NOT PERSUADED.
 8              MR. HOOVER:  YOUR HONOR, I'D LIKE AN OPPORTUNITY
 9    TO -- I'D LIKE AN OPPORTUNITY TO BRIEF THAT IF YOUR HONOR WOULD
10    CONSIDER THAT.
11          AGAIN, UNTIL WE GET THE COMPLAINT, I MEAN, WE ARE -- WE
12    HAVE A COMPLAINT THAT'S COMING, WE HAVE DISCOVERY THAT'S
13    STARTING, ALL THAT IS HAPPENING.  WE DON'T HAVE TO DECIDE TODAY
14    WHAT STATES BEFORE WE'VE EVEN SEEN --
15              THE COURT:  OH, I'M NOT ASKING ANYONE TO DECIDE WHAT
16    STATES.  BUT I LIKE THE STRUCTURE OF HAVING CALIFORNIA CLAIMS
17    GO FORWARD, LET THE PLAINTIFFS PICK ANOTHER STATE AND LET THE
18    DEFENDANTS PICK ANOTHER STATE.
19          I MEAN, I'M PROBABLY GOING TO REGRET THIS BECAUSE I COULD
20    END UP WITH 15 CAUSES OF ACTION, SO I MIGHT EVEN LIMIT IT
21    FURTHER.  MAYBE LIMIT IT TO THREE STATES, PLUS A TOTAL OF -- I
22    DON'T KNOW -- MAYBE THREE CAUSES OF ACTION, SO A TOTAL OF NINE
23    CAUSES OF ACTION.  EVEN THAT'S A LOT.  TO DO CLASS
24    CERTIFICATION ON NINE CAUSES OF ACTION IS GOING TO BE A LOT OF
25    WORK, SO I MAY LIMIT IT EVEN FURTHER.
```

```
1         BUT I'M OKAY WITH HAVING A FUNNEL AND HAVING IT BE A

2    LITTLE BIT BIGGER NOW AND THEN, AS YOU GET DISCOVERY, NARROWING

3    IT AS WE GO.

4         WHAT'S YOUR PROPOSAL AS TO WHEN WE SHOULD NARROW IT?

5         NOW, IF THIS WERE A PATENT CASE, I'D HAVE VERY, VERY

6    CERTAIN VIEWS ON WHEN I WOULD WANT TO NARROW IT.

7         I MEAN, CERTAINLY BEFORE CLASS CERT, I WANT IT NARROWED.

8         MAYBE WHAT WE'LL DO IS WE'LL HAVE A NARROWING AFTER THE

9    FIRST MOTION TO DISMISS; AFTER THE SECOND MOTION TO DISMISS

10   BEFORE THE CLOSE OF FACT DISCOVERY; AFTER THE CLOSE OF FACT

11   DISCOVERY; AND BEFORE CLASS CERTIFICATION AND DAUBERT MOTIONS.

12        ANYONE HAVE ANY THOUGHTS ON WHEN WE DO THE NARROWING?  I

13   MIGHT BE WILLING TO START OFF WITH 15 CLAIMS, BUT THEN WHAT IS

14   GOING TO GO TO CLASS CERT IS GOING TO BE NO MORE THAN FOUR

15   CLAIMS.

16             MR. FRIEDMAN:  BUT, YOUR HONOR, THEN WE'RE -- I DON'T

17   MEAN TO BEAT A DEAD HORSE ON THIS, BUT WE'RE GOING BACK TO THE

18   SAME ISSUE IF WE'RE NARROWING THIS, FUNNELING THIS, AND WE'RE

19   GOING TO HAVE A COMPLAINT WHICH HAS, YOU KNOW, PERHAPS 150

20   CLAIMS.

21             THE COURT:  RIGHT.

22             MR. FRIEDMAN:  TO WHAT END?  TO WHAT END?

23        SO THEN WE FUNNEL IT DOWN TO THREE AND WE ONLY HEAR A

24   MOTION TO DISMISS ON THREE OF THOSE.  I'M NOT SURE WHAT THE

25   PRACTICAL REALITY OF THAT IS, WHAT THE PRACTICAL EFFECT IS.  SO
```

1    THAT THE DEFENDANTS KNOW THAT THEY'RE BEING SUED IN 30 STATES?

2    THEY ALREADY KNOW THAT AND ALL YOUR HONOR HAS TO DO IS TOLL

3    THOSE CLAIMS AND THAT TAKES CARE OF IT.

4         THE COURT:  IT'LL BE TOLLED ANYWAY.  IT'S IN PENDING

5    LITIGATION.

6      I GUESS I DON'T UNDERSTAND WHAT YOU'RE SAYING.  IF YOU DO

7    AN OMNIBUS CONSOLIDATED AMENDED COMPLAINT, ALL OF THE CLAIMS IN

8    THAT COMPLAINT WILL BE TOLLED AS LONG AS THIS LAWSUIT IS

9    PENDING, SO I GUESS I DON'T UNDERSTAND WHAT YOU'RE STAYING.

10   THE STATUTE OF LIMITATIONS IS GOING TO RUN ON PENDING CLAIMS

11   THAT ARE PENDING IN FEDERAL COURT?  I MEAN, I'M NOT PERSUADED

12   BY THAT AT ALL.

13        MR. FRIEDMAN:  WELL, THE TOLLING WOULD COME INTO

14   EFFECT IF YOUR HONOR PERMITTED US TO JUST BRING THE TWO OR

15   THREE OR FOUR COMPLAINTS, OR STATES.

16        THE COURT:  RIGHT.  NO, IT NEEDS TO BE A CONSOLIDATED

17   AMENDED COMPLAINT.  THIS IS HERE AS AN MDL FOR A REASON.  IT

18   NEEDS TO BE A GLOBAL COMPLAINT.  BUT --

19        MR. FRIEDMAN:  BUT THEN YOU'RE ENVISIONING AT SOME

20   POINT, EVEN THOUGH WE HAVE A COMPLAINT ON 35 STATES, THAT THE

21   DEFENDANTS WOULD MOVE --

22        THE COURT:  MAYBE THREE STATES.

23        MR. FRIEDMAN:  THE DEFENDANTS WOULD MOVE TO

24   DISMISS --

25        THE COURT:  ON THREE STATES.  MOVE TO DISMISS ON

```
1        THREE STATES.

2             AND THEN WE'LL KEEP FUNNELING IT SO THAT IT'S A MORE AND

3        MORE MANAGEABLE.  AS WE GET DEEPER INTO THE LITIGATION, WE'LL

4        GET MORE AND MORE FOCUSSED.  OKAY?

5             SO WHAT SHOULD WE DO THEN?  SHOULD WE HAVE ANOTHER CMC

6        AFTER YOU FILE THE CONSOLIDATED AMENDED COMPLAINT?  I MEAN, I'M

7        LEANING TOWARDS THE THREE STATE LAWS, I'M LEANING TOWARDS

8        CALIFORNIA PLUS PLAINTIFFS PICKS ONE PLUS DEFENDANTS PICK ONE.

9             MR. HOOVER:  YOUR HONOR, CALIFORNIA WAS THE

10       PLAINTIFFS' PICK.  THAT'S TAKING WHAT WOULD BE THEIR PICK.

11       JUST SO IT'S CLEAR, THAT WOULD BE THEIR FIRST CHOICE.

12            THE COURT:  WHAT WOULD BE THEIR SECOND?  WHAT'S THE

13       SECOND CHOICE?

14            MR. FRIEDMAN:  WE'D HAVE TO GET BACK TO YOU, YOUR

15       HONOR.

16            THE COURT:  WHAT'S YOUR VIEW?  WHAT'S THE SECOND BEST

17       AFTER CALIFORNIA?

18            MR. HOOVER:  YOUR HONOR, I WOULD REALLY LIKE TO SEE

19       THE CLAIMS.  I'D LIKE TO SEE THE CONSOLIDATED AMENDED

20       COMPLAINT.  IT MAY LOOK -- I'VE BEEN IN MDL'S WHERE A

21       CONSOLIDATED AMENDED COMPLAINT COMES IN AND YOU WOULDN'T

22       RECOGNIZE SOME OF THE CLAIMS THAT WERE IN THE HUNDREDS OF

23       COMPLAINTS THAT WERE FILED.

24            SO I THINK WE SHOULD HAVE THE COMPLAINT COME IN AND THEN

25       WE KNOW WHAT WE'RE DEALING WITH.  THEY WILL BE IN A POSITION TO
```

```
 1    TELL YOU WHAT THEIR PREFERENCES ARE.

 2          IF YOUR HONOR IS GOING TO ORDER THIS PROCEDURE, EVEN

 3    THOUGH WE DON'T AGREE WITH IT, WE WOULD OBVIOUSLY HAVE OUR VIEW

 4    ON WHAT STATE OR STATES WE WOULD WANT TO GO DOWN, WHICH ARE

 5    REALLY EQUIVALENT OF CLAIMS WHEN YOU COME DOWN TO IT.

 6          THE COURT:  UM-HUM.

 7          MR. HOOVER:  AND, YOU KNOW, IF THEY ARE SEEKING A

 8    NATIONAL CLASS OF SOME KIND, ONE OF THE ISSUES THAT ALWAYS

 9    COMES UP IN THAT SITUATION IS THE DIFFERENCES IN STATE LAWS.

10    THAT'S AN ISSUE THAT COMES UP ON CLASS CERTIFICATION FROM

11    BRIDGESTONE/FIRESTONE ON DOWN.

12          AND SO IT -- THE PROCEDURE THAT WE'RE TALKING ABOUT DOING

13    HERE, I THINK WE SHOULD ALL GIVE SOME THOUGHT TO WHAT

14    PROCEDURAL PROTECTIONS ON EITHER SIDE ARE IMPLICATED BY JUST

15    PICKING ONE STATE OR TWO STATES OR THREE STATES AND ESSENTIALLY

16    PUTTING ALL THE OTHERS IN ABEYANCE.

17          AND THERE'S CASE LAW OUT THERE, THERE ARE PRIOR

18    EXPERIENCES OUT THERE, AND I THINK THAT WE WOULD BE PREPARED TO

19    GIVE YOU OUR VIEWS ON THESE ISSUES, YOUR HONOR.

20          AND I DON'T THINK WE NEED TO PICK STATES NOW BEFORE WE'VE

21    EVEN SEEN WHAT CLAIMS UNDER THOSE STATE LAWS THEY'RE BRINGING.

22          THE COURT:  ALL RIGHT.  WELL, I'D LIKE TO THINK ABOUT

23    THIS FURTHER, BUT MY CURRENT THINKING IS THAT THE MOTION TO

24    DISMISS WOULD BE ON TEN CAUSES OF ACTION, AND BY THE TIME WE

25    GET TO CLASS CERT, ONLY THREE CAUSES OF ACTION ARE GOING TO BE
```

```
 1        GOING THROUGH CLASS CERT AND DAUBERT MOTIONS.  AND I MIGHT EVEN

 2        LIMIT THIS FURTHER JUST BECAUSE IT'S -- IT'S TOO MUCH.  PICK

 3        YOUR BEST CASE.  TAKE YOUR BEST SHOT AND LET'S SEE HOW WE GO.

 4        OKAY?  SO THAT'S MY CURRENT THINKING.

 5             BUT I ALSO WOULD LIKE TO SEE THE CONSOLIDATED AMENDED

 6        COMPLAINT AS WELL.

 7                  MR. HOOVER:  YOUR HONOR, I THINK YOUR SUGGESTION OF

 8        GETTING BACK TOGETHER ONCE THAT'S BEEN FILED IS A GOOD ONE.

 9                  THE COURT:  OKAY.  WELL, THIS IS WHAT I WAS GOING TO

10        PROPOSE.  DID I GIVE YOU -- OH, 14 DAYS AFTER.  OKAY.

11             SO I'M GOING TO ADOPT THE PARTIES' PROPOSAL TO FILE A

12        CONSOLIDATED AMENDED COMPLAINT ON OCTOBER 19.

13             YOU CAN'T EXCHANGE INITIAL DISCLOSURES BY OCTOBER 26TH,

14        SEVEN DAYS LATER?

15                  MS. CERVANTEZ:  YOUR HONOR, IT WOULD REQUIRE ALL OF

16        THE INITIAL DISCLOSURES OF ALL OF THE PLAINTIFFS.

17                  THE COURT:  OKAY.  THAT'S FINE.  I'LL ADOPT YOUR

18        PROPOSAL OF NOVEMBER 2ND.

19             AND NOVEMBER 2ND FOR THE DEADLINE FOR DISCLOSURE OF

20        NON-PARTY INTERESTED ENTITIES OR PERSONS.

21             YOUR SCHEDULE ON THE FIRST MOTION TO DISMISS IS FINE.

22        NOVEMBER 16TH IS THE MOTION; DECEMBER 14TH IS THE OPPOSITION;

23        JANUARY 11TH IS THE REPLY; THE HEARING WILL BE FEBRUARY 4TH.

24             THERE WILL ALSO BE A FURTHER CASE MANAGEMENT CONFERENCE ON

25        THAT DATE.
```

UNFORTUNATELY, I DIDN'T LOOK TO SEE, WHAT DATE DO WE HAVE AFTER OCTOBER 19TH TO DECIDE WHEN TO HAVE OUR CASE MANAGEMENT CONFERENCE?

THE CLERK: AFTER OCTOBER 19TH, YOUR HONOR?

THE COURT: YOU KNOW, THE PAGE LIMITS ARE GOING TO BE 25/25/15. I'M NOT GOING TO EXTEND THE PAGE LIMITS ON ANY OF THE BRIEFING.

THE CLERK: JUDGE, DO YOU WANT THEM TO COME IN IN NOVEMBER?

THE COURT: YOU KNOW, I THINK MAYBE THE CAUSES OF ACTION ON THE FIRST ROUND MTD SHOULD BE SIX, AND BY CLASS CERT THERE WILL BE THREE. OKAY? BUT JUST TAKE YOUR VERY BEST SHOT.

WHAT -- I'M SORRY. WHAT DID YOU SAY?

THE CLERK: DID YOU WANT THEM TO COME IN IN NOVEMBER?

THE COURT: WELL, THEIR MOTION IS DUE THE 16TH OF NOVEMBER, SO THEY'LL NEED -- WHAT ABOUT --

(DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE CLERK.)

THE COURT: WHAT ABOUT FRIDAY, THE 30TH OF OCTOBER?

(DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE CLERK.)

THE COURT: HOW MUCH TIME WILL YOU NEED TO ASSESS THE CAUSES OF ACTION THAT'LL MOVE FORWARD IN THE MOTION TO DISMISS IN TIME TO ALSO BRIEF YOUR MOTION BY THE 16TH OF NOVEMBER?

MR. HOOVER: SO, YOUR HONOR, COULD -- I THOUGHT YOU

```
 1    WERE LOOKING AT THEM WHEN YOU WERE ASKING ABOUT --

 2             THE COURT:  I'M OPEN TO HEARING FROM BOTH.  WHAT

 3    WOULD YOU NEED?  I'D LIKE YOU TO COME IN SOON ENOUGH SO THAT WE

 4    ALL KNOW WHAT'S GOING TO BE THE SUBJECT OF THE MOTION TO

 5    DISMISS AND TO GIVE YOU ADEQUATE TIME TO BRIEF IT BEFORE YOUR

 6    DEADLINE OF NOVEMBER 16TH.

 7             MR. HOOVER:  SO DID YOU MENTION OCTOBER 30?  WOULD

 8    THAT -- THAT'S -- THE LAST WEEK OF OCTOBER WOULD BE THE WEEK OF

 9    THE 26TH.

10             THE COURT:  THAT'S A POSSIBILITY.  I DO CURRENTLY

11    HAVE TWO TRIALS SET THAT DAY, WHICH I DON'T KNOW IF THEY'RE

12    GOING OR NOT.

13        (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

14    CLERK.)

15             MR. HOOVER:  YOUR HONOR, HOW ABOUT --

16             THE COURT:  I'M SORRY.  GO AHEAD, PLEASE.

17             MR. HOOVER:  YOUR HONOR, WOULD OUR BRIEF BE DUE ON

18    THE 16TH?  OR -- THAT'S THE --

19             THE COURT:  YES.

20             MR. HOOVER:  OKAY.  SO IN THAT CASE I THINK WE WOULD

21    WANT TO TRY TO GET IN HERE MAYBE EVEN THAT WEEK, LATER IN THE

22    WEEK THAT THE PLAINTIFFS FILE BECAUSE THEN WE WOULD KNOW WHAT

23    WE'RE SHOOTING AT.  THE 22ND, FOR EXAMPLE, THURSDAY, THE 22ND.

24             THE COURT:  YEAH.  UNFORTUNATELY, I HAVE A CONFLICT

25    WITH THAT DATE.
```

```
 1        I GUESS THE POSSIBILITIES COULD BE THE AFTERNOON OF

 2    FRIDAY, OCTOBER 23RD, ALTHOUGH I STILL HAVE THE SAME TWO

 3    TRIALS.

 4            MR. HOOVER:  THAT WOULD WORK FOR US.

 5            THE COURT:  OR I COULD -- WOULD THE 20TH BE TOO SOON?

 6            MR. HOOVER:  I THINK IT WOULD.

 7            THE COURT:  AND THE MORNING OF THE 21ST WOULD BE TOO

 8    SOON, LIKE NOON, WEDNESDAY, THE 21ST?

 9            MR. HOOVER:  THE 21ST IS -- DOES NOT WORK.  THE 23RD

10    WOULD WORK, THE 22ND IN THE AFTERNOON WOULD WORK.  EITHER OF

11    THOSE WOULD WORK.  OR THE BEGINNING OF THE NEXT WEEK.

12            THE COURT:  OKAY.  WHAT ABOUT OCTOBER -- I MEAN, I

13    STILL HAVE THOSE TWO TRIALS SET FOR THAT DAY, SO IF THAT TRIAL

14    IS GOING, WE'LL HAVE TO MOVE THIS, BUT I'M WILLING TO TRIPLE

15    SET HERE.

16        SO OCTOBER 23RD, LET'S SAY 4:00 O'CLOCK.

17        OKAY.  THEN 30 DAYS AFTER THE RULING ON THE FIRST MOTION

18    TO DISMISS, FILE THE SECOND CONSOLIDATED AMENDED COMPLAINT; THE

19    SECOND ROUND MOTION TO DISMISS WOULD BE DUE 21 DAYS AFTER THAT;

20    THE OPPOSITION WOULD BE DUE 21 DAYS AFTER THAT; AND THE REPLY

21    WOULD BE 14 DAYS AFTER THAT.

22        THE HEARING ON THE SECOND ROUND MOTION TO DISMISS WOULD BE

23    ON MAY 26TH OF 2016 AT 1:30.

24        NOW -- BLESS YOU -- IF, BY SOME CHANCE, ANY CLAIM SURVIVES

25    THE FIRST ROUND MOTION TO DISMISS AND THE PLAINTIFFS CHOOSE NOT
```

```
 1     TO AMEND, THEN I WOULD WANT TO ADVANCE THE SCHEDULE, SO I'M

 2     GOING TO GIVE YOU TWO DATES FROM HERE ON OUT.  THE FIRST DATE

 3     ASSUMES THERE'S A SECOND ROUND MOTION TO DISMISS; THE SECOND

 4     DATE ASSUMES THERE'S NOT.  OKAY?

 5          SO OCTOBER 17TH, 2016, WILL BE THE CLOSE OF FACT

 6     DISCOVERY.  IF THERE'S NO SECOND ROUND MOTION TO DISMISS,

 7     JULY 25TH, 2016, WOULD BE THE CLOSE OF FACT DISCOVERY.

 8          SERVE YOUR CLASS CERT EXPERT REPORTS ON NOVEMBER 7TH OR

 9     AUGUST 15; SERVE YOUR RESPONSIVE CLASS CERT EXPERT REPORTS

10     NOVEMBER 28TH OR SEPTEMBER 6TH; AND SERVE YOUR REBUTTAL REPORTS

11     DECEMBER 19TH OR SEPTEMBER 26TH.

12          OKAY.  EXPERT DISCOVERY CUTOFF IS JANUARY 23RD OR

13     OCTOBER 31ST.

14          SO LAST DAY TO AMEND PLEADINGS, ADD PARTIES WOULD BE

15     EITHER FEBRUARY 3RD OR NOVEMBER 14; DEADLINE TO FILE -- AND I'M

16     NOT GOING TO HAVE THE STAGGERED DAUBERT MOTIONS.  THE MOTION

17     FOR CLASS CERT AND ANY DAUBERT MOTIONS WILL ALL BE DUE ON

18     FEBRUARY 17TH OR NOVEMBER 30TH; OPPOSITIONS TO BOTH CLASS CERT

19     AND ANY DAUBERT MOTIONS WILL BE FILED MARCH 17TH OR

20     JANUARY 6TH; REPLIES IN SUPPORT OF CLASS CERT OR DAUBERT

21     MOTIONS WILL BE FILED APRIL 14TH OR FEBRUARY 3RD; THE HEARING

22     ON THE DAUBERT MOTIONS AND THE MOTION FOR CLASS CERT WILL BE ON

23     MAY 4TH, 2017, AT 1:30, OR FEBRUARY 23RD, 2017, AT 1:30.

24          NOW, THERE'S GOING TO BE STRICT LIMITS ON DAUBERT MOTIONS.

25     EACH SIDE CAN ONLY FILE TWO, AND THEY CAN'T BE MORE THAN FOUR
```

1    PAGES.  SO THE DAUBERT MOTION AND OPPOSITION WILL BE FOUR

2    PAGES, FOUR PAGES, AND THE REPLY WILL BE THREE.  OKAY?

3            MR. HOOVER:  YOUR HONOR?

4            THE COURT:  YES?

5            MR. HOOVER:  COULD I JUST ADDRESS THE LIMIT ON

6    DAUBERT MOTIONS?

7            THE COURT:  YES.

8            MR. HOOVER:  IN THESE CASES, I'VE OFTEN SEEN THE

9    PLAINTIFFS COME IN WITH SIX EXPERTS AND SOMETIMES THERE ARE

10   EVEN TWO DAMAGES -- TWO ECONOMIC EXPERTS.  IF WE'RE -- IF WE'RE

11   LIMITED TO TWO DAUBERT MOTIONS, ALL THEY NEED TO DO TO HAVE

12   EXPERTS GOING THROUGH IS INCREASE THEIR NUMBER AND THEN THERE'S

13   NO ABILITY TO CHALLENGE, EVEN IF YOUR HONOR WOULD FIND

14   INVALID -- EVEN IF YOUR HONOR WOULD FIND THE METHODOLOGY

15   INVALID --

16           THE COURT:  BUT DO YOU THINK SIX EXPERTS WOULD BE

17   EXCLUDABLE?  YOU THINK THAT THERE'S NOT GOING TO BE A SINGLE

18   EXPERT THAT WOULD QUALIFY UNDER 702?

19           MR. HOOVER:  ALL I'M SAYING -- YOUR HONOR, WE MIGHT

20   NOT EVEN MOVE ON SOME OF THE EXPERTS.

21           THE COURT:  BUT IF I DON'T LIMIT IT, YOU WILL MOVE ON

22   ALL OF THEM.

23       (LAUGHTER.)

24           MR. FRIEDMAN:  YOUR HONOR, YOU TOOK THE WORDS FROM MY

25   MOUTH.

