1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11

12                                          | Case No. 15-MD-02617-LHK

13                                          | **ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS**

14

IN RE ANTHEM, INC. DATA BREACH
LITIGATION

15

16

17                                          Re: Dkt. No. 410, 413

18

19          Plaintiffs[1] bring this putative class action against Anthem, Inc., 28 Anthem affiliates,[2] Blue

20    _____

21    [1] All named Plaintiffs are identified in paragraphs 12 through 108 of the Consolidated Amended Complaint. *See* ECF No. 334-6 ("CAC") ¶¶ 12–108.

22    [2] The Anthem affiliates are: Blue Cross and Blue Shield of Georgia; Blue Cross Blue Shield Healthcare Plan of Georgia; Anthem Blue Cross and Blue Shield of Indiana; Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Anthem Blue Cross and

23    Blue Shield of Colorado and Anthem Blue Cross and Blue Shield of Nevada; Anthem Blue Cross and Blue Shield of Connecticut; Anthem Blue Cross and Blue Shield of Kentucky; Anthem Blue Cross and Blue Shield of Maine; Anthem Blue Cross and Blue Shield of Missouri; Anthem Blue

24    Cross and Blue Shield of Missouri (RightChoice Managed Care, Inc. & Healthy Alliance Life Insurance Company); Anthem Blue Cross and Blue Shield of New Hampshire; Empire Blue Cross

25    and Blue Shield; Anthem Blue Cross and Blue Shield of Ohio; Anthem Blue Cross and Blue Shield of Virginia (Anthem Health Plans of Virginia & HMO HealthKeepers); Anthem Blue Cross

26    and Blue Shield of Wisconsin (Blue Cross Blue Shield of Wisconsin & Compcare Health Services

27                                          1

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

Cross Blue Shield Association, and 17 non-Anthem Blue Cross Blue Shield Companies.[3]  The Court shall refer to Anthem, Inc. and the Anthem affiliates as the "Anthem Defendants," and shall refer to Blue Cross Blue Shield Association and the non-Anthem Blue Cross Blue Shield Companies as the "Non-Anthem Defendants."  The Court shall refer to the Anthem and Non-Anthem Defendants collectively as "Defendants."

Before the Court are separate motions to dismiss Plaintiffs' consolidated amended complaint ("CAC") filed by the Anthem and Non-Anthem Defendants.  *See* ECF No. 334-6 ("CAC"); ECF No. 410 ("Anthem Mot."); ECF No. 413 ("Non-Anthem Mot.").  Having considered the parties' submissions, the relevant law, and the record in this case, the Court hereby GRANTS in part and DENIES in part the Anthem Defendants' motion to dismiss and GRANTS in part and DENIES in part the Non-Anthem Defendants' motion to dismiss.

# I.      BACKGROUND

## A.  Factual Background

Defendant Anthem, Inc. ("Anthem") is one of the largest health benefits and health insurance companies in the United States.  CAC ¶ 109.  Anthem serves its members through various Blue Cross Blue Shield ("BCBS") licensee affiliates and other non-BCBS affiliates.  *Id.* ¶ 155.  Anthem also cooperates with the Blue Cross Blue Shield Association ("BCBSA") and several independent BCBS licensees via the BlueCard program.  *Id.* ¶ 156.  "Under the BlueCard program, members of one BCBS licensee may access another BCBS licensee's provider networks

---

Insurance Corporation); Amerigroup Services; HealthLink; Unicare Life & Health Insurance Company; CareMore Health Plan; the Anthem Companies; the Anthem Companies of California; Amerigroup Corporation; and the Amerigroup Kansas, Inc.
[3] The non-Anthem BCBS Companies are: Blue Cross and Blue Shield of Alabama; Blue Cross Blue Shield of Arizona; Arkansas Blue Cross and Blue Shield; Blue Shield of California; Blue Cross and Blue Shield of Illinois; Blue Cross and Blue Shield of Florida; CareFirst BlueCross BlueShield; Blue Cross and Blue Shield of Massachusetts; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of Minnesota; Horizon Blue Cross and Blue Shield of New Jersey; Blue Cross and Blue Shield of North Carolina; Highmark Blue Shield; Highmark Blue Cross Blue Shield West Virginia; BlueCross BlueShield of Tennessee; Blue Cross and Blue Shield of Texas; and Blue Cross and Blue Shield of Vermont.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

1    and discounts when the members are out of state." *Id.*

2         In order to provide certain member services, the Anthem and Non-Anthem Defendants

3    "collect, receive, and access their customers' and members' extensive individually identifiable

4    health record information." *Id.* ¶ 157.  "These records include personal information (such as

5    names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email

6    addresses, and employment information, including income data) and individually-identifiable

7    health information (pertaining to the individual claims process, medical history, diagnosis codes,

8    payment and billing records, test records, dates of service, and all other health information that an

9    insurance company has or needs to have to process claims)." *Id.*  The Court shall refer to

10   members' personal and health information as Personal Identification Information, or "PII."

11        Anthem maintains a common computer database which contains the PII of current and

12   former members of Anthem, Anthem's affiliates, BCBSA, and independent BCBS licensees.  *Id.* ¶

13   158.  In total, Anthem's database contains the PII of approximately 80 million individuals.  *Id.* ¶

14   204.  According to Plaintiffs, both the Anthem and Non-Anthem Defendants promised their

15   members that their PII would be protected.  Blue Cross of California, for instance, mailed the

16   following privacy notice to its members:

17        We keep your oral, written and electronic [PII] safe using physical, electronic,
18        and procedural means.  These safeguards follow federal and state laws.  Some of
          the ways we keep your [PII] safe include securing offices that hold [PII],
19        password-protecting computers, and locking storage areas and filing cabinets. We
          require our employees to protect [PII] through written policies and procedures. . .
20        .  Also, where required by law, our affiliates and nonaffiliates must protect the
          privacy of data we share in the normal course of business. They are not allowed to
21        give [PII] to others without your written OK, except as allowed by law and
          outlined in this notice.
22

23   *Id.* ¶ 163 (emphasis removed).  In February 2015, Anthem announced to the public that

24   "cyberattackers had breached the Anthem Database, and [had] accessed [the PII of] individuals in

25   the Anthem Database." *Id.* ¶ 203.  This was not the first time that Anthem had experienced

26   problems with data security.  In late 2009, approximately 600,000 customers of Wellpoint

27                                                    3

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    (Anthem's former trade name) "had their personal information and protected healthcare

2    information compromised due to a data breach." *Id.* ¶ 194.  In addition, in 2013, the U.S.

3    Department of Health and Human Services fined Anthem $1.7 million for various HIPAA

4    violations related to data security.  *Id.* ¶ 195.  Finally, in 2014, the federal government informed

5    Anthem and other healthcare companies of the possibility of future cyberattacks, and advised these

6    companies to take appropriate measures, such as data encryption and enhanced password

7    protection.  *Id.* ¶¶ 200–01.

8        Plaintiffs allege that Defendants did not sufficiently heed these warnings, which allowed

9    cyberattackers to extract massive amounts of data from Anthem's database between December

10    2014 and January 2015.  *Id.* ¶ 226.  After Anthem discovered the extent of this data breach, it

11    proceeded to implement various containment measures.  *Id.* ¶ 232.  The cyberattacks ceased by

12    January 31, 2015.  *Id.*  In addition, after learning of the cyberattacks, Anthem proceeded to retain

13    Mandiant, a cybersecurity company, "to assist in assessing and responding to the Anthem Data

14    Breach and to assist in developing security protocols for Anthem."  *Id.* ¶ 207.  Mandiant's work

15    culminated in the production of an Intrusion Investigation Report ("Mandiant Report"), which

16    Mandiant provided to Anthem in July 2015.  *Id.*

17        According to Plaintiffs, the Mandiant Report found that "Anthem and [its] Affiliates

18    [had] failed to take reasonable measures to secure the [PII] in their possession."  *Id.* ¶ 236.

19    Likewise, Plaintiffs allege that "Anthem and Anthem Affiliates [] lacked reasonable encryption

20    policies."  *Id.* ¶ 237.  Additionally, "BCBSA and non-Anthem BCBS allowed the [PII] that their

21    current and former customers and members had entrusted with them to be placed into the Anthem

22    Database even though there were multiple public indications and warnings that the Anthem and

23    Anthem Affiliates' computer systems and data security practices were inadequate."  *Id.* ¶ 243.

24    Plaintiffs further aver that although Anthem publicly disclosed the data breach in February 2015,

25    many affected customers were not personally informed until March 2015, if at all.  *Id.* ¶ 250.

26    Finally, Plaintiffs contend that Anthem still has not disclosed whether it has made any changes to

4

27

28    Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1   its security practices to prevent a future cyberattack.

2   **B. Procedural History**

3   A number of lawsuits were filed against the Anthem and Non-Anthem Defendants in the

4   wake of the Anthem data breach.  In general, these lawsuits bring putative class action claims

5   alleging (1) failure to adequately protect Anthem's data systems, (2) failure to disclose to

6   customers that Anthem did not have adequate security practices, and (3) failure to timely notify

7   customers of the data breach.

8   In spring 2015, Plaintiffs in several lawsuits moved to centralize pretrial proceedings in a

9   single judicial district.  *See* 28 U.S.C. § 1407(a) ("When civil actions involving one or more

10  common questions of fact are pending in different districts, such actions may be transferred to any

11  district for coordinated or consolidated pretrial proceedings.").  On June 12, 2015, the Judicial

12  Panel on Multidistrict Litigation ("JPML") issued a transfer order selecting the undersigned judge

13  as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict

14  litigation ("MDL") arising out of the Anthem data breach.  *See* ECF No. 1 at 1–3.[4]

15  On September 10, 2015, the Court held a hearing to appoint Lead Plaintiffs' counsel.

16  Following this hearing, the Court issued an order appointing Co-Lead Plaintiffs' counsel and

17  requesting that counsel file a single consolidated amended complaint by October 19, 2015.  ECF

18  No. 284 at 2.  On October 19, 2015, Plaintiffs filed their consolidated amended complaint, which

19  organized Plaintiffs' causes of action into thirteen different counts, with claims pursuant to various

20  state and federal laws asserted under each count.  The complaint's prayer for relief included

21  requests for class certification, injunctive relief, and damages.

22  On this final form of relief, Plaintiffs seek damages arising from four separate economic

23  losses.  First, Plaintiffs allege that they "paid Anthem money for services that should have

24

25  ───────────────────

26  [4] As of February 14, 2016, after remand or dismissal of 9 cases, this MDL is comprised of 114
active individual cases.  ECF No. 451-1 at 4.  An additional case is pending conditional transfer to
this MDL.

27                                                             5

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    included protecting their [PII] from unauthorized disclosure"; Plaintiffs refer to these losses as

2    "Benefit of the Bargain" losses.  ECF No. 424 at 3.  Second, Plaintiffs seek recovery for "the theft

3    of Plaintiffs' [PII]," which Plaintiffs refer to as the "Loss of Value of PII."  *Id.*  Third, Plaintiffs

4    allege that many class members "incurred out-of-pocket losses, including delayed tax returns, and

5    the time and costs of credit monitoring."  Plaintiffs refer to these losses as "Out of Pocket" costs.

6    *Id.*  Finally, Plaintiffs allege that all class members "are at significant risk of imminent identity

7    theft . . . as a result of the exfiltration of their [PII]," which Plaintiffs refer to as the "Imminent

8    Risk of Further Costs."  *Id.*

9         At the October 25, 2015 case management conference, the Court determined that the

10   Anthem Defendants and Non-Anthem Defendants would file separate motions to dismiss.  Both

11   motions would be "limited to a combined total of 10 claims, with 5 claims selected by Plaintiffs, 3

12   claims selected by the Anthem Defendants, and 2 claims selected by the [Non-Anthem

13   Defendants]."  ECF No. 326 at 2–3.  At the November 10, 2015 case management conference, the

14   parties informed the Court of the 10 claims that would be addressed in Defendants' motions to

15   dismiss.  ECF No. 366 at 2.

16        On November 23, 2015, the Anthem Defendants and Non-Anthem Defendants filed their

17   respective motions to dismiss.  ECF No. 410 ("Anthem Mot."); ECF No. 413 ("Non-Anthem

18   Mot.").  Plaintiffs filed their oppositions on December 21, 2015, and the Anthem Defendants and

19   Non-Anthem Defendants filed their replies on January 19, 2016.  ECF No. 424 ("Anthem

20   Opp'n"); ECF No. 425 ("Non-Anthem Opp'n"); ECF No. 432 ("Anthem Reply"); ECF No. 433

21   ("Non-Anthem Reply").

22   **II.    LEGAL STANDARD**

23        **A. Motion to Dismiss**

24        Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

25   action for failure to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell*

26   *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

*United States District Court*
*Northern District of California*

6

United States District Court
Northern District of California

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

For purposes of motions to dismiss, as with virtually all motions touching upon substantive legal matters, the general rule "is that the  MDL transferee court is generally bound by the same substantive legal standards, if not always the same interpretation of them, as would have applied in the transferor court." *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 (9th Cir. 2011).

### B.  Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted).  Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512

7

1   F.3d 522, 532 (9th Cir. 2008).

2   **III.   DISCUSSION**

3      **A. Standing**

4        Before addressing any of the specific claims at issue, the Court turns first to the three

5   arguments that the Non-Anthem Defendants have raised regarding standing.  First, "not one of the

6   98 named plaintiffs in the CAC alleges that he or she was insured by or had *any* connection with .

7   . . Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and

8   Highmark West Virginia, Inc."  Non-Anthem Mot. at 2 (emphasis added).  Thus, the Non-Anthem

9   Defendants request that these three Non-Anthem Defendants be dismissed from this action in its

10  entirety.

11       Second, the consolidated amended complaint fails "to allege any facts regarding ten Non-

12  Anthem Defendants with respect to" the selected claims at issue in the instant motions to dismiss.

13  Non-Anthem Mot. at 1 (emphasis removed).[5]  Accordingly, the Non-Anthem Defendants request

14  that the selected "claims . . . be dismissed as to those ten Non-Anthem Defendants."  Non-Anthem

15  Reply at 3.

16       Third, the consolidated amended complaint fails to allege any specific facts as to Plaintiffs'

17  Indiana negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, New

18  York unjust enrichment, New York General Business Law § 349, and California Unfair

19  Competition Law claims against 16 of the 17 Non-Anthem Defendants.  Specifically, the

20  consolidated amended complaint identifies a New Jersey Plaintiff—Elizabeth Ames—who was

21  enrolled in a plan managed by Non-Anthem Defendant Horizon Blue Cross Blue Shield of New

22  Jersey.  *See* CAC ¶ 146; Non-Anthem Mot. at 3.  Plaintiffs have thus properly asserted a New

23

24      [5] These ten Non-Anthem Defendants are: Blue Cross and Blue Shield of Alabama; Blue Cross and
25  Blue Shield of Arizona, Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of
    Michigan; Blue Cross and Blue Shield of North Carolina, Inc.; Highmark Health Services;
26  Highmark West Virginia, Inc.; BlueCross BlueShield of Tennessee, Inc.; Blue Cross and Blue
    Shield of Vermont; and Blue Cross and Blue Shield of Illinois.  Non-Anthem Mot. at 1.

27
    Case No. 15-MD-02617-LHK
28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

1   Jersey breach of contract claim against Horizon Blue Cross Blue Shield of New Jersey, but have

2   not alleged any specific facts as to the remaining 16 Non-Anthem Defendants.  The Non-Anthem

3   Defendants therefore request dismissal of those Non-Anthem Defendants who have not had any

4   specific facts alleged against them as to Plaintiffs' Indiana negligence, Kentucky Consumer

5   Protection Act, New Jersey breach of contract, New York unjust enrichment, New York General

6   Business Law § 349, and California Unfair Competition Law claims.

7        All three of these arguments implicate the same thorny legal question: when, in the context

8   of a nationwide consumer class action, should a federal court address issues of standing?  Indeed,

9   "[a]lthough standing is a 'threshold issue' usually considered at the outset of the case," two U.S.

10  Supreme Court decisions—*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v.*

11  *Fibreboard Corp.*, 527 U.S. 815 (1999)—"make clear that there are situations in which a court

12  may defer that issue to later in the case." *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp.

13  3d 1154, 1160 (D. Minn. 2014).  As the *In re Target* court summarized, both *Amchem* and *Ortiz*

14  involved "global settlements of [consumer] class actions" where the district court "was

15  simultaneously presented with class certification issues and Article III issues." *Id.* at 1159–60.  In

16  both *Amchem* and *Ortiz*, the U.S. Supreme Court determined that the district court could defer

17  standing questions until after class certification.  In the instant case, Plaintiffs request that the

18  Court adopt the same approach.

19       Neither *Amchem* nor *Windsor*, however, created a blanket exception for standing in the

20  consumer class action context.  Rather, the U.S. Supreme Court "in both cases stated that class

21  certification questions could be addressed first [because] they were 'logically antecedent' to the

22  standing questions." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1071 (N.D. Cal. 2015) (quoting

23  *Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 612).  The scope and applicability of this "logically

24  antecedent" exception has, in the aftermath of *Amchem* and *Windsor*, confounded both courts and

25  commentators alike. *See, e.g.*, *In re Target*, 66 F. Supp. 3d at 1160 ("Although some courts [have]

26  interpreted [*Amchem* and *Windsor*] to require deferral of the Article III standing determination

                                                    9

27  Case No. 15-MD-02617-LHK

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

until after class certification, [others courts have] found more persuasive the decisions that interpreted the Supreme Court precedent to allow consideration of the named plaintiff's Article III standing at an earlier stage, thus requiring a named plaintiff to establish standing for each claim set forth in a class action when the issue is presented prior to class certification.") (internal quotation marks omitted); Linda S. Mullenix, *Standing and Other Dispositive Motions After* Amchem *and* Ortiz*: The Problem of "Logically Antecedent" Inquiries*, 2004 Mich. St. L. Rev. 703.  Even district courts within the Northern District of California have split ways on when (and how) *Amchem* and *Ortiz* should apply in the consumer class action context.  *See generally In re Carrier IQ*, 78 F. Supp. 3d at 1068–75 (reviewing cases that have considered standing before and after class certification).

On this particular question, the Court finds instructive the reasoning in *In re Carrier IQ*. In *In re Carrier IQ*, the district court undertook a comprehensive analysis of U.S. Supreme Court and Ninth Circuit precedent, decisions from various federal district courts, and pertinent legal scholarship.  *See id.*  After surveying these sources in detail, the *In re Carrier IQ* court concluded "that it ha[d] the discretion to defer questions of standing until after class certification"—which it could decide to exercise on a case by case (or even an issue by issue) basis.  *Id.* at 1074.  In exercising this discretion, the *In re Carrier IQ* court noted that a district court might consider factors such as the cost and burden of discovery, "the breadth of the proposed class and the number of state law claims asserted on behalf of the class," and whether a named plaintiff's "claim is typical of those individuals whose claims arise under the laws of . . . other states."  *Id.* at 1072–75.  Following *In re Carrier IQ*, the Court finds that it has discretion to decide in the instant action when to consider issues of standing, and shall exercise this discretion as follows.

**1. All Claims as to Three Non-Anthem Defendants**

As to Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc., "not one of the 98 named plaintiffs in the CAC alleges that he or she was insured by or had *any* connection with" these entities.  Non-Anthem Mot. at 2.

10

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1   The Non-Anthem Defendants request that these three entities be dismissed from this action in its

2   entirety.  The Court finds the Non-Anthem Defendants' contentions well taken, for the reasons

3   stated below.

4       First, each of the factors described in *In re Carrier IQ* weigh in favor of the Court

5   addressing standing questions at the outset of this litigation, rather than deferring such questions

6   until class certification.  As to the cost and burden of discovery, for instance, the Court observes

7   that the parties must litigate the selected claims "through two motions to dismiss, through class

8   cert[ification], [and] through summary judgment."  ECF No. 359 at 60.  The parties expect

9   discovery to be expensive and time-consuming.  As this action moves forward, Plaintiffs may not

10  be able to find a single class member who can assert any claim with specific factual allegations

11  against Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and

12  Highmark West Virginia, Inc.  Under such circumstances, it would make little sense to require

13  these three Non-Anthem Defendants to be subject to extensive discovery and motions practice.

14      In addition, there are nearly 80 million potential class members, with each class member

15  asserting a variety of state and federal law claims.  Deferring questions of standing until class

16  certification would only make the Court's class certification decision all the more unwieldy, and

17  would not be in the interest of promoting efficient litigation.  *See In re Carrier IQ*, 78 F. Supp. 3d

18  at 1074–75 ("Moreover, given the breadth of the proposed class and the number of state law

19  claims asserted on behalf of the class, there is a meaningful risk that the requirements of class

20  certification under Rule 23 may not be met or, if they are, subclasses may have to be created

21  which would engender delay.").

22      Furthermore, as the parties acknowledge, there are subtle but significant differences in the

23  various state and federal law claims at issue.  Plaintiffs might, for instance, be able to move

24  forward with a breach of contract claim under California law but not a breach of contract claim

25  under the law of a different state.  Under such circumstances, grouping all Non-Anthem

26  Defendants together—particularly those who have had no specific factual allegations asserted

27                                                      11

28  Case No. 15-MD-02617-LHK
    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

1    against them—makes little sense.  *See id.* at 1072 (holding that deferring issues of standing until

2    after class certification may be appropriate where a claim brought by an individual with standing

3    "is typical of those individuals whose claims arise under the laws of the other states.").

