# EXHIBIT 8

ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile:  (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:   (202) 408-4699

*Lead Plaintiffs' Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION . | Case No. 5:15-md-02617-LHK<br><br>**DECLARATION OF GARRON KARABELNIK** |

**I.      BACKGROUND**

1.      I am the President of G Squared Computing, LLC.  I am a computer, network and information security expert.  I attended college specializing in Telecommunications and Film but rapidly migrated into the information technology arena and starting to work for a regional

informational technology and internet service provider. While still in college I worked with the FBI, who under my direct guidance and involvement arrested and successfully prosecuted the largest credit card hacker discovered at that time (1997). I am well versed in the methods and techniques used by hackers in large scale network penetrations as well as law enforcement techniques used in countering them. I have been a successful owner of a technology oriented company for the past twelve years, handling accounts for companies ranging in size from small local firms to large multi-national firms in a wide range of technical areas. We routinely handle network design, network and information security, penetration testing, data remediation, mobile device management and malware and virus removal. I make this declaration in response to the letter brief from Anthem in the above-captioned case in which it seeks forensic information from Plaintiffs' computers and other electronic devices. If requested, I could competently testify to the following information.

## II. EXTRACTING FORENSICALLY SOUND IMAGES FROM COMPUTERS AND OTHER DEVICES

2. A "forensically sound image" means an image that has been cryptographically signed by a "hash," a mathematical function that creates an unforgeable irreversible checksum. If the image has been modified in any way since it was taken, the hash of all the embedded data won't match such that the image will no longer be forensically sound.

3. While forensic imaging software will automatically create a forensically sound image, this software costs many thousands of dollars. This is not "off the shelf" software that an untrained layperson can download and use himself. Generally, the process of capturing a forensically sound image must be performed by an imaging technician who attests to the process, such that it is considered to be trustworthy irrespective of the chain of custody. Thus, Plaintiffs cannot themselves capture forensically sound images of their own computers. Either a trained technician will need to go to Plaintiffs' houses to extract the images, or the Plaintiffs will need to disconnect any desktop computers and bring them, along with any laptop computers, to a trained technician for examination. It generally takes many hours, depending on the size and speed of the

disk storage, to obtain a forensically sound image of a computer, during which time the device is not usable.

## III. DETECTION OF MALWARE WILL NOT SHOW THAT PII HAS BEEN STOLEN FROM PLAINTIFF'S COMPUTERS

4. There is no universal definition of the term "malware," and Defendants do not define this term in their request. The term could potentially be interpreted very broadly. For example, most malware scanners detect and remove website tracking "cookies" during a malware scan, but if cookies were incorporated within the scope of Defendants' request, then nearly all, if not all, of Plaintiffs' personal computers would be considered to have malware. Website cookies are simply data files generated when a user visits a website and saved by the user's web browser. The main purpose of cookies is to remember information about the user. Cookies are not used to detect and extract PII or PHI.

5. Many software applications designed to detect malware broadly look for any software performing any function not intended by the owner of the computer. In many circumstances, this may be a reasonable definition of "malware." However, the only "malware" of interest in this case is malware that is designed to or is able to extract PII or PHI. This software is more narrowly referred to as "crimeware," indicating that its primary purpose is to perpetrate a crime.

6. Symantec detected more than three hundred seventeen million new malware variants in 2014 alone. *See* http://www.symantec.com/content/en/us/enterprise/images/mktg/Symantec/Email/12395/FY16_Symantec_WSTR_PT1_final.pdf at page 22. Of the hundreds of millions, or potentially billions, of programs capable of being used as malware, only a tiny percentage of them are capable of finding and extracting PII or PHI on the plaintiffs' computers, and all of those operate by giving access to a human hacker who must then carry out the search and exfiltration tasks by means of a remote control connection setup by the malware.

7. The most common form of malware is called "adware." The purpose of adware is to download or display unwanted ads when a user is online or to force users to open specific

websites where the authors of the adware are registered as advertising referrers, such that they are paid by some advertising agency for delivering unique viewers. Adware is not used to detect and extract PII or PHI.

