# TAB 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

§
§
§
§
In Re Anthem, Inc. Data Breach Litigation    §        Case No. 15-MD-02617-LHK
§
§
§
§
§

**EXPERT REPORT OF PETER E. ROSSI**

**DECEMBER 2, 2016**

**TABLE OF CONTENTS**

I.      **Introduction** ................................................................................................... **2**
    A.   Qualifications ....................................................................................... 2
    B.   Assignment and Compensation ........................................................... 4
    C.   Summary of Conclusions .................................................................... 5
    D.   Materials Considered ........................................................................... 6
II.     **Background** ..................................................................................................... **7**
    A.   Overview of Anthem and Product Offering ........................................ 7
        1.   Anthem ..................................................................................... 7
        2.   Product Offering ...................................................................... 8
    B.   Overview of Anthem's Data Breach .................................................... 9
    C.   Plaintiffs' Claims Regarding Anthems' Data Security Procedures...... 11
III.    **Overview of Health Insurance and Benefit Market** ................................. **14**
    A.   Health Insurance and Benefit Plan Features ...................................... 14
    B.   Health Insurance Market .................................................................... 16
        1.   Group Plans ............................................................................ 16
        2.   Medicare ................................................................................. 19
        3.   Medicaid ................................................................................. 22
        4.   Individual plans ..................................................................... 23
IV.     **Price and Valuation Theory** ...................................................................... **25**
    A.   Price Premium Theory of Damages ................................................... 25
    B.   Measuring the Market Price Premium................................................ 28
    C.   A Short History of Conjoint Analysis ............................................... 31
        1.   Origins and Development of Conjoint Analysis .................... 31
        2.   Commercial Applications of Conjoint ................................... 34
        3.   Litigation Applications of Conjoint ...................................... 37
V.      **Survey and Calculations** ........................................................................... **39**
    A.   Survey Proposal................................................................................. 39
        1.   Process for Selecting Attributes and Levels........................... 39
        2.   Sample Frames and Sample Size ........................................... 43
    B.   Survey Process ................................................................................... 44
    C.   Price Premia Calculations ................................................................. 45
VI.     **Summary** .................................................................................................... **46**

**EXPERT REPORT OF PETER E. ROSSI**

**I.**  **Introduction**

    **A.**  **Qualifications**

1.  I am the James Collins Professor of Marketing, Statistics and Economics at the Anderson School of Management, UCLA. I hold a joint appointment in the Anderson School and the Economics Department. I received my BA in 1976 from Oberlin College with a double major in mathematics and history. My graduate degrees are from University of Chicago (MBA (1980) and PhD (1984)). I received my PhD in Econometrics which is the science of the application of statistical methods to economic data. During my doctoral training, I completed a wide variety of courses in sampling theory, statistics, econometrics, and economics.

2.  My first faculty appointment was at the Kellogg Graduate School of Management where I served as assistant professor of Managerial Economics. In 1985, I moved to the University of Chicago's Booth School of Business where I was appointed as assistant professor of econometrics and statistics. In 1994, I was promoted to Professor of Econometrics and Marketing. In 1996, I received an endowed chair. At the University of Chicago, I taught both masters and doctoral courses in statistics, market research, econometrics and economics. In 2009, I joined the Anderson School of Management as Collins Distinguished Professor. At Anderson, I have taught both doctoral and masters levels courses in Econometrics, Bayesian Statistics, New Product Development, and Data Analytics.

3.  In Exhibit A, I provide my Curriculum Vitae. I have authored over 65 refereed publications in leading journals in Statistics, Economics, Econometrics, and Marketing. I am the author

of books published by John Wiley and Sons and Princeton University Press. My published research has received wide attention as evidenced by more than 14,000 citations on Google Scholar. I have been elected fellow of the American Statistical Association and the Journal of Econometrics in partial recognition for my research contributions. My doctoral students are on the faculties of many leading research universities including Ohio State, Carnegie-Mellon, and the University of Rochester.

4.    I am senior editor of *Marketing Science* and founding editor of *Quantitative Marketing and Economics* (QME). These are two of the top three journals in the area of quantitative marketing.

5.    My research in marketing has focused on the quantitative evaluation of various marketing activities including pricing, promotions, and advertising. The goal of this research is to estimate the effects of marketing actions and help inform firms as to how to alter their marketing activities so as to improve profits. My research has been widely used in commercial contexts. For example, I helped found DemandTec (IPO in 2007 on NASDAQ and bought by IBM in 2012). DemandTec used my research ideas to help optimize the pricing, promotion, and assortment of consumer products.

6.    I have also been a key innovator in developing statistical methods for application to demand, marketing and survey data. In particular, I have been a pioneer in the development and application of Bayesian statistical methods for marketing and economics problems. My book, Bayeisan Statistics and Marketing (2005, Wiley) summarizes many of these efforts. More recently, I am the author of an advanced book on Bayesian methods for Princeton University Press.

3

7.    I have been involved in the design and analysis of survey data for more than 30 years. In particular, I helped pioneer (along with my student, Professor Greg Allenby (Ohio State)) the methods used in the analysis of conjoint survey data. Today, thousands of conjoint survey studies are analyzed each year using my Bayesian methods (see, for example, the proceedings of the bi-annual Sawtooth Software Conference for many examples of conjoint analysis applied in a commercial setting). The most widely used statistical software (R and SAS) contain implementations of methods for analysis of conjoint survey data which were developed by me. My R package, bayesm, is considered part of the core Bayesian statistical packages and is used across the world to analyze conjoint survey data.

8.    I have designed, supervised the fielding, and analyzed surveys in a wide variety of both business and litigation contexts. In the commercial sphere, I have designed surveys for many different consumer goods including over-the-counter pharmaceutical medications, packaged food products, personal grooming products such as razors, and digital cameras. I have published specifically on the use of conjoint surveys for valuation of product features.

9.    In a litigation context, I have been one of the pioneers in recognizing the value of conjoint-style surveys for patent valuation. I am the author of the only peer-reviewed paper that I am aware of on the use of conjoint surveys to establish damages in patent ligation. I have also served as an expert on the use of conjoint studies in consumer fraud, anti-trust, and false advertising. Exhibit B provides a full list of cases in which I have testified in the past four years.

**B.    Assignment and Compensation**

10.   I have been asked by counsel for the Plaintiffs to assume both that Defendants did not

4

provide appropriate data security and that the court or jury determines that Defendants are liable to at least some of the class members for that reason.[1] Counsel for Plaintiffs has informed me that one measure of damages in this litigation is known as "benefit of the bargain damages," which I am informed is a measure of damages that would place each class member "in the same position he would have been" in if Anthem had never committed the wrongdoing alleged in Plaintiffs' complaint.[2]

11.     Specifically, I have been asked whether and how the tools of survey research and economic analysis can be used to determine damages.

12.     I am compensated for my work in this matter at my standard rate of $900/hr. Employees of Analysis Group, Inc., an economic consulting firm, working under my direction, have assisted me in this assignment. My compensation in this matter is not contingent upon my findings or the outcome of this litigation.

###     C.     Summary of Conclusions

13.     If the court or jury determines that the defendants are liable, the tools of survey research and economic analysis can be used to determine damages. In my opinion, a sensible and objective measure of such damages that accords with economic principles is a Market Price Premium[3] theory. A market price premium should be based on the difference between the market price of the product with data security features the plaintiffs should have been

---

[1] All named Plaintiffs are identified in the Third Consolidated Amended Complaint, July 11, 2016 ("TAC"), at ¶¶ 12-122.
[2] See TAC, at ¶¶ 445-1175.
[3] The word "premium" does not referred to a "premium" that may be paid by insureds for their insurance coverage.

provided and the product as delivered. This difference represents the price premium that the court or jury has determined the defendants obtained by illegal means. I interpret that "benefit of a bargain theory of damages" may require that this price premium be paid to the class members to leave them in the same economic position as they would have been in if the defendants did not commit the wrongdoing alleged by the plaintiffs.

14.     I propose estimating the market price premiums associated with the difference between the level of data security expected and delivered based on methodologies demonstrated in my own published research. This approach will use conjoint analysis, a widely-employed survey method and associated analysis that has a long history in the valuation of products and product features.  Specifically, I propose to design and field several conjoint surveys to obtain estimates of customer demand for data security.  This data generated by conjoint surveys will serve as the basis for constructing consumer demand for the defendants' products at various levels of data security. This demand analysis coupled with equilibrium price computations will provide an estimate of the market price differentials or market price premiums.  Given the market price premiums, it is a simple matter to establish damages for the proposed class by applying the price premium to the amounts paid for class members' insurance.

### D.       Materials Considered

15.     In order to better understand the underlying issues involved in this case, I asked Plaintiffs' Counsel to provide me with a wide range of materials that I have now reviewed and considered in forming my opinions and writing this report. I have reviewed the Plaintiffs' Third Amended Complaint and other legal documents in this case, internal Anthem

documents, including but not limited to Anthem policies regarding data security, Anthem website materials, and Anthem financial information. The complete list of the materials I considered for this report is contained in Exhibit C of this report.

## II.     Background

### A.     Overview of Anthem and Product Offering

#### 1.     Anthem

16.   Anthem is one of the nation's leading health benefit companies, serving 39.9 million medical members, and offering plans to large and small employers, individuals, Medicaid, and Medicare markets, in addition to managed care services to self-funded customers and the federal government.[4] Anthem operates as an independent licensee of the Blue Cross and Blue Shield Association (BCBSA), which is an association of independent health benefit plans[5] that includes companies which are not owned by Anthem.[6]

17.   Anthem serves its members through its subsidiary companies. These subsidiaries can be divided into two groups: those which are BCBS-licensed and those which do not offer Blue Cross and/or Blue Shield products and services.[7]

------

[4] Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 7. *See also*, Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 7, and Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 7.

[5] Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 3. *See also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 3, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 3.

[6] For a complete list of companies in the BCBSA, see http://www.bcbs.com/about-the-companies/ (viewed November 16, 2016). For a list of Anthem companies that offer Blue Cross and/or Blue Shield products and services, see Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 3; *see also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 3, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 3.

[7] https://www.antheminc.com/Companies/index.htm (viewed November 16, 2016); https://www.antheminc.com/Companies/AffiliatedSpecialtyCompanies/index.htm (viewed November 16, 2016).

## 2.    Product Offering

18.    Anthem offers products to a broad range of customer segments.[8] Anthem subsidiaries sell group insurance and health benefits products to both local and national employers, including the federal government.[9] The plans sold to employers consist of both fully-insured products and self-funded products in which Anthem provides administrative services in exchange for a fixed fee.[10] Anthem also provides Medicare Advantage and Medicare Supplement benefit coverage as an option for Medicare enrollees, and acts as a state-sponsored managed care organization for Medicaid enrollees.[11] Anthem offers individual and small group insurance plans both on and off the ACA marketplace exchanges in 14 states.[12] Anthem also sells specialty insurance products including vision and dental plans, to individuals and groups. Finally, Anthem acts as a "host" for "BlueCard" customers who are members enrolled in plans sold by BCBS entities not owned by Anthem, but who receive services from a BCBS provider in one of Anthem's licensed BCBS market areas.[13]

19.    Of the segments, employer- or group-sponsored insurance is the largest with 24.8 million

---

[8] Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 42; *see also*, Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 39, and Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 33.

[9] https://www.antheminc.com/aboutantheminc/customersegments/index.htm (viewed November 16, 2016).

[10] Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 5; *see also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 4, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 4.

[11] https://www.antheminc.com/aboutantheminc/customersegments/index.htm (viewed November 16, 2016).

[12] Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 9; *see also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 9, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 9.

