ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
TONY LOPRESTI (SBN 289269)
tlopresti@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted pro hac vice)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted pro hac vice)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

*Lead Plaintiffs' Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No. 15-MD-02617-LHK |
| | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | Date: June 29, 2017<br>Time: 1:30 p.m.<br>Judge: Hon. Lucy H. Koh<br>Crtrm: 8, 8th Floor |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# **TABLE OF CONTENTS**

TABLES OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

   Anthem's Inadequate Data Security .................................................................................. 2

   The Data Breach .............................................................................................................. 3

   Anthem's Promises and Omissions .................................................................................. 4

   Non-Anthem Promises and Omissions ............................................................................. 5

   BCBSA and Anthem's Promises to Federal Employees .................................................. 5

   Harm to Class Members .................................................................................................... 6

ARGUMENT ........................................................................................................................... 6

I.    Plaintiffs' Proposed Classes Satisfy All Rule 23(a) Requirements ............................. 6

    1.  Numerosity ................................................................................................................. 6

    2.  Commonality ............................................................................................................... 6

    3.  Typicality .................................................................................................................... 7

        a.  California UCL against Anthem ........................................................................ 7

        b.  California UCL Against Non-Anthem Defendants ............................................ 8

        c.  New York GBL §349 ........................................................................................ 8

        d.  California Contract Claims ................................................................................ 9

        e.  California ASO Contract Claims ....................................................................... 9

        f.  Federal Employee Contract Claims .................................................................. 9

    4.  Adequacy of Representation ...................................................................................... 9

II.   UCL and GBL Classes Should be Certified For Injunctive Relief Under Rule 23(b)(2) ........................................................................................................................ 9

III.  The Damages Classes Should Be Certified Pursuant to Rule 23(b)(3) ...................... 11

   A.  The Common Liability and Damages Issues in this Litigation Predominate Within and Across Claims, and Render a Class Action Superior ............................... 11

    1.  Predominance ............................................................................................................ 11

    2.  Superiority ................................................................................................................. 13

B.   Each of the Selected Claims Should be Certified Because They Turn On Predominant Factual and Legal Issues, and Class Treatment is Superior ...................14

1.   California UCL Claims Against Anthem........................................................14

   a.   Liability: Unfair Practices................................................................15

   b.   Liability: Unlawful Practices ...........................................................15

   c.   Liability: Fraudulent Practices ........................................................15

   d.   Restitution ........................................................................................16

2.   California UCL Claims Against the Non-Anthem Defendants ...................17

3.   New York GBL § 349 Claims Against Anthem ...........................................18

4.   California Contract Claims Against Anthem ...............................................19

   a.   Anthem California Contract Class ...................................................19

      1. Contract Formation ...................................................................19

      2. Performance ..............................................................................19

      3. Breach .......................................................................................19

      4. Damages.....................................................................................22

   b.   Anthem California ASO Contract Class ..........................................23

5.   Federal Contract Claims Against Anthem and BCBSA .............................24

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.,*
   731 F.3d 952 (9th Cir. 2013) ........................................................................6, 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
   133 S. Ct. 1184 (2013)..........................................................................................11

*Antman v. Uber Technologies, Inc.,*
   2015 WL 6123054 (N.D. Cal. Oct. 19, 2015)........................................................16

*Berry v. Schulman,*
   807 F.3d 600 (4th Cir. 2015) ................................................................................18

*Briseno v. ConAgra Foods, Inc.,*
   2017 WL 53421 (9th Cir. Jan. 3, 2017) .................................................................17

*Briseno v. ConAgra Foods, Inc.,*
   844 F.3d 1121 (9th Cir. 2017) ................................................................................6

*Brown v. Hain Celestial Grp., Inc.,*
   No. 11-CV-03082-LB, 2015 WL 3398415 (N.D. Cal. May 26, 2015) ...................15

*Catholic Diocese of Biloxi Supplemental Med. Reimbursement Plan and Catholic Diocese
of Biloxi v. Blue Cross, Blue Shield of Tex.,*
   960 F. Supp. 1145 (S.D. Miss. 1997)....................................................................24

*Comcast Corp. v. Behrend,*
   133 S.Ct. 1426 (2013)...........................................................................................12

*Corona v. Sony Pictures Entm't, Inc.,*
   No. 14-CV-09600 RGK EX, 2015 WL 3916744 (C.D. Cal. June 15, 2015) .........10

*Daniel v. Ford Motor Co.,*
   806 F.3d 1217 (9th Cir. 2015) ..............................................................................16

*Delarosa v. Boiron,*
   275 F.R.D. 582 (C.D. Cal. 2011) ..........................................................................10

*Dupler v. Costco Wholesale Corp.,*
   249 F.R.D. 29 (E.D.N.Y. 2008) ............................................................................18

*Falco v. Nissan N. Am. Inc.,*
   No. cv-1300686, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) .............................22

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,*
   317 F.R.D. 374 (S.D.N.Y. 2016) ...........................................................................11

*In re High-Tech Employee Antitrust Litig.,*
   985 F. Supp. 2d 1167 (N.D. Cal. 2013)...................................................................6

*In re Korean Air Lines Co., Ltd.,*
   642 F.3d 685 (9th Cir. 2011) ..................................................................................6

*In re LabMD*,
    2016 WL 4128215 (F.T.C. July 28, 2016) ........................................................................15

*In Re Med. Capital Securities Litig.*,
    2011 WL 5067208 (C.D. Cal. July 26, 2011) ..................................................................20

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
    219 F.R.D. 661 (D. Kan. 2004) ........................................................................................9

*In re Yahoo Mail Litig.*,
    308 F.R.D. 577 (N.D. Cal. 2015) ......................................................................................7

*Ins. Co. of N. Am. v. Johnson*,
    959 F.2d 240, 1992 WL 69325 (9th Cir. 1992) ........................................................19, 20

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) ...............................................................................10, 19

*Johns v. Bayer Corp.*,
    280 F.R.D. 551 (S.D. Cal. 2012) ......................................................................................7

*Just Film v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ..........................................................................7, 13, 23

*Leyva v. Medline Indus., Inc.*,
    716 F.3d 510 (9th Cir. 2013) .............................................................12, 13, 14, 23

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ........................................................................................13

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ............................................................................................7

*Mund v. EMCC, Inc.*,
    259 F.R.D. 180 (D. Minn. 2009) ...............................................................................20, 21

*Newton v. Thomason*,
    22 F.3d 1455 (9th Cir. 1994) ............................................................................................6

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ....................................................................................23

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015) ...........................................................................................18

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ............................................................................................7

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) .............................................................................12, 16, 18

*Raffin v. Medicredit, Inc.*,
    No. CV 15-4912-GHK, 2017 WL 131745 (C.D. Cal. Jan. 3, 2017) .....................................10

*Ries v. Arizona Beverages USA LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012) ....................................................................................18

*Rodriguez v. City of Los Angeles*,
  No. CV-11-01135-DMG, 2014 WL 12515334 (C.D. Cal. Nov. 21, 2014) ..........................18

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2009) ...............................................................................................11

*Senne v. Kansas City Royals Baseball Corp.*,
  315 F.R.D. 523 (N.D. Cal. 2016) ..............................................................................................8

*Staton v. Boeing Co.*,
  327 F.3d 938 (2003) ..................................................................................................................9

*Steinberg Moorad & Dunn Inc., a California Corp. v. Dunn*,
  136 F. App'x 6 (9th Cir. 2005) ...............................................................................................14

*Steinberg v. Nationwide Mut. Ins. Co.*,
  224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................................................20, 21

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ...........................................................................................16

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) .................................................................................................6

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .......................................................................................................11, 12

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) .....................................................................................12, 17, 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................................6, 11

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (9th Cir. 2013) .................................................................................................11

*Yokoyama v. Midland Nat. Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ..........................................................................................16, 18

**STATE CASES**

*Bareno v. Employers Life Ins. Co.*,
  7 Cal. 3d 875 (1972) ...............................................................................................................20

*Caronia v. Philip Morris USA, Inc.*,
  22 N.Y.3d 439 (2013) ..............................................................................................................10

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*,
  4 Cal. App. 4th 963 (1992) ......................................................................................................10

*Engalla v. Permanente Med. Grp., Inc.*,
  938 P.2d 903 (Cal. 1997) .........................................................................................................16

*Fields v. Blue Shield of California*,
  163 Cal.App.3d 570 (1985) ...............................................................................................19, 20

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009) ..................................................................16

*Ins. Co. of N. Am. v. Bechtel*,
    36 Cal.App.3d 310 (1973) ...............................................................19

