# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

|  |  |  |
|---|---|---|
| In Re Anthem, Inc. Data Breach Litigation | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 15-MD-02617-LHK |

**REPLY EXPERT REPORT OF PETER E. ROSSI**

**JANUARY 13, 2017**

## TABLE OF CONTENTS

I.    **Introduction** ..................................................................................................... **2**
      A.    Assignment and Compensation ............................................................... 2
      B.    Qualifications .......................................................................................... 2
      C.    Summary of Conclusions ........................................................................ 3
      D.    Materials Considered .............................................................................. 4
II.   **Response to Choi Report** .............................................................................. **4**
      A.    Overview ................................................................................................. 4
      B.    My Initial Report Provides Sufficient Detail ......................................... 6
            1.    Conjoint Analysis is Appropriate in the Health Insurance Market ............ 9
            2.    WTP or Market Price Premium .................................................... 13
      C.    My Proposed Methodology Will Be Reliable in the Health Insurance Market .... 14
            1.    Adverse Selection ........................................................................ 16
            2.    Geographical Differences ............................................................ 16
            3.    Backwards-looking Preference Measurement ............................. 20
      D.    My Proposed Methodology Applies to the Sub-Populations ................ 22
            1.    ASOs ............................................................................................ 22
            2.    Non-Anthem Defendants .............................................................. 23
            3.    The FEP Claim ............................................................................. 24
            4.    Medicare and Medicaid ................................................................ 24
            5.    Enrollees Whose Premiums Were Paid by Others ....................... 26
      E.    Summary ................................................................................................ 27
III.  **Response to Van Liere Report** ................................................................... **28**
      A.    Overview ............................................................................................... 28
      B.    My Initial Report Provides Sufficient Detail ....................................... 29
            1.    Geographical Issues ..................................................................... 31
            2.    Timing .......................................................................................... 32
            3.    Sampling Methods ....................................................................... 33
            4.    Questionnaires and Procedures ................................................... 34
      C.    My Proposed Methodology is Reliable .................................................. 35
            1.    Hypothetical Bias ........................................................................ 35
            2.    Strategic Bias ............................................................................... 37
            3.    Unbiased and Neutral Wording of the Data Security Attribute ...... 38
            4.    Connection to Theories of Liability ............................................ 40
      D.    Summary ................................................................................................ 43

1

## EXPERT REPLY REPORT OF PETER E. ROSSI

### I.      Introduction

#### A.      Assignment and Compensation

1.    I issued an initial expert report in this matter on December 2, 2016 (the "Rossi Report" or "my report"). I subsequently received the December 21, 2016, reports of Dr. Kent D. Van Liere (the "Van Liere Report") and Dr. William S. Choi (the "Choi Report"). I have been asked by counsel for the Plaintiffs to review and address issues raised in those reports.

2.    I have further been asked by counsel for the Plaintiffs to assume both that Defendants did not provide appropriate data security and that the court or jury determines that Defendants are liable to at least some of the class members for that reason. Specifically, I have been asked whether and how the tools of survey research and economic analysis can be used to determine damages.

3.    I am compensated for my work in this matter at my standard rate of $900/hr. Employees of Analysis Group, Inc., an economic consulting firm, working under my direction, have assisted me in this assignment. My compensation in this matter is not contingent upon my findings or the outcome of this litigation.

#### B.      Qualifications

4.    I am the James Collins Professor of Marketing, Statistics and Economics at the Anderson School of Management, UCLA. I hold a joint appointment in the Anderson School and the Economics Department. I received my BA in 1976 from Oberlin College with a double major in mathematics and history. My graduate degrees are from University of Chicago (MBA (1980) and PhD (1984)). I have also been a faculty member at Kellogg Graduate School of Management and University of Chicago's Booth School of Business.

2

5.  My initial report in this matter contains a detailed description of my qualifications, as well my Curriculum Vitae (Exhibit A) and a full list of cases in which I have testified in the past four years (Exhibit B).

### C.  Summary of Conclusions

6.  The Defendants' experts, Dr. Choi and Dr. Van Liere, contend that my proposed damages methodology is not reliable based on three fundamental premises: 1) They contend that I have not provided sufficient detail to evaluate my proposal, 2) They contend that it "may be impossible" to design a conjoint survey to study attributes of health insurance, and 3) They contend that I have ignored important aspects of the health insurance industry as well as important subgroups of the proposed class.

7.  In this response, I explain that: 1) I have provided extensive detail regarding my proposed survey and market price calculations, including peer-reviewed articles, 2) Conjoint surveys are frequently used in assessing employee benefits, including health benefits, which directly refutes Dr. Van Liere's contention that this can't be done, 3) The factors identified by Dr. Choi regarding health insurance markets do not bear on my proposed method of measuring economic loss, and 4) My methodology is applicable to each of the sub-groups identified by Dr. Choi.

8.  Both Dr. Van Liere and Dr. Choi appear to be misinformed as to fundamental aspects of my proposal. Drs. Van Liere and Choi mistakenly believe that I am proposing to undertake a willingness to pay ("WTP") analysis of the data security attribute. This is incorrect, and I state so in my report. My peer reviewed supplementary article explains that a WTP analysis will overstate the economic losses incurred and that, instead, it is necessary to ask what firms can charge for various levels of data security (the "market price"). It is these market

3

prices that can be used to compute a market price premium. The market price premium is the difference between what Anthem can charge with adequate data security and what Anthem can charge for insurance products with an inadequate level of data security. In other words, I am proposing to use a difference in market prices, not WTP. This overcomes many of the objections of the Defendants' experts, as I explain in detail below.

### D.   Materials Considered

9.   In forming my opinions and writing this report, I have reviewed and considered information from a variety of sources. In Supplemental Exhibit C, I have provided a list of documents that I considered since the submission of my initial report.

## II.   Response to Choi Report

### A.   Overview

10.   I proposed to undertake the computation of a market price premium as a basis for establishing "benefit of the bargain" damages for the proposed class members. The market price premium would be based on simulated market price calculations conducted on the basis of data obtained from a conjoint survey, as well as a supply-side analysis using a Nash equilibrium, as explained in the peer-reviewed article that I referenced in my report.  I was not asked to implement this proposal and actually conduct the conjoint survey, but rather, to outline the proposed methodology in sufficient detail for the court to understand that I can calculate market price damages for the class with an appropriate and rigorous methodology. I provided an extensive report with examples, as well as a peer-reviewed article I wrote that

provides backup on the mathematical, economic, and statistical details.[1]

11.    Dr. Choi does not quarrel with the basic economic argument that a market price premium provides a sensible, objective, and economically valid measure of damages. Instead, he simultaneously claims both that my report lacks sufficient detail and that my proposed market price simulation lacks important features of the health insurance market. His critique does not explain how my proposed plan would result in either biased or unreliable estimates, but relies on the basic argument that any manner in which a model abstracts from reality must invalidate the model.  Finally, Dr. Choi claims that I have failed to deal with specific sub-populations of the proposed classes (including enrollees in so-called ASO plans, federal employees, Medicaid, and non-Anthem defendants).

12.    In this response, I will explain why

- Contrary to Dr. Choi's analysis, my report contains more than sufficient detail to explain the reliable methodology I proposed to calculate market price damages; *i.e.*, the differential in market price between the product Anthem should have provided and the product actually delivered. In particular, I demonstrated how I would determine the market price of data security as a feature of a health benefits plan. Among other things, I explained that my methodology is well-accepted both in peer-reviewed academic literature and in the business world.

- Dr. Choi's arguments regarding the health insurance market are unlikely to affect the

---

[1]    This peer-reviewed article also cites Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics 57, 629-663, 2014, which is a less technical discussion of how to use market or equilibrium prices to compute economic losses in a litigation context.  For clarity, I have appended these papers to my report at Exhibits 1A and 1B.

reliability of my proposed method.  This is because there is no reason to think that any of these differences would impact the relative market price of data security, which is the feature being measured. Further, conjoint analysis is frequently used in the health insurance market, invalidating Dr. Choi's argument that it should not be applied here due to the inherent complexity of the industry.

- My proposed methodology applies to the sub-populations called out by Dr. Choi.

13. Defendants engaged Dr. William Choi to critique, among other things, my proposal for a damages methodology. Dr. Choi is a professional litigation consultant whose training is in economics. There is no evidence that Dr. Choi has academic training or practical experience with survey design and the statistics of sampling or experimental design. Dr. Choi also appears to have no training in conjoint survey methodology, and it is not clear that Dr. Choi has ever attempted a conjoint or any other kind of survey for either research or litigation purposes. Therefore, Dr. Choi appears to assert that his basis for qualified opinions on conjoint analysis is his training in economics, his dissertation research on medical malpractice lawsuits that was conducted in 1999, and his experience in litigation consulting.

### B.   My Initial Report Provides Sufficient Detail

14. As I have explained, I was not asked to conduct a survey and compute damages for the proposed class.  It is not necessary to actually conduct a survey to establish that a proposed damages methodology exists that can be implemented to reliably measure classwide damages.  I provided not only an extensive discussion of the survey design process but also

6

specific examples of the product attributes to be tested.[2] I also provided the exact formulae for the calculations as well as the statistical methods designed to estimate the parameters that are input to the damages calculations. To back up my report, I provided an article which provides much of the technical detail required to evaluate my proposed methodology.

15.     Dr. Choi disagrees.  He claims that my proposal is "highly preliminary and subject to further research."[3]  Dr. Choi is correct that I cannot now provide the exact text of the survey or the exact wording of the product attributes, as this will require refinement as a part of the survey design process. However, as I noted in my report, I will conduct qualitative research, focus groups, pre-testing and piloting in order to ensure that my survey instrument is understandable to respondents, adequately addresses any potential biases, and results in reliable data. Dr. Choi does not cite any references on survey design, but survey design experts (including Bryan Orme, whose book defendant expert Dr. Van Liere cites) frequently explain that it is vital that the survey questions (in this case the conjoint choice tasks) be worded in such a way as to be maximally informative to respondents and crafted using the very language the respondents have come to use themselves to describe the product attributes. As I outline in my report, I will use an iterative process in which qualitative research and pre-testing is used to select the attributes and their levels.

16.     For example, suppose we were to design a survey for the purpose of valuing the coverage aspects of health insurance policies.  To design a reliable and useful survey, we would have to understand what the important dimensions of coverage are that potential respondents

---

[2]     *See* Rossi Report, at 39-45.
[3]     Choi Report, at 16.

would be concerned about—that is, which features do consumers consider when they purchase health insurance. Moreover, we would have to choose wordings that most closely match the way in which respondents describe coverage.[4] This will ensure that the attributes are clear and understood, and help to simulate the purchase decision. Similarly, for the data security attribute that is the focus of my proposal, it will be necessary to explore how potential respondents think about data security.  In my report, I provided three different examples of how the data security attribute could be presented to potential respondents. It is only through qualitative research and pre-testing that I will be able to specify the exact way in which this attribute will be represented in the final survey. A frequently relied on reference manual for survey design states that:

> A variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions. Cognitive interviewing, which includes a combination of think-aloud and verbal probing techniques, may be used for questionnaire evaluation. Pilot studies involving a dress rehearsal for the main survey can also detect potential problems. Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, and some courts have recognized the value of pretests. In many pretests or pilot tests, the proposed survey is administered to a small sample (usually between 25 and 75) of the same type of respondents who would be eligible to participate in the full-scale survey. The interviewers observe the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased if confusion or other difficulties arise.[5]

17.    As outlined in my report, the conjoint survey and associated data are only one input to the

---

[4]    *See, e.g.*, Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third Edition,* Federal Judicial Center (2011), at 388-389

[5]    Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third Edition,* Federal Judicial Center (2011), at 388-389.

market price premium calculations.[6] I make a specific and mathematically precise definition of how I will undertake those calculations using Nash equilibrium pricing,[7] a model that economists use to estimate how a company would choose to price, given its marginal costs, the market competition, and consumers' preferences. This approach is now regarded by economists as standard in concentrated industries such as health insurance.  Dr. Choi disagrees, stating "Dr. Rossi provides no substantive details regarding these proposed computations other than stating that he would conduct a 'Nash Equilibrium analysis,'… which is vague and unclear."[8] As I note in my report, the mathematical details of my proposed methodology are provided in my article.[9]  This constitutes sufficient detail.

### 1.        Conjoint Analysis is Appropriate in the Health Insurance Market

18.        While Dr. Choi did not seem to consider the theoretical model and equations for the market price premium calculation presented in my article, he focused instead on the portion of my article that provided an example of computing a market price premium. After providing the economic and mathematical basis for computing a market price premium in the article, I thought it appropriate to include an example for the sake of concreteness.  I used a survey designed to value a feature of a digital camera. I followed through on all of the calculations outlined and showed the reader the importance of computing a valid market price premium in the specific context of digital cameras.

---

[6]    *See* Rossi Report, at 45-46.
[7]    Rossi Report, at 45-46.
[8]    Choi Report, at 19.
[9]    *See, e.g.*, section 2.3 and equation (2.7) of Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014. *See also*, Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57, 629-663, 2014.

19.     Dr. Choi believes that health insurance is a different product and sold in a different kind of market than digital cameras.  Of course, digital cameras are different than health insurance, but many of the same aspects remain: health insurance, like digital cameras, is a complicated and multi-dimensional product and it is sold in markets with a high degree of concentration (as noted in the Gaynor et al. article cited by Dr. Choi).[10]  Taken at face value, Dr. Choi seems to be saying that each product must have its own damages methodology that is unique to that product. That is incorrect. While the specifics of digital camera features are different than features of health insurance, the underlying principles of the computation of market price premiums are similar for both products.

20.     Dr. Choi appears to be arguing that conjoint analysis should not be applied to health insurance due to the inherent complexity of health insurance.[11] He cites articles by Loewenstein et al. and Handel and Kolstad that show consumers find health insurance difficult to understand.[12]  He also claims that Anthem has a potentially large number of individual plan offerings.[13]  In fact, conjoint is ideal for complicated, multi-dimensional products and is routinely applied to high dimensional situations as outlined in my report.[14] The research Dr. Choi cites does not bear on whether a conjoint survey is appropriate as part of a market price premium calculation. It merely suggests that consumers have trouble understanding complicated financial products and, therefore, there may be societal gains

---

[10]     Gaynor, Martin, Kate Ho, and Robert J. Town, "The Industrial Organization of Health-Care Markets," *Journal of Economic Literature* 53:2, 235-284, 2015, at 242; Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014, at 450.

[11]     *See* Choi Report, at 21-27.

[12]     Choi Report, at 25-26 (footnotes 66 and 67).

[13]     Choi Report, at 29.

[14]     See Rossi Report, at 31-39.

from improving consumer understanding. This is irrelevant to the present issue of computing damages related to the failure to protect the confidentiality of customer information.

21.    Dr. Choi does not acknowledge that conjoint studies have been conducted in this market before, and are designed with similar attributes and levels as presented in the illustrative example laid out in my initial report.[15] For example, conjoint surveys on health insurance have included attributes such as: insurance company, premiums, co-pays for doctors' visits and hospital visits, and coverage for pharmacy benefits, mental health services and vision.[16] Similarly, many market research firms conduct conjoint analysis in this market in order to help companies design benefits packages for their employees.[17]   Conjoint studies for employee benefits (including health insurance) are so common that industry conjoint practitioners have a term "bene-metrics" to characterize conjoint studies using alternative benefit offerings.

22.    Dr. Choi cites an article by Gaynor et al. in which the authors provide an "overarching model" of the health care industry from the hospital and physician providers through

---

[15]   *See, e.g.*, Roger Gates, Carl McDaniel, Karin Braunsberger, "Modeling Consumer Health Plan Choice Behavior to Improve Customer Value and Health Plan Market Share," Journal of Business Research 48, 247-257 (2000), https://www.dssresearch.com/PDFs/Mod%20Cons%20HP%20Choice_RG.pdf (viewed December 27, 2016); Goutam Chakraborty, Richard Ettenson, and Gary Gaeth, "How Consumers Choose Health Insurance," Journal of Healthcare Marketing 14 (1994); A. Franklin Acito and Arun K. Jain, "Evaluation of Conjoint Analysis Results: A Comparison of Methods," Journal of Marketing Research, Vol. 17, No. 1 (Feb., 1980), pp. 106-112.

[16]   Roger Gates, Carl McDaniel, Karin Braunsberger, "Modeling Consumer Health Plan Choice Behavior to Improve Customer Value and Health Plan Market Share," Journal of Business Research 48, 247-257 (2000), https://www.dssresearch.com/PDFs/Mod%20Cons%20HP%20Choice_RG.pdf (viewed December 27, 2016); Goutam Chakraborty, Richard Ettenson, and Gary Gaeth, "How Consumers Choose Health Insurance," Journal of Healthcare Marketing 14 (1994); A. Franklin Acito and Arun K. Jain, "Evaluation of Conjoint Analysis Results: A Comparison of Methods," Journal of Marketing Research, Vol. 17, No. 1 (Feb., 1980), pp. 106-112.

[17]   *See, e.g.*, http://www.dobney.com/CaseStudies/cs_conjoint.htm (viewed January 7, 2017).

insurers and consumers.[18] A key part of this paradigm is a stage in which consumers choose from various health plans that are characterized by various attributes.[19]  This is nothing more than a standard choice model (*i.e.*, a model in which a consumer makes choices from a set of alternatives), which the conjoint study implements. Although consumers may experience difficulties (which economists call frictions) in evaluating or remembering all of the attributes, the basic model is the same as what I have proposed to use here. That same degree of "friction" or process costs will also be present in the conjoint survey, bestowing an element of realism.

23.     Finally, Dr. Choi claims that the examples I provide of alternative values of the data security attribute are too vague to be linked to the claims made in the complaint.[20] I am not a legal expert and, therefore, I am not qualified to assess liability aspects of the case. However, I have been asked by counsel for the Plaintiffs to assume both that Defendants did not provide appropriate data security and that the court or jury determines that Defendants are liable to at least some of the class members for that reason.  Therefore, I am proposing to measure the "but for" world in which consumers knew that Anthem did not have adequate data security, to determine the market value of that product. Although I gave examples of various practices set forth in the complaint, it may turn out that consumers only understand that the data security was sufficient or insufficient—that is, the choices would describe the functionality of the product, rather than the technical means of accomplishing that function.

---

[18]     Gaynor, Martin, Kate Ho, and Robert J. Town, "The Industrial Organization of Health-Care Markets," *Journal of Economic Literature* 53:2, 235-284, 2015, at 237, 269.

[19]     Gaynor, Martin, Kate Ho, and Robert J. Town, "The Industrial Organization of Health-Care Markets," *Journal of Economic Literature* 53:2, 235-284, 2015, at 269-272.

[20]     *See* Choi Report, at 38-42.

Since the examples I put forth are not the final levels of the data security attribute (which will be established following the pre-testing procedure described above and in my report), it is also premature on the part of Dr. Choi to make these criticisms.

## 2.    WTP or Market Price Premium

24.    Dr. Choi states in multiple places in his report that my proposed damages methodology is to compute a "Willingness To Pay" for the data security attribute.[21] For example, Dr. Choi states "I understand from Dr. Rossi's proposed conjoint model that he is intending to estimate the WTP for a data security attribute."[22] This is incorrect.  I am not proposing to use a WTP analysis in any way. I state in  my report:

> It is important to take this into account in any valid method for computing economic damages. A market price premium therefore differs from willingness to pay because it is what a firm can charge for a product with a particular feature rather than just the consumers' valuation of that product feature.[23]

25.    In fact, the whole point of my research in this area is to explain that a WTP analysis **cannot** be used for damage calculations and will tend to overstate damages. This is equally true in both the consumer fraud and patent areas.

26.    While I did not state in my initial report that I intend to calculate a WTP, it is possible that Dr. Choi is using the phrase "willingness to pay" to refer to the results of my survey, thereby critiquing the inputs into my market price premium calculation. However, as I explain in detail below, these critiques do not fundamentally affect the reliability of my survey or my proposed market price calculation.

---

[21]    *See* Choi Report, at 21-22, 32-33, 36, 38-41, 42, 47.
[22]    Choi Report, at 21.
[23]    Rossi Report, at 27.

### C.      My Proposed Methodology Will Be Reliable in the Health Insurance Market

27.     Dr. Choi spends the bulk of his report explaining that my proposed method does not take into account a number of factors that are unique to the health insurance market.[24]  In short, his argument is that any model or method that abstracts from reality is not reliable. He simply catalogues the various aspects of health insurance markets that, in his view, are not accommodated by my proposed model.  He does not provide any specific ways in which these aspects of insurance markets might render my calculations unreliable or biased.

28.     Generally, market value damages calculations represent some level of abstraction.  Given that I have proposed a peer-reviewed, valid method for calculating damages in this case, it is not a meaningful criticism for Dr. Choi to say – "you didn't incorporate feature X of insurance markets into your model." He must instead explain why there is any reason to think that the exclusion would bias the computations because there is no particular reason to think that it would. All economists, including Dr. Choi, abstract from reality in their analyses. In fact, it is exactly this abstraction that provides the value of economic reasoning. I have made the assumption that the health insurance market is characterized by a relatively small number of large firms competing in setting prices on insurance plans that are characterized by common attributes such as premium amount, co-pay, deductible, coverage and so on. This assumption is well supported by health economists and policy makers.[25]

29.     Moreover, my proposed damages value is based on the difference between two market prices – the difference between the price (premium) of the insurance product with adequate

---

[24]   *See* Choi Report, at 21-32, 42-47.
[25]   *See, e.g.*, Gaynor, Martin, Kate Ho, and Robert J. Town, "The Industrial Organization of Health-Care Markets," *Journal of Economic Literature* 53:2, 235-284, 2015, at 242; Congressional Budget Office, "Private Health Insurance Premiums and Federal Policy," February 2016, at 32-33.

data security and the market price for the product as received with the inadequate data security claimed by the Plaintiffs. For example, if the market premium with adequate data security is $225/month while the premium without adequate data security is $200/month then the market price premium is $25 per month.  In order for Dr. Choi's criticisms to have any force, he must argue that whatever assumption I have made that he disagrees with has a differential impact on the market prices with and without adequate data security. For example, if the Affordable Care Act ("ACA") had the consequence of raising premiums due to the elimination of the ability to exclude insureds with pre-existing conditions, the premiums would rise in both the but-for and actual world. This would leave the difference between plans with adequate and inadequate data security unchanged. Similarly, there might be differences between insurance markets (such as states) in the overall level of premiums, but this would not affect the difference in price for data security or my proposal for valuing the data security feature.

30. In summary, Dr. Choi has a long list of factors or assumptions that he argues I should take into account in my model of prices. I have proposed a standard, well-accepted methodology, and there is no reason to believe that any of Dr. Choi's proposals would bias my results with respect to the data security feature. Indeed, Dr. Choi does not explain how or why any of these factors would influence my damages calculation.  As explained above and in my first report, I provided a reliable method for calculating damages in this litigation. My damages model—like essentially all economics models—involves some abstraction. Merely saying that this is true does not undermine its reliability. In particular, Dr. Choi does not explain why any of the factors he lists would influence the level of prices, much less give any reason to think that any of these factors could affect the difference or market premium for data

15

security specifically.

## 1.    Adverse Selection

31.    For example, Dr. Choi cites the well-known problem of adverse selection in insurance markets:

> the long-studied adverse selection issues present in markets for insurance are well-documented in the economic literature, yet Dr. Rossi does not even mention them or discuss how such issues may affect his approach.[26]

32.    Adverse selection occurs when an insurance provider cannot observe the true risk of an insured; because of this, those who enroll in a plan will tend to be riskier than the population segment that this insurance product is designed for.  For example, if I advertise on late-night TV for "cheap" life insurance with no questions asked, I'm going to get folks with a lower than average life expectancy buying my policy.  If severe enough, the problem of adverse selection can result in no insurance offerings in the market or high premiums.  Dr. Choi does not explain why the problem of adverse selection would bias my damages method.

33.    The problem of adverse selection will have no impact on my computations of a market price premium as the market price premium is the *difference* between the market price of the health insurance with adequate data security and the market price with inadequate data security for a fixed set of insurance providers. Adverse selection might affect the *level* of market prices for *both* products, but not the difference *between* the products based on the level of data security.

## 2.    Geographical Differences

34.    Dr. Choi makes a similar "lack of realism" argument that there are local group plans where

---

[26]    Choi Report, at 25.

local is defined as an employer with most employees in one geographic area such as a state.[27] Dr. Choi is again silent as to how differences between geographic areas might render a market price analysis invalid. Economic forces can vary across states in four possible ways: 1) The distribution of consumer preferences may vary across states; 2) The costs of providing health insurance can vary across states; 3) The structure of competition among health insurance providers can vary across states; and 4) Insurance regulations can vary across states.[28]

35.    Again, Dr. Choi must not only argue that there exist differences between states, he must explain how these differences would differentially affect the actual and but-for market prices with respect to data security, in order for those differences to affect a market price premium calculation. It is not necessary for a market premium model to track all changes in an industry and to "explain" the course of insurance premiums over time. All that is necessary is to estimate the difference in premiums with and without data security.

36.    Let's take the argument that consumer preferences differ across states. The only way in which these differences could affect the market price premium for data security would be if the preference for *data security* varied systematically across states. For example, if residents of California were more concerned about data security than those of Massachusetts, Dr. Choi could argue that some adjustment might be needed. Dr. Choi presents no evidence or logical arguments as to why such statewide differences in preference for data security might

---

[27]    *See* Choi Report, at 30-32, 42-47.
[28]    *See, e.g.*, http://kff.org/other/state-indicator/total-population/ (viewed January 12, 2017); http://files.kff.org/attachment/Report-Employer-Health-Benefits-2016-Annual-Survey (viewed January 12, 2017); http://kff.org/other/state-indicator/number-of-issuers-participating-in-the-individual-health-insurance-marketplace/? (viewed January 12, 2017); https://www.aetna.com/health-care-professionals/insurance-regulations-state.html (viewed January 12, 2017).

exist. I anticipate using a large national sample for my conjoint survey. It would be a simple matter to test to see if there are differences between states in preference for data security preferences. I don't see any *a priori* reason for believing that these state differences are appreciable, and Dr. Choi has pointed to none. However, if there were large differences between states in data security, it is a simple matter to conduct separate state analyses.[29]

37.   Similarly, even though there can be differences in the cost of providing health insurance across states, there is no reason to believe that the cost of providing data security varies across states, particularly under the theory alleged in Plaintiffs' complaint, that the class members' data was all stored in one centralized database. That is, the provision of data security is a fixed cost that an insurance company incurs centrally no matter how many plans it offers or where those plans are located.

38.   Dr. Choi emphasizes that there may be large differences in the extent of competition for individual and group accounts across states.[30]   However, he provides no evidence of this. The fact that there are large national carriers who operate in multiple states suggest that there is a good deal of competition in most large states.[31] Most importantly, Dr. Choi does not explain how changes in the level of competition can affect a difference in market prices for the data security feature specifically. Certainly, if there is a state with few competitors for health insurance provision, we would expect the firms that serve that state to have more

---

[29]   This might require enlarging the sample or augmenting the national sample with state samples.
[30]   *See* Choi Report, 42-47.
[31]   For example, UnitedHealth, Aetna, and Humana operate in all 50 states. https://www1.aetna.com/about-aetna-insurance/aetna-corporate-profile/facts.html (viewed January 10, 2017); https://www.uhc.com/content/dam/uhcdotcom/en/AboutUs/PDF/Q4%202015%20FactBook.pdf (viewed January 10, 2017); http://press.humana.com/press-release/current-releases/humana-offers-affordable-2016-medicare-health-plans-designed-help-peo (viewed January 10, 2017).

market power and charge somewhat higher premiums in those states. However, this will not have a differential effect on the actual and but-for market prices for data security, meaning that it will have no effect on the *difference* that serves as my proposed damages estimate.