```
1              (LAUGHTER.)
2                   MR. HOOVER:  IF YOU PUT A LIMIT ON IT --
3                   THE COURT:  I MIGHT GO UP FROM TWO, BUT I'M NOT GOING
4       TO GO UP TO UNLIMITED OR -- I MEAN, THERE'S JUST --
5                   MR. HOOVER:  I'M FINE WITH --
6                   THE COURT:  I WISH I COULD GIVE YOU MORE RESOURCES.
7       I'M JUST SAYING THERE'S A HUMAN LIMIT TO WHAT WE CAN DO.
8                   MR. HOOVER:  I UNDERSTAND.
9                   THE COURT:  I LIKE TO GIVE YOU SPEEDY ACCESS TO
10      JUSTICE, AND IN ORDER TO DO THAT, I HAVE TO HAVE A MORE NARROW,
11      FOCUSSED CASE.
12                  MR. HOOVER:  I UNDERSTAND.
13                  THE COURT:  I DON'T WANT TO HAVE THESE MOTIONS
14      PENDING SIX MONTHS.  I WANT TO GET THEM OUT TO YOU QUICKLY AND
15      I CAN ONLY DO THAT IF IT'S LIMITED.  OKAY?
16           SO I MIGHT BE WILLING TO GO UP TO -- WELL, I'LL GO UP TO
17      THREE, FOUR PAGES EACH, BUT I'M NOT GOING TO MAKE IT UNLIMITED.
18      I'M NOT GOING TO MAKE IT SIX.  OKAY?
19           ALL RIGHT.  THE CLASS CERT WILL BE 25/25/15, THE REGULAR
20      CIVIL LOCAL RULES BRIEFING SCHEDULE, OR PAGE LIMITS.
21           OKAY.  WHAT ELSE -- IS THERE ANYTHING ELSE ON CLASS CERT?
22           SO WE HAVE OUR JOINT -- YOUR JOINT CASE MANAGEMENT
23      STATEMENT, WHEN SHOULD THAT BE FILED?  BECAUSE SEVEN DAYS IN
24      ADVANCE OF THE CMC ON OCTOBER 23RD WILL BE TOO LATE.  I MEAN,
25      IT'LL BE BEFORE THE CONSOLIDATED AMENDED COMPLAINT IS FILED, SO
```

1     YOU WON'T HAVE TIME TO ABSORB IT.

2          CAN YOU FILE IT -- WHAT ABOUT BY WEDNESDAY MORNING,

3     OCTOBER 21?  CAN WE SAY 10:00 O'CLOCK ON WEDNESDAY MORNING,

4     OCTOBER 21?  BECAUSE I'D LIKE SOME TIME TO THINK ABOUT IT.

5          MR. HOOVER:  YES.

6          THE COURT:  OKAY.  SO FILE YOUR JCMS ON OCTOBER 21 AT

7      10:00 A.M.

8          AND I THINK IT'S GOING TO BE SIX CAUSES OF ACTION.  I'LL

9     DEFER TO YOU AS TO IF YOU WANT PLAINTIFFS TO PICK FOUR,

10    DEFENDANTS PICK TWO, OR HOWEVER YOU WANT TO DECIDE IT.  GIVE ME

11    A PROPOSAL ON HOW YOU'RE GOING TO COME UP WITH THE SIX, OKAY,

12    TO GO FORWARD ON THE MOTION TO DISMISS.

13         ALL RIGHT.  WHAT ELSE?  ANYTHING ELSE ON CASE MANAGEMENT?

14         MR. LEVITT:  ONE THING, YOUR HONOR.

15         THE COURT:  YES.

16         MR. LEVITT:  ADAM LEVITT ON BEHALF OF THE ROSS

17     PLAINTIFF AND THE PROPOSED BCBSA TRACK.

18         WHILE WE HAD COORDINATED WITH BOTH MR. FRIEDMAN AND

19    MS. CERVANTEZ AND ALL OF THE DEFENDANTS' COUNSEL IN WORKING ON

20    THE SECOND CASE MANAGEMENT STATEMENT, AS YOU CAN TELL, A LOT OF

21    THE ENTRIES THE DEFENDANTS IN OUR CASE, WHICH ARE ENTIRELY

22    SEPARATE FROM THE DEFENDANTS IN THE ANTHEM CASE, HAVE CHOSEN TO

23    SIT THIS ONE OUT, SO TO SPEAK, AND NOT ENGAGE ON THIS CALENDAR.

24         SIMPLY SAYING, YOUR HONOR, WE HAVE AGREED WITH THIS ENTIRE

25    APPROACH, AND WE FURTHER AGREE WITH THE APPROACH THAT YOUR

```
 1    HONOR HAS PUT FORWARD FOR BOTH THE ANTHEM TRACK AND THE ROSS

 2    TRACK AS WELL.

 3         THAT'S ALL WE WANT TO SAY FOR THE RECORD, YOUR HONOR.

 4         THE COURT:  I'M SORRY.  I DIDN'T HEAR THAT LAST PART,

 5    LAST SENTENCE.

 6         MR. LEVITT:  OKAY.  WHAT I WAS SAYING WAS SIMPLY

 7    SPEAKING ON BEHALF OF THE PROPOSED BCBSA TRACK, WHICH WE HAVE

 8    PUT FORTH IN OUR 23(G) PAPERS, WE SIMPLY SAY IN COORDINATING

 9    THE SCHEDULE, A NUMBER OF THE ENTRIES IN THE SCHEDULE THAT YOUR

10    HONOR WAS SPEAKING ABOUT SIMPLY HAVE ADDRESSED ALL PLAINTIFFS

11    AND ANTHEM AND NOT THE NON-ANTHEM DEFENDANTS WHO ARE IN OUR

12    CASE, WHO ARE NOT IN THE ANTHEM CASE.

13         I JUST WANTED TO MAKE SURE, ON THE ASSUMPTION THAT YOUR

14    HONOR IS GOING TO HAVE A BCBSA TRACK AND AN ANTHEM TRACK --

15         THE COURT:  I ALREADY SAID I'M NOT GOING TO HAVE A

16    SEPARATE TRACK.  I'M NOT CONVINCED THAT THEY'RE DIFFERENT

17    DEFENDANTS.  I HAVE NOT BEEN PERSUADED ON THAT.  YOU HAD AN

18    OPPORTUNITY TO FIGHT THIS OUT IN JPML.  YOU WITHDREW YOUR

19    MOTION TO VACATE THE TRANSFER ORDER.  YOU'RE IN THIS PARTY WITH

20    US ALL.  I MEAN --

21         MR. LEVITT:  WE UNDERSTAND, YOUR HONOR.

22         THE COURT:  OKAY?

23         MR. LEVITT:  OKAY.

24         THE COURT:  ALL RIGHT.  SO LET'S GO TO THE LEAD

25    PLAINTIFFS' COUNSEL MOTION.
```

1        NOW, WHY DID MR. FEDERMAN OF FEDERMAN & SHERWOOD WITHDRAW

2    HIS MOTION?  IS HE NOW JOINING THE PLAINTIFF STEERING COMMITTEE

3    WITH THE CERVANTEZ/FRIEDMAN MOTION?

4        MR. FEDERMAN:  YOUR HONOR, THIS IS WILLIAM FEDERMAN

5    BEGGING LEAVE TO APPEAR BY TELEPHONE.

6        I AM -- I AM SUPPORTING THE COHEN MILSTEIN APPLICATION OF

7    ANDREW FRIEDMAN AND EVE CERVANTEZ, AS WELL AS CONTINUING

8    MICHAEL WEINBERGER AS A PLAINTIFF IN THIS ACTION.

9        THE COURT:  ARE YOU NOW JOINING THEIR STEERING

10    COMMITTEE?  OR WHAT -- WHAT IS THE ARRANGEMENT THAT CAUSED YOU

11    TO WITHDRAW YOUR MOTION?

12        MR. FEDERMAN:  I HAVE NO SPECIFIC ARRANGEMENT WITH

13    THEM, YOUR HONOR.

14        THE COURT:  OKAY.

15        MR. FEDERMAN:  I HAVE A PRESSING MATTER IN THAT

16    JUDGE WILSON IN THE CENTRAL DISTRICT OF CALIFORNIA DENIED A

17    JOINT MOTION FOR EXTENSION OF TIME IN A SECURITIES CLASS ACTION

18    AND REFUSED TO PROVIDE US WITH ADDITIONAL TIME, SO WE'RE GOING

19    TO TRIAL IN JANUARY.

20        THE COURT:  I SEE.  SO YOU HAD A RESOURCE ISSUE?

21        MR. FEDERMAN:  WELL, I GUESS.  THAT WOULD BE ONE WAY

22    TO FRAME IT.

23        (LAUGHTER.)

24        THE COURT:  ALL RIGHT.  OKAY.

25        LET ME ASK MR. FRIEDMAN AND MS. CERVANTEZ, I WAS VERY

```
 1     DISAPPOINTED TO SEE THAT YOU NEED EIGHT LAW FIRMS TO LITIGATE

 2     THIS CASE.  I THINK THAT'S VERY INEFFICIENT AND IT MAKES ME

 3     WONDER WHETHER YOUR TWO FIRMS DON'T HAVE THE RESOURCES OR THE

 4     EXPERTISE IN DATA BREACH AND PRIVACY CASES TO BE LEAD

 5     PLAINTIFFS' COUNSEL HERE, THAT YOU FEEL LIKE YOU NEED THE

 6     SUPPORT OF SIX ADDITIONAL LAW FIRMS.  TO ME, IT DOESN'T INSTILL

 7     CONFIDENCE IN YOUR MOTION.

 8          MS. CERVANTEZ:  WHAT -- I'D LIKE TO SAY SOMETHING

 9     BEFORE I THINK MR. FRIEDMAN WILL ADDRESS IT.

10          THE COURT:  YEAH.

11          MS. CERVANTEZ:  WE DO HAVE THE RESOURCES AND WE DO

12     HAVE THE EXPERTISE.  WE DO HAVE THE EXPERIENCE TO GO FORWARD.

13     COHEN MILSTEIN HAS 80 ATTORNEYS, VERY BIG OFFICES.

14     ALTSHULER BERZON IS OBVIOUSLY A SMALLER FIRM, BUT WE CERTAINLY

15     HAVE THE LEGAL BANDWIDTH TO DO THIS CASE.

16          WE HAVE ENOUGH EXPERIENCE.  DATA BREACH IS NOT A FIELD OF

17     LAW, CONSUMER LAW.  WE'RE VERY EXPERIENCED IN BRINGING COMPLEX

18     CLASS ACTIONS AND PROTECTING CONSUMERS AND PROTECTING THEIR

19     PRIVACY RIGHTS.

20          SO I -- THERE'S CERTAINLY NO LACK OF EXPERIENCE OR ABILITY

21     TO PROSECUTE THIS CASE OURSELVES.

22          MR. FRIEDMAN WANTED TO ADDRESS A LITTLE MORE, THOUGH, WHY

23     WE THOUGHT IT MADE SENSE TO BE TRANSPARENT WITH THE COURT AND

24     EXPLAIN THAT, TO THE EXTENT WE WERE GOING TO REACH OUT TO OTHER

25     FIRMS, THESE WERE THE FIRMS THAT WERE THE FIRST UP THERE ON
```

1        THAT LIST.

2                MR. FRIEDMAN:  YOUR HONOR, IF I MAY?

3            FIRST OF ALL, WE ARE NOT PROPOSING A SLATE OF EIGHT

4    PEOPLE.  THIS IS A CO-LEAD COUNSEL OF MS. CERVANTEZ AND MYSELF,

5    AND I THINK THAT'S VERY IMPORTANT AND THAT'S THE WAY WE'VE BEEN

6    OPERATING TO DATE AND THAT'S THE WAY WE INTEND TO OPERATE IN

7    THE FUTURE.

8            WE, FRANKLY, THINK IT'S IMPORTANT TO HAVE TWO CO-LEADS.

9    MY FIRM, AS MS. CERVANTEZ HAS SAID, IS ABSOLUTELY ABLE TO

10   HANDLE A CASE OF THIS MAGNITUDE, BUT I DON'T THINK IT'S IN THE

11   CLASS'S BEST INTEREST.  I THINK EVERYBODY IN THIS COURTROOM

12   KNOWS THAT THERE'S GOING TO BE A LOT GOING ON, A LOT GOING ON

13   AT THE SAME TIME, A LOT OF MOVING PARTS, AND I THINK THAT

14   HAVING TWO CO-LEADS IS THE RIGHT WAY TO GO.

15           TO DATE, IT'S WORKED VERY WELL, AND MS. CERVANTEZ AND I

16   HAVE WORKED TERRIFICALLY TOGETHER.  WE'VE BOUNCED THINGS OFF --

17   IDEAS OFF EACH OTHER AND I SEE THAT GOING FORWARD, AND I THINK

18   THAT'S VERY IMPORTANT IN A CASE OF THIS MAGNITUDE.  I THINK THE

19   CLASS IS BETTER SERVED THAT WAY.

20           AND I THINK THE CLASS IS BETTER SERVED WHEN WE CAN REACH

21   OUT TO FIRMS THAT HAVE EXPERTISE, THAT HAVE MADE A RESOURCE

22   COMMITMENT AND A TIME COMMITMENT, AND A FINANCIAL COMMITMENT IF

23   NEED BE, TO GOING FORWARD.

24           BUT, AGAIN, WE CAN'T LOSE SIGHT OF THE MAGNITUDE OF THIS

25   CASE.  THIS CASE IS -- YOUR HONOR'S PROPOSING AN EVEN MORE

1    AGGRESSIVE SCHEDULE, AND WE TAKE THAT VERY SERIOUSLY.  WE

2    BELIEVE THAT, WITH THE MOVING PARTS GOING FORWARD -- FOR

3    EXAMPLE, WHAT YOU'VE HEARD IS WE'RE GOING TO HAVE A 30 DAY, 30

4    DAY WINDOW TO FILE THE CONSOLIDATED AMENDED COMPLAINT.  THAT

5    MEANS WE'RE GOING TO BE VETTING.

6        WE'VE ALREADY DONE THAT.  WE'VE ALREADY STARTED DOING

7    THAT.  WE'VE BEEN DOING THAT FOR SEVERAL MONTHS.

8        AND THE WAY THIS HAS WORKED, SO YOUR HONOR KNOWS, THIS IS

9    NOT A FREE-FOR-ALL.  THIS IS NOT EIGHT FIRMS WORKING TOGETHER.

10   THIS IS TWO FIRMS, TWO PEOPLE, MS. CERVANTEZ AND MYSELF, WHO

11   HAVE BEEN LEADING THE CHARGE.

12       WHAT WE'VE DONE IS WE HAVE SELECTED PEOPLE THAT WE ARE

13   VERY COMFORTABLE WORKING WITH WHO HAVE GREAT EXPERTISE IN THE

14   AREA, AND WHAT WE'VE DONE IS WE'VE LOOKED TO THEM, NOT AS A

15   GROUP, BUT WE'VE LOOKED TO THEM ON AN INDIVIDUAL BASIS AND

16   SAYING, "YOU, FOR EXAMPLE, CAN YOU HELP US VET PLAINTIFFS?"

17       AND SO WE DON'T HAVE A TEAM OF EIGHT PEOPLE GOING OUT AND

18   DOING THAT.  WE HAVE TWO PEOPLE DOING THAT.

19       AND WE HAVE ANOTHER PERSON THAT'S BEEN MEETING WITH

20   EXPERTS ALREADY.  THAT'S INCREDIBLY IMPORTANT.  THAT'LL BE

21   IMPORTANT TO THE CONSOLIDATED AMENDED COMPLAINT.  WE'RE GOING

22   TO NEED EXPERTS ON DATA BREACH SECURITY, ON CYBER SECURITY,

23   PROBABLY DAMAGES, HIPAA, AND NOW IN LIGHT OF YOUR HONOR'S LAST

24   ORDER, WE'LL HAVE TO SORT OF ROLL UP OUR SLEEVES AND LEARN

25   ERISA AGAIN.

1        IN ANY CASE, WHAT WE'VE DONE IS WE'VE BEEN VERY

2    TRANSPARENT.  EVERYBODY IN THIS COURTROOM RECOGNIZES THAT THIS

3    IS A HUGE CASE AND IT'S GOING TO REQUIRE A LOT OF MANPOWER.

4        WHAT WE HAVE DONE IS WE'VE BEEN TRANSPARENT AND SAID,

5    "WHENEVER I NEED ASSISTANCE, THIS IS THE TEAM THAT WE'RE GOING

6    TO LOOK TOWARDS.  THIS IS THE TEAM THAT WE'RE GOING TO REACH

7    OUT TO" SO THAT YOUR HONOR KNOWS WHO'S THERE SO THERE'S NO

8    HIDDEN -- THERE'S NO HIDDEN AGENDA.  THERE'S NO PEOPLE OUT ON

9    THE FRINGES THAT ARE SUDDENLY GOING TO GET WORK BECAUSE THEY'VE

10   BEEN PROMISED WORK.  THAT'S NOT THE WAY THIS IS GOING DOWN.

11        INSTEAD, IT'S MS. CERVANTEZ AND MYSELF MAKING ALL THE

12   DECISIONS, AND MAKING THE DECISIONS SUBJECT TO THE GUIDELINES

13   THAT WE'VE PUT IN THE LEAD PLAINTIFF MOTION, BOTH IN TERMS OF

14   BILLING AND IN TERMS OF AN EVENTUAL FEE IF THERE IS ONE.

15        SO I THINK THAT'S VERY IMPORTANT TO RECOGNIZE.

16        THE COURT:  AND WHAT IS THE TOTAL NUMBER OF LAWYERS

17   YOU ENVISION WORKING ON THIS CASE?  MY CONCERN IS IF YOU HAVE,

18   YOU KNOW, PEOPLE AT EIGHT DIFFERENT LAW FIRMS READING THE SAME

19   CASE MANAGEMENT ORDER, YOU KNOW, READING THE SAME DEPOSITION

20   TRANSCRIPT.  I MEAN, HOW MANY PEOPLE ARE YOU ENVISIONING

21   WORKING ON THIS FROM THE EIGHT DIFFERENT LAW FIRMS?

22        MR. FRIEDMAN:  YOUR HONOR, THAT'S A VERY, A VERY

23   SIGNIFICANT CONCERN AND WE TRIED TO ADDRESS THAT IN OUR

24   GUIDELINES.  MS. CERVANTEZ CAN ADDRESS EXACTLY WHAT THOSE

25   GUIDELINES SAY, BUT --

```
 1              THE COURT:  WELL, I READ YOUR GUIDELINES.  I WANT TO
 2    KNOW, HOW MANY LAWYERS ARE GOING TO BE WORKING ON THIS CASE?
 3    THAT'S MY QUESTION.
 4              MR. FRIEDMAN:  YOUR HONOR, AGAIN, WHAT WE'RE TALKING
 5    ABOUT IS NOT HAVING A GROUP OF EIGHT LITIGATE THE CASE.  THERE
 6    ARE TWO PEOPLE LITIGATING THIS CASE, AND ONLY ON AN AS-NEEDED
 7    BASIS DO WE REACH OUT TO THOSE PEOPLE.
 8              SO THERE'S NO GUARANTEE OF WORK.  THERE IS NO GUARANTEE
 9    THAT EIGHT PEOPLE ARE EVER GOING TO WORK THIS CASE.  THERE IS
10    A -- THERE IS ONLY A GUARANTEE FROM MS. CERVANTEZ AND I THAT WE
11    WILL -- WE WILL LITIGATE THE CASE EFFICIENTLY, AND WE WILL DO
12    SO WITH YOUR HONOR'S ADMONITIONS ABOUT OVERBILLING.
13              BUT AT ANY GIVEN TIME, THERE COULD BE -- THERE COULD BE
14    THREE PEOPLE WORKING THE CASE.  THERE IS NOT GOING TO BE A
15    SCRUM, IF YOU WILL, ON A WEEKLY BASIS.  THAT'S NOT OUR
16    INTENTION AND THAT WAS NOT WHAT WE INTENDED TO PUT FORWARD IN
17    THE PAPERS.
18              THE COURT:  BUT THE PEOPLE THAT YOU'VE PROPOSED TO
19    WORK WITH ARE FAIRLY SENIOR, SO ARE YOU TELLING ME THERE'S
20    GOING TO BE NO JUNIOR, CHEAPER BILLER WHO IS SUPPORTING THAT
21    PERSON?
22              MR. FRIEDMAN:  NO.  THERE WILL BE.  THERE WILL BE
23    A --
24              THE COURT:  OKAY.  SO WHAT'S THE NUMBER?
25              MR. FRIEDMAN:  YOUR HONOR, FOR EXAMPLE, IT DEPENDS
```