4         In addition to the specific *In re IQ Carrier* factors discussed above, Plaintiffs acknowledge

5    that "named Plaintiffs from a particular state do not bring their individual state law claims against

6    Non-Anthem Defendants with whom they did not have a relationship."  Non-Anthem Opp'n at 5;

7    *see also Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *recognized as abrogated on other*

8    *grounds by Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) ("In order to assert claims on

9    behalf of a class, a named plaintiff must have personally sustained or be in immediate danger of

10   sustaining some direct injury as a result of the challenged statute or official conduct.").  Thus,

11   under Plaintiffs' own theory of the case, there is little reason to keep certain Non-Anthem

12   Defendants in this action when no specific factual allegations have been asserted against them

13   with respect to any of the claims in the consolidated amended complaint.

14        As a final point, in this particular instance, case law appears to tilt in the Non-Anthem

15   Defendants' favor.  In *In re Carrier IQ*, for instance, the district court addressed standing prior to

16   class certification and "require[d] the [p]laintiffs to present a named class member who possesses

17   individual standing to assert each state law's claims against Defendants."  78 F. Supp. 3d at 1074.

18   As in the instant case, the *In re Carrier IQ* court cited both "the expense and burden of nationwide

19   discovery" and "the breadth of the proposed class" in reaching this determination.  *Id.*  Likewise,

20   in *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013), the

21   district court observed that "there is only one named plaintiff and she has not alleged that she

22   purchased [defendant's product] outside of California."  Thus, "[p]laintiff does not have standing

23   to assert a claim under the consumer protection laws of the other states named in the Complaint."

24   *Id.*; *accord Harris v. CVS Pharmacy, Inc.*, 2015 WL 4694047, *4 (C.D. Cal. Aug. 6, 2015)

25   (finding that, "[a]s the party advocating for the application of Rhode Island law, [p]laintiff must

26   make at least [a] *prima facie* showing that the RIDTPA applies to him such that he would have

12

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    standing to bring that claim.").

2         Plaintiffs' attempt to distinguish this line of cases by relying on *In re Target* is unavailing.

3    Although the *In re Target* court did defer issues of standing until after class certification, the

4    district court reasoned that, "[a]s Target undoubtedly knows, there are consumers in Delaware,

5    Maine, Rhode Island, Wyoming, and the District of Columbia whose personal financial

6    information was stolen in the 2013 breach." 66 F. Supp. 3d at 1160.  Accordingly, even though no

7    named plaintiffs hailed from these specific jurisdictions at the time Target filed its motion to

8    dismiss, residents from these jurisdictions were almost certainly affected by the data breach and

9    could almost certainly be identified at some later point in the litigation.

10        This same principle does not apply with equal force in the instant case.  Here, unlike in *In

11   re Target*, Plaintiffs do not bring their claims against a single nationwide entity.  Instead, Plaintiffs

12   have brought suit against Anthem, 28 Anthem affiliates, and 17 Non-Anthem Defendants.  The

13   Non-Anthem Defendants do not dispute that the Anthem data breach affected upwards of 80

14   million individuals, and that these individuals have standing to bring their claims against at least

15   *some* Defendants.  The Non-Anthem Defendants, however, contest whether three specific Non-

16   Anthem Defendants should remain in this action when not a single named Plaintiff has been able

17   to assert any specific factual allegations against these three Non-Anthem Defendants.  Unless and

18   until Plaintiffs demonstrate otherwise, the Court finds that there is little use in keeping these three

19   Non-Anthem Defendants in this action.

20        Accordingly, the Court DISMISSES Blue Cross and Blue Shield of Arizona, Inc.,

21   BlueCross BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc. from this action in its

22   entirety.  Plaintiffs, however, shall have leave to amend.  It is possible that Plaintiffs may be able

23   to assert specific factual allegations against the three Non-Anthem Defendants listed above by, for

24   instance, adding a new named Plaintiff.  *See Lopez*, 203 F.3d at 1127 (holding that "a district court

25   should grant leave to amend . . . unless it determines that the pleading could not possibly be cured

26   by the allegation of other facts.")   The Court therefore GRANTS with leave to amend the Non-

27                                                    13

United States District Court
Northern District of California

1    Anthem Defendants' motion to dismiss Blue Cross and Blue Shield of Arizona, Inc., BlueCross

2    BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc. from this action in its entirety.

3        **2.  All Selected Claims as to Ten Non-Anthem Defendants**

4           For substantially the same reasons, the Court also GRANTS with leave to amend the Non-

5    Anthem Defendants' motion to dismiss the ten selected claims at issue in the instant motion to

6    dismiss against Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona,

7    Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue

8    Shield of North Carolina, Inc.; Highmark Health Services; Highmark West Virginia, Inc.;

9    BlueCross BlueShield of Tennessee, Inc.; Blue Cross and Blue Shield of Vermont; and Blue Cross

10   and Blue Shield of Illinois.

11          As noted above, the consolidated amended complaint fails to allege any specific facts

12   regarding these ten Non-Anthem Defendants with respect to the selected claims at issue in the

13   instant motions to dismiss.  Non-Anthem Mot. at 1.  Requiring these particular Non-Anthem

14   Defendants to undergo extensive discovery and motions practice in this action is both costly and

15   unnecessary.  Moreover, dismissing these ten Non-Anthem Defendants from the ten selected

16   claims at issue does not altogether absolve these Defendants from liability.  By requiring the

17   parties to focus on a set of selected claims, the Court sought to narrow the issues presented in

18   order to move forward with this MDL in a timely and cost-effective manner.  The Court's decision

19   to adopt such a streamlined approach, however, does not result in dismissal of the many

20   remaining, non-selected claims against these ten Non-Anthem Defendants asserted in the

21   consolidated amended complaint.

22       **3.  Selected Claims as to Most Non-Anthem Defendants**

23          Finally, the Non-Anthem Defendants request that the Court dismiss Plaintiffs' Indiana

24   negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, California Unfair

25   Competition Law ("UCL"), New York unjust enrichment, and New York General Business Law

26   ("GBL") § 349 claims against all Non-Anthem Defendants about whom the consolidated amended

27                                                                        14

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complaint makes no factual allegations.

2          As an initial matter, this argument is moot with respect to Plaintiffs' Indiana negligence

3    and Kentucky Consumer Protection Act claims.  As discussed in greater detail below, Plaintiffs

4    can not maintain these claims as a matter of law.  These claims will therefore be dismissed with

5    prejudice.

6          That leaves the Court with the following four claims: New Jersey breach of contract,

7    California Unfair Competition Law ("UCL"), New York unjust enrichment, and New York

8    General Business Law ("GBL") § 349.  Although the Non-Anthem Defendants acknowledge that

9    Plaintiffs have properly brought these claims against at least *one* Anthem or Non-Anthem

10   Defendant, the Non-Anthem Defendants contend that there is little point in keeping *all* Non-

11   Anthem Defendants in this litigation with respect to these particular claims.  The Court agrees.

12         Consistent with its reasoning throughout this section, the Court finds that it would be

13   improvident to require all 17 non-Anthem Blue Cross Blue Shield Defendants to answer for a

14   claim when Plaintiffs assert factual allegations against only a handful of these 17 Defendants.  The

15   breadth and complexity of this action make streamlining this litigation all the more important.

16   Thus, the Court GRANTS the Non-Anthem Defendants' motion to dismiss Plaintiffs' Indiana

17   negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, California Unfair

18   Competition Law ("UCL"), New York unjust enrichment, and New York General Business Law

19   ("GBL") § 349 claims against all Non-Anthem Defendants about whom the consolidated amended

20   complaint makes no factual allegations.  As above, Plaintiffs shall have leave to amend.[6]

21   **B.  Indiana Negligence (against Anthem and Non-Anthem Defendants)**

22         "The elements of a negligence claim under Indiana law are: (1) a duty owed to plaintiff by

23   defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care,

24   _____

25   [6] In the same vein, Plaintiffs must specifically and accurately identify the health plan of each
     named Plaintiff.  For example, although the consolidated amended complaint alleges that
26   California Plaintiff Michael Bronzo was enrolled in a "Blue Cross Blue Shield of California health
     plan," Non-Anthem Defendants allege that no such entity exists.  Non-Anthem Mot. at 10 n.2.

27                                                        15

28

1    and (3) a compensable injury proximately caused by defendant's breach of duty." *Pisciotta v. Old*

2    *Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007) (internal quotation marks omitted).  Here,

3    Plaintiffs allege that the Anthem and Non-Anthem Defendants "violated the duty of care owed

4    Indiana Plaintiffs and Class Members by collecting and storing their [PII] without adequate data

5    security."  Anthem Opp'n at 3.

6        Defendants contend that Plaintiffs' negligence claim fails for three reasons.  First,

7    Defendants assert "that Indiana law does not allow a cause of action in tort against a database

8    owner for failing to protect adequately personal information."  Anthem Mot. at 2.  Second,

9    Defendants argue that the economic loss doctrine bars recovery for Defendants' alleged

10   negligence.  *Id.* at 3.  Third, Defendants contend that the allegations in the consolidated amended

11   complaint fail to establish proximate causation.  Non-Anthem Mot. at 8.

12       As to whether Indiana law provides Plaintiffs a private cause of action, the parties

13   acknowledge that no Indiana court has yet ruled on this question.  The Court therefore looks to the

14   law of the Seventh Circuit, of which Indiana is a part.  On this point, the Court finds instructive

15   the Seventh Circuit's decision in *Pisciotta v. Old National Bancorp.*  In *Pisciotta*, Old National

16   Bancorp ("ONB") maintained a website containing the personal information of potential

17   customers.  In 2005, ONB learned that its website had been hacked, and ONB subsequently

18   informed affected potential customers of this breach.  Upon receiving this information, Luciano

19   Pisciotta ("Pisciotta") and Daniel Mills ("Mills") proceeded to file a putative class action

20   complaint against ONB.  As in the instant case, the *Pisciotta* complaint asserted a negligence

21   claim under Indiana law.  The District Court for the Southern District of Indiana determined that

22   Pisciotta and Mills could not bring such a claim as a matter of law, and granted ONB's motion for

23   judgment on the pleadings.  499 F.3d at 632–33 (reciting procedural history).  The Seventh Circuit

24   upheld the district court's decision on appeal.

25       In reaching this conclusion, the Seventh Circuit first observed that "[n]either the parties'

26   efforts nor our own have identified any Indiana precedent addressing" whether "Indiana would

27                                                    16

28

United States District Court
Northern District of California

1    consider that the harm caused by identity information exposure, coupled with the attendant costs

2    to guard against identity theft, constitutes an existing *compensable injury and consequent damages*

3    required to state a claim for negligence." *Id.* at 635.  Accordingly, "[w]ithout state authority to

4    guide us, '[w]hen given a choice between an interpretation of [state] law which reasonably

5    restricts liability, and one which greatly expands liability, we should"—as a general matter—

6    "choose the narrower and more reasonable path (at least until the [state] Supreme Court tells us

7    differently).'" *Id.* at 635–36 (quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.

8    1994) (en banc)) (alterations in original).

9        With this general canon of interpretation in mind, the Seventh Circuit further observed that

10   "the Indiana authority most closely addressed to the issue"—a series of statutes enacted by the

11   Indiana legislature in 2006—weighed against finding that Pisciotta and Mills could assert a private

12   right of action against ONB.  *Id.* at 636–37.  The statutory provisions "applicable to private

13   entities storing personal information require only that a database owner disclose a security breach

14   to potentially affected consumers; they do not require the database owner to take any other

15   affirmative act in the wake of a breach." *Id.* at 637.  Moreover, "[i]f the database owner fails to

16   comply with the only affirmative duty imposed by the statute—the duty to disclose—the statute

17   provides for enforcement *only* by the Attorney General of Indiana.  It creates no private right of

18   action against the database owner." *Id.*  Thus, disclosure to those affected is the only duty

19   imposed upon the database owners by Indiana's data breach statutes, and these statutes only allow

20   for enforcement by the Indiana Attorney General.

21       The Seventh Circuit went on to reject the view "that the statute is evidence that the Indiana

22   legislature believes that an individual has suffered a compensable injury at the moment his

23   personal information is exposed because of a security breach." *Id.*  Indeed, "given the novelty of

24   the legal questions posed by information exposure and theft, it is unlikely that the legislature

25   intended to sanction the development of common law tort remedies that would apply to the same

26   factual circumstances addressed by the statute." *Id.*

27                                             17

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1        The Court finds *Pisciotta* persuasive for the following reasons.  First, this Court, as an

2   MDL court, "must apply the law of the transferor forum, that is, the law of the state in which the

3   action was filed."  *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007); *see*

4   *also In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court is generally bound by the

5   same substantive legal standards . . .  as would have applied in the transferor court.").  This legal

6   principle means that, for a negligence claim brought under the laws of Indiana, the MDL court

7   should—as a general matter—follow the lead of the Seventh Circuit.

8        Second, although *Pisciotta* was decided in 2007, the parties have identified no subsequent

9   cases—state or federal—that have discussed Indiana's data breach statutes.  The Court has found

10  none in its own research.  Thus, *Pisciotta* continues to serve as the final word on how courts

11  should interpret Indiana's data breach statutes and, critically, whether individuals may maintain a

12  private cause of action for negligence.  499 F.3d at 637 ("Had the Indiana legislature intended that

13  a cause of action should be available against a database owner for failing to protect adequately

14  personal information, we believe that it would have made some more definite statement of that

15  intent.").

16       Third, the *Pisciotta* decision is consistent with the negligence law of other jurisdictions.  In

17  *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1054 (E.D. Mo. 2009), for instance,

18  plaintiff alleged "that defendant was negligent in its failure to properly secure its computerized

19  database system[,] thereby rendering the system vulnerable to a security breach and, further, was

20  negligent in its failure to timely disclose the alleged breach."  In rejecting plaintiff's claim, the

21  *Amburgy* court "note[d] that the Missouri legislature [had] recently enacted a data breach

22  notification law."  *Id.* at 1055.  That law, like Indiana's statutes, holds that the state "Attorney

23  General [is] to have exclusive authority in bringing claims against data handlers for a violation of

24  the notice requirements."  *Id.* The Missouri statute did not provide a private cause of action, and

25  the *Amburgy* court declined to create a cause of action "where one does not exist."  *Id.*

26       Similarly, in *Willingham v. Global Payments, Inc.*, 2013 WL 440702, *17 n.19 (N.D. Ga.

18

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Feb. 5, 2013), plaintiffs sought to assert a common law negligence claim against defendant.  In

2   arguing that defendant owed plaintiffs such a duty, plaintiffs cited data breach statutes from

3   Kansas and California.  *Id.*  After carefully reviewing these statutes, the *Willingham* court

4   concluded that the statutes "do not give [p]laintiffs a [private] cause of action for negligence."  *Id.*

5   As the district court explained, these statutes contain a notice provision which requires companies

6   to provide notice to affected customers of a data breach.  Like the statutes at issue in *Pisciotta* and

7   *Amburgy*, however, these statutes do not contain a private enforcement mechanism.

8          Third, and finally, Plaintiffs' attempts to distinguish *Pisciotta* are unavailing.  Plaintiffs,

9   for instance, point to the fact that the Indiana legislature amended Indiana's data breach statutes in

10  2009.  The statutes now require database owners to "maintain reasonable procedures . . . to protect

11  and safeguard from unlawful use or disclosure any personal information," a provision that did not

12  exist at the time *Pisciotta* was decided.  Anthem Opp'n at 4.  The amendments also exempt some

13  "database owners with security policies under HIPAA from some . . . [statutory] requirements."

14  Anthem Mot. at 2 n.3.  None of these amendments, however, address whether individual plaintiffs

15  may maintain a private cause of action in negligence.  Indiana's data breach statutes continue to

16  provide a single enforcement mechanism: an action brought by the state Attorney General.  Ind.

17  Code. Ann. § 24-4.9-4-2.  The Court thus fails to see how the 2009 amendments give support to

18  Plaintiffs' attempts to maintain a private cause of action.  *Pisciotta* was decided in 2007.  The

19  Indiana legislature, presumably aware of the *Pisciotta* decision, declined to provide plaintiffs a

20  private cause of action when given the opportunity to amend the state's data breach statutes in

21  2009.

22         Plaintiffs also contend that Indiana courts "frequently borrow from statutes that do not

23  contain a private right of action to impose common law duties."  Anthem Opp'n at 4.  Plaintiffs

24  cite *Kho v. Pennington*, 875 N.E.2d 208, 212 (Ind. 2007), where the Indiana Supreme Court

25  recognized a private right of action for statutory negligence "arising from the violation of the

26  identity confidentiality provision in Indiana Code § 34–18–8–7(a)(1)."

27                                                    19

1          There are two key flaws with Plaintiffs' reliance on *Kho*.  First, the fact that Indiana courts

2   have recognized claims for statutory negligence in *some* cases does not suggest that this Court

3   should recognize a private cause of action in the instant case.  This point is all the more

4   pronounced where, as here, the District Court for the Southern District of Indiana and the Seventh

5   Circuit—two federal courts that are significantly more familiar with Indiana law than this Court—

6   declined to recognize a private cause of action under nearly identical circumstances in *Pisciotta*.

7   *Cf. Butner v. United States*, 440 U.S. 48, 58 (1979) ("The federal judges who deal regularly with

8   questions of state law in their respective districts and circuits are in a better position than we to

9   determine how local courts would dispose of comparable issues.").

10         Second—and relatedly—all of the decisions cited in *Kho* are Indiana Supreme Court or

11  Indiana Court of Appeals decisions.  None are federal court decisions, much less decisions by a

12  federal court sitting in a different state.  This result is, in the Court's view, consistent with the

13  view of the Seventh Circuit, that "[w]hen [a federal court is] given a choice between an

14  interpretation of [state] law which reasonably restricts liability, and one which greatly expands

15  liability, [the federal court] should choose the narrower and more reasonable path." *Todd*, 21 F.3d

16  at 1412.  In light of these circumstances, Plaintiffs can not pursue their Indiana negligence claim

17  against Defendants.

18         Because Plaintiffs can not pursue such a claim as a matter of law, the Court need not

19  address Defendants' arguments concerning the economic loss doctrine and proximate causation.

20  Accordingly, Defendants' motions to dismiss Plaintiffs' Indiana negligence claim is GRANTED.

21         Moreover, the Court finds that amendment would be futile.  Case law and statutory

22  authority indicates that, in Indiana, data breach actions must be brought by the Indiana Attorney

23  General.  Plaintiffs have identified no relevant authority that would allow private individuals to

24  bring an Indiana data breach action under a common law negligence theory.  In the absence of

25  supporting authority for Plaintiffs' position, the Court finds that leave to amend would be futile,

26  and therefore denies leave to amend.  *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)

27                                               20

1    ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

2    Therefore, Plaintiffs' Indiana negligence claim is DISMISSED with prejudice.

3         **C. California Breach of Contract (against Anthem Defendants)**

4         The consolidated amended complaint asserts against the Anthem Defendants a breach of

5    contract claim under California law.  Specifically, Plaintiffs allege that "Anthem and Anthem

6    Affiliates did not satisfy their promises and obligations to Plaintiffs and Statewide Class Members

7    under the contracts in that they did not take reasonable measures to keep Plaintiffs' and Statewide

8    Class Members' [PII] secure and confidential and did not comply with the applicable laws,

9    regulations, and industry standards."  CAC ¶ 305.  In moving to dismiss Plaintiffs' claim, the

10   Anthem Defendants contend that "(a) the CAC fails to identify the contractual provisions that

11   allegedly were breached, (b) the CAC fails to allege facts showing any breach caused Plaintiffs to

12   suffer damages that are cognizable under California law, and (c) certain Plaintiffs' claims are

13   preempted by ERISA."  Anthem Mot. at 4.[7]

14        As to whether the consolidated amended complaint identifies the contractual provisions

15   that were breached, the Court observes that, "[u]nder California law, to state a claim for breach of

16   contract a plaintiff must plead the contract, plaintiffs' performance (or excuse for

17   nonperformance), defendant's breach, and damage to plaintiff therefrom."  *Low v. LinkedIn Corp.*,

18   900 F. Supp. 2d 1010, 1028 (N.D. Cal. 2012) (internal quotation marks omitted).  With respect to

19   this first requirement—the need to plead the contract—a plaintiff must, in actions involving breach

20   of a written contract, "allege the specific provisions in the contract creating the obligation the

21   defendant is said to have breached."  *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D.

22   Cal. 2011); *see also Frances T. v. Vill. Green Owners Ass'n*, 723 P.2d 573, 586 (Cal. 1986)

23

24   ───────────────────

     [7] The Anthem Defendants also allege that three California Plaintiffs (Joseph Blanchard, Lillian
25   Brisko, and Alvin Lawson) do not have a contractual relationship with an Anthem Defendant.
     Anthem Mot. at 4.  Plaintiffs concede this point, and acknowledge that these three Plaintiffs "do
26   not bring [California] breach of contract claims against [the] Anthem Affiliates with whom they
     had no relationship."  Anthem Opp'n at 6–7 n.6.

27                                                    21

     Case No. 15-MD-02617-LHK
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1  ("Plaintiff's allegation that defendants breached that contract . . .  must fail because she does not

2  allege that any provision in any of the writings imposed such an obligation on defendant.");

3  *Murphy v. Hartford Accident & Indem. Co.*, 2 Cal. Rptr. 325, 328 (Ct. App. 1960) ("In order for

4  an action to be based upon an instrument in writing, the writing must express the obligation sued

5  upon.").

6        The Court finds that the consolidated amended complaint fails to satisfy this requirement,

7  based on a review of (1) the language in the consolidated amended complaint, (2) the language on

8  Anthem's public websites and in various privacy notices, (3) the exhibits submitted in connection

9  with the consolidated amended complaint, and (4) relevant state and federal law.  The Court

10  addresses these four areas in detail below.