8. After adware, the next most common form of malware is designed to directly extort money from or be paid for services (such as the removal of said malware) by the end-user. The third most common form of malware is of the type that utilizes the resources of the victim computer to perpetrate large-scale cyber-attacks against third parties by harnessing many thousands of victim computers and controlling them to simultaneously deliver attacks from various locations throughout the Internet. The fourth most common form of malware is of the type that allows remote control of victim computers in order to proxy their Internet connections and perpetrate hacking against third parties that cannot be traced back to the original hacker. The extraction of PII or PHI from individuals' computers is not a common utilization of malware because of the difficulty of finding PII or PHI in the unstructured data of the victim computer (discussed further in Section VI below).

9. Defendants point to "keystroke loggers" as an example of malware which is capable of obtaining PII. While keystroke loggers are technically capable of obtaining PII, they are not well-suited to doing so and thus are not typically used to extract PII other than account credentials and passwords. Keystroke loggers only receive information that the user types in while they're typing it, and such information generally exists without context. Hackers primarily use keystroke loggers for harvesting of user credentials. For a keystroke logger to capture a social security number, for example, it must be active while the end-user types the social security number into their keyboard. This is not a common activity and most end-users will not type their social security number (or other significant PII) into their computer in a typical month (as opposed to their computer password, which they may type in every time they log on).

10. In my practice as a network administrator, and in the practice of my network services providing company, neither I nor any of my staff have ever encountered malware whose purpose was to obtain PII or PHI from personal computers other than keystroke loggers. According to the 2016 Verizon Data Breach Investigation Report, only 4% of Crimeware

1308187.3 - 4 - DECLARATION OF EXPERT GARRON KARABELNIK
RE FORENSIC EXAMINATION
CASE NO. 5:15-MD-02617-LHK

(defined as the subset of malware intended to perpetrate crimes, rather than display ads or re-utilize the computer's resources) are capable of any kind of data extraction from the computer upon which they are installed, and the vast majority of these data extraction tools capture account credentials and passwords, not PII. Defendants have not identified any examples of real-world infections of malware, the purpose of which is extract PII or PHI from personal computers, and it is my opinion that they will be hard-pressed to find any such examples.

11. In sum, the fact that a Plaintiff's computer contains malware does not mean that PII or PHI was extracted from the computer. This is true even if the malware detected was of the type that allows hackers to control the computer remotely. Thus, even if Defendants were to detect malware on any of the Plaintiffs' computers, they would not be able to show that the malware was used to detect and extract PII or PHI.

### IV. DEFENDANTS' PROPOSAL WOULD LIKELY NOT DETECT MALWARE THAT WAS PRESENT ON PLAINTIFFS' COMPUTERS AT THE TIME OF OR PRIOR TO THE ANTHEM DATA BREACH

12. Even if Plaintiffs' computers had been compromised by mythical malware that extracts PII or PHI, such malware would have had to have been present on their computers prior to December of 2014 when PII and PHI began to be extracted from Anthem's network. Such malware most certainly would no longer be detected on Plaintiffs' computers, as 98% of Windows computer users run anti-Malware software on their computers (according to the 2016 DBIR). First, many users routinely replace computers within a three-year period, meaning that many of the Plaintiffs likely replaced their computers prior to learning of the Anthem data breach. With respect to the computers still in Plaintiffs' possession, malware present on their computers on or before December 2014 would have been removed upon first being detected by antivirus software on Plaintiffs' computers, long before Anthem notified Plaintiffs of the data breach. Moreover, indicators of past infection by malware, such as system logs, are routinely configured by default to expire after 30 days and be overwritten; the vast majority of computer users do not even know about these logs or how they would configure them to retain data should they even consider a need to. Residual information regarding deleted files is routinely overwritten as space is needed, and after many weeks there would be little, if any, remaining information regarding

any previous malware infection to report. Defendants most likely waited too long to report their data breach to have given Plaintiffs any opportunity to preserve this sort of evidence in any useful form.