[13] https://www.antheminc.com/aboutantheminc/customersegments/index.htm (viewed November 16, 2016); https://www.anthem.com/wps/portal/ahpprovider?content_path=provider/me/f5/s2/t0/pw_036838.htm&state=me&label=What%20is%20the%20BlueCard%20Program? (viewed November 16, 2016).

members, or about two thirds of Anthem's business.[14] Anthem's Medicare Advantage had

1.4 million members, while its Medicaid MCO had 6.4 million members.[15] Anthem had 1.8

million members on individual plans and acted as a host for 5.6 million BlueCard

members.[16] Finally, Anthem had 21.6 million members on specialty product plans, including

dental and vision.[17]

20.    Within each of these markets, Anthem offers a wide variety of products and services to its

medical members. The types of plans Anthem offers include PPO, HMO, EPO, POS, and

consumer driven health plans, including high-deductible plans.[18] Anthem also offers

individual and small group products on the public exchanges that fit the ACA "metal"

product requirements (bronze, silver, gold, or platinum). In addition to these plans, Anthem

also offers traditional indemnity plans, life insurance, and disability products.[19]

### B.    Overview of Anthem's Data Breach

---

[14] Employer sponsored insurance includes Anthem's Local Group, with 15.4 million members, National Accounts with 7.8 million members and Federal Employees Program with 1.6 million members.  Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 43. For 2015 membership numbers, see Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 40, and for 2014 membership numbers, see Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 34.

[15] Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 43. For 2015 membership numbers, see Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 40, and for 2014 membership numbers, see Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 34.

[16] Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 43. For 2015 membership numbers, see Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 40, and for 2014 membership numbers, see Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 34.

[17] Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016, at 43. For 2015 membership numbers, see Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015, at 40, and for 2014 membership numbers, see Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014, at 34.

[18] Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 9-11; *see also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 9-11, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 8-11.

[19] Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015, at 9-11; *see also*, Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014, at 9-11, and Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013, at 8-11.

21.   In February 2015, Anthem publically announced that its database containing personal information on approximately 80 million current and former customers was breached by a cyberattack.[20] Anthem believed that the attack began in early December 2014 and continued through January 31, 2015.[21] Anthem informed affected members about the attack between February 2015 and March 2015.[22]

22.   The information accessed included personal information, such as names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, and employment information, including income data.[23]

23.   The impacted lines of business included customers enrolled in plans offered by all Anthem subsidiaries, including the Anthem and Empire Blue Cross Blue Shield companies, Amerigroup, Caremore, HealthLink, and UniCare.[24]

24.   Customers of Non-Anthem Blue Cross and Blue Shield companies who used their Blue Cross and Blue Shield insurance in one of fourteen states where Anthem operates were also impacted, including in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.[25]

-----

[20] Mathews, Anna Wilde and Danny Yadron, "Health Insurer Anthem Hit by Hackers, Breach Gets Away With Names, Social Security Numbers of Customers, Employees," *The Wall Street Journal*, February 4, 2015; Abelson, Reed and Matthew Goldstein, "Anthem Hacking Points to Security Vulnerability of Health Care Industry," *The New York Times*, February 5, 2015.

[21] Notice from Anthem, May 8, 2015, https://www.anthemfacts.com/ (viewed November 10, 2016); Order Granting in Part and Denying in Part Anthem Defendants' Motion to Dismiss and Order Granting in Part and Denying in Part Non-Anthem Defendants' Motion to Dismiss ("MTD"), at 4.

[22] MTD, at 4.

[23] Notice from Anthem, May 8, 2015, https://www.anthemfacts.com/ (viewed November 10, 2016).

[24] https://www.anthemfacts.com/ (viewed November 10, 2016).

[25] https://www.anthemfacts.com/ (viewed November 10, 2016).

### C.     Plaintiffs' Claims Regarding Anthems' Data Security Procedures

25.   The defendants are providers of various insurance and health benefit plans. The defendants provide health care insurance and benefits to millions of members either through individual, group, or government plans. Sensitive personal information pertaining to these members including personal identification, financial information, and records of medical claims is collected by the defendants. This information is processed through various databases and information systems throughout Anthem and its subsidiaries, and is aggregated and compiled by Anthem in a single data warehouse.[26]

26.   Plaintiffs allege in their Third Amended Complaint that Anthem experienced a breach of this data warehouse, resulting in unauthorized access and exfiltration of the sensitive personal information of approximately 79 million individuals.[27]

27.   The plaintiffs claim that despite aggregating sensitive personal information subject to legal protections, Anthem failed to adequately safeguard this data, including violating the requirements of HIPAA and industry standards.[28]

28.   Plaintiffs also allege that the Defendants informed their customers and the public that they had privacy policies and practices that protected the confidentiality of sensitive personal information that they collect, and that Defendants made these privacy policies and commitments available in a variety of documents, including on Defendants' websites, in written privacy notices, and in contract documents. In these contract terms and other

---

[26] TAC, at ¶¶168-172.
[27] TAC, at ¶383.
[28] TAC, at ¶¶2-5.

11

representations to Plaintiffs and the public, I understand that Plaintiffs allege that Defendants were obligated to protect their members' information, consistent with industry standards and federal and state law. Plaintiffs allege that Defendants failed to comply with this obligation.[29]

29.     For example, prior to and after the data breach, Anthem had a "Personal Information (including Social Security Number) Privacy Protection Policy" that it made available to members of the public on its website.[30] This policy states that Anthem:

> [M]aintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members… Anthem Blue Cross and Blue Shield's Privacy Policy imposes a number of standards to: guard the confidentiality of Social Security numbers and other personal information, prohibit the unlawful disclosure of Social Security numbers, and limit access to Social Security numbers.[31]

30.     Additionally, the policy stated that Anthem "safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place."[32]

31.     Plaintiffs also allege that consistent with HIPAA and state privacy laws, Anthem has also provided all of its members with a Notice of Privacy Practices, which stated that Anthem was "fully committed to the spirit and letter of… including but not limited to the Privacy Rule that was issued pursuant to HIPAA."[33] The notice further stated that a "major provision

---

[29] TAC, at ¶4.
[30] TAC, at ¶¶175-176.
[31] TAC, at ¶175.
[32] TAC, at ¶175.
[33] TAC, at ¶178.

of the Privacy Rule is to safeguard sensitive, personal information about members."[34]   The

Notice also states:

> We are dedicated to protecting your PHI, and have set up a
> number of policies and practices to help make sure your PHI is
> kept secure.
>
> We have to keep your PHI private. If we believe your PHI has
> been breached, we must let you know.
>
> We keep your oral, written and electronic PHI safe using physical,
> electronic, and procedural means. These safeguards follow federal
> and state laws. Some of the ways we keep your PHI safe include
> securing offices that hold PHI, password-protecting computers,
> and locking storage areas and filing cabinets. We require our
> employees to protect PHI through written policies and procedures.
> These policies limit access to PHI to only those employees who
> need the data to do their job.[35]

32.     I understand that Plaintiffs allege that at no time prior to the breach, did Anthem inform its

members that it was not complying with its stated policies or practices with respect to the

security and confidentiality of member personal information.[36]

33.     Despite the privacy practices distributed to customers and the internal data security practices

that Anthem had in place on paper, I understand that Plaintiffs allege that these policies and

practices were not fully adhered to by Anthem.[37]

34.     Plaintiffs allege that Anthem failed to implement basic industry-accepted data security tools

to prevent hackers from accessing the Anthem data warehouse: that Anthem did not require

the users of their computer systems to use a two-factor authentication procedure to enter

---

[34] TAC, at ¶178.
[35] TAC, at ¶182.
[36] TAC, at ¶4.
[37] TAC, at ¶4.

13

their computer systems; that Anthem did not require users to change their passwords; that Anthem allowed users to access personal information even when those users did not need to access that information for job-related purposes; and that Anthem failed to encrypt the sensitive personal information within the Anthem Database.[38] I understand that Plaintiffs further allege that Anthem failed to inform its customers that it did not follow these industry-standard security practices, and otherwise failed to inform its members that it was not complying with legally mandated and/or promised data security.[39]

35.     Plaintiffs' Third Consolidated Amended Complaint alleges a variety of legal claims against the Anthem and Non-Anthem Defendants arising out of the Anthem Data Breach and the failure to provide adequate security for customers' personal information, including names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, employment information, and income data. Plaintiffs claim that Anthem breached its contracts with approximately 80 million Americans (the "Affected Individuals"), was negligent and unjustly enriched, and violated many state consumer protection statutes. Likewise, Plaintiffs allege that the Non-Anthem Defendants also breached their contracts with Affected Individuals and were unjustly enriched, and violated various consumer protection statutes.[40]

## III.     Overview of Health Insurance and Benefit Market

### A.     Health Insurance and Benefit Plan Features

---

[38] TAC, at ¶5.
[39] TAC, at ¶4.
[40] TAC, at ¶¶ 2-8.

36.     Health insurance and benefit plans can vary across several features, all of which will affect consumer demand for those plans to a greater or lesser extent. These features include the cost of the plan, the types of services covered, and the health care providers the plan contracts with.

37.     Premiums function as the main "price" for purchasing health insurance and benefit plans. However, under most insurance and benefit plans, consumers will pay additional out-of-pocket costs when they receive health care services. These out-of-pocket expenses can consist of deductibles, copayments ("copays"), and coinsurance. A deductible is a fixed amount of medical expenses in a year that the customer is responsible for paying before his or her insurance plan begins to cover expenses.[41] Similarly, a copay is a fixed amount that the patient is responsible for paying each time he or she receives a service.[42] Unlike copays and deductibles, coinsurance is not a fixed amount; rather, the patient is responsible for paying a percentage of the contracted rate for the service he or she is receiving.[43] Each of these types of payments can vary across different types of services, as well as different health care providers.[44] Most plans have a maximum out-of-pocket limit that caps the amount of cost sharing that a customer can face.[45]

---

[41] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016); https://www.anthem.com/glossary/ (viewed November 25, 2016).
[42] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016); https://www.anthem.com/glossary/ (viewed November 25, 2016).
[43] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016); https://www.anthem.com/glossary/ (viewed November 25, 2016).
[44] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016).
[45] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016); https://www.anthem.com/glossary/ (viewed November 25, 2016).

38.     Insurance plans offer a network of health care providers that the insurer has contracted with

to provide services at a set price.[46] The hospitals and doctors that the insurer contracts with

are referred to as "in-network," while those not contracted with are "out of network." There

are a few main types of provider network structures: Preferred Provider Organizations

("PPOs"), Health Maintenance Organizations ("HMOs"), and Point-of-service ("POS").

With a PPO plan, a patient can see any doctor at any time; however, the patient will pay

lower out-of-pocket costs when seeing an in-network doctor.[47] With an HMO, only visits to

in-network doctors are covered.[48] Additionally, HMOs typically require that, before seeing a

specialist, the patient must first visit their primary care doctor and then receive a referral to a

specialist.[49] POS plans are a hybrid of the HMO and PPO structure—they operate similarly

to HMOs, but provide some coverage for out-of-network services.[50]

### B.     Health Insurance Market

#### 1.     Group Plans

##### a.     Overview

39.     Employer sponsored health insurance accounts for the single largest source of health

---

[46] Consumer Reports, How to Pick a Health Insurance Plan, September 2014,
http://www.consumerreports.org/cro/2012/09/understanding-health-insurance/index.htm (viewed November 23,
2016).
[47] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November
14, 2016); https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-
Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx (viewed November 14, 2016).
[48] https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-
Insurance-Plans/HMO-vs-PPO-Insurance.aspx (viewed November 14, 2016).
[49] https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-
Insurance-Plans/HMO-vs-PPO-Insurance.aspx (viewed November 14, 2016); http://www.bcbsm.com/index/health-
insurance-101/basics/hmo-ppo.html (viewed November 14, 2016).
[50] BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November
14, 2016); https://www.anthem.com/glossary/ (viewed November 25, 2016).

insurance in the U.S., covering about 155 million people.[51] This accounts for about half of the total U.S. population,[52] and two-thirds of all workers.[53]

40.    Typically, employers choose which plans to offer to their employees and also pay for a portion of employees' premiums.[54] Over 70 percent of firms offer their employees more than one plan option for insurance.[55] However, most of these option fall within the same plan "type"; that is, about 83 percent of firms offer only HMO plans, only PPO plans, or only POS plans.[56]

41.    In 2016, the average annual premium for employer sponsored health benefit plans was $6,435 for an individual and $18,142 for a family plan.[57] These costs were split between the employer and employee, with the average individual paying $1,129, or about 18 percent of the total premium, and families paying $5,277, or about 30 percent of the total premium.[58] Additionally, 83 percent of employer sponsored plans had an annual deductible, with an average deductible of $1,478.[59]

---

[51] Congressional Budget Office, "Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026," March 2016, at 30; "Health Insurance Coverage of the Total Population," The Kaiser Family Foundation, 2015.
[52] "Health Insurance Coverage of the Total Population," The Kaiser Family Foundation, 2015.
[53] Long, Michelle, Matthew Rae, Gary Claxton, and Anthony Damico, "Trends in Employer-Sponsored Insurance Offer and Coverage Rates, 1999-2014," The Kaiser Family Foundation Issue Brief, March 21, 2016, at 2.
[54] Andrew Villegas, "Employer Based Insurance Explained," The Kaiser Family Foundation, September 28, 2009, http://khn.org/news/npr-employer-explainer/ (viewed November 15, 2016).
[55] Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2015 Medical Expenditure Panel Survey-Insurance Component, Table I.B.2.c.
[56] Claxton, Gary, Matthew Rae, Michelle Long, Anthony Damico, Bradley Sawyer, Gregory Foster, Heidi Whitmore, and Lindsey Schapiro, "Employer Health Benefits, 2016 Annual Survey," The Kaiser Family Foundation and Health Research & Educational Trust, September 2016 ("Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016"), at 72-73.
[57] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 1.
[58] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 1-2.
[59] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 3-4.