*Kitchel v. Acree*,
    216 Cal.App.2d 119 (1963) .............................................................22

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) .......................................................15

*Parsons v. Bristol Dev. Co.*,
    402 P.2d 839 (1965) ........................................................................20

*Shaw v. Regents of Univ. of California*,
    58 Cal. App. 4th 44 (1997) .............................................................21

**FEDERAL STATUTES**

15 U.S.C. §45 ..........................................................................................15

15 U.S.C. §6801(a) ..................................................................................15

**STATE STATUTES**

Cal. Bus. & Prof. Code §17203 ................................................................9

N.Y. Gen. Bus. Law §349(h) ........................................................9, 10, 18

**RULES AND REGULATIONS**

45 CFR §164.306(a)(2) ............................................................................15

Fed. R. Civ. P. 23(a) .......................................................................passim

Fed. R. Civ. P. 23(b) .......................................................................passim

1

**INTRODUCTION**

2        Anthem's failure to implement adequate data security to protect class members' personally

3    identifying information ("PII"), including its failure to abide by its own information security

4    policies, caused one of largest data breaches in history, resulting in the exfiltration of PII belonging

5    to nearly 80 million Americans, now in the hands of cyber-criminals.  Class members have lost the

6    confidentiality of their permanently-identifying information, and do not know whether identity

7    theft will occur today, tomorrow, or next year.  Plaintiffs seek to hold Anthem responsible for its

8    shoddy security practices, which contravened its direct promises to safeguard their PII.  Plaintiffs

9    likewise seek to hold responsible the Non-Anthem Defendants that permitted Anthem to collect

10   their customers' PII without insuring that Anthem would protect it.

11       Plaintiffs seek certification of consumer protection claims under California and New York

12   law, and breach of contract claims under California and federal law.  This case is naturally suited

13   for resolution on a class-wide basis.  Each named plaintiff and each absent class member was

14   injured by the same Data Breach.  Anthem's grossly inadequate data security is at the root of each

15   claim.  Individual consumers cannot be expected to present the technical documents and expert

16   testimony needed to prove that Anthem knowingly skimped on data security.  They cannot be

17   expected to uncover and present internal documents showing that Anthem was more focused on

18   monetizing the value of its customers' sensitive data than securing it, or that Anthem was

19   repeatedly warned that it was violating the law and its own policies.  But collectively, class

20   members can present a detailed and convincing case that Anthem's data security was unreasonable

21   and led to one of the largest data breaches in history.

22       Answering the question of whether Anthem took reasonable security measures will go a

23   long way toward adjudicating millions of class member claims, including whether Anthem's

24   conduct was unfair or unlawful under the California UCL, and whether it breached the federal and

25   California contracts.  Other issues presented by Plaintiffs' claims are also amenable to common

26   proof and can be resolved for all class members through a single trial.  For example, California and

27   New York consumer protection claims depend on an objective standard of interpretation: if a

28   reasonable consumer would consider Anthem's inadequate security to be important, Anthem may

1   be held liable.  Similarly, California contract claims will require a showing that Anthem's uniform

2   privacy policies constitute a binding promise to protect member confidentiality.  Because the

3   contractual provisions in question are materially the same for all class members, that question of

4   interpretation can be answered for all California class members in one fell swoop.  The remedies

5   available to class members will also be similar.  All class members would be entitled to the same

6   injunction to protect them from future harm, and the monetary consequences of Anthem's

7   inadequate security can largely be established through expert testimony, under both a "Benefit of

8   the Bargain" and "Loss of Value of PII" theory.

9       Because Anthem's data security practices uniformly apply to all class members, common

10   issues will predominate with regard to the trial of all claims arising from the Data Breach, such

11   that the Court should certify Plaintiffs' claims pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

12                                   **FACTUAL BACKGROUND**

13       Defendant Anthem, Inc. is the second largest health insurer in the United States. T57 at 5.[1]

14   Anthem provides services to its members through its Blue Cross-Blue Shield ("BCBS") affiliates;

15   through non-BCBS subsidiaries; through administrative-services-only ("ASO") contracts with

16   employer-funded health plans; and through the Blue Cross and Blue Shield Service Benefit Plan,

17   also known as the Federal Employee Program ("FEP"). *Id.* at 5, 7.

18       **Anthem's Inadequate Data Security.**  For years, Anthem neglected data security and

19   focused instead on monetizing its vast collection of sensitive data.  It referred to customer PII as its

20   "most valuable asset," T25, and acted accordingly—compiling and storing data to "optimize

21   revenue."  T26 (at Slide 4).  Even though it created a serious security risk ███████████████████

22   ████████████████████████ Anthem did exactly that.  T26 at 825.  ██████████

23   █████████████████████████████████████████████████████████

24   ██████████████████████████ T26 at 825.  And even though it violated basic

25   security protocols ███████████████████████████████████████████████

26   ████████████ T28-29.

27   _____

28   [1] Citations throughout this brief are to Tabs ("T") in Plaintiffs' evidentiary submission in support of Plaintiffs' Motion for Class Certification.

1    Long before the Data Breach, Anthem was well aware that its cybersecurity defenses were

2  insufficient.  For instance, Anthem knew ███████████████████████████████████

3  █████████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████ in violation of its own security

5  policies, HIPAA, and cybersecurity standards.  T16 (Strebe Report at 29-33, 45-47, 50-52).

6  Multiple internal audits found Anthem's data security practices deficient. *Id.* at 42-45.  In 2013,

7  Anthem's Chief Information Security Officer ("CISO"), Roy Mellinger, repeatedly warned top

8  executives that Anthem fell "far short of having the capability to protect against APTs [Advanced

9  Persistent Threats] . . . . Such attacks are not unreal – two major healthcare organizations have

10  suffered such attacks in recent months…." T30 at 1.  He also explained that "anything

11  sophisticated or intentional will find our defenses lacking." T31.  Yet Anthem failed to act.

12    **The Data Breach.**  Plaintiffs' cybersecurity expert has provided a timeline of the Data

13  Breach, and outlined Anthem's deficiencies: Following ten months of activity within Anthem's

14  systems (which Anthem repeatedly failed to detect), in December 2014, hackers ██████████

15  █████████████████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████████████████

17  ███████████████████ extracting PII for nearly 80 million people. *See* T16 (Strebe Report at 20-

18  29). ████████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████████

20  ██████████████████████████████████ *Id.* at 42-45, 50-52. The day after

21  the Data Breach, Anthem's CISO emailed:

22    I'm sure you won't be surprised to hear that I have been trying for five years to lock down
   or close some of these open holes ... ███████████████… I've got
23    battle scars .... This organization, and the senior executives … have traditionally been more
   focused on "end user convenience" versus security... Just don't want you to think the
24    current environment that exists is one in which I am comfortable with....  T32 at 1.

25    The Data Breach occurred because Anthem failed to fix basic security deficiencies that it

26  had long known about and should have corrected. T16 (Strebe Report 29-69).  The following five

27  preventable deficiencies are representative examples of Anthems' serious security gaps:

28  • ██████████████████████████████████████████████████████████████

1

2   •   ████████████████████████████████████████

3       ██████████████████████████

4   ████████████████████████████████████████████

5       ████████████████████████████████

6   ██████████████████████████████████████████

7       ██████████████████████

8   ██████████████████████████████████████████

9        Following the Data Breach, Anthem mailed notification letters to individuals it identified as

10   affected by the Breach, informing them that their PII may have been accessed, including "names,

11   dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses,

12   and employment information, including income." T67.  As relevant here, the Data Breach affected

13   approximately 12.7 million Anthem customers residing in California (including millions of

14   customers enrolled in contracts with Anthem's California affiliates) and 4.2 million New York

15   Anthem customers. T58-59.  The Data Breach also affected approximately 650,000 California

16   customers of the Non-Anthem Defendants, and two million federal employees. T58; T169.

17        **Anthem's Promises and Omissions.** Federal and state law require that Anthem keep

18   member PII confidential, and Anthem has long promised all members that it will protect the

19   confidentiality of their information, on its websites, in its mailings, and in its contracts. T60-62

20   (Anthem NOPPs); T72 (RFAs: 263-264); T73 (RFAs: 633-647, 649-653, 655-659, 661-662); *see*

21   *infra* at 20-24.