39. Finally, Dr. Choi claims that there are differences in the extent of state regulation of health insurance.[32] However, I am calculating hypothetical prices with less-than-adequate data security for the purposes of a damages calculation, that therefore do not face actual regulatory approval. In any event, Dr. Choi fails to provide any evidence or logical argument as to why state regulations would differentially affect my calculation of the difference in market values based on differing levels of data security.

40. Dr. Choi suggests that among group policies there may be differential market power on the part of employers and that my model does not take into account the bargaining power of a large account.[33] The idea is that a large employer like Google might negotiate lower premiums than those suggested by my proposed Nash equilibrium pricing model.  Again, this may be true but is irrelevant to the *differences* between the premium Google might negotiate on behalf of its employees for insurance with and without adequate data security. Dr. Choi must argue that there is a correlation between the demand for data security and the degree of bargaining power that employers have. However, I see no reason to believe – and Dr. Choi has failed to establish – any such correlation.

41. Dr. Choi also claims that any model used for damage calculation must take into account changes in the insurance market over time, such as changes in regulation or competition.[34]

---

[32]   *See* Choi Report, at 30-32, 44.
[33]   Choi Report, at 23-24.
[34]   *See* Choi Report, at 32-34.

19

The ACA seems to be a good example of what Dr. Choi has in mind. Enacted in 2010, the provisions of the ACA were in force by 2014.[35] It is likely that premiums have been affected by various provisions of the ACA, some of which act to increase premiums and some of which decrease them.[36] However, this again represents level shifts (*e.g.*, the price for insurance rises in some cases and falls in others), not shifts in the difference between the price for insurance plans with and without adequate data security. It is not necessary for a market premium model to track all changes in an industry and to "explain" the course of insurance premiums over time. All that is necessary is to estimate the difference in premiums with and without data security.

### 3.    Backwards-looking Preference Measurement

42.    All conjoint studies can only measure preferences at the time that the survey is conducted. These preferences are then used to make various predictions about market outcomes. For example, consider a commercial application of conjoint analysis to assess the potential for a new product. The conjoint survey can be used to estimate demand for the new product configuration (as represented by a combination of product attribute levels). This is a "forward-looking" application of conjoint analysis, commonly conducted for commercial products, in the sense that the preferences for product attributes measured at the time of the conjoint survey are used to predict the behavior of consumers at some point in the future.

43.    By definition, all legal applications of conjoint analysis are "backward looking" in the sense that we are trying to construct a counterfactual world that might apply at the time at which

---

[35]    https://www.hhs.gov/healthcare/facts-and-features/key-features-of-aca-by-year/index.html (viewed January 10, 2017).

[36]    Congressional Budget Office, "Private Health Insurance Premiums and Federal Policy," February 2016, at 2.

damages occurred.  But whether you are predicting the future or the past, the assumption is that preferences don't change much over time or are generally stable. In fact, if preferences were not stable over time, all consumer research would be useless since all consumer research measures attitudes and preferences only at one point in time, even though the research is designed to be predictive. The huge commercial success of conjoint analysis suggests that in many product categories preferences are very stable over relatively short periods of time. If preferences were not stable, conjoint predictions would be poor.[37] In the litigation sphere, this argument that preferences are not stable over time would mean that no survey should be used to determine damages.

44.  Dr. Choi makes the argument that the recent history of data breaches has sensitized potential survey respondents and therefore our survey would tend to overstate the value of data security. It should be pointed out that the data breach occurred at the end of 2014 through early 2015, only a few years ago.  Moreover, I am informed by counsel that they are not seeking benefit of the bargain damages going any further back than 2011. Certainly, hacking and compromise of customer records has been a common occurrence for the last five to ten years.[38] Many people with a credit card have been inconvenienced by having their credit card numbers changed when a VISA/MasterCard merchant has had their data compromised.

---

[37]  *See, e.g.*, Orme, B.K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, "How Conjoint Analysis Is Used In Industry," Third Edition, Research Publishers LLC, 2014, at 143-157 ("[T]he vast majority of conjoint conclusions have proven correct over time. We not only have extensive experience with these methods, but also routinely replicate conjoint findings using traditional research methods.") ("Results from the conjoint analysis were consistent with women's past choice of delivery facility, suggesting congruence with revealed preference.") ("The strong demand for the MMA [money market account] predicted by conjoint simulations seems to be on target so far, since the actual percentage of deposits in MMAs versus savings accounts is already at 15 percent and steadily increasing.").

[38]  *See, e.g.*, http://www.informationisbeautiful.net/visualizations/worlds-biggest-data-breaches-static/ (viewed January 10, 2017).

This activity has been commonplace for many years, and it is likely things have not changed substantially in this time period. Again, Dr. Choi merely speculates that respondents may have a higher preference for data security today than at some point only a few years ago. He provides no evidence to support this contention.

### D.    My Proposed Methodology Applies to the Sub-Populations

#### 1.    ASOs

45.    Dr. Choi believes that I have failed to explain how I will "model ASOs."[39]  As I explained in my initial report, some of Anthem's customers simply contract for "administrative services" which can include claims processing, data storage and access to the Anthem network of health care providers.[40] Typically, these customers self-insure and bear the financial risk associated with benefit payouts to their employees.

46.    Dr. Choi seems to believe that the ASO arrangement requires a different modeling approach than the one I have proposed. I have suggested that we use our survey of benefit managers to determine the demand for health insurance attributes and employ equilibrium price calculations to determine a market price differential.  None of this changes if Anthem is not providing insurance benefits. Anthem is providing administrative services, including data security. Proposed class members are injured by paying insurance premiums that were higher than they would be in a world in which consumers know that Anthem is providing inadequate data security. This market price differential is a valid measure of damages as long as Anthem is the provider of data security. There is no conceptual difference between the situation in which Anthem is supplying both data security and insurance and the

---

[39]    Choi Report, at 35.
[40]    *See* Rossi Report, at 18-19.

situation in which Anthem is only supplying administrative services. In my report, I provided an example of a firm that represents a car product as accelerating more rapidly than the actual performance of the car. The purchasers of the car received an inferior product and paid a market price premium over the price of the product as delivered. It does not matter if the throttle assembly is produced by another manufacturer. If the court determines that the throttle supplier is liable, the damages to the class should be the market price premium.

47.    To the extent Dr. Choi is arguing that administrative service only contracts are a different product than insurance altogether, I could conduct a separate survey (if necessary), also of benefits managers, to determine the market price differential in administrative fees they would pay for an administrative services only contract with or without adequate data security.

### 2.    Non-Anthem Defendants

48.    Dr. Choi points out that some of the enrollees whose data was compromised in the Anthem breach were customers of other firms, called "Non-Anthem Defendants" in this litigation, and contends that benefit of the bargain damages against these Defendants should be examined separately because allegations against Non-Anthem Defendants are different than allegations against Anthem. It is my understanding from counsel that the class certification motion for which I submitted my report will not address breach of contract claims against Non-Anthem Defendants, which is why I did not address them separately. I understand that the class certification motion may address benefit of the bargain damages under certain states' consumer protection statutes with respect to Non-Anthem Defendants as well as Anthem. I also understand that the allegations differ slightly – that is, Plaintiffs allege that

Anthem failed to inform its customers about its poor data security, and in fact provided poor data security for the data in its possession, whereas in the case of Non-Anthem Defendants, Plaintiffs allege that Non-Anthem Defendants failed to protect the confidentiality of customer information by allowing Anthem (which itself had poor data security) to access their customers' personal information, and also failed to inform its customers that it was allowing their data to be accessed by an entity with poor data security. Either way, the market value being calculated – the differential between insurance with adequate and inadequate data security – is the same. There is no reason the same information about the value of insurance products with and without data security could not be used to calculate the market price differential with respect to insurance products provided by Non-Anthem Defendants.

### 3.    The FEP Claim

49.    Dr. Choi points out that I did not mention the plan for federal employees.[41] He appears to believe that the fact that benefits are paid out from Treasury funds, as opposed to consumers directly paying premiums to insure against risk, invalidates a sensible economic approach. This is merely an accounting practice that does not affect the fundamental economic forces at play. If the court finds that Anthem provided inadequate data security, then FEP members suffered an economic loss in the sense that their health benefits product was of lower value than they expected. I have proposed a sensible and economically valid measure of this loss of value.

### 4.    Medicare and Medicaid

---

[41]    Choi Report, at 47-48.

50. Dr. Choi believes that I have "misidentified" the Medicare group of class members and that I have not addressed Medicaid members.[42]  With respect to Medicare, Dr. Choi claims that "Anthem only provides Medicare Advantage (including Medicare Part D) and Medicare Supplement benefits, which only a fraction of individuals over the age of 65 purchase."[43] Dr. Choi does not explain why this is important or how it might bias or influence my proposed damages methodology, and there is no reason to believe that it would. In all survey contexts, we screen to a larger population segment than the actual customers for any product and service. Indeed, this is advisable—as Diamond notes, "An overinclusive sampling frame generally presents less of a problem for interpretation than does an underinclusive sampling frame."[44] What is important is to sample from the universe of potential customers. I proposed to conduct a conjoint survey for the sub-population of consumers over 65 who would be eligible for Medicare benefits—some of these consumers choose Medicare Advantage, some choose traditional Medicare with Medicare Supplemental insurance, and some choose traditional Medicare alone. Dr. Choi does not explain why this would not constitute a valid damages methodology for this subset of class members.

51. I did not specifically address the sub-population of health insurance customers who might be eligible for Medicaid (*i.e.*, those with incomes less than 133% of the poverty level).  Dr. Choi claims incorrectly that "Dr. Rossi's three proposed surveys do not include Medicaid

---

[42]  Choi Report, at 36, 38.
[43]  Choi Report, at 36.
[44]  Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Third Edition,* Federal Judicial Center (2011), at 379.

enrollees."[45]  My surveys are designed on the basis of scientifically determined samples of the US population. As I noted in my report, I will undertake surveys of different markets dependent upon further factual development and action by the Court. This could include a survey of Medicaid enrollees, or a modification of one of the three surveys I proposed in order to accommodate Medicaid enrollees. This is easily addressed and is not a conceptual problem with my approach.

### 5.   Enrollees Whose Premiums Were Paid by Others

52.   Dr. Choi states that I have "fail[ed] to address the issue of who actually paid [health] insurance premiums."[46] It is true that individuals who purchase plans directly from Anthem generally pay their own premiums, whereas in many group employer plans, the employer pays a significant portion of the health insurance costs. In some government programs, such as Medicare and Medicaid, the government pays for the health insurance benefits and enrollees pay only for small co-pay fees or to increase coverage over some mandated base level.

53.   The premium payment arrangements, however, do not affect the fundamental concept that members of the class incurred an economic loss as a result of receiving an insurance product with inadequate data security provisions. The only question is, how can we objectively measure this loss in a valid economic framework? I have proposed a market price premium framework and provided a method for estimating this market price premium. Arrangements for payment (directly or indirectly through an employer or the government) are simply

---

[45]   Choi Report, at 38.
[46]   Choi Report, at 34.

irrelevant to the fundamental economic logic applied here. Nevertheless, there is nothing to prevent me from undertaking different market premium calculations for major sub-groups, if necessary.

### E.    Summary

54.    Dr. Choi has no objection to the fundamental economic principle that proposed class members sustained a loss that can be quantified by the difference in market prices between insurance products with and without adequate data security.  He has not identified any mathematical, statistical or economic errors with my proposed damage calculations as laid out in a peer-reviewed article that supplemented my expert report.

55.    Dr. Choi's fundamental objection is that the health insurance market is complicated and that my proposed approach does not, in his opinion, include these complications.  He ignores the fact that conjoint analyses are frequently used to study market prices in the health care insurance market.  And he has not identified a single way in which the factors which are the subject of his criticisms could bias or render my results with respect to the price differential for data security unreliable. He simply says that my analysis abstracts from some institutional details of health insurance markets, therefore it must be wrong. Any valid critique of my proposed damage methodology must show how my results would be biased toward a higher valuation of the data security attribute. There is no reason to believe that they would. Dr. Choi's criticisms are merely a recounting of vaguely specified factors that might influence the level of market prices but not the difference between market prices with and without adequate data security – the measure of damages that I have proposed.

### III.     Response to Van Liere Report

#### A.     Overview

56.    The Defendants engaged Dr. Van Liere to rebut my proposed damages methodology. In this response, I will explain that Dr. Van Liere seems fundamentally mistaken regarding the goal of my proposed damages methodology, and also that I provided sufficient detail to meet each one of his concerns. Furthermore, I will explain that his arguments that a survey would be "impossible" to construct or that the results would suffer from various biases do not hold force.

57.    As I explain in detail below, virtually all of Dr. Van Liere's criticisms of my proposed survey and subsequent analyses are generic criticisms that could be leveled at many, if not all, surveys used in litigation contexts. Thus, it appears that Dr. Van Liere believes surveys can never meet the criteria he believes are necessary for use in litigation, in spite of his own claims to have sponsored many surveys, including conjoint surveys. Even though Dr. Van Liere has used conjoint methods in patent litigation and sponsored survey research in other litigation matters, Dr. Van Liere appears to claim that in this case, regarding inadequate data security, "it may be impossible"[47] to assess the economic losses that might have been incurred by the proposed class using a conjoint survey, no matter how well-crafted and analyzed.

58.    At the same time, Dr. Van Liere asserts that I have not provided sufficient detail to evaluate whether or not my proposed methodology would be reliable. He states that "the Rossi report does not provide a basis for concluding that his proposed conjoint analysis would be

---

[47]    Van Liere Report, at 17.

reliable."[48]  Dr. Van Liere seems to be saying that I didn't provide sufficient detail for him to evaluate my proposal, but that even if I did provide sufficient detail, he would inevitably conclude that such a survey could not be used to assess the economic losses suffered by class members due to inadequate data security.

59.     I also note that Dr. Van Liere is a professional litigation expert who has a Ph.D. in Sociology. Dr. Van Liere's CV lists no formal training or degrees in statistics, econometrics, economics or survey sampling. In addition, Dr. Van Liere has not published in any peer-reviewed journal in statistics or economics. Dr. Van Liere has also not published or conducted research on conjoint methods.

### B.     My Initial Report Provides Sufficient Detail

60.     Dr. Van Liere asserts that I did not provide sufficient detail regarding my proposed damages methodology. He incorrectly states that my report is mostly background material.[49] In fact, my proposed methodology is outlined in over 24 pages of text constituting 46 of the 107 paragraphs in the report. The approach that I propose using, conjoint analysis, is described in my report and is well-documented in a number of academic articles cited within my report. Moreover, mathematical details of my proposed supply-side analysis using the conjoint data are contained in my peer-reviewed article that I provided, which contains details regarding how conjoint surveys should be designed for the express purpose of computing a market premium measure of damages.[50]

---

[48]     Van Liere Report, at 6.
[49]     Van Liere Report, at 7.
[50]     Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014. *See also*, Allenby, Greg M., Jeff

61.   In addition, my report provides details on my proposed sampling methods. According to the Federal Judicial Center Manual for Complex Litigation, "[t]he sampling methods used must conform to generally recognized statistical standards. Relevant factors include whether

- the population was properly chosen and defined;

- the sample chosen was representative of that population;

- the data gathered were accurately reported; and

- the data were analyzed in accordance with accepted statistical principles."[51]

My report addresses how I will approach each of these factors, including discussing sample frames and sample size, the survey process that ensures high quality data is collected, and the statistical methodology from a peer-reviewed article that I will use to analyze the survey.[52]

62.   In addition, in accordance with survey best practices, such as those referenced in the Reference Guide for Survey Research by Shari Diamond, I provide complete details regarding the pre-testing of the survey. Further, I explain the design of my survey and a preliminary specification of each of the attributes to be used in a conjoint survey as well as levels of those attributes.[53] As Dr. Van Liere would surely admit, specification of a conjoint survey consists of a sampling plan (including screening criteria[54]) and proposed attributes/levels. This is covered in my report.

---

D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57, 629-663, 2014.

[51]   Federal Judicial Center, *Manual for Complex Litigation, Fourth.* Section 11.493 (2004), at 103.

[52]   *See* Rossi Report, at 43-46.

[53]   *See* Rossi Report, at 39-45.

[54]   Respondents begin a survey by responding to initial screening questions to ensure that they meet the criteria for the study. If they do not, the survey is terminated.

63.     Dr. Van Liere appears to be mistaken regarding the basic damages methodology that I have proposed. He states my proposed conjoint study is "unlikely to produce a reliable estimate of the 'willingness to pay' for data security."[55]  I do not propose to compute a "willingness to pay" for data security. In fact, in both my report and supporting articles I explain why a willingness to pay analysis would be biased and overstate economic losses.  I state in my report:

> It is important to take this into account in any valid method for computing economic damages. A market price premium therefore differs from willingness to pay because it is what a firm can charge for a product with a particular feature rather than just the consumers' valuation of that product feature.[56]

64.     Instead of willingness to pay, I propose using the conjoint analysis data to calculate a market price premium—the difference between the market value of what Anthem should have provided (insurance with adequate data security) and what Anthem actually provided (according to Plaintiffs, insurance products with an inadequate level of data security).

### 1.     Geographical Issues

65.     Dr. Van Liere claims that health insurance products are "regulated and purchased at the state and local level."[57] However, he is silent on how differences between geographic areas might render a market price analysis invalid.

66.     My proposal is to use a market price premium to measure economic loss, not a willingness to pay analysis. I will simulate market prices with and without adequate data security. The difference in these market prices will be used to estimate damages. As I discussed above,

---

[55]     Van Liere Report, at 13.
[56]     Rossi Report, 27-28.
[57]     Van Liere Report, at 7.

factors such as state regulation affect the level of market prices in both the condition where adequate and inadequate data security are offered and will not affect the difference between the prices. That is, state level regulation will not affect the value of data security, so premium changes in response to state regulation will occur in both the but-for and actual world, leaving the difference in value between plans with adequate and inadequate data security unchanged.

67.    The only way in which geographical issues might affect the market price premium that I calculate would be if there are large differences between states in preferences for or valuation of the data security attribute itself: that is, if people in New York have much different preferences for data security than people in California. There is no *a priori* reason to believe such differences exist, and Dr. Van Liere has not put forward an argument that these geographical differences in preferences exist. However, it will be possible to test this assumption of homogeneity in preferences for data security over states. I propose to use a large national sample in each of my surveys. Given that this sample will be comprised of respondents from many (if not all states), it will be a simple matter to test the assumption of no differences across states by comparing the preference within a state to the overall preference in the national data.  If there are appreciable differences, it would also be a simple matter to incorporate these adjustments into my market price calculation.[58]  A separate damages calculation can be conducted by state, for any state that deviates appreciably from the overall sample.

### 2.    Timing

---

[58]    This might require enlarging the sample or augmenting the national sample with state samples.

68.     Survey research is a critical tool in the real world commercially, in academia, and in litigation. All of this research necessarily measures only a single point in time, yet experience shows that it is consistently reliable.[59] The fact that many thousands of conjoint surveys are fielded each year is testament to the usefulness of this method and the stability of consumer preferences.[60] It should be pointed out that the data breach occurred at the end of 2014 through early 2015, only a couple years ago. Moreover, I am informed by counsel that they are not seeking benefit of the bargain damages going any further back than 2011. Dr. Van Liere appears to believe that data security concerns have only recently become salient to the public.[61] The only evidence he cites to support this contention is the deposition of one named class member.[62] As a survey expert, Dr. Van Liere should be well aware that a single person should not be used to make inferences about the prevalence of data security concerns. In fact, data breaches of various kinds have been commonplace for a number of years.[63]

### 3.     Sampling Methods

69.     It is a basic principle of statistics that the ideal sample is a random sample of the target

---

[59]     Orme, B.K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, "How Conjoint Analysis Is Used In Industry," Third Edition, Research Publishers LLC, 2014.

[60]     *See, e.g.*, Orme, B.K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, "How Conjoint Analysis Is Used In Industry," Third Edition, Research Publishers LLC, 2014, at 143-157 ("[T]he vast majority of conjoint conclusions have proven correct over time. We not only have extensive experience with these methods, but also routinely replicate conjoint findings using traditional research methods.") ("Results from the conjoint analysis were consistent with women's past choice of delivery facility, suggesting congruence with revealed preference.") ("The strong demand for the MMA [money market account] predicted by conjoint simulations seems to be on target so far, since the actual percentage of deposits in MMAs versus savings accounts is already at 15 percent and steadily increasing.")

[61]     Van Liere Report, at 8-9.

[62]     Van Liere Report, at 9.

[63]     *See, e.g.*, http://www.informationisbeautiful.net/visualizations/worlds-biggest-data-breaches-static/ (viewed January 10, 2017).

population.[64] This is rarely achievable in practice but all survey researchers should strive to approximate this ideal. I have a great deal of experience with numerous sample providers, including Survey Sampling International, which Dr. Van Liere used in a conjoint survey he conducted for a report submitted in SRI International Inc. v. Cisco Systems, Inc. (the "SRI Report")[65] and I would certainly select a high quality provider.[66] The exact sample size is usually determined by model simulations after the number of attributes and the levels are defined. That is, careful conjoint studies are designed to achieve a certain level of precision in the estimation of the relevant quantities. My experience in computing market price premiums suggests that this sample size will likely exceed 1,000 respondents, but the final details will have to await the completion of the conjoint design.

### 4.  Questionnaires and Procedures

70.  Dr. Van Liere claims that he cannot evaluate a proposed survey without the finalized questionnaire.[67]  Moreover, he argues that following accepted procedures in survey research does not guarantee a valid survey exercise.[68] Ultimately, Dr. Van Liere's concerns cannot be satisfied without performing the final questionnaire construction, sample selection and

---

[64]  Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third Edition,* Federal Judicial Center (2011), at 380 ("Identification of a survey population must be followed by selection of a sample that accurately represents that population. The use of probability [*i.e.*, random] sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of estimates obtained from the survey.") *See also*, https://faculty.unlv.edu/sloe/Courses/EPY%20702/Quantitative%20Sampling/Sampling2.html (viewed January 11, 2017); http://psc.dss.ucdavis.edu/sommerb/sommerdemo/sampling/types.htm (viewed January 11, 2017).

[65]  Expert Report of Dr. Kent D. Van Liere, *C.A. No. 13-1534 (SLR)*, August 5, 2015, at 9.

[66]  High quality providers use a variety of control measures to ensure the reliability and integrity of the respondents and the responses. For example, providers confirm the identity of respondents through means such as digital fingerprinting, third-party verification, and geo-IP controls. *See, e.g.*, https://www.surveysampling.com/audiences/consumer-online/ (viewed January 12, 2017).

[67]  Van Liere Report, at 10, 12.

[68]  Van Liere Report, at 12-13.

analysis. Dr. Van Liere states that "without having details regarding how Professor Rossi's study actually would be conducted, there is no basis for concluding that any results of such a study would be reliable."[69] This appears to be a matter of principle to Dr. Van Liere rather than a statement regarding my specific proposal.  I disagree with Dr. Van Liere that one cannot evaluate a proposed methodology without the specific instantiation of that methodology, as does the vast weight of social science literature and valid and accepted scientific practices.[70]  If this were true, we would have no statistics journals, no statistics textbooks and no statistical software.  Dr. Van Liere does not specify what details he would like to see and appears to take the position that "I will know a valid survey only when I see it."

### C.     My Proposed Methodology is Reliable

71.     In the second half of his report, Dr. Van Liere shifts from the position that there is not enough information for him to evaluate my proposal to the position that it "may be impossible" to design any survey that would address the demand for data security.[71]  Dr. Van Liere lists a standard set of possible biases that have the potential to compromise any survey. These criticisms could be leveled at any survey, including the surveys Dr. Van Liere sponsored as an academic, business consultant, and litigation consultant. Surveys have long been conducted that provide valid and useful results, despite Dr. Van Liere's generic criticisms

### 1.     Hypothetical Bias

---

[69]     Van Liere Report, at 13.
[70]     The fact that much of economics is based on theoretical modeling, which is as rigorously critiqued as its applied counterpart, refutes Dr. Van Liere's criticism here.
[71]     Van Liere Report, at 13-22.

72.     Dr. Van Liere cites a number of articles that discuss the problem of "hypothetical" bias.[72] The idea is that in hypothetical choice surveys respondents may overstate their willingness to pay for a product or some feature of a product. I have not proposed to conduct a willingness to pay analysis so it is not immediately clear how this concern applies to the market price premium. Presumably, the problem is that Dr. Van Liere believes that respondents will over-weight the data security attribute and this might result in a bias toward higher market price premia.

73.     Many (but not all) of the studies cited in these articles concern surveys about matters of public policy such as how much would you be willing to pay for cleaner air, or to remove roads from the rim of the Grand Canyon, or would you approve higher taxes to support better education.[73] These are situations in which one would expect overstatement due to social desirability bias, as Dr. Van Liere notes.[74] However, the conjoint surveys used in marketing applications present respondents with product choices similar to the ones they make in everyday life, and there is a long history of accurate predictions from choice models.[75]

74.     Conjoint practitioners have long recognized the potential for hypothetical bias and have

---

[72]   *See* Van Liere Report, at 14-15 (footnotes 33 & 34).
[73]   Ready, R., Champ, P., and Lawton, J. "Using Respondent Uncertainty to Mitigate Hypothetical Bias in a Stated Choice Experiment," *Land Economics* 86(2), 363-381, 2010; Loomis, J., "2013 WAEA Keynote Address: Strategies for Overcoming Hypothetical Bias in Stated Preference Surveys," *Journal of Agricultural and Resource Economics* 39(1), 34–46, 2014.
[74]   *See* Van Liere Report, at 18.
[75]   Orme, B.K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, "How Conjoint Analysis Is Used In Industry," Third Edition, Research Publishers LLC, 2014, at pp. 153-154 ("We are beginning to examine the validity of conjoint results versus actual market data by administering conjoint surveys periodically with online respondent panels… Such close correspondence is reassuring and builds confidence in the research… although we appreciate finding close research and market correspondence, we interpret conjoint results as being about consumer preference, assuming all other factors are equal. Conjoint results are not expected to deliver exact market forecasts.").

made some innovations in the conjoint design that have been shown to reduce bias. Dr. Van Liere cites my article with an example of a choice between different digital cameras.[76] Here we used the so-called "two-part" approach in which respondents are first asked which of the hypothetical products they would prefer and then are asked if they would buy their most preferred product.[77] I would use this approach here as well. I note that Dr. Van Liere used this same approach in the SRI Report.[78]

75.   Again, Dr. Van Liere's concerns regarding hypothetical bias are generic concerns. There is no reason to believe that this situation is particularly prone to hypothetical bias, nor has Dr. Van Liere provided any evidence to that effect.

### 2.   Strategic Bias

76.   Dr. Van Liere claims that respondents would infer that the conjoint survey is to be used for litigation purposes and that they might expect to gain financially by distorting their responses toward a high valuation of data security.[79] This is a particular cynical view of survey respondents and imparts a view that respondents have extra-ordinary powers of observation and inference. That is, they must first recognize the "data security" attribute as the focal attribute, then deduce that the survey is being used for litigation purposes, and then that it might be in their interest to report a high valuation. Furthermore, this all assumes they

---

[76]   Van Liere Report, at 13.
[77]   Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014, at 437-438. As I state in that article, while the two-part approach is one way to reduce bias in conjoint surveys, "[a]nother way of reducing bias toward higher purchase rates is to design a conjoint using an 'incentive-compatible' scheme in which the conjoint responses have real monetary consequences." However, "[i]ncentive compatible conjoint methods are difficult to implement in the case of new products or new product features for which no actual product may be available."
[78]   SRI Report, at 13.
[79]   Van Liere Report, at 15-16.

are in the proposed class *and* that the Plaintiffs prevail.