```
1    ON, FOR EXAMPLE, THE VOLUME OF DOCUMENTS THAT ARE PRODUCED BY

2    THE DEFENDANTS.  WE'RE OBVIOUSLY NOT GOING TO PUT SENIOR

3    ATTORNEYS TO REVIEW DOCUMENTS AS A FIRST CUT.  THOSE WOULD

4    BE -- WE WOULD TASK JUNIOR PEOPLE TO DO THAT, AND THAT'S -- AND

5    ACTUALLY, WE -- I THINK OUR TEAM HERE, THE PLAINTIFF STEERING

6    COMMITTEE, SORT OF SPANS THE SPECTRUM IN TERMS OF HOW LONG

7    THEY'VE BEEN OUT AND HOW LONG -- AND HOW EXPERIENCED THEY ARE.

8    WE HAVE PEOPLE ON THE LOWER END IN TERMS OF EXPERIENCE AND

9    PEOPLE, LIKE MYSELF, WHO HAVE BEEN AROUND THE BLOCK A FEW

10   TIMES.

11        SO I THINK THAT'S SOMETHING THAT YOUR HONOR OUGHT TO

12   CONSIDER AS WELL.

13            THE COURT:  I HAVE QUESTIONS FOR SOME OF THE OTHER

14   APPLICANTS, AND I DO WANT TO GIVE EVERYONE WHO'S APPLIED A VERY

15   BRIEF OPPORTUNITY TO SPEAK.

16        LET ME ASK A QUESTION OF -- OKAY.  THE KELLER/LOCKRIDGE

17   GROUP, I SEE YOU'VE BEEN INVOLVED IN THE TARGET DATA BREACH,

18   THE HOME DEPOT DATA BREACH, AND THE RECENT 2014 SONY DATA

19   BREACH LITIGATION.

20        HOW MUCH KNOWLEDGE OF THE TECHNOLOGY IS NECESSARY?  DO WE

21   NEED TO HAVE ELECTRICAL ENGINEERS OR COMPUTER SCIENTISTS?

22            MS. CAPPIO:  YOUR HONOR, GRETCHEN CAPPIO FROM

23   KELLER ROHRBACK.

24        AND I WOULD JUST SAY THAT BASED ON PRIOR EXPERIENCE IN

25   THESE CASES, WE HAVE WORKED VERY CLOSELY WITH EXPERTS IN THE
```

```
1     FIELD.  I, MYSELF, AND KAREN DID NOT GO TO ELECTRICAL

2     ENGINEERING SCHOOL, MS. RIEBEL.

3          BUT HAVING SAID THAT, WE HAVE WORKED WITH THE BEST AND THE

4     BRIGHTEST WHO HAVE CAUGHT US UP TO SPEED AND WE KNOW WHAT TO

5     LOOK FOR, YOUR HONOR.

6          THE COURT:  OKAY.  AND DID YOU HAVE CONSULTING

7     EXPERTS AND TESTIFYING EXPERTS HELPING YOU?  OR JUST THE

8     TESTIFYING?

9          MS. CAPPIO:  YOUR HONOR, SO FAR MAINLY JUST THE

10    TESTIFYING EXPERTS, ALTHOUGH A COUPLE OF PEOPLE HAVE ADVISED US

11    AS WE WERE INTERVIEWING THOSE TESTIFYING EXPERTS.

12         THE COURT:  OKAY.

13         MS. CAPPIO:  AND I'LL LET MS. RIEBEL ADDRESS IT IF

14    SHE HAS A DIFFERENT ANSWER BASED ON HER EXPERIENCE.

15         THE COURT:  BUT YOU SAID THE TECHNICAL EXPERTS WERE

16    ALSO ADVISING YOU, SO SORT OF SERVING AS BOTH?

17         MS. CAPPIO:  YES, YOUR HONOR, THAT'S RIGHT.

18         THE COURT:  ALL RIGHT.  LET ME ASK MS. TINA WOLFSON,

19    YOU HAVE A LOT OF EXPERIENCE ON DATA BREACH CASES, BUT YOUR LAW

20    FIRM IS EIGHT PEOPLE.  HOW DO YOU INTEND TO AUGMENT YOUR

21    RESOURCES AND HOW MANY ATTORNEYS DO YOU THINK IS THE RIGHT

22    NUMBER TO WORK ON THIS CASE?  AND DOES THAT FLUCTUATE, YOU

23    KNOW, DURING DOCUMENT REVIEW AND DURING DIFFERENT PHASES OF THE

24    CASE?

25         MS. WOLFSON:  GOOD AFTERNOON, YOUR HONOR.
```

```
1      TINA WOLFSON.

2           OUR APPLICATION WAS A JOINT MOTION AND WE -- OUR

3      APPLICATION FOR LEADERSHIP IS SUPPORTED BY NUMEROUS FIRMS WHO

4      HAVE DECIDED TO TAKE THE BACK SEAT.  NO WORK HAS BEEN PROMISED

5      TO THEM.  THEY ARE CONFIDENT IN OUR EXPERIENCE, OUR COMMITMENT,

6      AND OUR RESOURCES TO LITIGATE THIS CASE.

7           EIGHT -- EIGHT PEOPLE IS A MODERATE SIZE FIRM.  I THINK

8      THAT THERE ARE PLENTY OF PEOPLE TO DO THE WORK.  AND IT'S THE

9      TYPE OF SIZE THAT ALSO MAKES ONE VERY AWARE OF DOING THE WORK

10     EFFICIENTLY.

11          TO ANSWER YOUR HONOR FURTHER, I DO THINK IT DEPENDS ON

12     WHAT IS HAPPENING IN THE CASE AT THE TIME.  WE HOPE TO STAFF IT

13     SOLELY WITH THE PEOPLE IN OUR FIRM.

14          BUT SHOULD THAT NOT PROVE SUFFICIENT FOR A PARTICULAR

15     PROJECT AND A PARTICULAR DEADLINE, THE FIRMS WHO SUPPORT OUR

16     APPLICATION STAND READY AND ABLE TO ASSIST US IN ANY WAY.

17               THE COURT:  WELL, MY CONCERN IS YOU HAVE NINE LAW

18     FIRMS SUPPORTING YOU.  ARE YOU PLANNING TO HAVE ALL NINE

19     WORKING ON THE CASE?

20               MS. WOLFSON:  NO, YOUR HONOR.  THERE'S -- TO BE

21     CLEAR, THERE HAVE BEEN ABSOLUTELY NO PROMISES MADE TO THOSE

22     FIRMS.

23               THE COURT:  UM-HUM.

24               MS. WOLFSON:  THEY UNDERSTAND THAT IN SUPPORTING OUR

25     APPLICATION, THEY MAY OR MAY NOT GET WORK, DEPENDING ON THE
```

1    CIRCUMSTANCES OF THE CASE.

2        AND WE WILL HAVE, AS WE HAD IN HOME DEPOT AND THE TARGET

3    CASE AND IN THE PREMERA HEALTHCARE DATA BREACH CASE, THERE WILL

4    BE VERY STRICT PROTOCOLS ON BILLING WHICH WILL REQUIRE EVERY

5    SINGLE ATTORNEY WORKING ON THE MATTER TO INDICATE WHO HAS GIVEN

6    THEM THE ASSIGNMENT, AND WE HAVE OTHER SYSTEMS TO ENSURE THAT

7    THERE IS NO DUPLICATION AND THAT THE APPROPRIATE TASK IS

8    ASSIGNED TO A PERSON WITH THE APPROPRIATE SENIORITY.

9        THE COURT:  DID YOU ARGUE THE SEVENTH CIRCUIT

10   NEIMAN MARCUS CASE?

11       MS. WOLFSON:  MY PARTNER DID, THEODORE MAYA, WHOSE

12   NAME WAS CALLED EARLIER, BUT HE'S UNFORTUNATELY GETTING READY

13   FOR A TRIAL NEXT WEEK IN L.A. SUPERIOR COURT.  HE WAS THE ONE

14   WHO ARGUED IT IN PERSON.

15       OUR FIRM IS THE ONE WHO SPEARHEADED THAT EFFORT IN TERMS

16   OF WRITING THE BRIEFS AND ORAL ARGUMENT.

17       THE COURT:  OKAY.

18       MS. WOLFSON:  AND I WANT TO COMMEND THE SEVENTH

19   CIRCUIT PANEL ON BEING SMART ENOUGH, YOUR HONOR, TO FOLLOW YOUR

20   REASONING IN ADOBE, AND THANK YOU AGAIN FOR YOUR THOUGHTFUL

21   OPINION ON THAT.

22       THE COURT:  OKAY, THANK YOU.

23       I MEAN, EVERY APPLICATION WAS INCREDIBLY IMPRESSIVE AND

24   THIS IS REALLY, UNFORTUNATELY, A DIFFICULT AND SOMEWHAT

25   ARBITRARY DECISION BECAUSE I THINK EVERYONE ON THIS LIST WHO

1    HAS APPLIED IS INCREDIBLY IMPRESSIVE.

2         NOW, LET ME GO THROUGH THE -- LET ME ASK FOR

3    ROBIN GREENWALD OF WEITZ & LUXENBERG.

4         MS. GREENWALD:  YES, YOUR HONOR.

5         THE COURT:  OKAY.  SO YOU HAVE A VERY, VERY

6    IMPRESSIVE BACKGROUND.  OBVIOUSLY YOU DO A LOT OF MDL WORK.  I

7    LIKED THAT YOU SPOKE ABOUT THE BEST INTERESTS OF THE CLASS AND

8    THE EFFORTS THAT YOUR FIRM HAD MADE ON BEHALF OF THE CLASS,

9    WHICH IS NOT SOMETHING THAT WAS IN EVERY APPLICATION.

10        THE QUESTION I HAD IS YOU SEEM MORE TO BE AN ENVIRONMENTAL

11   AND PRODUCTS LIABILITY LAWYER.

12        MS. GREENWALD:  THAT'S CERTAINLY MY PAST WITH THE

13   GOVERNMENT, YOUR HONOR.

14        THE COURT:  YEAH.

15        MS. GREENWALD:  I SPENT ALL OF MY TIME WORKING ON

16   ENVIRONMENTAL ISSUES WITH THE U.S. ATTORNEY'S OFFICE AND

17   DEPARTMENT OF JUSTICE.

18        AT THIS FIRM WHERE I'VE BEEN FOR ABOUT TEN YEARS, I'VE

19   BEEN DOING BOTH CONSUMER AND ENVIRONMENTAL.

20        AND MY COLLEAGUE, JAMES BILSBORROW, DOES ONLY CONSUMER

21   CLASS AND ACTUALLY SPECIALIZES IN RULE 23 AND, IN PARTICULAR IN

22   RELATION TO THAT, DATA BREACH.

23        SO THAT'S SORT OF --

24        THE COURT:  SURE.  THAT WOULD BE MY ONE QUESTION IS

25   WHAT SORT OF DATA BREACH AND PRIVACY EXPERIENCE YOUR FIRM WOULD

1    HAVE, AND DO YOU EVEN THINK IT'S NECESSARY?  OR IS IT JUST

2    REALLY SMART, GOOD LAWYERS IS REALLY WHAT YOU NEED MORE THAN

3    EXPERTISE IN THE SUBJECT MATTER?  WHAT'S YOUR VIEW ON THAT?

4            MS. GREENWALD:  WELL, I MEAN, I WAS ACTUALLY GOING TO

5    SAY, YOUR HONOR, EXACTLY THE LATTER PART.  WE READ THE CASES.

6    I'M VERY FAMILIAR WITH THE LAW, AS ARE MY COLLEAGUES.

7        I MEAN, I'VE ONLY DEALT WITH LARGE LITIGATION MOST OF MY

8    CAREER, AND THE KIND OF CASE THAT THIS IS -- WE DRAFT

9    COMPLAINTS IN ALL OF THESE CASES, PREMERA, ANTHEM.  WE'RE

10   LOOKING AT OTHER DATA BREACH CASES NOW, AND I THINK IT'S

11   APPLYING FEDERAL AND VARIOUS STATE LAWS TO CONDUCT THAT IS --

12   THAT IS A VIOLATION OF VARIOUS LAWS.

13       SO I DON'T REALLY SEE IT AS NEEDING A SPECIALTY IN THAT.

14   IT'S HAVING A SPECIALTY IN FEDERAL COURT PRACTICE AND

15   UNDERSTANDING LARGE MDL'S AND WORKING WITH A LOT OF DIFFERENT

16   STAKEHOLDERS, WHICH I'VE DONE MY WHOLE CAREER.

17       SO, I MEAN, I GUESS THAT'S WHAT I BRING TO THE TABLE,

18   PARTICULARLY IN RELATION TO THIS CASE, IS HAVING WORKED WITH A

19   LOT OF DIFFERENT STAKEHOLDERS IN ALMOST ALL OF MY LITIGATION.

20           THE COURT:  I KNOW YOU HAVE SAID YOU WORKED WITH

21   TINA WOLFSON AND JOHN YANCHUNIS.

22           MS. GREENWALD:  YANCHUNIS, UM-HUM.

23           THE COURT:  WHAT IS THE SORT OF STRUCTURE THAT YOU

24   ENVISION?

25           MS. GREENWALD:  I ACTUALLY DIDN'T ANTICIPATE ANY

```
 1       STRUCTURE, YOUR HONOR.  I HAD BEEN TALKING WITH THEM ABOUT

 2       ANTHEM.  I WORKED WITH THEM BOTH INDIRECTLY AND DIRECTLY ON

 3       PREMERA.

 4            SO I HAD BEEN TALKING TO THEM BASICALLY ABOUT DATA BREACH

 5       AND HAVE WORKED WITH THEM IN OTHER MATTERS, AND SO I HADN'T

 6       REALLY -- I DIDN'T PUT IN ANY APPLICATION WITH ANYBODY ELSE.  I

 7       DON'T HAVE ANY RELATIONSHIPS WITH ANYONE ON PROMISES OR

 8       NON-PROMISES.

 9            I WILL WORK WITH ANYONE IN ANY CAPACITY ACTUALLY.  I JUST

10       THINK THIS IS IMPORTANT AND WE HAVE SOME INTERESTING EXPERTS,

11       WE HAVE SOME INTERESTING EVIDENCE.

12            I WORKED WITH MR. MADDIGAN QUITE A BIT EARLY ON.  WE HAD

13       VERY GOOD, PROFESSIONAL DISCUSSIONS BEFORE THE CASE WAS

14       ASSIGNED TO YOUR HONOR.

15            AND WE'D LIKE TO HELP IN ANY WAY WE CAN.

16            THE COURT:  ALL RIGHT.  THANK YOU.

17       LET ME HEAR FROM MR. YANCHUNIS OF MORGAN AND MORGAN.

18       YOU'RE ON THE EXECUTIVE COMMITTEE IN THE TARGET DATA

19       BREACH CASE.

20            MR. YANCHUNIS:  YES, YOUR HONOR, AND I'M PRESENTLY

21       CO-LEAD IN HOME DEPOT.

22            THE COURT:  HOW IMPORTANT DO YOU THINK IT IS TO HAVE

23       PRIOR DATA BREACH AND PRIVACY LITIGATION EXPERIENCE?

24            MR. YANCHUNIS:  I THINK IT'S EXTREMELY IMPORTANT.  IN

25       FACT, I'VE -- AND MY RECORD REFLECTS THAT I'VE BEEN HANDLING
```

1    LITIGATION IN THE PRIVACY ARENA SINCE 1999, AND CERTAINLY HAVE

2    LEARNED A LOT MORE WHERE THE PROPER FOCUS IS, BOTH IN TERMS OF

3    THE CLAIMS, AS WELL AS THE RELIEF TO BE SOUGHT.

4         MANY OF THE PEOPLE IN HERE ARE MY FRIENDS AND I'VE WORKED

5    WITH THEM IN CASES.  I'VE LEARNED FROM CERTAINLY THE TARGET

6    CASE, AND NOW THE HOME DEPOT CASE, WHAT CLAIMS CAN BE PURSUED

7    IN WHAT STATES.  THAT'S NOT RESEARCH THAT NEEDS TO BE REDONE.

8         WE'VE GONE THROUGH THE FORMULATION AND FILING OF TWO

9    CONSOLIDATED COMPLAINTS ON A 50 STATE BASIS BOTH IN TARGET AND

10   NOW HOME DEPOT.

11        WE HAVE THE MATRIX IN CONNECTION WITH THE STATE LAWS AND

12   OUR LAWS CAN BE BROUGHT UNDER COMMON LAW USUALLY IN THOSE

13   STATES.  THEY'RE, IN FACT, ATTACHED TO OUR RESPONSE IN THE

14   MOTION TO DISMISS IN HOME DEPOT.

15        SO THERE ISN'T A LOT OF RECREATION OF THIS.

16        ONE EXPERT WHO I'VE WORKED WITH SINCE 2005 I WORK WITH IN

17   EACH OF THE DATA BREACH CASES, THE TWO I MENTIONED AND THE

18   OTHER ONES THAT I HAVE PRESENTLY PENDING.

19        IN ADDITION, I HAVE THREE OTHER EXPERTS WHO HAVE WORKED IN

20   TWO OF THE -- IN BOTH HOME DEPOT, AS WELL AS IN TARGET, AND

21   THOSE ARE PEOPLE THAT I WOULD USE IN THIS CASE.  THEY KNOW EACH

22   OF THE ARENAS, BOTH IN TERMS OF THE TYPE OF COMPONENTS THAT THE

23   FTC TYPICALLY LOOKS AT, AS WELL AS WHAT THE STATE OF THE ART IS

24   IN DATA PROTECTION.

25        AND THEN MY THREE OTHER EXPERTS ARE EXPERTS IN CYBER

```
1    SECURITY AND DATA PROTECTION.  SO THERE'S NOT A LOT OF

2    RECREATION FOR ME.

3         AND I WOULD SAY FOR A NUMBER OF LAWYERS IN THIS ROOM,

4    YOU'VE SEEN THEIR APPLICATIONS, THEY'VE BEEN DOING THIS FOR A

5    WHILE.

6              THE COURT:  UM-HUM.  WHAT -- NOW, YOU HAVE 272

7    LAWYERS IN YOUR FIRM.  ARE YOU GOING TO HANDLE THIS -- WOULD

8    YOU HANDLE THIS MOSTLY IN-HOUSE, OR WHAT IS THE STRUCTURE?  WHO

9    ELSE WOULD YOU HAVE HELPING YOU?  WOULD YOU HAVE A STEERING

10   COMMITTEE OR EXECUTIVE COMMITTEE OR LIAISON?  OR --

11             MR. YANCHUNIS:  THE FIRM I'M WITH IS VERY UNIQUE IN

12   THAT WE'RE THE LARGEST PLAINTIFF FIRM IN THE COUNTRY AND WE

13   HAVE THE CAPABILITY OF DOING EVERYTHING IN-HOUSE.

14        I WOULD NOT DO THAT.  THERE ARE SOME STELLAR LAWYERS IN

15   THIS ROOM THAT I WOULD CALL UPON IF GIVEN THE OPPORTUNITY TO

16   PROVIDE A SLATE.  I BELIEVE A PSC, OR EXECUTIVE COMMITTEE, CAN

17   BE RESTRICTED TO FIVE FIRMS, EVEN DOWN TO FOUR IF THE COURT --

18   ONE THING I'VE LEARNED FROM BOTH TARGET AND NOW HOME DEPOT,

19   LAWYERS WHO ACTUALLY WORK ON THE CASE ARE A LOT SMALLER THAN

20   WHAT YOU MIGHT THINK.  ANTHEM IS A BIG CASE.  HOME DEPOT IS A

21   VERY BIG CASE.  TARGET IS A VERY BIG CASE.

22        AS THE COURT KNOWS -- AND, AGAIN, VINCE ESADES,

23   NORM SIEGEL, ARIANA TADLER ARE ALL IN THE ROOM, AND ERIC GIBBS

24   AND DAN -- WHO'S A PARTNER WITH DAN GIRARD, WHO'S ALSO ON THE

25   COMMITTEE, WE'VE REACHED A SETTLEMENT IN THAT CASE FOR 50
```

```
1      STATES.