      **1.  Language in Consolidated Amended Complaint**

11

12        First, with respect to the language in the consolidated amended complaint, Plaintiffs allege

13  that class members "who purchased individual insurance plans from Anthem Affiliates or who

14  received health insurance . . . under a contract between an employer . . . and Anthem or Anthem

15  Affiliates had valid, binding, and enforceable express, third party beneficiary, or implied contracts

16  with Anthem and Anthem Affiliates."  CAC  ¶ 303.

17        However, under the section of the consolidated amended complaint titled "Breach of

18  Contract," *id.* ¶¶ 302–311, Plaintiffs do not refer to any contractual language or any contractual

19  provisions that the Anthem Defendants allegedly breached.  Instead, Plaintiffs state—without

20  reference to an underlying contract or other documents—that class members provided "Anthem

21  and/or Anthem Affiliates with their [PII]."  *Id.* ¶ 303(a).  In exchange, the Anthem Defendants

22  promised "to protect [class members' PII in compliance with federal and state laws and

23  regulations, including HIPAA, and industry standards."  *Id.*  In the very next paragraph, Plaintiffs

24  state that "[t]he terms of Plaintiffs' and Statewide Class Members' contracts with Anthem and

25  Anthem Affiliates that concern the protection of Plaintiffs' [PII] [are] set forth above."  *Id.* ¶ 304.

26  However, this paragraph does not refer specifically to any other part of the consolidated amended

27                                                    22

28

1   complaint.  The remaining paragraphs in this section do no better.  One paragraph addresses

2   Plaintiffs' implied contract theory, *id.* ¶ 303(c), another paragraph alleges that Plaintiffs "fully

3   performed their obligations under their contracts," *id.* ¶ 307, and several paragraphs address the

4   damages that Plaintiffs seek, *id.* ¶¶ 308–310.  Considered together, none of these paragraphs

5   identify a specific contractual provision that the Anthem Defendants breached.

6         These stray allegations mirror the facts in *Young v. Facebook*, where plaintiff stated in the

7   complaint that "Facebook did not perform in accordance with the terms of [the] agreement in their

8   Statement of Rights and Responsibilities contract by arbitrarily and impulsively handling

9   [plaintiff's] member account."  *Young*, 790 F. Supp. 2d at 1117 (internal quotation marks omitted).

10  However, as the district court pointed out, plaintiff's "complaint [did] not allege any provision of

11  the contract prohibiting Facebook from terminating an account in the manner alleged."  *Id.*

12  Because plaintiff had failed to identify a relevant contractual provision that was breached, the

13  *Young* court granted Facebook's motion to dismiss plaintiff's California breach of contract claim.

14  *Id.* (finding that plaintiff had failed to "allege the specific provisions in the contract creating the

15  obligation the defendant is said to have breached.").  As in *Young*, Plaintiffs' conclusory

16  statements in the "Breach of Contract" section of the consolidated amended complaint are

17  insufficient to survive a motion to dismiss.

18         **2.  Language on Public Websites and in Privacy Notices**

19         Plaintiffs, however, contend that the paragraphs discussed above constitute "only . . . the

20  summary language [of Plaintiffs'] breach of contract count."  Anthem Opp'n at 5.  Instead,

21  Plaintiffs note, "specific promises . . . regarding data security" are located in paragraphs 161

22  through 170.  *Id.* at 5–6.  These paragraphs include language from the public websites of the

23  Anthem Defendants and from statements made by the Anthem Defendants in various privacy

24  notices.  The website for every Anthem BCBS affiliate, for instance, states:

25         **[PII] (including Social Security Number) Privacy Protection Policy**
26         **[Name of Anthem BCBS Affiliate] maintains policies that protect the**
        **confidentiality of [PII], including Social Security numbers, obtained from its**

27                                                    23

28

**members and associates in the course of its regular business functions.** [Name of Anthem BCBS Affiliate] is committed to protecting information about its customers and associates, especially the confidential nature of their [PII].

CAC ¶ 166 (second and fourth alterations in original).  Likewise, Blue Cross of California mailed the following privacy notice to customers:

> **We keep your oral, written and electronic [PII] safe using physical, electronic, and procedural means. These safeguards follow federal and state laws**. Some of the ways we keep your [PII] safe include securing offices that hold [PII], **password-protecting computers**, and locking storage areas and filing cabinets. We require our employees to protect [PII] through written policies and procedures. **These policies limit access to [PII] to only those employees who need the data to do their job.** Employees are also required to wear ID badges to help keep people who do not belong out of areas where sensitive data is kept. **Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business.** They are not allowed to give [PII] to others without your written OK, except as allowed by law and outlined in this notice.

*Id.* ¶ 163.  Although this language is more specific than the conclusory paragraphs discussed above, this language still does not give rise to a viable California breach of contract claim.

First, the consolidated amended complaint provides no information on when the language at issue was posted onto the Anthem Defendants' websites and when the various privacy notices were sent to class members.  Clearly, such notices would be of little assistance to Plaintiffs' claim if Plaintiffs received these notices *after* the data breach at issue.

More importantly, the consolidated amended complaint makes no attempt to connect the language in paragraphs 161 through 170 with the terms of Plaintiffs' alleged contracts.  At no point in paragraphs 161 through 170 do Plaintiffs allege that the privacy notices or public website statements were part of or were incorporated by reference into Plaintiffs' contracts with the Anthem Defendants.  In fact, the word "contract" does not appear at all in paragraphs 161 through 170.  By this same token, under the section of the consolidated amended complaint titled "Breach of Contract," *id.* ¶¶ 302–311, Plaintiffs do not at any point refer to the privacy notices or public websites discussed in paragraphs 161 through 170.

Plaintiffs can not bring a breach of contract claim based on language from documents that

24

United States District Court
Northern District of California

might have been issued after the alleged breach and based on language from documents that might not even have been part of the alleged contract.  In reaching this conclusion, the Court returns to the legal principle discussed above: that, "[i]n an action for breach of a written contract, a plaintiff must allege the specific provisions in the contract creating the obligation the defendant is said to have breached."  *Young*, 790 F. Supp. 2d at 1117; *see also Miron v. Herbalife Int'l, Inc.*, 11 F. App'x 927, 929 (9th Cir. 2001) ("The district court's dismissal of the Mirons' breach of contract claims was proper because the Mirons failed to allege any provision of the contract which supports their claim.").  Plaintiffs have failed to identify any such contractual provision because Plaintiffs have made no effort to connect the language in paragraphs 161 through 170 with the terms in Plaintiffs' contracts with the Anthem Defendants.  On this basis alone, the Court finds that dismissal of Plaintiffs' California breach of contract claim is warranted.  Below, the Court addresses additional bases upon which Plaintiffs' California breach of contract claim is unavailing.

### 3.  Exhibits Submitted in Connection With Consolidated Amended Complaint

Plaintiffs have failed to submit any relevant exhibits, such as a copy of the contract between an Anthem Defendant and a California Plaintiff, which might counsel against dismissal.  Although Plaintiffs are not required to submit such exhibits, these exhibits would certainly provide clarity on the scope and nature of the Anthem Defendants' obligations.  Thus, in *Young*, plaintiff included a copy of Facebook's Statement of Rights and Responsibility with the complaint.  790 F. Supp. 2d at 1118.  Likewise, in *Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215, 1220 (N.D. Cal. 2011), plaintiff included Paypal's user agreement as an exhibit to accompany the complaint.  In *Woods v. Google Inc.*, 2011 WL 3501403, *3–*4 (N.D. Cal. Aug. 10, 2011), plaintiff also filed a copy of Google's advertising contract with the complaint.  In all of these cases—*Young*, *Zepeda*, and *Woods*—the district court, after reviewing the allegations made in the complaint and the terms of the pertinent agreement, determined that the plaintiff could not maintain a cause of action for breach of contract under California law.  Here, on the other hand, there is nothing for the Court to review as Plaintiffs have submitted no contracts or other materials for the Court to examine.

25

1    In fact, the only possibly relevant exhibits filed were submitted by the Anthem Defendants,

2    not Plaintiffs.  The Anthem Defendants, for instance, filed a copy of the Summary Plan

3    Description under which Plaintiffs Daniel and Kelly Tharp allegedly received coverage.  *See* ECF

4    No. 411 at 1–2.  This Plan Description includes a five page "Privacy Notice."  *See* ECF No. 411-4

5    at 58–62.  This Privacy Notice provides a list of specific circumstances where Anthem or an

6    Anthem affiliate might disclose a member's personal health information.  *Id.*  The Notice further

7    provides that "[o]ther than as stated above, the Health Plan will not disclose your health

8    information other than with your written authorization."  *Id.* at 61.  Moreover, "[t]he Health Plan

9    is required by law to maintain the privacy of your health information and to provide you with this

10   Notice of the Plan's legal duties and privacy practices with respect to your health information.  If

11   you participate in an insured plan option, you will receive a notice directly from the Insurer."  *Id.*

12   at 62.  This final statement in the Summary Plan Description could plausibly be taken to

13   incorporate by reference future privacy notices sent to class members.

14        However, the problem with relying on this Summary Plan Description is that Plaintiffs

15   have, in the consolidated amended complaint, stated that such documents do not represent the

16   contract between class members and the Anthem Defendants.  *See* CAC ¶ 303(b) ("With respect to

17   contracts between employers and Anthem and/or Anthem Affiliates, the applicable contract is the

18   services agreement between the employer and Anthem and/or Anthem Affiliates, not the employer

19   benefits plan document.").  Plaintiffs repeat this assertion in opposing the Anthem Defendants'

20   motion to dismiss.  *See* Anthem Opp'n at 25 (describing Summary Plan Description documents as

21   "non-enforceable").  Given Plaintiffs' position, the Court can not rely upon the Summary Plan

22   Description to save Plaintiffs' breach of contract of claim from dismissal.

23        **4.  Incorporation of Applicable State and Federal Law**

24        As a final point, Plaintiffs state that, "[u]nder California law, Defendants' contracts

25   necessarily incorporate applicable laws even absent specific promises."  Anthem Opp'n at 7

26   (citing *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 297 (Cal. 2008)).  This contention alone,

26

27

28

1  however, does not save Plaintiffs' breach of contract claim.

2       First, the consolidated amended complaint provides little guidance as to which "applicable

3  laws" were incorporated into the contract.  Instead, the consolidated amended complaint merely

4  alleges that the Anthem Defendants were required to comply with "federal and state laws and

5  regulations, including HIPAA, and industry standards."  CAC ¶ 303(a).  In other words, outside of

6  a single passing reference to HIPAA, Plaintiffs have provided little detail on what other laws,

7  regulations, or standards the Anthem Defendants might have violated.  As other district courts

8  have noted, "plaintiffs must . . . do something more to allege a breach of contract claim than

9  merely point to allegations of a statutory violation."  *Wiebe v. NDEX West, LLC*, 2010 WL

10  2035992, *3 (C.D. Cal. May 17, 2010) (quoting *Berger v. Home Depot U.S.A., Inc.*, 476 F. Supp.

11  2d 1174, 1177 (C.D. Cal. 2007)).  The consolidated amended complaint fails to meet this

12  requirement.

13       Second, Plaintiffs' breach of contract claim reaches beyond mere violation of "applicable

14  laws."  Plaintiffs, for instance, also allege that the Anthem Defendants' actions ran afoul of certain

15  "industry standards."  CAC ¶ 303(a).  Thus, simply stating that Defendants' contracts incorporate

16  applicable laws does not accurately reflect the nature of Plaintiffs' breach of contract claim.

17       In sum, after examining the consolidated amended complaint, the exhibits (or lack thereof)

18  filed in connection with the consolidated amended complaint, and relevant case law and statutory

19  authority, the Court finds that Plaintiffs have failed to identify the specific contractual provisions

20  that were breached, as Plaintiffs must do in order to bring a breach of written contract claim under

21  California law.

22       **5. Breach of Implied Contract**

23       In addition to Plaintiffs' breach of express contract claim, Plaintiffs also state that "[b]y

24  demanding and accepting Plaintiffs' and Statewide Class Members' [PII], Anthem and Anthem

25  Affiliates entered into implied contracts with Plaintiffs and Statewide Class Members."  CAC ¶

26  303(c).  The consolidated amended complaint does not delve into additional detail on the terms

27  27

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and scope of this alleged implied contract.  In moving to dismiss Plaintiffs' California breach of

2  contract claim, the Anthem Defendants contend that "[t]he CAC fails to allege any facts showing

3  that [any] implied contracts existed beyond vague, conclusory allegations."  Anthem Mot. at 6.

4  Relying upon both federal and state case law, the Anthem Defendants argue that Plaintiffs'

5  implied contract theory is not well taken.  *Id.*

6       Plaintiffs declined to respond to these arguments in Plaintiffs' opposition.  *See* Anthem

7  Opp'n at 6 n.7 ("The fact that Plaintiffs have pled theories of contract formation *in the alternative*

8  is no reason to dismiss Plaintiffs' breach of contract claims.  This Court need not resolve now the

9  merits of any challenge to these alternative theories of contract formation.") (citation omitted).  In

10  light of Plaintiffs' position, the Court finds Plaintiffs' implied contract theory unavailing.  If

11  Plaintiffs intend to pursue an implied contract theory in lieu of an express contract claim, Plaintiffs

12  must elaborate upon the nature and scope of the implied contract in the pleadings and must

13  respond to any specific arguments made by the Anthem Defendants.

14      **6.  Conclusion**

15       The consolidated amended complaint fails to identify the contractual provisions that were

16  breached.  In addition, Plaintiffs' opposition fails to respond to the Anthem Defendants'

17  arguments concerning Plaintiffs' implied contract theory.  Accordingly, the Court finds that

18  Plaintiffs can not maintain a breach of contract claim under California law.  The Anthem

19  Defendants' motion to dismiss Plaintiffs' California breach of contract claim is therefore

20  GRANTED.  Pursuant to this decision, the Court need not address the Anthem Defendants'

21  arguments regarding contract damages and ERISA preemption.

22       However, Plaintiffs shall have leave to amend because the Court finds that amendment

23  would not be futile.  Plaintiffs may, for instance, be able to allege sufficient facts to show that the

24  privacy notices were incorporated by reference into Plaintiffs' contracts with the Anthem

25  Defendants.  Alternatively, Plaintiffs may be able to more specifically explain the scope and

26  nature of their implied contracts with the Anthem Defendants.   Plaintiffs' California breach of

27                                                           28

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1    contract claim is therefore DISMISSED with leave to amend.

2       **D.  New Jersey Breach of Contract (against Non-Anthem Defendants)**

3           Plaintiffs' have also asserted against the Non-Anthem Defendants a breach of contract

4    claim under New Jersey law.  Specifically, Plaintiffs allege that the Non-Anthem Defendants "did

5    not satisfy their promises and obligations to Plaintiffs . . . [because] they failed to ensure that

6    Plaintiffs' and Statewide Class Members' [PII] would be secured as required by the contracts.

7    Instead, Plaintiffs' and Statewide Class Members' [PII] was stored in the inadequately-secured

8    Anthem Database and accessed and exfiltrated in the Anthem Data Breach."  CAC ¶ 316.  In

9    response, the Non-Anthem Defendants contend that the CAC "fails to identify the contractual

10   provisions that allegedly were breached."  Non-Anthem Mot. at 4.

11          As the Non-Anthem Defendants acknowledge, this arguments essentially repeat the

12   Anthem Defendants' arguments concerning Plaintiffs' California breach of contract claim.  *Id.* at

13   4–6.  As with Plaintiffs' California breach of contract claim, the Court finds that the consolidated

14   amended complaint fails to identify the relevant contractual provisions that were breached.

15          Indeed, as with California breach of contract claims, parties seeking "[t]o prevail on a

16   breach of contract claim under New Jersey law" must "identify the specific contract or provision

17   that was allegedly breached."  *CIBC Inc. v. Grande Vill., LLC*, 2015 WL 5723135, *5 (D.N.J.

18   Sept. 29, 2015); *see also Skypala v. Mortg. Elec. Registration Sys., Inc.*, 655 F. Supp. 2d 451, 460

19   (D.N.J. 2009) (same).  The consolidated amended complaint fails to meet this requirement—no

20   New Jersey contracts are attached, no specific provisions are referred to, and no contractual

21   language is discussed.

22          Moreover, although the Non-Anthem Defendants filed a copy of the policy provided to

23   purchasers of the Horizon Blue Cross Blue Shield of New Jersey health plan, *see* ECF Nos. 414-1

24   & 414-2, which includes a section regarding privacy practices, Plaintiffs dispute that this exhibit

25   constitutes a true and accurate copy of the policy agreement between Plaintiffs and the Non-

26   Anthem Defendants, *see* Non-Anthem Opp'n at 8.

29

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    Accordingly, consistent with the Court's determination as to Plaintiffs' California breach

2    of contract claim, the Non-Anthem Defendants' motion to dismiss Plaintiffs' New Jersey breach

3    of contract claim is GRANTED, and Plaintiffs' New Jersey breach of contract claim is thus

4    DISMISSED with leave to amend.

5    **E.  New York Unjust Enrichment (against Anthem and Non-Anthem Defendants)**

6    Plaintiffs assert an unjust enrichment claim under New York law against the Anthem and

7    Non-Anthem Defendants.  *See, e.g.*, CAC ¶¶ 350–58.  Specifically, Plaintiffs argue that

8    Defendants "should not be permitted to retain the money belonging to Plaintiffs and Class

9    Members because Defendant[s] failed to implement (or adequately implement) the data security

10   and security practices and procedures that Plaintiffs and Class Members paid for."  *Id.* ¶ 355.

11   Defendants contend that this claim "should be dismissed because" such claims can not be brought

12   "where there exists an enforceable express contract."  Anthem Mot. at 11.  According to

13   Defendants, Plaintiffs must, pursuant to New York law, bring their claim against Defendants as a

14   breach of contract claim, and not as an unjust enrichment claim.  *See, e.g.*, *Goldman v. Metro. Life*

15   *Ins. Co.*, 841 N.E.2d 742, 746–47 (N.Y. 2005) ("Given that the disputed terms and conditions fall

16   entirely within the insurance contract, there is no valid claim for unjust enrichment.").

17   As the parties acknowledge, the viability of Plaintiffs' New York unjust enrichment claim

18   depends largely upon the viability of Plaintiffs' breach of contract claims.  *See* Anthem Mot. at 11;

19   Anthem Opp'n at 11.  As Plaintiffs point out, parties are barred from bringing unjust enrichment

20   claims in New York where "there is a 'valid written agreement, the existence of which is

21   undisputed, and the scope of *which clearly covers the dispute between the parties*.'"  Anthem

22   Opp'n at 11 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y.

23   1987)).  Here, there is significant uncertainty over the nature and scope of Plaintiffs' contracts

24   with Defendants, as Plaintiffs have failed to identify the specific contractual provisions that were

25   breached.  Based on this reason, the Court dismissed Plaintiffs' California and New Jersey breach

26   of contract claims.

27   30

United States District Court
Northern District of California

Because Plaintiffs' New York unjust enrichment claim depends upon Plaintiffs' breach of contract claims, the Court DISMISSES Plaintiffs' New York unjust enrichment claim.  However, consistent with the Court's ruling regarding Plaintiffs' breach of contract claims, Plaintiffs shall have leave to amend their New York unjust enrichment claim.

**F.  California Unfair Competition Law (against Anthem and Non-Anthem Defendants)**

California's Unfair Competition Law ("UCL") provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent.  Cal. Bus & Prof. Code § 17200, *et seq.*  "The UCL's coverage is sweeping, and its standard for wrongful business conduct intentionally broad."  *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1204 (N.D. Cal. 2014) (internal quotation marks omitted).  "Although the UCL targets a wide range of misconduct, its remedies are limited because UCL actions are equitable in nature."  *Pom Wonderful LLC v. Welch Foods, Inc.*, 2009 WL 5184422, *2 (C.D. Cal. Dec. 21, 2009).  "Remedies for private individuals bringing suit under the UCL are limited to restitution and injunctive relief."  *Id.*

Each prong of the UCL provides a separate and distinct theory of liability, *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007), and Plaintiffs assert that Defendants' conduct was unlawful, unfair, and fraudulent, *see* CAC ¶¶ 366.  Before addressing whether Plaintiffs have sufficiently pleaded liability under these three prongs, however, the Court must first determine whether Plaintiffs have standing to bring suit.  In order to establish standing under the UCL, "a plaintiff must make a twofold showing: he or she must demonstrate injury in fact and a loss of money or property caused by unfair competition."  *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1195–96 (C.D. Cal. 2011) (internal quotation marks omitted).  The California Supreme Court has referred to these elements as the "economic injury" and "caus[ation]" requirement.  *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).

**1.  Standing**

**a.  Economic Injury**

As to whether Plaintiffs have demonstrated "injury in fact" and "a loss of money or

31

United States District Court
Northern District of California

property caused by unfair competition," *Susilo*, 796 F. Supp. 2d at 1195–96, the California

Supreme Court has stated that "[t]here are innumerable ways in which economic injury from

unfair competition may be shown," *Kwikset*, 246 P.3d at 885.  A plaintiff may, for instance,

> (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary

*Id.* at 885–86.  Here, Plaintiffs seek recovery under the UCL for three types of economic injury:

"Loss of Benefit of the Bargain," "Out of Pocket Costs," and "Imminent Risk of Further Costs."[8]

Plaintiffs' request for "Loss of Benefit of the Bargain" mirrors the California Supreme Court's

determination in *Kwikset* that a plaintiff who has "surrender[ed] in a transaction more, or

acquire[d] in a transaction less, than he or she otherwise would have" may bring a UCL claim.