## V.    OTHER INDICATORS OF COMPROMISE ARE NOT LIKELY TO SHOW THAT PII HAS BEEN EXTRACTED FROM PLAINTIFFS' COMPUTERS

13.    It would be difficult, if not impossible, for Defendants to otherwise determine that PHI or PII had, in fact, been extracted from Plaintiffs' computers based solely on forensic images of Plaintiffs' computers.  General purpose personal computers are not configured by default to routinely create file access logged information trails and security audit trails the way that enterprise systems such as servers and data storage arrays are configured.  Furthermore, end-users do not invest in the types of enterprise-grade logging and alerting software to record the necessary information to completely reconstruct a hacking attack.  While some information is recoverable from file-system meta-data, it is by no means comprehensive enough to determine conclusively whether or not any specific information was extracted in the past from a personal computer or device over the network.

## VI.   HACKERS ARE UNLIKELY TO TARGET PERSONAL COMPUTERS TO EXTRACT PII

14.    In all cases, PII and PHI must be extracted from computers manually, by human hackers.  Because individual computers contain the PII or PHI of only a single individual, it is not worth a human hacker's time to target personal computers for the purpose of detecting and extracting PII.

15.    First, criminal hackers typically do not hack for pleasure; they hack for profit. Human hackers make return-on-investment calculations the same as everyone else, and so they go after large caches of poorly defended PII or PHI, such as the servers at Anthem.  Only large and high quality datasets of PII or PHI, such as those obtained from large data breaches, are available for sale on the dark net.  Persons do not seek to buy a single individual's PII or PHI on the dark net, unless perhaps the stolen PII or PHI pertains to a person of import.  Thus, hackers go where the data on many persons in the aggregate resides; *i.e.* large companies like Anthem that collect PHI and PII for many thousands or millions of individuals, not individual home computers.

16. According to Symantec, the world's largest provider of anti-malware and cybersecurity software, the value of a single individual's PII data in the cyber-crime black market for the original seller is between $0.10 and $20 dollars (depending on quality, completeness, etc.) per individual. Given that it takes many hours of manual labor to extract high-quality PII from the unstructured data on a personal computer, the return on time invested would be minimal. The value of exploiting a database holding millions of records of data, such as that operated by defendants, is exceptionally valuable at these rates. *See* http://www.symantec.com/connect/blogs/underground-black-market-thriving-trade-stolen-data-malware-and-attack-services.

17. Second, it would take significant time and resources to search individual personal computers or devices, one-by-one, for a useful amount of PII or PHI that could be sold in the dark economy.  This is especially so because such data, if it exists at all on personal computers or devices, would be stored in random, unstructured places such as Word Documents, PDFs, and Internet caches.  Personal computers or devices do not contain the software to perform searches for PII or PHI stored in such unstructured data.  Unstructured data can only be searched by keyword, but performing keyword searches when one does not already know the keyword (the data being sought) in question is impossible.  For example, there is no way to search for credit card numbers in general without already knowing what the credit card number is, because these numbers are not stored using a regular pattern or structure of data.  This is different than large structured databases where, for example, all credit card numbers may be stored in a database column called "credit card number."

18. The low likelihood that hackers would be able to find PII or PHI on personal computers or devices that, if present at all, would appear in random, unstructured, documents, combined with the low value of obtaining PHI or PII for a single individual as compared to the work required to extract it, combined with the low likelihood that Anthem could discover evidence of hacking of PII or PHI from personal device systems that do not record security information, all reduce the probability of any usable evidence being found in this effort to nearly zero.

19. Defendants still wish to examine computers running operating systems other than Microsoft Windows, but computers running Microsoft Windows are typically the only computers affected by malware. Macintosh and Linux are not routinely affected by malware, and no malware whose purpose is to extract PII has ever been reported for these platforms.

20. Defendants have declined to provide a list of software to be used to detect malware to class counsel. Anti-malware software including malware scanners routinely over-report malware in order to scare end-users into purchasing the malware scanner software. It is also possible for the digital patterns that malware scanners look for to be coincidentally present in non-malware files, resulting in mis-detection. Finally, many malware scanners consider routine non-malicious data such as website cookies to be malware when in fact they pose no threat whatsoever. For these reasons, it is likely that the malware scanners used by technicians will report malware when no malware is present.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of July, 2016.

_____

**GARRON KARABELNIK**