42.   Most firms also have cost-sharing requirements in their offered plans. Copays are more common than coinsurance for doctors' visits—about two-thirds of covered workers had a copay for primary care and specialist visits, while about a quarter of covered workers had coinsurance for those visits.[60] In 2016, average copays were $24 for primary care and $38 for specialty office visits.[61] For hospital visits, coinsurance was more common – 64 percent of covered workers had coinsurance, while only 14 percent of covered workers had copays.[62] In 2016, average coinsurance for hospitalizations was 19 percent.[63]

43.   Nearly all employer sponsored plans included prescription drug benefits, with close to 90 percent of covered workers having a plan with a tiered drug formulary.[64] The average copay for a tier-1 drug (typically a generic) was $11, while the average copay for a tier-2 drug was around $30.[65] Some employer or group-sponsored plans include, or offer standalone, dental and vision benefits.

**b.   ASO Plans**

44.   Self-funded health benefit plans are an increasingly popular type of employer sponsored health benefit. In such self-funded plans, the employer purchases the administrative services for a health insurance plan, but does not actually purchase insurance.[66] That is, the employer self-funds the health benefits, which means it retains financial responsibility for its

---

[60] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 121.
[61] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 121.
[62] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 120-121.
[63] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 120-121.
[64] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 172.
[65] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 173.
[66] Letter from Melinda Reid Hatton, Senior Vice President & General Counsel for the American Hospital Association to William Baer, the Associate Attorney General, April 18, 2016.

18

employees' medical claims (either fully or up to a maximum "stop-loss"), while paying the insurance company to process and adjudicate the claims, pay providers, and manage other administrative services.[67]   Additionally, the employer will get access to the insurance company's health care provider network.[68]   From the insurance company's point of view, this is known as an "Administrative Services Only" or "ASO" plan, because the employer is purchasing only administrative services, rather than actual insurance.[69]

45.   In 2016, 61 percent of people on employer sponsored health benefits plans are in a self-funded health plan, up from 44 percent in 1999.[70] Large firms are more likely to offer insurance plans that are partially or completely self-funded, with 82 percent of firms with more than 200 employees and 13 percent of firms with less than 200 employees self-funding their employees' health plans.[71]

## 2.   Medicare

46.   Medicare is a federal program that provides health insurance to people over the age of 65, as well as people with permanent disabilities.[72] The program covers about 55 million people, or 17 percent of the total U.S. population, including 9 million people under the age of 65 with

---

[67] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 188; BLS, Definitions of Health Insurance Terms, http://www.bls.gov/ncs/ebs/sp/healthterms.pdf (viewed November 14, 2016); TAC, at ¶ 224.
[68] Letter from Melinda Reid Hatton, Senior Vice President & General Counsel for the American Hospital Association to William Baer, the Associate Attorney General, April 18, 2016.
[69] TAC, at ¶¶ 238-242.
[70] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 191.
[71] Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2016, at 8, 31.
[72] Cubanski, Juliette, Christina Swoope, Cristina Boccuti, Gretchen Jacobson, Giselle Casillas, Shannon Griffin, and Tricia Neuman, "A Primer on Medicare," The Kaiser Family Foundation, March 2015 ("Kaiser Primer on Medicare"), at 1.

permanent disabilities.[73] Most people under the age of 65 who have Medicare qualify because they participate in the Social Security Disability Insurance program.[74]

47.    Most Medicare beneficiaries are automatically enrolled in Medicare Part A and Part B, which provide hospital and medical insurance, respectively.[75] While Medicare Part A is provided free of charge to all beneficiaries, Medicare Part B has a premium for enrollees who meet a certain income threshold.[76] People receiving Medicare can opt out of Medicare Part B if they do not wish to pay the premium.[77]

48.    However, rather than accept traditional Medicare as administered by the government, beneficiaries can also choose to enroll in Medicare Advantage, which is administered by private insurance companies.[78] In 2016, 17.6 million Medicare enrollees, or 31 percent, had Medicare Advantage.[79] Of these, 64 percent had an HMO plan, while 30 percent had a local or regional PPO plan.[80]

49.    Medicare Advantage plans must provide at least the benefits offered by Medicare Part A and Part B and receive an annual fixed fee per enrollee to administer those benefits that the

---

[73] Kaiser Primer on Medicare, at 1; "Medicare Beneficiaries as a Percent of Total Population," The Kaiser Family Foundation, 2015.
[74] Congressional Budget Office, "Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026," March 2016, at 30.
[75] "When & how to sign up for Part A & Part B," https://www.medicare.gov/sign-up-change-plans/get-parts-a-and-b/when-how-to-sign-up-for-part-a-and-part-b.html (viewed November 16, 2016).
[76] Kaiser Primer on Medicare, at 2.
[77] "When & how to sign up for Part A & Part B," https://www.medicare.gov/sign-up-change-plans/get-parts-a-and-b/when-how-to-sign-up-for-part-a-and-part-b.html (viewed November 16, 2016).
[78] Kaiser Primer on Medicare, at 2.
[79] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).
[80] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).

enrollee would have received under traditional Medicare.[81] Private insurers submit bids to Medicare to determine their reimbursement rate – the plan submits an estimate of its cost per enrollee, which is then compared to a county-level benchmark.[82] If the bid is higher than the benchmark, enrollees pay the difference in their premiums; if the bid is lower, the plan and Medicare split the difference between the bid and the benchmark.[83] The enrollee then pays the Medicare Part B premium, and if required, an additional premium to their private plan.[84]

50.    In 2016, average monthly premiums for Medicare Part B were about $122,[85] while average Medicare Advantage plan premiums were $37.[86] The average out-of-pocket maximum for Medicare Advantage plans was $5,223.[87]

51.    Private insurers also offer prescription drug, or Part D, benefits, either by themselves or as part of a Medicare Advantage plan.[88] Part D benefits are optional and typically require a monthly premium, plus cost sharing for prescriptions.[89] In 2015, about 42 million Medicare beneficiaries were enrolled in Part D.[90] Additionally, 87 percent of Medicare Advantage

---

[81] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).
[82] Kaiser Primer on Medicare, at 16.
[83] Kaiser Primer on Medicare, at 16.
[84] Kaiser Primer on Medicare, at 9.
[85] "Part B costs," https://www.medicare.gov/your-medicare-costs/part-b-costs/part-b-costs.html (viewed November 16, 2016).
[86] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).
[87] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).
[88] Kaiser Primer on Medicare, at 2.
[89] Kaiser Primer on Medicare, at 2.
[90] Kaiser Primer on Medicare, at 2.

plans offered prescription drug benefits.[91] The minimum required benefit for Part D benefits in 2016 was a $360 deductible, followed by 25 percent coinsurance up to an initial coverage limit of $3,310.[92]

### 3. Medicaid

52.     Medicaid offers public health insurance for low-income people. Medicaid is designed and administered by state governments and jointly paid for by states and the federal government.[93] Non-elderly adults who are at or below 133 percent of the federal poverty line[94] may be eligible for Medicaid.[95] About 62 million people, or 20 percent of the total U.S. population, have Medicaid.[96]

53.     Most states administer Medicaid through contracts with private managed care organizations ("MCO").[97] The state then pays the MCO a fixed monthly premium per enrollee.[98] MCOs accounted for 28 percent of Medicaid spending, or about $124 billion, in 2013.[99] Most states

---

[91] "Medicare Advantage," The Kaiser Family Foundation, May 11, 2016, http://kff.org/medicare/fact-sheet/medicare-advantage/ (viewed November 15, 2016).

[92] "The Medicare Part D Prescription Drug Benefit," The Kaiser Family Foundation, September 26, 2016, http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/ (viewed November 16, 2016); https://q1medicare.com/PartD-The-2016-Medicare-Part-D-Outlook.php (viewed December 1, 2016).

[93] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 1.

[94] In 2016, the federal poverty line for an individual was $11,880, and for a family of four was $24,300. https://aspe.hhs.gov/poverty-guidelines (viewed November 23, 2016).

[95] https://www.medicaid.gov/medicaid/eligibility/index.html (viewed November 23, 2016); https://aspe.hhs.gov/poverty-guidelines (viewed November 23, 2016).

[96] Congressional Budget Office, "Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026," March 2016, at 30; http://kff.org/other/state-indicator/total-population/ (viewed December 1, 2016).

[97] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 1.

[98] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 1.

[99] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 5.

with MCOs mandate that at least 85 percent of the revenues MCOs receive must be spent on clinical services for Medicaid enrollees.[100]

54.    As of 2014, six insurance companies including UnitedHealth Group, WellPoint (now Anthem), Centene, WellCare, Health Net, and Molina, had Medicaid MCO contracts that accounted for over one third of Medicaid enrollees.[101]

55.    Medicaid enrollees are not charged premiums,[102] but can be subject to cost sharing, though typically nominal amounts.[103] For example, in states that charge copays for non-preventive doctors' visits, the copays range from $0.50 to $10.[104]

### 4.    Individual plans

56.    Individuals who do not have access to employer sponsored insurance, Medicare, or Medicaid, or who do not want to purchase their employers' health plan, can purchase an individual health insurance policy either directly from insurance companies or, beginning in 2014, through the marketplace exchanges set up by the Affordable Care Act ("ACA").

57.    About 22 million people, or seven percent of the total U.S. population, have individual, non-

---

[100] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 7.
[101] Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014, at 10.
[102] Premiums cannot be charged to Medicaid enrollees with incomes below 150 percent of the federal poverty line. Brooks, Tricia, Joe Touschner, Samantha Artiga, Jessica Stephens, and Alexandra Gates, "Modern Era Medicaid: Findings from a 50-State Survey of Eligibility, Enrollment, Renewal, and Cost-Sharing Policies in Medicaid and CHIP as of January 2015," January 2015, at 15.
[103] Brooks, Tricia, Joe Touschner, Samantha Artiga, Jessica Stephens, and Alexandra Gates, "Modern Era Medicaid: Findings from a 50-State Survey of Eligibility, Enrollment, Renewal, and Cost-Sharing Policies in Medicaid and CHIP as of January 2015," January 2015, at 17.
[104] Brooks, Tricia, Joe Touschner, Samantha Artiga, Jessica Stephens, and Alexandra Gates, "Modern Era Medicaid: Findings from a 50-State Survey of Eligibility, Enrollment, Renewal, and Cost-Sharing Policies in Medicaid and CHIP as of January 2015," January 2015, at 59.

group health insurance.[105] This group of consumers is comprised of self-employed individuals, unemployed individuals, workers whose employer does not offer health insurance, and workers who do not want to purchase their employers' plan.[106] As of 2016, approximately two-thirds of this group purchased their insurance through the marketplace exchanges.[107]

58.    Premiums for individual insurance on the exchanges vary widely across states, as does the amount the consumers pay after the federal subsidy. The plans on the exchanges are grouped into "metal" categories, bronze, silver, gold, or platinum, which correspond to the cost-sharing obligation.[108] For bronze plans, which have the lowest premiums, the insurance company pays 60 percent of cost while the patient pays 40 percent.[109] For platinum plans, which have the highest premiums, the insurance company pays 90 percent of cost while the patient pays 10 percent.[110]

59.    In each market, the Silver plan with the second lowest premium is considered the ACA

---

[105] Congressional Budget Office, "Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026," March 2016, at 30; "Health Insurance Coverage of the Total Population," The Kaiser Family Foundation, 2015.