22        Since at least 2011, these promises have been uniform for every member of every plan, as

23   described in Anthem's Notice of Privacy Practices ("NOPP"), and in Anthem's Personal

24   Information (Including Social Security Number) Privacy Protection Policy ("PII Policy").

25

26   [2] ████████████████████████████████████

27   ██████████████████████████████████████

28   ███████████████████████████

T72 (RFA: 261); T73 (RFAs: 638-44, 647, 649-50, 653, 655-56, 659,  661-662); T63 (Nader depo. at 113:6-13; 114:9-12, 118:22-119:17); T60-62 (Anthem NOPPs); T64-66 (policies).  In particular, Anthem promised to protect the confidentiality of its members' PII:

- NOPP: "We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules."; "We have to keep your PHI private." T60-62.

- PII Policy: "Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions.";  "Anthem Blue Cross and Blue Shield is committed to protecting the confidentiality of Social Security numbers and other Personal Information." T73 (RFA 639).

And it promised to guard members' PII using reasonable security measures:

- NOPP: "we take reasonable safety measures to protect the PI we have about you";  "We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards follow federal and state laws."  T60-62.

- PII Policy: "Anthem Blue Cross and Blue Shield's Privacy Policy imposes a number of standards to: guard the confidentiality of Social Security numbers and other personal information, prohibit the unlawful disclosure of Social Security numbers, and limit access to Social Security numbers.";  "Anthem Blue Cross and Blue Shield safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place." T73 (RFA 639).

Anthem has admitted that it never informed customers that it was not complying with its own privacy policies, and was instead employing substandard security measures. T72 (RFAs 265-66).

**Non-Anthem Promises and Omissions.**  Customers of Non-Anthem Defendant insurance companies did not do business with Anthem, but their PII ended up in EDWard as a result of contractual arrangements between Anthem and the Non-Anthem Defendants. T106 ¶3.c-f.  The Non-Anthem Defendants did not disclose to their customers that they would not follow their own privacy policies and would not maintain the confidentiality of members' PII in accordance with law, including when it was shared with Anthem and stored indefinitely in Anthem's inadequately secured data warehouse.  T106 ¶4.c-d (RFAs 8-9).  They also failed to ensure that Anthem was adequately safeguarding their customers' PII, and ultimately failed to ensure it was protected, despite their promises to do so. T106 ¶4.a-b, g-i (and evidence cited therein).

**BCBSA and Anthem's Promises to Federal Employees.** Federal employees who participate in the FEP are the intended beneficiaries of the contract between the Blue Cross Blue

1   Shield Association ("BCBSA") (on behalf of itself and all member BCBS companies including

2   Anthem) and the Office of Personnel Management ("OPM"), Contract No. CS 1039 ("FEP

3   Contract"). T162.  BCBSA and Anthem expressly committed in the FEP Contract to preserve the

4   confidentiality of FEP member PII, but failed to do so. T162 (§1.6, "Confidentiality of Records,"

5   at 0000930); §1.6(d), amendment, at 0000974; *see also* §1.22 (0000941)).

6           **Harm to Class Members.**  All victims of the Anthem Data Breach are at increased risk of

7   identity fraud, for which they should take protective measures.  *See infra* at 13. They have all been

8   deprived of the benefit of their bargain, in that adequate data security should have been provided

9   with their health insurance plans, but was not.  And many suffered fraud (T103, 98, 99) or out of

10  pocket losses, including time and money spent dealing with suspected fraud (T100, 102) or

11  purchase of credit monitoring services to protect themselves.  T101.

12                                          **ARGUMENT**

13  **I.      Plaintiffs' Proposed Classes Satisfy All Rule 23(a) Requirements**

14          Each of the classes and subclasses, as defined and identified in the accompanying Notice of

15  Motion and Motion ("Mot."), meets the requirements of Rule 23(a), as follows:

16          1. *Numerosity*. Each of the classes that Plaintiffs seek to certify consist of hundreds of

17  thousands to millions of individuals – as to which joinder is plainly impossible. *See, e.g.*, *In re*

18  *High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013); Rule 23(a)(1).[3]

19          2. *Commonality*. The four selected claims, all of which involve questions of law and fact

20  pertaining to the adequacy of Anthem's data security, easily meet the Rule 23(a)(2) standard

21  requiring common questions that "generate common answers apt to drive the resolution of the

22  litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal-*

23  *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731

24  F.3d 952, 957 (9th Cir. 2013) ("[A]ll that Rule 23(a)(2) requires is a single significant question of

25  

26          [3] The proposed class members will be readily ascertainable from Defendants' records.
    Plaintiffs do not address this any further in light of the recent decision *Briseno v. ConAgra Foods,*
27  *Inc.,* 844 F.3d 1121, 1133 (9th Cir. 2017). With respect to this and all other aspects of Rule 23, like
    all questions of federal law, this Court applies Ninth Circuit law, not the law of the MDL transferor
28  court. *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 n.12, 701 (9th Cir. 2011); *Newton v.*
    *Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994).

1    law or fact") (internal punctuation and citation omitted).

2         The trial of this case will focus on Defendants' conduct and policies.  Anthem's

3    implementation, or lack of implementation, of adequate data security governing its centralized

4    database impacted all class members.  Proof concerning the adequacy of Anthem's uniform

5    security practices is therefore common to all class members.  The requisite commonality exists

6    here because the issues raised by the classes' claims have common answers that will drive the

7    resolution of this case. That is, either Anthem's data security was sufficient, or it was not.  Either

8    Anthem's cybersecurity violated HIPPA and its promises to its members, or it did not.  The Non-

9    Anthem Defendants either ensured that Anthem would adequately safeguard their members' PII, or

10   they did not.  The Non-Anthem Defendants either informed their members that those members' PII

11   would not be protected when stored in Anthem's (insecure) database, or they did not.

12        3. *Typicality*. Rule 23(a)(3) typicality is satisfied when the class representatives' claims

13   arise from the same course of events and rely on similar legal arguments as other class members'

14   claims. *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("[R]epresentative claims are 'typical'

15   if they are reasonably coextensive with those of absent class members; they need not be

16   substantially identical").  Typicality is necessarily satisfied where, as here, "the plaintiff endured a

17   course of conduct directed against the class." *Just Film v. Buono*, 847 F.3d 1108, 1118 (9th Cir.

18   2017); *accord Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007).  *See* Mot.

19   (defining classes and subclasses and identifying proposed class representatives).

20        *a. California UCL against Anthem.*  The proposed class representatives are typical of the

21   Statewide California Class, because all are California residents whose PII was exfiltrated in the

22   Breach due to Anthem's unfair and unlawful business practice of collecting, aggregating and

23   failing to adequately protect PII (and restitution subclass representatives were enrolled in a plan for

24   which Anthem was paid during the statute of limitations). T1-8; T70-71.  The class representatives

25   are typical of the class because they were subject to the same practices as other class members.

26   *See In re Yahoo Mail Litig.,* 308 F.R.D. 577, 593 (N.D. Cal. 2015); *Johns v. Bayer Corp.*, 280

27   F.R.D. 551, 557 (S.D. Cal. 2012) (plaintiffs typical of class seeking partial restitution of purchase

28   price where claims arose from same course of conduct).

*b. California UCL Against Non-Anthem Defendants.* Proposed class representative Karen Blanchard was enrolled in a plan with Non-Anthem Defendant HCSC, and Lillian Brisko was enrolled with Non-Anthem Defendant Blue Shield of California. T7-8.  They are typical of all Non-Anthem customers in California impacted by the Breach because, although they were not Anthem members, Anthem acquired their PII as a result of the Inter-Plan Program in which all Non-Anthem Defendants participated without insuring adequate safeguards for protection of their customers' PII, and their Non-Anthem Defendant was paid for their plans. T 7-8, T106 ¶4.f (Rogs); T106 ¶4.e)(compiling evidence).[4] Because the challenged conduct stems from a common contractual course of conduct binding all Non-Anthem Defendants (whereby they could have, but did not, require Anthem to provide adequate data security), these claims are "juridically related," such that customers of one Non-Anthem Defendant are typical of customers of other Non-Anthem Defendants.  *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 567–68 (N.D. Cal. 2016) ("[the 'juridically related' exception] applies where the defendants 'entered into . . . an agreement and were thereby bound to a common course of conduct' that gave rise to the plaintiff's alleged injuries") (finding member of one baseball team typical of members of all other teams).

*c. New York GBL §349.*   Each of the proposed class representatives have fraudulent omissions claims typical of those of the Statewide New York Anthem Customer Class:  they each enrolled in an Anthem plan during the limitations period, were never told that Anthem's data security practices were inadequate to safeguard their PII, and suffered injury as a result (in the form of lost-value of PII and loss of benefit of their bargain, described below). T9-12; T70-71.