77.     Dr. Van Liere's "strategic" bias argument would apply to all survey work conducted as part of class action litigation. That is, strategic bias, according to Dr. Van Liere, would always be present and, therefore, surveys could not be used. Many surveys use the "double-blind" method to avoid this issue. A commonly relied upon survey reference guide notes that: "it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."[80]   Again, this is a generic criticism and Dr. Van Liere has made no arguments and presented no evidence that this should be of particular concern in this matter. Furthermore, it assumes that survey respondents will have extra-ordinary powers of observation and inference.

### 3.     Unbiased and Neutral Wording of the Data Security Attribute

78.     The crux of Dr. Van Liere's argument that it "may be impossible" to conduct a survey in this matter is that he claims it may not be possible to provide an "unbiased" or neutral wording of the levels of the data security attribute.[81] Again, he provides no evidence that any of the suggested wordings in my report are biased; he simply argues, for example, that characterizing a level of data security as "fall[ing] short of industry standards" is biased because a company would not include the phrase in its marketing materials.[82] It is not clear to me how "meets or exceeds industry average for 5 of 13 requirements used in standard

---

[80]     Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Third Edition*, Federal Judicial Center  (2011), at 410-411.

[81]     Van Liere Report, at 17-19.

[82]     Van Liere Report, at 18.

security audits" is biased, but Dr. Van Liere seems to think the very mention of data security "would make respondents view some choices as highly undesirable."[83]  It is commonplace to use ratings systems in conjoint survey (*e.g.*, this is a "one-star" hotel).[84]  Respondents will understand that "one-star" means low quality and is less desirable than "five-star", and yet Dr. Van Liere would argue that this is biased. Just because there are both "good" and "bad" levels of an attribute does not render the wording biased or non-neutral.[85] Dr. Van Liere appears to feel that any wording that is "suggestive" is non-neutral.[86] That is not true: "informative" and "suggestive" are not the same.  In order to test how consumers trade off price and data security, I will have to include levels of the data security attribute that are "suggestive" of a lower level of data security. This, in and of itself, does not constitute a source of bias. Furthermore, as I discussed at length in my report, through focus groups, qualitative research, pre-testing and piloting, I will ensure that the survey is designed in a way that does not lead the respondents to answer in a specific manner. Dr. Van Liere's

---

[83]   Van Liere Report, at 18.

[84]   See, e.g, Ding, Sophie, Ursula Geschke, Robert Lewis, "Conjoint Analysis and its Application in the Hospitality Industry," *Journal of the International Academy of Hospitality Research*, 1991. Similarly, it is commonplace to use non-verbal attributes in conjoint surveys. For example, Sawtooth notes that "Attributes that cannot be adequately described in words should be represented in multimedia." (Orme, B., "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software, Research Paper Series, 2002, at 4.)

[85]   Many conjoint studies include attributes that go from negative to positive, whether or not this biases responses is contingent on whether demand artifacts are present. I take demand artifacts seriously, which is why I proposed extensive qualitative research and pre-testing of my survey instrument. As Diamond notes, "A variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions." Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence,* Third Edition, Federal Judicial Center (2011), at 388. Demand artifacts have long been recognized in the survey literature as an important, though addressable, issue. Sawyer (1975) explains that demand artifacts are "all aspects of the experiment which cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter." Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research* (1975), Vol. 1, No. 4, pp. 20-30, p. 20.

[86]   Van Liere Report, at 19.

warning of the potential for biased questions applies to all surveys, and it is standard practice in survey research to take the steps I've listed above to avoid this.[87]

#### 4.  Connection to Theories of Liability

79.  This section largely addresses legal issues that are not appropriate for me to respond to. To the extent that Dr. Van Liere is making an economics-related point here, it appears to be that survey respondents' inability to understand conjoint hypothetical levels of data security will undermine the results of the proposed survey(s). Dr. Van Liere claims that it is "unclear how Professor Rossi's key data privacy and security attribute would be tied to the theories of liability in this case."[88] He claims that this is "because of the highly technical nature of the issue."[89] Here Dr. Van Liere seems to confuse ability to understand the conjoint hypothetical levels of data security with the connection to the theories of liability.  Dr. Van Liere believes that respondents "would need to understand how the various industry data security practices may relate to the likelihood of having their information subject to a breach."[90] Dr. Van Liere appears to be claiming that if they don't understand this, what I'm testing would not be well-connected to the theories of liability. I can only infer that Dr. Van Liere is trying to say that the conjoint exercise might not be meaningful because some respondents may not

---

[87]  *See* Diamond, Shari, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Third Edition,* Federal Judicial Center (2011), at 387-389 ("A variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions. Cognitive interviewing, which includes a combination of think-aloud and verbal probing techniques, may be used for questionnaire evaluation. Pilot studies involving a dress rehearsal for the main survey can also detect potential problems. Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, and some courts have recognized the value of pretests.").

[88]  Van Liere Report, at 19.

[89]  Van Liere Report, at 19.

[90]  Van Liere Report, at 19-20.

understand fully what all of the attribute levels mean.  This is like saying you need to be an automotive engineer to appreciate the performance of a car. Certainly, consumers have been trained to use reviews, such as Consumer Reports and other services, to measure the reliability of many products and services.  If consumers see a low rating for the reliability of a car, they will infer, correctly, that there will be more frequent and costly repairs even if they have no understanding of how cars work. Consumers are very accustomed to these sorts of inferences. For example, Consumer Reports uses a ratings system in which a full red circle indicates the worst rating and a full black circle indicates the best rating, while half-red and half-black circles represent gradients. Consumers understand this system and incorporate this information into their purchase decision, despite the imprecision of the measure. Dr. Van Liere would have us believe that because consumers cannot assess the exact probability of failure or the magnitude of the repair costs, then consumers cannot make meaningful choices on the basis of qualitative ratings.  This would mean not only that one could not use these ratings in a survey but that these ratings would have no influence on the actual prices of cars determined in the marketplace as consumers lack sufficient understanding to evaluate the reliability of a car. The marketplace refutes Dr. Van Liere's argument rather conclusively.[91]

80.    Moreover, I will rely on pretesting to develop explanations of the data security attribute that respondents understand. However, if the respondents do not understand the levels of the

---

[91]    Similarly, as I note in my report, conjoint analysis is frequently used to test new products or new features that have never been introduced into the marketplace before. A conjoint survey provides a platform to "test" ideas by simulating marketplace outcomes in the survey environment. This allows firms to assess which product features (both new and old) are most valued by consumers. That consumers are able to evaluate the functionality and importance of a feature they have never encountered before indicates that they will be able to competently assess an attribute such as data security.

41

data security attribute they are likely to simply ignore it.[92]  For these respondents, we will infer a zero preference for data security which will result, all other things being equal, in a lower estimate of damages from my proposed methodology.

81.   One of the surveys I have proposed is of HR managers whose job is to understand the provisions of health care insurance products. This is similar to the survey Dr. Van Liere sponsored on behalf of SRI International of Cisco and Sourcefire customers to assess the value of various anti-intrusion components of network products.[93] In the case of the SRI survey, Dr. Van Liere was surveying employees who might have decision making power and indicated they were knowledgeable about network security products. [94] He used the results of this survey to "estimate the value consumers in the relevant market assign to the features."[95]

82.   There is a difference between tying the security attribute to the theory of liability and the respondents' level of understanding of the security attribute. Dr. Van Liere makes only arguments about the level of understanding. He is not arguing that the levels of data security that are in my preliminary proposal are unrelated to the theories of liability propounded by the Plaintiffs. As I explained in my initial report, I will measure the difference in market price between a health care product with adequate data security and one with inadequate data security.  Perhaps Dr. Van Liere's report is making another "impossibility" argument,

---

[92]   As Orme notes, "Because respondents see the products in full-profile (all attributes at once), they tend to use simplification strategies if faced with too much information to process. Respondents may key in on two or three salient attributes and largely ignore the others. Huber points out that buyers in the real world may also simplify when facing complex decisions for certain categories, so simplification isn't, by definition always a bad thing.") Orme, B.K., "Which Conjoint Method Should I Use?" Sawtooth Software, Research Paper Series, 2003, at 4.

[93]   SRI Report, at 1.
[94]   SRI Report, at 5-6.
[95]   SRI Report, at 13.

namely that respondents cannot understand the complexities of the manner in which data security was weakened by Anthem and, therefore, no survey could establish damages for this matter. Consumers do not need to understand *how* Anthem implemented (or not) adequate data security, but only the level of data security provided.

### D.    Summary

83.    Dr. Van Liere contends that I provide insufficient detail for him to evaluate the reliability of my proposed survey.   The only area of "insufficient" detail he addresses is in the construction of my data sample. Dr. Van Liere's critique implies that anyone who sponsors a survey should commit to a sample size prior to finalizing the survey and without any pilot testing. As a survey expert, Dr. Van Liere should understand that this is not possible, advisable, or scientifically valid.

84.    Dr. Van Liere's concerns regarding "timing" and "geographical issues" are presented largely without any evidence to support the conclusion that these concerns will undermine the results of the survey I will design. As explained above, surveys are easily designed to accommodate these concerns.

85.    Dr. Van Liere further contends that it "may be impossible" to design a survey to value data security levels for health insurance products because of the presence, he claims, of numerous biases, lack of understanding of data security attribute levels, and what he claims is biased wording. These criticisms are generic and he presents no arguments or evidence that these generic criticisms have any greater force than in another other survey context. I have explained above why none of these biases will undermine my results. Therefore, Dr. Van Liere appears to be contending that survey evidence cannot be used in class-action litigation or in any litigation, for that matter. These contentions lack any support in fact, and

43

are contrary to the scientific literature, including Dr. Van Liere's own work.

86. Finally, Dr. Van Liere appears to erroneously believe that I am proposing to do a WTP analysis. As outlined in my report, I am not doing a WTP analysis. I am proposing to undertake the estimation of a market price premium. These are two fundamentally different concepts.

My analysis may change before trial if additional information from any of the parties-in-suit or their experts becomes available. I, therefore, reserve the right to supplement my report accordingly.

Peter E. Rossi

## SUPPLEMENTAL EXHIBIT C

## MATERIALS REVIEWED AND/OR RELIED UPON

| Bates Documents | | |
|---|---|---|
| ANTMMDL-03036461 | – | ANTMMDL-03036648 |
| ANTMMDL-03038153 | – | ANTMMDL-03038453 |
| ANTMMDL-03093869 | – | ANTMMDL-03094082 |
| ANTMMDL-03140059 | – | ANTMMDL-03140182 |
| ANTMMDL-03157845 | – | ANTMMDL-03157927 |
| ANTMMDL-03158449 | – | ANTMMDL-03158612 |
| ANTMMDL-03158630 | – | ANTMMDL-03159014 |
| ANTMMDL-03341791 | – | ANTMMDL-03341946 |
| ANTMMDL-03352107 | – | ANTMMDL-03352278 |
| ANTMMDL-03369594 | – | ANTMMDL-03370488 |
| ANTMMDL-03370566 | – | ANTMMDL-03371318 |
| ANTMMDL-03371437 | – | ANTMMDL-03375711 |
| ANTMMDL-03375928 | – | ANTMMDL-03376045 |
| ANTMMDL-03376056 | – | ANTMMDL-03376549 |
| ANTMMDL-03376593 | – | ANTMMDL-03376942 |
| ANTMMDL-03377219 | – | ANTMMDL-03377370 |
| ANTMMDL-03377383 | – | ANTMMDL-03378451 |
| ANTMMDL-03380320 | – | ANTMMDL-03381930 |
| ANTMMDL-03381947 | – | ANTMMDL-03382210 |
| ANTMMDL-03382251 | – | ANTMMDL-03384538 |
| ANTMMDL-03386324 | – | ANTMMDL-03387388 |
| ANTMMDL-03387421 | – | ANTMMDL-03390498 |
| ANTMMDL-03391413 | – | ANTMMDL-03392064 |
| ANTMMDL-03392196 | – | ANTMMDL-03392526 |
| ANTMMDL-03392548 | – | ANTMMDL-03393836 |
| ANTMMDL-03393885 | – | ANTMMDL-03394286 |
| ANTMMDL-03394416 | – | ANTMMDL-03395211 |
| ANTMMDL-03395291 | – | ANTMMDL-03397083 |
| ANTMMDL-03397150 | – | ANTMMDL-03398219 |
| MDL2617_BCBSA_0000445 | – | MDL2617_BCBSA_0000600 |
| MDL2617_BCBSA_0000920 | – | MDL2617_BCBSA_0001093 |
| MDL2617_BCBSA_0001430 | – | MDL2617_BCBSA_0001451 |
| MDL2617_BCBSA_0005710 | – | MDL2617_BCBSA_0005713 |
| MDL2617_BCBSA_0011066 | – | MDL2617_BCBSA_0011095 |

Case Materials and Legal Documents:
Third Consolidated Amended Class Action Complaint, July 11, 2016.

Expert Reports:
Expert Report of William S. Choi, Ph.D., December 21, 2016.
Expert Report of Peter E. Rossi, December 2, 2016.
Expert Report of Dr. Kent D. Van Liere, *C.A. No. 13-1534 (SLR)*, August 5, 2015.
Expert Report of Dr. Kent D. Van Liere, December 21, 2015.

Depositions:
Deposition of William Breskin 30(b)(6), November 22, 2016.
Deposition of Martin Esquivel, December 1, 2016.

## SUPPLEMENTAL EXHIBIT C

## MATERIALS REVIEWED AND/OR RELIED UPON

Websites:

http://files.kff.org/attachment/Report-Employer-Health-Benefits-2016-Annual-Survey.

http://kff.org/other/state-indicator/number-of-issuers-participating-in-the-individual-health-insurance-marketplace/.

http://kff.org/other/state-indicator/total-population/.

http://press.humana.com/press-release/current-releases/humana-offers-affordable-2016-medicare-health-plans-designed-help-peo.

http://psc.dss.ucdavis.edu/sommerb/sommerdemo/sampling/types.htm.

http://www.dobney.com/CaseStudies/cs_conjoint.htm.

http://www.informationisbeautiful.net/visualizations/worlds-biggest-data-breaches-static/.

https://faculty.unlv.edu/sloe/Courses/EPY%20702/Quantitative%20Sampling/Sampling2.html.

https://www.aetna.com/health-care-professionals/insurance-regulations-state.html.

https://www.hhs.gov/healthcare/facts-and-features/key-features-of-aca-by-year/index.html.

https://www.surveysampling.com/audiences/consumer-online/.

https://www.uhc.com/content/dam/uhcdotcom/en/AboutUs/PDF/Q4%202015%20FactBook.pdf.

https://www1.aetna.com/about-aetna-insurance/aetna-corporate-profile/facts.html.

Articles, Books, and Publications:

A. Franklin Acito and Arun K. Jain, "Evaluation of Conjoint Analysis Results: A Comparison of Methods," *Journal of Marketing Research*, Vol. 17, No. 1 (Feb., 1980).

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* 12:4, 421-456, 2014.

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57, 629-663, 2014.

Blom, Kirstin B., and Ada S. Cornell, "Federal Employees Health Benefits (FEHB) Program: An Overview," *Congressional Research Service*, February 3, 2016.

Congressional Budget Office, "Private Health Insurance Premiums and Federal Policy," February 2016.

Diamond, Shari, "Reference Guide on Survey Research" in the Reference Manual on Scientific Evidence Third Edition, Federal Judicial Center (2011).

Ding, Sophie, Ursula Geschke, Robert Lewis, "Conjoint Analysis and its Application in the Hospitality Industry," *Journal of the international Academy of Hospitality Research*, 1991.

Federal Judicial Center, Manual for Complex Litigation, Fourth. Section 11.493 (2004).

Gaynor, Martin, Kate Ho, and Robert J. Town, "The Industrial Organization of Health-Care Markets," *Journal of Economic Literature* 53:2, 235-284, 2015.

Goutam Chakraborty, Richard Ettenson, and Gary Gaeth, "How Consumers Choose Health Insurance," *Journal of Healthcare Marketing* 14 (1994).

Loomis, J., "2013 WAEA Keynote Address: Strategies for Overcoming Hypothetical Bias in Stated Preference Surveys," *Journal of Agricultural and Resource Economics* 39(1), 34–46, 2014.

Orme, B., "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software, Research Paper Series, 2002.

Orme, B.K., "Which Conjoint Method Should I Use?" Sawtooth Software, Research Paper Series, 2003.

Orme, B.K., Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, "How Conjoint Analysis Is Used In Industry," Third Edition, Research Publishers LLC, 2014.

Ready, R., Champ, P., and Lawton, J. "Using Respondent Uncertainty to Mitigate Hypothetical Bias in a Stated Choice Experiment," *Land Economics* 86(2), 363-381, 2010.

Roger Gates, Carl McDaniel, Karin Braunsberger, "Modeling Consumer Health Plan Choice Behavior to Improve Customer Value and Health Plan Market Share," *Journal of Business Research* 48, 247-257 (2000).

Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," Journal of Consumer Research (1975), Vol. 1, No. 4, pp. 20-30.

Financial Filings:

Anthem, Inc. Form 10-K for the Fiscal Year ending December 31, 2015.

# Exhibit 1A

Quant Mark Econ (2014) 12:421–456
DOI 10.1007/s11129-014-9150-x

# Economic valuation of product features

**Greg M. Allenby · Jeff D. Brazell · John R. Howell · Peter E. Rossi**

Received: 16 January 2014 / Accepted: 17 August 2014 / Published online: 28 August 2014
© Springer Science+Business Media New York 2014

**Abstract** We develop a market-based paradigm to value the enhancement or addition of features to a product. We define the market value of a product or feature enhancement as the change in the equilibrium profits that would prevail with and without the enhancement. In order to compute changes in equilibrium profits, a valid demand system must be constructed to value the feature. The demand system must be supplemented by information on competitive offerings and cost. In many situations, demand data is either not available or not informative with respect to demand for a product feature. Conjoint methods can be used to construct the demand system via a set of designed survey-based experiments. We illustrate our methods using data on the demand for digital cameras and demonstrate how the profits-based metric provides very different answers than the standard welfare or Willingness-To-Pay calculations.

**Keywords** Product features · Conjoint · Equilibrium profits · Bayesian analysis

**JEL Classification** C11 · C23 · C25 · C81 · D12 · D43 · K11 · L13 · M3

G. M. Allenby
Fisher College of Business, Ohio State University, Columbus, OH, USA

J. D. Brazell
The Modellers, Salt Lake City, UT, USA

J. R. Howell
Smeal College of Business, Pennsylvania State University, University Park, PA, USA

P. E. Rossi (✉)
UCLA, Anderson School of Management, 110 Westwood Plaza, Los Angeles, CA 90095, USA
e-mail: perossichi@gmail.com



## 1 Introduction

Valuation of product features is a critical part of the development and marketing of products and services.[1] Firms continuously seek to improve existing products by adding new features. Many "new products" are essentially old products which have been enhanced with features previously unavailable. For example, consider the smartphone category of products. As new generations of smartphones are produced and marketed, existing features such as screen resolution/size or cellular network speed are enhanced to new higher levels. In addition, features are added to enhance the usability of smartphone. These new features might include integration of social networking functions into the camera application of the smartphone or increasing battery life. New and enhanced features often involve substantial development costs and sometimes also require new components which drive up the marginal cost of production.

The decision to develop new features is a strategic decision involving not only the cost and revenue potential of adding the feature but also the possible competitive response. The development and marketing costs of feature enhancement must be weighed against the expected increase in profits which will accrue if the product feature is added or enhanced. Expected profits in the marketplace in which the firm competes using the enhanced product should be compared to expected profits in the marketplace in which the firm's product is not enhanced. Computing this change in expected profits involves predicting not only demand for the feature but also assessing the new industry equilibrium that will prevail with a new set of products and competitive offerings.

To undertake equilibrium computations, we must build a valid demand system, obtain cost information, and add assumptions regarding the nature of competition. For many product features, informative demand data are difficult to come by. For example, if a product feature is genuinely new to the market, there is no existing data that can be used to estimate the demand for this product characteristic. In other situations where features have been introduced into the market, we do not see sufficient price variation or we may have concerns regarding the endogeneity of prices due to the standard omitted characteristics argument (see, for example, Berry et al. (1995)). Conjoint-based surveys can be thought of as an experimental approach to assessing demand for products. As has long been recognized, the virtue of conjoint analysis is that product features can be experimentally manipulated to tease out the demand for specific product features. Data obtained from randomized experiments or simulated markets do not suffer from the endogeneity and other measurement concerns that sometimes compromise market data. All of the variation in price and characteristics in conjoint data can be used to estimate data, instead of a smaller fraction identified through the use of instruments or other measures.

---

[1]Valuation of product features is also critical in patent disputes. In particular, damages from patent infringement are typically assessed as either royalty payments or lost profits. In either case, a valuation of the patented feature in terms of incremental profits should be at the heart of any valid damages calculation. In a companion paper, we consider the problem of patent damage calculations and provide explicit methods for using conjoint data to undertake these calculations (Allenby et al. 2014).



While conjoint analysis has long been appreciated as a valuable tool for estimating consumer preferences, the use of conjoint data for equilibrium calculations has seldom been considered. Valuation of product features is typically conducted via market share simulations and Willingness To Pay (hereafter WTP) calculations. Obviously, these calculations do not directly relate to the value of the product feature to the firm. The only sensible metric for assessing firm value is profit. In calculating changes in profits that can be ascribed to the product feature, competitive response must be considered, necessitating some sort of equilibrium computation. To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers. Conjoint studies will have to be designed with this in mind. In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised.

Our work should be distinguished from the work on the valuation of new products (see, for example, Trajtenberg (1989) and Petrin (2002)) in two critical aspects. First, the emphasis of the economics literature on new products is, not surprisingly, on the welfare effects of the new product introduction, while our emphasis is on the profit consequences for the firms adding a new product feature. Second, we do not add a new logit error for the products with feature enhancement as is common in the new product literature. It is well known that the infinite support of the logit error creates consumer surplus even for products which are dominated on observable features. Since we focus on feature enhancement, we are able to observe exactly what the "new product" is compromised of and do not have to assume there are unobservable aspects of the new product which create value through horizontal differentiation.

In the marketing literature, Ofek and Srinivasan (2002) have considered the problem of what they term "the market value of an attribute improvement (MVAI)." They define the MVAI for a feature enhancement as the increase in price that can be made to an enhanced product while keeping its share constant (p. 401 see text above equation (9)). This is similar to the "market simulation" approach to computing WTP in the conjoint literature. However, the MVAI measure does not consider the competitive response of other firms and is based exclusively on conjoint-derived demand parameters without any consideration of costs or a competitive equilibrium. We believe that the economic value of a feature enhancement must be based on what profits a firm can earn on the enhanced product which is not measured by MVAI.

There have been efforts to compute Nash equilibrium prices using characteristics models in the marketing literature. Horsky and Nelson (1992) use a cross-sectional survey on car purchases and preferences to compute Nash price equilibrium. However, their approach does not specify a valid demand system constructed from first principles and does not allow for a full distribution of heterogeneous preferences. Choi and DeSarbo (1994) consider the problem of product design and pricing and employ a branch-and-bound algorithm to search for equilibrium points. The discrete nature of product positioning decisions makes it difficult to search for equilibria and their model does not allow for heterogenous consumers. Srinivasan et al. (1997) discuss Nash pricing equilibrium but do not compute equilibria using a valid demand model with heterogenous consumers. None of these papers are able to provide full



finite-sample inference for either equilibrium quantities or firm profits as we demonstrate below. In addition, these papers do not consider the problem of valuation of a product feature or use equilibrium incremental profits as a metric for feature valuation.

We illustrate our profit-based approach to valuing product features using the digital camera survey. We designed and fielded a conjoint survey for the purpose of undertaking equilibrium calculations to value a particular camera feature. We contrast our equilibrium results to purely demand-based measures such as WTP and show that there are economically large differences between these approaches.

## 2 Economic valuation of features

The goal of feature enhancement is to improve profitability of the firm by introducing a product with feature enhancement into an existing market. For this reason, we believe that the only sensible measure of the economic value of feature enhancement is the incremental profits that the feature enhancement will generate.

$$\Delta \pi = \pi \left( p^{eq}, m^{eq} | A^* \right) - \pi \left( p^{eq}, m^{eq} | A \right) \tag{2.1}$$

$\pi$ is the profits associated with the industry equilibrium prices and shares given a particular set of competing products which is represented by the choice set defined by the attribute matrix. $A^*$ denotes the set of products where one of the products has been enhanced by adding or improving a product feature. $A$ represents the set of products without feature enhancement. The set of products in the market is defined via their vector of characteristics.

The equilibrium depends on the set of products offered in the market place. $(p^{eq}, m^{eq})$ is the outcome of a price equilibrium with $m$ denoting the vector of market shares. An equilibrium is defined as a set of prices and accompanying market shares which satisfy the conditions specified by a particular equilibrium concept. We use the standard Nash Equilibrium concept for differentiated products. While we concentrate on a pricing-game equilibrium, our idea that valuation should be obtained from long-run equilibrium profit consequences can be applied to more complicated multistage games where there are equilibria computed in the choice of both features and price. Our view is that the price equilibrium is the logical starting point and that for the question of the marginal value of a feature it is the pricing game that determines the value of the feature. In the patent setting, there are restrictions on whether or not other firms can add the feature (if the feature is enabled by a patent) and it would not be appropriate to consider an equilibrium involving feature choice.

In the abstract, our definition of economic value of feature enhancement seems to be the only relevant measure for the firm that seeks to enhance a feature. All funds have an opportunity cost and the incremental profits calculation is fundamental to deploying product development resources optimally. In fairness, industry practitioners of conjoint analysis also appreciate some of the benefits of an incremental profits orientation. Often, marketing research firms construct "market simulators" that simulate market shares given a specific set of products in the market. Some even go further as to attempt to compute the "optimal" price by simulating different market



shares corresponding to different "pricing scenarios." In these exercises, practitioners fix competing prices at a set of prices that may include their informal estimate of competitor response. This is not the same as computing a marketing equilibrium but moves in that direction.

## 2.1 Assumptions

Once the principle of incremental profits is adopted, the problem becomes one of defining the nature of competition, the competitive set and to choose an equilibrium concept. These assumptions must be added to the assumptions of a specific parametric demand system (we will use a heterogeneous logit demand system which is flexible but still parametric) as well as the assumption (implicit in all conjoint analysis) that products can be well described by bundles of attributes. Added to these assumptions, our valuation method will also require cost information.

Specifically, we will assume

1. Demand Specification: A standard heterogenous logit demand that is linear in the attributes (including price)
2. Cost Specification: Constant marginal cost[2]
3. Single product firms
4. Feature Exclusivity: The feature can only be added to one product
5. No Entry-Exit: Firms cannot enter or exit the market after product enhancement takes place
6. Static Nash Price Competition

Assumptions 2, 3, 4 can be easily relaxed. Assumption 1 can be replaced by any valid or integrable demand system. Assumptions 5 and 6 cannot be relaxed without imparting considerable additional complexity to the equilibrium computations.

## 2.2 A standard logit model for demand

Valuation of product features depends on a model for product demand. In most marketing and litigation contexts, a model of demand for differentiated products is appropriate. We briefly review the standard choice model for differentiated product demand. In many contexts, any one customer purchases at most a single unit of the product. While it is straightforward to extend our framework to consider the quantity decision, we limit attention to the unit demand situation. The demand system then becomes a choice problem in which customers have $J$ choice alternatives, each with characteristics vector, $a_j$, and price, $p_j$. The standard random utility model (McFadden 1981) postulates that the utility for the $j$th alternative consists of a deter-

---

[2]In equilibrium after a feature introduction, it is possible that there may be quantity adjustments which may change the marginal cost of production. It would be a simple matter to add a specification in which cost changes as a function of quantity produced. It should be noted that this is yet another way in which the failure to account for equilibrium adjustments may bias traditional approaches to feature valuation such as Willingness To Pay.

ministic portion (driven by $a$ and $p$) and an unobservable portion which is modeled, for convenience, as a Type I extreme value distribution.

$$u_j = \beta' a_j - \beta_p p_j + \varepsilon_j \qquad (2.2)$$

$a_j$ is a $k \times 1$ vector of attributes of the product, including the feature that requires valuation, one of which is the focal feature.