2              SO WE'VE LEARNED A LOT.

3                      THE COURT:  FOR WHICH ONE?  FOR WHICH ONE?

4                      MR. YANCHUNIS:  TARGET.  WE HAD -- JUDGE MAGNUSON HAS

5      GIVEN PRELIMINARY APPROVAL TO THAT.

6                      THE COURT:  OKAY.

7                      MR. YANCHUNIS:  AND THAT'S PENDING FOR FINAL

8      APPROVAL.

9              SO THIS IS NOT THE RECREATION OF THE WHEEL FOR ME AND,

10     AGAIN, FOR THOSE LAWYERS WHO I NAMED.

11             SO THERE'S -- YOU'VE GOT A HARD CHOICE.  THERE'S A LOT OF

12     GREAT TALENT IN THIS ROOM.

13                     THE COURT:  THAT'S TRUE.  THAT'S WHAT MAKES THIS VERY

14     DIFFICULT.

15                     MR. YANCHUNIS:  YES.  SO TO ANSWER YOUR QUESTION,

16     AGAIN, I WOULD CALL UPON -- AGAIN, VERY MINDFUL OF THE FACT

17     THAT THE COURT DOES NOT WANT TO WASTE -- AND, QUITE FRANKLY,

18     I'VE ALWAYS THOUGHT THAT TO BE A FOREIGN CONCEPT IN DOING

19     CONTINGENT WORK IS THAT WE DON'T GET PAID UNTIL WE SUCCEED, AND

20     TO THROW ASSETS AT A CASE UNNECESSARILY IS A WASTE,

21     PARTICULARLY WHEN ALL WE HAVE IS OUR TIME AND WE DON'T GET PAID

22     FOR OUR TIME UNLESS WE PREVAIL.

23                     THE COURT:  UM-HUM.

24                     MR. YANCHUNIS:  SO I TOOK A LITTLE DIFFERENT

25     APPROACH.  THERE'S NO COMMON FUND HERE.  I'VE NEVER SEEN THAT
```

1    IN ANY OF THE PRIVACY CASES THAT I'VE SETTLED.  THIS IS A

2    LODESTAR CASE.

3         THE MOST IMPORTANT FOCUS, WHICH I THINK SOMETIMES LAWYERS

4    LOSE SIGHT OF, IS TRYING TO PROTECT INFORMATION WHICH RESIDES

5    IN THE POSSESSION OF THE DEFENDANT GOING FORWARD, IT CERTAINLY

6    WAS TAKEN, BUT IT WASN'T TAKEN.  IT STILL REMAINS THERE.

7         AND MY FOCUS -- I THINK MY EXPERTISE IS ON THE INJUNCTIVE

8    COMPONENT, ALONG WITH THE EXPERTS THAT I BRING, ALTHOUGH I ALSO

9    UNDERSTAND THE IMPORTANCE OF GIVING PEOPLE MONETARY RELIEF FOR

10   THE DAMAGES THAT THEY'VE SUFFERED.

11             THE COURT:  SO YOUR HOME DEPOT SETTLEMENT IS A

12   LODESTAR?

13             MR. YANCHUNIS:  THE TARGET.

14             THE COURT:  OH, THE TARGET.  I'M SORRY.

15             MR. YANCHUNIS:  YES.

16             THE COURT:  TARGET IS THE ONE THAT SETTLED.

17             MR. YANCHUNIS:  TARGET AGREED TO PAY $10 MILLION,

18   NON-REVERSIONARY FUND -- AND MR. ESADES WILL STAND UP -- I

19   THINK 6.5 MILLION, OR 6.75 MILLION, WHICH BASICALLY IS -- OUR

20   APPLICATION IS LODESTAR-BASED.  IT IS NOT COMMON FUND.

21             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

22             MR. YANCHUNIS:  THANK YOU.

23             THE COURT:  LET ME ASK, I WANT TO GIVE EVERYONE A

24   CHANCE TO SPEAK, AND I KNOW, MR. ESADES, YOU'VE ALREADY SPOKEN,

25   SO I'D PREFER TO MOVE ON, BUT I'LL ASK YOU A QUICK QUESTION.

1    WHAT KIND OF SUPPORT WOULD YOU ENVISION?  WHAT KIND OF

2    STRUCTURE?

3              MR. ESADES:  YOUR HONOR, I HAVE NO SPECIFIC STRUCTURE

4    IN MIND.

5         IN TARGET I WAS ABLE TO DRAW UPON SOME EXCELLENT LAWYERS,

6    AND JOHN JUST NAMED THEM, AND JOHN WAS ONE OF THEM.  IN

7    PARTICULAR, IT WOULD HAVE BEEN A BAD DECISION TO NOT INCLUDE

8    HIM IN PICKING AN EXPERT.  HE'S GOT FANTASTIC EXPERIENCE IN

9    THAT.  SO THERE'S OTHER LAWYERS IN THE ROOM THAT HAVE THOSE

10   SIMILAR EXPERIENCES.

11        I'D DO IT ON AN AD HOC BASIS.  IF THERE'S A PROJECT THAT

12   NEEDS TO BE DONE, THERE'S A TASK THAT NEEDS TO BE DONE, THERE'S

13   USUALLY A VERY GOOD LAWYER THAT, OF COURSE, ALL THE OTHER

14   LAWYERS ALL KNOW WHO THEY ARE, THAT YOU CAN SELECT FOR THOSE

15   TASKS AND THAT'S HOW I WOULD APPROACH ORGANIZING IT.

16             THE COURT:  OKAY.  SO YOU WOULDN'T HAVE A SET

17   STRUCTURE THEN?

18             MR. ESADES:  I DON'T THINK YOU NEED ONE.  YOU CAN

19   HAVE ONE, BUT FROM A PRACTICAL STANDPOINT, YOU'RE GOING TO

20   REACH OUT TO A LAWYER TO DO A SPECIFIC PROJECT WHEN YOU KNOW

21   THE EXPERTISE THAT THEY HAVE.  I DON'T THINK THE STRUCTURE IS

22   AS IMPORTANT AS IS THE FUNCTIONING OF PEOPLE.

23             THE COURT:  OKAY.  THANK YOU.

24        LET ME GO TO MS. BHUJWALA.  DID I PRONOUNCE THAT RIGHT?

25             MS. BHUJWALA:  BHUJWALA.

```
 1              THE COURT:  BHUJWALA, I'M SORRY.

 2              MS. BHUJWALA:  GOOD AFTERNOON, YOUR HONOR.

 3              THE COURT:  GOOD AFTERNOON.  I KNOW YOU'RE ON THE

 4    STEERING COMMITTEE OF THE ADOBE CASE.

 5              MS. BHUJWALA:  CORRECT.  AND I WOULD LOVE THE

 6    OPPORTUNITY TO SERVE CONSUMERS AFFECTED IN THIS CASE ON A

 7    PLAINTIFFS' STEERING COMMITTEE AS WELL.

 8              THE COURT:  UM-HUM.

 9              MS. BHUJWALA:  I'D LIKE TO SUPPORT LEAD COUNSEL IN

10    THAT ROLE.

11              THE COURT:  AND WHAT DO YOU THINK IS THE RIGHT NUMBER

12    OF LAWYERS THAT SHOULD BE WORKING ON THE PLAINTIFFS' SIDE IN

13    THIS CASE?

14              MS. BHUJWALA:  THIS IS A LARGE CASE.  I THINK IT

15    DEPENDS ON THE FIRMS THAT ARE APPOINTED TO LEADERSHIP, YOU

16    KNOW, THE RESOURCES THAT THEY HAVE INTERNALLY AND THE LAWYERS

17    THAT THEY HAVE WHO ARE EXPERIENCED IN PRIVACY LITIGATION AND

18    DATA BREACH LITIGATION AS WELL.

19              THE COURT:  UM-HUM.

20              MS. BHUJWALA:  BUT I DO THINK THAT THE PLAINTIFFS

21    COULD EFFECTIVELY PROSECUTE CLAIMS IN THIS CASE PROBABLY WITH

22    SUPPORT FROM FOUR TO FIVE LAWYERS.

23              THE COURT:  YOU SAID FOUR TO FIVE OR 45?

24              MS. BHUJWALA:  FOUR TO FIVE.

25              THE COURT:  FOUR TO FIVE?
```

1          MS. BHUJWALA:  YES, FOUR TO FIVE.

2          THE COURT:  OKAY.  THANK YOU.  THANK YOU VERY MUCH.

3          MS. BHUJWALA:  THANK YOU.

4          THE COURT:  I ALREADY HEARD FROM MR. FEDERMAN WHO'S

5     GOING TO BE WITH JUDGE WILSON DOWN IN L.A.

6        LET'S GO TO MR. BARNOW, OR IS IT BARNOW?

7          MR. BARNOW:  IT'S ACTUALLY BARNOW.  THANK YOU.

8          THE COURT:  BARNOW.  OKAY.

9          MR. BARNOW:  THANK YOU, YOUR HONOR.  GOOD AFTERNOON

10    AGAIN.

11         THE COURT:  GOOD AFTERNOON.  WELCOME.

12         MR. BARNOW:  THANK YOU.

13         THE COURT:  SO WHAT DO YOU THINK IS THE RIGHT NUMBER

14    OF LAWYERS THAT SHOULD WORK ON THIS CASE AND THE RIGHT NUMBER

15    OF LAW FIRMS?

16         MR. BARNOW:  WELL, FIRST, I THINK IT SHOULD BE

17    LAWYERS AT A LAW FIRM.  I'M NOT A BIG BELIEVER IN HAVING

18    CONTRACT WORKERS, ALTHOUGH I UNDERSTAND A NEED ON OCCASION WHEN

19    YOU HAVE A LOT OF DOCUMENTS.  I THINK IT TAKES AWAY FROM

20    CONTROLLING THE MATTER.  I THINK THERE'S A DIFFERENT DEDICATION

21    TO THE SITUATION.  SO I'D LIKE TO KEEP THINGS WITHIN A LAW

22    FIRM.

23        I THINK, AS THE COURT SEES FROM MY APPLICATION, I TEND TO

24    DEAL WITH CASES WHERE THERE ARE A LOT OF FIRMS INVOLVED.  I

25    THINK IN THIS PARTICULAR CASE, AGAIN, IT DEPENDS ON WHICH LAW

```
1     FIRMS ARE INVOLVED.  FRANKLY, EVEN THOUGH THERE ARE MANY GREAT

2     LAWYERS IN THE ROOM, MANY OF WHOM I WOULD LOVE TO ACCESS SHOULD

3     I HAVE THE HONOR TO DO SO, THIS CASE COULD BE RUN BY, FOR

4     INSTANCE, MYSELF AND PAUL GELLER'S FIRM.

5          HOW DO I KNOW THAT?  BECAUSE WE RECENTLY WENT THROUGH THE

6     SONY PLAYSTATION CASE, AND MR. LEVITT WAS ALSO ON THAT CASE.

7          IN THAT PARTICULAR CASE, GOING BACK TO THE QUESTION THE

8     COURT ASKED, I WAS IN MY OFFICE AND I GOT A CALL FROM

9     JUDGE BATTAGLIA'S LAW CLERK, AND THE QUESTION THAT SHE HAD FROM

10    JUDGE BATTAGLIA WAS, JUDGE BATTAGLIA WANTS TO KNOW, IF HE

11    APPOINTS YOU, ARE YOU GOING TO WORK ON THE CASE?  WILL YOU BE

12    THE PERSON?

13         I SAID YES, AND I DID.  THERE'S AN OBVIOUS REASON FOR

14    THAT.  ONE, I THINK MY RECORD SHOWS I KNOW A LOT ABOUT THIS

15    AREA, AS DO SOME OTHER LAWYERS HERE.

16         NUMBER TWO, THAT'S THE WAY I HANDLE MY CASES.

17         I DO HAVE A FEW ASSOCIATES.  I TEND TO INTERPLAY WITH

18    OTHER LAW FIRMS.

19         MY EXPERIENCE IN THE SONY PLAYSTATION, FOR ME, WAS

20    INCREDIBLE, IN LARGE PART BECAUSE I WAS ABLE TO WORK WITH A

21    VERY TIGHTLY KNIT PLAINTIFFS' STEERING COMMITTEE.

22         MR. GELLER AND I, I THINK, HOLD THE RECORD.  WE'RE THE

23    ONES THAT SHEPHERDED THE CASE TO SETTLEMENT, ALONG WITH

24    MR. LEVITT AND SOME OTHER PEOPLE.

25         I DO THINK THE SEVEN WOULD BE A LITTLE UNWIELDY AS IT
```

```
 1        WORKED OUT, BUT EVERYBODY DID GOOD WORK.  EVERYTHING WE DID --
 2             THE COURT:  YOU MEAN YOU HAD SEVEN LAWYERS ON YOUR
 3        STEERING COMMITTEE?
 4             MR. BARNOW:  WITH JUDGE BATTAGLIA, THAT'S CORRECT.
 5        BUT WHAT WE EARLY ON DID WAS WE HAD TO IDENTIFY ANY
 6        ASSOCIATES THAT WOULD WORK ON THE CASE, AND WE FUNDAMENTALLY
 7        KEPT IT TO ONE ASSOCIATE, SOMETIMES ANOTHER WOULD CREEP IN,
 8        SLIP IN, BUT IT KEPT EVERYBODY KNOWLEDGEABLE AS TO WHAT WAS
 9        GOING ON.  SOME OF THE PEOPLE, BECAUSE OF LEAVING THE FIRM, ET
10        CETERA, WOUND UP WITH NO ASSOCIATES.  BUT ALL IN ALL, IT WAS A
11        VERY TIGHTLY KNIT GROUP.
12        OUR LODESTAR WAS RELATIVELY LOW FOR A CASE OF THAT SIZE
13        AND MAGNITUDE, 60 MILLION CLASS MEMBERS.  WE SETTLED IT, NOT
14        ONE OBJECTION, AND WE GOT FINAL APPROVAL.
15        THAT PATTERN, I THINK, FOLLOWS THROUGH WITH MOST OF THE
16        CASES THAT I'VE HAD.
17        ONE THING THAT THE COURT SAID EARLY ON HERE THAT -- WELL,
18        A NUMBER OF THINGS THE COURT SAID, BUT ONE THAT MADE ME FEEL
19        GOOD, BECAUSE I HAD THE SAME REACTION WHEN I SAW PAPERS THAT
20        SUGGESTED THAT YOU NEED THESE VOLUME OF LAWYERS.
21        WELL, YOU KNOW, IF YOU'RE GOING TO HAVE A LOT OF CARGO,
22        YOU NEED A CARGO SHIP.
23        WHAT I HAVE FOUND IN THESE CASES, FROM TJX ON, IS THAT YOU
24        HAVE A CORE ELEMENT OF RESPONSIBILITY AND BREACH OF THAT
25        RESPONSIBILITY.  EVERYBODY KNOWS YOU HAVE TO HAVE THOSE
```

```
1     INTRUDERS.

2          IT'S NOT AS COMPLICATED AS PEOPLE CAN MAKE IT,

3     PARTICULARLY IF NOT EXPERIENCED IN THE AREA.  THERE WAS ONE OF

4     THE APPLICATIONS BY ONE OF THE LARGER FIRMS, I THINK

5     MR. HAUSFELD'S FIRM BY MS. SWEENEY, WHO I HAVE WORKED WITH, AND

6     HER PARTNER, MR. PIZZIRUSSO, WHO I'VE ALSO WORKED WITH, THAT

7     INDICATED, CONTRARY TO SOME OF THE OTHER PAPERS, THAT THEY

8     DIDN'T SEE THE CASE AS COMPLICATED.

9          IT IS A BIG CASE.  IT IS NOT A COMPLICATED CASE.  IN FACT,

10    I CALLED UP MS. CERVANTEZ AND WE HAD A VERY CORDIAL CHAT, AND

11    I'M GLAD I DID, AND I POINTED OUT, WHY DO YOU NEED ALL THOSE

12    LAWYERS?

13         SHE CAN TELL YOU HERSELF, I -- WELL, WHAT SHE SAID WAS, I

14    HEAR YOU.  AND IT WAS A TREMENDOUS CALL.  SHE WAS WORKING ON

15    THE CASE AS I CALLED HER, AND SHE HAS A LOT OF EXPERIENCE IN

16    TERMS OF, YOU KNOW, WHAT SHE'S DONE TO DATE IN THIS CASE.

17         MY OBSERVATION I THINK FITS THE COURT'S OBSERVATIONS --

18    AND THIS HAS NOTHING TO DO WITH HOW FINE LAWYERS ARE AND THE

19    CAPABILITIES AND THE QUALITY OF THEIR WORK -- BUT I THINK THE

20    REASON THAT THAT APPLICATION STRAYED FROM WHAT THE COURT

21    POINTED OUT WAS THAT THEY DON'T KNOW THE AREA.

22         AND, MY GOODNESS, I KNOW MR. STRANCH'S FATHER FROM

23    MICROSOFT LITIGATION, AND WHEN YOU GO THROUGH IT, A LOT OF THE

24    CASES IN THE NATION, THEY HAVEN'T BEEN SETTLED.

25         I DON'T KNOW HOME DEPOT.  I DIDN'T FILE HOME DEPOT.
```

1        BUT WHEN YOU TAKE THE CASE TO THE END, SUCH AS MR. GELLER

2   AND MR. LEVITT AND I DID WITH REGARD TO SONY PLAYSTATION, AND

3   I'VE DONE IT IN OTHER CASES, YOU REALLY GET TO KNOW THE ISSUES.

4        SO ONE OF THE REASONS YOU THINK YOU NEED EIGHT LAW FIRMS,

5   AND EACH FIRM PROBABLY HAS FOUR LAWYERS, SO NOW YOU'VE GOT 32

6   LAWYERS, IS BECAUSE YOU OVERSEE THE SITUATION.

7        AND, BACK AGAIN, I THINK THE SEVEN -- THE SEVEN MEMBER PSC

8   WAS TOO LARGE, BUT WE FIXED IT TO FIT WHAT THE JUDGE WANTED AND

9   GIVE EVERYBODY A CHANCE BY LIMITING THE AMOUNT OF LAWYERS THAT

10  COULD WORK ON IT.  AND THERE WERE NO OUTSIDE CONTRACTORS.

11       SO I THINK -- WELL, TO BACK UP, I TRULY BELIEVE THAT

12  PAUL GELLER'S FIRM AND MYSELF COULD HANDLE THE WHOLE CASE.  HE

13  HAS A NATIONAL LAW FIRM.  WE DID IT IN THAT ONE.

14       ON THE OTHER HAND, THERE ARE SO MANY GOOD LAWYERS HERE

15  WITH GOOD IDEAS, I COULD NOT BE -- I WOULD NOT WANT TO RESIST

16  THE TEMPTATION TO INCLUDE OTHERS.

17       I WILL TELL THE COURT, AND MS. GREENWALD CAN CONFIRM IT,

18  THAT I CALLED HER UP -- AND I NEVER MET HER IN MY LIFE.  I READ

19  HER APPLICATION AND I CALLED HER UP AND I SAID, YOU HAVE A

20  TREMENDOUS APPLICATION, AND I WAS LOOKING FORWARD TO MEETING

21  HER HERE.

22       AND I KNOW MR. YANCHUNIS, TREMENDOUS LAWYER.

23       I CAN'T SAY ENOUGH ABOUT VINCE ESADES.  ANYBODY IN THE BAR

24  KNOWS WHAT A GENTLEMAN HE IS AND HOW COMPETENT HE IS.

25       SUMMARY OF THAT, YOU'RE GOING TO MAKE THE CUT AS THE COURT

1    IS GOING TO HAVE TO DO.  I THINK I BRING EFFICIENCY, I THINK I

2    BRING RESULTS, AND I THINK I BRING EXPERIENCE THAT ALLOWS THIS

3    LITIGATION TO PROCEED EXACTLY HOW THE COURT WANTS IT TO

4    PROCEED.

5              THE COURT:  ALL RIGHT.  THANK YOU.

6              MR. BARNOW:  THANK YOU.

7              THE COURT:  LET ME HEAR FROM -- MR. GELLER, I THINK,

8    IS HERE.

9         I WAS IMPRESSED YOU ALL WERE SOLE LEAD COUNSEL IN THE

10   ENRON CASE, OVER $7 MILLION; INVOLVED IN THE SOUTHERN DISTRICT

11   OF CALIFORNIA SONY DATA BREACH CASE.

12        I HAVE TO SAY, I THOUGHT THE TONE OF YOUR MOTION WAS

13   PERHAPS A LITTLE AGGRESSIVE.  I'M NOT SURE HOW OTHER

14   PLAINTIFFS' COUNSEL WILL FEEL ABOUT THAT TONE.

15        DO YOU WANT TO ADDRESS THAT?

16             MR. GELLER:  YES, YOUR HONOR.  IS THAT THE MOTION OR

17   THE RESPONSE?  BECAUSE I THINK WE'RE THE ONLY ONES THAT FILED A

18   RESPONSE AND PEOPLE WERE SURPRISED GIVEN YOUR HONOR'S ORDER

19   THAT YOU WERE NOT -- YOU WERE HOPING THAT THERE WOULDN'T BE

20   RESPONSES.

21             THE COURT:  I DON'T HAVE ANY BEEF THAT YOU FILED ONE.

22             MR. GELLER:  OKAY.

23             THE COURT:  BUT I DID THINK THE TONE WAS A BIT

24   AGGRESSIVE ON BOTH, FRANKLY.  SO DO YOU WANT TO ADDRESS THAT?

25   I MEAN, I SEE THAT YOU HAVE WORKED WITH WELL WITH OTHER LAW