246 P.3d at 885; *see also* CAC ¶ 309 ("As a result of Anthem and Anthem Affiliates' failure to

implement the security measures required by the contracts, Plaintiffs and Statewide Class

Members did not receive the full benefit of their bargain, and instead received health insurance

and/or related health care services that were less valuable than what they paid for.").

Moreover, more recent case law within the data breach context confirms that benefit of the

bargain damages represent economic injury for purposes of the UCL.  *See In re Adobe Sys., Inc.*

*Privacy Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014) (finding standing under the UCL

because "[f]our of the six [p]laintiffs allege they personally spent more on Adobe products than

they would had they known Adobe was not providing the reasonable security Adobe represented it

was providing."); *In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, *4 (N.D. Cal. Mar. 28,

2014) (finding that benefit of the bargain losses are "sufficient to confer . . . statutory standing

under the UCL.").  Taken together, *Kwikset*, *In re Adobe*, and *In re LinkedIn* demonstrate that

---

[8] The consolidated amended complaint also alleges economic injury in the form of the "Loss of Value of PII."  Plaintiffs, however, concede "that the loss of Value of PII" does not "constitute[] economic injury for purposes of the UCL."  Anthem Opp'n at 14 n.16.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    benefit of the bargain losses, as alleged in the consolidated amended complaint, constitute

2    economic injury cognizable under the UCL.

3            Incidentally, the fact that Plaintiffs have sufficiently pleaded benefit of the bargain losses

4    also establishes that Plaintiffs may seek restitution under the UCL.  "[I]n the context of the UCL,

5    'restitution' is limited to the return of property or funds in which the plaintiff has an ownership

6    interest (or is claiming through someone with an ownership interest)."  *Madrid v. Perot Sys.*

7    *Corp.*, 30 Cal. Rptr. 3d 210, 219 (Ct. App. 2005).  "Under the UCL, an individual may recover

8    profits unfairly obtained to the extent that these profits represent monies given to the defendant or

9    benefits in which the plaintiff has an ownership interest."  *Pom Wonderful*, 2009 WL 5184422, *2

10   (internal quotation marks omitted).  In requesting benefit of the bargain damages, Plaintiffs allege

11   (1) that Defendants promised to undertake reasonable data security measures in accordance with

12   the law, (2) that some portion of Plaintiffs' plan premiums went towards data security, and (3) that

13   Defendants failed to undertake the promised data security measures.  Plaintiffs therefore

14   "overpa[id]" for their health insurance.  CAC ¶ 309.  In other words, Defendants profited from

15   their lax security measures.  Because Plaintiffs seek to "recover profits unfairly obtained," *Pom*

16   *Wonderful*, 2009 WL 5184422, *2, Plaintiffs have sufficiently established that they may seek

17   restitution in the instant action.

18           Defendants' reliance on *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*

19   *("Sony I")*, 903 F. Supp. 2d 942 (S.D. Cal. 2012), to challenge this conclusion is misplaced.  In

20   *Sony I*, defendants provided users with access to the Playstation Network ("PSN") free of charge.

21   903 F. Supp. 2d at 966.  Because the *Sony I* plaintiffs "received the PSN services free of cost," the

22   district court concluded that "[p]laintiffs have not alleged 'lost money or profits,'" as required to

23   seek restitution under the UCL.  *Id.*  In contrast, in the instant action, Plaintiffs did pay Defendants

24   for their health benefits.  Moreover, Plaintiffs understood that some portion of this payment would

25   be directed "to protect Plaintiffs' and Statewide Class Members' [PII] in compliance with federal

26   and state laws and regulations."  CAC ¶ 303(a).  Based on these allegations, Plaintiffs have

27                                              33

28

1    established that Defendants received money in exchange for protecting Plaintiffs' data and that

2    Plaintiffs now seek recovery of this money.

3        Because Plaintiffs have established economic injury and restitution under the UCL by

4    pleading benefit of the bargain losses, the Court need not address whether "Out of Pocket Costs"

5    and "Imminent Risk of Further Costs" constitute economic injury under the UCL.  The Court

6    recognizes, however, that the case law on these questions is still developing.  On the one hand,

7    some district courts have held that such costs are not actionable under the UCL.  *See, e.g.*, *Sony I*,

8    903 F. Supp. 2d at 966 ("Plaintiffs' allegations that the heightened risk of identity theft, time and

9    money spent on mitigation of that risk, and property value in one's information, do not suffice as

10   injury under the UCL."); *Ruiz v. Gap, Inc.*, 2009 WL 250481, *4 (N.D. Cal. Feb. 3, 2009) ("[I]t is

11   far from clear that the time and expenditure associated with monitoring one's credit is the kind of

12   loss of money or property necessary for standing to assert a claim under section 17200.").

13       Several other district courts, however, have found otherwise.  *See, e.g.*, *Corona v. Sony*

14   *Pictures Entm't, Inc.*, 2015 WL 3916744, *5 (C.D. Cal. June 15, 2015) ("[T]he Court finds that

15   [p]laintiffs adequately allege a cognizable injury by way of costs relating to credit monitoring,

16   identity theft protection, and penalties."); *Witriol v. LexisNexis Grp.*, 2006 WL 4725713, *6 (N.D.

17   Cal. Feb. 10, 2006) ("Plaintiff has expressly alleged that[] he and the Class Members have

18   incurred costs associated with monitoring and repairing credit impaired by the unauthorized

19   release of private information.  Thus, plaintiff has sufficiently alleged that he has suffered actual

20   injury and sustained monetary loss as a result of [d]efendants' actions.") (internal quotation marks

21   omitted).

22       Although *Kwikset* does contain language that appears to weigh in Plaintiffs' favor, *see,*

23   *e.g.*, 246 P.3d at 885–86 (economic injury includes instances where an individual is "required to

24   enter into a transaction, costing money or property, that would otherwise have been unnecessary"),

25   because Plaintiffs have already established economic injury under the UCL by pleading "Benefit

26   of the Bargain" losses, the Court need not resolve whether "Out of Pocket Costs" and "Imminent

27                                         34

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    Risk of Further Costs" constitute economic injury under the UCL.

2              **b.  Causation**

3              "Generally, to prove that a data breach caused identity theft, the pleadings must include

4    allegations of a nexus between the two instances beyond allegations of time and sequence."

5    *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1326 (11th Cir. 2012).  "[P]*urely* temporal connections are

6    often insufficient to establish causation."  *Stollenwerk v. Tri-West Health Care All.*, 254 F. App'x

7    664, 668 (9th Cir. 2009).  Instead, the "pleadings must indicate a logical connection between the

8    two incidents."  *Resnick*, 693 F.3d at 1327.

9              Here, the consolidated amended complaint sufficiently establishes a logical connection

10   between the Anthem data breach and the harm suffered by Plaintiffs.  Every Plaintiff was at one

11   point enrolled in a health plan administered by a Defendant.  *See* CAC ¶¶ 12–108.  As a condition

12   of this enrollment, each Plaintiff provided his or her PII to a Defendant, which was thereafter

13   inputted into Anthem's database.  Defendants do not contest that each Plaintiff had his or her PII

14   stolen as a result of the Anthem data breach.  Finally, many Plaintiffs allege that third parties used

15   Plaintiffs' PII in the wake of the data breach.  *See, e.g.*, *id.* ¶ 21 ("[T]he Tharps received a

16   confirmatory letter from the IRS informing them that someone may have attempted to impersonate

17   them by using their names and Social Security numbers to file a 2014 federal tax return.").  These

18   allegations—that each Plaintiff was enrolled in a health plan administered by a Defendant, that

19   each Plaintiff had his or her PII stolen, and that specific aspects of Plaintiff's PII were used for

20   illicit financial gain after the breach—establish the requisite logical and temporal connection

21   necessary to demonstrate causation.

22             Defendants' contentions to the contrary lack merit.  Defendants argue that Plaintiffs "rel[y]

23   . . . on tenuous temporal relationships that fail to connect the cyberattack and the alleged injuries,

24   rather than stating sufficient facts to show economic injury caused by the unfair business

25   practice."  Anthem Mot. at 16 (internal quotation marks and alteration omitted).  As the Court has

26   pointed out, however, Plaintiffs do more than simply allege a temporal relationship between their

27                                                      35

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

economic injury and the data breach at issue.  Rather, Plaintiffs state that (1) they were enrolled in a particular health plan administered by a Defendant, (2) that they provided their PII to Anthem, (3) that their PII was compromised as a result of the data breach, and (4) that their PII was used for illicit financial gain.  Taken together, these allegations "plausibly link Plaintiffs' purported injuries to the Anthem cyberattack." *Id.* at 9.

On this particular point, the Court also observes that Defendants have argued that "[s]cores of other cyber intrusions and data thefts have compromised the personal information of tens of millions of individuals." *Id.* at 9 n.7.  In support of this argument, Defendants point to recent data breaches at eBay, Target, Home Depot, Neiman Marcus, and various other entities. *Id.*  This contention fails for multiple reasons.  First, Defendants' argument relies upon facts taken from a *Forbes* magazine article—an article not cited or referred to in the consolidated amended complaint.  Defendants' argument thus represents little more than an end around the rule that, on a motion to dismiss, the Court may generally "consider only the contents of the complaint." *Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997).

Second, and more importantly, under Defendants' theory, a company affected by a data breach could simply contest causation by pointing to the fact that data breaches occur all the time, against various private and public entities.  This would, in turn, create a perverse incentive for companies: so long as enough data breaches take place, individual companies will never be found liable.  No part of the UCL, the relevant authority addressing causation, or the specific facts of this case support such a legal theory.

As a final matter, Defendants focus on the allegations of Plaintiff Joseph Blanchard ("Blanchard").  Blanchard alleges that he "spent over 60 hours addressing credit fraud, monitoring his accounts, and addressing issues arising from the Anthem data breach."  CAC ¶ 22.  However, according to Defendants, Blanchard never received notice that his PII had been "compromised in the Anthem cyberattack."  Non-Anthem Mot. at 11.  "Rather, the CAC alleges that Plaintiff Blanchard's wife—who is not a named Plaintiff—received notice that ***her*** [PII] may have been

36

1    compromised." *Id.*

2        As with Defendants' other arguments concerning causation, the Court finds this argument

3    unavailing.  The consolidated amended complaint states that Blanchard "was enrolled in a Blue

4    Cross Blue Shield of Texas health plan," and that he provided his PII to Blue Cross Blue Shield of

5    Texas as a condition of his enrollment.  CAC ¶ 22.  The consolidated amended complaint further

6    states that Blanchard and his wife were enrolled in the same health plan.  Thus, the only apparent

7    difference between the two is that Blanchard's wife received notice of the data breach, but

8    Blanchard did not.  This difference in circumstances, however, does not excuse the Non-Anthem

9    Defendants from liability.  Again, Plaintiffs allege that *every* individual enrolled in a health plan

10   administered by an Anthem or Non-Anthem Defendant was affected by the data breach.  *Id.* ¶¶ 1,

11   3.  That means that Blanchard, after reviewing the notice sent to his wife, could have reasonably

12   concluded that his PII had also been compromised.

13       Additional allegations in the consolidated amended complaint lend further support to

14   Blanchard's decision to take action.  According to Blanchard, "[f]ollowing announcement of the

15   Anthem breach, at least 10 credit cards or credit accounts were opened or attempted to be opened

16   in Mr. Blanchard's name and using his [PII]."  *Id.* ¶ 22.  Although Blanchard spent significant

17   time contesting the new charges on his accounts, Blanchard's credit score nonetheless dropped by

18   approximately 130 points.  These events suggest that Blanchard's data was not only compromised,

19   but also that Blanchard suffered significant financial harm as a result of the Anthem data breach.

20       To summarize, the Court finds that Plaintiffs have sufficiently demonstrated both a logical

21   and temporal relationship necessary to establish causation.  Defendants' attempts to direct the

22   Court to the facts (1) that many other data breaches occurred during the relevant time period and

23   (2) that a named Plaintiff did not receive notice from an Anthem or Non-Anthem Defendant do not

24   negate this finding.  Thus, by demonstrating both causation and economic loss, Plaintiffs have

25   sufficiently established standing under the UCL.

26       **2. Unlawful**

27                                                        37

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    "The unlawful prong of the UCL prohibits anything that can properly be called a business

2    practice and that at the same time is forbidden by law."  *In re Adobe*, 66 F. Supp. 3d at 1225

3    (internal quotation marks omitted).  "Generally, violation of almost any law may serve as a basis

4    for a UCL claim."  *Antman v. Uber Technologies, Inc.*, 2015 WL 6123054, *6 (N.D. Cal. Oct. 19,

5    2015) (internal quotation marks omitted).  However, a UCL claim "must identify the particular

6    section of the statute that was violated, and must describe with reasonable particularity the facts

7    supporting the violation."  *Baba v. Hewlett-Packard Co.*, 2010 WL 2486353, *6 (N.D. Cal. June

8    16, 2010) (internal quotation marks omitted).

9         Plaintiffs allege that, with respect to the UCL's unlawful prong, Defendants' actions

10   violated the Federal Trade Commission Act, HIPAA, the Gramm-Leach-Bliley Act, California's

11   Confidentiality of Medical Information Act, California's unfair insurance practices statutes,

12   California's Insurance Information and Privacy Protection Act, and California's data breach

13   statute.  CAC ¶ 366(b).  In support of this contention, the consolidated amended complaint

14   identifies specific provisions of HIPAA, *id.* ¶¶ 177–81, the Gramm-Leach-Bliley Act, *id.* ¶ 182,

15   the Federal Trade Commission Act, *id.* ¶ 183, and California's data breach statute, *id.* ¶ 366(b),

16   that were allegedly violated.  Such references directly rebut Defendants' claim that the

17   consolidated amended complaint "references . . . statutes only generally, and does not specify how

18   . . . Defendants supposedly violated them."  Anthem Mot. at 17.  Instead, a review of the

19   complaint demonstrates that Plaintiffs' allegations "identify the particular section of the statute

20   that was violated," and other allegations in the consolidated amended complaint "describe with

21   reasonable particularity the facts supporting the violation."  *Baba*, 2010 WL 2486353, *6.

22   Accordingly, the Court finds that Plaintiffs' claim survives under the UCL's unlawful prong.

23        **3. Unfair**

24        "The 'unfair' prong of the UCL creates a cause of action for a business practice that is

25   unfair even if not proscribed by some other law."  *In re Adobe*, 66 F. Supp. 3d at 1225.  "The UCL

26   does not define the term 'unfair.' . . .  [And] the proper definition of 'unfair' conduct against

27                                          38

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   consumers 'is currently in flux' among California courts." *Id.*

2       Some California appellate courts apply a balancing approach, which requires courts to

3   "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."

4   *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (internal quotation marks

5   omitted).  Other California appellate courts have held that "unfairness must be tethered to some

6   legislatively declared policy or proof of some actual or threatened impact on competition."

7   *Lozano*, 504 F.3d at 735.  Finally, at least one California appellate court has adopted and applied

8   the three-part test set forth in § 5 of the Federal Trade Commission Act: "(1) the consumer injury

9   must be substantial; (2) the injury must not be outweighed by any countervailing benefits to

10   consumers or competition; and (3) it must be an injury that consumers themselves could not

11   reasonably have avoided."  *Camacho v. Auto. Club of Southern California*, 48 Cal. Rptr. 3d 770,

12   777 (Ct. App. 2006).  The Court shall refer to these tests as the "balancing test," the "tethering

13   test," and the "FTC test," respectively.

14       In challenging whether Plaintiffs have sufficiently pleaded a UCL claim under the unfair

15   prong, Defendants argue that the consolidated amended complaint "does not allege facts that

16   support the conclusion that Defendants' failure to prevent the cyberattack resulted from *immoral,*

17   *unethical, oppressive, or unscrupulous* conduct on Defendants' part."  Anthem Mot. at 18.

18   Defendants' singular focus on whether their actions were immoral, unethical, oppressive, or

19   unscrupulous, however, is misplaced.

20       None of the three tests for unfairness require plaintiffs to plead that defendants acted in an

21   immoral, unethical, oppressive, or unscrupulous manner.  With respect to the balancing test, for

22   instance, the California Courts of Appeal have stated that "an unfair business practice occurs when

23   it offends an established public policy *or* when the practice is immoral, unethical, oppressive,

24   unscrupulous or substantially injurious to consumers."  *Bardin v. Daimlerchrysler Corp.*, 39 Cal.

25   Rptr. 3d 634, 638 (Ct. App. 2006) (internal quotation marks omitted) (emphasis added).  In other

26   words, parties may proceed with a UCL claim under the balancing test by either alleging immoral,

27

39

28

1   unethical, oppressive, unscrupulous, or substantially injurious conduct by Defendants *or* by

2   demonstrating that Defendants' conduct violated an established public policy.  Similarly, with

3   respect to the tethering test, parties need not show immoral, unethical, oppressive, unscrupulous,

4   or substantially injurious conduct in order to move forward with a UCL claim.  The tethering test

5   only requires parties to show "that the public policy which is a predicate to a consumer unfair

6   competition action under the 'unfair' prong of the UCL [is] tethered to specific constitutional,

7   statutory, or regulatory provisions." *In re Adobe*, 66 F. Supp. 3d at 1226.  Finally, the FTC test

8   also does not require parties to show immoral, unethical, oppressive, unscrupulous, or

9   substantially injurious conduct by Defendants.

10      In any event, the Court finds dismissal of Plaintiffs' UCL claim under the unfair prong

11  unwarranted.  In *In re Adobe*, this Court observed that various California statutes—including

12  several statutes upon which Plaintiffs rely here—reflect "California's public policy of protecting

13  customer data." *Id.* at 1227 (internal quotation marks omitted).  Based on the allegations in the

14  consolidated amended complaint, Defendants' actions violated this public policy.  Whether

15  Defendants' public policy violation is outweighed by the utility of their conduct under the

16  balancing test is a question to be resolved at a later stage in this litigation.  Thus, based on the

17  balancing test alone, the Court DENIES Defendants' motion to dismiss Plaintiffs' UCL claim

18  under the unfair prong.

19      **4. Fraudulent**

20      "To state a claim under the 'fraud' prong of [the UCL], a plaintiff must allege facts

21  showing that members of the public are likely to be deceived by the alleged fraudulent business

22  practice." *Antman*, 2015 WL 6123054, *6.  Claims stated under the fraud prong of the UCL are

23  subject to the particularity requirements of Federal Rule of Civil Procedure 9(b). *Kearns v. Ford*

24  *Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  Under this Rule, "[i]n alleging fraud or mistake,

25  a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ.

26  P. 9(b).  Plaintiffs must include "an account of the time, place, and specific content of the false

27                                                         40

28  Case No. 15-MD-02617-LHK
    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    representations" at issue.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal

2    quotation marks omitted).

3            The gravamen of Plaintiffs' fraud claim is that Defendants promised to carry out

4    reasonable security measures, but ultimately failed to carry through with this promise.  *See*

5    *generally* CAC ¶¶ 2–6.  At first blush, these allegations appear sufficient to state a claim under the

6    fraud prong of the UCL: Defendants represented to Plaintiffs that they would do one thing, but

7    ended up doing another.  In general, such allegations constitute a misrepresentation in the most

8    classic sense.  *See Northstar Fin. Advisors Inc. v. Schwab Invs.*, 2015 WL 5785549, *16 (N.D.

9    Cal. Oct. 5, 2015) ("[Defendant] represented . . . to shareholders that [defendant] would do one

10   thing, but ended up doing another.  That is a misrepresentation in the most classic sense.").

11          However, Plaintiffs' fraud claim suffers from one notable flaw: as with Plaintiffs' breach

12   of contract claims, Plaintiffs have not "include[d] an account of the *time* . . . of the false

13   representations" at issue.  *Swartz*, 476 F.3d at 764 (emphasis added).  Instead, Plaintiffs once

14   again direct the Court to review statements made by Defendants in various privacy notices and on

15   Defendants' public websites.  *See* Anthem Opp'n at 17 (citing CAC ¶¶ 161–76).  As the Court has

16   explained, the consolidated amended complaint does not specify when these privacy notices were

17   received or when certain statements were made on Defendants' websites.  In fact, for several of

18   the statements at issue, the only date identified in the consolidated amended complaint is October

19   19, 2015, the last day that Plaintiffs visited Defendants' websites.  That date postdates the Anthem

20   data breach and does not establish that Plaintiffs relied upon or were deceived by promises that

21   Defendants made to Plaintiffs prior to the data breach.

22          Consistent with the Court's reasoning with respect to Plaintiffs' breach of contract claims,

23   it is possible that Plaintiffs may amend the complaint to state with particularity the time that the

24   specific misrepresentations occurred.  Accordingly, the Court finds that Plaintiffs have not stated a

25   fraud claim under the UCL, but that Plaintiffs may be able to do so after amendment.  Thus,

26   Plaintiffs' fraud claim under the UCL is DISMISSED with leave to amend.  Plaintiffs, however,

27                                                      41

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1   have sufficiently established standing under the UCL and have sufficiently stated a UCL claim to

2   survive dismissal under the unlawful and unfair prongs.  Defendants' motion to dismiss Plaintiffs'

3   UCL claim is therefore GRANTED in part and DENIED in part.

4   **G. New York General Business Law § 349 (against Anthem and Non-Anthem**
    **Defendants)**

5       New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in

6   the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen.

7   Bus. § 349(a).  To successfully assert a claim under this section, "a plaintiff must allege that a

8   defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that

9   (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v.*

10  *Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).  In moving to dismiss Plaintiffs' GBL § 349 claim,

11  Defendants contend, with respect to (1), that Plaintiffs' claim is based on a private contract

12  dispute, and is therefore not the result of consumer-oriented conduct.  Anthem Mot. at 19–20.