[106] Hamel, Liz, Jamie Firth, Larry Levitt, Gary Claxton, and Mollyann Brodie, "Survey of Non-Group Health Insurance Enrollees, Wave 3," The Kaiser Family Foundation, May 20, 2016.

[107] Hamel, Liz, Jamie Firth, Larry Levitt, Gary Claxton, and Mollyann Brodie, "Survey of Non-Group Health Insurance Enrollees, Wave 3," The Kaiser Family Foundation, May 20, 2016.

[108] "How to pick a health insurance plan," https://www.healthcare.gov/choose-a-plan/plans-categories/ (viewed November 23, 2016).

[109] "How to pick a health insurance plan," https://www.healthcare.gov/choose-a-plan/plans-categories/ (viewed November 23, 2016).

[110] "How to pick a health insurance plan," https://www.healthcare.gov/choose-a-plan/plans-categories/ (viewed November 23, 2016). I understand that many of the class members with individual plans purchased these plans before 2014, and therefore did not purchase through the ACA marketplaces.

benchmark plan, from which subsidies are calculated.[111] In 2016, pre-subsidy premiums for these plans averaged $408 per month,[112] with wide geographic variation, ranging from $186 per month in Albuquerque, NM to $719 in Anchorage, AK.[113] Average deductibles for these plans were just under $3,000, with average copays of $30.[114]

60.     In 2016, out-of-pocket maximums, including copays, coinsurance and deductibles, were capped at $6,850 for an individual and $13,700 for a family.[115]

## IV.     Price and Valuation Theory

### A.     Price Premium Theory of Damages

61.     Plaintiffs allege that the defendants were required to safeguard their customers' sensitive personal data, but did not.[116]   Since data privacy and security are part of the insurance product offered by defendants to class members, Plaintiffs' argument is that class members received a product that did not include all the benefits that they were promised, reasonably

---

[111] Cox, Cynthia, Michelle Long, Ashley Semanskee, Rabah Kamal, Gary Claxton, and Larry Levitt, "2017 Premium Changes and Insurer Participation in the Affordable Care Act's Health Insurance Marketplaces," The Kaiser Family Foundation, October 24, 2016.

[112] Sullivan, Peter, "Average ObamaCare premium rises to $408 per month," The Hill, January 21, 2016, http://thehill.com/policy/healthcare/266651-average-obamacare-premium-rises-to-408 (viewed December 1, 2016).

[113] Premiums are calculated for a 40-year old, non-smoker. Cox, Cynthia, Michelle Long, Ashley Semanskee, Rabah Kamal, Gary Claxton, and Larry Levitt, "2017 Premium Changes and Insurer Participation in the Affordable Care Act's Health Insurance Marketplaces," The Kaiser Family Foundation, October 24, 2016.

[114] Nascimento, Nathan, "The Latest Problem under the Affordable Care Act: Deductibles," The National Review, April 12, 2016, http://www.nationalreview.com/article/433940/obamacare-deductibles-are-skyrocketing-affordable-care-act-health-insurance-anything (viewed December 1, 2016); Munro, Dan, "Average Cost Of Obamacare 'Silver' Plan - $328 Per Month," Forbes, September 29, 2013, http://www.forbes.com/sites/danmunro/2013/09/29/average-cost-of-obamacare-silver-plan-328-per-month/ (viewed December 1, 2016).

[115] http://obamacarefacts.com/health-insurance/out-of-pocket-maximum/ (viewed December 1, 2016).

[116] I understand that Plaintiffs have a number of legal allegations: (1) that Defendants affirmatively promised a certain level of security, but did not provide it; (2) that Defendants were legally required to provide a certain level of security, but did not provide it; (3) that Defendants failed to disclose their true level of security.  The market price damages I propose are equally applicable to each of these legal theories.

expected, or to which they were otherwise entitled under these plans. If Plaintiffs are correct, it is clear that class members suffered an economic loss: the difference in value between the product as received and the product that they should have received. The goal of this report is to outline a method for computing this reduction in value on a class-wide basis.

62. Any valid method for computing the difference in value between the product defendants provided (allegedly lacking adequate data security), and the product class members should have received (with data security) must be based on objective economic measures. It is my opinion that one objective economic measure may be derived on the basis of market prices. That is, we must compute the difference between the market price of the product that Anthem "should" have provided and the market price of the product as delivered.

63. The use of a market price provides a common, objective measure of value. If there is a difference between the market valuation of the product that should have been provided and the product as received, then all class members have suffered the same loss commensurate or proportional to the price paid by them or on their behalf for the product. This loss occurs regardless of whether or not an individual class member cares about data integrity. The market establishes a value for the loss of a particular product feature by aggregating the views of all current and potential customers in the establishment of a market price level. Additionally, the use of market prices relates not only to customer valuation of a product feature but also to the extent to which this feature is available in competing products.

64. A simple example might help to make these ideas clear. Consider a car manufacturer who represents a car as being able to accelerate from 0 to 60 mph in 5 seconds. In fact, the car does not perform at this level but only reaches 60 mph after 10 seconds. Clearly, the car

manufacturer is misrepresenting the product and may be liable for consumer fraud. The question is how much is the loss incurred by those consumers who purchased the misrepresented car. Some would argue that this is an entirely subjective matter – we must ask each consumer how much they value acceleration and base loss calculations on these valuations. Of course, this is highly problematic for class action in that some consumers may not value additional acceleration performance faster than 10 seconds. In addition, it would be impractical to survey all class members to obtain these subjective valuations. Finally, and most important, subjective personal valuations, no matter how rigorously measured, should not be the basis for a valid economic loss.

65.    The correct and objective measure of economic loss in this example would be the market price of the car as represented less the market price of the car as received with the slower acceleration. These market prices reflect an objective valuation which is uniform across all consumers. Economic losses would then consist of the market price premium for the identical car with 5 second versus 10 second acceleration. If this price premium is high, then class members suffered large losses.

66.    It is important to remember that the market price is determined not only by consumer demand and willingness to pay for a product feature but also by competition from other manufacturers. If many other manufacturers offer similar cars with high (5 second) acceleration performance, there will not be a large price premium for fast acceleration even if consumers value this a great deal. Thus, in the case of strong competition for this feature, the market price premium may be low. It is important to take this into account in any valid method for computing economic damages. A market price premium therefore differs from

27

willingness to pay because it is what a firm can charge for a product with a particular feature rather than just the consumers' valuation of that product feature.

67.     Based on the information presented to me thus far regarding this case, a valid measure of economic loss or damages would be based on a market price premium for the data security feature of the defendants' health insurance products. The market price premium is the difference between the premiums or fees the defendants could charge with their represented claims of data security and the premiums or fees that would prevail in the market for the defendants' products with the lower level of data security safeguards actually delivered.

### B.     Measuring the Market Price Premium

68.     I have argued that a proper measure of damages could be based on a market price premium. The question then becomes one of how to measure such a premium. There are two fundamental challenges to measuring the market price premium in this case. First, data security or data integrity safeguards is only one feature of a complicated health insurance or benefits product. This means we must extract only the value conferred by a data security product feature and not the other product features. The second challenge is that we do not observe market prices for the product as received. That is, we could, in principle, measure the premiums or fees charged for the various insurance products offered by the defendants. This would be a valid measurement of the market price Defendants were allegedly required to provide, but not the market price as received. The market price as received is determined in what economists call the "counterfactual" world in which consumers are fully aware of the actual level of data security provided by the defendants. The reason this is called the "counterfactual" world is that we do not observe any actual market transactions in this

28

situation.

69. In order to meet the challenges posed by the problem of calculating a market price premium, I propose to use what is called a conjoint survey as well as a subsequent market price calculation based on the results of the conjoint survey and also incorporating certain aspects of competition in the market for health insurance.

70. The conjoint survey technique was invented to value product features and predict market demand. In a standard, "choice-based," conjoint survey, hypothetical products are constructed as a set of product attributes each with specific levels. That is, one product might be a specific insurance product with a specific "price" or insurance premium, deductible, copay, and extent of coverage. The conjoint survey design constructs many such hypothetical products with different levels of these product attributes. Groups of these hypothetical products are presented to a survey respondent who is asked to choose their preferred product (or "none of the above"). The choices of the survey respondent reveal the way in which that consumer "trades off" attributes for each other. In particular, we can estimate the tradeoff between any product feature and the price of the product on the basis of this choice data. The choice between competing products which are represented as "bundles" of product features is very similar to the actual purchase decisions made by consumers in the real marketplace. Thus, conjoint is best viewed as a simulation of the marketplace.

71. The appeal of the conjoint survey is that it can be used to value a single product feature in a product with many features. In addition, the conjoint survey should be thought of as a type of simulated market in which we can experimentally alter the data security feature and

explore what happens to consumer demand when the level of data security is less than that promised by or required of the defendants. This allows us to simulate the counterfactual case in which consumers are aware of the deficiencies in the defendants' data security systems. This might cause a reduction in consumer valuation that could lead to a market price premium for the absent data security.

72. Simply put, the conjoint survey technique was designed precisely for the valuation of products with many features. In these situations, consumers are often forced to choose one of several products, each one of which has a different collection of product features. It is common for product features to be presented in a tabular format in which each column of the table represents a distinct product and each row is a feature. For example, when I make my annual health insurance selection, I am sent a booklet from UCLA that compares each of the possible insurance choices in terms of product features such as the insurance company's name (Blue Cross/Blue Shield, Kaiser, Health Net, etc.), deductible, copay, and various aspects of coverages. These are presented as a table for ease of comparison. This is precisely the format of most conjoint surveys. The advantage of a conjoint survey is that product features can be altered by the survey designer to "tease out" the marginal, or incremental, value accorded different product features or different levels of the same feature. For example, the coinsurance may have many levels from 10 to 40 percent.

73. Calculation of a market price premium does not begin and end with just a conjoint survey. The conjoint survey determines what consumers demand and value—what economists call the "demand side." We all know that market prices are determined by supply factors as well as demand. In particular, what other products are available in the marketplace represents

30

important competitive factors that determine how much a firm can actually charge for a potentially valuable feature. After analyzing the conjoint survey results to measure demand, I will undertake a competitive simulation to compute the final market price premium.

74.    Conjoint analysis is not a new method. It has been tried and tested. Each year, thousands of conjoint surveys are used to value product features in commercial applications. The statistical methods used to design and analyze conjoint data have gone through rigorous testing and analytical examination over a more than 30-year period by some of the world's experts in statistics and survey analysis. In the next section, I provide a short summary of the development and uses of conjoint as well as key references.

### C.    A Short History of Conjoint Analysis

75.    Conjoint analysis is a survey method and associated analysis that has a long history in the valuation of products and product features. In this section, I will describe the origins of conjoint analysis in commercial problems and trace through its evolution to its current application in the litigation sphere.

### 1.    Origins and Development of Conjoint Analysis

76.    Conjoint analysis was invented by two statisticians, Duncan Luce and John Tukey, and published in a 1964 article.[117] The ideas in this article were recognized as useful for marketing problems by Paul Green and Vithala Rao in a 1971 article published in the

---

[117] Luce, R. Duncan and John Tukey, "Simultaneous Conjoint Measurement: A New Type of Fundamental Measurement," *Journal of Mathematical Psychology*, 1:1-27 (1964).

*Journal of Marketing Research*.[118] For example, US automotive manufacturers in the 1970s faced strong and new competition from Japanese and European manufacturers. Japanese products soon acquired a reputation for quality and durability while European manufacturers featured front-wheel drive products. An American manufacturer might be considering investments to produce a front-wheel drive car or quality improvements. In order to make a decision about which features to incorporate, some notion of the amount by which feature improvement would increase the price that a car can demand in the marketplace is required. The problem is that the market prices of front-wheel drive European cars, for example, contain not only a price premium for front wheel drive but also other possible sources of higher price including different styling and the cache associated with European products. The early advocates of conjoint analysis demonstrated that the method could tease apart the components of value that are ascribed to various product features.