*d. California Contract Claims.*   The proposed class representatives have contract claims

---

[4]Anthem and all Non-Anthem Defendants are signatory to a uniform governing contract, the BCBS License Agreement, and accompanying Business Associate Agreement ("BAA"). T106 ¶3.a. As a condition of BCBSA membership, all were required to participate in BCBSA's Inter-Plan programs, including the BlueCard program, which permit members to access care outside their home state. T106 ¶3.c. The Non-Anthem customers' PII was thus provided to Anthem pursuant to the BCBS License Agreement and implementing standards established by the BCBSA Board of Directors, which includes the CEOs of each Non-Anthem Defendant and Anthem. T106 ¶3.b-f. Although they had authority by virtue of their representation on the BCBSA Board of Directors to create the standards that governed these Inter-Plan programs, the Non-Anthem Defendants did not create cybersecurity standards or otherwise provide for the security of their members' PII conveyed to Anthem before the Data Breach. T106 ¶3.h-i.

1   typical of the Anthem California Contract Class, because they were enrolled in Anthem insurance

2   plans in 2014 or 2015 through an Anthem California-based affiliate, and had their data taken in the

3   Breach. T1-2, 6; T70.  They are typical because, like all class members, their insurance contracts

4   incorporated Anthem's uniform privacy policies that Anthem breached. *See In re Universal Serv.*

5   *Fund Tel. Billing Practices Litig*., 219 F.R.D. 661, 667–68 (D. Kan. 2004) (typicality satisfied

6   where the "substance of the contractual provision[s]" in question is same for all class members).

7       *e.  California ASO Contract Claims*.  The proposed class representative was enrolled in a

8   self-funded plan governed by an ASO agreement subject to California law during 2014 and 2015

9   (that did not contain any "no third party beneficiary language") and had his data taken in the

10  Breach, such that he is typical of other class members with similar ASO agreements breached by

11  Anthem.  T3; T70.

12      *f.  Federal Employee Contract Claims*.  The proposed class representatives' claims are

13  typical of the FEP class, because they were covered by the same FEP Contract, and had their PII

14  taken in the Data Breach due to Anthem and BCBSA's breach of contract. T4, 13-15; T70.

15      4. ***Adequacy of Representation***. Adequacy is satisfied when 1) the named plaintiffs and

16  counsel have no conflicts with the class; and 2) plaintiffs will "prosecute the action vigorously."

17  *Staton v. Boeing Co*., 327 F.3d 938, 957 (2003); *see also* Rule 23(a)(4). The class representatives

18  have no conflicts with the class, and instead share the same interests in prosecuting these claims.

19  They have participated actively in this case, including by responding to discovery, sitting for

20  depositions, and allowing their personal computers to be examined. T1-15. Proposed class counsel

21  are experienced class action attorneys and are committed to prosecuting this case. T170-173.

22  **II.    UCL and GBL Classes Should be Certified For Injunctive Relief Under Rule 23(b)(2)**

23      Class certification of a claim for injunctive relief is appropriate when, in addition to the

24  four requirements of Rule 23(a) discussed above, "the party opposing the class has acted or refused

25  to act on grounds that apply generally to the class, so that final injunctive relief … is appropriate

26  respecting the class as a whole." Rule 23(b)(2). Here, Plaintiffs' UCL and GBL claims easily

27  meet that standard because Anthem acted in a manner common to the class.[5] Specifically, Anthem

28  _____

[5] The UCL and GBL provide for injunctive relief.  Cal. Bus. & Prof. Code §17203; N.Y. Gen.

9

1    stored all class members' PII in EDWard subject to the same security deficiencies; class members'

2    PII was compromised as a result of those deficiencies; Anthem is still in possession of class

3    members' PII; and Anthem still has not adequately secured the PII. Final injunctive relief is thus

4    needed to remediate Anthem's poor security, and will be the same for all class members. Plaintiffs'

5    expert has set forth the security controls needed to protect class members' PII in the future. T16

6    (Strebe Report at 73-82).  Courts commonly certify (b)(2) classes in such circumstances.  *See, e.g.,*

7    *Delarosa v. Boiron*, 275 F.R.D. 582, 591 (C.D. Cal. 2011) (UCL); *Jermyn v. Best Buy Stores, L.P.*,

8    256 F.R.D. 418, 434 (S.D.N.Y. 2009) (GBL).[6]  *See* Mot. (identifying (b)(2) classes).

9         Plaintiffs also intend to request that the Court require Anthem to provide class members

10   with at least five years of fraud-prevention and detection services to mitigate the deleterious effects

11   of its prior sub-standard security practices, as recommended by their identity fraud expert. *See* T21

12   (Van Dyke Report at ¶¶40-54); *Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600 RGK EX,

13   2015 WL 3916744, at *4 (C.D. Cal. June 15, 2015) (credit monitoring necessary for victims of

14   data breach); *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 4 Cal. App. 4th 963,

15   973 (1992) (upholding court's authority under the UCL to issue injunctive relief needed to "correct

16   the consequences of past conduct"); *cf. Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 452

17   (2013) (medical monitoring is available under New York law).

18         Similarly, the Non-Anthem Defendants all acted through common contractual

19   arrangements on grounds that apply to all members of the Non-Anthem customer California

20   Subclass in the same way. Final injunctive relief is therefore appropriate for that subclass as well:

21   an injunction prohibiting Non-Anthem Defendants from requiring or permitting their members' PII

22   from being conveyed to other BCBS licensees, unless that licensee implements necessary security

23   controls to safeguard that PII (*See* T16 (Strebe Report at 73-82)); and prohibiting any BCBS

24   licensee from aggregating and storing such information indefinitely for non-operations purposes,

25   as Anthem did.

26   _____

     Bus. Law §349(h).

27       [6] The Court should certify Plaintiffs' claims for injunctive relief under Rule 23(b)(2) and their
     claims for monetary relief under Rule 23(b)(3).  *See, e.g., Raffin v. Medicredit, Inc.*, No. CV 15-
28   4912-GHK, 2017 WL 131745, at *10 (C.D. Cal. Jan. 3, 2017) (collecting cases).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
CASE NO. 15-md-02617-LHK

Defendants' failure to provide adequate data security applies to everyone in these classes, necessitating the same remedy for all class members. That is, "a single injunction … would provide relief to each member of the class." *Dukes*, 564 U.S. at 360; *Rodriguez v. Hayes,* 591 F.3d 1105, 1125 (9th Cir. 2009) (court need "only to look at whether class members seek uniform relief from a practice applicable to all of them."). The single requested injunction—unlike monetary damages—will protect the rights of all California and New York consumers. *See, e.g., Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 317 F.R.D. 374, 397 (S.D.N.Y. 2016).

## III.   The Damages Classes Should Be Certified Pursuant to Rule 23(b)(3)

### A.   The Common Liability and Damages Issues in this Litigation Predominate Within and Across Claims, and Render a Class Action Superior

Plaintiffs first demonstrate that Rule 23(b)(3) predominance and superiority are satisfied with respect to issues that cut across all claims, and then move on to discuss claim-specific issues.

1. *Predominance*.  Rule 23(b)(3) predominance "focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah*, 731 F.3d at 963–64 (citing *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538 (9th Cir. 2013)). The Supreme Court recently explained:

> The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations omitted).

*a. The most important liability issues in this case have common answers.*  The central liability issues in the case all concern Anthem's data security.  What matters for purposes of class certification is not whether this Court or a jury will ultimately agree that Anthem's data security was woefully insufficient (although the evidence shows that it was), but whether all class members' claims will rise or fall in unison.  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 1194 (2013).  The answer to that question is yes: either Anthem's data security was adequate, or it was not. Either Anthem was required to provide adequate security, or it was

not.  Either Anthem was required to disclose its security failings, or it was not.