In choice models used for demand data, it is now common to include an aggregate demand shock, a la Berry et al. (1995). In the conjoint design, we explicitly delineate the relevant set of characteristics and instruct respondents to assume that all other characteristics are held constant across choice alternatives. This breaks any possible correlations between observed and unobserved characteristics.

Feature enhancement is modeled as alternative levels of the focal feature, $a_f$ (one element of the vector $a$), while additional features would simply have $a_f$ as a dummy or indicator variable. There are three important assumptions regarding the model in Eq. 2.2 that are important for feature valuation: 1. this is a compensatory model with a linear utility, 2. we enter price linearly into the model instead of using the more common dummy variable coding used in the conjoint literature,[3] 3. there is a random utility error with infinite support. The random utility error, $\varepsilon_j$, represents the unobservable (to the investigator) part of utility. This means that actual utility received from any given choice alternative depends not only on the observed product attributes, $a$, and price but also on realizations from the error distribution. In the standard random utility model, there is the possibility of receiving up to infinite utility from the choice alternative. This means that in evaluating the option to make choices from a set of products, we must consider the contribution not only of the observed or deterministic portion of utility but also the distribution of the utility errors. The possibilities for realization from the error distribution provide a source of utility for each choice alternative.

The random utility model was designed for application to revealed preference or actual choice in the marketplace. The random errors are thought to represent information unobservable to the researcher. This unobservable information could be omitted characteristics that make particular alternatives more attractive than others. In a time series context, the omitted variables could be inventory which affects the marginal utility of consumption. In a conjoint survey exercise, respondents are explicitly asked to make choices solely on the basis of attributes and levels presented and to assume that all other omitted characteristics are the same. It might be argued that there role of random utility errors is different in the conjoint context. Random utility errors might be more the result of measurement error rather than omitted variables that influence the marginal utility of each alternative.

---

[3]That is, if price takes on K values, $p_1, \ldots, p_K$, then many conjoint investigators include $K - 1$ dummy variables for each of the values. This makes the market demand a non-continuous function and can create a situation in which there does not exist an equilibrium price. Existence of pure strategy equilibria requires (at a minimum) a continuous best-response function. If utility is a discontinuous function of price, then there can be discontinuities in the best response functions. As our proposed method requires equilibrium calculations, we do not use a dummy variable coding. Nonlinearities in the utility function with respect to price can be handled via non-linear continuous functions, if desired.



However, even in conjoint setting, we believe it is still possible to interpret the random utility errors as representing a source of unobservable utility. For example, conjoint studies often include brand names as attributes. In these situations, respondents may infer that other characteristics correlated with the brand name are present even though the survey instructions tell them not to make these attributions. One can also interpret the random utility errors as arising from functional form misspecification. That is, we know that the assumption of a linear utility model (no curvature and no interactions between attributes) is a simplification at best. We can also take the point of view that a consumer is evaluating a choice set prior to the realization of the random utility errors which occurs during the purchase period. For example, consider the value of choice in the smartphone category at some point prior to a purchase decision. At this point, the consumers knows the distribution of random utility errors which will depend on features not yet discovered or from demand for features which is not yet realized (i.e. the benefit from a better browser is not known with certainty prior to choice). When the consumer actually purchases a smartphone, he/she will know the realization of these random utility errors.

To derive the standard choice model, we must calculate the probability that the $j$th alternative has the maximum utility, employing the assumption that the error terms have a specific distribution. As is well known, the utility index in Eq. 2.2 is arbitrary and is preserved under both a location and scale shift. That is, if any number is subtracted from the utility of all choice alternatives, then the index of the maximum remains unchanged. Another way of saying this is that utility can only be expressed in a relative sense and that utility is not on a ratio scale. It is also true that the index of the maximum utility is not changed if each alternative is scaled by the same positive number. In conjoint applications with dummy variable coding the attributes (each level except one is introduced via dummy variables), there is one level of all variables (the "default" or base level) which is assigned a utility of zero. This means that, in conjoint designs, there is no location invariance problem. However, there is still a scaling problem. Typically, researchers set the scale parameter of the Type I extreme value distribution to 1.0. Another approach to the scaling invariance problem is to set the price coefficient to the value $-1.0$ and estimate the scale parameter. This later approach may have some advantages as Sonnier et al. (2007) point out. However, all of the conjoint studies we are familiar with use the conventional restriction of setting the scale parameter to 1.0 and allowing for a price coefficient. This means that absolute value of the price coefficient should be interpreted as the reciprocal of the error scale parameter.

Assuming that every consumer has sufficient budget to purchase any alternative, the random utility model yields that standard logit specification commonly used to analyze choice-based conjoint with the scale parameter set to 1.0.

$$\Pr(j) = \frac{\exp\left(\beta' a_j - \beta_p p_j\right)}{\sum_{j=1}^{J} \exp\left(\beta' a_j - \beta_p p_j\right)} \tag{2.3}$$

To simplify notation, we will combine both $\beta$ and $\beta_p$ into one vector, denoted $\beta$. In the conjoint literature, the $\beta$ coefficients are called part-worths. It should be noted that the part-worths are expressed in a utility scale which has an arbitrary origin (as

defined by the base alternative) and an equally arbitrary scaling (somewhat like the temperature scale). This means that we cannot compare elements of the $\beta$ vector in ratio terms or utilizing percentages. In addition, if different consumers have different utility functions (which is almost a truism of marketing) then we cannot compare part-worths across individuals. For example, suppose that one respondent gets twice as much utility from feature A as feature B, while another respondent gets three times as much utility from feature B as A. All we can say is that the first respondent ranks A over B and the second ranks B over A; no statements can be made regarding the relative "liking" of the various features.

The aggregate demand facing the firm is simply the integral of Eq. 2.3 over the distribution of preferences.

$$q_j\left(p\right) = M \int \Pr\left(j|\beta,\, A,\, p\right) \delta\left(\beta|\Theta\right) d\beta$$

Here $\beta$ refers to the entire vector part-worths (including the price coefficient). $\delta\left(\bullet\right)$ is the probability density function of preferences, indexed by parameters, $\Theta$. $M$ is the size of the market. $p$ is the vector of prices for all $J$ products. $A$ is the current choice set of competitive offerings in the market. That is, the $j$th row of $A$ contains the attributes/characteristics of the $j$th product in the market.

$$A = \begin{bmatrix} a_1' \\ a_2' \\ \vdots \\ a_J' \end{bmatrix}$$

Our equilibrium calculations will depend on the demand for products in a market place in which one of the products is enhanced or augmented with a specific feature. We denote the set of products in the world with feature enhancement by $A^*$ and the set without any feature enhancement as $A$.

### 2.3 Computing equilibrium prices

The standard static Nash equilibrium in a market for differentiated products is a set of prices that simultaneously satisfy all firms profit-maximization conditions. Each firm chooses price to maximize firms profits, given the prices of all other firms. These conditional demand curves are sometimes called the "best response" of the firm to the prices of other firms. An equilibrium, if it exists,[4] is a set of prices that are simultaneously the best response or profit maximizing for each firm given the others.

In a choice setting, the firm profit function[5] is

$$\pi\left(p_j|p_{-j}\right) = M\mathbb{E}\left[Pr\left(j|p,\, A\right)\right]\left(p_j - c_j\right). \tag{2.4}$$

---

[4]There is no guarantee that a Nash equilibrium exists for heterogeneous logit demand.

[5]Again, we do not have an aggregate demand shock in the model. We think of the firm problem as setting prices given the observed characteristics and prices of all products in the marketplace. There is no sense in which firms are setting prices as a function of some unobserved characteristic as this is explicitly ruled out by the nature of the conjoint randomized experiment.



M is the size of the market, $p$ is the vector of the prices of all $J$ firms in the market, $c_j$ is the marginal cost of producing the firms product. The expectation is taken with respect to the distribution of choice model parameters. In the logit case,[6]

$$\mathbb{E}\left[\Pr\left(j|p, A\right)\right] = \int \frac{\exp\left(\beta'a_j - \beta_p p_j\right)}{\sum_j \exp\left(\beta'a_j - \beta_p p_j\right)} \delta\left(\beta, \beta_p\right) d\beta d\beta_p. \qquad (2.5)$$

The first order conditions of the firm are

$$\frac{\partial \pi}{\partial p_j} = \mathbb{E}\left[\frac{\partial}{\partial p_j}\Pr\left(j|p, A\right)\right]\left(p_j - c_j\right) + \mathbb{E}\left[\Pr\left(j|p, A\right)\right] \qquad (2.6)$$

The Nash equilibrium price vector is a root of the system of nonlinear equations which define the F.O.C. for all $J$ firms. That is if we define

$$h\left(p\right) = \begin{bmatrix} h_1\left(p\right) = \frac{\partial \pi}{\partial p_1} \\ h_2\left(p\right) = \frac{\partial \pi}{\partial p_2} \\ \vdots \\ h_J\left(p\right) = \frac{\partial \pi}{\partial p_J} \end{bmatrix} \qquad (2.7)$$

then the equilibrium price vector, $p^*$, is a zero of the function $h\left(p\right)$.

There are two computational issues that arise in the calculation of Nash equilibrium prices. First, both the firm profit function (2.4) and the FOC conditions for the firm (2.6) require the computation of integrals to compute the expectation of the market share (market demand) and expectation of the derivative of market share in the FOC. Second, an algorithm must be devised for calculating the equilibrium price, given a method of approximating the integrals. The most straightforward method to approximate the requisite integrals is a simulation method. Given a distribution of demand parameters over consumers, we can approximate the expectations by a simple average of draws from this distribution. Given that both the market share and the derivatives of market share are virtually costless to evaluate, an extremely large number of draws can be used to approximate the integrals (we routinely use in excess of 50,000 draws).

Given the method for approximating the integral, we must choose an iterative method for computing equilibrium prices. There are two methods available. The first is an iterative method where we start from some price vector, compute the optimal price for each firm given other prices, updating the price vector as we progress from the 1st to the Jth firm. After one cycle through the J firms, we have updated the price vector to a second guess of the equilibrium. We continue this process until $\left\| p^r - p^{r-1} \right\| < tol$. The method of iterative firm profit maximization will work if

---

[6]We do not include a market wide shock to demand as we are not trying to build an empirical model of market shares. We are trying to approximate the firm problem. In a conjoint setting, we abstract from the problem of omitted characteristics as the products we use in our market simulators are defined only in terms of known and observable characteristics. Thus, the standard interpretation of the market wide shock is not applicable here. Another interpretation is that the market wide shock represents some sort of marketing action by the firms (e.g. advertising). Here we are directly solving the firm pricing problem holding fixed any other marketing actions. This means that the second interpretation of the market wide shock as stemming from some unobservable firm action is not applicable here.

there is a stable equilibrium. That is, if we perturb the price vector away from the equilibrium price, the iterative process will return to the equilibrium (at least in a neighborhood of the equilibrium). This is not guaranteed to occur even if there exists a unique equilibrium.

The second method for computing equilibrium prices is to find the root of the set of FOCs (2.7). The optimization problem

$$\min_{p} \|h(p)\|$$

can be solved via a quasi-Newton method which is equivalent to finding the roots directly using Newton's method with line search. This provides an alternative way of finding equilibria, if they exist, but does not provide a way of finding the complete set of equilibria if multiple equilibria exist. The zeroes of the set of first order conditions are not guaranteed to be equilibria and we must check candidate roots to see if they are indeed profit maximizing for the firm. In practice, we use both the iterative best response method and the root finding method to check all of our solutions to insure that they represent valid equilibria. The existence of multiple equilibria would have to be demonstrated by construction via starting the optimizer/root finder from different starting points. In our experience with heterogeneous logit models, we have not found any instance of multiple equilibria; however we have found situations where we cannot find any equilibria (though only rarely and for extreme parameter values).

## 2.4  WTP measures of feature value

Willingness to Pay (WTP) is a demand-based measure of social welfare used to value product features. We introduce it here for comparison to an equilibrium-based profits approach. WTP is a measure of social welfare derived from the principle of compensating variation. That is, WTP for a product is the amount of income that will compensate for the loss of utility obtained from the product; in other words, a consumer should be indifferent between having the product or not having the product with an additional income equal to the WTP. Indifference means the same level of utility. For choice sets, we must consider the amount of income (called the compensating variation) that must be paid to a consumer faced with a diminished choice set (either an alternative is missing or diminished by omission of a feature) so that consumer attains the same level of utility as a consumer facing a better choice set (with the alternative restored or with the feature added). Consumers evaluate choices *a priori* or before choices are made. Features are valuable to the extent to which they enhance the attainable utility of choice. Consumers do not know the realization of the random utility errors *until* confronted with the specific choice tasks and the description of the choice alternatives. Addition of the feature shifts the deterministic portion of utility or the mean of the random utility. Variation around the mean due to the random utility errors is equally important as a source of value.

To evaluate the utility afforded by a choice set, we must consider the distribution of the maximum utility obtained across all choice alternatives. This maximum has a distribution because of the random utility errors. For example, suppose we add the feature to a product configuration that is far from utility maximizing. It may



still be that, even with the feature, the maximum deterministic utility is provided by a choice alternative without the feature. This does not mean that feature has no value simply because the product it is being added to is dominated by other alternatives in terms of deterministic utility. The alternative with the featured added can be chosen after realization of the random utility errors if the realization of the random utility error is very high for the alternative that is enhanced by addition of the feature.

More formally, we can define WTP from a feature enhancement by using the indirect utility function associated with the choice problem. Let $A$ be a matrix which defines the set of products in a choice set. $A$ is a $J \times K$ matrix, where $J$ is the number of choice alternatives and $K$ is the number of attributes which define each choice alternative (other than price). The rows of the choice set matrix, $a_j$, show the configuration of attributes for the $j$th product in the choice set. That is, the $j$th row of A defines a particular product – a combination of attribute levels for each of $K$ attributes. If the $k$th attribute is the feature in question, then $a_{j,k} = 1$ implies that the feature has been added to the $j$th product. Let $A$ denote a set of products which represent the marketplace without the new feature and $A^*$ denotes the same set of products but where one of the products has been enhanced by adding the feature. We define the indirect utility function for a given choice set as

$$V\left(p, y|A\right) = \max_{x} U\left(x|A\right) \quad \text{subject to} \quad p'x \le y \tag{2.8}$$

WTP is defined as the compensating variation required to make the utility derived from the feature-poor choice set, $A$, equal to the utility obtained from the feature-rich choice set, $A^*$. $U\left(\right)$ is a standard direct utility function defined over the vector, $x$, of consumption of goods.

$$V\left(p, y + WTP|A\right) = V\left(p, y|A^*\right) \tag{2.9}$$

As such, WTP is a measure of the social welfare conferred by the feature enhancement expressed in dollar terms. The choice set may include not only products defined by the $K$ product attributes but also an outside option which is coded as row of zeroes in the feature matrix and a price of 0. Thus, a consumer receives utility from three sources: 1. observed characteristics of the set of products in the market, 2. expenditure on a possible outside alternative and 3. the random utility error.

For the logit demand system, the indirect utility function is obtained by finding the expectation of the maximum utility (see, for example, McFadden (1981)).

$$\begin{aligned} V\left(p, y|A\right) &= E\left[\max_j U_j|A\right] \\ &= \beta_p y + \ln \sum_{j=1}^{J} \exp\left(a_j'\beta - \beta_p p_j\right) \end{aligned} \tag{2.10}$$

To translate this utility value into monetary terms, we divide by the marginal utility of income. In these models, the price coefficient is viewed as the marginal utility of

income. We can then transform the utility value in Eq. 2.10 in to monetary terms, resulting in the "social surplus" (Trajtenberg 1989).

$$W\left(A|p, \beta, \beta_p\right) = y + ln\left[\sum_{j=1}^{J} \exp\left(\beta' a_j - \beta_p p_j\right)\right]/\beta_p \qquad (2.11)$$

We can then solve for WTP using the Eq. 2.9.

$$WTP = ln\left[\sum_{j=1}^{J} \exp\left(\beta' a_j^* - \beta_p p_j\right)\right]/\beta_p - ln\left[\sum_{j=1}^{J} \exp\left(\beta' a_j - \beta_p p_j\right)\right]/\beta_p$$
$$(2.12)$$

In the conjoint literature (Orme 2001), another "WTP" measure is often used. If we simply scale the part-worth corresponding to the feature enhancement by the price coefficient, a monetary measure of the incremental utility afforded by the feature enhancement is obtained. This measure does not take into account the utility value afforded by the omitted characteristics represented by the random utility errors. In addition, this measure, which we term a "pseudo-WTP" measure is invariant to which product the feature enhancement is applied to a property not shared by either a true WTP measure or the incremental profits measure proposed here. Thus, while the "pseudo-WTP" measure might be useful as a way of interpreting and comparing coefficients in conjoint models, there is no rigorous basis for the use of this measure as a measure of social surplus.

## 3 Using conjoint designs for equilibrium calculations

Economic valuation of feature enhancement requires a valid and realistic demand system as well as cost information and assumptions about the set of competitive products. In order to use a conjoint survey as the basis for calibration of a valid demand system, we must use the choice-based conjoint method. That is, we must measure demand (product choice) at the respondent level. In some forms of conjoint data, respondents are asked to rate various product configurations or to allocation 100 points across the configurations according to their "preferences." These methods have fallen out of favor relative to choice based conjoint as they don't provide a realistic simulation of the marketplace in which consumers choose among different products.

If conjoint studies are to be used to calibrate the demand system, then particular care must be taken to design a realistic conjoint exercise. The low cost of fielding and analyzing a conjoint design makes this method particularly appealing. However, there is no substitute for careful conjoint design. Many designs fielded today are not useful for economic valuation of feature enhancement. For example, conjoint studies in which there is no outside option, only one brand, and only a small subset of product features are often used in commercial applications. A study with any of these limitations is of questionable value for true economic valuation.

 Springer

Practitioners of conjoint have long been aware that conjoint is appealing because of its simplicity and low cost but that careful studies make all the difference between realistic predictions of demand and useless results. We will not repeat the many prescriptions for careful survey analysis which include crafting questionnaires with terminology that is meaningful to respondents, thorough and documented pre-testing, and representative (projectable) samples.[7] Furthermore, many of the prescriptions for conjoint design including well-specified and meaningful attributes and levels are extremely important. Instead, we will focus on the areas we feel are especially important for economic valuation and not considered carefully enough.

It is also well known that conjoint studies can be used to assess the distribution of preferences for products and features but are silent regarding awareness and availability. That is, the conjoint exercise makes the consumers (survey respondents) aware of the new product features and assumes that all choice alternatives are, hypothetically at least, available for purchase. For some consumer products, issues of awareness and availability (distribution) are extremely important. For consumer electronics examples, such as the one featured here, availability is typically not a problem, but awareness may be still be, particularly for minor feature enhancements. Our results for feature valuation should be viewed, therefore, as the maximum possible value under the assumption that, in the long run, consumers would become aware of a product feature which has utility value.

### 3.1 Set of competing products

The guiding principle in conjoint design for economic valuation of feature enhancement is that the conjoint survey must closely approximate the marketplace confronting consumers. In industry applications, the feature enhancement has typically not yet been introduced into the marketplace (hence the appeal of a conjoint study).

Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used. This means that the product attributes in the study should include not only functional attributes such as screen size, memory etc but also the major brands. This point is articulated well in Orme (2001).

In a highly competitive product category with many highly substitutable products, the economic value or increment profits that could accrue to any one competitor would typically be very small. However, in an isolated part of the product space (that is a part of the attribute space that is not densely filled in with competing products), a firm may capture more of the value to consumers of a feature enhancement. Therefore, it is important to design the study to consider the major competing products both in terms of brands and the attributes used in the conjoint design. It is not required that the conjoint study exactly mirror the complete set of products and brands that are in the marketplace but that the main exemplars of competing brands and product positions must be included.

---

[7]For a general discussion of surveys and sampling, see Rossi et al. (1983). For specific guidelines on the development of conjoint surveys see Orme (2009).



## 3.2 Outside option

There is considerable debate as to the merits of including an outside option in conjoint studies. Many practitioners use a "forced-choice" conjoint design in which respondents are forced to choose one from the set product profiles in each conjoint choice task. The view is that "forced-choice" will elicit more information from the respondents about the tradeoffs between product attributes. If the "outside" or "none of the above" option is included, advocates of forced choice argue that respondents may shy away from the cognitively more demanding task of assessing tradeoffs and select the "none" option to reduce cognitive effort. On the opposite side of the argument, some practitioners advocate inclusion of the outside option in order to assess whether or not the product profiles used in the conjoint study are realistic in the sense of attracting considerable demand. The idea being that if respondents select the "none of the above" option too frequently then the conjoint design has offered very unattractive hypothetical products. Others (see, for example, Brazell et al. (2006)) argue the opposite side of the argument for forced choice. They argue that there is a "demand" effect in which respondents select at least one product to "please" the investigator. There is also a large literature on how to implement the outside option.

Whether or not the outside option is included depends on the ultimate use of the conjoint study. Clearly, it is possible to measure how respondents trade-off different product attributes against each other without inclusion of the outside option. For example, it is possible to estimate the price coefficient in a conjoint study which does not include the outside option. Under the assumption that all respondents are NOT budget constrained, the price coefficient should theoretically measure the trade-offs between other attributes and price. The fact that respondents might select a lower price and pass on some features means that they have an implicit valuation of the dollar savings involved in this trade-off. If all respondents are standard economic agents, then this valuation of dollar savings is a valid estimate of the marginal utility of income.

While demand parameters can, in principle, be measured from a conjoint study conducted without the outside option, valid equilibrium calculations do require an outside alternative. In order to compute valid equilibrium prices, we need to explicitly consider substitution from and to other goods including the outside good. For example, suppose we enhance a product with a very valuable new feature. We would expect to capture sales from other products in the category as well as to expand the category sales; the introduction of the Apple iPad dramatically grew the tablet category due, in part, to the features incorporated in the iPad. Chintagunta and Nair (2011) make a related observation that price elasticities will be biased if the outside option is not included.

We conclude that an outside option is essential for economic valuation of feature enhancement as the only way to incorporate substitution in and out of the category is by the addition of the outside option. At this point, it is possible to take the view that if respondents are pure economic actors that they should select the outside option corresponding to their true preferences and that their choices will properly reflect the marginal utility of income. However, there is a growing literature which suggests that different ways of expressing or allowing for the outside option will change the



frequency with which it is selected. In particular, the so-called "dual response" way of allowing for the outside option (see Uldry et al. (2002) and Brazell et al. (2006)) has been found to increase the frequency of selection of the outside option. The "dual-response" method asks the respondent first to indicate which of the product profiles (without the outside option) are most preferred and then asked if the respondent would actually buy the product at the price posted in the conjoint design. Our own experience confirms that this mode of including the outside option greatly increases the selection of the outside option. Our experience has also been that the traditional method of including the outside option often elicits a very low rate of selection which we view as unrealistic. The advocates of the "dual response" method argue that the method helps to reduce a conjoint survey bias toward higher purchase rates than in the actual marketplace.

Another way of reducing bias toward higher purchase rates is to design a conjoint using an "incentive-compatible" scheme in which the conjoint responses have real monetary consequences. There are a number of ways to do this (see, for example, Ding et al. (2005)) but most suggestions (an interesting exception is Dong et al. (2010)) use some sort of actual product and a monetary allotment. If the products in the study are actual products in the marketplace, then the respondent might actually receive the product chosen (or, perhaps, be eligible for a lottery which would award the product with some probability). If the respondent selects the outside option, they would receive a cash transfer (or equivalent lottery eligibility). Incentive compatible conjoint methods are difficult to implement in the case of new products or new product features for which no actual product may be available.

## 4 Statistical inference for economic valuation

Bayesian hierarchical models are now by far the dominant method for use in analysis of choice-based conjoint data. The reason for the widespread use of Bayesian methods is the ability to conduct inference at both the individual consumer or respondent level as well as on the aggregate level. All inferences are made without resort to asymptotic approximations which can be very poor for highly nonlinear models and functions of model parameters. For example, the posterior distribution of equilibrium profits involves computing Nash Equilibrium prices. Equilibrium prices are a highly nonlinear function of the distribution of preferences in the marketplace, an expression which is not available in closed form. As is well known, a simulation-based Bayesian approach can compute the finite sample distribution of any function (in closed form or not) of model parameters. In our case, we must compute the posterior predictive distribution of market share and use this distribution to simulate the posterior distribution of equilibrium prices and profits.

We employ a standard hierarchical Multinomial Logit model. This consists of a MNL model for each respondent's data (denoted $y_i$) given attribute information, $A_i$, and preference parameters, $\beta_i$, coupled with a two-stage prior. The first stage of the prior is a multivariate normal distribution for the model parameters and the second stage is a set of priors on the parameters of the random coefficient distribution parameters (in Section 6.3, we consider a mixture of normals specification for the first



stage prior or random coefficient distribution). In non-Bayesian literature it is common to restrict heterogeneity to only a subset of the model parameters or to assume that the model parameters do not have a full co-variance matrix, something that is unnecessary in a full Bayesian treatment. Our hierarchical model is specified as

$$
\begin{aligned}
y_i &\mid A_i, \beta_i \\
\beta_i &\sim N\left(\mu, V_\beta\right) \\
\mu, V_\beta &\sim p\left(h\right).
\end{aligned}
\tag{4.1}
$$

The second-stage prior is the standard Normal-Inverted-Wishart conditionally conjugate prior (see, for example, Rossi et al. (2005), Section 2.12).

### 4.1 Individual or market quantities?

The appeal of Bayesian methods is based primarily on the ability to produce inferences at the respondent level as well as to free statistical inference from asymptotic approximations which are dubious at best in conjoint exercises where very few (invariably less than 20) observations are collected per respondent. However, there has been a great deal of confusion as to how to develop and use respondent-level inferences. Many simply compute Bayesian estimates at the respondent level based on averages of the MCMC draws of the parameter vector at the respondent level.

$$
\hat{\beta}_i = \frac{1}{R} \sum_r \beta_i^r
\tag{4.2}
$$

Here $i$ is the index of the respondent and $r$ is the index of the MCMC draws for that respondent. While there is nothing inherently wrong with this estimate, the distribution of these estimates across respondents is not a valid estimate of true distribution of preference or part-worth parameters than constitutes the market. Intuitively, we all know that there is a great deal of uncertainty in the respondent level parameter estimates as they are based only on a handful of observations and the Bayes procedures do not borrow a great deal of strength from other observations unless the distribution of heterogeneity is inferred to be very tight. These problems are magnified for the WTP measure. One cannot simply plug in estimates of respondent-level parameters into the equation defining WTP (2.9) and then compute the average of these estimated WTP as an estimate of the population average WTP. A coherent full Bayesian approach requires the definition of the population object of interest (here is is the population average of the WTP measure) and then compute the full posterior distribution of this measure.