```
1      FIRMS.
2              MR. GELLER:  YEAH.  I THINK -- SO, YOUR HONOR, I
3      APOLOGIZE TO THE COURT IF YOU FELT THAT THE TONE WAS TOO
4      AGGRESSIVE.
5              THESE ARE DIFFICULT -- YOU KNOW, IT'S DIFFICULT FOR THE
6      COURT.  IT'S ALSO DIFFICULT, I THINK FOR US AS LAWYERS,
7      CERTAINLY FOR ME PERSONALLY, MAYBE MORE SO THAN SOME OF MY
8      PARTNERS.  I LIKE MY FRIENDS IN THE BAR.  IT'S -- IT'S -- IN
9      SOME WAYS, IT'S UNCOMFORTABLE TO TRY AND NOT ONLY TRUMP OUR OWN
10     ACHIEVEMENTS, BUT TO A CERTAIN EXTENT, YOU HAVE TO SAY, "I'M
11     MORE EXPERIENCED THAN THIS PERSON OR THAT PERSON."
12             THE COURT:  DRAW DISTINCTIONS.
13             MR. GELLER:  SO IT'S TOUGH TO DO TO STRIKE THAT
14     BALANCE OF HAVING A TONE THAT MAKES THE COURT KNOW THAT WE'RE
15     SERIOUS, WE REALLY THINK WE'RE THE BEST AT WHAT WE DO, BUT AT
16     THE SAME TIME YOU WANT TO STILL BE RESPECTFUL.  SO I THINK WE
17     USUALLY STRIKE THAT CHORD AND THAT BALANCE, AND IF YOUR HONOR
18     DIDN'T THINK WE DID HERE, THEN WE NEED TO DO A BETTER JOB OF
19     THAT.
20             BUT THE SUBSTANCE OF IT IS -- I THINK IT'S IMPORTANT.  YOU
21     KNOW, THERE'S -- THERE'S SORT OF A FINE LINE.  THERE'S
22     RESOURCES AND A BIG FIRM HAS RESOURCES.  OUR FIRM HAS THE
23     RESOURCES.  WE DID ENRON BY OURSELVES.  WE DID A TRIAL IN THE
24     SEVENTH CIRCUIT THAT WAS A MULTI-BILLION DOLLAR VERDICT ALL BY
25     OURSELVES, MUCH MORE COMPLEX IN TERMS OF THE DOCUMENTS AND THE
```

1   MILLIONS AND MILLIONS OF PAGES OF DOCUMENTS.

2        HERE, AS MR. HOOVER SAID, WE HAVE AT LEAST ONE

3   COMPREHENSIVE REPORT OF A FEW HUNDRED PAGES THAT YOUR HONOR,

4   YOU KNOW, IS REQUIRING THEM TO TURN OVER NOW.

5        I DON'T THINK IT'S A COMPLEX CASE.  I THINK HAVING

6   EXPERIENCE IN DATA BREACH IS IMPORTANT.  I CERTAINLY HAVE THAT

7   FROM ONE OF THE EARLY CASES WHERE IT WAS A (B)(3) CASE AND WE

8   GOT $50 MILLION, WHICH WAS A LOT OF MONEY AT THE TIME.  I LED

9   THE CASE.  MR. YANCHUNIS GOT INVOLVED LATER ON IN THE CASE.

10       AND THEN, OF COURSE, THE SONY DATA BREACH CASE MOST

11  RECENTLY.

12       AND I ECHO WHAT MR. BARNOW SAID.  JUDGE BATTAGLIA

13  APPOINTED SEVEN LAWYERS.  THERE WERE VARIOUS MOTIONS, SOME IN

14  GROUPS, SOME NOT IN GROUPS, AND HE JUST SORT OF HAND PICKED

15  LAWYERS.  WE DIDN'T MOVE TOGETHER AS A GROUP.

16       AND WHAT HAPPENED IS -- IT JUST WOULDN'T BE FAIR TO SAY

17  THERE WERE SEVEN CO-LEAD COUNSEL.  THERE WERE TWO OR THREE

18  CO-LEAD COUNSEL, AND MAYBE FOUR CO-LIGHT COUNSEL BECAUSE THEY

19  DIDN'T REALLY TAKE OWNERSHIP OF THE CASE.  THEY DIDN'T.

20       AND SO I DON'T THINK YOU NEED ANYWHERE NEAR THAT

21  STRUCTURE, AND THE REASON THAT WE DID FILE A RESPONSE, AND I'M

22  GLAD THAT YOU WEREN'T OFFENDED BY IT, IS BECAUSE THE ONE THING

23  YOUR HONOR SAID IS, QUOTE, "I WOULD JUST LIKE A VERY LEAN

24  STRUCTURE.  IT'S MY OWN REQUEST."

25       AND WITH ALL RESPECT TO MR. FRIEDMAN AND MS. CERVANTEZ,

1    WHO -- I DON'T KNOW THEM WELL.  I KNOW MR. FRIEDMAN'S FIRM VERY

2    WELL.  I'VE DONE A LOT OF CASES WITH COHEN MILSTEIN.  I SPOKE

3    TO BOTH OF THEM.  THEY SEEM NICE AND THEY'VE CERTAINLY DONE A

4    GREAT JOB THUS FAR.

5         BUT THEY DID THE ANTITHESIS OF WHAT YOU WANTED.  THEY DID

6    NOT GIVE YOU A LEAN STRUCTURE.  YOU WANT A LEAN STRUCTURE, AND

7    CLEARLY FROM THIS AFTERNOON, YOU WANT A LEAN CASE GOING

8    FORWARD, AND WE CAN DO THAT.

9         WHAT I THINK, I THINK THAT THEY'VE DONE SO MUCH, THEY'VE

10   INVESTED THEMSELVES IN THE CASE THUS FAR, AND EVEN THOUGH YOUR

11   HONOR HAS SAID THEIR APPOINTMENT AS INTERIM CO-LEAD IS NOT A

12   PRECURSOR FOR THEM TO BE APPOINTED LEAD, I CERTAINLY THINK, IN

13   SOME WAYS, THEY'VE EARNED THEIR STRIPES AND THEY OUGHT TO

14   CONTINUE IN THE CASE, OR AT LEAST ONE OF THEM IF NOT BOTH OF

15   THEM.

16        I DON'T THINK THAT THEIR STRUCTURE -- AND SOME OF THE

17   PEOPLE ON THEIR EXECUTIVE COMMITTEE, WHATEVER YOU WANT TO CALL

18   IT, THE OTHER SIX FIRMS, SOME OF THEM I'VE WORKED WITH, I LIKE,

19   THEY'RE VERY GOOD.  SOME OF THEM I DON'T THINK ARE AS

20   EXPERIENCED IN THIS GENRE.

21        BUT I DON'T THINK YOU SHOULD APPOINT THE STRUCTURE, IF I

22   MAY BE SO BOLD AS TO SAY THAT.  I THINK THAT I WOULD LOVE TO

23   WORK ON THE CASE PERSONALLY.

24        I THINK, LIKE MR. BARNOW SAID, WE WORKED VERY, VERY WELL

25   TOGETHER.  HE'S A TERRIFIC LAWYER.  HE HAS EXPERIENCE IN THIS.

```
 1    AND IF THE TWO OF US WERE APPOINTED WITH ONE OR BOTH OF THE

 2    INTERIM CO-LEAD, I THINK WE COULD ENSURE AN EFFICIENT PROCESS.

 3         BUT, AGAIN, THERE'S OTHER LAWYERS -- LIKE EVERYBODY ELSE,

 4    I CAN POINT TO PEOPLE WHO I LIKE, WHO I'VE WORKED WITH.

 5         I THINK IF YOU ASK ANY OF THEM FROM YANCHUNIS TO BARNOW TO

 6    KAREN HANSON TO, YOU KNOW, ARIANA TADLER OR ADAM LEVITT -- AND

 7    I'M LEAVING OUT PEOPLE -- I'VE WORKED WITH EVERYBODY AND WE GET

 8    ALONG AND WE WORK WELL TOGETHER.

 9         THE OTHER THING I'D LIKE TO MENTION --

10         THE COURT:  SO YOU THINK IT REALLY, AND YOU DID SAY

11    THIS IN YOUR PAPER, YOU THINK IT SHOULD ONLY BE THREE LAW

12    FIRMS?

13         MR. GELLER:  YEAH, THREE OR FOUR TOPS.  AND THAT'S

14    REALLY WHAT IT WAS IN THE SONY DATA BREACH, DESPITE THE SEVEN

15    LAWYERS BEING APPOINTED.

16         THE LAST THING I'LL SAY, I DON'T WANT TO TAKE TOO MUCH

17    TIME, YOU SAID -- YOU TALKED ABOUT BILLING AND THE RECORD

18    KEEPING, AND I'M SURE EVERY LAWYER IN THIS COURT HAS READ YOUR

19    RECENT OPINION IN THE HIGH-TECH POACHING CASE.

20         THE COURT:  YEAH.  I'M SURPRISED PEOPLE STILL WANT TO

21    WORK ON THIS CASE.

22         (LAUGHTER.)

23         MR. GELLER:  YOU KNOW, BELIEVE ME, WE ALL THOUGHT

24    ABOUT THAT, DO WE REALLY WANT TO GET ON THAT?

25         THE COURT:  I THOUGHT I'D GET A LOT OF WITHDRAWALS
```

```
1          AFTER THAT.

2                  (LAUGHTER.)

3                      MR. GELLER:  IT'S AN INTERESTING POINT.

4              BUT THE THING --

5                      THE COURT:  YOU CAN WITHDRAW NOW.

6                      MR. GELLER:  I'M ALL IN.  I'M ALL IN.  I'M HERE.

7              I'VE GOT A BLACK EYE.  IT WAS NOT FROM A LEAD PLAINTIFF

8      FIGHT BY THE WAY.

9                      THE COURT:  OKAY.

10                     MR. GELLER:  BUT WHAT I'LL SAY ABOUT THIS IS, LIKE IN

11     THE SONY CASE, MY FIRM, WE TOOK THE RESPONSIBILITY OF RECEIVING

12     TIME ENTRIES FROM EACH OF THE OTHER, SIX OTHER LAWYERS OR LAW

13     FIRMS REGULARLY.  WE WENT THROUGH THEM, WE CALLED PEOPLE ON

14     THINGS.  WE SAID, THERE'S NO WAY, YOU DIDN'T SPEND THIS MUCH

15     TIME ON THIS.  YOU KNOW?

16             AND SO BY THE TIME WE SUBMITTED IT TO JUDGE BATTAGLIA, IT

17     WAS -- WE DIDN'T HAVE THE ISSUES THAT YOUR HONOR HAD TO DEAL

18     WITH, FRANKLY, WITH CO-LEAD COUNSEL NOT TRUSTING EACH OTHER.

19                     THE COURT:  COMMITTING FRAUD ON THE COURT AT THE

20     FINAL APPROVAL HEARING.

21                     MR. GELLER:  AND THAT'S SORT OF A POX ON ALL OF US AS

22     CLASS ACTION LAWYERS.  WE NEVER LIKE TO SEE THAT.

23             AND I CAN JUST TELL YOU, MAYBE IT'S ABOUT THE RESOURCES OR

24     MAYBE IT'S MY BATTERY, I'VE WORKED WITH A PUBLIC DEFENSE LAW

25     FIRM, SO I'VE BILLED CLIENTS ON A MONTHLY BASIS, BUT IF I WERE
```

1    TO BE APPOINTED, I CERTAINLY WOULD ASK THE COURT TO ALLOW ME TO

2    TAKE ON THAT IMPORTANT RESPONSIBILITY BECAUSE YOU HAVE ENOUGH

3    TO DEAL WITH.  YOU SHOULDN'T DEAL WITH A FEE FIGHT AT THE END

4    AND THOSE KINDS OF THINGS.

5              THE COURT:  OKAY.  THANK YOU.

6              MR. GELLER:  THANK YOU.

7              THE COURT:  LET ME HEAR FROM MS. TADLER FROM MILBERG.

8         WHAT KIND OF STRUCTURE WOULD YOU ENVISION WORKING ON THE

9    CASE?

10             MS. TADLER:  YOUR HONOR, I THINK THAT THERE SHOULD BE

11   SOME KIND OF STRUCTURE.  I DO AGREE THAT IT SHOULD NOT BE A

12   SINGLE LEAD COUNSEL.  I THINK YOU HAVE TO HAVE AT LEAST TWO

13   CO-LEADS.

14             THE COURT:  UM-HUM.

15             MS. TADLER:  AND THE REASON IS THAT THESE CASES --

16   WHILE PERHAPS SOME MAY DISAGREE WITH THE COMPLEXITY OF THEM,

17   THERE ARE COMPLEX ISSUES THAT ARISE NOT ONLY SUBSTANTIVELY, BUT

18   INSOFAR AS THE MANAGEMENT OF THE CASE ITSELF.

19        AS I SAID IN MY PAPERS, I'VE HAD THE PRIVILEGE OF WORKING

20   WITH A NUMBER OF LAWYERS -- AND I WOULD LIKE TO MAKE ONE POINT

21   ON THE OVERSIGHT THAT I MADE IN MY PAPERS, WHICH I DID NOT

22   INCLUDE MR. VINCE ESADES, WHO WAS THE LEAD COUNSEL IN THE

23   TARGET CASE AND DID A TRULY STELLAR JOB, NOT ONLY IN TERMS OF

24   LEADING THOSE OF US WHO SAT ON THE COMMITTEE WITH HIM, BUT ALSO

25   ENSURING THAT WE WERE FOCUSED ON THE STRENGTHS THAT EACH OF US

1       BROUGHT TO THE TABLE.

2           IN MY INSTANCE, MY FOCUS WAS DISCOVERY BECAUSE OF THE

3       REPUTATION THAT I HAVE GARNERED OVER NEARLY -- IT'S NEARLY 15

4       YEARS ACTUALLY WORKING ON E-DISCOVERY ISSUES.  I'VE HAD THE

5       PRIVILEGE OF WORKING ON THE AMENDMENTS TO THE FEDERAL RULES.

6       I'VE HAD THE PRIVILEGE OF WORKING ON CERTAIN LOCAL GUIDELINES,

7       INCLUDING IN CALIFORNIA.

8           SO THAT WAS MY -- THAT WAS MY AREA.  THAT WAS SOMETHING

9       THAT I COULD BRING OF STRENGTH.

10          MR. YANCHUNIS -- I RESPECT SO MANY PEOPLE IN THIS ROOM,

11      BUT WHEN IT COMES TO EXPERTS IN THIS AREA, MR. YANCHUNIS IS THE

12      GUY.

13          MR. SIEGEL, IN THE TARGET MATTER, DID STELLAR, STELLAR

14      WORK, NOT ONLY SUBSTANTIVELY THROUGHOUT THE LITIGATION, BUT

15      ALSO SPECIFICALLY WITH RESPECT TO THE PLAINTIFFS.

16          AND TAKING INTO ACCOUNT THE KIND OF SCHEDULE THAT YOU'VE

17      PUT US ON, I THINK YOU DO NEED TO HAVE SOMEBODY WHO REALLY

18      UNDERSTANDS THE INTRICACIES AND THE TIME REQUIRED TO REALLY

19      MANAGE THAT PROCESS.

20          I ALSO NOTED OTHER PEOPLE IN MY PAPERS.  GIRARD GIBBS,

21      PHENOMENAL FIRM, ESPECIALLY WHEN IT COMES TO CERTAIN TYPES OF

22      NEGOTIATIONS.

23          BUT, AGAIN, TO ANSWER YOUR QUESTION, I THINK THERE HAVE TO

24      BE AT LEAST TWO CO-LEADS.  I DO THINK THAT YOU NEED SOME OTHER

25      FIRMS TO HELP OUT.  THEY NEED TO BE RESPONSIVE TO WHAT THE

1    REQUEST OR ASSIGNMENT IS AND DO NO MORE.

2         AND THERE HAS TO BE A STRUCTURE FOR PURPOSES OF BILLING.

3    TAKING MR. GELLER ON HIS POINT, IN THE IPO SECURITIES

4    LITIGATION, WHICH IS NEARLY 15 YEARS AGO NOW, IN THAT CASE WE

5    HAD TO MONITOR AND MANAGE THE TIME OF OVER 62 PLAINTIFFS'

6    FIRMS, AND THAT EXERCISE IS ONE THAT IS VERY WORTHWHILE.  IT'S

7    AN IMPORTANT ONE, AND IT'S IMPORTANT TO REALLY GET TO THE HEART

8    OF WHAT PEOPLE ARE BILLING EVERY MONTH SO THAT IF THERE IS AN

9    ISSUE, IF THERE'S SOME KIND OF PROBLEM OR INCONSISTENCY OR A

10   QUESTION, THAT CAN BE RESOLVED CONTEMPORANEOUSLY AND NOT LATER

11   AT THE END OF THE DAY SUCH THAT THERE IS GOING TO BE FIGHTING,

12   WHICH NONE OF US SHOULD BE DOING.

13        AGAIN, THERE ARE OTHER PEOPLE THAT ARE PART OF

14   MR. FRIEDMAN AND MS. CERVANTEZ'S GROUP.  I'VE HAD THE PRIVILEGE

15   OF WORKING WITH THEM.

16        I CAN'T THINK OF REALLY ANY FIRM IN THIS COURTROOM THAT I

17   HAVEN'T HAD A POSITIVE OPPORTUNITY TO WORK WITH.  IF I HAVEN'T

18   WORKED WITH YOU, THAT MEANS I JUST HAVEN'T HAD THE OPPORTUNITY

19   AND I HAVE NO DOUBT, BASED UPON MY COLLABORATIVE SPIRIT, THAT

20   IT WOULD BE A POSITIVE EXPERIENCE.

21        AND I THINK IF YOU WERE TO LOOK AT MY CREDENTIALS NOT ONLY

22   IN THE DISCOVERY ARENA, BUT ALSO THE FACT THAT IN THE COURSE OF

23   DEVELOPING THAT REPUTATION, I'VE WORKED VERY, VERY HARD TO NOT

24   ONLY COLLABORATE WITH THE PEOPLE ON MY SIDE OF THE "V," BUT TO

25   WORK WITH THE OTHER SIDE TO IDENTIFY ISSUES WHERE WE CAN REACH

```
1    AGREEMENT.
2         CERTAINLY I'VE BEEN AN ENDORSER AND AN INITIAL CONTRIBUTOR
3    TO THE DEVELOPMENT OF THE COOPERATION PROCLAMATION, WHICH WAS
4    WRITTEN AND PUBLISHED BY THE SEDONA CONFERENCE, AND I'VE
5    ACTUALLY EVEN HAD THE PRIVILEGE TO WORK ON THE OPPOSITE SIDE OF
6    HOGAN LOVELLS.
7         SO I THINK THAT COLLABORATION HAS TO GO BOTH WAYS.  WE
8    HAVE A RESPONSIBILITY IN THIS SYSTEM, ESPECIALLY GIVEN THE
9    TAXED RESOURCES OF THE COURT, TO MAKE SURE THAT WE ARE MAKING
10   LITIGATION AS STREAMLINED AND AS EFFICIENT AND AS INEXPENSIVE
11   AS POSSIBLE AND TO BE VERY, VERY MINDFUL OF WHAT RULE 1 CALLS
12   UPON US TO DO.
13             THE COURT:  ALL RIGHT.  THANK YOU.
14             MS. TADLER:  YOU'RE WELCOME.
15             THE COURT:  ALL RIGHT.  THANK YOU.
16        MR. COTCHETT.
17             MR. COTCHETT:  YES, YOUR HONOR.
18             THE COURT:  SO OTHER THAN APPOINTING YOU, WHAT'S YOUR
19   RECOMMENDATION FOR THE COURT?
20             MR. COTCHETT:  I THINK YOU CLEARLY NEED CO-COUNSEL
21   HERE, AND TO BE BRUTALLY CANDID WITH YOU, MS. CERVANTEZ'S FIRM
22   IS A LABOR LAW FIRM, BUT I THINK SHE'D BE EXCELLENT, AND THE
23   REASON WHY I THINK SHE WOULD BE EXCELLENT, BECAUSE I READ HER
24   MOTION IN TERMS OF -- TO ME THERE ARE TWO KEY PAGES HERE.  WHAT
25   WE'RE REALLY TALKING ABOUT IS EFFICIENCY AND WE'RE TALKING
```

```
1      ABOUT BENEFIT TO THE CLASS.

2              THE COURT:  UM-HUM.

3              MR. COTCHETT:  SO WHEN I READ THE FACT THAT

4      MS. CERVANTEZ, EVERY MONTH, WOULD KEEP TRACK OF THE HOURS,

5      THAT'S THE TYPE OF LAWYER I WANT.

6          I DON'T THINK THERE'S A LAWYER IN THIS ROOM THAT KNOWS THE

7      PHYSICS OF THE HACK IN.  SO TO SAY THAT THEY'VE WORKED ON

8      WAL-MART, WHATEVER THE HELL IT IS, THE BOTTOM LINE IS, ARE YOU

9      A GOOD, EFFICIENT LAWYER?

10         WE BRING TO THE TABLE -- AND BY THE WAY, I THINK THE TWO

11     OF THEM HAVE DONE YEOMAN WORK, THEY OUGHT TO BE CO-CHAIRS, AND

12     THEN THEY'RE GOING TO NEED BODIES TO WORK WITH.

13         YOU ASKED HOW MANY BODIES.  I CAN'T TELL YOU HOW MANY

14     BODIES.

15         I CAN TELL YOU THIS:  YOU SHOULD LOOK TO THE FIRMS --

16     THERE ARE SOME FABULOUS FIRMS IN THIS ROOM.  LOOK TO THE FIRMS

17     WHO WORK EFFICIENTLY AND CAN QUICKLY GET THE JOB DONE, BECAUSE

18     THE BOTTOM LINE HERE IS THE BENEFIT TO THE CLASS.

19         THE OTHER THING I LIKED WAS THAT THEY SET UP A CONCEPT OF

20     HOW BILLING WOULD BE DONE BECAUSE YOU KNOW AND I KNOW THAT IF

21     YOU WERE TO ASK ME, AM I GOING TO BE THE LEAD PERSON ON THIS

22     CASE IN MY FIRM, I WOULD HONESTLY TELL YOU NO BECAUSE I DON'T

23     HAVE THE TIME TO SIT AND DRAFT INTERROGATORIES AND REVIEW

24     INTERROGATORIES.  BUT I HAVE SOME FABULOUS YOUNG PEOPLE IN OUR

25     FIRM, AS ALL OF THESE FIRMS DO.
```

```
 1            BUT TO HEAR A PERSON STAND UP HERE JUST RECENTLY AND SAY,
 2       "I PERSONALLY WILL WORK ON THE FIRM" -- THIS IS MY 50TH YEAR
 3       PRACTICING LAW.  I HAVE HAD OVER 100 JURY TRIALS.  I KNOW HOW
 4       THEY WORK.
 5            YOU'RE FAMILIAR WITH OUR FIRM.  I THINK YOU MAY HAVE SEEN
 6       ME ARGUE A CASE OR TWO TO A JURY.
 7            IT'S ALL ABOUT EFFICIENCY AND, IN THIS CASE, WHAT IS THE
 8       BENEFIT TO THE CLASS?
 9            SO WHEN I LOOK AT PAGE 8, I THINK IT IS, OF THE MOVING,
10       THAT IS TO SAY, CLASS COUNSEL MOVING PROPOSAL AND FEE
11       STRUCTURE, THAT TO ME IS VERY CRITICAL BECAUSE WHAT THEY ARE
12       GOING TO DO, AS I UNDERSTAND IT, IS MAKE THE ASSIGNMENTS, WORK
13       TO BE DONE.  THEY'RE GOING TO MAKE THE ASSIGNMENTS TO PEOPLE IN
14       THIS ROOM WHO CAN WORK -- I'M GOING TO USE THIS WORD ONE MORE
15       TIME -- EFFICIENTLY.  THAT'S WHAT THIS IS ALL ABOUT.
16            WHETHER OR NOT SOMEONE HAS WORKED ON A DATA BREACH CASE TO
17       ME IS IMMATERIAL.  I HEARD THIS WONDERFUL WOMAN --
18       MRS. GREENWALD WAS IT?  I APOLOGIZE -- I THINK SHE'S AN
19       ENVIRONMENTAL LAWYER.  I HEARD HER SPEAK.  I LOOKED AT HER
20       PAPERS.  IT'S GOING TO COME AS A SHOCK TO HER, BUT I THINK SHE
21       WOULD BE FABULOUS.
22            THE FACT THAT SHE WORKED ON ENVIRONMENTAL CASES IS
23       NONSENSE, "NONSENSE" MEANING AS AN ADJUDICATION AS TO WHETHER
24       OR NOT SHE CAN WORK EFFICIENTLY AND AS A GOOD LAWYER.  THAT'S
25       WHAT THIS CASE REQUIRES.
```