13  Defendants also argue, with respect to (3), that Plaintiffs have failed to demonstrate actual harm

14  and causation.  The Court addresses these contentions in turn.

15      **1. Consumer-Oriented Conduct**

16      "To provide the basis for a Section 349 claim, a disputed private transaction must have

17  'ramifications for the public at large,' or be harmful to the general public interest."  *M & T Mortg.*

18  *Corp. v. White*, 736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010).  "The conduct need not be repetitive or

19  recurring but defendant's acts or practices must have a broad impact on consumers at large;

20  private contract disputes *unique to the parties* would not fall within the ambit of the statute."  *Id.*

21  (internal quotation marks omitted) (emphasis added).  Similarly, the New York Court of Appeals

22  held, in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d

23  741, 744 (N.Y. 1995), that "[p]rivate contract disputes, unique to the parties . . . would not fall

24  within the ambit of [GBL § 349]."  *See also id.* (finding that single shot transactions are not

25  covered by section 349).  In general, New York courts have held that the consumer-oriented

26

27                                                        42

28

*United States District Court*
*Northern District of California*

1  requirement should be "construed liberally."  *New York v. Feldman*, 210 F. Supp. 2d 294, 301

2  (S.D.N.Y. 2002).

3        In interpreting this requirement, courts have found consumer-oriented conduct where

4  banks operated a standard savings account policy for customers, *Oswego*, 647 N.E.2d at 745, and

5  where a mortgage company offered a standard lending policy to prospective borrowers, *M & T*

6  *Mortg. Corp.*, 736 F. Supp. 2d at 571.  On the other hand, courts have determined that the

7  consumer-oriented requirement was not met where an insurance company denied an individual's

8  claim for coverage, *Daniels v. Provident Life & Cas. Ins. Co.*, 2001 WL 877329, *8 (W.D.N.Y.

9  July 25, 2001), and where a party failed to fulfill a specific provision in an advertising contract,

10  *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011).

11        Plaintiffs' claims satisfy the GBL's consumer-oriented requirement.  The instant case does

12  not involve a unique, single shot dispute over the nature or scope of an individual's insurance

13  coverage.  Instead, Plaintiffs seek to bring a putative class action on behalf of approximately 80

14  million individuals who were affected by the Anthem data breach.  The purpose of bringing this

15  litigation as a putative class action is to ensure that consumers who might not have the resources to

16  serve as named Plaintiffs can nonetheless recover for Defendants' alleged misconduct.  Moreover,

17  Plaintiffs aver that the instant breach is but the latest in a series of data security incidents.

18  Notably, Anthem's database was also breached in 2009.  In 2013, the Office of the Inspector

19  General found Anthem's information systems deficient in several respects.  *See* CAC ¶¶ 193–98.

20  Anthem's continued non-compliance with data security practices would therefore not only affect

21  the named Plaintiffs, but also "a broad group of individuals"—all 80 million individuals whose PII

22  is stored on Anthem's database.  *See Feldman*, 210 F. Supp. 2d at 301.  Accordingly, Plaintiffs

23  have sufficiently alleged that Defendants' conduct was consumer-oriented in nature.

24        **2.  Actual Harm**

25        Parties seeking damages under the GBL must provide "proof that a material deceptive act

26  or practice caused actual, although not necessarily pecuniary, harm."  *Small v. Lorillard Tobacco*

27                                                            43

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1  *Co., Inc.*, 720 N.E.2d 892, 897 (N.Y. 1999) (internal quotation marks and emphasis omitted).  As

2  with Plaintiffs' UCL claim, Plaintiffs allege the following forms of harm under the GBL: "Out of

3  Pocket Costs," "Imminent Risk of Further Costs," and "Loss of Benefit of the Bargain."  Plaintiffs

4  also allege harm in the form of "Loss of Value of PII."  Anthem Opp'n at 18.[9]

5  **a.  "Out of Pocket Costs" and "Imminent Risk of Further Costs"**

6  As to "Out of Pocket Costs" and "Imminent Risk of Further Costs," the Court finds

7  instructive the Southern District of New York's decision in *Shafran v. Harley-Davidson, Inc.*,

8  2008 WL 763177 (S.D.N.Y. Mar. 20, 2008).  In *Shafran*, plaintiff brought suit against defendants

9  "seeking monetary damages and injunctive relief for himself and on behalf of a putative class of

10  60,000 . . .  who were informed by [defendants] that a laptop computer containing members'

11  personal information had been lost."  *Id.* at *1.  As in the instant case, plaintiff in *Shafran* asserted

12  a claim under GBL § 349.  In reviewing defendants' motion to dismiss, the district court

13  summarized the question before it as follows: "whether, under New York law, the time and money

14  that could be spent to guard against identity theft constitutes an existing compensable injury."  *Id.*

15  at *2.  The *Shafran* court observed that "New York courts have not addressed the issue," but that

16  several other courts had considered and rejected such claims.  *Id.*  Consistent with these decisions,

17  the *Shafran* court determined that plaintiff's claim for credit monitoring damages failed as a matter

18  of law.  *Id.* at *3.

19  Several district courts within the Second Circuit have relied upon *Shafran* to find that "Out

20  of Pocket Costs" and "Imminent Risk of Further Costs" do not represent injuries cognizable under

21  GBL § 349.  *See, e.g.*, *Hammond v. The Bank of New York Mellon Corp.*, 2010 WL 2643307, *13

22  (S.D.N.Y. June 25, 2010) (citing *Shafran* and concluding that "[p]laintiffs cannot establish that

23  [d]efendant engaged in consumer-oriented fraud or other misconduct which caused actual

24  damages within the meaning of the laws of their respective states."); *Willey v. J.P. Morgan Chase,*

25

26  _____

[9] Plaintiffs did not seek recovery for this form of injury with respect to their UCL claim.

27  Case No. 15-MD-02617-LHK

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    *N.A.*, 2009 WL 1938987, *10 (S.D.N.Y. July 7, 2009) ("Willey's claims for expenses related to

2    credit monitoring, anxiety, emotional distress, and loss of privacy all arise due to the probability

3    that his data might have been misused.  Because this does not rise to the level of actual damages,

4    the state law claims fail to allege actual damages and must be dismissed.").

5    　　　Tellingly, Plaintiffs have not cited any cases interpreting GBL § 349 that have found to the

6    contrary.  Instead, Plaintiffs rely upon the First Circuit's decision in *Anderson v. Hannaford Bros.*

7    *Co.*, 659 F.3d 151 (1st Cir. 2011).  Plaintiffs' reliance on this case is misplaced.  In *Anderson*, the

8    First Circuit was charged with interpreting and applying Maine tort and contract law.  *Id.* at 162–

9    67.  The *Anderson* court did not interpret, apply, or consider whether "Out of Pocket Costs" and

10   "Imminent Risk of Further Costs" were recoverable under GBL § 349.  Thus, rather than rely

11   upon *Anderson*—which did not address the state statutory provision at issue here—the Court shall,

12   in the instant case, follow the lead of *Shafran*, *Hammond*, and *Willey* and find that "Out of Pocket

13   Costs" and "Imminent Risk of Further Costs" are not cognizable injuries under GBL § 349.

14   　　　　　**b.  "Loss of Value of PII"**

15   　　　As to the "Loss of Value of PII," the Court observes that no New York state courts have

16   yet ruled on this question.  Nor has the Second Circuit or any federal district court in the Second

17   Circuit provided guidance on whether such losses constitute cognizable injury under GBL § 349.

18   Instead, Defendants rely entirely upon the Southern District of California's decision in *In re Sony*

19   *Gaming Networks & Consumer Data Security Breach Litigation ("Sony II")*, 996 F. Supp. 2d 942,

20   1004–05 (S.D. Cal. 2014).  In *Sony II*, the district court held that "a loss of privacy and/or a loss in

21   value of [one's] Personal Information" does not constitute injury under GBL § 349.  In reaching

22   this decision, the *Sony II* court relied solely upon the three Southern District of New York

23   decisions discussed above (*Shafran*, *Hammond*, and *Willey*), as well as the Seventh Circuit's

24   decision in *Pisciotta*.

25   　　　The Court finds *Sony II* inapposite.  First, *Shafran*, *Hammond*, and *Willey* did not address

26   whether "Loss of Value of PII" represented a cognizable injury under GBL § 349.  Instead, the

27                                                          45

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Shafran*, *Hammond*, and *Willey* courts examined whether "Out of Pocket Costs" and "Imminent

2  Risk of Further Costs" represented a cognizable injury under GBL § 349.  *See, e.g.*, *Shafran*, 2008

3  WL 763177, *2 ("Thus, the question before the Court is whether, under New York law, the time

4  and money that could be spent to guard against identity theft constitutes an existing compensable

5  injury."); *Hammond*, 2010 WL 2643307, *13 (focusing on whether plaintiffs could recover for

6  costs of credit monitoring);  *Willey*, 2009 WL 1938987, *10 (same).  Although these concepts are

7  somewhat similar to one another, they are not the same.  Indeed, as this Court explained in *In re

8  Adobe*, the "[i]ncreased risk of harm" to an individual's personal information that arises after a

9  data breach and the money that an individual spends to mitigate a data breach are two different

10  injuries. *See, e.g.*, 66 F. Supp. 3d at 1217 ("[T]he Court finds that Plaintiffs have plausibly alleged

11  that the substantial risk of harm [p]laintiffs face following the 2013 data breach constitutes a

12  cognizable injury-in-fact.  The costs [certain] [p]laintiffs . . . incurred to mitigate this risk of harm

13  constitute an *additional cognizable injury*.") (emphasis added).

14        In addition, in *Pisciotta*—the only other decision cited by the *Sony II* court—plaintiffs did

15  not bring a GBL § 349 claim.  Instead, plaintiffs asserted an Indiana negligence claim, and the

16  *Pisciotta* court examined whether plaintiffs could proceed under Indiana law with a "cause of

17  action in tort against a database owner for failing to" adequately protect personal information.

18  Anthem Mot. at 2.  Given the fact that *Pisciotta* interpreted a different cause of action from a

19  different state, the Court declines to rely upon *Pisciotta* to find that "Loss of Value of PII" is not a

20  cognizable injury under GBL § 349.

21        To summarize, none of the cases cited in *Sony II* addressed whether "Loss of Value of PII"

22  constitutes a cognizable injury under GBL § 349.  Under such circumstances, the Court need not

23  follow *Sony II*.  Instead, the Court finds more persuasive a set of more recent decisions, all

24  published after *Sony II*, where courts have recognized that "Loss of Value of PII" does represent a

25  cognizable economic harm.

26        In *In re Adobe*, for instance, this Court rejected defendant's argument that an "'increased

27                                                    46

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    risk [of future harm]' is not a cognizable injury for Article III standing purposes."  66 F. Supp. 3d

2    at 1211.  In reaching this conclusion, this Court held that "the risk that [p]laintiffs' personal data

3    will be misused by the hackers who breached Adobe's network is immediate and very real."  *Id.* at

4    1214.  According to plaintiffs in *In re Adobe*, "hackers deliberately targeted Adobe's servers and

5    spent several weeks collecting names, usernames, passwords, email addresses, phone numbers,

6    mailing addresses, and credit card numbers and expiration dates."  *Id.*  After the Adobe data

7    breach, hackers misused plaintiffs' personal information to decrypt credit card accounts and "to

8    discover vulnerabilities in Adobe's products."  *Id.* at 1215–16.  Under these facts, this Court

9    concluded that "[p]laintiffs' allegations of a concrete and imminent threat of future harm suffice to

10   establish Article III injury-in-fact at the pleadings stage under both" prevailing Ninth Circuit and

11   U.S. Supreme Court precedent.  *Id.* at 1216; *see also Corona*, 2015 WL 3916744, *3 (determining

12   that plaintiffs had sufficiently established injury under Article III by alleging "that the[ir] PII was

13   stolen and posted on file-sharing websites for identity thieves to download.").

14          Here, too, Plaintiffs allege that cyberattackers extracted Plaintiffs' PII from the Anthem

15   database over an extended time period, from December 2014 to January 2015.  Plaintiffs further

16   allege that these cyberattackers misused Plaintiffs' personal information.  A false tax return, for

17   instance, was allegedly filed on behalf of New York Plaintiff Juan Carlos Cerro.  CAC ¶ 87.

18   Thus, under the reasoning set forth in *In re Adobe*, Plaintiffs' "Loss of Value of PII" would

19   represent a cognizable injury under Article III.

20          Likewise, in *In re Facebook Privacy Litigation*, 572 F. App'x 494, 494 (9th Cir. 2014),

21   plaintiffs contended that "they were harmed both by the dissemination of their personal

22   information and by losing the sales value of that information."  The Ninth Circuit concluded that,

23   "[i]n the absence of any applicable contravening state law," such "allegations [were] sufficient to

24   show the element of damages for [plaintiffs'] breach of contract and fraud claims," and that "the

25   district court erred in dismissing these state law claims."  *Id.*

26          Most recently, in *Svenson v. Google, Inc.*, 2015 WL 1503429, *5 (N.D. Cal. Apr. 1, 2015),

27                                             47

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    the district court, following *In re Facebook*, concluded that plaintiff's "allegations of diminution

2    in value of her personal information are sufficient to show contract damages for pleading

3    purposes."

4            The Court acknowledges that the *In re Adobe*, *Corona*, *In re Facebook*, and *Svenson*

5    decisions are not perfectly analogous to the claim that is currently before the Court.  Both *In re*

6    *Adobe* and *Corona*, for instance, addressed the loss in value of an individual's PII in the standing

7    context, and both *In re Facebook* and *Svenson* addressed the loss in value of an individual's PII in

8    the context of a common law breach of contract claim.  However, the consistent theme running

9    through these decisions—all of which were, again, published after *Sony II*—is that "Loss of Value

10   of PII" represents a cognizable form of economic injury.  Absent any state law or Second Circuit

11   precedent that holds to the contrary, the Court finds that it would be appropriate to apply this

12   general principle to Plaintiffs' GBL § 349 claim.  Accordingly, the Court finds that "Loss of Value

13   of PII" constitutes a cognizable injury under GBL § 349.

14                       c.  **"Loss of Benefit of the Bargain"**

15           Finally, the Court turns to consider harm in the form of "Loss of Benefit of the Bargain."

16   On this point, the case law tips in Plaintiffs' favor.  In *Orlander v. Staples, Inc.*, 802 F.3d 289, 301

17   (2d Cir. 2015), the Second Circuit determined that plaintiff had "sufficiently alleged an injury

18   stemming from [a] misleading practice" by pleading that "he would not have purchased [a set of

19   services] had he known that [d]efendant intended to decline to provide him any [such] services"

20   during the first of year of his contract.  The reasoning in *Orlander* directly governs Plaintiffs'

21   claim here for "Benefit of the Bargain" losses: Plaintiffs allege that, "[h]ad Defendants disclosed

22   to Affected Individuals that their computer systems and data security practices were inadequate to

23   safeguard Affected Individuals' highly sensitive [PII], Affected Individuals would not have

24   entrusted their [PII] to Defendants and would not have enrolled in their insurance or health care

25   plans."  CAC ¶ 249.

26           In challenging this finding, Defendants rely upon an earlier Second Circuit decision,

27                                                        48

28

*Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  Anthem Mot. at 20.  Defendants'

reliance on *Spagnola* is not well taken.  In fact, in *Orlander*, the Second Circuit discussed and

distinguished *Spagnola*.  Specifically, the Second Circuit observed that, in *Spagnola*, although

plaintiffs alleged "damages in the amount of the purchase price of their contracts," plaintiffs

"*failed to allege* that defendants had denied them the services for which they contracted."  802

F.3d at 302.  In *Orlander*, however, "[p]laintiff . . . alleged both [1] a monetary loss stemming

from the deceptive practice and [2] the [d]efendant's failure to deliver contracted-for services."

*Id.*  Similarly, in the instant case, Plaintiffs have alleged both (1) a monetary loss stemming from a

deceptive practice—"overpayment[] to Defendants for health insurance or health care services

purchased," CAC  ¶ 267(h)—and (2) Defendants' failure to deliver to Plaintiffs certain services—

"reasonable and adequate security measures to protect Affected Individuals' [PII]," *id.*

In sum, although "Out of Pocket Costs" and "Fear of Imminent Further Costs" are not

cognizable injuries under GBL § 349, "Loss of Value of PII" and "Loss of Benefit of the Bargain"

are cognizable injuries under GBL § 349.  Accordingly, Plaintiffs have sufficiently pleaded injury

under GBL § 349.

### 3. Causation

Last, "[t]o properly allege causation, a plaintiff must state in his complaint that he has seen

the misleading statements of which he complains before he came into possession of the products

he purchased."  *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 480

(S.D.N.Y. 2014).  Unlike the UCL, "an action under § 349 is not subject to the pleading-with-

particularity requirements of Rule 9(b), but need only meet the bare-bones notice-pleading

requirements of Rule 8(a)."  *Pelman ex rel. Pelman v. McDonald's Corp*, 396 F.3d 508, 511 (2d

Cir. 2005) (citation omitted); *see also id.* ("[B]ecause § 349 extends well beyond common-law

fraud to cover a broad range of deceptive practices, . . . a private action under § 349 does not

require proof of the same essential elements (such as reliance) as common-law fraud.").

As the Court has explained, Plaintiffs aver that Defendants made various representations

49

that Plaintiffs' PII would be protected.  These representations came in the form of statements made on Defendants' websites and statements made in Defendants' privacy notices.   The Court finds that Plaintiffs have sufficiently alleged causation under GBL § 349 based on GBL § 349's pleading requirements and case law interpreting GBL § 349.

First, as the Court has pointed out, GBL § 349 is not subject to the more demanding pleading requirements of Federal Rule of Civil Procedure 9(b).  Thus, the New York Court of Appeals has held that Plaintiffs bringing claims under GBL § 349 must simply raise a reasonable inference of causation rather than demonstrating reliance.  *See, e.g.*, *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) ("Reliance and causation are twin concepts, but they are not identical."); *see also id.* at 612–13 (elaborating upon differences between reliance and causation).

Several recent federal district court decisions from the Eastern and Southern Districts of New York help illustrate the difference between causation and reliance.  In *Dash v. Seagate Technology (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357 (E.D.N.Y. 2014), for instance, the district court *denied* dismissal of plaintiff's deceptive practices claim under GBL § 349, but *granted* dismissal on plaintiff's common law fraud claim.  Although plaintiff did not specify when plaintiff saw the misrepresentations at issue, "[t]he reasonable inference to be drawn from [plaintiff's] allegations is that [plaintiff] saw the misleading statements and, as a result of such, purchased the [product] at issue." *Id.* at 361.  Accordingly, the *Dash* court found causation "sufficiently pled" for purposes of GBL § 349.  *Id.*  However, after reciting the applicable pleading requirements under Rule 9(b), the *Dash* court determined that, under these same facts, plaintiffs' "concluso[ry] alleg[ations]" were insufficient to state a claim for common law fraud.  *Id.* at 362–63.

Consistent with *Dash*, plaintiff in *Goldemberg v. Johnson & Johnson* "describe[d] in particular [detail] the allegedly misleading advertising and other statements."  8 F. Supp. 3d at 480.  Plaintiff "then allege[d] that '[defendant]'s false, misleading, and deceptive misrepresentations and omissions . . . deceived and misled [plaintiff].'" *Id.*  Although plaintiff did not specify when defendant made the "false, misleading, and deceptive misrepresentations" at

50

United States District Court
Northern District of California

United States District Court
Northern District of California

1    issue, the district court concluded that "[t]he reasonable inference to be drawn from these

2    allegations . . . is that [plaintiff] saw the [misrepresentations] described previously in the

3    Complaint, and was thus deceived into purchasing the products in question."  *Id.*

4         Finally, in *Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015),

5    the pleadings also failed to specify when plaintiff viewed the misrepresentation at issue.  The

6    district court, however, found this detail "not decisive" for purposes of plaintiff's GBL § 349

7    claim.  *Id.*  Consistent with *Goldemberg* and *Dash*, the district court stated that the reasonable

8    inference to be drawn was that plaintiff first viewed the misrepresentation, and then went on to

9    purchase the product at issue.  *Id.*

10        In sum, after reviewing the allegations in the consolidated amended complaint, the

11   different pleading requirements between GBL § 349 and Federal Rule of Civil Procedure 9(b), and

12   case law addressing GBL § 349, the Court finds that Plaintiffs have sufficiently alleged causation

13   for purposes of their GBL § 349 claim.