77. Both academics and practitioners immediately saw the potential in applications of conjoint and there was an explosion of research in the 1970s that applied conjoint methods to a wide variety of problems.[119]

78. In the 1980s, conjoint researchers recognized that Choice-Based Conjoint ("CBC") offered the best potential for simulating the choices made by consumers in the marketplace. CBC uses a set of choice tasks in which survey respondents are asked to choose among

---

[118] Green, Paul E. and Vithala R. Rao, "Conjoint Measurement for Quantifying Judgmental Data," *Journal of Marketing Research*, 8 (1971).

[119] *See* Green and Srinivasan (1978) for a summary of applications of conjoint analysis in this earlier era. Green, Paul E. and V. Srinivasan, "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research* 5:2, September 1978.

hypothetical products constructed from a set of product features. For example, we could ask respondents to choose between different smartphone products defined by such features as screen size, storage, battery life and price. In making these choices, respondents implicitly reveal their preferences for the various features and the rate at which they are willing to trade off various features for price. Today, CBC is the dominant method with over 90 percent of conjoint analyses using this approach.

79.     In the 1990s, the Bayesian revolution took place in CBC. Based on early work by myself and Greg Allenby, Hierarchical Bayesian modeling for CBC data facilitated more precise statistical estimates and allowed for respondents to have different weights or preferences for various product features. The Bayesian methods we developed have become the dominant methods used in analysis of conjoint data today.

80.     At this point, there are more than 1,000 published articles on conjoint analysis in the academic literature. Nearly every aspect of conjoint studies has been studied exhaustively. As a result, we probably know more about how to design, field and analyze conjoint data than any other survey technique. Many of these principles for best practice in conjoint studies are summarized in Bryan Orme's excellent book, *Getting Started With Conjoint Analysis*.

81.     An important recent development in conjoint analysis is the use of conjoint to undertake more formal industry-level equilibrium pricing calculations as I have laid out in a recent

publication.[120] The idea here is that one must not only use conjoint to assess market demand for various products as represented by combinations of product features, but that one should consider the competitive response of other firms in the market to the enhancement of a specific firm's product. For example, if Nikon were to add a new feature to their CoolPix point and shoot digital camera, then a conjoint study can be used to determine how much more consumers are willing to pay for the feature-enhanced CoolPix camera. However, the analysis should not stop at this point. What consumers are willing to pay to have a product enhanced with a new feature is not the same as the price premium that a firm can charge for that product. This is determined by market forces including the actions of competing firms. For example, in the short run, Sony might decide to reduce the price of its digital cameras in response to the introduction of an improved Nikon camera. These considerations can be formally accounted for by undertaking what economists call a Nash equilibrium calculation. This represents an important advance in the use of conjoint to compute price premia associated with product features.

### 2.    Commercial Applications of Conjoint

82.    There are thousands if not tens of thousands of conjoint analyses done each year for commercial applications. The range of commercial applications is remarkable. It would be difficult to find a product category in which a conjoint analysis has not been done. Examples include consumer electronics, consumer packaged goods such as food, health and beauty

---

[120] *See* Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014.

products, restaurants and hotels, pharmaceutical products including prescription drugs, medical devices such as radiology equipment, cars and trucks, construction equipment such as cranes and earthmoving equipment, financial products such as credit cards, mutual funds, and banking products, transit systems, and the entertainment industry. Conjoint measurement is used worldwide. For example TNS, a leading marketing research firm in Germany, uses very large scale conjoint measurement to advise BMW and Audi on how to design and configure luxury cars.

83. Conjoint surveys can be implemented via internet panels of the general consumer population or they can be used to survey very specific sub-populations. For example, conjoint surveys of physicians and other medical professions are commonly used to help market and design new medical devices and pharmaceutical products. Conjoint surveys are also used in the business to business marketing context. For example, it is common to undertake conjoint surveys of buyers of electronic equipment such as data-base servers.

84. Equally diverse are the set of marketing problems which conjoint analysis has been applied to. These include design of new products, pricing of new and existing products, and measurement of brand equity. All of these problems have the common feature that the researcher wants to simulate demand conditions in a "counterfactual" state of the world that has not been observed. New products provide a classic example of the utility of a conjoint approach. Most firms regard the development of new products as fundamental to the long term viability of the firm. For example, if Apple is unable to move much beyond the current versions of the iPhone and iPad, the company might well return to the low revenue and low profit state it was in prior to the introduction of the iPhone in 2007. Therefore, Apple must

35

constantly strive to improve its current set of products and invent new products that respond to future consumer needs. The problem from a research point of view is that there may literally be thousands of ideas put forth for new product features or completely new products. For each of these ideas, some estimate of the potential market demand for the feature or product must be developed. It is prohibitively expensive to develop these ideas and introduce them into the marketplace. A conjoint survey provides a platform to "test" ideas by simulating marketplace outcomes in the survey environment. This allows firms to assess which product features (both new and old) are most valued by consumers. Equally important, conjoint allows researchers to determine which configurations of product features can be best.

85.   A "classic" example of the application of conjoint is instructive. The Marriot Corporation used conjoint studies to develop a moderate priced business traveler oriented hotel which has become known as "Courtyard by Marriot."[121] A hotel can be thought of as a very complex combination of various product features such as: 1) an on-site restaurant, 2) a pool/spa, 3) sizes of desk, 4) beds and bedding, and 5) bathroom fixtures to name only a few. Conjoint studies allowed Marriot to survey business travelers to assess the tradeoffs between various features. For example, how large should the desk be? Are the potential customers willing to forgo a pool in order to reduce the nightly rate? All of these questions could be answered by building prototype hotels and experimenting with the room rates but

---

[121] *See* Wind, Jerry, Paul Green, Douglas Shifflet, and Marsha Scarbrough, "Courtyard by Marriott: Designing a Hotel Facility with Consumer-Based Marketing Models," *Interfaces* 19:1, 25-47, 1989.

this would be very time consuming and very expensive. It also might reveal Marriot's plans for a more moderate-priced hotel to a number of key competitors, thereby, depriving Marriot of potential first-mover advantages. All of these questions can easily be answered using conjoint survey methods. Finally, once a configuration has been chosen for implementation as the Courtyard concept, conjoint surveys can help Marriot choose the profit-maximizing price or room rate.[122]

86.    In short, conjoint surveys and their analysis form an integral part of product and marketing strategy for most large firms in the world today. Conjoint has been accepted as a valid way of making inferences about how consumers value product features and how much they are willing to pay for products that are enhanced by the addition of new features. This is not a recent phenomenon but extends back more than 30 years.

### 3.    Litigation Applications of Conjoint

87.    In many litigation contexts, a damages analysis is vital to any claim. For example, if a firm claims that their patents or trademarks are infringed by another firm, then not only must the plaintiffs establish that infringement did take place, but a damages estimate of the lost profits or license fees must be provided. Similarly, in claims of misleading or false advertising, an assessment must be made regarding how firms or consumers suffered economic losses due to the advertising claims. In the Lanham-style false advertising situation, one firm alleges that it was harmed by misleading or false advertising claims made

---

[122] *See* Wind, Jerry, Paul Green, Douglas Shifflet, and Marsha Scarbrough, "Courtyard by Marriott: Designing a Hotel Facility with Consumer-Based Marketing Models," *Interfaces* 19:1, 25-47, 1989.

by another firm. Similarly, in consumer fraud cases, a group of consumers allege that they suffered economic losses from false claims made about products they have purchased.

88.     Damage analyses hinge on the key counterfactual—what would firm profits or consumer prices be in the "but-for" world in which the alleged harmful action was removed. For example, in the patent arena, the key counterfactual for a lost profits analysis is what profits would the firm whose patents were infringed upon have earned in a world without infringement. If the patents apply to a specific product feature, then it is possible that valid counterfactual would be what profits would the patent holder earn on the products which practice the patent if there were not competitors practicing the patent. The difference in profits between the world with and without patent infringement should provide the basis for any valid patent damages analysis.

89.     Similarly, in consumer fraud cases, the counterfactual should be what prices would consumers have paid for the products as properly described without the alleged fraudulent claims, or with any deficiencies in the product truthfully disclosed. Damages would consist of the difference between what consumers actually paid for the products and what they would have paid in a world with full "revelation" of the true state of the products. The classic example is real estate fraud. If a seller of a parcel of real estate falsely claimed there was a trout stream running through the property, then the damages analysis should focus on what the market price of the parcel would be without the false claim of a trout stream. The fact that there is not a trout stream doesn't mean that the parcel is worthless, but may mean it has a lower value than the buyer paid. The market price premium measures the difference between the price actually paid for the parcel and the price that would prevail without the

38

false claim of a trout stream.

90.     A common theme, therefore, is the need to simulate or estimate what consumer and market responses would be in the counterfactual world in which whatever is deemed harmful is removed. This is the fundamental source of the appeal of conjoint analysis is a litigation context. This is the same source of the value of conjoint analysis in a commercial context. A properly designed, fielded and analyzed conjoint survey can be used to develop these counterfactual estimates.

91.     In summary, in the last ten years, conjoint analysis has become increasingly used in litigation.[123] The uses of conjoint for litigation build on a more than 30 year old history of research about, refinement in, and application of conjoint analysis to commercial products.

V.      **Survey and Calculations**

    A.      **Survey Proposal**

        1.      **Process for Selecting Attributes and Levels**

92.     Recall that a conjoint survey provides survey respondents with choices among different product configurations in order to assess how respondents value various product features. Just as in the real world, products are represented as bundles of product features or "attributes." The conjoint design process selects the set of features or attributes to be used in constructing hypothetical products. Small sets of these hypothetical product configurations are presented to the respondent and they are asked to pick one of the alternatives offered (or

---

[123] Guido v. L'Oreal, USA, Inc., No. 2:11-cv-01067-CAS (JCx), 2014 U.S. Dist. LEXIS 165777, at 8 (C.D. Cal. July 24, 2014) ("Conjoint analysis has been used for decades as a way of estimating the market's willingness to pay for various product features.").

"none-of-the-above"). Thus, to implement a conjoint design, we must choose a relevant set of product features. It is important to emphasize that it is not necessary to include all of the product features to conduct a useful and valid conjoint survey. It is, however, important to include some of the important product features. In the case of health insurance, the set of important features would likely include deductibles, copays and coinsurance, health provider network type, such as HMO, PPO or POS, out-of-pocket maximum, and various coverage options. In addition, respondents will review a brief glossary at the beginning of the survey with an explanation of the meaning of each attribute as well as the levels.

93.   Once product features/attributes are chosen, we must choose the alternative values of levels of each feature. For example, we could specify a set of coinsurance percentages from no coinsurance to 30 percent or more. There is vast academic literature on the selection of features and levels in conjoint surveys. This literature demonstrates the remarkable insensitivity of the conjoint results to the number of features (within a reasonable range such as 5 to 15) and the number of levels (within a range of two to four).