  *b. The primary damages issues in this case also have common answers.* Plaintiffs show here that their two primary forms of damages "'stem[] from the defendant's actions that created the legal liability.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2410 (2016) (quoting *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  This Court has already held that Benefit of the Bargain and Loss of the Value of PII damages are available if Plaintiffs prove Defendants' conduct that gives rise to liability with respect to particular claims.  ECF 468 at 32-22, 45-49; ECF 524 at 23-27, 75-77. Like the central liability issues, Plaintiffs' proposed expert methods of measuring both types of classwide damages will rise or fall together, and that satisfies Rule 23. *Tyson Foods,* 136 S.Ct. at 1047-49; *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016).[7]

  First, Defendants' conduct deprived all class members of the benefit of their bargain – health insurance with adequate data security.  Plaintiffs have proposed a widely-accepted methodology to place a dollar value on what Defendants failed to provide – available as a measure of restitution under the UCL, and as damages for the GBL and contracts claims.  T19-20 (Rossi Reports).  Peter E. Rossi, a professor at UCLA and leading expert in the use of conjoint analysis, has outlined the conjoint survey and supply-side analyses that he will conduct to determine the difference in value between the product Anthem should have provided class members (insurance with adequate data security) and the product it actually provided (insurance without adequate data security).  T19 (Rossi Report, ¶¶14, 62-63, 67-107); T20 (Reply Report, ¶¶8, 14-17, 21-22, 57, 60-62, 70-71, Ex. 1a, Ex. 1b).[8]

  Second, Defendants' conduct resulted in a loss of the value of PII, which has economic

---

[7] *Tyson Foods* and *Vaquero* provide an important gloss on the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013). In particular, these recent cases confirm that while the Court still must engage in a rigorous analysis of the Rule 23 factors, arguments about the validity of expert analysis used to measure classwide damages — which really are merits arguments — are issues for summary judgment or trial — not class certification. *Tyson Foods*, 136 S.Ct. at 1047-49; *Vaquero*, 824 F.3d at 1155.

[8] Plaintiffs discuss an alternative measure of Benefit of the Bargain damages available under contract law – repair damages—below.  *See infra*, at 22.   Plaintiffs also discuss Out-Of-Pocket Expenses, an additional measure of damages available only for breach of contract, below.

1   value.  The loss of value of PII can be measured in several ways.  There is a black market on which

2   PII is sold, and this black market value serves as a floor for damages.  The only dispute is the level

3   of the floor:  Plaintiffs' expert puts the baseline value at no less than $10 per record (T21, Van

4   Dyke Report ¶21), whereas Defendants' expert puts the "market price" at $4 per record.  T105.

5          The black market value may understate class member losses.  A more appropriate measure

6   is the value of preserving the confidentiality of PII, which was lost as a direct result of the Data

7   Breach.  A reasonable economic proxy for the monetary value of keeping one's PII private is the

8   cost to protect oneself from fraud when that PII is made public (here, deliberately stolen).

9   Plaintiffs' identity theft expert explained that identity fraud is not possible without exposure of

10  confidential PII, that individuals whose PII has been stolen face increased risk of identity theft (a

11  risk that increases with each subsequent theft), and that people whose permanent information is

12  compromised should take concrete steps to protect themselves.  In particular, consumers who have

13  reason to believe that their name, SSN, and DOB were exfiltrated in the Anthem Data Breach

14  should take several steps to protect against that risk at a cost of $9 to $20 per month, for five years

15  following the Data Breach. T21 (Van Dyke Report, ¶¶17, 23, 29-34, 40-53), T22 (Van Dyke Reply

16  Report, ¶¶3a, 8-9, 31-33).

17         2. *Superiority*.  A class action is certainly superior here to millions of individual trials. *See*

18  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152,

19  1163 (9th Cir. 2001) (superiority requires comparative analysis).  If Plaintiffs cannot proceed as a

20  class, they are unlikely to proceed at all, due to the high cost of proving Anthem's liability with

21  expert technical and damages evidence. Rule 23(b)(3)(a); *e.g., Just Film,* 847 F.3d at 1123 (class

22  action superior when "individual damages … are too small to make litigation cost effective in a

23  case against funded defenses and with a likely need for expert testimony"). All federal cases are

24  consolidated in this MDL, and because Plaintiffs will prove their case with classwide evidence, it

25  is desirable to litigate in a particular forum. Rule 23(b)(3)(b), (c); ECF 690 at 11.

26         Finally Plaintiffs' Trial Plan sets forth the common evidence that Plaintiffs will use to

27  prove each of the four selected claims, demonstrating that a class trial is easily managed, and is

28  certainly far more manageable than the alternative of millions of individual trials.  *See Leyva*, 716

1  F.3d at 515 (Rule 23(b)(3)(d) requires comparative analysis).  Beyond the two central disputes

2  discussed above (adequacy of data security and Defendants' criticisms of Plaintiffs' expert

3  damages models), most of the other elements of Plaintiffs' claims as discussed below and in

4  Plaintiffs' Trial Plan — such as the content of Defendants' privacy policies, or that Anthem never

5  disclosed its inadequate data security — will be proven with common evidence and are not in

6  dispute.  Plaintiffs rely on binding admissions, discovery responses, and 30(b)(6) deposition

7  testimony, indicating that many of these facts will either be resolved on partial summary judgment

8  or be the subject of fact stipulations for trial.  Other issues – such as contract interpretation -- will

9  be resolved as a matter of law by the Court.  Accordingly, the actual trial of these four claims,

10  which Plaintiffs suggest take place before this Court as the next step in the MDL process, will be

11  streamlined and efficient.

12  **B.    Each of the Selected Claims Should be Certified Because They Turn On Predominant Factual and Legal Issues, and Class Treatment is Superior**

13  **1.    California UCL Claims Against Anthem**

14      The Court should certify a Rule 23(b)(3) Statewide California Anthem UCL Restitution

15  Subclass that includes all California residents whose PII was compromised in the Data Breach and

16  were enrolled in a health plan for which Anthem was paid during the four-year statute of

17  limitations. This Court's prior Orders permitted Plaintiffs to proceed on three UCL theories against

18  Anthem:  One under the unfair prong for compiling and maintaining PII with inadequate data

19  security to protect the confidentiality of the information (ECF 524 at 60); one under the unlawful

20  prong for violating the privacy and security requirements of HIPAA, the Gramm-Leach-Bliley

21  Act, the FTC Act, and California's Unfair Insurance Practice statute (*id.* at 58); and one under the

22  fraudulent prong for failing to inform customers that Anthem did not have adequate data security

23  to protect their PII. *Id.* at 63.  An overview of the common evidence Plaintiffs will rely upon to

24  prove these three UCL claims is included in Plaintiffs' accompanying Trial Plan, and focuses on

25  Anthem's common course of conduct. Because the UCL is an equitable statute, the Court, rather

26  than the jury, decides this claim, *Steinberg Moorad & Dunn Inc., a California Corp. v. Dunn*, 136

27  F. App'x 6, 9 (9th Cir. 2005), providing the Court flexibility in managing argument and evidence.

28      *a. Liability: Unfair Practices*. Plaintiffs' unfair practices claim will yield a common result

1   for each class member. It hinges on (i) whether Anthem's security practices violated California

2   public policy of protecting the confidentiality of PII, and (ii) whether that public policy violation is

3   outweighed by the utility of Anthem's conduct. ECF 468 at 40; *see also McKell v. Washington*

4   *Mut., Inc.,* 142 Cal. App. 4th 1457, 1473 (2006). These determinations are focused entirely on

5   Anthem's conduct. *See Brown v. Hain Celestial Grp., Inc.,* No. 11-CV-03082-LB, 2015 WL

6   3398415, at *13 (N.D. Cal. May 26, 2015) ("the UCL focuses on the defendant's conduct"). The

7   evidence Plaintiffs will present at trial to demonstrate how Anthem collected, aggregated, stored,

8   and secured the PII it collected is all common, generalized evidence that does not vary at all by, for

9   example, the type of plan in which a class member enrolled. Once that evidence is evaluated and

10  weighed against any utility that Anthem may attribute to its procedures, it will necessarily lead to a

11  single conclusion applicable to the entire class: either Anthem's security procedures are unfair

12  practices under the UCL or they are not.

13      *b. Liability: Unlawful Practices.* To hold Anthem liable under the unlawful prong,

14  Plaintiffs will need to show that Anthem's conduct violated HIPAA, the Gramm-Leach-Bliley

15  Act, or the FTC Act. ECF 468 at 38; ECF 524 at 58.  As with the unfair prong, each of these

16  statutes focus exclusively on Anthem's conduct. HIPAA's Privacy Rule and Security Rule, for

17  example, mandate that Anthem implement certain technical safeguards and generally "[p]rotect

18  against any reasonably anticipated threats." 45 CFR §§164.306(a)(2), 164.308. The Gramm Leach-

19  Bliley Act requires Anthem to "protect the security and confidentiality of [its] customers'

20  nonpublic personal information."  15 U.S.C. §6801(a). And the FTC Act prohibits unfair practices

21  and is violated when a company fails to maintain reasonable data security or delete old customer

22  data. 15 U.S.C. §45; *In re LabMD,* 2016 WL 4128215 (F.T.C. July 28, 2016). The central issue of

23  whether Anthem violated any of these statutes will not vary at all from class member to class

24  member; either Anthem's data security procedures were unlawful or they were not.