Instead of focusing on individual estimates and exposing the attendant problems with these estimates, economic valuation forces the investigator to estimate the distribution of tastes which is then used to compute market demand. To review, if we know the distribution of part-worths (preferences) over respondents we can compute market demand for any firm's product as

$$
\text{MS}\left(j \mid p, A\right) = \int \Pr\left(j \mid \beta, p, A\right) \delta\left(\beta \mid \Theta\right) d\beta.
\tag{4.3}
$$



Here MS(j) is the market share[8] of product j. However, we do not know the exact distribution of preferences. What we have is a model for preferences (the first stage of the hierarchical model) and inferences about the parameters of this model. We assume that the model parameters (or some transform of them) takes a specific parametric form. In particular, it is common to assume that preferences are normally distributed.

$$\delta\left(\beta|\Theta\right) = \phi\left(\beta|\mu, V_\beta\right) \tag{4.4}$$

Here $\phi\left(\bullet\right)$ is the multivariate normal density and $\Theta$ represents the normal density parameters. This means that market share defined in Eq. 4.3 a is function of the hyper-parameters that govern the normal, first-stage or random coefficient, distribution. Some might argue (see, for example, Rossi (2014)) that the normal distribution is overly restrictive as the first-stage of the prior or the random coefficient distribution. In Section 6.3, we explore the sensitivity of our results to the assumption of normality by considering a much more flexible mixture of normals approach.

$$\text{MS}\left(j|\mu, V_\beta\right) = \int \text{Pr}\left(j|\beta\right)\phi\left(\beta|\mu, V_\beta\right)d\beta \tag{4.5}$$

The posterior predictive distribution of market share is obtained from the posterior distribution of the normal distribution hyper-parameters, $p\left(\mu, V_\beta|data\right)$ used in conjunction with Eq. 4.5. We simply draw from the multivariate normal density given each draw of the hyper-parameters to obtain a draw from the relevant posterior predictive distribution.

$$\text{MS}\left(j\right)^r = \int \text{Pr}\left(j|\beta\right)\phi\left(\beta|\mu^r, V_\beta^r\right)d\beta \tag{4.6}$$

This idea can be used to compute the posterior distribution of any quantity including the posterior distribution of equilibrium prices as equilibrium prices are also a function of the random coefficient parameters. In the illustration of our method, we will take draws of the normal hyper-parameters and then for each draw we will solve for the equilibrium prices. This will build up the correct posterior distribution of equilibrium quantities.

### 4.2 Estimating price sensitivity

Equilibrium prices are sensitive to inferences regarding the price coefficient. If the distribution of price sensitivities puts any mass at all on positive values, then there does not exist a finite equilibrium price. All firms will raise prices infinitely, effectively firing all consumers with negative price sensitivity and make infinite profits on the segment with positive price sensitivity. Most investigators regard positive price coefficients as inconsistent with rational behavior. However, it will be very difficult for a normal model to drive the mass over the positive half line for price sensitivity to a negligible quantity if there is mass near zero on the negative side. We must distinguish uncertainty in posterior inference from irrational behavior. If a number of

---

[8]In the conjoint literature, this is often termed the "choice share."

respondents have posteriors for price coefficients that put most mass on positive values, this suggests a design error in the conjoint study; perhaps, respondents are using price as a proxy for the quality of omitted features and ignoring the "all other things equals" survey instructions. In this case, the conjoint data should be discarded and the study re-designed. On the other hand, we may find considerable mass on positive values simply because of the normal assumption and the fact that we have very little information about each respondent. In these situations, we have found it helpful to change the prior or random effect distribution to impose a sign constraint on the price coefficient.

$$\begin{bmatrix} \beta \\ \beta_p = \ln\left(-\beta_p^*\right) \end{bmatrix} \sim N\left(\mu, V_\beta\right) \tag{4.7}$$

Given that a RW-Metropolis step is used to draw logit parameters, this re-parameterization can be implemented trivially in the evaluation of the likelihood function only.[9] The only change that should be made is in the assessment of the IW prior on $V_\beta$. In the default settings, we use a relatively diffuse prior, $V_\beta \sim IW(\nu, \nu V)$, with $V = I$ and we typically use a value of $\nu$ which yields a barely proper IW distribution (such as $\nu = dim(\beta) + 5$). We must recognize that the price element of $\beta$ is now on a log-scale and it would be prudent to lower the prior diffusion to a more modest level such as .5 rather than leaving that diagonal element at 1.0. In addition, very low values of $\nu$ will result in very thick tails and admit extremely small price coefficients. For these reasons, we believe somewhat larger values of $\nu$ are appropriate. We use $\nu = dim(\beta) + 15$. For these conjugate priors, $\nu$ can be interpreted as the size of a sample which provided the basis of the prior. Since we have over 300 respondents, the $\nu$ values we employ are still only mildly informative in the sense that the actual sample size is about 10 times the prior degrees of freedom.

Figure 1 shows the implied prior distribution on the price coefficient at both "default" prior settings and a tighter prior that uses $\nu = dim(\beta) + 15$ and the appropriate diagonal value of V set to .5. The top row of histograms shows the standard default prior distribution. The prior distribution of the log-scale parameter, $\beta_p^*$ is shown on the left and the implied prior distribution for the price coefficient on the right. The low degrees of freedom for the IW distribution and the relatively large value of V imply a left tail of negative values which are large. This mass gets transformed into extremely small price coefficients, barely less than zero. Clearly, this is not a diffuse prior at all but, rather, a very informative prior that puts high prior probability near zero. Our suggested prior is shown in the bottom row of histograms. The prior on $\beta_p^*$ is has much thinner tails and, therefore, the implied prior on the price coefficient is much more reasonable and puts less mass on extremely values of price sensitivity.

Even with a prior that only puts positive mass on negative values, there may still be difficulties in computing sensible equilibrium prices due to a mass of consumers with negative but very small price sensitivities. Effectively this will flatten out the profit

---

[9]It should be noted that the prior outlined here will have a zero probability of a price coefficient which is $\geq 0$. This is not true for more ad hoc methods such as the method of "tie-breaking" used in Sawtooth Software.





**Fig. 1** Default and tighter prior distributions of the price coefficient

function for each firm and make it difficult to find an equilibrium solution. The lower the curvature of the profit function, the more sensitive the profit function (or first order conditions) will be to simulation error in the approximation of the integrals.



In many conjoint studies, the goal is to simulate market shares for some set of products. Market shares can be relatively insensitive to the distribution of the price coefficients when prices are fixed to values typically encountered in the marketplace. It is only when one considers relative prices that are unusual or relatively high or low prices that the implications of a distribution of price sensitivity will be felt. By definition, price optimization will stress-test the conjoint exercise by considering prices outside the small range usually consider in market simulators. For this reason, the quality standards for design and analysis of conjoint data have to be much higher when used for economic valuation than for many of the typical uses for conjoint. Unless the distribution of price sensitivity puts little mass near zero, the conjoint data will not be useful for economic valuation using either our equilibrium approach or for the use of the more traditional pseudo-WTP methods.

## 5 Decision-theoretic considerations and "optimal" pricing

Our approach has been to compute equilibrium prices under the assumption that firms are fully informed regarding not only the form of the distribution of preferences but also the parameters of this distribution. We, as the researcher, do not have full information and must make inferences regarding what equilibrium prices would be under the assumption of fully informed firms and on the basis of the sample (conjoint data) information. If we denote the generic distribution of consumer preferences as, $\delta(\beta|\Theta)$, then the set of equilibrium prices that simultaneously satisfy all $J$ firms' first order conditions (2.7) are function of $\Theta$, denoted $p^*(\Theta)$. Using draws from the posterior distribution of $\Theta$, we can simulate the posterior distribution of $p^*$ or any other function of equilibrium prices as discussed in Section 4. Our feature valuation metric is the incremental profits that accrue to products with enhanced features and we can compute the posterior distribution of incremental profits given our assumption that firms have full information and that there is a Nash equilibrium in a pricing game.

The posterior mean of equilibrium prices (the standard Bayes estimator) is not the solution to the "optimal" pricing problem of the firm under the assumption that the firm's information regarding preferences is limited to conjoint sample information. If there was only one firm, the firm would solve a decision-theoretic problem of maximizing expected profits where the expectation is taken with respect to the posterior distribution of preference parameters.

$$\max_p \bar{\pi}(p) = \int \pi(p|\Theta)\, p(\Theta|Data)\, d\Theta \tag{5.1}$$

Here $\pi(p|\Theta) = \int Pr(j|\beta)(p-c)\,\delta(\beta|\Theta)\,d\beta$.

The solution to this problem in Eq. 5.1 is not the same finding the optimal price given $\Theta$ and then taking the average of these optimal prices with respect to the posterior distribution of $\Theta$. The problem defined above provides the solution to the optimal pricing problem of the monopolist and results in only one value of an "optimal" price.



However, if there is more than one firm in the industry (as is invariably the case with differentiated products), we cannot simply apply the decision theoretic paradigm and provide advice regarding optimal price to the firm without further assumptions. One simple solution would be to make some assumptions regarding the prices of other products and simply condition on them in the solution to the decision theoretic problem. This, of course, does not recognize that as features are added to products there is likely to be a competitive price response and that we must make assumptions regarding the prices of competing products both in the world with and without the product feature enhancement. Rather than making arbitrary assumptions, our contribution is to use equilibrium notions to solve this problem.

In order to apply equilibrium concepts to the situation where the firm does not have full information regarding the distribution of preferences, we must make assumptions regarding what information is available to other firms and define an equilibrium for the pricing game with these information sets. Progress along these lines could be made in two ways: 1. we could assume that all firms have the same information set, namely our conjoint data and 2. that the focal firm is the only firm with access to the conjoint data and all other firms have information equivalent to that which provides the prior for the focal firm. If we assume that all firms have the same posterior distribution over preference parameters given by the posterior from our conjoint data, then we can define a Nash equilibrium by finding the zero of the set of first order conditions based on integrating out $\Theta$ with respect to the posterior derived from this common information set. While the symmetry of the assumption of the same information set is mathematically convenient, it may be hard to justify this assumption. One would have to argue that all firms are aware of the possibility of the feature enhancement in question and have the resources to conduct similar conjoint surveys. The second situation where there are different information sets for different firms presents theoretical and computational challenges which we leave for future research.

Some would argue that the assumption that all firms have full information about the distribution of consumer preferences is particularly unrealistic in the case of new product features. In the case of new product features, there is often little or no marketplace data. In fact, the widespread commercial use of conjoint surveys for feature valuation indicates that many firms do not fully know the distribution of consumer preferences. It is important to understand that our valuation calculations are not prescriptive. We are not claiming to solve the optimal pricing problem of the firm, given limited information. Our view is that the valuation computations based on profits in equilibrium with full information provides an approximation to a somewhat longer run view of firm profits. That is, we would expect that firms will introduce products into the marketplace with the features in question and that, overtime, all firms in the marketplace will learn from both survey and marketplace data regarding the distribution of consumer preferences. In the longer run, the sequence of industry equilibria could be expected to converge to the full information Nash equilibrium calculated here. In that sense, the firm today, with only the results of the conjoint survey, is like the researcher studying industry equilibrium with fully informed firm.

 Springer

The firm can form posterior beliefs about the eventual industry outcome which can be approximated by the full information Nash equilibrium.

## 6 An illustration using the digital camera market

To illustrate our proposed method for economic valuation and to contrast our method with standard WTP methods, we consider the example of the digital camera market. We designed a conjoint survey to estimate the demand for features in the point and shoot submarket. We considered the following seven features with associated levels:

1. Brand: Canon, Sony, Nikon, Panasonic
2. Pixels: 10, 16 mega-pixels
3. Zoom: $4\times$, $10\times$ optical
4. Video: HD (720p), Full HD (1080p) and mike
5. Swivel Screen: No, Yes
6. WiFi: No, Yes
7. Price: $79–279

We focused on evaluating the economic value of the swivel screen feature which is illustrated in Fig. 2. The conjoint design was a standard fractional factorial design in which each respondent viewed sixteen choice sets, each of which featured four hypothetical products. A dual response mode was used to incorporate the outside option. Respondents were first asked which of the four profiles presented in each choice task was most preferred. Then the respondent was asked if they would buy the preferred profile at the stated price. If no, then this response is recorded as the "outside option" or "none of the above." Respondents were screened to only those who owned a point and shoot digital camera and who considered themselves to be a major contributor to the decision to purchase this camera.

The survey was fielded to the Sampling Surveys International internet panel in August 2013. We received 501 completed questionnaires.[10] We recorded time to complete the conjoint portion of the survey. The median time to complete is 220 seconds or about 14 seconds per conjoint task. The 25th percentile is 151 seconds and the 75th percentile is 333 seconds. To check sensitivity to time spent on the survey, we conducted analyses deleting the bottom quartile of the respondents and found little change. It is a common and well-accepted practice to remove respondents who "straight-line" or always select the same option (such as the left most choice). The idea is that these "straight-liners" are not putting sufficient effort into the choice task. Of our 501 complete questionnaires, only two respondents displayed straight-line behavior and were eliminated. We also eliminated six respondents who always selected the same brand and one respondent who always selected the high

---

[10]This study was part of a wave of four other very similar conjoint studies on digital cameras each with the same screening criteria. For all studies in the wave, 16,185 invitations were sent to panelists, 6,384 responded. Of those who responded to the invitation, 2,818 passed screening and of those passing screening 2,503 completed the questionnaire. Thus, the overall completion rate is 89 per cent which is good by survey standards.





**Fig. 2** Swivel screen attribute

price brand. Our reasoning is that these respondents did not appear to be taking the trade-offs conjoint exercise seriously. We also eliminated 23 respondents who always selected the outside option as their part-worths are not identified without prior information.

The remaining 469 respondents were considered for inclusion in our analysis. Conjoint survey experts frequently impose further screening criteria in order to eliminate respondents who appear to be doing little more than providing random responses to the survey. Typically this is done by fitting the logit model to the complete data set and then removing respondents whose hit rate or log-likelihood values are barely above chance (in our case that would be a 1/5 probability of selecting one of the four brands and the outside option). We are reluctant to impose such criteria for selection into our estimation sample. However, we recognize that this means that our sample of respondents will contain some respondents who appear to be rather price insensitive. This may lower overall own price elasticities and result in somewhat higher margins. In Section 6.3, we will explore the sensitivity of our results to both the criteria used to select respondents as well as the form of the first-stage prior for heterogeneity.

To analyze the conjoint data, we use the *bayesm* routine rhierMnlMixture. We employed standard diffuse prior settings as discussed in Section 4 and 50,000 MCMC draws were made. The first 10,000 draws were discarded for burn-in purposes. The hierarchical model we employed assumes that the conjoint price-worths are normally distributed. We can compute the posterior predictive distribution of part-worths as follows:

$$p\left(\beta|data\right) = \int \phi\left(\beta|\mu, V_\beta\right) p\left(\mu, V_\beta|data\right) d\mu \, dV_\beta \qquad (6.1)$$

Equation 6.1 shows the influence of both the model (the normal random coefficient distribution) and the data through the posterior distribution of the normal hyperparameters. The resulting distributions will be symmetric but of fatter tails that the normal. Figure 3 shows the posterior predictive distribution of the swivel screen part-worth. Most the mass of this distribution is on positive values. It is difficult to interpret the size of these part-worths without reference to the price coefficient. Figure 3 displays the posterior predictive distribution of the price coefficient. This coefficient has been restricted to only negative values by the reparameterization in Eq. 4.7. Note that this is the price coefficient for price expressed in $100s.



444                                                                                              G. M. Allenby et al.



**Fig. 3** Posterior predictive distribution of price and swivel screen part-worths

Aggregate demand is found by taking the expectation of choice probabilities with respect to the distribution of preference parameters over the population. The distribution of the part-worths shown in Fig. 3 is the correct predictive distribution of preferences. In order to shed some light as to the substitution structures found in aggregate demand, we compute the posterior distribution of the market share elasticity matrix. This is obtained by computing the elasticity matrix given the normal distribution hyper-parameters and then constructing the posterior distribution of this quantity using draws from the posterior distribution of the hyper-parameters.

$$\frac{\partial MS(i)}{\partial lnp_j}(\mu, V_{beta}) = \frac{\partial}{\partial lnp_j} \int Pr(i|\beta) \phi(\beta|\mu, V_{beta}) d\beta \tag{6.2}$$

The posterior mean of these elasticities is presented in Table 1. These own price elasticities, while plausible, imply a reasonably high markup of two- three times cost.



**Table 1**  Posterior mean of aggregate demand elasticities

| Price  Mkt Share | $MS_{Sony}$ | $MS_{Canon}$ | $MS_{Nikon}$ | $MS_{Pansonic}$ |
|---|---|---|---|---|
| $P_{Sony}$ | −1.78 | .51 | .39 | .45 |
| $P_{Canon}$ | .48 | −1.69 | .36 | .35 |
| $P_{Nikon}$ | .40 | .40 | −1.61 | .30 |
| $P_{Panasonic}$ | .55 | .45 | .36 | −1.75 |

The cross-price elasticities are also quite high, showing a high degree of substitution between these brands.

### 6.1 Changes in equilibrium prices, shares, and profits

We have argued that economic value should be expressed as incremental profits that accrue to the firm that engages in feature enhancement. It is difficult to provide a realistic base or scaling for firm profits without more information regarding market size and cost. However, we can compute equilibrium prices with and without feature enhancement to provide an idea of how much the focal firm can charge as a price premium and how market shares will adjust in the new industry equilibrium. Here we consider the change in equilibrium outcomes from adding the swivel screen display to the Sony base product (a Sony brand camera with all attributes turned to their "lowest" value except, of course, price which is not constrained). The value conferred by the addition of the swivel screen will also depend on the configuration of other competing products. For illustration purposes only, we considered a competitive set that consists of three other brands (Canon, Nikon, and Panasonic) all similarly configured at the "base" level of attributes. We set the marginal cost of product for all brands to be $75. When the Swivel Screen feature is added, we assume marginal cost is increased by $5 to $80.

Table 2 presents the posterior means of the equilibrium prices computed with and without the swivel screen addition to the Sony product.[11] As we might expect, adding the swivel screen gives the Sony brand more effective market power relative to the other branded competitors who do not have the feature (note: we could have easily simulated a competitive reaction in which some or all of the other brands adopted the feature). Not only does Sony find it optimal to raise price, the stronger competition and diminished value of the other brands forces them to lower prices in equilibrium.

Figure 4 plots the posterior distribution of the change in equilibrium price as the swivel screen feature is added to the Sony product. This distribution is distributed around the mean of $34.42, represented by the single light-shaded vertical bar. The two dark-shaded vertical bars on either side of the mean represent a 95 per cent posterior interval.

---

[11]The numbers displayed in the table are posterior means.

**Table 2** Changes in equilibrium prices

|        | Sony      | Canon     | Nikon     | Panasonic |
|--------|-----------|-----------|-----------|-----------|
| W/O SS | $172.06   | $186.52   | $203.10   | $178.30   |
| W SS   | $206.49   | $181.53   | $192.47   | $173.34   |
| Δ      | $34.42    | −$4.98    | −$10.63   | −$4.95    |

Table 3 displays the equilibrium market shares for each of the four branded products and the outside good calculated with and without the swivel screen display. Only very minor share changes are observed. The feature enhanced Sony product



**Fig. 4** Posterior distribution of the change in Sony equilibrium price

**Table 3**  Changes in equilibrium shares

|         | Sony  | Canon | Nikon | Panasonic | Outside Good |
|---------|-------|-------|-------|-----------|--------------|
| W/O SS  | 13.0% | 12.9% | 11.0% | 10.3%     | 53%          |
| W SS    | 13.6% | 12.9% | 11.3% | 10.4%     | 52%          |
| Δ       | .6%   |       | .4    | 0         | −1%          |

gains share, primarily from the outside alternative. As we have seen, the other brands reduce their prices in equilibrium, compensating for the greater desirability of the Sony product.

In differentiated markets, competitive forces drive down the profits that the firm with the feature enhanced product can capture from the consumer surplus generated by the feature improvement. For this reason, pure measures of change in consumer surplus are not an appropriate measure of the value to the firm as competition will dissipate rents. To illustrate how competition effects equilibrium profits, we consider reducing the number of competitors, thus, softening competition. With product differentiation, firms will still earn positive equilibrium profits but the market power of any one firm depends not only on the number of competitors but the positions they occupy in the product space. To see this, we conduct a different market simulation in which there are only two competing firms, Sony and Canon, instead of four. The IIA property of the logit demand system at the consumer level allows us to easily compute the new market pricing equilibrium in the market with only two competitors. The IIA property means that, at the individual level, the demand system for a reduced set of alternatives (Canon, Sony, and the outside good) can be found simply by renormalizing the choice probabilities based only the market shares for these three alternatives. We then can form market demand by integrating up over the distribution of preferences.

We find that in a system with only the Sony and Canon products, Sony faces less competition and is able to extract a greater fraction of consumer surplus from adding the swivel screen feature. The equilibrium price goes up by $36.17 an amount larger than the change in equilibrium prices with four firms and a more densely filled in product space.

Finally, we can compute the posterior predictive distribution of the percentage change in Sony profits as the Swivel Screen feature is added. This is the ultimate measure of the value to Sony of this product feature. We can compute equilibrium profits with and without the Swivel Screen features. This computation allows other competitors to adjust their prices downward to compensate for lost demand. A more naive approach would be to assume no competitive reaction and compute the change in profits from the base equilibrium in which no firm has as Swivel Screen feature to profits earned by Sony without allowing for competitive reaction. This calculation will overstate the profit potential of the feature as it assumes that other firms will not adjust prices.

Panel (a) of Fig. 5 shows the posterior distribution of the change in Sony profits assuming no competitive reaction. The posterior mean is a 92.9 per cent increase



in profits. Panel (b) shows the results from comparisons of price equilibria with and without the feature addition. The mean change in equilibrium profit is 35.8 per cent. This represents the true economic value for the feature after accounting for competitive response and cost considerations. Given that, under our cost assumptions



**Fig. 5** Posterior distribution of the change in sony equilibrium profits



(a marginal cost of \$80 to produce the camera with SS), this translates into an increase into an incremental profit of about \$33 per unit sold.[12]

## 6.2 WTP computations

We have emphasized that economic valuation of product feature enhancement should be done by computing the incremental profits generated by the feature enhancement. Incremental profit calculations will take into account demand, cost, and competitive considerations. In the new products literature in economics (see, for example, Petrin (2002) and Trajtenberg (1989)), welfare based measures are typically used. That is, the new products should create additional consumer surplus and this surplus is monetarized using estimates of the marginal utility of income as in Eq. 2.11. For example, if we consider the social planner problem of how much to invest in improving trout fishing by stream improvement (see Train (1998)), then it is reasonable to use a social surplus measure to compute the social return on investment in improved recreation. However, in the private sector, the valuation of product features is determined by the firm profits that can be derived from the feature enhancement. The competitive structure of the industry will determine how the total surplus generated by the feature enhancement is divided between the consumers and the firm. However, even in the case of a monopoly, the firm profits will be less than the social surplus if the firm can only charge a uniform price. In this section, we will consider social surplus calculations as implemented via the WTP measure.

In order to compute a valid true WTP measure, we must integrate the WTP measure (shown in Eq. 2.11) over the distribution of preferences in the population. In the full Bayesian approach, we would compute the posterior predictive distribution of preferences and compute the posterior distribution of the $\mathbb{E}\,[\text{WTP}]$.

$$\mathbb{E}\left[\text{WTP}|\mu, V_\beta\right] = \int \text{WTP}\left(\beta\right) p\left(\beta|\mu, V_\beta\right) d\beta \qquad (6.3)$$

The posterior distribution of this quantity can easily be computed using the posterior of the hyper-parameters, $p\left(\mu, V_\beta|Data\right)$. Figure 6 presents this posterior distribution. The vertical light yellow line is the mean of this distribution and a 95 percent posterior interval is shown by smaller and darker green lines.

The posterior mean of the $\mathbb{E}\,[WTP]$ is \$14.63. There is considerable uncertainty in this quantity but even the upper limit of a 95 per cent posterior interval is below the change in equilibrium price of about \$34. The reason for this is that the outside good share at the equilibrium prices is about 50 per cent. This means that a substantial portion of the mass of the distribution of WTP is below the market price. $\mathbb{E}\,[WTP]$ is, of course, an average over all potential customers

---

[12]The profits per unit sold are \$172-75 and 35 per cent of this is \$33.



**Fig. 6**   Posterior Distribution of $\mathbb{E}[\text{WTP}]$

including those who would decide not to purchase a digital camera at the equilibrium prices. This is the reason why $\mathbb{E}[WTP]$ is below the change in equilibrium price.

The total social surplus generated by the feature enhancement will be the average WTP times the total size of the market. By definition, total social surplus will always exceed the firm profits attributed to the feature enhancement, since the firm can only capture part of the total consumer surplus for the subset of the market that purchases the firm's product.



**Table 4**  Posterior mean of aggregate demand elasticities: censored sample

| Price Mkt Share | $MS_{Sony}$ | $MS_{Canon}$ | $MS_{Nikon}$ | $MS_{Pansonic}$ |
|---|---|---|---|---|
| $P_{Sony}$ | $-2.74$ | .70 | .64 | .70 |
| $P_{Canon}$ | .62 | $-2.48$ | .63 | .48 |
| $P_{Nikon}$ | .62 | .69 | $-2.45$ | .47 |
| $P_{Panasonic}$ | .92 | .73 | .65 | $-2.90$ |

## 6.3 Sensitivity to prior and sample selection

In conducting our analysis of the swivel screen data, we used a normal specification for heterogeneity coupled with a fairly diffuse prior. We also used all respondents except for a very small number who exhibited anomalous choice behavior such as "straight-lining." In this section, we explore the sensitivity of our results to the choice of the sample and to the normal specification of heterogeneity. In particular, we consider removing respondents who appear to be answering more or less at random and we consider a mixture of normals specification for the distribution of preferences across respondents.

### 6.3.1 Sample selection

In many applications of conjoint analysis, investigators routinely do not fit the demand model on the sample of all respondents but, instead, exclude respondents who appear to be doing little more than randomly selecting product configurations. The rationale behind this censoring is that these are respondents who are not taking the survey as seriously as they would if confronted with the sample product choice task in the marketplace. These respondents could also be people who have a great deal of difficulty either understanding the conjoint choice task or in making multi-dimensional comparisons. There are many rules used to select respondents but most are based on computing model parameters at the respondent level and predicting choice for a "hold-out" sample of the conjoint choice tasks. If a respondent has a very low hit-rate (close to random choice) on the holdout sample, the respondent is excluded from analysis. There are many problems with this sort of ad hoc sample selection rule; these include choice of the size of the hold-out sample as well as the use of a crude hit rate as a index of predictability.

A more coherent approach[13] in the same vein would be to fit the demand/choice model and compute the marginal likelihood for each respondent. If the marginal likelihood is very low, then one could argue that this respondent is choosing in a nearly random fashion. Given that there are five possible choices (four goods and the out-

---

[13]However, survey respondents who do not follow the compensatory model assumed by utility theory and conjoint analysis but, instead, follow some sort of screening or non-compensatory choice rule may have high likelihood. We may not be able to eliminate this type of respondent simply on the basis of in-sample fit.

**Table 5**  Changes in equilibrium prices: censored sample

|         | Sony     | Canon    | Nikon    | Panasonic |
|---------|----------|----------|----------|-----------|
| W/O SS  | $118.49  | $126.09  | $127.45  | $114.72   |
| W SS    | $144.09  | $124.31  | $125.24  | $114.76   |
| Δ       | $25.60   | −$1.78   | −$2.21   | −$0.04    |

side option), a purely random choice would produce a marginal likelihood value of approximately $16 ln (.2) = -25.75$. We establish a cut-off for the purpose of sensitivity analysis at $16 ln (.4) = -14.66$. This cut-off eliminates 136 respondents or about 29 per cent of the original sample. Table 4 shows the new elasticity structure computed at the new vector of equilibrium prices. All elasticities are larger in magnitude than those from the full sample with a particularly sharp increase in the own price elasticity. These elasticities imply much lower equilibrium prices and lower margins.

Table 5 shows the equilibrium prices for the "baseline" and Swivel Screen enhanced product configurations. Given that these are equilibrium prices for what we have been calling the "baseline" product configurations (all non-price attributes are set to the "low" value), we find these equilibrium prices to be more reasonable and more in line with actual market prices (under our marginal cost assumption of $75). Clearly, the censored sample is comprised of more price sensitive respondents.[14]

### 6.3.2 Non-normal heterogeneity

Virtually all industry and academic applications of choice-based conjoint use a normal distribution of heterogeneity even though the technology for handling more general flexible distributions has existed for some time. In the I/O literature, only restricted normal distributions of preferences have been used to construct market demand. The normal distribution is very flexible in terms of the pattern of covariance and variability but imposes a restricted thin-tailed and uni-modal distribution. Although we use a relatively diffuse prior, the assumption of normality itself should be viewed as a strong prior assumption. In many applications, the increased shrinkage afforded by the normal distribution is desirable. In our application, we are using the normal assumption to compute the predictive distribution of preference parameters. The predictive distribution is the ultimate source for the patterns of demand and there is a legitimate concern that the assumption of normality may strongly influence the results.