```
 1            TO HAVE EIGHT LAW FIRMS -- IT'S NOT EIGHT TOTAL, THE WAY I

 2     COUNTED IT.  IT'S THEY WANT TWO LEAD AND EIGHT LAW FIRMS.

 3     THAT'S TOO MANY, "TOO MANY" ONLY IN THE SENSE THAT IT APPEARS

 4     TO ME THAT FOUR OR FIVE LAW FIRMS, LED BY THESE TWO RIGHT

 5     HERE -- I DON'T MEAN TO REFER TO THEM AS TWO, THESE TWO LAW

 6     FIRMS -- THEY'VE OBVIOUSLY GOT THEIR FEET ON THE GROUND.

 7            YOU HEARD THE DISCUSSION THAT WENT ON FOR A HALF HOUR

 8     ABOUT WHETHER OR NOT WE SHOULD EVEN HAVE -- WHAT WE SHOULD HAVE

 9     IN THE CONSOLIDATED AMENDED COMPLAINT.

10            SO YOU KNOW THE EFFICIENCIES ARE GOING TO HAVE TO BE

11     BROUGHT TO THE TABLE HERE.

12            I WROTE DOWN A QUOTE FROM YOU.  YOU TALKED ABOUT HUMAN

13     LIMITS ON WHAT WE CAN DO.  THAT'S WHAT THIS CASE IS ALL ABOUT,

14     BECAUSE THAT SEAL UP ABOVE YOUR HEAD IS ALL ABOUT JUSTICE, AND

15     WE ONLY HAVE SO MUCH TIME TO WORK THESE CASES.

16            SO WHEN I HEARD THE WORDS COME OUT OF YOUR MOUTH, "HUMAN

17     LIMITS," I KNOW WHAT YOU DO AS A FEDERAL JUDGE.  I KNOW THE

18     LIMITS THAT ARE GOING TO HAVE TO BE PUT ON THIS CASE, AND IN

19     CONJUNCTION WITH THAT, IT'S GOING TO HAVE TO BE EFFICIENT.

20            SO THE REAL ISSUE IS, IF YOU WANT A FIRM THAT'S GOING TO

21     SERVE ON THE EXECUTIVE COMMITTEE, OR WHATEVER YOU WANT TO CALL

22     IT, IT'S GOT TO BE A FIRM THAT THESE TWO INDIVIDUALS KEEP TOTAL

23     CONTROL OF, UNDERSTAND THEIR ABILITIES, AND USE THEM WHERE THEY

24     CAN BEST BE USED.

25            I RECENTLY HEARD A YOUNG LAWYER TAKE A DEPOSITION,
```

```
1    WATCHED, READ THE DEPOSITION THAT TOOK EIGHT HOURS.  IT SHOULD
2    HAVE BEEN DONE IN A HALF HOUR.  THAT'S WHAT I'M TALKING ABOUT.
3         WE CAN RUN UP SUCH BILLS HERE.  I WOULD BE -- I DON'T KNOW
4    HOW TO SAY THIS.  I WOULD BE OVER MY HEAD IN TELLING YOU,
5    HAVING SAT AND SAW.
6         BUT THERE'S SOMETHING VERY IMPORTANT HERE, AND EVERYBODY
7    IN THIS ROOM SHOULD HAVE READ, IF THEY HAVEN'T, YOUR DECISION
8    ON FEES IN THE POACHING CASE.  IT WAS FAR MORE THAN FEES.  IT
9    WAS ABOUT HOW WE HAVE TO GIVE JUSTICE TO THOSE VICTIMS OUT
10   THERE.
11        THE VICTIMS ARE THE CLASS.  THE VICTIMS ARE NOT SITTING IN
12   THIS COURTROOM HERE.  THESE ARE THE PEOPLE THAT ARE GOING TO
13   HELP THE VICTIMS.  THEY SHOULD READ YOUR DECISION.  IT'S NOT
14   JUST ABOUT FEES.  IT'S ALSO ABOUT EFFICIENCY.
15        I'M SORRY I WENT ON SO LONG.  I HAVE THIS TENDENCY LATE IN
16   THE DAY TO SPEAK.
17             THE COURT:  OKAY.  THANK YOU.  ALL RIGHT.
18        OH, I'M SORRY.  WE SHOULD -- LET'S TAKE A BREAK.  WHY
19   DON'T WE TAKE A BREAK NOW?
20        OKAY.  LET'S TAKE A TEN MINUTE BREAK.
21             THE CLERK:  COURT WILL STAND IN RECESS FOR TEN
22    MINUTES.
23        (RECESS FROM 3:49 P.M. UNTIL 4:03 P.M.)
24             THE COURT:  OKAY.  WELCOME BACK.
25             THE CLERK:  GO AHEAD AND BE SEATED.
```

```
1              THE COURT:  ALL RIGHT.  I'VE ALREADY HEARD FROM

2        MS. FREEMAN AND MS. CAPPIO.

3              LET'S GO TO THE BERGER & MONTAGUE FIRM, MS. SAVETT.

4              LET ME ASK YOU A DIFFERENT QUESTION.  I DID LIKE YOUR

5        APPLICATION.  FROM WHAT I'VE SEEN OF SOME PRIVACY CASES, MAYBE

6        DATA BREACH CASES, TOO, BUT I'VE SEEN PLAINTIFFS' LAWYERS OUT

7        LAWYERED ON THE MOTIONS.  SO THE SECOND MOTION TO DISMISS IS

8        GRANTED WITH PREJUDICE, THE CASE IS DEAD; SUMMARY JUDGMENT IS

9        GRANTED IN FAVOR OF DEFENDANTS, THE CASE IS DEAD.

10             AND SO HOW MUCH DOES EXPERIENCE WITH PRIVACY OR DATA

11       BREACH CASES MATTER VERSUS JUST REALLY, REALLY, REALLY, REALLY

12       SHARP SMARTS THAT ARE GOING TO KNOW HOW TO SURVIVE A MOTION TO

13       DISMISS OR PREVAIL ON SUMMARY JUDGMENT?  DO YOU SEE WHAT I'M

14       SAYING?

15             MS. SAVETT:  I ABSOLUTELY DO.

16             THE COURT:  YEAH.  I'VE CERTAINLY GRANTED MOTIONS TO

17       DISMISS IN PRIVACY CASES.

18             MS. SAVETT:  WELL, I WILL JUST TELL YOU ABOUT MY OWN

19       SITUATION IN DATA BREACH CASES.  I'VE ONLY BEEN LEAD IN ONE,

20       I'VE REALLY ONLY WORKED ON ONE, AND THAT WAS ALMOST THE FIRST

21       ONE, THE TJX CASE.  IT WAS A VERY BIG DATA BREACH, IT WAS A

22       RETAIL STORE.  45 MILLION CUSTOMERS HAD THEIR CREDIT CARD OR

23       DEBIT CARD NUMBERS STOLEN, AND ABOUT HALF A MILLION SOCIAL

24       SECURITY NUMBERS WERE STOLEN.

25             I HAD NEVER DONE A DATA BREACH CASE BEFORE IN MY LIFE AND
```

1    I WAS CO-LEAD COUNSEL, INCIDENTALLY, WITH MR. BARNOW AND

2    ANOTHER GENTLEMAN -- THERE WERE THREE CO-LEAD COUNSEL -- AND WE

3    JUST PLUNGED IN AND WE LITIGATED THE CASE AND WE GOT AN

4    EXCELLENT RESULT.

5          AND IT WAS BEFORE JUDGE YOUNG IN THE DISTRICT OF

6    MASSACHUSETTS, HE WAS THE FORMER CHIEF JUDGE, AND HE'S A TOUGH

7    JUDGE IF YOU KNOW HIM.  AND AT THE END OF THE DAY, HE SAID THAT

8    OUR SETTLEMENT WAS INNOVATIVE, GROUNDBREAKING, AND EXCELLENT,

9    AND THAT DOESN'T COME LIGHTLY FROM HIM.

10          THE COURT:  UM-HUM.

11          MS. SAVETT:  AND I WANTED TO TALK -- I'M GOING TO GET

12    BACK TO THE ANSWER TO YOUR QUESTION.  I THINK THE ANSWER IS

13    THAT GOOD LAWYERS, GREAT LAWYERS, WORKING TOGETHER

14    COOPERATIVELY CAN GET GREAT RESULTS, EVEN IF THE SUBJECT MATTER

15    IS NOT SOMETHING THEY'VE WORKED WITH EVERY SINGLE DAY.

16          I MEAN, I WAS A SECURITIES CLASS ACTION LAWYER PRIMARILY

17    FOR 20 YEARS.  NOW I DO QUI TAM, I DO CONSUMER LITIGATION, AND

18    I DID THAT ONE DATA BREACH CASE AND IT WAS REALLY SUCCESSFUL.

19          AND THE RELIEF THAT WE GOT HAS REALLY BEEN THE TEMPLATE

20    FOR ALL THE SUCCESSFUL DATA BREACH CASES SINCE.  WE GOT TWO

21    YEARS OF EXTRA CREDIT MONITORING INSURANCE AND WE GOT -- WE HAD

22    A FUND FOR LOSSES, WHICH WAS $17 MILLION OF VOUCHERS OR $9

23    MILLION IN CASH.  THE PEOPLE HAD THEIR CHOICE.

24          AND WHAT WAS UNIQUE ABOUT IT IS THAT PEOPLE COULD

25    SELF-CERTIFY.  IF THEY SPENT HOURS TRYING TO MITIGATE THEIR

1     LOSS, ALL THEY HAD TO DO WAS CHECK A BOX AND THEY GOT A CERTAIN

2     AMOUNT, AND IF THEY HAD ACTUAL PROOF OF SOME DAMAGE, THEY GOT A

3     HIGHER AMOUNT.

4          THE COURT:  UM-HUM.

5          MS. SAVETT:  BUT WE ALL KNOW NOW, THOSE OF US THAT

6     HAVE DONE DATA BREACH CASES, THAT THEY'RE NOT BIG DAMAGE CASES,

7     ESPECIALLY THE RETAIL STORE ONES, BECAUSE THE BANKS PAY THE

8     FALSE CHARGES.

9          AND HERE IT'S NOT CLEAR ALL THE DIFFERENT WAYS THAT PEOPLE

10    HAVE BEEN DAMAGED.

11         BUT THE BIGGEST DAMAGE IS THIS IMMINENT THREAT, WHICH

12    YOU'VE RECOGNIZED IN YOUR OPINIONS AND NOW THE SEVENTH CIRCUIT

13    HAS, OF IDENTITY THEFT.  AND IT'S SO SERIOUS BECAUSE IT AFFECTS

14    CHILDREN FOR THE REST OF THEIR LIVES.

15         AND SO THE INJUNCTIVE RELIEF IS REALLY THE MOST IMPORTANT

16    THING IN THESE CASES.  YES, THERE ARE OUT-OF-POCKET DAMAGES AND

17    IT'S IMPORTANT TO PROVIDE FOR THEM.

18         BUT WE HAVE TO THINK ABOUT TWO KINDS OF INJUNCTIVE RELIEF.

19    ONE IS CORRECTING THE SYSTEM NOW IN A COMPANY WHOSE SYSTEM IS

20    WEAK SO IT WON'T CONTINUE.

21         THE COURT:  UM-HUM.

22         MS. SAVETT:  AND THEN THE OTHER PART OF IT IS, HOW DO

23    YOU PROTECT PEOPLE?  BECAUSE THE INFORMATION IS OUT THERE IN

24    THE HANDS OF HACKERS AND THEY CAN HOLD ON TO IT FOR YEARS.

25         SO I THINK ONE OF THE CHALLENGES OF THIS CASE IS GOING TO

1    BE HOW WE CRAFT THE INJUNCTIVE RELIEF, AND WE WILL NEED

2    EXPERTS.

3         NOW, IN TJX, WE DID SOMETHING THAT I THOUGHT WAS WISE, AND

4    I THINK I WOULD EXPAND UPON IT HERE.  WHAT WE DID WAS WE MADE

5    THE WHOLE SETTLEMENT CONTINGENT UPON AN EXAMINATION BY AN

6    INDEPENDENT EXPERT SELECTED BY PLAINTIFFS WHO REVIEWED THE

7    SYSTEM AT TJX THAT THEY REVISED TO MAKE SURE THAT IT REALLY WAS

8    UP TO PAR, THAT THERE WOULD BE A MINIMIZATION OF FUTURE

9    BREACHES, AND OUR SETTLEMENT WAS ENTIRELY CONTINGENT ON THAT

10   INDEPENDENT EXPERT'S OPINION.

11        I THINK WE COULD DO MORE.  I'M ENVISIONING THE KINDS OF

12   RELIEF THAT WE COULD HAVE.

13        BUT TO GET BACK TO YOUR -- THAT BEING LIKE, FOR EXAMPLE,

14   ANNUAL AUDITS BY AN INDEPENDENT BODY TO MAKE SURE SYSTEMS ARE

15   UP TO PAR.

16             THE COURT:  UM-HUM.

17             MS. SAVETT:  BUT ON YOUR QUESTION, I DON'T THINK

18    HAVING THE DATA BREACH EXPERIENCE IS THE BE-ALL AND THE

19    END-ALL.  I THINK SMART LAWYERS WHO CAN FIGURE OUT DIFFICULT

20    SITUATIONS AND STRATEGIC WAYS TO GET CLASSES CERTIFIED OR TO

21    FORMULATE CLASSES IS REALLY THE MOST IMPORTANT THING.

22        AND IF I COULD GO TO A QUESTION YOU ASKED SOME OF THE

23   OTHER PEOPLE, WHICH IS, LIKE, HOW BIG OF A STRUCTURE?

24             THE COURT:  UM-HUM.

25             MS. SAVETT:  I THINK TWO LEAD COUNSEL IS EXCELLENT,

```
1        MAYBE THREE AT THE MOST.

2             AND I DON'T EVEN THINK IT'S IMPORTANT TO HAVE A SET

3        COMMITTEE IN PLACE BECAUSE THERE ARE REALLY A LOT OF GREAT

4        LAWYERS HERE, AND FIRMS WITH DEEP RESOURCES LIKE MINE COULD

5        PROBABLY LITIGATE THE WHOLE CASE THEMSELVES.

6             BUT I FIND THERE'S A TREMENDOUS BENEFIT TO HAVING AN

7        EXCELLENT CO-LEAD COUNSEL, OR EVEN TWO, TO BOUNCE IDEAS OFF, TO

8        STRATEGIZE, TO OWN THE CASE.

9             BECAUSE I TRY TO OWN THE CASES.  I WORK ON THEM MYSELF,

10       AND I'VE BEEN PRACTICING 40 YEARS, AND I'M STILL VERY, VERY

11       EXCITED WHEN I'M LEADING A CASE THAT I CARE ABOUT, AND THIS IS

12       A CASE TO REALLY CARE ABOUT BECAUSE THERE'S SO MUCH DANGER OUT

13       THERE TO ALL THE PEOPLE THAT WE WOULD BE REPRESENTING.

14            THE COURT:  SO FROM YOUR OBSERVATION OF DATA BREACH

15       CASES, BECAUSE THE DAMAGES EXPOSURE IS LOW, DO THEY TEND TO

16       SETTLE OUT EARLY AND FOR LESS THAN $10 MILLION?  WHAT'S YOUR

17       EXPERIENCE, OR WHAT YOU'VE OBSERVED --

18            MS. SAVETT:  I'VE SEEN THAT.

19            THE COURT:  -- OF THE LANDSCAPE?

20            MS. SAVETT:  I HAVE SEEN THAT.  AND I THINK WHAT'S

21       IMPORTANT IS THE --

22            THE COURT:  SO WHEN DO THEY TEND TO SETTLE THEN?

23       JUST AFTER A MOTION TO DISMISS, BUT BEFORE CLASS CERT?  IS THAT

24       USUALLY IT?

25            MS. SAVETT:  THAT WAS MY EXPERIENCE, YES.
```

```
 1              THE COURT:  OKAY.  WHAT'S THE LARGEST SETTLEMENT
 2    YOU'VE SEEN?  10 MILLION?
 3              MS. SAVETT:  I THINK OUR TJX MIGHT HAVE BEEN THE
 4    LARGEST IN TERMS OF DOLLARS.
 5              THE COURT:  UH-HUH.
 6              MS. SAVETT:  PEOPLE HAD THE OPTION OF EITHER VOUCHERS
 7    THAT EQUALLED -- ACTUALLY, IT WAS $18 MILLION, OR IF THEY
 8    DIDN'T WANT TO TAKE THE VOUCHER, THEY COULD TAKE THE CASH,
 9    WHICH WAS HALF AS MUCH.
10              THE COURT:  RIGHT.
11              MS. SAVETT:  THAT WAS 9 MILLION, AND ODDLY, I DIDN'T
12    KNOW HOW IT WAS GOING TO WORK OUT, BUT MORE PEOPLE TOOK THE
13    VOUCHERS BECAUSE THEY HAD REAL VALUE.  THEY COULD BUY THINGS AT
14    TJX.
15              THE COURT:  UM-HUM.
16              MS. SAVETT:  I HAVEN'T SEEN TOO MANY LARGE CASH
17    SETTLEMENTS, BUT PART OF IT IS BECAUSE THE OUT-OF-POCKET
18    DAMAGES ARE NOT THAT LARGE.
19              THE COURT:  UM-HUM.
20              MS. SAVETT:  NOW, HERE THERE'S DIFFERENT KINDS OF
21    NEGATIVE EFFECTS THAT WERE CAUSED BY THIS BREACH, LIKE WE KNOW
22    THERE'S ALREADY BEEN TAX FRAUD.
23              THE COURT:  UM-HUM.
24              MS. SAVETT:  BUT HOW DO YOU COMPENSATE FOR THAT?
25        I MEAN, I THINK THE CREDIT MONITORING INSURANCE AND MAKING
```