14        **4.  ERISA Preemption**

15        As a final matter, the consolidated amended complaint includes four named New York

16   Plaintiffs, all of whom assert a GBL § 349 claim on behalf of themselves and a putative statewide

17   class.  CAC ¶¶ 85–88.  Defendants contend that New York Plaintiff Matthew Gates' ("Gates")

18   GBL § 349 claim is preempted by ERISA.  *See* Anthem Mot. at 22.  Defendants, however, do not

19   assert ERISA preemption against New York Plaintiffs Barbara Gold, Marne Onderdonk, and Juan

20   Carlos Cerro.  Thus, because Plaintiffs have demonstrated all of the required elements to plead a

21   GBL § 349 claim, Plaintiffs' GBL § 349 claim survives whether or not Gates' claim is preempted.

22   Defendants' motion to dismiss Plaintiffs' GBL § 349 claim is therefore DENIED.

23        Additionally, the Court denies without prejudice Defendants' motion to dismiss Gates'

24   GBL § 349 claim as preempted by ERISA.  As the Ninth Circuit has observed, "[t]here are two

25   strands of ERISA preemption: (1) 'express' preemption under ERISA § 514(a), 29 U.S.C. §

26   1144(a); and (2) preemption due to a 'conflict' with ERISA's exclusive remedial scheme set forth

27                                                       51

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1  in [ERISA § 502(a),] 29 U.S.C. § 1132(a)." *Fossen v. Blue Cross and Blue Shield of Mont., Inc.*,

2  660 F.3d 1102, 1107 (9th Cir. 2011).  "Under § 514(a), ERISA broadly preempts any and all State

3  laws insofar as they may now or hereafter *relate to* any covered employee benefit plan." *Id.* at

4  1108 (internal quotation marks and alteration omitted) (emphasis added).  "A [state] law 'relates

5  to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or

6  reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983).  "[T]he words

7  'relate to,'" however, "cannot be taken too literally." *Roach v. Mail Handlers Benefit Plan*, 298

8  F.3d 847, 849 (9th Cir. 2002).  "If 'relate to' were taken to extend to the furthest stretch of its

9  indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really,

10  universally, relations stop nowhere.'"" *N.Y. State Conf. of Blue Cross & Blue Shield Plans v.*

11  *Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (alteration omitted).  Instead, "relates to" must be

12  "read in the context of the presumption that in fields of traditional state regulation the historic

13  police powers of the States are not to be superseded by a Federal Act unless that was the clear and

14  manifest purpose of Congress." *Roach*, 298 F.3d at 850 (internal quotation marks and alteration

15  omitted).

16      Under ERISA § 502(a), a civil enforcement action may be brought:

17      (1) by a participant or beneficiary— . . . (B) to recover benefits due to him under
        the terms of his plan, to enforce his rights under the terms of the plan, or to clarify
18      his rights to future benefits under the terms of the plan.

19  29 U.S.C. § 1132(a).  Pursuant to this provision, a "state-law cause of action that duplicates,

20  supplements, or supplants the ERISA civil enforcement remedy" is preempted because it

21  "conflicts with the clear congressional intent to make the ERISA remedy exclusive." *Aetna*

22  *Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

23      The primary points of disagreement between the parties is whether, for purposes of both

24  conflict and express preemption, (1) Defendants' promises to protect Plaintiffs' PII represents a

25  "benefit" under Plaintiffs' health plans, as defined by ERISA, and (2) whether state laws that

26  implicate Plaintiffs' data security "relate to" or conflict with ERISA.

52

United States District Court
Northern District of California

1    There is insufficient information at this time to make a determination on either question.

2    As noted above, Plaintiffs have failed to produce a copy of their insurance contracts with

3    Defendants and have failed to identify which contractual provisions Defendants allegedly

4    breached.  In addition, although Defendants have submitted a copy of Gates' Summary Plan

5    Description, *see* ECF No. 412-1, Plaintiffs contend that Gates' contract and the Summary Plan

6    Description are different documents.  Anthem Opp'n at 25.  Defendants' obligations to protect

7    Gates' data, Plaintiffs argue, were memorialized in Gates' contract, and "[t]here is no preemption

8    when plaintiffs sue to enforce the terms of some contract other than the ERISA plan."  *Id.*  As a

9    final point, neither party has provided briefing on whether Congress necessarily intended for

10   ERISA to preempt state consumer protection laws such as New York's GBL § 349.

11   Given the disputed contentions made by the parties and the fact that the parties have not

12   produced a copy of Gates' contract, the Court can not decide whether Gates' GBL § 349 claim is

13   preempted by ERISA.  In reaching this conclusion, the Court finds instructive statements made by

14   U.S. Department of Labor ("DOL") staff at the 2010 Joint Committee of Employee Benefits

15   Technical Session, hosted by the American Bar Association.  Specifically, DOL staff were asked

16   the following:

17   In an era of enhanced privacy protections, some participants have complained that
18   personally identifiable information (PII) releases have occurred under State
     privacy laws . . .

19
20   Does the DOL agree that State privacy laws regarding PII releases are not
     applicable to plan administration communications from authorized third party
21   service providers?

22   *Questions and Proposed Answers for the Department of Labor Staff for the 2010 Joint Committee*

23   *of Employee Benefits Technical Section* at 20–21 (May 5, 2010), *available at*

24   http://tinyurl.com/jhp2hcp.  DOL staff declined to provide a definitive "answer [to] this question

25   due to insufficient information."  *Id.* at 21.  After citing and discussing ERISA § 514(a) and the

26   applicable legal standards behind this section, DOL "staff note[d] that without specific statutory

53

United States District Court
Northern District of California

language and a description of how the statute relates to [a specific] ERISA-covered employee benefit plan, [DOL] staff [could not] determine whether a particular state privacy statute is preempted by ERISA." *Id.* In sum, when confronted with a general inquiry as to whether state privacy laws were preempted by ERISA, DOL staff declined to provide a sweeping response, and instead requested additional information on the specific laws at issue.

The Court's decision to deny without prejudice is in line with DOL's position. Without specific information on the contours of Gates' health plan and the statutory purpose behind GBL § 349, the Court can not decide whether Gates' GBL § 349 claim is subject to ERISA preemption. Accordingly, the Court DENIES without prejudice Defendants' motion to dismiss Gates GBL § 349 claim as preempted by ERISA.

**H. Kentucky Consumer Protection Act (against Anthem and Non-Anthem Defendants)**

Plaintiffs allege that the Anthem and Non-Anthem Defendants "engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce," in violation of the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. § 367.170, *et seq.* CAC ¶ 425. Defendants contend that Plaintiffs' KCPA claim fails "because the Act cannot be used to bring a class action." Anthem Mot. at 12. Moreover, Defendants assert that Plaintiffs do not have standing to bring a KCPA claim. *Id.* at 12–13.

With respect to the viability of class certification, the Court turns first to the Kentucky Circuit Court's decision in *Arnold v. Microsoft Corporation*, 2000 WL 36114007 (Ky. Cir. Ct. July 21, 2000). In *Arnold*, plaintiffs brought suit against Microsoft under the KCPA and under Kentucky's version of the Sherman Antitrust Act. *Id.* at *1. Plaintiffs sought damages and class certification. *Id.* In granting Microsoft's motion to dismiss, the Kentucky Circuit Court concluded that "[t]he Court does not believe that KRS 367.170 [the KCPA] is the correct statute to bring a claim based on monopolistic practices." *Id.* at *6. Moreover, "[t]he Court also does not believe that KRS 367.170 was meant to be a vehicle for Class Action suits and declines to open such a sweepingly vague statute for use as a blunt instrument in a Class Action suit." *Id.*; *see also*

54

*id.* at *8 ("Based on venue requirements and other language[,] . . . this Court . . . feels that KRS 367.170 was never meant to encompass class action litigants.").  The Kentucky Court of Appeals affirmed the Circuit Court's judgment.  *Arnold v. Microsoft Corp.*, 2001 WL 1835377, *7–*8 (Ky. Ct. App. Nov. 21, 2001).

A number of federal courts—including several in the MDL context—have relied upon *Arnold* to find that plaintiffs can not bring a class action claim under the KCPA.  In *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 84 (D. Mass. 2005), for instance, the district court relied upon *Arnold* to find that, "[u]nder the laws of . . . Kentucky . . . there is no right to bring a class action to enforce the consumer protection statutes."  *Id.*  Thus, the court concluded that "[c]onsumers in [Kentucky] may be excluded out of hand" in an MDL brought against 42 pharmaceutical manufacturers.  *Id.*  Likewise, in *In re Grand Theft Auto Video Game Consumer Litigation (No. II)*, 251 F.R.D. 139, 160 (S.D.N.Y. 2008), the district court, citing *Arnold*, held that "Kentucky['s] consumer-fraud provision does not permit [a] class-action suit." *Id.*  Finally, in *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), the Ninth Circuit vacated the district court's decision to certify a nationwide class.  In reaching this decision, the Ninth Circuit determined that nationwide class certification was inappropriate because of differences amongst various state consumer protection laws.  *See id.* at 590–92.  In dissent, Judge Dorothy Nelson disagreed with the majority's conclusion "that material differences exist between California law and that of the 43 jurisdictions in which class members reside."  *Id.* at 597 (Nelson, J., dissenting).  As Judge Nelson observed, "I find only one potentially material difference: Louisiana, Georgia, Mississippi, Kentucky, Virginia and Alabama prohibit class actions that allege unfair trade practices under state law."  *Id.* at 597–98; *see also id.* at 598 (citing *Arnold*).  Thus, even though Judge Nelson disagreed with the majority's determination, she nonetheless acknowledged that consumer protection laws in some states—including Kentucky— bar private plaintiffs from bringing class action claims.

More recently, in *In re Target*, the District of Minnesota district court dismissed plaintiffs'

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1  KCPA claim upon finding that "[t]he consumer-protection statutes in eight states—Alabama,

2  Georgia, Kentucky, Louisiana, Mississippi, Montana, South Carolina, and Tennessee—prohibit

3  class-action treatment of claims under those statutes." 66 F. Supp. 3d at 1163. The *In re Target*

4  court did not cite *Arnold*; instead, the *In re Target* court cited *Davenport v. Charter*

5  *Communications, LLC*, 35 F. Supp. 3d 1040 (E.D. Mo. 2014). 66 F. Supp. 3d at 1165. As

6  Plaintiffs note, the *Davenport* court was not presented with a KCPA claim. Anthem Opp'n at 12.

7  Instead, the *Davenport* court was presented with a claim under Ky. Rev. Stat. § 337.385, a statute

8  governing unpaid overtime. *See Davenport*, 35 F. Supp. 3d at 1051. The Court therefore finds the

9  *In re Target* decision to be less instructive than the decisions in *In re Pharmaceutical* and *In re*

10  *Grand Theft Auto*. Nonetheless, the common theme running through all of these cases is that,

11  consistent with *Arnold*, courts have found that plaintiffs can not pursue a class action claim under

12  the KCPA.

13  Plaintiffs have not cited any case law that would compel a different conclusion. Instead,

14  Plaintiffs argue only that the KCPA "does not contain an express class action ban," and that some

15  "courts have certified class actions under the KCPA, both before and after *Arnold*." Anthem

16  Opp'n at 12. In support of this latter point, Plaintiffs rely upon two Western District of Kentucky

17  decisions: *Brummett v. Skyline Corporation*, 1984 WL 262559 (W.D. Ky. Apr. 11, 1984), and

18  *Clark v. BellSouth Telecommunications, Inc.*, 461 F. Supp. 2d 541 (W.D. Ky. 2006).

19  As Plaintiffs acknowledge, *Brummett* was decided sixteen years prior to *Arnold*. This fact

20  alone renders Plaintiffs' reliance on *Brummett* unavailing. As the Sixth Circuit, of which

21  Kentucky is a part, has noted, "[t]he function of [a federal court] is to apply the law of the state

22  which governs the suit, not to take a position regarding the advisability or fairness of the rule

23  applied." *San Francisco Real Estate Inv'rs v. J.A. Jones Real Estate Constr. Co.*, 703 F.2d 976,

24  977 n.2 (6th Cir. 1983); *see also In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court

25  is generally bound by the same substantive legal standards . . . as would have applied in the

26  transferor court."). Here, the federal district court for the Western District of Kentucky predicted

56

1   that the KCPA would be interpreted one way in *Brummett*, and then the Kentucky Circuit Court

2   concluded in *Arnold* that the KCPA should be interpreted in a different way.  Under such

3   circumstances, *Arnold*—not *Brummett*—is more persuasive.  *See Goranson v. Kloeb*, 308 F.2d

4   655, 656–57 (6th Cir. 1962) ("We should not attempt to make new law for the state in conflict

5   with its existing decisions.").

6       In addition, the *Brummett* plaintiffs sought class certification on a number of different

7   claims.  *See Brummett*, 1984 WL 262559, *1 (asserting claims under the KCPA, the Kentucky

8   Uniform Commercial Code, the Kentucky Mobile Home Sales Act, Kentucky common law, and

9   various federal laws).  The parties did not assert and the district court did not conduct a separate

10   analysis of plaintiffs' KCPA claim.  Thus, in light of this procedural posture and intervening state

11   authority in *Arnold*, the Court finds *Brummett* insufficient to allow Plaintiffs to proceed with their

12   KCPA class action claim in the instant case.

13       Plaintiffs' reliance on *Clark v. BellSouth Telecommunications* is likewise unavailing.  As

14   in *Brummett*, plaintiffs in *Clark* asserted a number of claims under state and federal law.  With

15   respect to plaintiffs' KCPA claim, the *Clark* court found the parties' briefing incomplete.  461 F.

16   Supp. 2d at 549.  Consequently, the district court stated that it would "set a schedule for additional

17   briefing on" plaintiffs' KCPA claim.  *Id.*  Following this discussion of the KCPA claim, the *Clark*

18   court reviewed plaintiffs' motion for class certification, and found class certification appropriate.

19   The district court, however, described its certification decision as being "provision[al]" in nature,

20   *id.* at 550, a description which would comport with the court's decision to order additional briefing

21   on the KCPA claim.  Under these circumstances, the Court is not persuaded by Plaintiffs'

22   argument that the *Clark* court "certified [a] class action[] under the KCPA . . . after *Arnold*."

23   Anthem Opp'n at 12.

24       Outside of *Brummett* and *Clark*, Plaintiffs have not identified any cases where courts have

25   allowed parties to proceed with a class action claim under the KCPA.  The Court has found none

26   in its own research.  Instead, *Arnold* remains the most pertinent state authority on this issue, and

27                                                          57

28

several courts have relied upon *Arnold* to hold that parties can not, as a matter of law, bring a KCPA claim as a class action.  *See In re Pharm.*, 230 F.R.D. at 84; *In re Grand Theft Auto*, 251 F.R.D. at 160.  Consistent with the reasoning of *Arnold* and of these courts, the Court finds that Plaintiffs can not maintain a putative class action claim under the KCPA.  In addition, because Plaintiffs can not pursue such a claim as a matter of law, the Court need not address Defendants' arguments regarding standing.  Accordingly, Defendants' motions to dismiss Plaintiffs' KCPA claim is GRANTED.

Furthermore, in the absence of any authority for the position that a KCPA claim may be brought as a class action, the Court finds that leave to amend would be futile, and thus denies Plaintiffs leave to amend.  *See Bonin*, 59 F.3d at 845 ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").  Plaintiffs' KCPA claim is therefore dismissed with prejudice.

### I.   Kentucky Data Breach Act (against Anthem Defendants)

In opposing the instant motions to dismiss, Plaintiffs have moved to withdraw their cause of action against the Anthem Defendants for violation of Kentucky's Data Breach Act.  Anthem Opp'n at 11 n.13.  Accordingly, the Anthem Defendants' motion to dismiss Plaintiffs' Kentucky data breach claim is GRANTED, and Plaintiffs' Kentucky data breach claim is DISMISSED with prejudice.

### J.   Georgia Insurance Information and Privacy Protection Act (against Anthem Defendants)

The Georgia Insurance Information and Privacy Protection Act ("IIPA") states that "[a]n insurance institution, agent, or insurance-support organization shall not *disclose* any personal or privileged information about an individual collected or received in connection with an insurance transaction unless the *disclosure*" falls under a list of specifically enumerated exceptions.  Ga. Code. Ann. § 33-39-14 (emphasis added).  In the consolidated amended complaint, Plaintiffs allege that "Defendants Anthem and Anthem Affiliates disclosed individually-identifiable [PII]

ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

regarding members of the Georgia Class that was collected or received in connection with an insurance transaction without their authorization, in violation of" the IIPA.  CAC ¶ 801.

In response, the Anthem Defendants contend that Plaintiffs' PII was never "disclosed." *See, e.g.*, Anthem Reply at 12.  Rather, Plaintiffs' PII was "stole[n]" by "a third-party cyberattacker." *Id.*  The IIPA, the Anthem Defendants argue, protects only against disclosure, and not against theft.  In addition, the Anthem Defendants contend that Plaintiffs have failed to allege any actual damages. *See id.* at 13.

As to the scope of the IIPA's disclosure requirement, the Court notes that neither party has identified a case—state or federal—interpreting Ga. Code. Ann. § 33-39-14.  The Court has found none in its own research.  Thus, this action presents an issue of first impression: whether the IIPA, which proscribes the unlawful disclosure of personal information, also applies to the theft of one's personal information.

In interpreting the IIPA, the Court must examine statutory rules of construction as applied by courts in Georgia.  *See In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court is generally bound by the same substantive legal standards . . . as would have applied in the transferor court.").  On this particular point, the Georgia Supreme Court has stated that, "[w]e begin our analysis of the statute by recognizing that fundamental rules of statutory construction require us to construe a statute according to its terms, to give words their plain and ordinary meaning, and to look diligently for the intention of the General Assembly." *Atlanta Indep. Sch. Sys. v. Atlanta Neighborhood Charter Sch., Inc.*, 748 S.E.2d 884, 886 (Ga. 2013).  "Where the plain language of a statute is clear and susceptible of only one reasonable construction, we must construe the statute according to its terms."  Thus, following the Georgia Supreme Court, the Court shall begin by reviewing the IIPA's text, before examining other pertinent canons of statutory interpretation.

### 1. Statutory Text

As an initial point, the Court observes that the Georgia Code does not define the term

59

United States District Court
Northern District of California

1    "disclose" or "disclosure" in the IIPA.  *See* Ga. Code. Ann. § 33-39-3 (providing list of

2    definitions).  Where a statute does not define a key term, the Court must "look to the ordinary

3    meaning of that word."  *Jackson v. State*, 709 S.E.2d 44, 46 (Ga. Ct. App. 2011).  With respect to

4    the ordinary meaning analysis, courts generally begin by examining dictionary definitions of the

5    term at issue.  *Id.*; *see also* Jacob Scott, *Codified Canons and the Common Law of Interpretation*,

6    98 Geo. L.J. 341, 357 (2010) (finding use of dictionary definitions to be the most commonly used

7    textual canon).

8          Black's Law Dictionary defines "disclosure" as "[t]he act or process of making known

9    something that was previously unknown; a revelation of facts."  Black's Law Dictionary 531 (9th

10   ed. 2009).  Black's Law Dictionary also defines "act" as "[s]omething done or performed, esp.

11   voluntarily."  *Id.* at 27.  The Oxford English Dictionary defines "disclose" as "[t]o uncover and

12   expose to view (anything material); to remove a covering from; to reveal, allow to be seen."

13   Oxford English Dictionary Online (3d ed. 2013), *available at* tinyurl.com/jlynyc8.  Taken

14   together, these definitions suggest that, in order to "disclose" something, the information holder

15   must commit some affirmative, voluntary act.

16         An analysis of the structure of the IIPA lends further support to this conclusion.  As noted

17   above, the IIPA states that "[a]n insurance institution, agent, or insurance-support organization

18   shall not disclose any personal or privileged information . . . unless the disclosure" falls under a

19   set of 18 exceptions.  These exceptions allow the insurance institution, agent, or insurance-support

20   organization to disclose an individual's personal information "[t]o a medical-care institution or

21   medical professional," Ga. Code Ann.  § 33-39-14(4), "[t]o an insurance regulatory authority," Ga.

22   Code Ann.  § 33-39-14(5), and "[t]o a law enforcement or other governmental authority," Ga.

23   Code Ann.  § 33-39-14(6), among other entities.  Indeed, for each of these 18 exceptions, the

24   insurance institution, agent, or insurance-support organization must affirmatively provide an

25   individual's personal information to a third party.  Thus, under the dictionary definition of

26   "disclosure" and under the structure of the IIPA, it is unlikely that the Georgia Legislature

27                                                        60

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    intended for "disclosure" to encompass instances of third party cyberhacking and data breach.

2        **2. Additional Considerations**

3        In addition to the IIPA's text and structure, several other considerations lend support to this

4    more narrow reading of the IIPA's scope.  Indeed, in predicting how the Georgia Supreme Court

5    would rule on this issue, the Court believes that the Georgia Supreme Court would review how the

6    terms "disclose" or "disclosure" have been defined in other statutes and how these terms have

7    been interpreted by other courts.

8        On this particular point, the Federal Privacy Act defines "disclosure" to "mean[] providing

9    personal review of a record, or a copy thereof, to someone other than the data subject or the data

10   subject's authorized representative."  5 C.F.R. § 297.102.  Courts have restricted this definition to

11   situations where information holders have willfully provided data to an unauthorized third party.

12   In *Walia v. Chertoff*, 2008 WL 5246014, *6 (E.D.N.Y. Dec. 17, 2008), for instance, plaintiff's

13   medical and legal records were allegedly placed in an unlocked credenza located in the office of

14   plaintiff's supervisor.  Other employees, including those not authorized to review plaintiff's

15   medical and legal records, had access to this office.  *Id.*  Upon learning these facts, plaintiff

16   brought suit against his employer.  The *Walia* court rejected plaintiff's Federal Privacy Act claim

17   and held that plaintiff's claim rested "on the accessibility of [plaintiff's] medical and legal records

18   to individuals in the office."  *Id.* at *11.  Mere accessibility, however, is insufficient to constitute

19   "willful or intentional disclosure by the agency, a required element of a [Federal Privacy Act]

20   claim."  *Id.*  Here, as in *Walia*, Plaintiffs' IIPA claim pivots around the idea of access and

21   accessibility, not willful and active disclosure.  *See e.g.*, Anthem Opp'n at 21 ("[A]s Plaintiffs

22   contend . . . unauthorized *access* resulted from Anthem's actions.") (emphasis added).   Thus, at

23   least as understood in the context of the Federal Privacy Act, Plaintiffs have failed to sufficiently

24   allege that the Anthem Defendants "disclosed" Plaintiffs' PII to cyberattackers during the data

25   breach.