94.   The set of features as well as the levels of these features are chosen as part of a survey design process which usually begins with qualitative research in the form of in-depth interviews of potential customers. Thus, the exact wording and choice of the product features and the levels of each of these features would change as the result of the survey design process.[124] However, to illustrate the likely form of my survey, as well as to

---

[124] The levels of these features could also be informed by the actual levels that were offered to Anthem customers, information that I understand Plaintiffs have requested from Defendants.

demonstrate feasibility, I present an illustrative set of features and levels in Table 1 for the

potential survey of employer benefits managers.[125]

**Table 1. Illustrative Attributes and Levels**

| Attribute | Illustrative Levels |
|---|---|
| Insurance Company | 1. Anthem/BCBS<br>2. Aetna<br>3. United<br>4. Cigna |
| Plan Type | 5. HMO<br>6. PPO<br>7. POS |
| Plan Name (Coinsurance) | 1. Platinum (10%)<br>2. Gold (20%)<br>3. Silver (30%)<br>4. Bronze (35%) |
| Annual Premium | 1. $5,000 Single/ $16,000 Family<br>2. $5,750 Single/ $17,000 Family<br>3. $6,250 Single/ $18,000 Family<br>4. $7,000 Single/ $19,000 Family |
| Deductible | 1. $0<br>2. $500<br>3. $1,000<br>4. $2,000<br>5. $5,000 |
| Out-of-pocket Maximum (Medical and Pharmacy Combined) | 1. $3,000<br>2. $4,000<br>3. $5,000<br>4. $6,000 |
| Office Visit Copay (Primary Care) | 1. $10<br>2. $20<br>3. $30<br>4. $40<br>5. $50 |

---

[125] The levels of attributes would vary for each survey according to the results of my qualitative research in that market. For example, the premiums and out-of-pocket maximums would vary in the survey of customers under the age of 65 purchasing individual insurance and the survey of individuals over the age of 65 choosing a Medicare Advantage plan.

| Office Visit Copay (Specialist) | 1. $30<br>2. $40<br>3. $50<br>4. $75<br>5. $100 |
|---|---|
| Urgent Care Copay | 1. $50<br>2. $100 |
| Pharmacy Copay | 1. $15 generic/ $25 Tier 2<br>2. $15 generic/ $35 Tier 2<br>3. $15 generic/ $40 Tier 2<br>4. $15 generic/ $50 Tier 2 |
| Additional Coverage | 1. Eye exams<br>2. Rehabilitation services<br>3. Mental / behavioral health services<br>4. Pregnancy care (prenatal, postnatal, delivery care) |

95.     A critical aspect of the survey will be to specify a set of levels for the data security attribute. The results of the qualitative research, as well as the findings of the technical security experts, will guide my selection of the correct security features and attributes. Below, I present some illustrative examples:

Example 1:

    1. Highest Level: Exceeds industry standards.

    2. Intermediate Level: Meets industry standards.

    3. Lowest Level: Falls short of industry standards in one or more important areas.

Example 2:

[Optional Pop-up Message] Comprehensive security audits examine the following 13 metrics: Identity and Access Management, Data Classification and Protection, Risk Management, Security Monitoring, Strategy, Reporting and Metrics, Organization, Policy Framework, Awareness, Third Party Risk Management, Threat Intelligence, Vulnerability Management, Incident Management.

42

1. Meets or exceeds industry average for 11 of 13 metrics used in standard security audits.

2. Meets or exceeds industry average for 8 of 13 metrics used in standard security audits.

3. Meets or exceeds industry average for 5 of 13 metrics used in standard security audits.

Example 3:

[Optional Pop-up Message] Fundamental practices related to data integrity include complex password protection, monitoring traffic for unusual logins or data transfers, and secure remote logins.

1. All fundamental data security practices are adhered to.

2. One or more fundamental data security practices is not adhered to.

## 2.  Sample Frames and Sample Size

96.    Dependent upon further factual development and action by the Court, I will undertake surveys of different markets. In particular, I currently plan to take a survey of benefit officers who have responsibility for plan selection for their company's employees, one of customers under the age of 65 purchasing individual insurance, and one of individuals over the age of 65 choosing between traditional Medicare and Medicare Advantage. These surveys will be analyzed independently to determine market price premia in each of these distinct markets. Survey respondents will be pre-screened so that only those individuals who might be eligible to purchase health insurances and the appropriate benefit officers are surveyed.

97.    It is important to design a survey with adequate sample size in order to ensure precise and reliable estimates of the price premium. The price premium calculations are more

43

demanding of the conjoint survey data than the standard market share simulations and will likely require larger samples than often are seen in conjoint.

### B.    Survey Process

98.    Survey researchers have long accepted that a well-designed survey must involve a sequence of steps, no one of which can be ignored. All well-designed surveys start with qualitative or focus group research using in-depth interviews with consumers and decision makers. This process is designed to obtain a better understanding of how choices are made and the language with which customers describe the product or aspects of insurance coverage.

99.    In this matter, this process will help to better understand the set of attributes that matter to health insurance customers, as well as how both employer benefits managers and insureds think of these attributes. More importantly, it will help inform me about how consumers think about data integrity, what types of data security features they think about, and the language they use to describe them.

100.    After the qualitative research is complete, a draft questionnaire is created. This questionnaire is then pre-tested for comprehension. The pre-tests consist of administering the questionnaire and engaging respondents in a conversation as they fill out the survey. This is designed to ensure the survey can be well understood and is interpreted in the manner intended by the survey designers. It is often the case that survey researchers use a different vocabulary than many members of the general public, and it is important to eliminate ambiguities or misunderstandings. Typically, the survey questionnaire is revised several times during the pre-test period. All careful survey researchers keep records of the pre-test revisions.

44

101.   After the pre-test period, a pilot sample is fielded for final checking and to ensure that the survey can be completed in the length of time expected by researchers and to test the yield on any screening criteria.

### C.   Price Premia Calculations

102.   A properly designed conjoint survey can be coupled with the appropriate analysis tools to form estimates of the demand for each of the features of health insurance products, including the focal data security feature. However, as noted above, this alone is not sufficient to compute a market price premium or an estimate of what the defendants were able to charge by misrepresenting or concealing the level of data security afforded their customers. The market price premium must be based on market prices. Market prices are determined by balancing demand and supply forces in what is called a market equilibrium. An equilibrium is a stable point where supply and demand are exactly equalized; any deviation from the market equilibrium results in an imbalance between demand and supply which pushes prices back to the equilibrium state.

103.   Many are familiar with what economists call a perfectly competitive equilibrium – the one represented by the familiar "scissors" diagram of a downward sloping demand curve intersecting an upward sloping supply curve. Equilibrium or market price computations can be applied in situations with a small number of competing firms or situations with high market concentration (a small number of firms have the bulk of the share of the market revenue). Developments in the Industrial Organization subfield of economics over the last 20 years have introduced models of imperfect competition that are applicable to the health insurance market which has a number of larger firms with high market share. The dominant

paradigm now used to compute equilibrium prices is what is called the Nash equilibrium. With some analysis on the supply side,[126] it is possible to compute Nash equilibrium prices for health insurance products associated with a range of data security levels.

104.    I propose to make two equilibrium price computations: 1) The equilibrium prices for the defendants' products with an adequate level of data security; and 2) Equilibrium prices for the defendants' products with an inadequate level of data security.[127] I would use the difference in these equilibrium prices as the measure of the price premium afforded the defendants. This is an objective measure of the price premium that is based on actual data as well as rigorous economic reasoning. This price difference approach can be applied separately in the individual, employer, and Medicare markets.

## VI.    Summary

105.    If the court or jury establishes that the defendants are liable for failing to provide adequate data security to their customers, the critical issue becomes how to establish a measure of economic loss for the proposed class. I am informed that one legally valid measure of damages in this case is known as "benefit of the bargain damages." A benefits of the bargain theory of damages seeks to restore the class members to the same economic position as they would have been in had the defendants not undertaken the alleged wrongdoing. One way to implement this theory of damages, that accords with economic reasoning, is to pay class

---

[126] For example, one could do the type of analysis that is done in Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," Quantitative Marketing and Economics 12:4, 421-456, 2014.

[127] The exact comparison will depend on my qualitative research into the best way to describe security features in the survey.

members whatever price premium was obtained via the defendants' alleged wrongdoing. That is, Plaintiffs allege that the defendants promised and were legally obligated to provide a higher level of data security in their insurance products than was actually delivered to their customers, or that they failed to inform customers about their deficient data security. A market price premium is based on the difference between the market price of the products as promised and the market price as delivered.

106.   While one could argue that the prices charged by the defendants (in the form of insurance premia) constitute the market price of their insurance plans with data security levels as represented; however, we have no way to observe the counterfactual world in which the level of data security actually delivered was known to customers, in order to obtain a market price of the products as delivered. We must simulate market prices in this counterfactual world in order to compute an estimate of the market price premium.

107.   I propose to design and field conjoint surveys to obtain estimates of customer demand for data security. This survey data will serve as the basis for constructing consumer demand for the defendants' products at various levels of data security. This demand analysis coupled with equilibrium price computations will provide an estimate of the market price differential or market price premium.

My analysis may change before trial if additional information from any of the parties-in-suit or their experts becomes available. I, therefore, reserve the right to supplement my report accordingly.

Peter E. Rossi

EXHIBIT A

CURRICULUM VITAE
PETER E. ROSSI
(May 2016)

Date of Birth: November 25, 1955
Citizenship: United States

<u>Business address</u>:
UCLA
Anderson School of Management
110 Westwood Plaza, B5.15
Los Angeles, CA 90095
email: perossichi@gmail.com

<u>Education</u>:
B.A., 1976, Oberlin College (Mathematics and History).
M.B.A., 1980, Graduate School of Business, The University of Chicago
(Management Science)
Ph.D., 1984, Graduate School of Business, The University of Chicago (Econometrics).
Dissertation Title: "Specification and Analysis of Econometric Production Models."

<u>Fellowships, Honors, and Grants</u>
Phi Beta Kappa Zeta of Ohio, elected 1975.
University of Chicago Fellowship, 1978-1980.
G.M. Fellowship, University of Chicago, 1980-1981.
Kellogg Research Chair, Northwestern University, 1983-84.
NSF grant, SES-8510193, "Comparison of Non-nested Production Models," 1985-1987.
1987 Savage Prize for best dissertation in Bayesian Econometrics and Statistics
I. B. M. Scholar, Graduate School of Business, University of Chicago, 1988-89.
Bozell, Jacobs, Kenyon and Eckhardt Faculty Scholar, Graduate School of Business, University
of Chicago, 1994-95.
Elected Fellow, American Statistical Association, June 1998.
1999 Mitchell Prize for Best Applications Paper in Bayesian Statistics,
for "Estimating Price Elasticities with Theory-based Priors (with A. Montgomery),"
awarded by American Statistical Association, Bayesian Statistics Section.
2000 Arthur Kelly Faculty Price, GSB, U of Chicago, (awarded bi-annually for service to
school).
"Bayesian Analysis of Stochastic Volatility Models" named one of most influential articles
in twentieth anniversary issue of *Journal of Business and Economic Statistics* (2002).
Named Fellow, *Journal of Econometrics*, 2001.
2010 Long-term Impact Award, Marketing Science Society (with Greg Allenby).
2016 Dean's Prize for Exceptional Faculty Mentorship of PhD Students.

Areas of Research Interest
*Marketing*: Brand Choice, Target Marketing, Price Promotions, Consumer Heterogeneity, Couponing, Search Theory, Direct Marketing
*Econometrics*: Hypothesis testing in systems of equations, non-nested hypothesis-testing procedures, Bayesian methods, limited dependent variable models, non-parametric time series methods.
*Microeconomics*: demand analysis applied to individual consumer expenditure data.

Positions Held:
Analyst, Abt Associates Inc., 1976-1977.
Consultant, SRI International Inc., 1978.
Research Assistant, University of Chicago, 1979-1981.
Lecturer in Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1981-1983.
Assistant Professor of Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1983- 86.
Visiting Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1985-1986.
Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1986- 1990.
Associate Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1990- 1994.
Professor of Marketing, Econometrics and Statistics, Graduate School of Business, University of Chicago, 1994- 1997.
Joseph T. and Bernice S. Lewis Professor of Marketing and Statistics, Booth School of Business, University of Chicago, 1997- 2010.
James Collins Professor of Marketing, Statistics, and Economics, Anderson School of Management, UCLA, 2010-present.

Consultant for RFG Options, Harris Bank, Hull Trading, GE Capital, Ernst and Young, KPMG Peat Marwick, Abbott Labs, Department of Defense, Booz Allen and Hamilton, Arthur Andersen, Kestnbaum and Company, Oliver, Wyman and Co.

Expert Witness for various legal proceedings involving statistical analysis, survey sampling, marketing and pricing, anti-trust, valuation of lost personal and business income, franchise rights, patent and trademark infringement, bio-statistics and job discrimination, and trademark infringement. Law firms involved include: Ross and Hardies, Rudnick and Wolfe, Seyfarth and Shaw, Sidley and Austin, Winston and Strawn, Arnold, White and Durkee, Hinshaw and Culbertson, Kirkland and Ellis, Cravath, Swaine and Moore, Mayer, Brown and Platt, Howrey, Bryan Cave LLP,  Jones Day, Latham and Watkins, WilmerHale.