25      *c. Liability: Fraudulent Practices*. To establish liability under the UCL's fraudulent prong,

26  Plaintiffs will have to prove that "members of the public [were] likely to be deceived" by

27  Anthem's failure to disclose that PII would be stored on systems that do not meet reasonable

28  standards for data security adequate to protection the confidentiality of their PII.  ECF 524 at 61

1    (quoting *Antman v. Uber Technologies, Inc.*, 2015 WL 6123054 *6 (N.D. Cal. Oct. 19, 2015)).

2    Anthem's liability therefore will not depend on any individual's subjective experiences, but on the

3    results of an objective "reasonable consumer" test. *Pulaski*, 802 F.3d at 986-87; *Daniel v. Ford*

4    *Motor Co*., 806 F.3d 1217, 1225 (9th Cir. 2015) (under California UCL law:  "An omission is

5    material if a reasonable consumer 'would attach importance to its existence or nonexistence in

6    determining his choice of action in the transaction in question.'") (quoting *In re Tobacco II Cases*,

7    207 P.3d 20, 39 (Cal. 2009), and *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal.

8    1997)).  Anthem has *admitted* that it failed to disclose to *any* of its customers that its security was

9    inadequate. T72 (RFAs 265-66).  Either Anthem's failure to disclose its sub-standard data security

10   practices and violations of its own data security policies will be deemed a fraudulent business

11   practice as to all class members, or as to none of them—making Plaintiffs' claims under the UCL's

12   fraudulent prong ideal for class treatment. *See Yokoyama v. Midland Nat. Life Ins. Co.,* 594 F.3d

13   1087, 1093 (9th Cir. 2010) (reversing denial of certification where the factfinder "will not have to

14   determine whether each plaintiff subjectively relied on the omissions, but will instead have to

15   determine only whether those omissions were likely to deceive a reasonable person.  This does not

16   involve an individualized inquiry"); *accord Pulaski*, 802 F.3d at 987–88; *Tait v. BSH Home*

17   *Appliances Corp.,* 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("This objective test renders claims under

18   the UCL … ideal for class certification.").

19          *d. Restitution*. If Anthem is found liable under any prong of the UCL, Plaintiffs will ask the

20   Court to award the Rule (b)(3) Subclass a partial refund of the money that Anthem received during

21   the limitations period in exchange for services provided to these members that should have

22   included lawful and fair protections for class members' PII, but did not. *See* ECF 468 at 33-34.

23   Whether (b)(3) class members are entitled to restitution is a common issue. *Pulaski,* 802 F.3d at

24   986 ("restitution is available on a classwide basis once the class representative makes the threshold

25   showing of liability under the UCL"). "[I]n calculating restitution under the UCL," the focus is not

26   on individualized circumstances but on "the difference between what was paid and what a

27   reasonable consumer would have paid" in the absence of the unfair business practice. *Id.* at

28   989.  This differential in value is, as explained above, precisely what Plaintiffs' expert Dr. Rossi

1   intends to measure.  It flows directly from Anthem's conduct, and is therefore sufficient for class

2   certification. *Briseno v. ConAgra Foods, Inc*., 2017 WL 53421 at *2 (9th Cir. Jan. 3, 2017) (citing

3   *Vaquero*, 824 F.3d at 1154).

4           **2. California UCL Claims Against the Non-Anthem Defendants**

5           The Court should certify the Statewide California Non-Anthem Customer Restitution

6   Subclass, consisting of Non-Anthem customer California residents enrolled in a Non-Anthem

7   Defendant Plan within the four-year statute of limitations.  Just as Anthem's liability under the

8   unfair prong depends on whether its security practices violated California public policy, the Non-

9   Anthem Defendants' liability will depend on whether their collective policy and practice of

10  requiring member PII to be conveyed to, and permitting PII to be retained indefinitely by, Anthem,

11  without appropriate safeguards violated California public policy. Likewise, the Non-Anthem

12  Defendants' liability under the unlawful prong presents the similarly common question of whether

13  the Non-Anthem Defendants' lack of safeguards for member PII provided to Anthem was

14  unlawful. Both claims will yield answers that will be the same for all class members.

15          Plaintiffs' deceptive omission claim will, like the claim against Anthem, depend on a

16  common, objective test:  if a "reasonable consumer" would be deceived by an insurer's failure to

17  disclose that PII would be shared and retained by Anthem, without requiring that the PII be

18  adequately secured, the Non-Anthem Defendants will be liable to their members. Here, the Non-

19  Anthem Defendants *admitted* that they did not inform their customers that they would not follow

20  their own privacy policies and would not maintain the confidentiality of members' information in

21  accordance with law, including when it was shared with Anthem and stored indefinitely in

22  Anthem's inadequately secured data warehouse.  T106 ¶4.c-d (RFAs 8-9).  Because Plaintiffs'

23  evidence with respect to the Non-Anthem Defendants focuses entirely on the common course of

24  conduct in which they all were engaged that led directly to their customers' PII winding up in

25  Anthem's unsecured database, the claims against the Non-Anthem Defendants will be manageable.

26  As described in the Trial Plan and summary chart of Non-Anthem evidence (T106), all that will be

27  needed with respect to each of the 13 Non-Anthem Defendants are short deposition excerpts and a

28  few documents.  Finally, the restitution claimed is subject to common proof, as described above.

### 3. New York GBL § 349 Claim Against Anthem

The Court should certify a Statewide New York Anthem Customer Damages Subclass, consisting of New York residents enrolled in an Anthem health plan for which Anthem was paid during the three year statute of limitation.  Each of the elements of the GBL §349 claim pose common questions that can be answered for the entire class through generalized evidence, establishing both predominance and manageability. *See* ECF 524 at 67; *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (listing elements).

First, the "consumer-oriented conduct" element depends on a legal interpretation, which will not vary from class member to class member, and has already been addressed by the Court in some detail. ECF 468 at 42-43.  Next, as to the "materially misleading" element, the standard is whether conduct is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander*, 802 F.3d at 300. For the reasons discussed above with respect to the parallel claim under the UCL, an objective answer can be reached on a class-wide basis. *Supra* at 15-16; *Yokoyama*, 594 F.3d at 1093; *Pulaski* at 987-88.  Finally, proving injury requires only that an injury result from Anthem's deceptive conduct but does not require proof of individual reliance. *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 43 (E.D.N.Y. 2008); *see Yokoyama*, 594 F.3d at 1093. This class of Anthem customers have suffered injury and damages in the form of "Loss of Benefit of the Bargain" and "Loss of Value of PII."  ECF 468 at 45-49.

With respect to the *amount* of these damages, the NY GBL includes a statutory damages provision of $50 per violation or actual damages, whichever is greater.  N.Y. Gen. Bus. Law §349(h).[9]  As described above, the amount of Plaintiffs' Benefit of the Bargain and Value of PII

---

[9] The statutory damages may also be certified under Rule 23(b)(2). *See Rodriguez v. City of Los Angeles*, No. CV-11-01135-DMG, 2014 WL 12515334, at *5 (C.D. Cal. Nov. 21, 2014) (certifying statutory damages claims under both Rule 23(b)(2) and 23(b)(3)). The Court has discretion to include statutory damages claims in a (b)(2) class because they "do not turn on the individual circumstances of class members [and so] may be sufficiently 'incidental' to warrant certification under (b)(2)." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012); *see also Berry v. Schulman*, 807 F.3d 600, 610 (4th Cir. 2015) (statutory damages flow directly from liability to the class as a whole, making them "incidental" for purposes of (b)(2)).

1  losses will be proven on a classwide basis with common evidence. *Supra* at 12-13.  Accordingly,

2  Plaintiffs' GBL §349 omission claim should be certified. *See Jermyn*, 256 F.R.D. at 435 ("Courts

3  have repeatedly held that section 349 claims based upon omissions, non-disclosures and deceptive

4  corporate policy are well suited to class certification.").

5      **4.  California Contract Claims Against Anthem**

6      **a.  Anthem California Contract Class.**  The Court should certify an Anthem California

7  Contract Class, consisting of the millions of individuals who were enrolled in 2014 or 2015 in

8  individual or group insurance through any Anthem Affiliate offering plans in California, and

9  whose PII was compromised as a result of the Anthem Data Breach.  Plaintiffs have defined the

10  California contract class with respect to Anthem's California-based Affiliates because their

11  contracts are governed by California law. T56 at ¶39 (compiling evidence).  Plaintiffs will

12  establish the elements of California contract law this Court previously discussed (ECF 524 at 12-

13  13), through common evidence as follows:

14      1. *Contract formation*. Anthem admits that it enters into contracts for insurance purchased

15  by individuals. ECF 581 (Answer ¶200). Members enrolled in group plans likewise have a

16  contractual relationship with their insurance carrier under well-established California law. *Fields v.