In order to assess sensitivity to the normality assumption, we re-estimated our model using a mixture of normals approach (see, for example, Rossi et al. (2005), chapter 5, Section 5). We found that if we estimated the model on the full sample of all respondents, the mixture of normals model assigned a component to very tiny

---

[14]Note that there is only a very weak correlation between time spent on the survey and the marginal log-likelihood value.





**Fig. 7** Posterior predictive distribution of price and swivel screen part-worths: mixture of normals model

price coefficients and we were not able to compute equilibrium prices with a reasonable value (equilibrium prices are typically greater than $1000 for the baseline configuration of product features). The reason for this is that this view of preferences allows for a non-neglible mass of consumers with such low price sensitivity that it is optimal for the firm to set very high prices to exploit these consumers. We do not think that this provides a realistic estimate of aggregate demand. For this reason, we estimated the mixture of normals model on the censored sample of only those respondents with appreciable log-likelihood (the same censoring criterion used in the sub-section entitled "Sample Selection" above). Figure 7 shows the distributions of the Price and Swivel Screen part-worths for a censored sample of 332 out of the original full sample of 468. The mixture of normals model produces a posterior predictive distribution for the Swivel Screen part-worth that is nearly identical to the posterior predictive from the normal model (compare to Fig. 3).[15] However, the mixture normals model produces a multi-modal distribution of the price part-worth. There is a mode centered around -.5, a mode around -2.5, and a fat left tail. Comparisons to the results for the normal model (see Fig. 3), show that the normal model (as might be expected) represents a compromise between the mass of consumers with low and moderate price sensitivity.

---

[15]This is from a three component mixture of multivariate normals. A somewhat tighter prior was used with $v = dim(\beta) + 25$ and the diagonal elements of $V$ set to .5 for all part-worths except the price partworth (transformed) that has a diagonal element of .05. This prior has much thinner tails than our default settings. Without these tighter settings, the mixture of normals model will product a large enough mass of respondents with very low price sensitivity and, even with the restricted sample, we will obtain some very large equilibrium prices (> $500).

**Table 6**  Posterior mean of aggregate demand elasticities: censored sample with a mixture of normals model

| Price  Mkt Share | $MS_{Sony}$ | $MS_{Canon}$ | $MS_{Nikon}$ | $MS_{Pansonic}$ |
|---|---|---|---|---|
| $P_{Sony}$ | −2.58 | .77 | .05 | 1.07 |
| $P_{Canon}$ | .91 | −2.70 | .09 | .72 |
| $P_{Nikon}$ | 1.15 | 020 | −1.47 | .11 |
| $P_{Panasonic}$ | 1.33 | .75 | .05 | −2.75 |

While the fitted distributions of price part-worths differ between the normal and mixture of normals models, it remains to be seen if this has an appreciable effect on the estimated elasticity structure for the industry and on the changes in equilibrium price from the addition of the Swivel Screen. Table 6 shows the elasticity structure for the mixture of normals fit to the censored sample. Overall, the price elasticities are similar to those obtained from the normal model except for the case of Nikon. The mixture of normals model shows the Nikon brand with a lower own price elasticity and very small cross-elasticities with respect to the other brands. This will have profound implications for the equilibrium prices for Nikon which will be much higher in the mixture of normals specification. Examination of the implied marginals of the posterior predictive distribution of part-worths show no obvious explanation for this difference. There is a small mass of respondents with low price sensitivity and high Nikon part-worths. This mass must be driving the overall elasticity structure.

Table 7 shows equilibrium prices for the industry at the baseline product configuration and for the industry in which the Sony product is enhanced by addition of the swivel screen. The results are nearly identical to the normal results (compare to Table 5) with the exception that the Nikon equilibrium prices are higher (consistent with the lower estimated own price elasticity).

We conclude that the results of any equilibrium pricing exercise are sensitive to the assumptions regarding the form of the distribution of preferences. The applied demand literature has not yet advanced to the point of implementation of non-normal preferences but it is clear that this is a general point, not restricted to our study. Specific to our objectives, however, is a concern for a mass of respondents who appear to exhibit very small price sensitivity. Attention must turn to the question of whether it is desirable to censor the sample to remove respondents who appear to be guessing at random. Our position is that removal of this sub-sample is reasonable and will result in more realistic demand estimates.

**Table 7**  Changes in equilibrium prices: censored sample with a mixture of normals model

|  | Sony | Canon | Nikon | Panasonic |
|---|---|---|---|---|
| W/O SS | $117.66 | $136.88 | $247.25 | $114.30 |
| W SS | $140.94 | $135.31 | $249.15 | $114.26 |
| Δ | $23.27 | −$1.58 | −$1.90 | −$0.04 |



## 7 Conclusions

Valuation of product features is an important part of the development and marketing of new products. We take the position that the only sensible measure of the economic value of a feature enhancement (either the addition of a completely new feature or the enhancement of an existing feature) is incremental profits. That is, we compare the equilibrium outcomes in a marketplace in which one of the products (corresponding to the focal firm) is feature enhanced with the equilibrium profits in the same marketplace but where the focal firm's product is not feature enhanced. This measure of economic value can be used to make decisions about the development of new features or to choose between a set of feature that could be enhanced.

Conjoint studies can play a vital role in feature valuation provided that they are properly designed, analyzed, and supplemented by information on the competitive and cost structure of the marketplace in which the feature-enhanced product is introduced. Conjoint methods can be used to develop a demand system but require careful attention to the inclusion of the outside option and inclusion of the relevant competing brands. Proper negativity constraints must be used to restrict the price coefficients to negative values. The Nash equilibrium prices computed on the basis of the conjoint-constructed demand system are sensitive to the precision of inference with respect to price sensitivity. This may mean larger and more informative samples than typically used in conjoint applications today. Finally, equilibrium prices can be sensitive to the assumption of a normal distribution of preferences. In our application, we find that respondents who appear to be randomly guessing provide a mass of what are estimated to be price insensitive consumers. To obtain realistic equilibrium results, we must censor the sample to remove this small but non-neglible group. The assumption of a normal preference distribution obscures identification of this group.

We illustrate our method by an application in the point and shoot digital camera market. We consider the addition of a swivel screen display to a point and shoot digital camera product. We designed a fielded a conjoint survey with all of the major brands and other major product features. Our equilibrium computations show that the economic value of the swivel screen is substantial and discernible from zero and corresponds to about a 35 per cent increase in firm profits. Social Surplus calculations which are behind WTP or equivalent measures will overstate the value of the feature enhancement as the firm captures only a fraction of the total consumer surplus generated by the feature enhancement.

**Acknowledgments** Rossi would like to acknowledge the Collins Chair, Anderson School of Management, UCLA for research funding. Allenby thanks the Fisher College of Business at Ohio State University for generous research support. All correspondence may be addressed to the authors at the UCLA, Anderson School of Management, 110 Westwood Plaza, Los Angeles, CA 90095; or via e-mail at perossichi@gmail.com.

## References

Allenby, G.M., Brazell, J., Howell, J., Rossi, P.E. (2014). Valuation of Patented Product Features. *Journal of Law and Economics*, forthcoming.



Berry, S., Levinsohn, J., Pakes, A. (1995). Automobile prices in market equilibrium. *Econometrica*, *63*(4), 841–890.

Brazell, J., Diener, C., Karniouchina, E., Moore, W., Severin, V., Uldry, P.-F. (2006). The no-choice option and dual response choice designs. *Marketing Letters*, *17*(4), 255–268.

Chintagunta, P. K., & Nair, H. (2011). Discrete-choice models of consumer demand in marketing. *Marketing Science*, *30*(6), 977–996.

Choi, S.C., & DeSarbo, W.S. (1994). A conjoint-based product designing procedure incorporating price competition. *Journal of Product Innovation Management*, *11*, 451–459.

Ding, M., Grewal, R., Liechty, J. (2005). Incentive-aligned conjoint. *Journal of Marketing Research*, *42*(1), 67–82.

Dong, S., Ding, M., Huber, J. (2010). A simple mechanism to incentive-align conjoint experiments. *International Journal of Research in Marketing*, *27*(25-32).

Horsky, D., & Nelson, P. (1992). New brand positioning and pricing in an oligolopolistic market. *Marketing Science*, *11*(2), 133–153.

McFadden, D.L. (1981). In M. Intrilligator, Z. Griliches, D. L. McFadden (Eds.) *Econometric models of probabilistic choice* (pp. 1395–1457). North-Holland.

Ofek, E., & Srinivasan, V. (2002). How much does the market value an improvement in a product attribute. *Marketing Science*, *21*(4), 398–411.

Orme, B.K. (2001). *Assessing the monetary value of attribute levels with conjoint analysis*. Discussion paper, Sawtooth Software, Inc.

Orme, B.K. (2009). *Getting started with conjoint analysis*. Research Publishers, LLC.

Petrin, A. (2002). Quantifying the benefits of new products: The case of the Minivan. *Journal of Political Economy*, *110*(4), 705–729.

Rossi, P.E. (2014). In *Bayesian non- and sem-parametric methods and applications, The Econometric and Tinbergen Institutes Lectures*. Princeton: Princeton University Press.

Rossi, P.E., Allenby, G.M., McCulloch, R.E. (2005). *Bayesian statistics and marketing*. Wiley.

Rossi, P.H., Wright, J.D., Anderson, A.B. (1983). In *Handbook of survey research*. New York: Academic Press.

Sonnier, G., Ainslie, A., Otter, T. (2007). Heterogeneity distributions of willingness-to-pay in choice models. *Quantitative Marketing and Economics*, *5*, 313–331.

Srinivasan, V., Lovejoy, W.S., Beach, D. (1997). Integrated product design for marketability and manufacturing. *Journal of Marketing Research*, *34*(1), 154–163.

Train, K.E. (1998). Recreational demand models with taste differences over people. *Land Economics*, *74*(2), 230–239.

Trajtenberg, M. (1989). The welfare analysis of product innovations, with an application to computed tomography scanners. *Journal of Political Economy*, *97*(2), 444–479.

Uldry, P., Severin, V., Diener, C. (2002). Using a Dual Response Framework in Choice Modeling. In *AMA Advanced Research Techniques Forum*.



# Exhibit 1B



The University of Chicago
The Booth School of Business of the University of Chicago
The University of Chicago Law School

Valuation of Patented Product Features
Author(s): Greg M. Allenby, Jeff Brazell, John R. Howell, and Peter E. Rossi
Source: *Journal of Law and Economics*, Vol. 57, No. 3 (August 2014), pp. 629–663
Published by: The University of Chicago Press for The Booth School of Business of the University of Chicago and The University of Chicago Law School
Stable URL: http://www.jstor.org/stable/10.1086/677071
Accessed: 22/05/2015 19:19

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.



*The University of Chicago Press, The University of Chicago, The Booth School of Business of the University of Chicago, The University of Chicago Law School* are collaborating with JSTOR to digitize, preserve and extend access to *Journal of Law and Economics.*

http://www.jstor.org

# Valuation of Patented Product Features

Greg M. Allenby   *Ohio State University*

Jeff Brazell   *The Modellers*

John R. Howell   *Pennsylvania State University*

Peter E. Rossi   *University of California, Los Angeles*

Ultimately, patents have value to the extent to which the product features enabled by the patents have economic value in the marketplace. Products that are enhanced by inclusion of patented features should generate incremental profits. Incremental profits can be assessed by considering demand for products with patented features and contrasting that demand with demand for the same product without the patented features. Profit calculations must be based on valid estimates of demand as well as assumptions about how competitive forces affect demand via computation of market equilibria. A conjoint survey can be used to estimate demand. Recently, conjoint methods have been applied in the patent setting, but the measures of value used are purely demand based and do not involve equilibrium profit calculations. We illustrate our method using the market for digital cameras and show that current methods can overstate the value of a patent.

## 1. Introduction

Many patents derive their primary value from the product features that are enabled by practicing the patent. For example, consider a patent that can be construed to cover the so-called smart gestures of smartphone operating systems[1] (such as various ways of navigating and zooming in and out using finger swipes). This patent has value only to the extent that this feature is valued by consumers and not achievable by other methods with similar functionality that do not infringe the patent. This is nothing more than an application of the principle

Rossi would like to acknowledge the Collins Chair, Anderson School of Management, University of California, Los Angeles, for research funding. Allenby thanks the Fisher College of Business at Ohio State University for generous research support.

[1] This example is from recent patent litigation between Apple and Samsung (*Apple Electronics Co. Ltd. v. Samsung Electronics Co. Ltd.,* No. 11-CV-1846 [N.D. Cal. December 2, 2011]).

[*Journal of Law and Economics*, vol. 57 (August 2014)]

© 2014 by The University of Chicago. All rights reserved. 0022-2186/2014/5703-0018$10.00

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

that demand elasticity (and hence market power) is driven by the extent to which competing products are substitutable for the focal product.

Clearly, estimates of the demand or consumer valuation of product features are a vital part of the problem of patent valuation. However, our perspective is that the economic valuation of a patent does not end with a calibration of consumer demand for product features. The economic value of a patent should be based on the incremental profits that can accrue to firms that enhance their products with the features enabled by the patents.[2] These incremental profits are based not just on consumer valuation of features (demand) but also on cost and competitive factors (supply). Therefore, incremental-profit calculations should be based on equilibrium profits. That is to say, we should consider equilibrium in the industry prior to addition of the product features enabled by the patent and then recompute the industry equilibrium after products are enhanced with the features covered by the patent. Incremental equilibrium profit calculations can also provide an economically coherent basis for either reasonable-royalty or lost-profit calculations in the damages portion of patent litigation.

Equilibrium profit calculations are accurate only if we can estimate the industry demand system, measure the marginal cost of feature enhancement, and correctly characterize the nature and extent of competition in the industry. Observational data on demand for products in the marketplace are often inadequate to estimate the demand for patented features, as there is no information on sales of products in the counterfactual case in which the patented features are absent from the industry. In addition, there may be inadequate price variation or concerns about price endogeneity that render observational data uninformative with respect to price sensitivity. Instead, a conjoint survey can be used to calibrate demand. A conjoint survey can be viewed as a market simulator in which consumers are asked to choose among hypothetical products whose features (including price) are varied in a randomized design.

However, a conjoint survey, in and of itself, is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria. This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept. We argue that a differentiated-products demand system and a Nash equilibrium pricing game provide a reasonable basis for equilibrium calculations in many patent situations.

The practice of patent valuation has typically not involved rigorous quantitative methods or the use of survey data. Instead, judgmental methods are often used without any compelling economic framework. Recently, however, survey-based methods of calibrating demand systems have begun to assume a role in some damage analyses (see, for example, *Apple Electronics Co. Ltd. v. Samsung Elec-*

---

[2] To be precise, the economic value of a patent is the highest value of the patent in use. That is, the value is determined by the largest incremental profits that could accrue to the firm that adds the product feature or feature enhancement afforded by the patent.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

*tronics Co. Ltd.*, No. 11-CV-1846 [N.D. Cal. December 2, 2011] and *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 [9th Cir. 2012]). In this early work, only pure demand-based measures of product feature value have been used. For example, it is possible to compute the change in average willingness to pay (WTP) as a patented feature is added to a product. A pure demand-based measure, WTP is only indirectly related to incremental firm profits. Similarly, the so-called willingness to buy (WTB) analysis of the gains and/or losses in market share attributed to patented product features does not consider price response to the introduction of new products with the patented features.

In summary, we advocate using equilibrium outcomes (both price and shares) to determine the incremental economic profits that would accrue to a firm as a product is enhanced by patented features as a way of computing the economic value of a patent. To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers. Conjoint studies have to be designed with this in mind. In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised. We illustrate our method using a conjoint survey for digital cameras and the addition of a swivel-screen display as the object of the valuation exercise. We show that other methods advocated in recent patent litigation (such as WTP and WTB) can overstate the value of a patent and inflate damages estimates.

## 2. Economic Valuation of Patents and an Economic Basis for Patent Damages

The primary source of value for many patents is to enable a firm to enhance a product with differentiating features. Economists who have studied innovation in products have emphasized the increase in consumer surplus afforded by the product innovations (see, for example, Trajtenberg 1989; Petrin 2002). While a social welfare point of view is certainly relevant for policy issues such as whether patents should exist in the first place, it is our view that the valuation of patents in the marketplace and the losses incurred from patent infringement are based on firm profitability. What a firm is willing to pay for a patent should be determined, at least in part, by the incremental profits that the features enabled by the patent can create. Similarly, the license fees or royalties charged for use of a patent should depend on the flow of incremental profits to the firm practicing the patent under license.

To compute the incremental profits afforded by a patented feature, we must consider two states of the world. First, we consider a world without the focal feature. In this world, no firm will have access to the feature (or feature enhancement). In this counterfactual world, firms would set prices in an industry equilibrium and obtain profits based not only on demand for the nonenhanced products but also on costs and the degree of competition. The value of the patent

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

is calculated by adding the patented feature to one or more existing products and recomputing the industry equilibrium. If the feature creates greater demand (increased consumer surplus or WTP), then the firm with the enhanced products may be able to earn higher profits than in the counterfactual world. However, we do not expect that industry equilibrium prices will remain the same in the new world with the enhanced products. Typically, firms whose products do not have the enhanced features will face stiffer competition for customers. In response, these firms will lower their prices, which results in a new industry equilibrium. It is the comparison of the focal firm's profits in the new world with the enhanced product to the firms' profits in the counterfactual world for the product without the feature that we advocate as a reasonable measure of the economic value of the patent.

Patents, by their very nature, can have value only in oligopolistic industries with differentiated products. In industries (such as consumer electronics) with differentiated products and a relatively modest number of competitors, firms can earn rents on the patented features. In perfectly competitive industries or in the case of homogenous products, firms cannot generally earn rents on patented features. This means that we must employ a model of differentiated product demand along with an appropriate equilibrium concept for oligopolistic industries. We employ a characteristics-based discrete-choice model with heterogeneous preferences (see, for example, Berry, Levinsohn, and Pakes 1995), which has now become standard for models of the demand for differentiated products. We compute a static Nash price equilibrium, conditional on a set of competing products defined by points in the characteristics space.

Patent litigation has become a high-stakes game in which large damages claims are made for patents involving consumer products such as gaming consoles, smartphones, and tablet computers. The patents at stake in this litigation involve only a small subset of the features of these electronic devices. Therefore, the question of how to apportion value over a very large set of features is important. Conjoint surveys are beginning to be employed in order to determine what portion of demand or total consumer surplus originates in the patented features. While this is certainly an important first step toward valuing the features, it is not a complete solution to the damages problem. If a firm seeks damages from patent infringement, those damages are almost certainly in the form of either lost profits or license/royalty fees. If the firm that owns the patent also practices the patent, then a lost-profits analysis is appropriate. Only that portion of profits that can be ascribed to the patented features should form the basis of a lost-profits analysis. For example, in the case of Apple suing Samsung over infringement of so-called smart-gesture patents, Apple practices the patent, as the iPhone embodies smart-gesture features. Apple contends that Samsung has infringed on these patents and therefore reduced Apple's profits from what they would have been in the absence of infringement. This requires calculation of incremental profit that compares Apple's profits in the counterfactual situation in which Samsung's smartphone products do not contain features enabled by the patents

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

with Apple's profits earned in the marketplace in which Samsung's products have smart-gesture features. Computation of the lost profits requires that we solve for two industry equilibria corresponding to the cases in which smart-gesture features are present or absent from Samsung's products.

In situations in which the plaintiff firm does not practice the patents under litigation, it is common to seek damages in the form of a license fee or reasonable-royalty analysis. The idea is that there should have been a negotiation between the owner of the patent and the firms accused of infringement to establish a license payment or royalty rate. Other than examining other market transactions involving licensing similar patents, there is no rigorous approach to establishing a license fee. In principle, the basis for this hypothetical negotiation should be the value of practicing the patent on the part of the licensee. That is, if the licensee incorporates the features enabled by the patent at issue, then this should generate a stream of incremental profits from the sales of the enhanced products. These incremental profits stem from a price premium that the licensee can charge for the enhanced product or from increased sales or both. The fundamental point is that these incremental profits should form the basis of the negotiation. In other words, the pie that is being split between the licensor and licensee is made from the incremental profits. Again, the methods advocated here can be used to compute the incremental profits. This should be the basis for the science of a reasonable-royalty analysis. The art continues to be answering the question of how the incremental profits are split between the licensor and licensee. Presumably, this stems from the relative negotiating power of the two parties. We are not contributing to the question of how to establish a splitting rule, but, rather, we provide one way of establishing the profit base to be split.

We now review how a conjoint survey method can form the basis of a valid demand system and, coupled with competitive assumptions, provide a way of computing incremental profits.

### 3. Defining and Measuring Demand for Product Features

Clearly, any valid paradigm for patent valuation must measure demand in the relevant market. The demand schedule facing any firm's product can be constructed from the distribution of preferences across the population of consumers. We take a characteristics view of products; that is, products are simply bundles of features or characteristics. Firms pick a particular bundle of features, which can be thought of as a point in the space of possible product configurations. The competitive structure of the industry is defined not only by the number of competing products but also by the positions of those products in the characteristics or product feature space. Given a set of products with associated demand, a competitive equilibrium can be computed, which enables computation of the incremental profits flowing to the firm offering a product with patented features.

We use a standard model for the demand for differentiated products. Con-

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

sumers choose only one product at any one purchase occasion and may elect to not purchase any product. A firm introduces a product into the marketplace by announcing a particular configuration of product features or characteristics and a price. The demand schedule facing this firm is the expected sales of the product given the price, configuration of features, and distribution of preferences across consumers. For example, a digital camera product might consist of a brand name (for example, Sony), a particular resolution (measured in mega-pixels), a particular level of zoom performance, a style of display (swivel screen), and so forth. The firm announces a price for this product. Consumers evaluate this product and compare it with other products in the marketplace. Each consumer makes a choice, and these choices add up to total demand for the product. Each consumer is represented by a specific utility function that is specified by a set of utility weights on the product characteristics. A choice model can predict the probability that a consumer will pick a specific product from a set of products on the basis of the characteristics of each product and the weights that represent that consumer's preferences for features.

### 3.1. The Standard Choice Model for Differentiated Product Demand

The consumer faces a marketplace that consists of $J$ products each specified by a characteristics vector $x_j$ and a price $p_j$. If there are $k$ characteristics, then the characteristics vector identifies the specific values of each of the $k$ characteristics. In our example, $x_j =$ (Sony, 16 mp, 10× zoom, without swivel screen). Many characteristics have only a discrete set of possibly unordered values. For these characteristics (like the presence or absence of a swivel-screen display), we introduce a set of binary indicator or dummy variables into the characteristics vector. For example, if there are four major brands in the marketplace, then four indicator (zero/one) variables[3] would be included in the characteristics vector.

The utility derived from the purchase and use of any product is modeled via what has become a standard random utility model (McFadden 1983) for choice applications. The observed characteristics and price enter the utility for the $j$th brand in a linear fashion. An error term is introduced to account for unobserved factors that influence choice. The error term is often interpreted as representing unmeasured characteristics that influence choice-specific utility. In the equation

$$u_j = \boldsymbol{\beta}' x_j - \beta_p p_j + \varepsilon_j, \tag{1}$$

$x_j$ is a $k \times 1$ vector of attributes of the product, including the feature that requires valuation. For mathematical convenience, it is assumed that the error terms have an extreme-value type I or Gumbel distribution. Consumers are assumed to know the realization of the error term and simply choose the alternative with maximum total utility.

To derive the standard choice model, we must calculate the probability that

---

[3] Unlike standard regression models, a characteristics model does not have an intercept.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

the $j$th alternative has the maximum utility, employing the assumption that the error terms have a Gumbel distribution with a scale parameter of 1. That is, since we do not observe the error terms but only the deterministic portion of utility, there is an entire region of possible errors that are consistent with the choice of a specific alternative. To derive the choice probability, we have to integrate over this region of possible values of the errors using the joint distribution of the errors. The fact that the error terms have positive support (can take on, in theory, any value in the interval $(-\infty, \infty)$) means that any choice alternative is possible even if the deterministic portion of utility for that choice alternative is small relative to all other alternatives. The Gumbel distribution produces a standard logit model for the choice of products:

$$\Pr(j) = \frac{\exp(\boldsymbol{\beta}' \boldsymbol{x}_j - \beta_p p_j)}{\sum_{j=1}^{J} \exp(\boldsymbol{\beta}' \boldsymbol{x}_j - \beta_p p_j)}. \tag{2}$$

It should be noted that utility is measured only on an interval scale with an arbitrary origin. That is, the same number can be added to the utility of all $J$ alternatives without altering which alternative has maximum utility or the choice. This property is nothing more than the statement that only relative utility matters in choice models. We can arbitrary assign one of the products as the base alternative and express utility relative to this base alternative. In most situations, it is reasonable to assign the outside option as the base alternative. That is, one of the possibilities is that the consumer decides not to purchase one of the $J$ products and spends his or her money on other types of goods. For example, not everyone has a point-and-shoot digital camera. This is because the base utility for nonpurchase is higher for some than the utility they would obtain net of price from purchasing in the product category. It is common, therefore, to assign a utility of 0 to the outside option, and, therefore, the utility for each of the $J$ products is expressed relative to the outside option of nonpurchase. Thus, a model with the outside option, or possibility of nonpurchase of any of the $J$ products, can be written as

$$\Pr(j) = \frac{\exp(\boldsymbol{\beta}' \boldsymbol{x}_j - \beta_p p_j)}{1 + \sum_{j=1}^{J} \exp(\boldsymbol{\beta}' \boldsymbol{x}_j - \beta_p p_j)};$$

$$\Pr(\text{No Purchase}) = \frac{1}{1 + \sum_{j=1}^{J} \exp(\boldsymbol{\beta}' \boldsymbol{x}_j - \beta_p p_j)}. \tag{3}$$

Of course, most firms do not observe the choice decisions of individual consumers. Instead, firms face the aggregate demand for their products, which is the sum of the quantities demanded by each possible consumer. In most product markets, there is a very large number of potential customers. It is well documented that consumers differ dramatically (Allenby and Rossi 1999) in their preferences. In the context of our choice model, this means that consumers have very different utility weights $\beta$. For example, some consumers are very price

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

sensitive and regard all digital cameras as roughly equivalent in terms of performance and features. For these consumers, choice is a matter of locating the lowest priced alternative. Others may be less price sensitive and more loyal to specific brands. In terms of product features, some consumers assess little or no value to the patented feature, while others may accord it substantial value. The best way to think about this is that there is a continuum of preferences for any one characteristic rather than only a small number of segments, or types of consumers. In this situation, the consumer population is best thought of in terms of the distribution of preferences. The fact that there is a very large number of different types of consumers (each with different preferences) means that we can think of there being a continuous distribution of consumer preferences. This continuous distribution is represented by a density, $p(\boldsymbol{\beta}, \boldsymbol{\beta}_p)$. To sum over all possible consumers to create aggregate demand is the same as averaging the choice probabilities with respect to the density of consumer preferences. In the equation

$$\text{Sales}_j = M \times \int \Pr(j|\boldsymbol{\beta}, \boldsymbol{\beta}_p)\boldsymbol{p}(\boldsymbol{\beta}, \boldsymbol{\beta}_p)d\beta d\beta_p, \tag{4}$$

$M$ is the total size of the market (the number of total potential customers). The choice probability average over the distribution of preferences is the market share that the firm can expect to attain given the configuration of the product characteristics and price. In this model in which consumers buy at most only one product, market share is equivalent to unit sales.