```
 1       SURE THAT IT'S REALLY VALUABLE WHERE PEOPLE ARE COUNSELLED AS

 2       TO HOW TO DEAL WITH IDENTITY THEFT IS VERY IMPORTANT, AND I

 3       THINK HAVING IT FOR A NUMBER OF YEARS AFTER THE BREACH IS

 4       MEANINGFUL BECAUSE OF THE WAY HACKERS HOLD ON TO THE MATERIALS

 5       AND USE THEM OVER TIME.

 6                  THE COURT:  UM-HUM.  OKAY.  THANK YOU.

 7                  MS. SAVETT:  THANK YOU.

 8             OH, ONE LAST POINT, YOUR HONOR.

 9                  THE COURT:  YES, GO AHEAD.

10                  MS. SAVETT:  I'VE NEVER HAD A FEE FIGHT WITH ANYBODY

11       IN ANY CASE.  AND I THINK IT'S IMPORTANT TO PUT OUT GUIDELINES

12       RIGHT AT THE BEGINNING TO ALL OF THE LAWYERS IN THE CASE THAT

13       TELL THEM -- BASICALLY SIMILAR TO THE ONES THAT WERE DEVELOPED

14       BY MR. FRIEDMAN AND MS. CERVANTEZ.

15             AND THEN I THINK THE LEAD COUNSEL SHOULD HAVE THE FREEDOM,

16       AS YOU EXPRESSED IN THE YAHOO! CASE, TO ASK PEOPLE TO DO

17       ASSIGNMENTS THAT ARE REALLY DISCRETE AND IMPORTANT AND FIT

18       THEIR SKILLS AS OPPOSED TO HAVING A SET, BIG STEERING COMMITTEE

19       WHO HAVE EXPECTATIONS AND MAYBE WILL TRY TO BILL MORE TIME THAN

20       NECESSARY FOR THE FUNCTIONS THAT THEY'RE DOING.

21                  THE COURT:  UM-HUM.  OKAY.  THANK YOU.

22                  MS. SAVETT:  THANK YOU.

23                  THE COURT:  THANK YOU VERY MUCH.

24             LET ME HEAR FROM HAUSFELD, PLEASE.

25             ALL RIGHT.  WELL, I'M IMPRESSED WITH THE VITAMIN C
```

1    ANTITRUST LITIGATION, I WAS FOLLOWING THAT, CERTAINLY O'BANNON.

2    I KNOW YOU'RE ON THE STEERING COMMITTEE FOR TARGET AND HOME

3    DEPOT.

4         DO YOU HAVE ANY THOUGHTS ABOUT -- I'VE JUST SEEN SO MANY

5    PRIVACY CASES WHERE I FELT THE PLAINTIFFS WERE GETTING OUT

6    LAWYERED BY THE DEFENSE, SO I REALLY WANT SMART LAWYERS.  I DO

7    WANT THE EFFICIENCY, BUT I REALLY WANT SMART LAWYERS THAT ARE

8    GOING TO PUT TOGETHER THE STRONGEST BRIEF POSSIBLE.

9         I MEAN, WHATEVER HAPPENS AFTER THAT IS FINE, BUT LOOKING

10   OUT FOR THE INTERESTS OF THE CLASS, THE CLASS NEEDS TO TRY TO

11   HAVE THE LAWYERS THAT WOULD BEST REPRESENT THEM.

12        I'VE CERTAINLY DISMISSED A LOT OF -- NOT A LOT, BUT A

13   NUMBER OF PRIVACY CASES AT SUMMARY JUDGMENT OR MOTION TO

14   DISMISS WHERE I WONDER, IF THEY HAD DIFFERENT LAWYERS, WHETHER

15   THE OUTCOME WOULD HAVE BEEN DIFFERENT.

16        MR. LEBSOCK:  RIGHT.  WELL, LET ME SAY A COUPLE

17   THINGS ABOUT THAT.

18             THE COURT:  YEAH.

19        MR. LEBSOCK:  FIRST OF ALL, BONNY SWEENEY, WHO IS MY

20   PARTNER, IS ON A LONG-SCHEDULED TRIP.  SHE IS THE PERSON THAT

21   WOULD BE THE DAY-TO-DAY PERSON TO WORK THIS CASE, ALONG WITH

22   JAMES PIZZIRUSSO, WHO WAS ON THE PSC OF TARGET AND HOME DEPOT.

23        THE WAY WE SEE THIS CASE --

24             THE COURT:  YEAH.

25        MR. LEBSOCK:  -- IS RATHER CLEAR, I THINK.  THERE ARE

1    SOME INJUNCTIVE RELIEF ISSUES AND QUESTIONS ABOUT WHETHER WHAT

2    HAS BEEN DONE HERE IS SUFFICIENT TO PROTECT THE CLASS GOING

3    FORWARD AND WHETHER ANTHEM HAS DONE ENOUGH TO PROTECT DATA

4    GOING FORWARD.  SO, YOU KNOW, THERE ARE SOME INJUNCTIVE RELIEF

5    ISSUES AROUND THAT.

6        I THINK WE ARE THE ONLY FIRM THAT, IN THE KRISSMAN CASE,

7    THAT HAS CLAIMED STATUTORY DAMAGES UNDER THE CMIA IN CALIFORNIA

8    FOR THE LOSS OF THE MEDICAL I.D. NUMBERS, AND THAT'S $1,000

9    STATUTORY DAMAGE PER CLASS MEMBER.

10       AND I DON'T KNOW THAT WE CAN ALLEGE THAT CLAIM ON BEHALF

11   OF A NATIONWIDE CLASS, BUT THERE IS A SERIOUS EXPOSURE TO

12   DAMAGES HERE, AT LEAST AS TO THE CALIFORNIA CLASS.

13       AND WE WOULD BE VERY AGGRESSIVE IN ADVOCATING THAT THERE

14   WAS NEGLIGENCE HERE, THAT DATA WAS EXPOSED, THAT THE MEDICAL

15   I.D. NUMBERS WERE EXPOSED, AND THAT THAT EXPOSES ANTHEM TO

16   DAMAGES AT LEAST FOR THAT CALIFORNIA CLASS.

17       NOW, AS FAR AS BEING EXPERTS IN THE FIELD, YOUR HONOR, WE

18   ARE LEAD COUNSEL PROBABLY IN MORE CASES THAN ANY OTHER FIRM.

19   WE DO VERY COMPLEX WORK.

20       WE DON'T SEE THIS AS A PARTICULARLY COMPLEX CASE.  I MEAN,

21   LET'S BE REALISTIC ABOUT THIS.  THE WAY THE COURT WANTS TO MOVE

22   THIS CASE AND THE FACT THAT IT'S PROBABLY GOING TO BE LIMITED

23   TO, YOU KNOW, SIX CAUSES OF ACTION, PROBABLY CALIFORNIA BEING

24   ONE OF THOSE CLAIMS THAT MOVE FORWARD, THERE'S GOING TO BE AN

25   INITIAL ISSUE OF CONSOLIDATING ALL THE PLAINTIFFS, GETTING THE

1    INFORMATION ABOUT ALL THE PLAINTIFFS AND PREPARING CONSOLIDATED

2    AMENDED COMPLAINTS THAT'S GOING TO INVOLVE A LOT OF LAWYERS

3    HERE.

4         BUT THEN THERE'S GOING TO BE A MOTION TO DISMISS AND THAT

5    CAN BE DONE BY, YOU KNOW, A HANDFUL OF PEOPLE.

6         AND THEN GOING FORWARD, WE'RE GOING TO NEED EXPERTS AND

7    WE'RE GOING TO NEED A COUPLE OF LAWYERS TO DEAL WITH THE

8    EXPERTS AND THEN GET THE CLASS CERTIFICATION PAPERS ON FILE AND

9    PROCEED WITH THE CASE.

10        SO WE DON'T SEE IT AS BEING A PARTICULARLY LAWYER

11   INTENSIVE PROJECT.  IT'S GOING TO REQUIRE A LOT OF WORK FROM

12   SOME PEOPLE.

13        AND WE PROPOSED -- WE MET WITH JOE COTCHETT, WE TALKED

14   ABOUT THE FINANCIAL ISSUES, PARTICULARLY IN LIGHT OF WHAT WENT

15   ON IN HIGH-TECH.

16        WE THINK WE OFFER THE MOST BENEFICIAL FINANCIAL PACKAGE

17   HERE WHERE WE PROPOSE LIMITING ATTORNEY BILLING TO $600 AN

18   HOUR, $300 AN HOUR FOR ASSOCIATE DOCUMENT REVIEW AND LEGAL

19   RESEARCH, $250 TO THE EXTENT WE USE ANY CONTRACT LAWYERS, AND

20   THAT WE PUT TOGETHER A FEW LAWYERS FROM MY FIRM, IF THE COURT

21   IS WILLING, FROM JOE COTCHETT'S FIRM, AND REALLY RUN THIS CASE

22   LEANLY AND QUICKLY.

23             THE COURT:  OKAY.  THANK YOU.

24             MR. LEBSOCK:  THANK YOU.

25             THE COURT:  ALL RIGHT.  MR. LEVITT, I THINK I HEARD

```
1      FROM YOU, BUT --
2                MR. LEVITT:  IF I MAY SAY ONE THING, YOUR HONOR?
3                THE COURT:  OKAY.  GO AHEAD.
4                MR. LEVITT:  GOOD AFTERNOON ONCE AGAIN, YOUR HONOR.
5       ADAM LEVITT FOR THE ROSS PLAINTIFF.
6            WHILE I UNDERSTAND THAT YOUR HONOR HAS NOW SAID THAT
7       THERE'S NOT GOING TO BE A SEPARATE TRACK, LET ME JUST MAKE A
8       FEW THINGS CLEAR AS TO IN THIS ROOM, EVERY OTHER CASE THAT WAS
9       FILED IS SEEKING ESSENTIALLY THE GARDEN VARIETY DATA BREACH
10      CASE AGAINST ANTHEM.
11           AND TO BE CLEAR, THE NUMBER OF CLASS MEMBERS IN ANTHEM IS
12      APPROXIMATELY 37 AND A HALF MILLION, GIVE OR TAKE.
13           THE BLUE CROSS BLUE SHIELD DEFENDANTS WHO WE HAD SUED --
14      AND IF YOUR HONOR WANTS THEM ALL CONSOLIDATED INTO A SINGLE
15      COMPLAINT, I CAN EXPLAIN HOW THAT CAN BE STRUCTURED -- IS
16      APPROXIMATELY 67 AND A HALF MILLION CLASS MEMBERS.
17           SO WHILE THIS CASE STARTED OUT AS AN ANTHEM DATA BREACH
18      CASE SEEKING, AGAIN, THE GARDEN VARIETY DATA BREACH RELIEF, AND
19      THE CLAIMS WERE BASED ON HOLDING ANTHEM LIABLE FOR ALLOWING
20      THAT BREACH TO HAPPEN AND HOW THE RELIEF AT ISSUE IN ANTHEM IS
21      ABOUT PROTECTING THE INSUREDS FROM THE RISK OF IDENTITY THEFT,
22      THE CLAIMS THAT WE HAD ALLEGED THAT, AGAIN, AS YOUR HONOR IS
23      GOING TO WANT IN A SINGLE COMPLAINT, ARE MORE FOCUSSED ON
24      CONTRACTUAL ISSUES.
25           AND THE ISSUE IS WHETHER AN INSURER PROMISES THAT, AS PART
```

1    OF PROVIDING INSURANCE, OR ANY SERVICE, THAT THEY WILL

2    IMPLEMENT CERTAIN MEASURES OF DATA SECURITY THAT WE BELIEVE

3    HAVE NOT HAPPENED HERE WITH THE BCBSA LICENSEES AND THE

4    ASSOCIATION.

5         FOR THAT REASON, THE ENTIRE DAMAGE APPROACH THERE, YOUR

6    HONOR, IS VERY, VERY DIFFERENT.  IN FACT, ACTUALLY, WHILE THE

7    ANTHEM BREACH SHOWED -- WAS A CONSEQUENCE OF THE BLUE CROSS

8    BLUE SHIELD ASSOCIATION DEFENDANTS' WRONGDOING BECAUSE IT

9    SHOWED THE FLAWS IN THOSE COMPANIES' DATA SECURITY PRACTICES,

10   IT IS NOT -- IT IS NOT THE CAUSE.  IT IS THE CONSEQUENCE.

11        SO FOR THAT REASON, I THINK THAT TO THE EXTENT THAT YOUR

12   HONOR IS GOING TO PUT TOGETHER A SINGLE LEADERSHIP STRUCTURE,

13   MR. EDELSON AND MYSELF, AND I THINK YOU SAW WITH THE FIRM

14   RESUMES AND OUR BACKGROUNDS, NOT TO -- IT'S FUNNY.  IN ANY

15   LEADERSHIP HEARING, IT'S ALWAYS LIKE A WOEBEGONE APPROACH WHERE

16   EVERYONE IS ABOVE AVERAGE.

17        HOWEVER, IF YOU LOOK AT THE RESULTS THAT MR. EDELSON'S

18   FIRM HAS HAD IN THESE SORTS OF CASES AND THE KIND OF RESULTS

19   THAT MY FIRM AND I HAVE HAD FROM THE VERY BEGINNING OF THE VERY

20   FIRST DATA BREACH CASES -- EXCUSE ME -- THE VERY FIRST ONLINE

21   PRIVACY CASES AGAINST REEL NETWORKS IN 1999, WE'VE BEEN DOING

22   THIS A LONG TIME, THE RESULTS SPEAK FOR THEMSELVES.

23        AND ALSO, IN TERMS OF WORKING WITH EVERYONE ELSE IN THIS

24   ROOM, I'VE EITHER BEEN LEAD OR CO-LEAD OR OTHERWISE WORKED WITH

25   95 PERCENT OF THE LAWYERS IN THIS ROOM; AND ON THE DATA BREACH

```
1     FRONT AND THE PRIVACY FRONT, MR. EDELSON'S FIRM IS THE EXACT

2     SAME WAY.

3          SO WHAT I'M ASKING FOR, YOUR HONOR, IS THERE'S A NEED TO

4     PROTECT THE CLAIMS WE HAVE ASSERTED.  COULD WE LEAD THE ENTIRE

5     CASE?  SURE, WE COULD.  COULD WE AND MR. EDELSON LEAD THE

6     ENTIRE CASE?  ABSOLUTELY WE CAN.  IF THAT'S WHAT YOUR HONOR

7     WANTS, WE'RE HAPPY TO DO SO.  WE'VE DONE THIS BEFORE.  WE'RE

8     DOING IT NOW.

9          BUT TO THE EXTENT YOUR HONOR IS INTERESTED IN HAVING THE

10    LARGER PIECE OF THE PROPOSED CLASS, WHICH IS OUR CLASS IN

11    REALITY, THE LOSS CLASS, PROTECTED, WE WOULD LIKE A ROLE, AND A

12    LEAD ROLE, IN THIS CASE AS PART OF A STRUCTURE OF YOUR HONOR'S

13    OWN CHOOSING TO MAKE THAT HAPPEN AND MAKE SURE THAT THOSE

14    INTERESTS ARE ACTUALLY PROTECTED.

15         I'LL GO ONE STEP FURTHER.  WHILE YOUR HONOR HAD ASKED A

16    FEW MINUTES AGO, ARE MOST DATA BREACH RESOLUTIONS LOW, I THINK

17    THE ANSWER TO THAT IS NOT NECESSARILY.

18         AND THE SECOND THING IS, OUR CASE IS NOT A GARDEN VARIETY

19    DATA BREACH CASE.  THE BREACH OF CONTRACT ISSUES, AND IF EVEN A

20    FRACTION OF EACH OF THE 67 AND A HALF MILLION CLASS MEMBERS

21    AGAINST THE BLUE CROSS BLUE SHIELD ASSOCIATION DEFENDANTS, IF

22    IT'S A QUARTER A MONTH, A NICKEL A MONTH, YOU'RE TALKING TENS

23    AND TENS AND TENS OF MILLIONS OF DOLLARS.  LET'S NOT FORGET

24    THAT, YOUR HONOR.  WE WERE THE ONLY ONES WHO ACTUALLY SAW THAT.

25    WE ALLEGED IT.  WE WANT TO GO FORWARD WITH IT AS PART OF A
```

1    UNIFIED STRUCTURE.

2         THANK YOU.

3              THE COURT:  ALL RIGHT.  THANK YOU.

4         IS THERE ANYONE FROM KAPLAN, FOX & KILSHEIMER?

5              MR. KING:  YES, YOUR HONOR.  GOOD AFTERNOON, YOUR

6    HONOR.  LAURENCE KING.

7              THE COURT:  GOOD AFTERNOON.

8              MR. KING:  YOUR HONOR, YOU POSED THE QUESTION TO SOME

9    OF MY COLLEAGUES IN THE ROOM -- AND FIRST LET ME SAY THAT THE

10   ROOM, AS OTHERS HAVE OBSERVED, IS FULL OF VERY QUALIFIED

11   LAWYERS --

12             THE COURT:  AND I ABSOLUTELY AGREE.

13             MR. KING:  -- AND IT WILL BE A DIFFICULT CHOICE.

14   I'VE WORKED WITH MANY OF THEM.  I'M FRIENDS WITH MANY OF THEM

15   AND IT WOULD BE A DIFFICULT CHOICE FOR ANYONE TO MAKE.

16        YOUR HONOR POSED THE QUESTION A FEW MOMENTS AGO, DOES THIS

17   REALLY REQUIRE LAWYERS WITH EXPERIENCE IN PRIVACY VERSUS VERY

18   SMART LAWYERS?

19        WE THINK --

20             THE COURT:  NOT THAT THOSE ARE MUTUALLY EXCLUSIVE.

21             MR. KING:  I WAS GOING TO MAKE THAT VERY POINT, YOUR

22   HONOR.

23        AND I WOULD SAY THAT CERTAINLY IN THIS ROOM YOU HAVE

24   PLENTY OF BOTH, AND I WOULD -- I WOULD RESPECTFULLY POINT OUT

25   THAT OUR FIRM, IN THE YAHOO! MAIL LITIGATION BEFORE YOUR HONOR,

1    WERE CO-LEAD COUNSEL WITH THE GIRARD GIBBS FIRM, AND AS YOUR

2    HONOR IS AWARE, WE DEFEATED THE MOTION TO DISMISS AND YOUR

3    HONOR GRANTED CLASS CERTIFICATION RECENTLY AND WE BELIEVE WE

4    HAVE BOTH THE MIX OF PRIVACY EXPERIENCE, AS WELL AS DEEP CLASS

5    ACTION EXPERIENCE IN THE SECURITIES CASES AND ANTITRUST CASES,

6    CONSUMER CASES, INCLUDING SOME VERY LARGE RECOVERIES WHICH

7    WE'VE POINTED OUT IN OUR PAPERS.

8         THE COURT:  AND I WANT TO NOTE, THE NINTH CIRCUIT

9    DENIED 23(F) REVIEW IN YAHOO!.

10        MR. KING:  YES, YOUR HONOR.  WE WERE, NOT SURPRISINGLY,

11   PLEASED.

12        OTHERS HAVE SPOKEN ABOUT EFFICIENCY AND YOUR HONOR HAS

13   RAISED THAT ISSUE AS WELL.  WE AGREE.  WE THINK A SMALL NUMBER

14   OF FIRMS CAN AND SHOULD LEAD THE CASE DRAWING ON THE DEEP

15   TALENTS IN THIS ROOM AS NECESSARY IN SPECIFIC SITUATIONS BASED

16   ON PEOPLE'S EXPERIENCE.  AND I WON'T REPEAT EXAMPLES OTHERS

17   HAVE GIVEN, BUT THERE WERE SOME VERY GOOD EXAMPLES GIVEN.

18        WE BELIEVE EFFICIENCY ALSO EXTENDS TO LITIGATING THE CASE

19   EFFICIENTLY, NOT JUST NUMBER OF LAWYERS, BUT TRYING TO RESOLVE

20   ISSUES WITHOUT BRINGING THEM TO THE COURT NECESSARILY.

21        I WOULD POINT OUT IN THE YAHOO! CASE, WHILE WE'VE HAD

22   DISCOVERY DISPUTES WITH THE OTHER SIDE, THEY NEVER ROSE TO THE

23   LEVEL WHERE WE NEEDED TO GET YOUR HONOR OR MAGISTRATE LLOYD

24   INVOLVED AND WE WORKED HARD TO RESOLVE THEM TO KEEP THE CASE

25   MOVING AND WE WERE SUCCESSFUL IN THAT.

```
1          THE COURT:  ALL RIGHT.  THANK YOU.

2          MR. KING:  THANK YOU, YOUR HONOR.

3          THE COURT:  OKAY.  LET'S GO TO ROBINSON/KILKENNY.

4          MR. ROBINSON:  THANK YOU, YOUR HONOR.  DAN ROBINSON,

5     ROBINSON/KILKENNY.

6          FIRST BEFORE WE BEGIN, LET ME SAY THANK YOU TO YOUR HONOR

7     AND YOUR STAFF, MS. SAKAMOTO AND ESTEEMED CLERKS, FOR LETTING

8     US GO ON THIS LONG.  IT'S TRULY A MARATHON EFFORT.

9          THE COURT:  SO YOU SETTLED A DATA BREACH CASE AGAINST

10    WELLPOINT.  HOW MUCH OF WELLPOINT'S DATA SECURITY IS SIMILAR TO

11    ANTHEM'S?

12         MR. ROBINSON:  WELLPOINT AND ANTHEM ARE THE SAME

13    COMPANY, YOUR HONOR.  THE ONLY DIFFERENCE IS ABOUT A YEAR AGO,

14    THEY CHANGED THEIR NAME.  THEY WERE WELLPOINT.  THEY CHANGED IT

15    TO ANTHEM.  I DON'T KNOW WHAT IT WAS FOR --

16         THE COURT:  OH, IT WASN'T AN ACQUISITION OR A MERGER

17    OR SOMETHING LIKE THAT?

18         MR. ROBINSON:  IT WAS THE SAME COMPANY.

19         THE COURT:  I SEE.

20         MR. ROBINSON:  AND THEY BASICALLY HAD AN EMPHASIS IN

21    CALIFORNIA LOCATIONS AND SHIFTED THEIR HEADQUARTERS SO THAT IT

22    WAS IN INDIANAPOLIS AND THEY WENT UNDER THE NAME ANTHEM.

23         BUT IT'S THE SAME COMPANY WITH THE SAME NETWORKS, THE SAME

24    NETWORK LOCATION, WHICH WAS BASED IN VIRGINIA.

25         AS PART OF THAT CASE, WE DID A TWO-DAY INSPECTION OF THE
```

1    NETWORK FACILITY.  WE RAN OVER 2600 TESTS ON THAT NETWORK IN

2    VIRGINIA AS PART OF OUR DISCOVERY AND LITIGATED THAT CASE VERY

3    AGGRESSIVELY AND, WITHIN SIX MONTHS, WE WERE ABLE TO START

4    SETTLEMENT NEGOTIATIONS.

5             THE COURT:  AND WHAT WAS THE SETTLEMENT IN THAT CASE?

6             MR. ROBINSON:  THE SETTLEMENT IN THE CASE WAS A

7    SERIES OF CREDIT MONITORING, IDENTITY THEFT PROTECTION, AS WELL

8    AS FUNDS FOR ACTUAL IDENTITY THEFT LOSSES, AS WELL AS

9    OUT-OF-POCKET EXPENSES TOWARDS THOSE FUNDS.

10        THERE WAS ALSO SEVERAL VERY IMPORTANT REMEDIAL MEASURES

11   THAT THE COMPANY WAS REQUIRED TO TAKE, REMEDIAL MEASURES THAT

12   WILL BE IMPORTANT TO THIS CASE.

13        THAT'S ONE THING THAT I THINK DISTINGUISHES ME FROM MANY

14   OF THE GREAT LAWYERS IN THIS ROOM IS THAT, YOU KNOW, IN TERMS

15   OF -- INSTEAD OF WASTING THE NEXT SIX TO TEN MONTHS GETTING UP

16   TO SPEED ON WHAT ANTHEM IS LIKE AND WELLPOINT IS LIKE

17   INTERNALLY, I ALREADY KNOW AND I'VE ALREADY DONE THE DISCOVERY

18   AND I'VE REVIEWED DOCUMENTS.  MANY OF THE DISCOVERY DOCUMENTS

19   WE STILL HAVE BECAUSE THAT SETTLEMENT'S PERIOD OF BENEFITS

20   DOESN'T EXPIRE UNTIL DECEMBER.

21        AND, FRANKLY, I'VE HAD A VERY GOOD RELATIONSHIP WITH

22   DEFENSE COUNSEL, CHAD FULLER.

23             THE COURT:  WHO WAS AT THE SAME LAW FIRM,

24   HOGAN LOVELLS?

25             MR. ROBINSON:  HOGAN LOVELLS WAS NOT ON THAT CASE.

```
 1                    THE COURT:  I SEE.