26       In addition, in *Galaria v. Nationwide Mutual Insurance Co.*, 998 F. Supp. 2d 646, 650

27                                                                61

United States District Court
Northern District of California

1    (S.D. Ohio 2014), plaintiffs provided Nationwide Mutual Insurance ("Nationwide") their PII "in

2    the course of purchasing or seeking to purchase insurance products."  In November 2012,

3    plaintiffs "received a letter from [Nationwide] indicating that on October 23, 2012, thieves hacked

4    into a portion of [Nationwide's] computer network and that their PII was stolen and disseminated

5    as part of the theft."  *Id.*  In response, plaintiffs brought suit against Nationwide alleging, *inter*

6    *alia*, common law invasion of privacy.  *Id.* at 661.

7           The district court granted Nationwide's motion to dismiss.  In reaching this decision, the

8    district court observed that the common law tort of invasion of privacy requires publicity of a

9    private fact.  Publicity, in turn, "means that [a] matter is made public, by communicating it to the

10   public at large, or to so many persons that the matter must be regarded as substantially certain to

11   become one of public knowledge."  *Id.*  Plaintiffs had failed to satisfy this publicity requirement

12   because "there is no allegation in the Complaint that [Nationwide] *disclosed* Named Plaintiffs'

13   private affairs."  *Id.* at 662 (emphasis added).  Moreover, "[t]here are no factual allegations in the

14   Complaint to make plausible the allegation that [Nationwide] disseminated Named Plaintiffs' PII."

15   *Id.*  Rather, "the Complaint alleges the PII was *stolen* from [Nationwide], not that [Nationwide]

16   disseminated it to anyone."  *Id.*  In sum, when presented with a substantially similar set of facts,

17   the *Galaria* court clearly understood "disclosure" as requiring a party to commit some voluntary,

18   affirmative act.  The *Galaria* court, moreover, drew a distinction between when information is

19   "disclosed" and when information is "stolen."  Thus, although the questions presented in *Galaria*

20   were somewhat different than the questions presented in the instant case, this Court nevertheless

21   finds the *Galaria* court's understanding of "disclosure" informative.

22          The D.C. District Court's decision in *In re Science Applications International Corp.*

23   *(SAIC) Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14 (D.D.C. 2014), is similarly

24   illuminating.  In *In re SAIC*, as in *Galaria*, "[p]laintiffs . . . allege[d] that they ha[d] been injured

25   because their privacy [had been] invaded by [a] data breach."  *Id.* at 28.  In deciding to dismiss

26   plaintiffs' invasion of privacy claim, the district court held that "[f]or a person's privacy to be

27                                                       62

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

invaded, their personal information must, at a minimum, *be disclosed to* a third party." *Id.*

(emphasis added).  The *In re SAIC* court proceeded to refer to a number of different sources

discussing disclosure.  The district court, for instance, cited a decision by the Eastern District of

Wisconsin, which defined disclosure as "the placing into the view of another information which

was previously unknown." *Id.* (quoting *Schmidt v. Dep't of Veteran Affairs*, 218 F.R.D. 619, 630

(E.D. Wis. 2003)).  The district court also cited a decision by the District of South Carolina, which

defined disclosure as "the imparting of information which . . . was previously unknown to the

person to whom it was imparted." *Id.* (quoting *Harper v. United States*, 423 F. Supp. 192, 197

(D.S.C. 1976)).  These definitions all conform to the Court's understanding of what disclosure

should mean in the context of the IIPA: an active, voluntary decision by the information holder to

provide data to an unauthorized third party.

In opposing the Anthem Defendants' motion to dismiss, Plaintiffs rely upon a statement in

*Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994, 1008 (N.D. Ill. 2009).

Specifically, in discussing the viability of an Indiana common law negligence claim, the *Shames-*

*Yeakel* court stated that "[i]f th[e] duty not to disclose customer information is to have any weight

in the age of online banking, then banks must certainly employ sufficient security measures to

protect their customers' online accounts." *Id.*  Although this statement does appear to weigh in

Plaintiffs' favor, Plaintiffs' reliance on *Shames-Yeakel* is ultimately inapposite.

First, as discussed above, private plaintiffs can not, under *Pisciotta*, bring a cause of action

in Indiana for negligence for injuries arising out of a data breach.  The Northern District of

Illinois' decision in *Shames-Yeakel* is therefore, at the very least, in tension with the Seventh

Circuit's decision in *Pisciotta*.  Tellingly, in discussing the negligence claim in *Shames-Yeakel*,

the district court did not refer to *Pisciotta*.  The district court also acknowledged that "this court

could not find an Indiana case addressing the matter" of whether a bank has a "duty to sufficiently

secure its online banking system." *Id.*  Thus, by allowing plaintiffs in *Shames-Yeakel* to move

forward with their Indiana negligence claim, the *Shames-Yeakel* court appeared to overlook both

63

United States District Court
Northern District of California

1    the specific and general precedent of its circuit court of appeals, the Seventh Circuit, that federal

2    courts, sitting in diversity, should refrain from creating new causes of action under state law.  *See,*

3    *e.g.*, *Pisciotta*, 499 F.3d at 637 ("Had the Indiana legislature intended that a cause of action should

4    be available against a database owner for failing to protect adequately personal information, we

5    believe that it would have made some more definite statement of that intent."); *Insolia v. Philip*

6    *Morris, Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) ("When confronted with a state law question that

7    could go either way, the federal courts usually choose the narrower interpretation that restricts

8    liability.").

9           Second, with respect to the specific statement quoted by Plaintiffs—that a bank's duty not

10   to disclose must include a duty to protect customers' personal information—the *Shames-Yeakel*

11   court did not discuss, refer to, or cite any supporting authority.  In the nearly six and a half years

12   since the *Shames-Yeakel* decision, no federal or state court has cited *Shames-Yeakel* for this

13   proposition.  In light of these circumstances, and in light of the fact that *Shames-Yeakel* appears to

14   be in tension with prevailing Seventh Circuit precedent, the Court finds Plaintiffs' reliance on

15   *Shames-Yeakel* not well taken.

16          To conclude, Plaintiffs have failed to persuade the Court that a broader construction of the

17   IIPA is warranted.  Under the facts alleged in the consolidated amended complaint, the Anthem

18   Defendants did not "disclose" Plaintiffs data, as required under the IIPA.  Pursuant to the Court's

19   finding, the Court need not address the Anthem Defendants' arguments regarding whether

20   Plaintiffs have sufficiently alleged damages for purposes of the IIPA.  The Anthem Defendants'

21   motion to dismiss Plaintiffs' IIPA claim is GRANTED.

22          Plaintiffs, however, shall have leave to amend because the Court finds that amendment

23   would not be futile.  Plaintiffs may be able to allege facts to demonstrate that the Anthem

24   Defendants disclosed Plaintiffs' PII to a third party.  *See Lopez*, 203 F.3d at 1127 (holding that "a

25   district court should grant leave to amend . . . unless it determines that the pleading could not

26   possibly be cured by the allegation of other facts.").  Plaintiffs' IIPA claim is therefore

27                                                        64

28

DISMISSED with leave to amend.

**K. Federal Law Third Party Beneficiary (against Non-Anthem Defendants)**

Finally, Plaintiffs assert a third party beneficiary claim for breach of contract under federal law against the Non-Anthem Defendants. CAC ¶ 331–42. Specifically, Plaintiffs assert that Blue Cross Blue Shield Association ("BCBSA") "had a valid, binding, and enforceable express contract with OPM [the Office of Personnel Management] to provide insurance and other benefits to those Plaintiffs who received health insurance and related benefits under the Federal BCBSA Plan." *Id.* ¶ 332. Under this contract (hereinafter referred to as the "Federal BCBSA contract"), BCBSA "promised to take reasonable measures to protect the security and confidentiality of Federal Employee Plaintiffs' [PII]." *Id.* ¶ 333. Plaintiffs allege that the Federal Employee Plaintiffs were "intended third-party beneficiaries of the data security provisions in the contract between BCBSA . . . and OPM, and are entitled to directly enforce its terms." *Id.* ¶ 339.

The Non-Anthem Defendants contend that Plaintiffs' third party beneficiary claim fails because OPM is the *only* party that can seek relief under the Federal BCBSA contract. Plaintiffs can not, in other words, pursue a private cause of action against BCBSA. The Non-Anthem Defendants also argue that "the Federal Employee Plaintiffs' state law claims are preempted." Non-Anthem Mot. at 19.

Given that adjudication of the instant claim involves a nuanced understanding of federal law, administrative regulations, and various rules governing contract interpretation, the Court first provides an overview of the background and statutory framework behind the Federal BCBSA contract. The Court shall then address the Non-Anthem Defendants' arguments in turn.

**1. Background**

The Federal Employee Health Benefits Act ("FEHBA"), enacted in 1959, "established a comprehensive program to provide federal employees and retirees with subsidized health care benefits." *Hayes v. Prudential Ins. Co. of Am.*, 819 F.2d 921, 922 (9th Cir. 1987). "Under the Act, the United States does not act as an insurer, but, through the Office of Personnel Management

65

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (OPM), contracts with various private carriers to develop health care plans with varying coverages

2  and costs." *Id*. "After OPM negotiates changes with the carriers[,] all federal enrollees are

3  permitted to switch enrollment from one plan to another, regardless of their state of health, during

4  a period called 'open season.'" *Id*.

5  "Among the plans offered to federal employees is the Blue Cross Blue Shield Service

6  Benefit Plan," which is governed by the Federal BCBSA contract (known internally as 2013

7  Contract No. CS 1039).  CAC ¶ 172.[10]  The Federal BCBSA contract provides that "[a]ny

8  inconsistency in this contract shall be resolved by giving precedent in the following descending

9  order: the Act,[11] the regulations in part 890, title 5, Code of Federal Regulations, the regulations in

10  chapters 1 and 16, title 48, Code of Federal Regulations, and this contract."  Fed. BCBSA Contract

11  § 1.3.  The Federal BCBSA contract also states that "[t]he Carrier [BCBSA] shall provide the

12  benefits as described in the agreed upon" Statement of Benefits, which are attached as an

13  addendum to the contract.  *Id.* § 2.2(a).

14  The framework under which the Federal BCBSA contract operates is notable in three

15  important respects.  First, Plaintiffs assert, and the Non-Anthem Defendants do not dispute, that

16  the Federal Employee Plaintiffs are intended third party beneficiaries of the Federal BCBSA

17  contract.  *See* CAC ¶ 339; Non-Anthem Mot. at 14; Non-Anthem Opp'n at 14; *see also Catholic*

18  *Diocese of Biloxi Supplemental Med. Reimbursement Plan and Catholic Diocese of Biloxi v. Blue*

19

20  _____

21  [10] Plaintiffs refer to Contract No. CS 1039 in the consolidated amended complaint, and the Non-Anthem Defendants have submitted a copy of this contract, the 2014 and 2015 amendments to the contract, and the contract's 2014 and 2015 Statement of Benefits.  *See* ECF No. 416-1 ("Fed. BCBSA Contract"); ECF No. 416-2 ("2014 Amendments"); ECF No. 416-3 ("2015 Amendments"); ECF No. 416-4 ("2014 Statement of Benefits"); ECF No. 416-5 ("2015 Statement of Benefits").  Unlike the Summary Plan Descriptions described above, Plaintiffs do not dispute that these documents are true and accurate copies of their contract with BCBSA and the accompanying statement of benefits.  Non-Anthem Opp'n at 13 n.9.  Accordingly, the Court takes judicial notice of these documents.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (stating that court "may consider documents on which the complaint necessarily relies and whose authenticity is not contested.") (internal quotation marks and ellipses omitted).

22

23

24

25

26  [11] The Federal BCBSA contract defines "Act" to mean "FEHBA."  Fed. BCBSA Contract § 1.1.

27  66

Case No. 15-MD-02617-LHK

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

*Cross, Blue Shield of Tex.*, 960 F. Supp. 1145, 1146 (S.D. Miss. 1997) ("The federal employee does not enter into a separate contract with the carrier, but rather is a third-party beneficiary of the OPM-carrier contract.").  As a result of this arrangement, "[a]ll *health benefits claims* [under the Federal BCBSA contract] must be submitted initially to the carrier of the covered individual's health benefits plan." 5 C.F.R. § 890.105(a)(1) (emphasis added).  "If the carrier denies a [health benefits] claim (or a portion of a claim), the covered individual may ask the carrier to reconsider its denial." *Id.*  "If the carrier affirms its denial or fails to respond . . . . , the covered individual may ask OPM to review the claim." *Id.*  Notably, "[a] covered individual must exhaust both the carrier and OPM review processes specified in this section before seeking judicial review of [a] denied claim." *Id.*  The administrative apparatus designed to handle health benefits claims is, in short, fairly comprehensive.

Second, the Federal BCBSA contract and various administrative regulations vest OPM with general management authority over the contract.  As discussed, individuals filing health benefits claims must, prior to going to federal court, present their claims in an administrative proceeding before OPM.  Outside of handling such health benefits claims, OPM "shall" also "notify [BCBSA] of [various] deficiencies" which relate to BCBSA's "financial resources, facilities, providers, staff and other necessary resources to meet [BCBSA's] obligations under this contract." Fed. BCBSA Contract § 1.12(a).  Relatedly, BCBSA must "notify" OPM "of any Significant Event within ten (10) working days after [BCBSA] becomes aware of it." *Id.* § 1.10; *see also id.* (providing list of Significant Events).  If BCBSA does not address a Significant Event in a satisfactory manner, OPM may suspend new enrollments, advise enrollees of the asserted deficiencies and provide enrollees an opportunity to transfer to another plan, withhold payment, and refuse to renew the contract. *Id*.  On a more general level, federal law provides that OPM "may prescribe reasonable minimum standards for health benefits plans," 5 U.S.C. § 8902(e), and "may prescribe regulations necessary to carry out" FEHBA, 5 U.S.C. § 8913(a).

Third, and finally, the Federal BCBSA contract includes several provisions that address

67

ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

data privacy.  Section 1.30(a) states that BCBSA must "at a minimum, comply with equivalent privacy and security policies as are required of a 'covered entity' under the HIPAA Privacy and Security regulations."  *Id.* § 1.30(a).  The Federal BCBSA contract was specifically amended in 2014 so that BCBSA could be required to go beyond compliance with the minimum privacy standards required under federal law.  Section 1.30(d), for instance, now states that an OPM representative "may recommend that the Carrier adopt a best practice drawn from NIST Special Publication 800-53 (or its current equivalent)."  2014 Amendments § 1.30(d).  This document— NIST Special Publication 800-53—"provides a catalog of security and privacy controls for federal information systems and organizations and a process for selecting controls to protect organizational operations."  National Institute of Standards and Technology, *NIST Special Publication 800-53 (Revision 4): Security and Privacy Controls for Federal Information Systems and Organizations*, http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf (last updated Jan. 22, 2015).  Notably, many of the practices listed in NIST Special Publication 800-53 are recommendations that go above and beyond current requirements under federal law.  A third section of the Federal BCBSA contract, § 1.6(b), states that BCBSA "shall . . . hold all medical records, and information relating thereto, of Federal subscribers confidential."  Fed. BCBSA Contract § 1.6(b).  Neither the Federal BCBSA contract nor federal law specifies who may seek a remedy for breach of these data privacy obligations.

### 2. Enforcement of Federal BCBSA Contract

#### a. "Health Benefits Claim"

The Non-Anthem Defendants first contend that Plaintiffs' third party beneficiary claims constitute health benefits claims.  Thus, pursuant to the Federal BCBSA contract, Plaintiffs must exhaust the administrative apparatus described above before bringing their claims into federal court.  The Court finds this contention unavailing.

The administrative apparatus to which Non-Anthem Defendants refer applies to "health benefits claims."  Federal regulations define "claim" to mean a "request for (i) payment of a

68

United States District Court
Northern District of California

health-related bill; or (ii) provision of a health-related service or supply." 5 C.F.R. § 890.101.

The Federal BCBSA contract, in turn, defines "[b]enefits" as "[c]overed services or payment for

covered services set forth in [the Statement of Benefits], to which Members are entitled to the

extent provided by this contract." Fed. BCBSA Contract § 1.1.  The Statement of Benefits

accompanying the Federal BCBSA contract does not define "benefit."  *See* 2015 Statement of

Benefits at 145 (providing list of definitions).  However, the Statement of Benefits does list the

following as "Benefits": "Preventative care," "Allergy care," and "Prescription drug benefits."  *Id.*

at 32.  In short, "benefits"—at least as understood in the context of the Federal BCBSA contract

and the Statement of Benefits—appears to refer only to the provision of medical-related coverage.

Tellingly, neither patient privacy nor data security is listed as a "benefit" in the Statement of

Benefits.  Indeed, there is but one reference to patient privacy in the Statement of Benefits,

confined to a single sentence in the 160 page document: "We [BCBSA] will keep your medical

and claims information confidential." *Id.* at 14.  There is, in sum, little to suggest that "health

benefits claims" were meant to encompass claims regarding data privacy.

In further support of this conclusion, the Court observes that, in *Roach v. Mail Handlers*

*Benefits Plan*, the Ninth Circuit construed "benefits" under FEHBA narrowly.  Specifically, the

Ninth Circuit noted that, in interpreting the scope of FEHBA, several "courts have created a divide

between claims based on a denial of benefits, which are preempted, and claims based on medical

malpractice, which are not." *Roach*, 298 F.3d at 850.  Upon examining these decisions, the Ninth

Circuit determined that such a "division protects the federal interest in uniformity of FEHBA plan

interpretation" while also "preserv[ing] the traditional state interest in the quality of medical care."

*Id.*  In sum, the Ninth Circuit distinguished "denial of benefit claims," which "are preempted by . .

. FEHBA," from "malpractice claims," which "are not" preempted by FEHBA.  *Id.*  Under this

narrow construction, claims related to one's data privacy—which do not concern health benefits or

payment for health benefits—would seem to fall outside the purview of a "denial of benefit"

claim.

69

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

To summarize, the Federal BCBSA contract, the Statement of Benefits, and Ninth Circuit precedent all counsel in favor of finding that Plaintiffs here have not asserted a claim that should have first gone through an established administrative review apparatus.

The Non-Anthem Defendants have not cited any authority to support their arguments to the contrary.  Instead, the Non-Anthem Defendants point to the allegations in the consolidated amended complaint, which state that "[a]s a result of BCBSA, Anthem BCBS Affiliates, and non-Anthem BCBS's failure to implement the security measures required by the Federal BCBSA contract, OPM did not receive the full *benefit* of its bargain."  CAC ¶ 340 (emphasis added).  This argument lacks merit.  In seeking benefit of the bargain damages, Plaintiffs state that they received "services that were less valuable than what OPM bargained for."  *Id.*  This understanding of "benefit" differs significantly from the term of art referenced in FEHBA and employed in the Federal BCBSA contract.  Accordingly, the Court finds that Plaintiffs' third party beneficiary claim is not a "health benefits claim."

### b.  Exclusive Enforcement Authority

In the alternative, the Non-Anthem Defendants argue that even "[i]f the Federal Employee Plaintiffs are suing for something other than benefits, their claims are no less barred because FEHBA's scheme gives OPM exclusive authority over all aspects of the contractual relationship, not just over benefits."  Non-Anthem Mot. at 17.  The gist of this contention is that "FEHBA leaves no room for" Plaintiffs to seek a remedy as a third party beneficiary.  *Bridges v. Blue Cross and Blue Shield Ass'n*, 935 F. Supp. 37, 41 (D.D.C. 1996).  Instead, "the broad enforcement and oversight powers of the OPM established in the statute indicate that the exclusive remedy for an action cognizable under . . . FEHBA" lies with OPM.  *Id.*

The Court disagrees with this argument.  As an initial matter, the Court notes that, "[w]hen interpreting contracts under federal law, courts look to general common law on contracts."  *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013).  "One such general principle is that only a party to a contract or an intended third-party beneficiary may

70

United States District Court
Northern District of California

1    sue to enforce the terms of a contract or obtain an appropriate remedy for breach."  *GECCMC*

2    *2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027,

3    1033 (9th Cir. 2012).  "This [rule] distinguishes intended beneficiaries to a contract whose rights

4    are judicially enforceable from incidental beneficiaries whose rights are not judicially

5    enforceable."  *Id.*  In the instant case, Plaintiffs assert—and, more importantly, Defendants do not

6    challenge—the fact that Plaintiffs are intended third party beneficiaries under the Federal BCBSA

7    contract.  *See, e.g.*, CAC ¶ 339 ("Federal Employee Plaintiffs and Class Members are intended

8    third-party beneficiaries of the data security provisions in the contract between BCBSA . . . and

9    OPM, and are entitled to directly enforce its terms.").  Thus, at least for purposes of the instant

10    motions to dismiss, Plaintiffs have cleared the first hurdle by demonstrating intended third party

11    beneficiary status.

12         Assuming that Plaintiffs are intended third party beneficiaries of the Federal BCBSA

13    contract, it is—as a general matter—"no objection to an action by the third party that the

14    contracting party (here the government) could also sue upon the contract for the same breach."

15    *Shell v. Schmidt*, 272 P.2d 82, 89 (Cal. Ct. App. 1954); *see also Malone v. Crescent City M & T*

16    *Co.*, 18 P. 858, 860 (Cal. 1888) ("[I]t is no objection to the maintenance of a suit by him for whose

17    benefit the promise is made that an action might be brought also against the one to whom the

18    promise was made."); *id.* (citing supporting case law from New York, Kansas, Wisconsin, and

19    Alabama).  To emphasize: as a matter of general contract law, both an intended third party

20    beneficiary and a party to the contract may sue for breach.  *See generally Zigas v. Superior Court*,

21    174 Cal. Rptr. 806, 811 (Ct. App. 1981) (reaffirming holding in *Shell*).