Publications:

Google Scholar Cites: 14,145,  H-index: 45 as  of 7/16.

**Books**

*Modelling Stock Market Volatility: Bridging the Gap to Continuous Time* (1996), San Diego: Academic Press (editor).

*Bayesian Statistics and Marketing*, with G. Allenby and R. McCulloch (2005), John Wiley & Sons, Probability and Statistics Series.

*Bayesian Semi-Parametric and Non-Parametric Methods in Marketing and Micro-Econometrics* (2014), Princeton University Press.

**Book Chapters**

"When BDT in Marketing Meant Bayesian Decision Theory: The Influence of Paul Green's Research," with E. Bradlow, P. Lenk, and G. Allenby (2004), in *Marketing Research and modeling: Progress and Prospects, A Tribute to Paul Green*, Y. Wind and P.E. Green (eds.), p. 17-39, Kluwer Academic Press.

"Hierarchial Bayes Models: A Practitioner's Guide," with G. Allenby (2006), in The Handbook of Marketing Research, R. Grover and M.Vriens (eds.), Sage Publications.

"Choice Models in Marketing: Economic Assumptions, Challenges and Trends," with S. Chandukala, J. Kim, T. Otter, and G. Allenby (2009), *Foundations and Trends in Marketing*, Vol 2, No. 2, 97-184. Now Publishers.

"Bayesian Applications in Marketing" with G. Allenby (2011) in *Handbook of Bayesian Econometrics* (Geweke, Koop, and Van Dijk eds), Chapter 8, pp. 390-438, Oxford: Oxford University Press.

 "Bayesian Econometrics" (forthcoming) with G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Feature Valuation Using Equilibrium Analysis," (forthcoming) with J. R. Howell and G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Economic Models of Choice," (forthcoming) with G. Allenby and J. Kim  in *Handbook of Marketing Decision Models*, B. Wierenga and R. Lands, eds, Springer.

**Articles**

"Economic Valuation of Product Features" with G. Allenby, J. Howell, and J. Brazell (2014), *Quantitative Marketing and Economics 12, 4, 421-456*.

"All Roads Lead to Arnold" (2014), *Econometric Reviews* 33, 1-4, 421-423.

"Even the Rich Can Make Themselves Poor: a critical examination of the use of IV methods in marketing" (2014),  *Marketing Science*, Vol. 33, No. 5, 655-672.

"Valuation of Patented Product Features" with G. Allenby, J. Howell, and J. Brazell  (2014), *Journal of Law and Economics*, 57, 629-663.

"Plausibly Exogenous" with T. Conley and C. Hansen (2012), *Review of Economics and Statistics*, 94, pp. 260-272.

"State Dependence and Alternative Explanations for Consumer Inertia," with J.P. Dubé and G. J. Hitsch (2010), RAND *Journal of Economics*, Vol 41, No. 3, pp. 417-445.

"A Model for Trade-Up and Change in Considered Brands," with G. M. Allenby and M. J. Garratt (2010), *Marketing Science*, Vol. 29, No. 1, January-February, pp. 40-56.

"Do Switching Costs Make Markets Less Competitive?" and "Commentaries and Rejoinder to Shin and Sudhir and to Cabral" with G. J. Hitsch and J. P. Dubé (2009), *Journal of Marketing Research*, Vol. XLVI, August.

"Both Network Effects and Quality are Important", *Journal of Marketing Research*, (2009).

"Bayesian Analysis of Random Coefficient Logit Models Using Aggregate Data," with R. Jiang and P. Manchanda (2009), *Journal of Econometrics*, Vol.149, April, pp. 136-148.

"Teaching Bayesian Statistics to Marketing and Business Students," with G. Allenby (2008), *The American Statistician*, August, Vol. 62, No. 3, 195-198.

"A Semi-Parametric Bayesian Approach to the Instrumental Variable Problem," with T. Conley, C. Hansen and R. McCulloch, *Journal of Econometrics*, 144 (2008) 276–305.

"Category Pricing with State Dependent Utility," with J. P. Dubé, G. J. Hitsch, and M. Vitorino (2008), *Marketing Science*, Vol. 27, No. 3, May–June, pp. 417–429.

"Product Attributes and Models of Multiple Discreteness," with J. Kim and G. Allenby (2007), *Journal of Econometrics*, 138, pp. 208-230.

"Structural Modeling in Marketing: Review and Assessment," with P. Chintagunta, T. Erdem and M. Wedel (2006), *Marketing Science*, Vol. 25, No. 6, November–December, 581-605.

"A Direct Approach to Data Fusion," with Z. Gilula and R. McCulloch (2006), *Journal of Marketing Research*, Vol. XLIII, February, 73-83.

"Structural Modeling and Policy Simulation," with B.Bronnenberg and N.Vilcassim (2005), *Journal of Marketing Research*, Vol. XLII, February, 22–26.

"The HB Revolution," with G. Allenby and D. Bakken, (2004), *Marketing Research,* Summer, 20-25.

"Response Modeling with Non-random Marketing Mix Variables," with P. Chintagunta and P. Manchanda (2004), *Journal of Marketing Research*, Vol. XLI, November, 467–478.

"The Role of Retail Competition and Retail Strategy as Drivers of Promotional Sensitivity," with P. Boatwright and S. Dhar, (2004), *Quantitative Marketing and Economics*, 2, 169–190.

"Bayesian analysis of stochastic volatility models with fat-tails and correlated errors," with E. Jacquier and N. Polson (2004), *Journal of Econometrics,* 122, 185-212 .

"Bayesian Statistics and Marketing"with G. Allenby (2003), *Marketing Science*, 22, Summer, 304-329.

"Why Don't Prices Rise During Periods of Peak Demand?" with J. Chevalier and A. Kashyap (2003), *AER,* 93(1), 15-37.

"Modeling Consumer Demand for Variety," with G. Allenby and J. Kim (2002), *Marketing Science,* 21, Summer,  229-250.

"Overcoming Scale Usage Heterogeneity: a Bayesian Hierarchical Approach," with G. Allenby and Z. Gilula (2001), *Journal of the American Statistical Association* 96, 20-31

"Bayesian Analysis of the Multinomial Probit Model with Fully Identified Parameters," with R. McCulloch (2000), *Journal of Econometrics*, 99, 173-193.

"Statistics and Marketing," with G. Allenby (2000), *Journal of the American Statistical Association,* 65, 635-638.

"Bayesian Analysis of Multinomial Probit Model," (2000), *Simulation-Based Inference in Econometrics*, (Mariano, Weeks and Schuermann, eds), Cambridge: Cambridge University (with Rob McCulloch).

"Making Sense of Scanner Data," with P. Delurgio and D. Kantor (2000), *Harvard Business Review, March-April*, 24.

"Account-Level Modeling for Trade Promotion: An Application of a Constrained Parameter Hierarchical Model" with P. Boatwright and R. McCulloch (1999), *JASA* , 94, December,  1063-1073.

"Estimating Price Elasticities with Theory-Based Priors," with A. Montgomery (1999), *Journal of Marketing Research* 36, 413-423.

"Marketing Models of Consumer Heterogeneity" with G. Allenby (1999), *Journal of Econometrics*, 89, 57-78.

"Similarities in Choice Behavior Across Product Categories" with A. Ainslie (1998), *Marketing Science*, 17, 2, 91-106.

"On the Taxation of Capital Income,"(1997),  *Journal of Economic Theory*, 73, 93-117(with L. Jones and R. Manuelli).

"The Value of Purchase History Data in Target Marketing," (1996), *Marketing Science*, 15, 4,  321-340 (with G. Allenby and R. McCulloch).

"Bayes Factors for Testing the Equality of Covariance Matrix Eigenvalues", *Modelling and Prediction* (1996), W. Johnson (ed), New York: Springer, 305-314.

"Existence of Bayes Estimators for the Binomial Logit Model,"(1996),  D. Berry, K. Chaloner, and J. Geweke (eds), *Bayesian Statistics and Econometrics: Essays in Honor of Arnold Zellner* , New York: John Wiley and Sons, 91-100.

"Modelling the Distribution of Price Sensitivity and Implications for Optimal Retail Pricing," with B. Kim and R. Blattberg (1995), *Journal of Business and Economics Statistics*, 13, 291-304.

"Hierarchical Modelling of Consumer Heterogeneity: An Application to Target Marketing,"(1995),  *Case Studies in Bayesian Statistics*, Kass and Singpurwalla (eds), New York: Springer Verlag., 323-350.

"Determinants of Store-level Price Elasticity," with S. Hoch, B. Kim and A. Montgomery (1995), *Journal of Marketing Research*, 32, 17-29.

"Advances in Random Utility Models," with Joel Horowitz, et al (1994), *Marketing Letters* (1994), 5, 311-322.

"Bayesian Analysis of Stochastic Volatility Models," with N. Polson and E. Jacquier (1994), *Journal of Business and Economic Statistics*, 12 , 371-418.

"Purchase Frequency, Sample Selection and Price Sensitivity," with B. Kim (1994), *Marketing Letters* (1994), 5, 57-68.

"An Exact Likelihood Analysis of the Multinomial Probit Model," with R. McCulloch (1994), *Journal of Econometrics*, 64, 207-240.

"A Marginal-Predictive Approach to Estimating Household Parameters," with G. Allenby (1993), *Marketing Letters,* 4, 227-239.

"Nonlinear Dynamic Structures," with A. R. Gallant and G. Tauchen (1993), *Econometrica* 61, 871-908.

"Optimal Taxation in Models of Endogenous Growth," with L. Jones and R. Manuelli (1993), *Journal of Political Economy*, 485-517.

"A Bayesian Approach to Estimating Household Parameters," with G. Allenby (1993), *Journal of Marketing Research,* XXX, 171-182.

"Bayes Factors for Nonlinear Hypotheses and Likelihood Distributions," with R. McCulloch (1992), *Biometrika* 79, 4, 663-676.

"Stock Prices and Volume," with A. R. Gallant and G. Tauchen (1992), *Review of Financial Studies,* 5, 199-242.

"Quality Perceptions and Asymmetric Switching Between Brands" (with G. Allenby), *Marketing Science* 10 (1991), 185-204.

"Posterior, Predictive, and Utility-Based Approaches to Testing the Arbitrage Pricing Theory," (with R. McCulloch), *Journal of Financial Economics* 28 (1991), 7-38

"A Bayesian Approach to Testing the Arbitrage Pricing Theory," (with R. McCulloch), *Journal of Econometrics* 49 (1991), 141-168.

"There is No Aggregation Bias: Why Macro Logit Models Work," (with G. Allenby) *Journal of Business and Economic Statistics* 9 (1991), 2-14.

"*Econometric Theory* Interview with Arnold Zellner," *Econometric Theory* 5 (1989), 287-317.

"Comparison of Dynamic Factor Demand Models," in *Austin Symposia in Economics: Dynamic Econometric Models* (1987), Cambridge: Cambridge University Press.

"Discussion: 'Statistical Properties of Generalized Method of Moments Estimates Using Financial Market Data'," *Journal of Business and Economic Statistics* 4 (1986), 417-419.

"Evaluating the Methodology of Social Experiments," in *The Income Maintenance Experiments* edited by J. Peckman, Boston: Federal Reserve Bank of Boston (with A. Zellner).

"Comparison of Functional Forms in Production," *Journal of Econometrics* 30 (1985) 345-361.

"Bayesian Analysis of Dichotomous Quantal Response Models,"with A. Zellner (1984), *Journal of Econometrics,* 25, 365-394.

"Asymptotic Search Behavior Based on the Weibull Distribution," *Economics Letters* 3 (1979), 211-213.

"The Cost of Search and Rational Random Behavior," (1979),  *Economics Letters,* 3, 5-8.

"The Independence Transformation of Specific Substitutes and Specific Complements," (1979), *Economics Letters,* 2, 299-301.

"Body Time and Social Time: Mood Patterns by Menstrual Cycle Phase and Day of the Week" with A. S. Rossi (1977), *Social Science Research,* 6, 273-308.