17  Blue Shield of California,* 163 Cal.App.3d 570, 579 (1985) (health insurer liable for breach of

18  contract action brought by enrollee in group plan); *see also Ins. Co. of N. Am. v. Bechtel*, 36

19  Cal.App.3d 310, 317 (1973).  Anthem has already produced aggregate numbers (T58), and has

20  been ordered to produce member-level data shortly. ECF 678.

21      2. *Performance*. Anthem does not contest that performance is satisfied for all class

22  members. T74 (Rog. 16).  In other words, Anthem was paid for all of its insurance contracts.

23      3. *Breach*. Plaintiffs will prove that Anthem's uniform promises to protect the

24  confidentiality of member PII and to use reasonable and adequate safeguards, as set forth in the

25  NOPP and PII Privacy Policy (*supra* at 5), are terms of *all* individual and group insurance

26  contracts.[10]  Any questions of contract interpretation will be decided by the Court.  *Ins. Co. of N.*

27

28      [10] Plaintiffs requested all 2014 and 2015 contract documents applicable to individuals affected
by the Data Breach in discovery. Anthem objected on burdensomeness grounds, and instead
elected to produce only a subset of template and actual contract documents across six lines of

1  *Am. v. Johnson*, 959 F.2d 240, 1992 WL 69325, *3 (9th Cir. 1992), *citing Parsons v. Bristol Dev.*

2  *Co.,* 402 P.2d 839, 842 (Cal. 1965). Once the Court has determined that all contracts incorporate

3  by reference identical or near-identical contract terms, likely on partial summary judgment, the

4  jury will decide the common factual issue of breach based on the common evidence of Anthem's

5  inadequate data security.

6       Plaintiffs' contract claims are based on the language of standardized plan booklets provided

7  to members.[11]  They are essentially form contracts. Anthem relies on templates and exemplar

8  language submitted to state regulators for approval. T56 at ¶40 (compiling evidence). Courts

9  routinely certify class claims based on the language in form contracts, including similar but not

10  identical language. *See, e.g, In Re Med. Capital Securities Litig.*, 2011 WL 5067208 at *3 (C.D.

11  Cal. July 26, 2011) (certifying contract claims involving "substantially identical" terms and

12  collecting cases in which courts certified class actions involving breaches of form contracts); *Mund*

13  *v. EMCC, Inc.*, 259 F.R.D. 180, 184-185 (D. Minn. 2009) (certifying claims involving "materially

14  identical" contracts over defendant's objection that the language in the contracts varied); *Steinberg*

15  *v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004) (certifying contract claims where

16

---

17 business (individual, group, ASO, Medicaid, Medicare, specialty) – a sample that Anthem stated
18 would be sufficient to show the documents provided to affected individuals in 2014 and 2015 –
and agreed that it would not seek to rely on any contract that it did not produce before the close of
discovery.

19 [11] For enrollees with individual plans, the "Evidence of Coverage (EOC)" or "booklet" is the
20 contract. ECF 581 (¶ 202), T77 (Tabler at 30:10-31:1). For enrollees with group plans, the EOC or
booklet sets forth the enforceable contract terms. *See Fields,* 163 Cal. App. 3d at 579; *see also*
21 *Bareno v. Employers Life Ins. Co.*, 7 Cal. 3d 875, 881–82 (1972); T76 (McHaffie at 129-30).
While Anthem disputes that group enrollees form direct contracts with Anthem (admitting only
22 that the group enters into a contract, ECF 581 (¶200)), Anthem's group contract language
uniformly and expressly defines that contract to include the benefits booklets provided to
23 members. *See also, e.g.*, T89 (template enterprise-wide Anthem group contract language defining
contract to include "the Booklet and any amendments"). There can be no real dispute that the
24 benefits booklets set forth the terms to which group enrollees are entitled under California law.

25       Group enrollees sue in the alternative as third party beneficiaries of that group contract.
ECF 714 (FAC ¶456). Because the group contract incorporates the plan booklet, analysis of
26 relevant terms and breach is essentially the same. Plaintiffs will prove entitlement to sue as third
party beneficiaries on this alternative claim through common evidence, as Anthem uses
27 enterprise-wide group contract templates that contain no third party beneficiary exclusion. At the
least, third party beneficiary status is a common issue of law. *In Re Med. Capital*, 2011 WL
28 5067208 at *4.

1   the key terms were substantially similar).

2   Anthem's 2014 and 2015 plan booklets provided to members in California all either:

3   expressly incorporate Anthem's NOPP and privacy policies; expressly promise to protect the

4   confidentiality of PII; or were sent to customers at enrollment with documents that included the

5   NOPP.  T44 (Rule 1006 Summary); *infra* n. 12.  Most of them do all three. *Id*. All of the *express*

6   references to the NOPP and privacy policies – which cover the vast majority of Anthem's

7   California contracts across all lines of business – fall within this Court's reasoning in denying

8   Anthem's motion to dismiss. ECF 524 at 15-17. Of the 245 Calfornia contract documents for 2014

9   and 2015 produced in discovery, 235 booklets include at least one express reference to Anthem's

10  privacy notices and policies, and most contain more than one reference, as set forth in Plaintiffs'

11  Rule of Evidence 1006 chart. T43 ¶¶8-28 & T44; T75 (Rogs 23-25) (admitting language referring

12  to "statements" pertaining to medical confidentiality, "privacy statement," "privacy policies" and

13  "privacy rules" refer to NOPP).[12]

14  In addition to these express references, the language of Anthem's plan booklets also

15  directly promises to protect the confidentiality of member information. T43 ¶¶8-28 & T44. *Cf.*

16  *Mund*, 259 F.R.D. at 183-84 & n.2 (variations on contract language all presented the same

17  "common legal question").

18  Finally, there remain ten California plan booklets for 2014 and 2015 that do not fall into

19  either of the above categories. T43 ¶12-14 & T44.  For this small category, a common legal

20  question exists whether the NOPP provided to members along with these plan booklets would be

21  understood to create contract terms by a reasonable insured, under the objective standard of

22  contract interpretation. *Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 55 (1997).[13]

23  

---

24  [12] Anthem's 30(b)(6) witnesses also consistently confirmed that Anthem's plan booklets contained references to Anthem's privacy policies across the board. T76 (McHaffie at 179:25-180:16, 191:7-192:24; 197:17-199:3; 200-204); T77 (Tabler at 104:14-106:1; 115:18-116:20; 125:2-127:23; 128:19-129:6; 141:14-142:6; 222:16-223:7); T79 (Brumley at 151:23-153:2; 153:23-154:18; 193:22-196:10); T80 (Esquival at 128:24-132:4).

26  [13] The ten plans include four dental, two vision, one Medicare Supplemental, and one student plan samples, plus two examples of these dental and vision plans for a particular plaintiff. T43 ¶12-14 & T44.  Evidence regarding Anthem's standard policies (and 30(b) witness testimony) will prove that the NOPP was provided by Anthem to members with the enrollment packet of materials. T68-69 (NOPP policies); T56 ¶41 (compiling evidence).

1    Anthem has admitted, across the board, that it never informed any customers that it did *not* intend

2    to comply with its privacy policies (T72), and this common evidence will be sufficient to establish

3    that a reasonable insured would understand the provided NOPP to constitute part of the contract.

4        4. *Damages.* This Court previously determined that all of Plaintiffs' damages theories --

5    Benefit of the Bargain, Loss of Value of PII and Out-of-Pocket Expenses -- are viable contract

6    damages under California law. ECF 524 at 22-29. Plaintiffs' common, classwide methods for

7    proving Loss of Value of PII and one measurement of Benefit of the Bargain are described above.

8    *Supra* at 12-13.

9        For contract claims, there is an additional measure of benefit of the bargain damages

10   available under California law – the cost of repair. *See, e.g., Kitchel v. Acree*, 216 Cal.App.2d 119,

11   123 (1963). Anthem's data breach letter told class members that their SSN and DOB may have

12   been stolen. T67. Plaintiffs' identity theft expert has explained that class members with reason to

13   believe their SSNs and DOBs have been stolen need to purchase credit monitoring and identity

14   protection for at least five years. *See* T21 (Van Dyke Report ¶ 40-52) (giving average cost). The

15   cost of this identity protection service is the "cost necessary to make the [health insurance]

16   conform to the value Plaintiffs thought they were getting in the price tendered." *Falco v. Nissan*

17   *N. Am. Inc.*, No. cv-1300686, 2016 WL 1327474, at *12 (C.D. Cal. Apr. 5, 2016) (recognizing cost

18   of average repairs as one measure of benefit of the bargain damages in breach of warranty action).