Product features have value to the extent to which consumers obtain utility from them. For example, if the first product characteristic is a patented product feature, then demand for that feature depends on the distribution of the first element of the $\beta$ vector over the population of potential customers. If most consumers place positive and substantial weight on the patented feature, then the firm can increase sales by adding the feature while keeping the price constant or maintain sales with a higher price. Economic valuation of any product feature will require estimation of the demand system given by equations (3) and (4).

### 3.2. Estimating Demand

We have seen that valuation of a product feature must be driven on the demand side by the utility weight accorded that feature and the distribution of these utility weights across individuals. Thus, a critical, but not the only, component of patent valuation is to estimate the demand system. In particular, we must estimate the distribution of utility weights for the patented product feature, which requires observing demand for products with and without this particular feature. We should start by delineating the set of features that determine demand for this type of product or product category. This list might be very extensive. For example, new versions of a smartphone may incorporate changes to over 1,000 different features, only some of which we are interested in valuing for patent

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

purposes. If we could specify a list of the product features or characteristics, we would then, in an ideal world, conduct controlled experiments in which product features and prices are varied according to a randomized orthogonal design. We would also want to observe individual demand or choice decisions. With this panel data structure (multiple observations for the same consumer), we could estimate the utility weights for a sample of consumers. This would provide an estimate of the distribution of preference parameters and allow us to construct an estimate of aggregate demand. From this aggregate demand estimate, we could then undertake some type of equilibrium analysis to compare firm profits for products with and without the patented feature.

From a practical point of view, the estimation of demand for patented features may require data not available to us. Typically, we have access only to aggregate sales or market share data for a small number of time periods. With a great deal of aggregate share data, it is possible, in principle, to estimate the distribution of utility weights, but with only small number of observations, these estimates are apt to be unreliable. More important, we typically do not have access to data in which the same product (in terms of brand and other relevant characteristics) is sold both with and without the patented feature. Without variation in the inclusion of the patented feature, no amount of data, at either the aggregate or consumer level, will allow us to estimate the utility weights accorded the patented feature.

In some cases, we can observe aggregate sales of a product in a time series in which the feature is added at some point during the time series. Again, we might consider using this time-series variation as a way of identifying the value of the patented feature. However, such analysis must also control for other changes in the market such as the feature composition of competing brands. Moreover, for many consumer products, there is very little time-series variation in prices. Without variation in prices, we will not be able to determine how consumers might trade off the utility they obtain for the patented feature against an increase in price. For example, consider the addition of fourth-generation (4G) technology to smartphones. There is a times series of aggregate sales for smartphones both before and after the introduction of 4G technology. However, the prices of smartphones do not vary much over time, which makes it difficult to determine what sort of price premium the addition of 4G could command.

In observational data, we also face the problem of omitted product characteristics and price endogeneity (see, for example, Berry, Levinsohn, and Pakes 1995). No matter what set of characteristics we are able to measure and add to our demand model, one can always make the argument that there are omitted or unmeasured product characteristics that drive demand. If this is the case, then we might expect that firms set prices, in part, with reference to these omitted characteristics. This means that prices are not exogenous, and typically the utility weight on price $\beta_p$ would be biased downward. In general, there may be unobserved drivers of demand that are correlated with price, and thus we cannot

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

use all of the variation in price (however small in the first place) to estimate the price coefficient.

In summary, standard observational data are inadequate for valuation of patented features for four reasons: we often do not observe the same product with and without the patented feature, we have only a short time series of aggregate data, there is often little or no price variation, and what price variation we observe may be confounded with unobserved or unmeasured product characteristics, which results in endogeneity biases.

To overcome the shortcomings of observational data, the only real option would be to collect experimental demand data at the consumer level. This might appear impractical in the context of patent litigation. It certainly would require time and a level of resources typically not available in the litigation process. Instead, we can employ a survey-based experimental method called conjoint analysis to conduct what amounts to controlled, but simulated, experiments at the consumer level. With modern Bayesian statistical methods, these data can be used to obtain estimates of the distribution of consumer preferences and aggregate demand that can then be used to compute a profit-based measure of product value.

### 3.3. Conjoint Surveys and Demand Estimation

While it may be impractical to conduct field experiments in which patented features are added and removed from products to assess demand, it is possible to devise a survey-based simulation that achieves the same end. In a choice-based conjoint survey, products are described as bundles of characteristics. A survey respondent is recruited and confronted with a sequence of choice tasks. In each task, the respondent is asked to choose from a menu of hypothetical products described by their characteristics. Figure 1 shows a typical choice task from a survey designed to measure demand for digital cameras. The respondent is asked to choose between four hypothetical cameras. Each hypothetical camera is described by seven characteristics. Each characteristic has a number of values or levels. For example, price has four possibilities spread over the range from $79 to $379, while there are only two possibilities for the swivel-screen feature (present or not). In addition, the respondent is given the option of electing not to purchase any of the products offered in each choice task screen.

The respondent is faced with a small number of choice tasks (in this survey there were 16 choice tasks, or screens). The conjoint choice task is designed to simulate a marketplace in which products are described by their features. In making choices, respondents reveal their preferences for each of the product characteristics (including the patented feature) in the same way as they would in the marketplace. Thus, conjoint surveys are designed to measure preferences in the spirit of revealed-preference theory. That is, we are not asking each respondent directly, what is the maximum you would be willing to pay for this camera, or how important is feature A relative to feature B? Instead, we deduce

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

| Scenario 1 of 16 | Camera 1 | Camera 2 | Camera 3 | Camera 4 | None of these |
|---|---|---|---|---|---|
| **Brand** | **Canon Powershot** | **Panasonic Lumix** | **Sony Cyber-shot** | **Nikon COOLPIX** | |
| Megapixels | 16 | 16 | 16 | 16 | |
| Optical Zoom | 10x | 4x | 10x | 4x | |
| Video | Full HD Video (1080p) with Stereo Microphone | HD Video (720p) | HD Video (720p) | Full HD Video (1080p) with Stereo Microphone | |
| Swivel Screen | No | Yes | No | Yes | |
| Wifi | Yes | Yes | No | Yes | |
| Price | $79 | $279 | $379 | $179 | |
| Which of these digital cameras do you prefer? | ⦿ | ⦿ | ⦿ | ⦿ | ⦿ |

As a reminder, you can hover over the features to view the definitions.

**Figure 1.** Conjoint survey choice task screen

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

what these preferences are via simulated choice behavior. The assumption is that the preferences that respondents reveal in the conjoint exercise are the same as the preferences that dictate behavior in the marketplace. There is a long history of successful application of conjoint methodology and surveys in forecasting demand for new products and customer response to price changes (see Orme [2009] for many examples).

### 3.3.1. Conjoint Design

To undertake a rigorous conjoint survey for the purpose of estimating demand for patented features, specific criteria must be met. A representative sample must be used, major product features must be included in the design, product features or characteristics must be described in terms meaningful to the respondents, a proper randomized experimental design must be used to select the combinations of characteristics and levels used in the conjoint survey, the outside or no-choice option must be included, and the major set of competitive brands must be included.

### 3.3.2. Sampling Procedure

In any survey, we are extrapolating or projecting from the sample to the relevant population. In the application of conjoint surveys to patent valuation, the relevant population is the population of potential customers for the product category. The best way to ensure representativeness for this population is to start with a representative sample of all consumers in the United States and then screen this sample to those who are in the market for the products under consideration. The only sampling procedures that can guarantee representativeness are random-sampling procedures. For example, if we have a list of all U.S. residents, we would select respondents at random (each respondent is equally likely) for the screening portion of the survey.

Unfortunately, much survey work today is done with Internet panels that are not random samples. An Internet panel is a group of potential respondents who have indicated a willingness to take surveys using Web-based methods. Invitation e-mail messages with a link to the survey are sent to a random sample of the Internet panel. The problem with most Internet panel providers is that the Internet panelists are harvested via display ads and e-mail lists. This is what statisticians call a convenience sample, in that the sample is collected by any means necessary and is not designed to be representative of any population. The fact that only a random sample of the entire Internet panel is invited does not mean that the final sample of screened respondents is a random sample of the population of potential customers. Yeager et al. (2011) document that nonrandom Internet panels can yield biased estimates of population quantities. There are Internet providers who attempt a close approximation to random samples. If at all possible, higher-quality providers should be used.

If the survey sample is not obtained via high-quality, screened random samples,

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

then it is still possible to use the sample but only if checks for representativeness are made. The typical check for representativeness is to compare the demographic characteristics of the prescreened sample (this requires asking demographic questions prior to screening) with census-based demographics. This assures representativeness only if the product preferences of consumers are highly correlated with demographics. For example, we could find that our sample collected by nonscientific methods is representative on the basis of the gender demographic variable. That is, the sample proportion of women is the same as the population proportion. This does not, however, guarantee that the views of our sample with respect to a specific product feature are representative of the relevant population. This would be true only if preferences for the product feature are closely related to the gender of the consumer. Clearly, for most products, demographics cannot explain very much of the variation in brand and feature preferences. Our recommendation is that variables more closely related to the product category be used. For example, if we were doing a survey of smartphones, we might insert questions about ownership of smartphones by make or model and compare the market shares of our survey with those known in the U.S. market.

Considerations of sample representativeness are critical to the reliability and generalizability of any survey, conjoint or otherwise. No survey evidence should be considered admissible or relevant unless evidence of representativeness is provided.

### 3.3.3. Inclusion of Product Features

The heart of the demand for product features is a specification of the relevant product characteristics. For many products, the number of features is so large that it would seem impractical to ever attempt to apportion the utility or demand that can be ascribed to any one feature. One reaction is that this makes any characteristics approach to demand impractical. However, the logit choice model of demand in equation (1) has an important property called the irrelevance of irrelevant alternatives (IIA) (see, for example, Train 2003). This property implies that any set of characteristics that are constant across choice alternatives drop out of the choice probabilities. For example, partition the characteristics vector into two parts, $(\boldsymbol{x}_0, \boldsymbol{x}_1)$. The vector segment $\boldsymbol{x}_0$ varies across choice alternatives while the vector segment $x_1$ does not:

$$\Pr(j) = \frac{\exp(\boldsymbol{\beta}_0'\boldsymbol{x}_{0,j} + \boldsymbol{\beta}_1'\boldsymbol{x}_1)}{\sum_j \exp(\boldsymbol{\beta}_0'\boldsymbol{x}_{0,j} + \boldsymbol{\beta}_1'\boldsymbol{x}_1)} = \frac{\exp(\boldsymbol{\beta}_0'\boldsymbol{x}_{0,j})}{\sum_j \exp(\boldsymbol{\beta}_0'\boldsymbol{x}_{0,j})}. \tag{5}$$

The IIA property of a logit model[4] means that if consumers assume that only a subset of the characteristics are varied while all other characteristics are constant across choice alternatives, then we can construct valid demand estimates by testing

---

[4] It should be noted that although we are assuming that the irrelevance of irrelevant alternatives holds at the individual consumer level, this does not mean that it holds as a property of the aggregate demand system.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

only a subset of relevant product characteristics. This greatly enhances the power of a choice-based conjoint survey. In theory, as long as we assume that the logit model of demand is correct, we have to examine only a subset of product features. We will have to instruct respondents to assume, in making their choices, that all other features are constant. This is common in conjoint surveys.

In contrast, aggregate demand modeling with observational data does not hold the unobserved characteristics constant across products. If we do not observe important product features, then we might find that prices are determined, in part, by the unobserved features, which creates an endogeneity bias problem. We would have to find variables, called instruments, that move prices but are uncorrelated with the unobserved characteristics. It can be difficult to identify such variables. In theory, this is not a problem in a conjoint survey because the respondents are specifically instructed to assume that all features or characteristics other than those varied in the survey are constant across alternatives.

Taken literally, the IIA property means that we could conduct a conjoint survey with only two characteristics—the patented feature and price. In this extreme case, we are constructing a very unrealistic simulation of the marketplace.[5] For example, if one of the hypothetical products in the choice task has a very high price, it is unlikely that the respondents will hold constant other features. Their natural inclination is to assume that, perhaps, the high price indicates that this hypothetical product has very important features that are missing from the alternatives. This violation of the hold-constant instruction is much less likely if other important features are included in the conjoint survey design. This means that, even though we may wish to test only a small number of patented features, we must include many of the other important features in the product. This, of course, does not mean that we have to include all features of the product, a typical criticism of conjoint methods. All scientific models are abstractions that attempt to capture the important aspects of the problem. For example, when *Consumer Reports* provides comparisons of cars, smartphones, televisions, or other consumer products, it does not list all features but, instead, concentrates on the important features. It is important to undertake research prior to the conjoint survey design to determine the major and most important features of the product.

There are cases in which conjoint designs have been used that test only patented product features and do not include other important product features. Not only does this invite the respondents to make attributions that are not correct, but it also calls attention to the patented features. This practice can lead to an overstatement of feature value.

### 3.3.4. Description of Features

A general principle of conjoint survey design is that the product characteristics must be defined in terms that are understandable and meaningful to the re-

---

[5] As Orme (2009, p. 91) puts it, "realism begets better data."

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

spondents. For example, smartphone battery capacity should be specified in terms of battery life in use rather than in units of capacity such as milliamperes. This is a particularly challenging problem with patented features. Patents often describe a very specific apparatus or, in the case of a method patent, a specific set of steps that must be undertaken to practice the patent. For example, it might be impossible to obtain a patent for a generic functionality such as transmitting pictures in e-mail messages, but there may be patents that describe a specific method for attaching a picture file to an e-mail message. A conjoint survey that construes this patented feature as simply the ability to send pictures via e-mail messages would overstate the value of the patent. It may well be the case that it is possible to send pictures via e-mail messages using a method that does not infringe on the specific patent in question. If this noninfringing alternative provides the same functionality to the user, then there is no point in doing a conjoint survey. However, if alternatives to the patent provide inferior functionality, then the conjoint survey must be designed to value this specific functionality. For example, if the patented technology provides greater speed or reliability of transmission, then the challenge in the conjoint survey is to describe diminished speed or reliability to the survey respondent.

For patent litigation, it is important that the conjoint survey relate as closely as possible to the actual specifications or construals of the patent. If there are noninfringing alternatives, then the conjoint survey must be designed to test the relative value of the patented feature to the noninfringing alternatives. Features and functionality must be described to the respondent in simple and meaningful terms. This may involve the use of graphics and video descriptions.

There is no question that many patents are complex, and there will still be much debate as to the appropriate construal of the patent. We do not offer a solution to this problem, which will certainly continue to be much debated in the litigation process. However, our main point is that the valuation of patents depends critically on the valuation of product features. In order to construct a meaningful survey to value these features, descriptions of the features must be understandable by the survey respondents. This certainly means that careful pretesting will be required (for a discussion on surveys and pretesting, see Sheatsley 1983).

### 3.3.5. Experimental Design

Conjoint surveys are properly viewed as experiments in which the products considered in the simulated choices are designed for maximum discrimination between features. Once a set of characteristics or features (called attributes in the conjoint literature) are selected, then the levels of these attributes must be selected. For example, if we include megapixels as a characteristic, or attribute, of digital cameras, then we need to select the specific values (for example, 10 or 16 mp). Given the set of attributes and the possible levels for each attribute, the conjoint design task then consists of creating hypothetical products as bundles

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

of these attributes and specific levels. While this is a highly technical subject (see, for example, Box and Draper 1987, chs. 4 and 5), the central intuition is that we must vary each attribute independently of the other attributes in order to learn about the utility weights for each attribute. For example, we cannot always have those products with the patented feature be priced higher than those hypothetical products without the feature.

There are well-known and reliable ways of automatically generating choice tasks that will yield maximally informative and balanced choice task designs. It is this experimental design that makes conjoint surveys especially valuable, as these designs create hypothetical products with configurations for the purpose of revealing survey respondents' preferences. In the marketplace, we tend to see less independent variation of product features and price.

### 3.3.6. The Outside Option

In the real marketplace, not all potential customers purchase one of the available products. For example, although the market penetration of digital cameras is high, not everyone has one. This means that, in order to be realistic, the conjoint study must include the outside option, "none of the above," to allow respondents to opt out of the purchase. This is especially important in the evaluation of new product features. Firms invest in the development of new patented features in order to compete for customers not only with existing products but also with the hope of attracting new customers into the market. For example, the design features incorporated into the first iPad greatly expanded the market for tablet computers. If the outside option is not included in the conjoint study, then demand can come only at the expense of competing products with no growth in the overall market.

Practitioners of conjoint surveys have found that how the outside option is included makes a difference. Just adding a column for "none of the above" has been found to cause respondents to overstate their purchase intentions (Brazell et al. 2006). One possible explanation for this overly optimistic reported behavior is that respondents do not pay sufficient attention to the price attribute. Another is that respondents sometimes feel awkward rejecting products in which they believe the conjoint survey designer has a personal stake. It is common to use a dual-response mode of incorporating the outside option. In the choice task, respondents are forced to choose one option that is their preferred option. Then the respondents are asked explicitly if they would purchase their preferred product at the stated price.

### 3.3.7. The Set of Competing Brands

Our method of valuing a patented feature is to compute the incremental profits that the patent holder would earn from including the patented feature in the product. This depends on the structure of competition in the market. Competition is defined both by the number of competitors and by the position of

their products in the marketplace. Unless competing brands are included in the conjoint analysis, it will be impossible to make realistic estimates of the profits that can be realized from the patented feature.

This point seems to be lost on some involved in patent damages calculations. If a firm is accused of infringement, there is the natural inclination to focus on the value of the feature for the products accused of infringement. The evolution of thought in patent damages is that not all sales of the accused infringing products are due entirely to the contribution of the infringing feature. For this reason, the emphasis has been on decomposing the value of the feature in terms of what incremental sales are attributed to the infringement. This has contributed to the attraction of conjoint methods, which offer the possibility of decomposing demand. However, it is clear that if the infringing products were removed from the market, the patent holder's products that practice the patent would garner only some of the sales of the infringing product. Furthermore, the prices in the market would be expected to adjust to the withdrawal of the infringing products. Without a realistic demand system for all major brands in the market, it is not possible to calculate a meaningful new industry equilibrium for the world without the infringing products.

In summary, conjoint surveys when properly designed, pretested, and applied to representative samples can be used to estimate industry demand for patented product features. However, a proper valuation of patented features does not end with the production of conjoint data. These data must be analyzed to produce reliable estimates of aggregate demand for the relevant firms, and we must undertake equilibrium calculations.

## 4. Equilibrium Calculations

The value of a patent is ultimately derived from the profits that accrue to firms who practice the patent by developing products that utilize the patented technology. In fact, the standard economic argument for allowing patent holders to sell their patents is that patents will eventually find their way into the hands of those firms who can best utilize the technology to maximize demand and profits. We believe that a reasonable measure of the economic value of feature enhancement is the incremental profits that the patented feature will generate. In the equation

$$\Delta \pi = \pi(p^{\text{eq}}, m^{\text{eq}} | A^{\star}) - \pi(p^{\text{eq}}, m^{\text{eq}} | A), \qquad (6)$$

$\pi$ is the profits associated with the industry equilibrium prices and shares given a particular set of competing products, which is represented by the choice set defined by the attribute matrix; $A^{\star}$ refers to the set of competing products, one or more of which has been enhanced by the addition of the patented feature; and $A$ refers to the set of products without feature enhancement. This definition allows for both price and share adjustment as a result of feature enhancement.

In order to compute incremental profits as in equation (6), we must make

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

assumptions about the demand for product features, costs, and competitive structure. Finally, we use the standard Nash price equilibrium concept to compute equilibrium prices. We assume the following:

1. a standard heterogenous logit demand specification that is linear in the attributes (including price),
2. a cost specification with constant marginal cost,
3. single-product firms,
4. no exit (firms cannot exit or enter the market after product enhancement takes place), and
5. static Nash price competition.

Assumptions 2 and 3 can be easily relaxed. Assumption 1 can be replaced by any valid or integrable demand system. Assumptions 4 and 5 cannot be removed without imparting considerable complexity to the equilibrium computations.

The standard static Nash equilibrium in a market for differentiated products is a set of prices that simultaneously satisfy all firms' profit-maximization conditions. Each firm chooses a price to maximize its profits, given the prices of all other firms. These conditional demand curves are sometimes called the best response of the firm to the prices of other firms. An equilibrium, if it exists,[6] is a set of prices that are simultaneously the best response or profit maximizing for each firm given the others.

In a choice setting, firm demand is

$$\pi(p_j|p_{-j}) = M\mathbb{E}[\Pr(j|\boldsymbol{p}, A)](p_j - c_j), \tag{7}$$

where $M$ is the size of the market, $\boldsymbol{p}$ is the vector of the prices of all $J$ firms in the market, and $c_j$ is the marginal cost of producing the firm's product. The expectation is taken with respect to the distribution of choice model parameters. In the logit case,[7]

$$\mathbb{E}[\Pr(j|\boldsymbol{p}, A)] = \int \frac{\exp(\beta'a_j - \beta_p p_j)}{\sum_j \exp(\beta'a_j - \beta_p p_j)} \boldsymbol{p}(\beta, \beta_p)d\beta d\beta_p. \tag{8}$$

The first-order conditions of the firm are

$$\frac{\partial\pi}{\partial p_j} = \mathbb{E}\left[\frac{\partial}{\partial p_j}\Pr(j|\boldsymbol{p}, A)\right](p_j - c_j) + \mathbb{E}[\Pr(j|\boldsymbol{p}, A)]. \tag{9}$$

The Nash equilibrium price vector is a root of the system of nonlinear equa-

---

[6] There is no guarantee that a Nash equilibrium exists for a heterogeneous logit demand model.
[7] We do not include a marketwide shock to demand, as we are not trying to build an empirical model of market shares. We are trying to approximate the firm problem. In a conjoint setting, we abstract from the problem of omitted characteristics, as the products we use in our market simulators are defined only in terms of known and observable characteristics. Thus, the standard interpretation of the marketwide shock is not applicable here. Another interpretation is that the marketwide shock represents some sort of marketing action by the firms (for example, advertising). Here we are directly solving the firm pricing problem and holding fixed any other marketing actions. This means that the second interpretation of the marketwide shock as stemming from some unobservable firm action is not applicable.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

tions that define the first-order condition for all $J$ firms. That is, if we define

$$
h(\boldsymbol{p}) = \begin{bmatrix} h_1(\boldsymbol{p}) = \dfrac{\partial \pi}{\partial p_1} \\[2mm] h_2(\boldsymbol{p}) = \dfrac{\partial \pi}{\partial p_2} \\[2mm] \vdots \\[2mm] h_J(\boldsymbol{p}) = \dfrac{\partial \pi}{\partial p_J} \end{bmatrix},
\tag{10}
$$

then the equilibrium price vector $\boldsymbol{p}^\star$ is a zero of the function $h(\boldsymbol{p})$. There are computational issues in both evaluating the firm first-order conditions and computing the root of the system of equations given in equation (10). We refer the reader to Allenby et al. (2014) for details.

## 5. Willingness to Pay and Willingness to Buy

In some recent patent cases, valuation of patents and associated product features is conducted via either WTP or WTB analysis. The concept of WTP should be defined as the monetary amount required to compensate a consumer for the loss of product value. For example, WTP for a product is the amount of extra income that must be given to the consumer so that the consumer is indifferent between purchasing the product and not purchasing the product but receiving the extra income. The concept of WTP for a patented product feature can be defined as the difference between WTP for a product with the enhanced feature and WTP for a product that is identical in every way except that the product no longer has the feature. The concept of WTB is often defined as the increase in product sales or market share that can be obtained by the addition of the feature to an existing product but holding prices constant.

As such, the WTP and WTB measures cannot be measures of the market value of a product feature,[8] as they do not directly relate to what incremental profits a firm can earn on the basis of the product feature. The WTP and WTB measures utilize only demand-side information and are independent of costs or the competitive structure of the industry. That is, WTP will be the same no matter how strong the competition is for the focal firm's customer base. The WTB measure holds prices fixed and does not allow the industry to adjust to a new pricing equilibrium.

---

[8] Ofek and Srinivasan (2002) define the market's value for an attribute improvement as the amount by which a firm can raise the price when the feature is added to a product and still command the same market share. This is a willingness-to-pay (WTP) measure and is not based on any market equilibrium computation.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

**The Journal of LAW & ECONOMICS**

### 5.1. Computing Willingness to Pay with Conjoint Data

What is called WTP in the conjoint literature is one attempt to convert the part worth of the focal feature $f$ to the dollar scale. Using a standard dummy variable coding, we can view the part worth of the feature as representing the increase in deterministic utility that occurs when the feature is turned on.[9] If the feature part worth is divided by the price coefficient,[10] then we have converted to the dollar scale, which is a ratio scale. Some call this a WTP for the product feature:

$$\text{WTP} \equiv \frac{\beta_f}{\beta_p}. \tag{11}$$

This WTP measure is often justified by appeal to the simple argument that this is the amount by which price could be raised and still leave the utility for choice alternative $J$ the same as when the product feature is turned on. Others define this as a willingness to accept by giving the completely symmetric definition as the amount by which price would have to be lowered to yield the same utility in a product with the feature turned off as in a product with the feature turned on. Given the assumption of a linear utility model and a linear price term, these definitions are identical.[11] In the literature on conjoint methods (Orme 2001), WTP is sometimes defined as the amount by which the price of the feature-enhanced product can be increased and still leave its market share unchanged. In a homogeneous logit model, this is identical to expression (11).

The WTP measure is properly viewed simply as a scaling device. That is, WTP is measured in dollars and is on a ratio scale so that valid inter- and cross-respondent comparisons can be made. As such, WTP should properly be interpreted as an estimate of the change in WTP from the addition of the feature:

$$\Delta\text{WTP} = \text{WTP}_{f^*} - \text{WTP}_f. \tag{12}$$

Here $\text{WTP}_{f^*}$ is the WTP for the product with the feature, and $\text{WTP}_f$ is the WTP for the product without the feature. This measure of WTP is commonly used by conjoint analysis practitioners. However, this measure of WTP is not the standard measure of WTP for an enhanced choice set or a product innovation as defined in the economics literature (see Trajtenberg 1989). In a companion paper (Allenby et al. 2014), we compute the standard WTP measure, which should be interpreted as a measure of the consumer surplus generated by feature enhancement. Of course, welfare or consumer surplus measures are not the same as incremental firm profits, the relevant measure for patented feature valuation. With uniform pricing and competition, firms are not able to extract all of the

[9] For feature enhancement, a dummy coding approach would require that we use the difference in part worths associated with the enhancement in the WTP calculation.

[10] We have defined the price coefficient such that this is always positive. See Section 3.3.

[11] In practice, reference price effects often make willingness to accept differ from WTP (see Viscusi and Huber 2012), but in the standard economic model these are equivalent.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

consumer surplus, and the WTP measure could overstate the value of a patented feature.

### 5.2. Willingness to Buy

In some analyses, product features are valued using a WTB concept. The WTB is the change in market share that will occur if the feature is added to a specific product. In the expression

$$\mathrm{WTB} \equiv \mathrm{MS}(j|\boldsymbol{p}, A^\star) - \mathrm{MS}(j|\boldsymbol{p}, A), \tag{13}$$

$\mathrm{MS}(j)$ is the market share equation for product $j$. The market share depends on the entire price vector and the configuration of the choice set. Expression (13) holds prices fixed as the feature is enhanced or added. The market share equations are obtained by summing the logit probabilities over possibly heterogeneous (in terms of taste parameters) customers.

The WTB assumes that firms will not alter prices in response to a change in the set of products in the marketplace as the feature is added or enhanced. In most competitive situations, if a firm enhances its product and the other competing products remain unchanged, we would expect the focal firm to be able to command a somewhat higher price, while the other firms' offerings would decline in demand, and therefore the competing firms would reduce their prices.