 2                    MR. ROBINSON:  BUT MR. FULLER WAS, AND OBVIOUSLY

 3       IN-HOUSE COUNSEL, PAM WILLIAMS AT ANTHEM, WAS ABLE -- WAS

 4       CRITICAL IN NEGOTIATING THAT SETTLEMENT.

 5                    THE COURT:  WHAT WAS THE YEAR?  WHEN WAS THAT CASE

 6       LITIGATED?

 7                    MR. ROBINSON:  LITIGATED FROM 2010 THROUGH 2012, YOUR

 8       HONOR.

 9                    THE COURT:  OKAY.

10                    MR. ROBINSON:  BUT THE SETTLEMENT BENEFITS CONTINUE

11       UNTIL THE END OF DECEMBER.

12                    THE COURT:  OKAY.  AND HOW MUCH WAS THE COMMON FUND

13       FOR OUT-OF-POCKET EXPENSES AND IDENTITY THEFT AND THOSE LOSSES?

14                    MR. ROBINSON:  I BELIEVE IT WAS 5 MILLION, YOUR

15       HONOR.

16                    THE COURT:  OKAY.

17                    MR. ROBINSON:  BUT SINCE THEN, YOUR HONOR, THERE HAVE

18       BEEN A NUMBER OF OTHER BREACH CASES THAT WE'VE BEEN INVOLVED

19       IN.  WE'VE ACTUALLY SERVED AS -- I PERSONALLY SERVED AS LEAD

20       COUNSEL IN A DATA BREACH CASE THAT WAS SUPPOSED TO GO TO TRIAL

21       TWO WEEKS AGO, BUT ENDED UP RESULTING IN A SETTLEMENT.  WE HAD

22       THREE EXPERTS READY TO GO.  THE SETTLEMENT IS THE LARGEST CASH

23       PAYOUT IN ANY DATA BREACH CASE, HEALTH CARE OR OTHERWISE, $240

24       PER PERSON, WE BELIEVE TO OUR KNOWLEDGE.

25                    AND THAT GETS TO ANOTHER THING THAT I THINK THAT I ADD,
```

1     YOUR HONOR, BECAUSE MY BACKGROUND, I USED TO BE A PROSECUTOR IN

2     THE NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE AND I WAS PART

3     OF THE FIRST IDENTITY THEFT UNIT THERE CREATED UNDER THE

4     HONORABLE ROBERT MORGENTHAU.

5          THEN I WORKED AT O'MELVENY & MYERS AND WAS HELPING WITH

6     SECURITY AUDITING FOR FORTUNE 500 COMPANIES.

7          I UNDERSTAND THE SECURITY TECHNICAL KNOWLEDGE.  I

8     UNDERSTAND WHAT'S REQUIRED.

9          TO ANSWER YOUR QUESTION POSED EARLIER, I DO BELIEVE THAT

10    HEALTHCARE DATA SECURITY BREACHES ARE DIFFERENT THAN JUST

11    GARDEN VARIETY DATA SECURITY BREACHES, THAT THE RULES THAT

12    APPLY, THE HIPAA RULES, THE HIPAA SECURITY RULE, THE PRIVACY

13    RULE, HIGH-TECH, THESE SET THE STANDARD OF CARE FOR NEGLIGENCE.

14    THEY SET THE INTERNAL STANDARDS.

15         AND THEN THERE'S ADDITIONAL INDUSTRY STANDARDS WHICH ARE

16    EVER EVOLVING AS THE THREATS GET GREATER.  WE NOW KNOW --

17    WITHIN THE LAST MONTH WE'VE LEARNED THAT THE HACKERS INVOLVED

18    IN THIS CASE WERE A GROUP CALLED BLACK VINE, AND THEY WERE THE

19    SAME HACKERS INVOLVED IN THE OFFICE OF PERSONNEL MANAGEMENT

20    HACK, AS WELL AS THE UNITED HACK, AND WE KNOW THAT BASED ON THE

21    SIGNATURE TECHNIQUES THEY USE AND THE TYPE OF ATTACKS THEY USE.

22         UNDERSTANDING HOW THEY WERE ABLE TO EXPLOIT ANTHEM'S

23    VULNERABILITIES AND WHETHER ANTHEM WAS ADHERING TO INDUSTRY

24    STANDARDS AT THE TIME ARE GOING TO BE CRITICAL COMPONENTS OF

25    THIS CASE AND I THINK A TECHNICAL KNOWLEDGE OF THAT IS REQUIRED

1     FOR ANY MEMBER OF THE TEAM.

2              THE COURT:  OKAY.  THANK YOU.

3              MR. ROBINSON:  THANK YOU.

4              THE COURT:  LET ME HEAR FROM MR. SKEPNEK.  IS HE

5     PRESENT?

6              MR. SKEPNEK:  I AM, RIGHT HERE.

7              THE COURT:  OKAY.

8              MR. SKEPNEK:  GOOD AFTERNOON.  WILLIAM SKEPNEK,

9     LAWRENCE, KANSAS.

10             THE COURT:  WELCOME.

11             MR. SKEPNEK:  THANK YOU.

12             THE COURT:  SO WHAT IS THE STRUCTURE THAT YOU WOULD

13    ENVISION?

14             MR. SKEPNEK:  I'VE BEEN INVOLVED IN A NUMBER OF

15    COMPLICATED TECHNICAL CASES OVER THE YEARS INVOLVING

16    ENGINEERING ISSUES, PRODUCT LIABILITY ISSUES, COMPLICATED

17    ENGINEERING ISSUES.  I DON'T BELIEVE THAT THIS PARTICULAR CASE

18    PRESENTS ANY SIGNIFICANT ISSUES THAT CAN'T EASILY BE HANDLED BY

19    A COUPLE OF LAWYERS ON THE -- GOOD LAWYERS ON THE TECHNICAL

20    SIDE.

21         I THINK -- AND THEN OBVIOUSLY YOU NEED SOME, A COUPLE OF

22    GOOD LAWYERS ON THE BRIEFING ISSUES WHO UNDERSTAND THE LAW IN

23    THE JURISDICTIONS THAT ARE GOING TO BE PRESENTED TO THE COURT

24    AND ARE GOOD LEGAL BRIEFING LAWYERS.

25             SO I THINK WE NEED THAT.

1          I DON'T THINK THAT'S WHERE THE REAL PROBLEM IN THIS CASE

2     IS.  I THINK THE REAL PROBLEM IN THIS CASE IS THAT THE -- AS

3     THE LAW DEVELOPS IN THIS AREA OF DATA BREACHES, WE HAVE TO BE

4     CONCERNED ABOUT MEANINGFUL RELIEF TO CLIENTS, TO THE VICTIMS OF

5     THESE DATA BREACHES, AND I HEAR NUMBERS THROWN OUT THAT AREN'T

6     VERY REMUNERATIVE, DON'T REALLY HANDLE THE PROBLEM, DON'T SOLVE

7     THE PROBLEM FOR THESE PEOPLE.  THESE PEOPLE WHO HAD THEIR

8     IDENTITIES STOLEN, PARTICULARLY THESE PEOPLE IN A CASE LIKE

9     THIS WHO'VE LOST THEIR SOCIAL SECURITY NUMBER AND SOME -- AND

10    THEIR MEDICAL DATA, THEY HAVE VERY SERIOUS CONCERNS OVER A LONG

11    PERIOD OF TIME.

12         I'VE BEEN INVOLVED IN THE ASBESTOS LITIGATION, AS AN

13    EXAMPLE, AND IN THAT -- IN THOSE CASES, A REGISTRY IS SET UP SO

14    THAT OVER TIME PEOPLE WHO SUFFER -- WHO SUFFER FROM DISEASES AS

15    A RESULT OF ASBESTOS EXPOSURE OR SILICA EXPOSURE CAN COME BACK

16    IN AND GAIN RELIEF.

17         I MEAN, WE NEED TO -- WE NEED TO BE THINKING ABOUT THAT.

18         AS THE COURT KNOWS FROM LOOKING AT MY PAPERS, I'M SORT OF

19    THE ODD DUCK HERE.  I DON'T KNOW ANYBODY IN THIS ROOM.  I'M

20    AWFULLY IMPRESSED WITH A LOT OF WHAT I'VE HEARD.  I THINK THERE

21    ARE VERY, VERY GOOD LAWYERS WHO WILL, AS PART OF A TEAM OR

22    ACTING INDEPENDENTLY, DO A VERY GOOD JOB DEVELOPING THE

23    LIABILITY ASPECTS OF THE CASE.

24         WHAT I'M MOST CONCERNED ABOUT, AND WHAT I THINK MY CAREER

25    HAS DEMONSTRATED, IS I'M MOST CONCERNED ABOUT GETTING

```
 1        MEANINGFUL HELP TO PEOPLE, AND AS THE COURT HAS SEEN FROM MY

 2        MOVING PAPERS, A GOOD PART OF MY EXPERIENCE HAS BEEN IN SUING

 3        LAWYERS WHO AGGREGATE THEIR CLIENTS INTO A SINGLE SETTLEMENT

 4        AND DON'T GET THEM MEANINGFUL RELIEF.

 5             SO MY PRIMARY PURPOSE AND MY PRIMARY ROLE --

 6                  THE COURT:  SO YOU REPRESENT OBJECTORS?  I'M NOT

 7        SURE --

 8                  MR. SKEPNEK:  NO.  ACTUALLY, THESE HAVE BEEN IN

 9        NON-CLASS AGGREGATE SETTLEMENTS.

10                  THE COURT:  OH.

11                  MR. SKEPNEK:  SO THESE WOULD BE -- THESE WOULD BE IN

12        SETTLEMENTS IN WHICH INDIVIDUAL CLAIMS HAVE BEEN AGGREGATED FOR

13        SETTLEMENT PURPOSES, AND THESE HAVE BEEN CASES IN WHICH PEOPLE

14        HAVE BEEN -- THEREAFTER SUED THEIR LAWYERS.

15                  THE COURT:  OKAY.  THANK YOU.

16                  MR. SKEPNEK:  YOU'RE WELCOME.

17                  THE COURT:  THANK YOU VERY MUCH.

18             OKAY.  WELL, THANK YOU EVERYONE FOR YOUR PATIENCE.

19                  MR. EDELSON:  YOUR HONOR, I'M SORRY.  JAY EDELSON.  I

20        HAVEN'T HAD A CHANCE TO SPEAK.

21                  THE COURT:  OH, OKAY.  ALL RIGHT.  YOU WANT TO ADD TO

22        WHAT MR. LEVITT SAID?

23                  MR. EDELSON:  WELL, I WAS GOING TO SAY SOMETHING A

24        LITTLE BIT DIFFERENT IF I CAN.  I PROMISE I'LL SPEAK QUICKLY,

25        AND I APPRECIATE ALL THE TIME YOU'VE GIVEN US TODAY.
```

```
 1              THE COURT:  OKAY.

 2              MR. EDELSON:  MY VIEW IS THAT THERE'S A PHILOSOPHICAL

 3      DIVIDE IN TERMS OF HOW PLAINTIFFS' ATTORNEYS APPROACH DATA

 4      BREACH CASES.  IF YOU HEARD HOW EVERYBODY TALKS ABOUT IT IN

 5      PRIVATE, EVERYBODY KNOWS, ON THE PLAINTIFFS' SIDE, THE BIG

 6      ISSUE IS DAMAGES.

 7              A BIG PORTION OF THE PLAINTIFFS' BAR -- AND I HAVE A LOT

 8      OF RESPECT FOR THE ATTORNEYS HERE -- A BIG PORTION OF THE

 9      PLAINTIFFS' BAR DOESN'T REALLY BELIEVE IN THE DAMAGE THEORIES.

10              WHAT THEY THINK IS THE ONLY TIME YOU'VE REALLY BEEN HURT

11      IS IF YOU SHOW IDENTITY THEFT AND YOU CAN'T GET A CLASS

12      CERTIFIED, SO WE'VE GOT TO COBBLE TOGETHER SOMETHING TO SURVIVE

13      THE MOTION TO DISMISS.

14              AND YOU CAN DO THAT.  YOU CAN GET PLAINTIFFS WHO HAVE

15      SUFFERED IDENTITY THEFT AND YOU GET PAST MOTION TO DISMISS, AND

16      THEN EVERYONE KNOWS IF YOU GET PAST MOTION TO DISMISS IN A DATA

17      BREACH CASE, YOU GO INTO SETTLEMENT NEGOTIATIONS AND THEN YOU

18      COME UP WITH THESE LARGE SETTLEMENTS WHICH REALLY AREN'T LARGE.

19              THE SETTLEMENTS THAT HAVE BEEN PUT TOGETHER ARE

20      SETTLEMENTS WHICH GIVE INJUNCTIVE RELIEF, CREDIT MONITORING,

21      AND THEN MONEY PAID BACK ONLY IF THERE'S SOME SORT OF LOSS AS A

22      RESULT OF IDENTITY THEFT, WHICH TENDS TO BE VERY LITTLE MONEY.

23              IN TARGET, FOR EXAMPLE, IT'S A $10 MILLION FUND, BUT

24      THERE'S TENS AND TENS OF MILLIONS OF PEOPLE, PEOPLE WHO HAD

25      THEIR INFORMATION STOLEN WHO GOT NOTHING FROM IT.
```

1          THAT'S -- THAT'S ONE PART OF THE PLAINTIFFS' BAR AND THEIR

2     APPROACH.

3          THE OTHER APPROACH IS TO THINK A LITTLE BIT HARDER ABOUT

4     WHAT ARE THE DAMAGE THEORIES THAT ACTUALLY WORK?  WHAT --

5     BECAUSE I KNOW WHEN I TALK TO MY CLIENTS AND I -- AND THEY SAY

6     THAT THEIR IDENTITY -- THAT THEIR PERSONAL INFORMATION WAS

7     STOLEN OR HEALTH RECORDS WERE STOLEN, THAT MATTERS MORE TO THEM

8     THAN IF THEY LOST $20.  THEY FEEL A HURT THAT THE COURTS

9     HAVEN'T RECOGNIZED HISTORICALLY.

10          WE STARTED WORKING YEARS AGO ABOUT TRYING TO COME UP WITH

11     REALLY COMMON SENSE ARGUMENTS WHICH THE COURTS COULD ENDORSE,

12     AND WE DID THAT IN AVMED, WHICH WAS A BREACH OF CONTRACT

13     THEORY, WHICH WE LOST IN THE DISTRICT COURT IN FLORIDA AND THEN

14     THE ELEVENTH CIRCUIT REVERSED AND SAID IF A HEALTH INSURANCE

15     COMPANY -- THAT WAS THE SAME ISSUE IN AVMED -- PROMISES

16     SOMETHING AND THEY DON'T PERFORM, THEY OWE YOU THE

17     DIFFERENTIAL.  IT'S A DIMINUTION OF VALUE THEORY.

18          WHEN WE GOT THAT CASE REVERSED AND WE WERE BACK IN COURT

19     AND WE FOUGHT CLASS CERTIFICATION ISSUES -- THEY TRIED TO

20     STRIKE CLASS CERTIFICATION AND THE COURT SAID, NO, UNDER YOUR

21     THEORY, YOU CAN ACTUALLY GET A CLASS CERTIFIED, WE WENT TO THE

22     BARGAINING TABLE IN A TOTALLY DIFFERENT POSITION AND WE GOT

23     PEOPLE ACTUAL CASH, REGARDLESS OF HAVING TO SHOW THAT THEY

24     SUFFERED SOME SORT OF OUT-OF-POCKET LOSS.

25          WE THEN DID THE SAME THING IN LINKEDIN.  IN LINKEDIN,

1    WHICH WAS IN FRONT OF JUDGE DAVILA -- DAVILA, EXCUSE ME, IT'S

2    BEEN A LONG DAY -- THE ONLY THING THAT WAS STOLEN WAS PASSWORDS

3    AND USER NAMES AND WE GOT PEOPLE ACTUAL CASH BACK.  PEOPLE GOT

4    ABOUT $40 BACK WITHOUT HAVING TO SHOW ANYTHING ELSE, NO

5    IDENTITY THEFT.

6         I THINK WHEN YOU ASK THE FUNDAMENTAL QUESTION OF, DOES IT

7    MATTER IF YOU APPOINT AN ATTORNEY WHO LIVES AND BREATHES DATA

8    BREACH CASES, THE ANSWER IS YES.

9         I THINK I'M A REALLY GOOD ATTORNEY.  YOU SHOULD NOT

10   APPOINT ME TO HANDLE A CASE INVOLVING ENVIRONMENTAL CLASS

11   ACTIONS.  I'VE DONE ONE.  I GOT A GOOD RESULT.  I COULD TALK

12   ABOUT IT.  I COULD COME UP WITH A FEW SENTENCES WHICH MADE IT

13   SEEM LIKE I'M REALLY KNOWLEDGEABLE.

14        BUT I SHOULDN'T BE DOING THAT AND I DON'T SEEK LEAD IN

15   THOSE CASES.

16        OUR FIRM IS A 25 PERSON FIRM WHERE WHAT WE DO IS PRIVACY

17   CASES.  THAT'S 90 PERCENT OF OUR CASES ARE PRIVACY CASES, AND

18   WE'VE GOTTEN RESULTS, FRANKLY, WHICH I THINK OTHER FIRMS

19   HAVEN'T GOTTEN.

20        AND I THINK THE KEY IS HOW YOU STRUCTURE THE CASE FROM THE

21   BEGINNING, NOT JUST AS TO SURVIVE A MOTION TO DISMISS, BUT TO

22   MAKE SURE YOU'RE GOING TO GET A CLASS CERTIFIED AND ULTIMATELY

23   WIN AT TRIAL.

24        AND THAT'S IT.

25            THE COURT:  THANK YOU.

```
 1              MR. EDELSON:  THANK YOU.

 2              THE COURT:  OKAY.  WELL, LET ME GIVE ONE LAST -- I'LL

 3      GIVE ONE MINUTE TO MR. FRIEDMAN AND MS. CERVANTEZ.  YOU KNOW

 4      THAT I'M NOT HAPPY WITH YOUR STEERING COMMITTEE AND YOUR

 5      STRUCTURE.

 6              ANYTHING ELSE YOU WANT TO SAY IN A LAST MINUTE?

 7              (LAUGHTER.)

 8              MS. CERVANTEZ:  WELL, WE HATE IT WHEN A FEDERAL JUDGE

 9      IS DISAPPOINTED WITH US.  THAT'S NOT A GOOD WAY TO START THE

10      DAY.

11              AND AS I THINK MR. FRIEDMAN TRIED TO EMPHASIZE, AGAIN,

12      THAT WE'RE PROPOSING THE TWO OF US AS A TEAM AS CO-LEAD

13      COUNSEL.  IN THE INTERESTS OF TRANSPARENCY, WE SET FORTH OTHER

14      PEOPLE, PEOPLE WE THOUGHT WE WOULD CALL UPON.

15              HOWEVER, AS I THINK EVERYBODY HAS SAID, WE COULD WORK VERY

16      WELL WITH ALL OF THE ATTORNEYS HERE.  WE'LL CONTINUE TO DO THAT

17      AND WE WILL BE VERY HAPPY TO WORK WITH ANY OTHER ATTORNEYS.

18              I THINK YOU'VE HEARD FROM MOST ATTORNEYS THAT THEY DO

19      THINK THERE NEEDS TO BE -- THAT CO-LEADS IS A GOOD IDEA, THAT

20      TWO OR THREE CO-LEADS IS A GOOD IDEA, THAT MOST FIRMS WOULD

21      WANT TO CALL UPON OTHER FIRMS, THAT THIS ISN'T A CASE THAT

22      SHOULD NECESSARILY BE LITIGATED BY ONE ATTORNEY OR ONE FIRM OR

23      TWO.

24              AND THEN THE ONLY OTHER THING I WANTED TO MENTION WAS IN

25      TERMS OF THE DATA BREACH CASES, IT IS REALLY IMPORTANT, AS A
```

```
1    FEW OTHER ATTORNEYS HAVE MENTIONED, THAT THIS IS A HEALTHCARE

2    INSURER AND THAT THE LAW IS DIFFERENT THAN IN THE RETAIL CASES

3    AND THAT THE REMEDIATION AND WHAT NEEDS TO BE DONE TO PROTECT

4    THE DATA IS VERY DIFFERENT, TOO, AND SO THAT REALLY NEEDS TO BE

5    TAKEN INTO ACCOUNT BY WHOEVER IS APPOINTED LEAD.

6         THE COURT:  BUT YOU DIDN'T EVEN TRY TO PUT ANYONE ON

7    YOUR STEERING COMMITTEE WHO'S DONE ONE OF THESE DATA BREACH

8    CASES INVOLVING A HEALTHCARE COMPANY.

9         THERE ARE TWO OTHER FIRMS THAT DID ORMOND IN INDIANA

10   AGAINST ANTHEM.  YOU DIDN'T CHOOSE TO SELECT ANY OF THEM TO

11   TAKE ADVANTAGE OF THEIR KNOWLEDGE EITHER OF THE TECHNICAL

12   FUNCTIONING OF HOW ANTHEM DOES DATA BREACH AND THEIR

13   INTERNAL -- YOU KNOW, YOU LEARN A LOT WHEN YOU LITIGATE AGAINST

14   A COMPANY ABOUT WHO THE DECISION MAKERS ARE AND HOW THEIR

15   CORPORATE STRUCTURE IS AND WHERE YOU NEED TO GO AND WHERE THE

16   DOCUMENTS ARE AND HOW THAT CONDUCTS ON WHATEVER, AND YOU DIDN'T

17   AVAIL YOURSELF OF THOSE WHO HAVE LITIGATED AGAINST ANTHEM OR

18   WELLPOINT.

19        MS. CERVANTEZ:  WELL, WE LOOKED AT IT IN A DIFFERENT

20   WAY.

21        THE COURT:  YEAH.

22        MS. CERVANTEZ:  FOR EXAMPLE, WE AVAILED OURSELVES OF

23   SOMEBODY WHO ADVISES HEALTH INSURANCE PLANS ON HOW TO PROTECT

24   THEIR DATA.

25        SO WE LOOKED AT IT IN A DIFFERENT WAY.  WE HAVE TRIED TO
```

1      CALL UPON THAT KIND OF EXPERTISE.

2           BUT, AGAIN, I DON'T THINK WE'VE EVER SAID THAT WE WOULD

3      NOT CALL UPON ANY OTHER COUNSEL, AND I THINK THAT MANY PEOPLE

4      SPOKE UP AND SAID WE'VE BEEN DOING A GOOD JOB SO FAR.

5           I THINK THAT WE HAVE PUT FORWARD A TASK LIST, A LIST OF

6      REALLY GOING FORWARD WHAT TO DO, AND I THINK THAT'S IMPORTANT

7      THAT WE'VE REALLY BEEN THINKING AHEAD, WORKING WITH OTHER

8      COUNSEL TO START VETTING PLAINTIFFS AND REALLY MOVING THIS CASE

9      FORWARD.

10          THE COURT:  OKAY.

11          MR. GIBBS:  YOUR HONOR, IT'S ERIC GIBBS.

12          MAY I SAY ONE THING?  I'M ONE OF THE LAWYERS WHO'S

13     SUPPORTING MR. FRIEDMAN AND MS. CERVANTEZ.

14          AND JUST FOR THE RECORD, OUR FIRM HAS LITIGATED TWO

15     MEDICAL PRIVACY CASES, ONE CALLED SMITH V. U.C. REGENTS, WHICH

16     WAS I THINK A CUTTING EDGE CASE.  I THINK WE CERTIFIED THE

17     FIRST CLASS UNDER THE CMIA.  I WORKED ON THAT CASE WITH

18     MR. GEORGE, WHO'S HERE TODAY AND IS NOW AT MR. KING'S FIRM.

19          AND WE ALSO WERE LEAD COUNSEL IN A CASE AGAINST HEALTHNET

20     ABOUT TWO AND A HALF YEARS AGO WHERE WE WORKED WITH MR. SOBOL

21     AND WE RESOLVED THAT CASE SUCCESSFULLY AS WELL.  IT WAS A LARGE

22     DATA BREACH CASE OF A HEALTH INSURER.

23          THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.

24          MR. GIBBS:  THANK YOU.

25          THE COURT:  THANK YOU.

1          MR. HOOVER:  THANK YOU, YOUR HONOR.

2          MR. FRIEDMAN:  THANK YOU, YOUR HONOR.

3       (THE PROCEEDINGS WERE CONCLUDED AT 4:43 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                                    CERTIFICATE OF REPORTER

4

5

6

7            I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

      LEE-ANNE SHORTRIDGE, CSR, CRR

17    CERTIFICATE NUMBER 9595

18           DATED:  SEPTEMBER 21, 2015

19

20

21

22

23

24

25