22         The Restatement of Contracts is in accord with this conclusion.  Section 145, which

23    addresses "Beneficiaries Under Promises to the United States," states that:

24         A promisor bound to the United States . . . by contract to . . . render a service to
25         some or all of the members of the public, is subject to no duty under the contract
         to such members to give compensation for the injurious consequences of
26         performing or attempting to perform it, or of failing to do so, *unless*, . . . an

71

United States District Court
Northern District of California

intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation.

Restatement (First) of Contracts § 145 (emphasis added).  In other words, under the Restatement, promisors such as BCBSA have duties to the Federal Employee Plaintiffs because these Plaintiffs are intended third party beneficiaries.

In addition, the U.S. Supreme Court's decision in *Astra USA, Inc. v. Santa Clara County, California*, 563 U.S. 110 (2011), is not inconsistent with this conclusion.  In *Astra*, the U.S. Supreme Court determined that plaintiffs did not have standing to sue as third party beneficiaries where plaintiffs merely sought to enforce certain statutory obligations memorialized in a federal contract.  *See, e.g.*, *id.* at 118 ("The absence of a private right to enforce the statutory ceiling price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling price obligations instead.  The statutory and contractual obligations, in short, are one and the same.").  The *Astra* Court emphasized that "[t]he form agreements, composed by HHS, contain no negotiable terms."  *Id.*

On the other hand, as the Court has noted, the Federal BCBSA contract here was specifically amended in 2014 such that BCBSA could be held to privacy standards above and beyond the standards required under federal law.  *See* 2014 Amendments § 1.3(d).  In addition, in direct contrast to the contract in *Astra*, where the agreement contained "no negotiable terms," the 2014 Amendments include three full paragraphs that allow BCBSA to negotiate with OPM over which best practices BCBSA should implement.  *See id.* § 1.3(d)(2) ("In a written response to such a recommendation, [BCBSA] shall (i) agree to adopt the recommendation, (ii) explain that it is already in compliance with the recommendation, or (iii) explain why maintaining its current practice . . . is equally, if not more, appropriate for its business purposes than the recommended best practice.").  As a final point, the consolidated amended complaint alleges that BCBSA breached the contract by failing to comply with various laws, regulations, and—most importantly—"industry standards for data security."  CAC ¶ 335.  Thus, Plaintiffs' claim clearly reaches beyond the mere statutory violations that were at issue in *Astra*.

72

1       In sum, under general principles of contract law, as reflected in the Restatement, U.S.

2   Supreme Court precedent, and relevant state court case law, the mere fact that OPM could also

3   bring suit against BCBSA does not bar Plaintiffs from bringing suit as a third party beneficiary.

4       The Non-Anthem Defendants, however, contend that the Federal BCBSA contract does not

5   comport with these general contract law principles.  Rather, the Non-Anthem Defendants contend

6   that the Federal BCBSA contract is unique because it is governed by FEHBA, which gives

7   exclusive enforcement authority to OPM.  In support of this contention, the Non-Anthem

8   Defendants point to both the structure of the Federal BCBSA contract and case law interpreting

9   FEHBA.

10       The Court is not persuaded by either of these points.  With respect to the structure of the

11  Federal BCBSA contract, the Court has already noted that the Federal BCBSA contract provides

12  an extensive administrative review process for "health benefits claims," but that Plaintiffs' claims

13  are not "health benefits claims."  The Court also observes that, under § 1.10 of the Federal

14  BCBSA contract, BCBSA must notify OPM within ten days if BCBSA becomes aware of the

15  occurrence of a "Significant Event."  Fed. BCBSA Contract § 1.10(a).  BCBSA and OPM must

16  then work together to address the Significant Event.  *Id.* § 1.10(b).  The Federal BCBSA contract

17  provides a list of 13 Significant Events.  None of these Significant Events mention or relate to data

18  security.  Thus, under a plausible reading of this section, BCBSA might not even have been

19  required to notify OPM of the Anthem data breach, and OPM would not necessarily have needed

20  to take corrective action.

21       Taken together, the extensive administrative review process and the "Significant Event"

22  provisions appear to delineate some of the contours of OPM's authority.  On a conceptual level, it

23  might be helpful to consider OPM, the BCBSA, and Plaintiffs as being three separate but related

24  actors.  Here, OPM contracts with BCBSA, and Plaintiffs serve as an intended third party

25  beneficiary.  The instant contract, however, is unique in two ways.  First, if Plaintiffs have a health

26  benefits claim, Plaintiffs must go to OPM first.  Second, if BCBSA experiences a Significant

27                                                                73

28

United States District Court
Northern District of California

1   Event, such as the "[d]isposal of major assets" or a loss of more than 15% of its membership, *id.* §

2   1.10(b)(1) & § 1.10(b)(2), then BCBSA must go to OPM.  The contract is silent as to all

3   remaining matters, including matters of data security.  Given this contractual structure, the Court

4   finds that it would be equally (if not more) plausible to find that general contract law principles

5   govern matters where the Federal BCBSA contract is silent, rather than the Non-Anthem

6   Defendants' exclusive enforcement theory.

7          The Court also finds unavailing the Non-Anthem Defendants' reliance on *Miscellaneous*

8   *Service Workers v. Philco-Ford Corp.*, 661 F.2d 776 (9th Cir. 1981), and *Bridges v. Blue Cross*

9   *and Blue Shield Association*, 935 F. Supp. 37 (D.D.C. 1996).  *Miscellaneous Service Workers*

10  addressed OPM's exclusive enforcement authority under the Service Contract Act, an altogether

11  different act than FEHBA.  661 F.2d at 777.  Given the complicated interplay here between

12  specific contractual provisions, specific federal laws, and specific federal regulations, the Court

13  declines to rely on a case interpreting a different contractual provision in the context of a different

14  federal law.

15         *Bridges* appears to be more on point.  In *Bridges*, plaintiffs "allege[d] that BCBSA's

16  licensee entities, with BCBSA's knowledge and approval, secretly negotiated discounts on the

17  cost of services of member facilities and physicians, and then failed to apply those discounts to the

18  enrollees' coinsurance payments."  935 F. Supp. at 39 (internal quotation marks omitted).

19  Plaintiffs thereafter brought suit against BCBSA and OPM, with plaintiffs asserting violations of

20  breach of contract and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *Id.* at

21  40.  Plaintiffs did not bring a third party beneficiary claim.  With respect to plaintiffs' breach of

22  contract claim, the *Bridges* court observed that plaintiffs had "failed to exhaust . . . [the]

23  administrative remedies under . . . FEHBA before filing suit against the carrier."  *Id.* at 44.  With

24  respect to plaintiffs' RICO claims, the *Bridges* court stated that "nothing in . . . FEHBA, nor in its

25  implementing language or legislative history, indicates that the legislature had any intent to allow

26  a civil RICO action to spring out of a violation of . . . FEHBA."  *Id.* at 42.  The district court also

27                                                      74

28

United States District Court
Northern District of California

1    noted that plaintiffs had failed to exhaust plaintiffs' breach of contract and RICO claims through

2    the administrative review process.  Finally, the district court observed that plaintiffs had failed "to

3    allege injury resulting from BCBSA's investment of racketeering income into its business," a

4    substantive pleading requirement specific to RICO.  *Id.* at 43; *see also* 18 U.S.C. § 1962(a)

5    (specifying RICO pleading requirements).

6         The Court finds *Bridges* distinguishable for three reasons.  First, the *Bridges* court did not

7    rely only on an "exclusive enforcement" theory.  Instead, the district court determined that

8    plaintiffs had also failed to sufficiently allege a RICO violation as a substantive matter.

9         Second, the Court believes the RICO claim in *Bridges* is at least somewhat analogous to a

10   "health benefits claim."  Indeed, the *only* way that plaintiffs in *Bridges* could have been

11   overcharged for a coinsurance payment is if plaintiffs actually decided to exercise their health

12   benefits.  In the Statement of Benefits, for instance, the "Benefits Description" section provides a

13   statement of what benefits are covered, followed by a discussion of the coinsurance payment that

14   the insured must incur in exchange for a particular benefit.  *See, e.g.*, 2014 Statement of Benefits

15   at 37–118.  On the other hand, the Statement of Benefits includes but a single sentence on data

16   privacy, and a class member's data privacy could have been compromised even if that class

17   member did not decide to exercise any health benefits.

18        Similarly, under the "Disputed Claims Process" section of the Statement of Benefits, an

19   insured can readily dispute a coinsurance payment by including "copies of documents that support

20   your claim, such as . . . bills . . . and explanation of benefits (EOB) forms."  *Id.* at 130.  There is no

21   clear parallel provision for recovery for a personal data breach.

22        Third, and finally, it is not clear that the Court should follow *Bridges*.  *Bridges* was

23   decided by the D.C. District Court in 1996.  Since that time, more recent federal court precedent

24   has appeared to take a more narrow understanding of OPM's enforcement authority.  As this Court

25   has noted, for instance, the Ninth Circuit allowed plaintiff in *Roach*, who was covered by a

26   FEHBA plan, to proceed with a state medical malpractice claim against her health insurance

27                                              75

United States District Court
Northern District of California

carrier after finding that such a claim fell outside of OPM's purview. 298 F.3d at 850–51. In reaching this decision, the Ninth Circuit relied upon supporting decisions from the Third, Fifth, and Tenth Circuits. *Id.*

To conclude, neither the structure of the Federal BCBSA contract nor the case law cited by the Non-Anthem Defendants compels the Court to find, as a matter of law, that OPM has exclusive enforcement authority over the Anthem data breach as it applies to the Federal Employee Plaintiffs. Instead, under general principles of contract law and after a careful review of the interaction between relevant laws, regulations, and contractual provisions, the Court finds that Plaintiffs may proceed with their third party beneficiary claim. The Non-Anthem Defendants' motion to dismiss Plaintiffs' third party beneficiary claim is therefore DENIED.

### 3. Preemption of State Law Claims

In addition to arguments concerning OPM's enforcement of the Federal BCBSA contract, the Non-Anthem Defendants contend that the Federal Employee Plaintiffs' state law claims are preempted. This contention applies to two Plaintiffs in particular: Stella Williams ("Williams"), a resident of Indiana, and Alvin Lawson ("Lawson"), a resident of California.[12]

The Court need not address whether Williams' Indiana state law claims are preempted. Only one of the ten causes of action selected by the parties is based on Indiana law—the Indiana negligence claim. As the Court has already determined, Plaintiffs can not proceed with this claim as a matter of law.

With respect to Lawson, two of the ten causes of action selected by the parties are based on California law—the California breach of contract claim and the California UCL claim. The Court finds Lawson's California breach of contract claim preempted, for two reasons. First, Plaintiffs do not contest that this claim is preempted. *See, e.g.*, Non-Anthem Opp'n at 15 (contesting Lawson's

---

[12] The remaining Federal Employee Plaintiffs are residents of Connecticut and Nevada. The instant motions to dismiss do not address claims brought under Connecticut and Nevada law. Non-Anthem Opp'n at 15 n.10; Non-Anthem Mot. at 19.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

California UCL claim and Williams' Indiana negligence claim, but making no mention of

Lawson's California breach of contract claim).  Second, the Federal BCBSA contract expressly

provides that "United States law will apply to resolve any claim of breach of this contract."  Fed.

BCBSA Contract § 5.62; CAC ¶ 332 ("Under the . . . Federal BCBSA Contract, federal law

applies to breach of contract claims.").

On the other hand, whether or not Lawson's UCL claim is preempted is a more difficult

question.  The U.S. Supreme Court "has identified three types of preemption: express preemption,

field preemption, and implied conflict preemption."  *Deweese v. Nat'l R.R. Passenger Corp.

(Amtrak)*, 590 F.3d 239, 245 (3d Cir. 2009).  Express preemption "exists when Congress includes

in a statute explicit language stating an intent to preempt conflicting state law."  *Id.*  Field

preemption "occurs when a state law impinges upon a field reserved for federal regulation."  *Id.*

(internal quotation marks omitted).  Finally, implied conflict preemption exists "when compliance

with both federal and state regulations is a physical impossibility, or when a state law stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1141 (9th Cir. 2015) (internal quotation

marks omitted).  Here, the Non-Anthem Defendants contend that Lawson's UCL claim is subject

to both express and implied conflict preemption.[13]  The Court addresses these contentions in turn.

### a. Express Preemption

On the issue of express preemption, FEHBA contains the following express preemption

provision:

> The terms of any contract under this chapter which *relate to* the nature, provision,
> or extent of coverage or benefits (including payments with respect to benefits)
> shall supersede and preempt any State or local law, or any regulation issued

---

[13] The Non-Anthem Defendants also assert that "the Federal Employee Plaintiffs' state law claims are displaced by federal common law."  Non-Anthem Reply at 9.  Consistent with the approach taken by other federal courts, the Court addresses this displacement theory in its conflict preemption discussion.  *See Helfrich v. Blue Cross and Blue Shield Ass'n*, 804 F.3d 1090, 1097 (10th Cir. 2015) ("On the other hand, no conflict, no displacement.").

77

United States District Court
Northern District of California

thereunder, which relates to health insurance or plans.

5 U.S.C. § 8902(m)(1) (emphasis added).  Because this preemption provision mirrors ERISA's express preemption provision, *see* ERISA § 514, 29 U.S.C. § 1144(a), the Ninth Circuit has referred to U.S. Supreme Court decisions interpreting ERISA's "relate to" requirement in examining cases brought under FEHBA.  *Botsford v. Blue Cross and Blue Shield of Mont., Inc.*, 314 F.3d 390, 393–94 (9th Cir. 2002).  Specifically, the Ninth Circuit has stated that FEHBA's "relate to" requirement must, as with ERISA's "relate to" requirement, not "be taken too literally." *Roach*, 298 F.3d at 849.  "If relate to were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere." *Id.* at 849–50 (internal quotation marks omitted).

With this principle in mind, the Ninth Circuit has "held that FEHBA preempts disputes over a "'denial of benefits' and 'the nature or extent of coverage for benefits.'" *Botsford*, 314 F.3d at 395.  Indeed, "[t]he application of different state standards would disrupt the nationally uniform administration of *benefits* which FEHBA provides." *Id.* (emphasis added).  To further underscore this point, the Ninth Circuit has characterized "[a] dispute over benefits" as "precisely the kind of dispute that FEHBA preempts." *Id.*  Thus, in *Botsford*, the Ninth Circuit determined that a dispute over the amount of reimbursement of a particular claim constituted a dispute over benefits.  Accordingly, plaintiff in *Botsford* could not pursue such a claim under Montana's Unfair Trade Practices Act.

In like manner, the Tenth Circuit recently observed that a number of federal courts have concluded that "FEHBA preempts state laws limiting subrogation and reimbursement." *Helfrich*, 804 F.3d at 1107.  Such state laws directly implicate how an insured's benefits are processed and how much an insured can receive after filing a health benefits claim.  Thus, consistent with the decisions of these other federal courts, the *Helfrich* court determined that FEHBA preempted a "Kansas insurance regulation prohibiting subrogation and reimbursement clauses in insurance contracts." *Id.* at 1092.

78

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1    In contrast, as noted above, the Ninth Circuit has determined that state medical malpractice

2    claims are not necessarily preempted by FEHBA.  *Roach*, 298 F.3d at 850.  In reaching this

3    decision, the Ninth Circuit relied upon supporting case law from a number of other federal circuit

4    courts, *see id.* (citing decisions from the Third, Fifth, and Tenth Circuits), and determined that

5    state medical malpractice laws did not jeopardize "the federal interest in uniformity of FEHBA

6    plan interpretation," *id.*

7    After carefully reviewing these decisions, the Court concludes that Lawson's UCL claim

8    does not represent a claim for benefits. The understanding of "benefits," as elucidated in *Roach*,

9    *Helfrich*, and *Botsford*, is that benefits pertain to an individual's medical coverage and payments

10    related to such medical coverage.  Benefits do not, however, pertain to claims related to data

11    privacy.  Accordingly, the Court finds that Lawson's UCL claim is not expressly preempted under

12    FEHBA's express preemption provision, 5 U.S.C. § 8902(m)(1).

13                **b.  Conflict Preemption**

14    Turning to the issue of conflict preemption, the Court notes that conflict preemption

15    applies when compliance with federal and state law is physically impossible (hereinafter referred

16    to as "impossibility preemption") or where the state law is an obstacle to the purposes and

17    objectives of the federal law (hereinafter referred to as "obstacle preemption").  "Courts will find

18    impossibility preemption where it is impossible for a private party to comply with both state and

19    federal requirements." *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 584 (6th Cir. 2013) (internal

20    quotation marks omitted).  Lawson's UCL claim is not subject to impossibility preemption.  It

21    would not be "impossible" for BCBSA to comply with both federal and state law.  All BCBSA

22    must do is take affirmative and reasonable measures to protect Plaintiffs' PII.  According to

23    Plaintiffs, Defendants' collective failure to take such steps resulted in the approximately 120

24    individual complaints filed against them.

25    Lawson's UCL claim is also not subject to obstacle preemption.  The Non-Anthem

26    Defendants' primary argument in this regard is that "the state law claims interfere with OPM's

27                                              79

28    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1  exclusive authority to police FEHBA carriers." Non-Anthem Reply at 9. According to the Non-

2  Anthem Defendants, the Federal BCBSA contract implicates uniquely federal interests, which thus

3  preempts parties from asserting state law claims. *Id.* at 10. These arguments largely repeat the

4  Non-Anthem Defendants' contentions concerning Plaintiffs' third party beneficiary claims. As

5  with those claims, the Court finds that OPM's exclusive authority does not apply to claims over an

6  individual's data privacy.

7       A review of the Congressional purpose behind FEHBA lends additional support to this

8  finding. A report from the House of Representatives, for instance, "expressed fear that the

9  imposition of state-law requirements on FEHBA contracts would result in . . . a lack of uniformity

10  of *benefits* for enrollees in the same plan." *Helfrich*, 804 F.3d at 1106 (quoting H.R. Rep. No. 95-

11  282 at 4 (1977)) (alteration omitted) (emphasis added). Additional reports from the House and

12  Senate further confirm the importance of FEHBA in the administration of benefits and medical

13  coverage. *See id.* at 1106–07 (citing additional reports). In other words, health benefits—rather

14  than promises concerning data privacy—represent the unique federal interests protected by

15  FEHBA. Accordingly, because data privacy is not a "benefit" under FEHBA and is not, therefore,

16  a uniquely federal interest, Lawson's UCL claim is not obstacle preempted.

17       In sum, the Court need not address whether Williams' Indiana negligence claim is

18  preempted because Plaintiffs can not proceed with this claim as a matter of law. In addition, the

19  Court finds that, as Plaintiffs concede, Lawson's California breach of contract claim is preempted.

20  Lawson's California breach of contract claim is therefore DISMISSED with prejudice. Finally,

21  the Court finds that Lawson's UCL claim is not preempted. Therefore, the Non-Anthem

22  Defendants' motion to dismiss Lawson's UCL claim is DENIED.

23  **IV.   CONCLUSION**

24       To conclude:

25       1.   The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

26            dismiss Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of

27                                                    80

28  Case No. 15-MD-02617-LHK
   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
   AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
   DISMISS

United States District Court
Northern District of California

1   Arizona, Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan;

2   Blue Cross and Blue Shield of North Carolina, Inc.; Highmark Health Services;

3   Highmark West Virginia, Inc.; BlueCross BlueShield of Tennessee, Inc.; Blue Cross

4   and Blue Shield of Vermont; and Blue Cross and Blue Shield of Illinois, with respect

5   to the selected claims at issue in the instant motions to dismiss.

6   2.   The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

7   dismiss Blue Cross and Blue Shield of Arizona, Inc.; BlueCross BlueShield of

8   Tennessee, Inc.; and Highmark West Virginia, Inc. from this action in its entirety.

9   3.   The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

10  dismiss all Non-Anthem Defendants against whom no specific factual allegations were

11  made with respect to Plaintiffs' New Jersey breach of contract, New York unjust

12  enrichment, New York General Business Law § 349, and California Unfair

13  Competition Law claims.

14  4.   The Court GRANTS with leave to amend Defendants' motions to dismiss Plaintiffs'

15  California breach of contract, New Jersey breach of contract, New York unjust

16  enrichment, and Georgia Information and Privacy Protection Act claims.  In addition,

17  the Court GRANTS with leave to amend Defendants' motion to dismiss Plaintiffs'

18  fraud claim under California's Unfair Competition Law.

19  5.   The Court GRANTS with prejudice Defendants' motions to dismiss Plaintiffs' Indiana

20  negligence, Kentucky Consumer Protection Act, Kentucky Data Breach Act, and

21  Plaintiff Lawson's California breach of contract claim.

22  6.   The Anthem and Non-Anthem Defendants' motions to dismiss are otherwise DENIED.

23  Should Plaintiffs elect to file an amended complaint curing the deficiencies identified

24  herein, Plaintiffs shall do so within 30 days of the date of this Order.  Failure to meet the 30 day

25  deadline to file an amended complaint or failure to cure the deficiencies identified in this Order

26  will result in a dismissal with prejudice.  Plaintiffs may not add new causes of actions or parties

27                                                    81

1    without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure

2    15.

3    **IT IS SO ORDERED.**

4    Dated:  February 14, 2016

5                                                                         *Lucy H. Koh*

6                                                                    LUCY H. KOH
                                                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                         82

United States District Court
Northern District of California