Working Papers are available on SSRN

PhD Students (year)

Eric Gyhsels (84), Professor of Economics, University of North Carolina
Greg Allenby (88), Kurtz Professor of Marketing, Ohio State University
Eric Jacquier (91), Associate Professor of Finance, HEC Montreal
Byung-Do Kim (92), Professor of Marketing, Seoul National University
Alan Montgomery (94), Associate Professor of Marketing, CMU
Peter Boatwright (98), Associate Professor of Marketing, CMU
Andrew Ainslie (98), Associate Professor of Marketing, UCLA
Renna Jiang (09), Assistant Professor of Marketing, UC Davis

Professional Activities
Associate Editor, *Journal of Business and Economic Statistics* (1986- 1988)
Associate Editor, *Journal of Econometrics*, 1987 - 1995.
Member, Editorial Board *Marketing Science*, 1994 -2003.
Member, Editorial Board, *Journal of Marketing Research*, 1998- .
Associate Editor, *Journal of American Statistical Association* (applications section), 1995 – 2001.
Chair, Business and Economics Section, American Statistical Association, 1995.
Seminar Leader, NBER/NSF Seminar on Bayesian Inference in Econometrics, 1995-1998.
Member, Savage Award Committee, ASA, 1995-2000.
Member, Advanced Research Forum Program Committee, AMA, 2000-2003.
Founding Editor (with Rajiv Lal), *Quantitative Marketing and Economics, 2000-2010.*
Referee for *Econometrica*, *Journal of Econometrics*, *Journal of Political Economy*, *Journal of the American Statistical Association*, *American Statistician*, *Econometric Theory*, *Journal of Applied Econometrics*, *Journal of Business*, *Marketing Science*, *Review of Financial Studies*, *Review of Economics and Statistics*, *Management Science*, *Journal of Marketing Research*,*Journal of the Royal Statistical Society.*

Anderson/UCLA Service Activities
Vice-Chair, FEC (faculty policy committee advisory to Dean), 2013-2014.
Chair, Staffing Committee, 2012-13.
Chair, MFE Review Committee, 2012.

Chicago Booth Service Activities
Director, Strategic Marketing Management (short course exec ed program), 96-09.
Chair, Deans Reappointment Committee, 05.
Elected member, Dean's Search Committee, 96.
Elected member, Dean's Policy Committee, 96-09.
Chair of Recruiting, Marketing Group, 96-00, 01-03, 05-09.
Course Scheduler, Marketing Group, 96- 00.
Founder, Kilts Center for Marketing

**EXHIBIT B**

**TRIAL AND DEPOSITION HISTORY**

**PETER E. ROSSI**

**2012**  **Apple v. Samsung**, *US District Court, Northern District of California, San Jose Division.*  Retained by Wilmer Hale on behalf of Apple.  Prepared expert report and gave deposition testimony.
- Patent Infringement.

**2012**  **Microsoft v. Motorola**, *US District Court, Western District of Washing.* Retained by Sidley Austin on behalf of Microsoft.  Prepared expert report and gave deposition testimony, and testified at ITC hearing.
- Patent Infringement.

**2013**  **Brown et al v. American Tobacco et al**, *California Supreme Court.*  Retained by Phillip Morris USA.  Prepared expert report, gave deposition testimony.
- Consumer Fraud

**2013**  **Apple v. Samsung (II)**, *US District Court, Northern District of California, San Jose Division.*  Retained by Wilmer Hale on behalf of Apple.  Prepared expert report and gave deposition testimony.
- Patent Infringement.

**2015**  **ContentGuard v. Amazon, et al.**, *US District Court, Eastern District of Texas.* Retained by Sidley and Austin on behalf of the defendants. Prepared expert report and gave deposition testimony.
- Patent infringement.

**2015**  **Western Sugar Cooperative v. Archer-Daniels-Midland et al.**, *US District Court, Central Division of California.* Retained by Winston and Strawn on behalf of the defendants. Prepared expert report and gave deposition testimony. Settled during trial.
- Lanham Act false Advertising Claims

**2016**  **Alvin Todd, et al v. Tempur-Sealy**, *US District Court, Northern Division of California.* Retained by plaintiffs. Prepared expert report and gave deposition testimony. On going matter.
- Class Certification for Consumer Fraud

**2016**  **Dzielak et al v. Whirlpool Corporation**, *US District Court, District of New Jersey.* Retained by Wheeler Trigg O'Donnell LLP on behalf of the defendants. Prepared Expert Report and gave deposition testimony. On going matter.
- Class Certification for Consumer Fraud

**EXHIBIT C**

**MATERIALS REVIEWED AND/OR RELIED UPON**

| Bates Documents | | |
|---|---|---|
| ANTMMDL-00187766 | – | ANTMMDL-00187862 |
| ANTMMDL-00518735 | – | ANTMMDL-00518750 |
| ANTMMDL-00661480 | – | ANTMMDL-00661497 |
| ANTMMDL-00811815 | – | ANTMMDL-00811837 |
| ANTMMDL-00992956 | – | ANTMMDL-00992957 |
| ANTMMDL-01302841 | – | ANTMMDL-01302842 |
| ANTMMDL-01922016 | – | ANTMMDL-01922017 |
| ANTMMDL-0201291 | | |
| ANTMMDL-02400751 | – | ANTMMDL-02400766 |

Case Materials and Legal Documents:

Order Granting in Part and Denying in Part Anthem Defendants' Motion to Dismiss and Order Granting in Part and Denying in Part Non-Anthem Defendants' Motion to Dismiss, February 14, 2016.

Order Granting in Part and Denying in Part Anthem Defendants' Second Motion to Dismiss, Granting in Part and Denying in Part Non-Anthem Defendants' Second Motion to Dismiss, and Denying Motion for Clarification, May 27, 2016.

Third Consolidated Amended Class Action Complaint, July 11, 2016.

Notice from Anthem, May 8, 2015.

Consolidated Amended Class Action Complaint, October 19, 2015.

Guido v. L'Oreal, USA, Inc., No. 2:11-cv-01067-CAS (JCx), 2014 U.S. Dist. LEXIS 165777, (C.D. Cal. July 24, 2014).

Websites:

http://kff.org/medicare/fact-sheet/medicare-advantage/.
http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.
http://khn.org/news/npr-employer-explainer/.
http://obamacarefacts.com/health-insurance/out-of-pocket-maximum/.
http://thehill.com/policy/healthcare/266651-average-obamacare-premium-rises-to-408.
http://www.bcbs.com/about-the-companies/.
http://www.bcbsm.com/index/health-insurance-101/basics/hmo-ppo.html.
http://www.bls.gov/ncs/ebs/sp/healthterms.pdf.
http://www.consumerreports.org/cro/2012/09/understanding-health-insurance/index.htm.
http://www.forbes.com/sites/danmunro/2013/09/29/average-cost-of-obamacare-silver-plan-328-per-month/.
http://www.nationalreview.com/article/433940/obamacare-deductibles-are-skyrocketing-affordable-care-act-health-insurance-anything.
https://aspe.hhs.gov/poverty-guidelines.
https://q1medicare.com/PartD-The-2016-Medicare-Part-D-Outlook.php.
https://www.anthem.com/glossary/.
https://www.anthem.com/wps/portal/ahpprovider?content_path=provider/me/f5/s2/t0/pw_036838.htm&state=me&label=What%20is%20the%20BlueCard%20Program?.
https://www.anthemfacts.com/.
https://www.antheminc.com/aboutantheminc/customersegments/index.htm.
https://www.antheminc.com/Companies/AffiliatedSpecialtyCompanies/index.htm.
https://www.antheminc.com/Companies/index.htm.
https://www.healthcare.gov/choose-a-plan/plans-categories/.
https://www.medicaid.gov/medicaid/eligibility/index.html.
https://www.medicare.gov/sign-up-change-plans/get-parts-a-and-b/when-how-to-sign-up-for-part-a-and-part-b.html.
https://www.medicare.gov/your-medicare-costs/part-b-costs/part-b-costs.html.
https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx.

# EXHIBIT C

## MATERIALS REVIEWED AND/OR RELIED UPON

<u>Articles, Books, and Publications</u>:

"Health Insurance Coverage of the Total Population," The Kaiser Family Foundation, 2015.

"Medicare Beneficiaries as a Percent of Total Population," The Kaiser Family Foundation, 2015.

Abelson, Reed and Matthew Goldstein, "Anthem Hacking Points to Security Vulnerability of Health Care Industry," *The New York Times*, February 5, 2015.

Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends, 2015 Medical Expenditure Panel Survey-Insurance Component.

Allenby, Greg M., et al., "Economic valuation of product features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014.

Brooks, Tricia, Joe Touschner, Samantha Artiga, Jessica Stephens, and Alexandra Gates, "Modern Era Medicaid: Findings from a 50-State Survey of Eligibility, Enrollment, Renewal, and Cost-Sharing Policies in Medicaid and CHIP as of January 2015," January 2015.

Claxton, Gary, Matthew Rae, Michelle Long, Anthony Damico, Bradley Sawyer, Gregory Foster, Heidi Whitmore, and Lindsey Schapiro, "Employer Health Benefits, 2016 Annual Survey," The Kaiser Family Foundation and Health Research & Educational Trust, September 2016.

Congressional Budget Office, "Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026," March 2016.

Cox, Cynthia, Michelle Long, Ashley Semanskee, Rabah Kamal, Gary Claxton, and Larry Levitt, "2017 Premium Changes and Insurer Participation in the Affordable Care Act's Health Insurance Marketplaces," The Kaiser Family Foundation, October 24, 2016.

Cubanski, Juliette, Christina Swoope, Cristina Boccuti, Gretchen Jacobson, Giselle Casillas, Shannon Griffin, and Tricia Neuman, "A Primer on Medicare," The Kaiser Family Foundation, March 2015.

Green, Paul E. and V. Srinivasan, "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research* 5:2, September 1978.

Green, Paul E. and Vithala R. Rao, "Conjoint Measurement for Quantifying Judgmental Data," Journal of Marketing Research, 8 (1971).

Hamel, Liz, Jamie Firth, Larry Levitt, Gary Claxton, and Mollyann Brodie, "Survey of Non-Group Health Insurance Enrollees, Wave 3," The Kaiser Family Foundation, May 20, 2016.

Letter from Melinda Reid Hatton, Senior Vice President & General Counsel for the American Hospital Association to William Baer, the Associate Attorney General, April 18, 2016.

Long, Michelle, Matthew Rae, Gary Claxton, and Anthony Damico, "Trends in Employer-Sponsored Insurance Offer and Coverage Rates, 1999-2014," The Kaiser Family Foundation Issue Brief, March 21, 2016.

Luce, Duncan and John Tukey, "Simultaneous Conjoint Measurement: A New Type of Fundamental Measurement," *Journal of Mathematical Psychology*, 1:1-27 (1964).

Mathews, Anna Wilde and Danny Yadron, "Health Insurer Anthem Hit by Hackers, Breach Gets Away With Names, Social Security Numbers of Customers, Employees," *The Wall Street Journal*, February 4, 2015.

Munro, Dan, "Average Cost Of Obamacare 'Silver' Plan - $328 Per Month," *Forbes*, September 29, 2013.

Nascimento, Nathan, "The Latest Problem under the Affordable Care Act: Deductibles," The National Review, April 12, 2016.

Paradise, Julia, "Key Findings on Medicaid Managed Care: Highlights from the Medicaid Managed Care Market Tracker," The Kaiser Commission on Medicaid and the Uninsured, December 2014.

Sullivan, Peter, "Average ObamaCare premium rises to $408 per month," *The Hill*, January 21, 2016.

Wind, Jerry, Paul Green, Douglas Shifflet, and Marsha Scarbrough, "Courtyard by Marriott: Designing a Hotel Facility with Consumer-Based Marketing Models," *Interfaces* 19:1, 25-47, 1989.

<u>Financial Filings</u>:

Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2014.

Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015.

Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2015.

Anthem, Inc. Form 10-Q for the Quarterly Period ending September 30, 2016.

Wellpoint, Inc. Form 10-K for the Fiscal Year ending December 31, 2013.

Wellpoint, Inc. Form 10-Q for the Quarterly Period ending September 30, 2014.