19   This too is a common damages measure that can be determined on a classwide basis.

20       Finally, Out-of-Pocket expenses are an additional remedy available for breach of contract

21   to those individuals who made such payments. Whether particular Out-of-Pocket expenses are

22   recoverable is a common legal question that should be decided on a class wide basis. Types of

23   expenses incurred by the class representatives include money spent on identity protection (T101,

24   T102), delayed tax refunds (T103), and time and expenses such as notary fees to rectify identity

25   fraud (T100). [14] While not all class members will ultimately claim this form of damages, "the need

26   

27       [14]These are reasonable expenses given the Data Breach's lasting effect on class members.
     *See, e.g.,* T98 ("all of my information, all of my family's information, it's out there in the wind
28   forever so just because they haven't used it yet doesn't mean that we're out of the woods and
     they're not going to."); T101 ("sometimes they wait, and it takes a few years. And it's always
     over—it's always there, the specter of worrying about it"); T102 ("my name and my Social

1   for individual damages calculations does not, alone, defeat class certification." *Vaquero*, 824 F.3d

2   at 1155. The Ninth Circuit recently affirmed class certification when one method of calculating

3   damages was based on class members using their individual records to show their expenses,

4   including time and effort expended. *Just Film*, 847 F.3d at 1120-21; *see also Nitsch v.*

5   *Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 313 (N.D. Cal. 2016) (certifying class where

6   "defenses peculiar to some individual class members will have to be tried separately").

7         **b. Anthem California ASO Contract Class.** Plaintiffs also move the Court to certify an

8   Anthem California ASO Contract Class, consisting of affected individuals who were enrolled in

9   2014 or 2015 in a self-funded plan governed by an Administrative Services Only ("ASO")

10  Agreement with a California-based Anthem affiliate.[15]  The above contract analysis applies

11  equally to their claims. ASO contracts entered into by Anthem's California-based affiliates are

12  governed by California law. T81 (Evers at 128:17-133:3). There is no dispute regarding formation

13  or performance, including whether Anthem was paid for these contracts, which it was.  ECF

14  581(¶239); T74 (Rog No. 16); T81 (Evers at 78:20-79:2, 227:4 -228:23). The common evidence

15  regarding Anthem's inadequate data security and damages calculations apply here as well.

16        The contract terms breached are also similar, and will be proven with common evidence.

17  Just as it promised individual and group insurance members, Anthem also promised to protect the

18  confidentiality of ASO members' PII, including by safeguarding members' PII through physical,

19  technical, and administrative means.  T63 (Nader at 114:9-22, 118:22-119:17) (PII Policy applies

20  to ASO members).  This promise is either set forth in the terms of the ASO itself, or is

21  incorporated by reference within a BAA or Benefits Booklet.  T93-97; T56 ¶¶42-50.  For example,

22  every Anthem ASO Agreement incorporates a BAA that promises to comply with data security

23  and privacy requirements consistent with HIPAA. T92; T93-97; T56 ¶¶42-50; T81 (Evers at 87:8-

24  ───────────────

25  Security number and my personal information is out in the world somewhere.  I have no control
    over that.  It's been taken.")

26  [15] As specified in Plaintiffs' proposed class definition (*see* Mot.), in light of this Court's
    dismissal of Plaintiff Randrup's breach of contract claim with prejudice (ECF 524 at 32), Plaintiffs

27  have excluded individuals enrolled in plans provided by groups with agreements produced by
    Anthem in discovery that contain a "no third party beneficiary" clause.  *Id.*  Plaintiffs reserve for

28  appeal their argument that all ASO enrollees are entitled to enforce the contracts made for their
    benefit, despite the "no third party beneficiary" language

19; 88:6-9); *see* ECF 524 at 34-36.  And Anthem complies with HIPAA by taking the measures set forth in Anthem's privacy policies. T81 (Evers at 154:12-155:13); T63 (Nader at 114:9-22, 118:22-119:17).  Anthem's ASO Agreements also incorporate the plan booklets created by Anthem and provided to ASO members, which also incorporate Anthem's privacy policies.  T94, 96-97; T56 ¶¶40-50; T81 (Evers at 152: 5-154:11). These common documents will prove that Anthem is contractually bound to comply with its own privacy policies, including the PII Policy. The common terms, which are addressed to and benefit class members, are also the basis for Plaintiffs to establish their right to third party beneficiary enforcement, which also presents a common legal question subject to objective contract interpretation standards.

### 5. Federal Contract Claims Against Anthem and BCBSA

Plaintiffs will prove the federal contract claim, involving Defendants' obligations under a single contract, through common law and evidence.[16] The FEP Contract is explicitly governed by federal law.  T162 (§5.62, at 0004174). Plaintiffs will prove that all Federal Employee Class members are intended third party beneficiaries of this contract – a common legal issue relying on common evidence (the language of the contract, including the FEHB brochure which is incorporated by reference). *See e.g.*, *Catholic Diocese of Biloxi Supplemental Med. Reimbursement Plan and Catholic Diocese of Biloxi v. Blue Cross, Blue Shield of Tex.*, 960 F. Supp. 1145, 1146 (S.D. Miss. 1997).

The relevant terms of the single contract at issue are subject to common proof.  In the FEP Contract, BCBSA and Anthem made commitments regarding the confidentiality of FEP members' PII. *See* T162 (§1.6 at 0000930; §1.6(d) (amendment) at 0000974); *see also* §1.22 at 0000941).

Specifically, both Defendants promised that they "shall hold all medical records, and information relating thereto, of Federal subscribers confidential…." *Id.* at §1.6(b). BCBSA and Anthem are also required to abide by HIPAA regulations. *Id.* at §1.22(b). The FEP Contract also expressly incorporates the Federal Employees Health Benefits brochure ("FEHB brochure"), (incorporated *id.* at Appendix A), which promises that "[w]e will keep your medical and claims information confidential." T163 at 14.

---

[16] Plaintiffs seek certification of the federal contract claim only against Anthem and BCBSA.

Common evidence will prove that both Defendants breached the FEP Contract. Anthem, which received the FEP class members' PII at issue and stored that PII without adequate security, breached the contract promises for all the reasons discussed above.  BCBSA also breached the contract by failing to protect the confidentiality of FEP class members' PII. BCBSA created an Information and Data Security Policy for the FEP program for Anthem (and other BCBS licensees) to follow. T164 (Breskin at 234:7-18); *see also* T165 (at Ex. 15-I).[17] BCBSA enforced this policy solely through audits. T164 (Breskin at 234:7-235:1). Yet, BCBSA failed to conduct a single audit of Anthem from 2013 to 2015. T166 ¶ 6.[18]  FEP class members seek damages for Benefit of the Bargain, Loss in Value of PII, and Out of Pocket Expenses, as described above. Because all elements of plaintiffs' claims will be proven with common evidence, the trial will be manageable.

## CONCLUSION

For the foregoing reasons, the Court should certify the classes and subclasses requested, as defined in Plaintiffs' Notice of Motion and Motion In Support of Class Certification.



[17]

[18]

If BCBSA had audited Anthem, it would have found similar deficiencies, and could have helped Anthem prevent the Anthem Data Breach.

1                                              Respectfully Submitted,

2

3                                              **ALTSHULER BERZON LLP**

                                          EVE H. CERVANTEZ

4                                              JONATHAN WEISSGLASS

                                          DANIELLE LEONARD

5                                              MEREDITH JOHNSON

                                          TONY LOPRESTI

6

7    Dated:  March 10, 2017                  By: /s/ *Eve H. Cervantez*

                                                Eve H. Cervantez

8                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**

9                                              ANDREW N. FRIEDMAN

                                          GEOFFREY GRABER

10                                             SALLY M. HANDMAKER

                                          ERIC KAFKA

11

12   Dated:  March 10, 2017                  By: /s/ *Andrew N. Friedman*

                                              Andrew N. Friedman

13

14                                             *Lead Plaintiffs' Counsel*

15                                             **LIEFF CABASER HEIMANN & BERNSTEIN, LLP**

16

                                          MICHAEL SOBOL

17                                             JASON LICHTMAN

18                                             **GIRARD GIBBS LLP**

19                                             ERIC GIBBS

                                          DAVID BERGER

20

21                                             *Plaintiffs' Steering Committee*

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
CASE NO. 15-md-02617-LHK