### 5.3. Why Willingness to Pay and Willingness to Buy Are Inadequate

Neither WTP nor WTB take into account equilibrium adjustments in the market as one of the products is enhanced by addition of a feature. For this reason, we cannot view WTP as what a firm can charge for a feature-enhanced product, nor can we view WTB as the market share that can be gained by feature enhancement. Computation of changes in the market equilibrium due to feature enhancement of one product is required to develop a measure of the economic value of the feature. In many cases, WTP will overstate the price premium afforded by feature enhancement, and WTB will also overstate the impact of feature enhancement on market share. Equilibrium computations in differentiated-product cases are difficult to illustrate by simple graphical means. In this section, we use standard demand and supply graphs to provide an informal intuition as to why WTP and WTB will tend to overstate the benefits of feature enhancement.

Figure 2 shows a standard industry supply-and-demand setup.[12] The demand curve is represented by the downward-sloping lines, while D denotes demand without the feature, and D* denotes demand with the feature. The vertical difference between the two demand curves is the change in WTP as the feature is added. We assume that addition of the feature may increase the marginal cost of production (note that for some features, such as those created purely via

---

[12] Here we consider the case of a competitive industry to provide an intuition for why the WTP and willingness-to-buy measures are not equilibrium quantities. In the case of imperfect competition or oligopoly, it is not possible to represent the equilibrium in this manner.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 2.** Difficulties with a willingness-to-pay analysis

software, the marginal cost will not change). The cost curves are marked C and C*. It is easy to see that, in this case, the change in WTP exceeds the change in equilibrium price.

The analogous situation is shown for WTB in Figure 3. We have the same cost and demand curves, but we illustrate the WTB exercise, which is to compute the change in quantity sold assuming that prices do not change. The WTB clearly overstates the changes in equilibrium quantity demanded. Figures 2 and 3 show very clearly that both WTP and WTB are purely demand-based quantities that do not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved.

### 5.4. Willingness to Pay in the Case of Heterogeneous Customers

Even in the case of homogeneous customers, we have seen that WTP should not be regarded as a proper measure of economic value. In the case of heterogeneous consumers, additional problems are associated with the WTP concept. In almost all choice-based conjoint settings, hierarchical Bayes methods are used to estimate the choice model parameters. In the hierarchical Bayes approach (see, for example, Rossi, Allenby, and McCulloch 2005, ch. 5 and app. A), each respondent may have different logit parameters $\beta$ and $\beta_P$, and the complete posterior distribution is computed for all model parameters, including individual respondent-level parameters. The problem, then, becomes how to summarize the distribution of WTP, which is revealed via the hierarchical Bayes analysis.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

Valuation of Patented Features                                    651



**Figure 3.** Difficulties with a willingness-to-buy analysis

The concept of WTP provides no guidance as to how this distribution should be summarized. One natural summary would be that the expectation is taken over the distribution of model parameters:

$$\mathbb{E}[\text{WTP}] = \int \frac{\beta_f}{\beta_p} \boldsymbol{p}(\beta_f, \ \beta_p | \text{Data}) d\beta_f d\beta_p.$$

However, there is no compelling reason to prefer the mean over any other scalar summary of the distribution of WTP. Some propose using a median value of WTP instead. Again, there are no economic arguments as to why the mean or median or any other summary should be preferred. The statistical properties of various summaries (for example, mean versus median) are irrelevant, as we are not considering the sampling performance of an estimator but rather the appropriate summary of a population distribution. A proper economic valuation will consider the entire demand curve as well as competitive and cost considerations. Equilibrium quantities will involve the entire distribution via the first-order conditions for firm profit maximization. These quantities cannot be expressed as a function of the mean, median, or any other simple set of scalar summaries of the distribution of WTP.

However, it is possible to provide a rough intuition as to why the mean of WTP may be a particularly poor summary of the distribution for equilibrium

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

computations. It is the marginal rather than the average consumer that drives the determination of equilibrium prices. Exactly where in the distribution of WTP the marginal customer will be is determined by nature of the distribution as well as where supply factors that slice into the distribution of WTP lie. It is possible to construct cases in which the average WTP vastly overstates the WTP of the marginal customer. If the bulk of the market has a low value of WTP, and there is a small portion of the market with an extremely high value of WTP, then a profit-maximizing firm may set the price much lower than the average WTP so as to sell to the majority of potential customers who have relatively low values of WTP. There are situations in which the greater volume from low-WTP consumers outweighs the high margins that might be earned from the high-WTP segment. In these cases, the mean WTP will vastly overstate the price premium a firm will charge over cost for a product. It is more difficult, but possible, to construct similar scenarios for the median WTP.

One of the major problems with using any measure of the central tendency of the distribution of WTP (mean, median, or mode) is that this includes consumers whose WTP is insufficient to be in the market. That is, our surveys should qualify respondents to be in the market for the products (with a screening question such as "Do you plan to buy a digital camera in the next 6 months?"). However, simply averaging WTP over all survey respondents averages in those whose WTP for the product as a whole is below the market price of any product and, therefore, would not purchase in the product category. This is a downward bias for WTP computations. Instead of debating whether a particular WTP computation is upward or downward biased for feature valuation, our view is that we should employ an incremental-profits measure of economic value for the patent context.

## 6. An Illustration Using the Digital Camera Market

To illustrate our proposed method for patent valuation and to contrast our method with standard WTP and WTB methods, we consider the example of the digital camera market. We designed a conjoint survey to estimate the demand for features in the point-and-shoot submarket. This is a consumer electronics category that is very similar to the product categories in which there have been patent litigation (smartphones, tablets, and gaming consoles).

We considered the following features with associated levels: (1) brand: Canon, Sony, Nikon, and Panasonic; (2) pixels: 10 and 16 mp; (3) zoom: 4 × and 10 × optical; (4) video: high-definition (720p) and full high-definition (1080p) with microphone; (5) swivel screen: no or yes; (6) Wi-Fi: no or yes; (7) price: $79–$279. We chose the swivel-screen feature as the focus of our analysis. This feature

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 4.** Swivel-screen attribute

is illustrated in Figure 4. We consider the problem of valuing a patent that covers the swivel-screen feature.[13]

The conjoint design was a standard fractional factorial design in which each respondent viewed 16 choice sets, each of which featured four hypothetical products. A dual response mode was used to incorporate the outside option. Respondents were first asked which of the four profiles presented in each choice task was most preferred. Then respondents were asked if they would buy the preferred profile at the stated price. If the response was no, then this response was recorded as the outside option, "none of the above." Respondents were screened to include only those who owned a point-and-shoot digital camera and who considered themselves to be a major contributor to the decision to purchase this camera.

The survey was fielded to the Sampling Surveys International Internet panel in August 2013. We received 501 completed questionnaires.[14] We recorded time to complete the conjoint portion of the survey. The median time to complete was 220 seconds, or about 14 seconds per conjoint task. The 25th percentile is 151 seconds, and the 75th percentile is 333 seconds. To check sensitivity to time spent on the survey, we conducted analyses deleting the bottom quartile of the respondents and found little change. It is a common and well-accepted practice to remove respondents who "straight-line," or always select the same option (such as the left-most choice). The idea is that these straight-line respondents are not putting sufficient effort into the choice task. Of our 501 complete questionnaires, only two respondents displayed straight-line behavior and were elim-

---

[13] We are not aware of a specific patent related to the swivel-screen apparatus, but this feature is representative of many patented features.

[14] This study was part of a wave of four other very similar conjoint studies on digital cameras, each with the same screening criteria. For all studies in the wave, 16,185 invitations were sent to panelists, and 6,384 responded. Of those who responded to the invitation, 2,818 passed screening, and of those passing screening 2,503 completed the questionnaire. Thus, the overall completion rate is 89 percent, which is good by survey standards.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

inated. We also eliminated six respondents who always selected the same brand and two respondents who always selected the high-price brand. Our reasoning is that these respondents did not appear to be taking the trade-offs conjoint exercise seriously. We also eliminated 23 respondents who always selected the outside option, as their part worths are not identifiable without prior information. Thus, our final sample size is 468.

Our conjoint survey data consist of repeated choice observations for a set of respondents. This allows for the possibility that each of the logit coefficients in the choice model is different for each survey respondent. We use a Bayesian hierarchical logit model that specifies a normal distribution of coefficients (preferences) (see, for example, Rossi, Allenby, and McCulloch 2005). This can be interpreted as a Bayesian analysis of a random coefficient logit model. In the Bayesian approach, priors are placed on the normal distribution parameters. This model can be represented by a sequence of three distributions:

$$y_i \sim \text{Multinomial}(\boldsymbol{\pi}(\boldsymbol{\beta}_i | \boldsymbol{p}, A));$$

$$\boldsymbol{\beta}_i \sim N(\boldsymbol{\mu}_\beta, V_\beta); \tag{14}$$

$$\boldsymbol{\mu}_\beta, V_\beta \sim N(\bar{\boldsymbol{\mu}}, a_\mu^{-1} V_\beta) \times \text{IW}(\nu, V).$$

The first distribution is a multinomial choice outcome, where $\boldsymbol{\pi}$ is a vector of choice probabilities, one for each product in the market. The choice probabilities are driven by choice-alternative characteristics as in equation (1) as well as individual-specific utility weights $\beta_i$. The second distribution is the random coefficient model, and the third represents priors on what Bayesians call the hyperparameters of the normal distribution. The Bayesian hierarchical approach overcomes many of the limitations of standard maximum likelihood estimation of random coefficient choice models. For our purposes, it is especially important to recognize that we are not able to know the parameters of the distribution of preferences in the population precisely after observing our sample of about 500 respondents. In a Bayesian procedure, this uncertainly is characterized by the posterior distribution of the normal distribution parameters $(\mu, V_\beta)$. Thus, we must integrate out or average over possible values of these distributional parameters to form what is known as the posterior predictive distribution:

$$\boldsymbol{p}(\boldsymbol{\beta} | \text{Data}) = \int \varphi(\boldsymbol{\beta} | \boldsymbol{\mu}, V_\beta) \boldsymbol{p}(\boldsymbol{\mu}, V_\beta | \text{Data}) d\boldsymbol{\mu} dV_\beta. \tag{15}$$

Equation (15) reflects the influence of both the model (the normal random coefficient distribution) and the data through the posterior distribution of the normal hyperparameters. The resulting distributions will be symmetric but of fatter tails than in the normal distribution. We also impose the constraint that the price coefficient is strictly negative (for details, see Allenby et al. 2014 ).

We find aggregate demand by taking the expectation of choice probabilities with respect to the distribution of preference parameters over the population.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

Table 1
Posterior Mean of Aggregate Demand Elasticities

|  | MktShare$_{\text{Nikon}}$ | MktShare$_{\text{Canon}}$ | MktShare$_{\text{Sony}}$ | MktShare$_{\text{Panasonic}}$ |
|---|---|---|---|---|
| $p_{\text{Nikon}}$ | $-1.60$ | .39 | .41 | .28 |
| $p_{\text{Canon}}$ | .36 | $-1.71$ | .50 | .33 |
| $p_{\text{Sony}}$ | .39 | .52 | $-1.82$ | .43 |
| $p_{\text{Panasonic}}$ | .34 | .43 | .56 | $-2.14$ |

The distribution of the part worths is the correct predictive distribution of preferences. In order to shed some light on the substitution structures found in aggregate demand, we compute the posterior distribution of the market share elasticity matrix:

$$\frac{\partial MS(i)}{\partial lnp_j} = \frac{\partial}{\partial lnp_j} \int \Pr(i|\boldsymbol{\beta})\boldsymbol{p}(\boldsymbol{\beta}|\mu, V_{\text{Beta}})d\beta. \qquad (16)$$

We note that the elasticities in equation (16) are functions of the normal distribution hyperparameters. We average the elasticities with respect to draws from the posterior distribution of the hyperparameter to obtain the posterior mean of these elasticities and present them in Table 1. These own-price elasticities are quite reasonable and imply a reasonably high markup of about three times the cost. The cross-price elasticities are large but significantly smaller than the own-price elasticities. This means that each of these brands (products) is not regarded as very substitutable for other digital cameras, but there is a good deal of price sensitivity for the category purchase decision. This comes from heterogeneity in brand preferences across consumers. That is, there are some consumers, for example, who prefer the Nikon brand. This means that Nikon cameras are not regarded as close substitutes for other brands. This does not mean, however, that those people who prefer Nikon are not also price sensitive, which drives up the own-price elasticity for the Nikon-branded product. Strong brand preferences are common in consumer goods markets, so we regard this industry elasticity structure as fairly typical.

### 6.1. Changes in Equilibrium Prices and Shares

We have argued that the economic value of a patented feature should be the incremental profits that accrue to the firm that practices the patent by incorporating the patented feature. Before showing changes in profits, we first explore changes in equilibrium prices and associated market shares. We compute equilibrium prices with and without the patented feature to provide an idea of how much of a price premium a firm can charge and how market shares will adjust in the new industry equilibrium.

Unlike the WTP computations, any equilibrium calculation will depend, as it should, on which brand and product configuration is being enhanced by addition of the patented feature. Here we consider the change in equilibrium outcomes

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

The Journal of LAW & ECONOMICS

### Table 2
#### Posterior Means of Equilibrium Prices

|  | Nikon | Canon | Sony | Panasonic |
|---|---|---|---|---|
| Without swivel screen | 207.59 | 188.79 | 172.87 | 185.00 |
| With swivel screen | 263.83 | 186.55 | 172.24 | 177.84 |
| Change | 56.24 | −2.24 | −.63 | −7.16 |

### Table 3
#### Equilibrium Market Shares

|  | Nikon | Canon | Sony | Panasonic | Outside Good |
|---|---|---|---|---|---|
| Without swivel screen | 10.7 | 12.7 | 13.3 | 10.3 | 53.0 |
| With swivel screen | 10.9 | 12.8 | 13.3 | 10.5 | 52.5 |

from adding the swivel-screen display to the Nikon base product (a Nikon base camera with all attributes set at their lowest value except, of course, price, which is not constrained). The value conferred by the addition of the swivel screen will also depend on the configuration of other competing products. For illustration purposes only, we considered a competitive set that consists of three other brands (Canon, Nikon, and Panasonic) all similarly configured at the base level of attributes without the swivel-screen feature. We set the marginal cost for all brands at $75. When the swivel-screen feature is added, marginal cost is increased by $5 to $80.

Table 2 presents the posterior means of the equilibrium prices computed with and without the swivel-screen addition to the Nikon product. Adding the swivel screen gives the Nikon brand more effective market power relative to the other branded competitors that do not have the feature. Not only does Nikon find it optimal to raise the price, but the stronger competition and diminished value of the other brands force them to lower prices in equilibrium.

Table 3 displays the equilibrium market shares for each of the four branded products and the outside good calculated with and without the swivel-screen display. Only very minor share changes are observed. The Nikon product with the swivel screen gains share, primarily from the outside alternative. As we have seen, the other brands reduce their prices in equilibrium to compensate for the greater desirability of the Nikon product. We show below that these share results are much different from a WTB analysis in which prices are not allowed to adjust. A WTB analysis will overstate the share gain for Sony from feature enhancement, as the prices in a WTB analysis are not allowed to equilibrate in the new structure of competing products.

### 6.2. Changes in Equilibrium Profits

Our entire perspective on patent valuation is based on the incremental profits that accrue to a firm whose products include the patented feature. Obviously,

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 5.** Posterior distribution of the change in Nikon's equilibrium profits from addition of a swivel screen.

the absolute dollar levels of profits depend on the size of the market. In order to present incremental profits in an interpretable manner, we report the posterior distribution of the percentage change in profits. That is, we again consider the addition of the swivel screen to the base Nikon product:

$$\%\Delta\pi = \frac{\pi_{\text{Nikon}}(p_{\text{SS}}^{\star}) - \pi_{\text{Nikon}}(p_{\text{w/oSS}}^{\star})}{\pi_{\text{Nikon}}(p_{\text{w/oSS}}^{\star})}.$$

To compute the posterior distribution of the percentage change in Nikon profits, we recompute the price and share equilibria for each draw from the posterior distribution of the normal distribution hyperparameters $(\mu, V_\beta)$. Figure 5 shows this posterior distribution, which is centered over an increase in equilibrium profits of about 42 percent; the posterior mean is indicated by the heavy dashed vertical line. This increase in profits is due primarily to the price premium that Nikon is now able to charge for the product. It should be emphasized that our equilibrium computations take into account the adjustments that will occur in the market after the introduction of the enhanced Nikon product. A 95 percent posterior interval (indicated by the small vertical bars along the $X$-axis) for percentage change in profits is quite wide, extending from about 26 percent to 58 percent. This reflects an important finding that, even with 500 respondents, we do not have a great deal of precision in the estimates of quantities relevant to patent valuation.

### 6.3.  A Damages Point of View

The problem of calculating damages due to patent infringement can also be solved by application of our principle of economic valuation with incremental

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 6.** Posterior distribution of the change in Nikon's profits from Sony infringement

profits. Consider the case in which Nikon owns the patent for the swivel-screen technology. Sony infringes on this patent by introducing a point-and-shoot camera with the same swivel-screen feature. How has Nikon been injured by this act of infringement? The answer is clearly that Nikon is injured only to the extent that its profits are lower than in the case in which Sony does not infringe. Our demand models and equilibrium calculations allow us to compute this loss of profits. Profits in the counterfactual in which Sony does not infringe can be computed simply from the equilibrium prices and shares shown above. We then add the swivel screen to both the Nikon and Sony models and compute the associated price equilibrium. The percentage change in profits for Nikon represents the damages that can be attributed to the Sony infringement:

$$\%\Delta\pi_{\text{Nikon}} = \frac{\pi_{\text{Nikon}}(p^{\star}_{\text{Nikon, Sony SS}}) - \pi_{\text{Nikon}}(p^{\star}_{\text{Nikon Only SS}})}{\pi_{\text{Nikon}}(p^{\star}_{\text{Nikon Only SS}})}. \tag{17}$$

Here $p^{\star}$ refers to the equilibrium prices. These equilibrium computations take into account that if Sony were to infringe, Nikon might be forced to lower prices; this is often termed the problem of price erosion. In sum, this method takes full account of all ways in which Sony's infringement might harm Nikon.

Figure 6 shows how Nikon's profits would decline in the face of stiffer competition from the Sony product with the infringing feature. The posterior mean (indicated by the vertical dashed line) is an 11 percent reduction in Nikon's profits. When Sony adds the swivel screen to its product, demand for the Sony product increases dramatically. If Nikon were to keep its price at the equilibrium price that would prevail with only the Nikon product having the swivel screen, then Nikon would lose significant share to Sony. However, we would not expect Nikon to simply stand by and not react to the more formidable competition

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 7.** Posterior distribution of $\mathbb{E}[\text{WTP}]$ (in dollars)

from Sony. In response to the upgrade of the Sony product, Nikon would be forced to reduce its price significantly. In the end, the new equilibrium results in Nikon reducing its price from \$263.55 to \$225.12 and maintaining approximately the same share as before the entry of the swivel-screen Sony product. This illustrates the importance of undertaking equilibrium calculations instead of simply holding prices or shares constant.

### 6.4. Willingness to Pay

As indicated in Section 5, the most common practice in product and feature valuation is a WTP analysis. We can easily use our digital camera data to reproduce this analysis for the swivel-screen feature. Since WTP is a consumer-specific concept, any WTP analysis for a set of consumers will have to summarize the distribution of WTP across consumers. A sensible summary would be to estimate the expected or population average WTP, $\mathbb{E}[\text{WTP}]$. The term $\mathbb{E}[\text{WTP}]$ is the mean WTP across the population represented by our normal model of preferences:

$$\mathbb{E}[\text{WTP}|\boldsymbol{\mu},\ V_\beta]\ =\ \int \frac{\beta_f}{\beta_p}\boldsymbol{p}(\beta_f,\ \beta_p|\boldsymbol{\mu},\ V_\beta)d\beta_f d\beta_p. \tag{18}$$

To construct the posterior distribution of $\mathbb{E}[\text{WTP}]$, we use the draws from the posterior distribution of $(\boldsymbol{\mu},\ V_\beta)$. For each draw of the hyperparameter, a very large number of draws are made from the normal distribution of preferences (we used 10,000) to approximate the integral in equation (18). We do this for each draw from the posterior of the hyperparameters to build up the posterior predictive distribution of the mean WTP.

Figure 7 shows the posterior distribution of WTP. This distribution is centered

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

over very large dollar values (mean of $64.66 and median of $63.71). The posterior interval for WTP extends from $25 to $110 (indicated by the small vertical lines), which reveals a considerable amount of uncertainty. This high level of posterior uncertainty is all the more remarkable considering the large sample size of around 500 and an orthogonal design with prices varying from $79 to $279. This suggests that considerably larger samples would be required to produce precise estimates of WTP. Of course, larger and more informative data would not overcome the conceptual limitations of WTP as a method of valuation. The WTP analysis provides an estimate of the expected WTP, which is larger than the equilibrium price premium reported in Table 2 and is in accordance with the intuition that this is apt to be the case when the WTP of the marginal consumer is different from the average WTP.[15]

### 6.5. Willingness to Buy

There are two possible WTB analyses relevant to patent valuation. The value of the patent to the firm practicing the patent (under the assumption of no infringement) might be informed by a WTB analysis in which we measure the gain in market share for a firm that adds the patented feature to an existing product. The WTB would be computed simply by enhancing the product while holding the prices constant. If we take the example of adding the swivel-screen feature to a Nikon product, then we have already seen that the primary source of value in an equilibrium analysis is not the gain in share made possible by the patented feature but rather the increased price premium. Figure 8 shows a WTB analysis for the simple case of the addition of the swivel screen to the Nikon product. The WTB analysis shows a very large increase in Nikon's market share of almost 5 percentage points. This is a misleading estimate for two reasons: Nikon will not find it profit maximizing to keep the price constant when the swivel-screen feature is added, and competing brands will adjust their prices downward. We have already seen that the change in equilibrium shares is minimal when these price adjustments are made.

The second WTB analysis that could be undertaken is one to examine the loss of Nikon's market share when Sony enters the market with an infringing product. That is, we consider the market share of the Nikon product with the swivel screen in a market in which no other competitor has the patented swivel-screen feature and compare this with the market share of the Nikon product in a market in which the Sony product also has the swivel-screen feature. All share computations hold the price of the Nikon product constant at the equilibrium price that would prevail in the market prior to Sony's infringement. In other words, Nikon does not respond by lowering its price in the face of the Sony entry. This shows the flaw in the WTB analysis; it takes a static and nonequi-

---

[15] While the difference between the equilibrium price premium and the average WTP is relatively small in this example, if you add the swivel-screen feature to the Sony brand, the price premium will be only about one-half of the $\mathbb{E}[\text{WTP}]$ estimate.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

Valuation of Patented Features                                    661



**Figure 8.** Posterior distribution of the change in Nikon's share from addition of the swivel-screen feature.

librium view. In recent *Apple v. Samsung* litigation, this method of WTB analysis was employed. Figure 9 shows the posterior predictive distribution of the decline in Nikon's share resulting from a WTP analysis that does not account for Nikon's price reduction in response to the entry of Sony with an infringing product. The distribution is centered on a decline in Nikon's share of about 2 percent. Equilibrium computations show no appreciable change in Nikon's share because Nikon finds it optimal to lower its price in response to Sony's infringement as detailed in Section 6.3. Thus, a damages analysis that uses the WTB estimate of lost market share would be misleading and tend to overestimate damages.

## 7. Conclusions

Our perspective is that a patent for a product feature has value only to the extent to which firms can earn incremental profits from the addition of the patented feature. Incremental profits are determined not only by the value that individual consumers place on the patented feature but also on the nature and extent of competition in the relevant market. This means that in order to implement our economic paradigm for patent valuation, we need to be able to estimate demand for product features and model competitive behavior. In many situations, observational data on the products, prices, and quantity demanded are not sufficient to estimate demand for patented features, and we must turn to survey-based methods.

A conjoint survey attempts to simulate marketplace purchase behavior for a sample of consumers. Product features are manipulated according to an experimental design, and the respondents are asked to choose from among hypothetical

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions



**Figure 9.** Posterior distribution of the change in Nikon's share when Sony infringes

products defined by product features. This eliminates many of the drawbacks of using observational data, which are frequently not sufficiently informative to be useful in patent valuation. However, conjoint studies must be designed specifically for demand and profit calculations. In particular, the set of competitive brands available in the marketplace must be included, and the choice tasks must include the outside option.

We illustrate our approach with conjoint data obtained from a survey on digital cameras. After calibrating a demand system for digital cameras that is based on a characteristics model, we compute incremental profits from adding a patented feature to one or more of the competing products. Equilibrium calculations allow prices to adjust as a feature is added to a product, which generates more realistic measures of economic value.

Finally, while we have demonstrated that conjoint data can be used to value patented features in an incremental-profits approach, the demands are greater on the design and analysis of conjoint data if the data are to be used for patent valuation. We have shown that the standard-size samples are inadequate to precisely estimate profit-based measures of patent value.

## References

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi. 2014. Economic Valuation of Product Features. Working Paper No. 2013-05-01. Fisher College of Business, Ohio State University, Columbus.

Allenby, Greg M., and Peter E. Rossi. 1999. Marketing Models of Consumer Heterogeneity. *Journal of Econometrics* 89:57–78.

Berry, Steven, James Levinsohn, and Ariel Pakes. 1995. Automobile Prices in Market Equilibrium. *Econometrica* 63:841–90.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions

Box, George E. P., and Norman R. Draper. 1987. *Empirical Model-Building and Response Surfaces.* Hoboken, N.J.: John Wiley & Sons.

Brazell, Jeff D., Christopher G. Diener, Ekaterina Karniouchina, William L. Moore, Válerie Séverin, and Pierre-Francois Uldry. 2006. The No-Choice Option and Dual Response Choice Designs. *Marketing Letters* 17:255–68.

McFadden, Daniel L. 1983. Econometric Analysis of Qualitative Response Models. Pp. 1395–1456 in vol. 2 of *Handbook of Econometrics,* edited by Zvi Griliches and Michael D. Intriligator. Amsterdam: North-Holland.

Ofek, Elie, and V. Srinivasan. 2002. How Much Does the Market Value an Improvement in a Product Attribute? *Marketing Science* 21:398–411.

Orme, Bryan K. 2001. Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions. Unpublished manuscript. Sawtooth Software, Sequin, Wash.

———. 2009. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research.* Madison, Wis.: Research Publishers.

Petrin, Amil. 2002. Quantifying the Benefits of New Products: The Case of the Minivan. *Journal of Political Economy* 110:705–29.

Rossi, Peter, Greg Allenby, and Robert McCulloch. 2005. *Bayesian Statistics and Marketing.* Hoboken, N.J.: John Wiley & Sons.

Sheatsley, Paul. 1983. Questionnaire Construction and Item Writing. Pp. 195–230 in *Handbook of Survey Research,* edited by Peter H. Rossi, James D. Wright, and Andy B. Anderson. New York: Academic Press.

Train, Kenneth E. 2003. *Discrete Choice Methods with Simulation.* Cambridge: Cambridge University Press.

Trajtenberg, Manuel. 1989. The Welfare Analysis of Product Innovations, with an Application to Computed Tomography Scanners. *Journal of Political Economy* 97:444–79.

Viscusi, W. Kip, and Joel Huber. 2012. Reference-Dependent Valuations of Risk: Why Willingness-to-Accept Exceeds Willingness-to-Pay. *Journal of Risk and Uncertainty* 44: 19–44.

Yeager, David S., Jon A. Krosnick, Linchiat Chang, Harold S. Javitz, Matthew S. Levendusky, Alberto Simpser, and Rui Wang. 2011. Comparing the Accuracy of RDD Telephone Surveys and Internet Samples Conducted with Probability and Non-probability Samples. *Public Opinion Quarterly* 75:709–47.

This content downloaded from 208.85.77.1 on Fri, 22 May 2015 19:19:23 PM
All use subject to JSTOR Terms and Conditions