ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
TONY LOPRESTI (SBN 289269)
tlopresti@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted pro hac vice)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted pro hac vice)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

*Lead Plaintiffs' Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No. 15-MD-02617-LHK |
| | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES** |
| | Date: February 1, 2018<br>Time: 1:30 p.m.<br>Judge: Hon. Lucy H. Koh<br>Crtrm: 8, 4th Floor |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

I. INTRODUCTION ........................................................................................................1

II. ARGUMENT ...............................................................................................................1

    A. The Requested Fee Award is Reasonable ............................................................1

        1. Counsel Achieved Exceptional Results for the Class ....................................2

            a. The $115 million settlement fund benefits the class.............................3

            b. Anthem's business practice changes benefit the class...........................5

            c. The innovative notice plan benefits the class........................................6

            d. The timing of the settlement benefits the class.....................................7

        2. This Case Required Extraordinary Skill and High Quality Work......................7

            a. Size and scope of claims and class.........................................................7

            b. Novelty and complexity of legal claims ................................................8

            c. Complexity of factual issues in litigation ..............................................9

            d. Scope and timeline of discovery..........................................................10

            e. Complex settlement negotiations .........................................................11

            f. Quality of representation ......................................................................11

        3. Risk of Litigation and Contingent Nature of Representation..........................12

        4. Awards Made in Similar Cases Show That the Requested Fee Award is
           Reasonable ................................................................................................15

        5. The Lodestar Cross-Check Shows That the Requested Fee is Reasonable........17

    B. Class Counsel's Expenses are Reasonable .......................................................21

    C. The Requested Service Awards are Reasonable................................................22

III. CONCLUSION ..........................................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Barbosa v. Cargill Meat Solutions Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013).......................................................................... 12, 16

*Barrera v. Home Depot U.S.A., Inc.*,
No. 12-CV-05199, 2015 WL 2437897 (N.D. Cal. May 20, 2015) ..................................... 4, 5

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .............................................................................................. 1

*Camacho v. Bridgeport Financial, Inc.*,
523 F.3d 973 (9th Cir. 2008)................................................................................. 19

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) .............................................................................................. 6

*Corson v. Toyota Motor Sales U.S.A., Inc.*,
No. CV-12-8499, 2016 WL 1375838 (C.D. Cal. Apr. 4, 2016)......................................... 21

*de Mira v. Heartland Emp. Serv., LLC*,
No. 12-cv-04092, 2014 WL 1026282 (N.D. Cal. Mar. 13, 2014)............................... 5, 21, 22

*Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*,
2016 WL 5938722 (C.D. Cal. May 16, 2016) .................................................................. 10

*Garner v. State Farm Mut. Auto. Ins. Co.*,
No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ........................................ 24

*Goldberger v. Integrated Res.*,
209 F.3d 43 (2d Cir. 2000)................................................................................... 13

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)............................................................................... 17

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994)................................................................................... 21

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .............................................................................................. 2

*Holmes v. Countrywide Fin. Corp.*,
No. 5:08-CV-00205-R, 2012 WL 2873892 (W.D. Ky. July 12, 2012)................................. 13

*Hopkins v. Stryker Sales Corp.*,
  No. 11-CV-02786, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013) ........................................ 9, 21

*In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*,
  No. 09 MDL 2007, 2014 WL 12591624 (C.D. Cal. Jan. 10, 2014) ...................................... 7

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 1917, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ...................................................... 25

*In re Combustion, Inc.*,
  968 F.Supp. 1116 (W.D. La. 1997) ............................................................................ 16, 17

*In re Equity Funding Corp. of Am. Sec. Litig.*,
  438 F.Supp. 1303 (C.D. Cal. 1977) .................................................................................... 13

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
  293 F.R.D. 21 (D. Me. 2013) .............................................................................................. 13

*In re: High-Tech Emp. Antitrust Litig.*,
  No. 5:11-cv-02509 (N.D. Cal. May 7, 2015) ...................................................................... 20

*In re: High-Tech Emp. Antitrust Litig.*,
  No. 5:11-cv-03541 (N.D. Cal. Sept. 2, 2015) ..................................................................... 20

*In re Nat'l Sec. Agency Telecomm. Records Lit.*,
  2010 WL 11475732 (N.D. Cal. 2010) ........................................................................... 19, 20

*In Re Nuvelo, Inc. Securities Litigation*,
  2011 WL 2650592 (N.D. Cal., 2011) .................................................................................. 17

*In re Omnivision Techs., Inc.*,
  559 F.Supp.2d 1036 (N.D. Cal. 2008) ................................................................ 2, 11, 12, 14

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ....................................................................................... passim

*In re Pacific Enterprises Securities Litigation*,
  47 F.3d 373 (9th Cir. 1995) ................................................................................................ 16

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  991 F.Supp.2d 437 (E.D.N.Y. 2014) .................................................................................... 2

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005) .......................................................................................... 16

*In re Target Corp. Customer Data Security Breach Litig.*,
　No. 14-md-02522 (D. Min. Nov. 11, 2015) ................................................................. 15, 16

*In re: The Home Depot Inc. Customer Data Sec. Breach Litig.*,
　No. 1:14-md-02583 (N.D. Ga. Mar. 8, 2017) ................................................................. 15

*In re TJX Companies Retail Sec. Breach Litig.*,
　246 F.R.D. 389 (D. Mass. 2007) ................................................................. 13

*In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liab. Litig.*,
　No. 3:15-md-02672, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ................................................................. 20

*In re Washington Public Power Supply Sys. Sec. Litigation*,
　19 F.3d 1291 (9th Cir. 1994) ................................................................. 2, 19, 24

*In re Yahoo Mail Litig.*,
　No. 13-CV-4980, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016) ................................................................. 23

*Jenson, v. First Tr. Corp.*,
　No. CV 05-3124, 2008 WL 11338161 (C.D. Cal. June 9, 2008) ................................................................. 14

*Johansson-Dohrmann v. Cbr Sys., Inc.*,
　No. 12-cv-1115, 2013 WL 3864341 (S.D. Cal. July 24, 2013) ................................................................. 3, 4

*Knight v. Red Door Salons, Inc.*,
　No. 08-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ................................................................. 12

*Krottner v. Starbucks Corp.*,
　406 F. App'x 129 (9th Cir. 2010) ................................................................. 12

*Lofton v. Verizon Wireless (VAW) LLC*,
　No. C 13-05665, 2016 WL 7985253 (N.D. Cal. May 27, 2016) ................................................................. 12

*McCoy v. Health Net, Inc.*,
　569 F.Supp.2d 448 (D. N.J. 2008) ................................................................. 5

*Medeiros v. HSBC Card Servs., Inc.*,
　No. CV 15-09093 (C.D. Cal. Oct. 23, 2017) ................................................................. 16

*Miller v. Ghirardelli Chocolate Co.*,
　No. 12-CV-04936, 2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ................................................................. 23

*Missouri v. Jenkins*,
　491 U.S. 274 (1989) ................................................................. 19

iv

*Morris v. Lifescan, Inc.*,
  54 Fed. App'x 663 (9th Cir. 2003) ....................................................................................... 16

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) .................................................................................................. 2

*Perkins v. Linkedin Corp.*,
  No. 13-CV-04303, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ...................................... 6, 7

*Razilov v. Nationwide Mut. Ins. Co.*,
  No. 01-cv-1466, 2006 WL 3312024 (D. Or. Nov. 13, 2006) ............................................... 8

*Rhom v. Thumbtack, Inc.*,
  No. 16-CV-02008, 2017 WL 4642409 (N.D. Cal. Oct. 17, 2017) ...................................... 25

*Smith v. Triad of Alabama, LLC*,
  No. 1:14-cv-324, 2017 WL 1044692 (M.D. Ala. Mar. 17, 2017) ......................................... 8

*Spears v. First Am. Eappraiseit*,
  No. 5:08-cv-00868, 2015 WL 1906126 (N.D. Cal. Apr. 27, 2015) ...................................... 8

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) .............................................................................................. 5, 6

*Stuart v. Radioshack Corp.*,
  No. C07-4499, 2010 WL 3155645 (N.D. Cal. Aug. 9, 2010) ............................................. 16

*Van Vranken v. Atl. Richfield Co.*,
  901 F.Supp. 294 (N.D. Cal. 1995) .................................................................................. 20, 23

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .................................................................................... *passim*

# I.     INTRODUCTION

Plaintiffs' Counsel have successfully litigated a groundbreaking case.  The proposed settlement is the largest ever achieved in a data breach case, yielding a $115 million non-reversionary settlement fund that provides many times that amount in value to class members through a comprehensive credit monitoring program worth at least $240 per class member.  Class members will also directly benefit from business practice changes that require Anthem to commit ████████ of additional funds to cybersecurity and to deploy specific security measures to protect class members' personally identifying information ("PII") into the future.  In reaching this historic result, Counsel took on four well-resourced law firms and matched them every step of the way, beating back two motions to dismiss; completing a massive discovery effort that included nearly 200 depositions and 3.8 million pages of documents; and fully briefing class certification in the near absence of precedent certifying a data breach class.

In compensation for their work, and in recognition of the risks they faced and the significant investment they made, Plaintiffs' Counsel ask the Court for $37,950,000 in fees – a figure that is 33% of the $115 million settlement fund, ████████ million ($115 million settlement fund plus ████████ additional funds that Anthem must spend on cybersecurity), and a miniscule percentage of the billions of dollars value of the credit monitoring made available to the class.  This is an eminently reasonable figure, as evidenced by the modest multiplier of less than 1.1 that would apply to Counsel's current lodestar of $37,832,349 (not taking into account the remaining work Counsel must undertake to secure final approval and oversee the claims process, which will likely result in an overall negative multiplier).

Plaintiffs also seek $1,999,638 in litigation costs reasonably expended, plus a $60,000 reserve for expert costs to monitor the settlement.  Finally, Plaintiffs seek benchmark $5,000 service awards for the majority of Class Representatives and $7,500 service awards for 29 Class Representatives whose computers were forensically examined.

# II.     ARGUMENT

## A.     The Requested Fee Award Is Reasonable.

The common fund doctrine is an equitable exception to the American rule that litigants must bear their own attorneys' fees.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  Under the doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client

is entitled to a reasonable attorney's fee from the fund as a whole." *Id.*  The doctrine avoids unjust enrichment: "[T]hose who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994).

In common fund cases, the district court has discretion to employ either the lodestar method or the percentage-of-recovery method in determining reasonable attorneys' fees. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  The Ninth Circuit encourages courts to cross-check their chosen method of calculating fees against the other method.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).  Although courts may use either method, "the percentage method in common fund cases appears to be dominant." *In re Omnivision Techs., Inc.*, 559 F.Supp. 2d 1036, 1046 (N.D. Cal. 2008).  That method "better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, . . ." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F.Supp.2d 437, 440 (E.D.N.Y. 2014).  The Ninth Circuit recognizes 25% of the common fund as a "benchmark," which can be adjusted upward or downward based on the circumstances of the case.  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  "[I]n most common fund cases, the award exceeds that benchmark." *Omnivision Techs., Inc.*, 559 F. Supp.2d at 1047.

Regardless of the chosen method, courts must award attorneys' fees based on an evaluation of "all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048.  The Ninth Circuit has identified the following non-exhaustive factors as being relevant to that evaluation: (1) the results achieved for the class; (2) the skill required of counsel and the quality of the work; (3) the risk of the litigation; (4) the contingent nature of the fee and the financial burden on counsel; and (5) awards in similar cases.  *Id.* at 1048-50.  All of these factors support the requested fee award here.

### 1. Counsel Achieved Exceptional Results for the Class.

Of the *Vizcaino* factors, "[t]he overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *Omnivision*, 559 F.Supp.2d at 1046; *see also Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) (the "most critical factor" to the reasonableness of an attorney fee

award is "the degree of success obtained").  Here, the proposed settlement directly benefits the class by providing comprehensive relief, as described below: [1]

### a.   The $115 million settlement fund benefits the class.

The $115 million settlement fund constitutes the largest settlement ever achieved in a data breach case, even *without* taking into account the ████████ in additional funds Anthem has committed to improving its cybersecurity.  The monetary component of the settlement directly benefits the class by providing class members who submit claims with comprehensive credit monitoring services tailored to their specific needs:  Class Counsel worked with Experian and Plaintiffs' expert to ensure that the product addresses the vulnerabilities class members face as a result of the particular type of PII that was compromised in the data breach.  Cervantez Dec. ¶8.

The credit monitoring services provide an extraordinary benefit for class members.  As explained in Plaintiffs' Final Approval Brief, every class member who signs up for credit monitoring receives a product worth at least $239.76.  In some cases, courts have calculated the value of a common fund against which attorneys' fees should be measured by multiplying the value of credit monitoring services times the total number of class members.  For example, in *Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115, 2013 WL 3864341 (S.D. Cal. July 24, 2013), the court measured attorneys' fees as a percentage of $114,251,187.00, a figure it reached by multiplying the parties' valuation of the credit monitoring ($15.95 per month, or $382.80 over a 24-month period) times the number of class members ("approximately 292,000") and adding that figure to the funds allocated for out-of-pocket expenses and identity theft reimbursement.  *Id.* at **2, 9.

Using that approach, the total value of the credit monitoring package here would be billions of dollars ($9.99 per month x 24 months x 79,150,000), of which the requested attorneys' fees would be less than 1%.  Cervantez Dec. ¶9.  Moreover, even using only the number of claims for credit monitoring that have been filed through November 30, 2017 (891,431) – a conservative approach, given that the claims deadline is not until January 29, 2018 – the credit monitoring has provided a value of at least 213 million

---

[1] Plaintiffs' Motion for Final Approval and the accompanying Declaration of Eve H. Cervantez, filed concurrently with this Motion, provide a detailed description of the excellent result achieved for the class and an overview of the relevant facts and procedural history, demonstrating the immense amount of work Plaintiffs' Counsel necessarily put into this case to achieve that exceptional result.

1    to the class.  *Id.*

2            The monetary component of the settlement also provides a benefit to class members who already

3    have credit monitoring and do not want additional services; such class members can opt for an alternative

4    cash payment of up to $50 instead.  Cervantez Dec. Ex. 11, Settlement Agreement ("SA") ¶5.

5    Additionally, the settlement provides any class member, even those who fail to file a claim within the

6    claim filing deadline, with the assistance of a trained identity resolution expert to help with any instances

7    of identity theft or fraud within the next two years.  *Id.* ¶4.9.

8            In addition, class members who have incurred out-of-pocket costs associated with the data breach

9    can file a claim to recoup up to $10,000 of those costs.  SA ¶6.4 & Ex. 12.  For instance, class members

10   who paid for credit monitoring services or a credit freeze after the data breach became public, and attest

11   that those costs were incurred in response to the data breach, will be reimbursed for the money they paid

12   for those services.  *Id.*  Similarly, class members who attest that they have experienced identity theft,

13   falsified tax returns, or other wrongdoing resulting from the data breach will be reimbursed for fraud

14   losses and costs incurred, such as hiring a tax preparer or taking time off work to file a police report.  *Id.*

15   Significantly, although class members must provide documentation of costs incurred, they do not need to

16   prove that the Anthem data breach *caused* the loss – which might have proved an insurmountable barrier

17   for many class members.  In short, the settlement fund delivers direct and valuable benefits to the class

18   and ensures that people who suffered a direct loss because of the data breach can recoup that loss.

19           The settlement is also non-reversionary.  Any funds that remain after all valid claims for

20   alternative compensation and out-of-pocket costs have been paid will be used to extend the credit

21   monitoring that Experian provides to class members who claim those services.  SA ¶4.8.  The credit

22   monitoring services will be extended in monthly increments for up to two additional years.  *Id.*  If there

23   are still remaining funds after the credit monitoring services have been extended for two years, the

24   proposed settlement provides for a *cy pres* payment to cybersecurity-related non-profit organizations.  SA

25   ¶7.1.  Accordingly, regardless of the quantity of claims that class members submit for credit monitoring

26   services, alternative compensation, or reimbursement for out-of-pocket costs, the $115 million in the

27   settlement fund is a fixed sum.  *Id.*  This Court, as well as other courts, have favored non-reversionary

28   settlements in evaluating the success of a proposed settlement.  *See, e.g.*, *Barrera v. Home Depot U.S.A.,*

*Inc.*, No. 12-CV-05199, 2015 WL 2437897, at *1 (N.D. Cal. May 20, 2015); *de Mira v. Heartland Emp. Serv., LLC*, No. 12-cv-04092, 2014 WL 1026282, at **2, 4 (N.D. Cal. Mar. 13, 2014).

### b.    Anthem's business practice changes benefit the class.

The mandated changes to Anthem's cybersecurity practices provide additional core benefits to the class.  Anthem continues to retain class members' PII in its databases.  Cervantez Dec. ¶11.  The settlement vastly reduces the vulnerability of that PII by mandating that Anthem make a major investment in cybersecurity and requiring it to take specific measures that fill the cybersecurity gaps that Plaintiffs and their expert believe allowed the data breach to occur.

The proposed settlement requires that Anthem invest ███████ per year for three years on cybersecurity, which is a total of ████████ more than it was spending prior to the data breach. *Id.* ¶12. This investment will fund a comprehensive set of cybersecurity measures that benefit class members by addressing the weaknesses in Anthem's systems that Plaintiffs' expert found allowed the data breach to occur.  This is not cookie-cutter injunctive relief.  Plaintiffs' expert and Class Counsel determined the cybersecurity measures needed based on their extensive work compiling data on Anthem's cybersecurity systems and identifying the weaknesses in them.  The proposed settlement also requires a third-party assessment to annually verify that Anthem is implementing the cybersecurity measures identified in the Settlement, so Class Counsel will be able to ensure that Anthem follows through on its cybersecurity commitments.  SA ¶2.3.

The value of the changes to Anthem's cybersecurity practices, including Anthem's obligation to commit a sum certain to cybersecurity for the next three years, must be considered in evaluating the requested fee award.  "[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees."  *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *see also McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 478 (D. N.J. 2008) (including value of injunctive relief that benefits the class in percentage-of-recovery calculation).  Here, the value of the business practice changes can be accurately ascertained because the proposed settlement requires that Anthem spend a defined amount of money ███████████ per year) for a defined amount of time (at least three years), for a total of ████████.  Settlement Ex. 2 ¶8.  Anthem's spending

on cybersecurity prior to the data breach was approximately ████████ per year.  Cervantez Dec. ¶12.

Assuming that Anthem maintained that level of spending during the first three years of the proposed

settlement term, Anthem would have spent only ██████ on cybersecurity.  Thus, the proposed

settlement includes an additional ████████ of investment in cybersecurity measures aimed at

protecting class members' PII.  Adding the $115 million settlement fund to the ████████ value-added

cybersecurity investment, the proposed settlement is worth ███████.  Using this calculation, the

requested fee award is less than ████ of the common fund.

 Moreover, even if the value of the required cybersecurity changes is not included as part of the

"fund" against which the fee request is measured, the Court should still consider the mandated

cybersecurity improvements "as a relevant circumstance in determining what percentage of the common

fund class counsel should receive as attorneys' fees."  *Staton*, 327 F.3d at 974 (internal quotations

omitted); *see also Vizcaino*, 290 F.3d at 1049 ("Incidental or non-monetary benefits conferred by the

litigation are a relevant circumstance.").  Setting aside the ████████ of value-added cybersecurity

investment, the requested fee award is 33% of the $115 million common fund.  This adjustment upwards

from the Ninth Circuit's 25% benchmark is justified by the exceptional benefit that Anthem's specific

cybersecurity measures will provide to class members.[2]

**c.** **The innovative notice plan benefits the class.**

 The proposed settlement includes an extensive multimodal system for notifying class members

about the settlement.  In addition to postcard, email and publication notice, the notice plan included a

social media advertisement campaign that purchased over 180 million advertising "impressions" to target

the 23 million plus class members for whom Anthem did not have contact information and who may not

have otherwise learned that they were victims of the breach and should take steps to protect themselves.

Cervantez Dec. ¶13; Geraci Dec. ¶15.  This Court has looked favorably on notice provisions that provide

additional benefits to the class when evaluating the success of a settlement.  *See, e.g.*, *Perkins v. Linkedin*

---

[2] Additionally, the changes in Anthem's cybersecurity methods benefit individuals *beyond* the class
because any new Anthem member will receive the same added cybersecurity protection.  *See City of
Riverside v. Rivera*, 477 U.S. 561 (1986) (courts may consider the public benefit of counsel's efforts in
determining reasonable attorneys' fees); *Vizcaino*, 290 F.3d at 1049 (considering the benefits to non-class
members).

6

*Corp.*, No. 13-CV-04303, 2016 WL 613255, at \*14 (N.D. Cal. Feb. 16, 2016); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 953 (noting important role notice plays in class action settlements).

### d.   The timing of the settlement benefits the class.

The efficiency with which Counsel achieved the proposed settlement is itself a benefit to the class, given the time-sensitivity of providing class members with credit monitoring and improving defendants' cybersecurity in a data breach case.  Lead Counsel was appointed to this MDL on September 11, 2015 and filed Plaintiffs' Motion for Preliminary Approval less than two years later, on June 23, 2017.  ECF No. 284, 869.  Counsel's ability to quickly push through rigorous litigation and obtain substantial settlement benefits allowed class members to realize the benefits of the settlement sooner, thereby reducing their overall vulnerability.  In fact, the credit monitoring services that Anthem had provided to class members after the data breach lasted two years and recently lapsed.  The efficiency of the settlement means that class members will not have to wait an undue amount of time before they receive credit monitoring services again.  Additionally, class members will benefit sooner from mandated cybersecurity improvements.  This Court and others favor settlements that are efficiently achieved when evaluating fee awards.  *See, e.g.*, *Linkedin*, 2016 WL 613255, at \*2; *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007, 2014 WL 12591624, at \*4 (C.D. Cal. Jan. 10, 2014).

### 2.   This Case Required Extraordinary Skill and High Quality Work.

#### a.   Size and scope of claims and class

The size and scope of this case presented unique challenges that required a high level of skill from Plaintiffs' Counsel.  Counsel represented a class of 80 million persons – roughly one quarter of the U.S. population – on whose behalf they brought hundreds of state law claims and one federal claim against 43 defendants.  *See* ECF No. 714-4 ¶¶ 114-142, 144-157, 433-1163.  Because no single federal or state claim could be asserted on behalf of all class members, counsel undertook the significant task of researching the laws of 50 states to identify and evaluate potential class claims.  Cervantez ¶25.

Because class members resided in all 50 states (plus D.C. and US territories), had been insured by different defendants, and had different types of health plans, Class Counsel had to interview many hundreds of class members to locate over 100 suitable Named Plaintiffs and determine which of them could represent which class members on which claims.  *Id.* ¶26.  This complicated factual and legal

research was necessary to defeat Defendants' argument that Named Plaintiffs did not have standing to represent all class members, as well as to respond to Defendants' typicality and adequacy arguments at class certification. *See* ECF No. 524 at 8-12 (Order denying Defendants' motion to dismiss on standing grounds); ECF No. 780-4 (Opp. to Mot. for Class Cert. raising standing, typicality, and adequacy arguments). Lead Counsel strategically added only the minimum number of Named Plaintiffs necessary to withstand a motion to dismiss and opposition to class certification, so as to maximize efficiency and minimize discovery and expense. Cervantez ¶26; ECF No. 537-4 (Third Amended Complaint).

### b.  Novelty and complexity of legal claims

Courts have recognized that litigating novel and complex issues requires a high level of skill, such that an upward departure from the benchmark fee is warranted. *See, e.g.*, *Spears v. First Am. Eappraiseit*, No. 5:08-cv-00868, 2015 WL 1906126, at *2 (N.D. Cal. Apr. 27, 2015) (awarding 35% of net recovery in fees to counsel who faced "at least three significant novel issues of law"); *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-cv-1466, 2006 WL 3312024, at *2 (D. Or. Nov. 13, 2006) (awarding 30% of settlement fund to counsel in case that involved "difficult legal issues of first impression" regarding statutory language and "difficult class-certification issues").

Here, Plaintiffs' Counsel brought novel and complex claims on behalf of the class, including claims under previously untested state privacy statutes; third party beneficiary claims based on the contract between Defendant BCBSA and the federal government; and claims against Non-Anthem Defendants whose members' PII was taken from Anthem's databases. *See e.g.* ECF No. 468 ("As to the scope of the IIPA's disclosure requirement, the Court notes that . . . this action presents an issue of first impression[.]"). Counsel litigated two motions to dismiss with great success, obtaining favorable orders on significant claims and theories, including their "loss of value of PII" and "benefit of the bargain" theories of damages. *See* ECF No. 468, 524. They also prevailed on complicated questions of preemption under ERISA and the Federal Employee Health Benefits Act. *See* ECF No. 468, 524. Moreover, counsel fully briefed a motion for class certification (and related *Daubert* motions) in the absence of any certified consumer class action data breach cases to rely on as precedent.[3]

---

[3] One court has certified a data breach class action on behalf of a consumer class, but that was after Plaintiffs' opening brief here had already been filed. *Smith v. Triad of Alabama, LLC*, No. 1:14-cv-324, 2017 WL 1044692, at *16 (M.D. Ala. Mar. 17, 2017), *on reconsideration in part,* 2017 WL 3816722

### c.   Complexity of factual issues in litigation

Class Counsel's skill is also evident from their command of multiple complicated factual areas, which they learned with the help of experts, and which drove their ability to take effective discovery, make strong arguments in favor of class certification, and ultimately reach a favorable settlement for the class that reflected Counsel's command of the facts. *See generally Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at *2 (N.D. Cal. Feb. 6, 2013) (counsel's use of experts to help evaluate case was part of "skillful preparation" that demonstrated skill and quality of work).

First, Counsel mastered extraordinarily technical details about cybersecurity, including facts about Anthem's security and about industry best practices. Cervantez Dec. ¶41. Counsel's understanding of this area was critical to drafting targeted discovery requests, conducting effective 30(b)(6) depositions on technical topics, developing affirmative expert testimony set forth in three reports in support of class certification, and, ultimately, requiring appropriate business practice changes from Anthem during the settlement process based on Counsel's in-depth knowledge and understanding of the facts. *Id.* ¶40; *see also* ECF No. 744-17, 744-19, 744-21.

Second, Counsel developed a deep understanding of Anthem's business models and complex insurance products, including its individual and group plans, Medicare plans, Medicaid plans, and plans offered through self-funded employers ("ASOs"), among others. Cervantez Dec. ¶41. Counsel's understanding enabled them to take effective discovery on Plaintiffs' contract-based claims and show that Rule 23 commonality and predominance were satisfied at class certification. *Id.*; *see also* ECF No. 743-12 at 26-31; ECF No. 746-2 (Rule 1006 summary of evidence chart of Anthem contracts). Counsel's understanding informed their work with expert Peter E. Rossi, who analyzed Anthem's products, submitted two reports in support of class certification, and was prepared to design a conjoint survey to measure damages under Plaintiffs' "benefit of the bargain" theory. Cervantez Dec. ¶41; *see also* ECF No. 744-22; 744-23.

Third, Counsel developed in-depth knowledge of issues related to identity theft and credit monitoring, including the risks associated with theft of PII and the most effective remedies to prevent fraud following such theft. Cervantez Dec. ¶42. Counsel drew upon this knowledge as they developed

(M.D. Ala. Aug. 31, 2017).

theories of class member damages, crafted injunctive relief requests for credit monitoring, provided the Court with expert reports in support of class certification, and crafted a custom monitoring product to provide to the class. *Id.*; ECF No. 744-25, 744-27, 744-28.

### d.    Scope and timeline of discovery

Plaintiffs' Counsel undertook a massive discovery effort in a very short timeframe.  Notably, while the parties selected ten bellwether claims, their discovery was *not* limited to those claims.  Instead, Counsel had to complete *all* discovery for all of Plaintiffs' hundreds of claims against all 43 defendants, as well as discovery on class-wide damages, in a period of less than fifteen months.  Cervantez Dec. ¶30. This effort required considerable skill, including making strategic decisions about which discovery to prioritize and developing Plaintiffs' class-wide damages theories prior to class certification.  *Id.*

Counsel's discovery effort required an enormous amount of time-consuming and high-quality work.  Counsel reviewed 3.8 million pages of documents, including technical documents pertaining to data security, complex contracts with self-funded employers, and hundreds of long plan documents. Cervantez Dec. ¶31; *see Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL 5938722, at *10 (C.D. Cal. May 16, 2016) (awarding an upward adjustment on the benchmark in part because the litigation "required highly skilled counsel who could understand the complexity of" ERISA law and counsel had reviewed "thousands of documents . . . including the relevant plan documents for over 50 ERISA plans").  This involved not only page-by-page reviews by attorneys, but ever-evolving memos and others means to get the important documents into the hands of Plaintiffs' experts and those attorneys taking depositions and drafting class certification briefs.  Cervantez Dec. ¶31.  Counsel also served 668 Requests for Admission on Anthem; 63 Requests for Admission on the Non-Anthem Defendants; 26 interrogatories on Anthem; and 20 Interrogatories on the Non-Anthem Defendants.  *Id.* ¶32.  In addition, Counsel obtained third party discovery from the Office of Personnel Management ("OPM") and the National Association of Insurance Commissioners (NAIC) and vigorously sought (but did not ultimately obtain) discovery from a third-party cybersecurity expert that had aided Anthem in assessing and responding to the data breach.  *Id.* ¶33.  Counsel also collected and produced thousands of pages of documents relevant to the 100-plus Named Plaintiffs and individually responded to 12 interrogatories directed to each of the 100-plus Named Plaintiffs by Anthem, as well as 12 additional interrogatories

directed to 10 Named Plaintiffs by Defendants HCSC and BCBSA. *Id.* ¶64.

In addition, Counsel engaged in a deposition marathon, taking or defending almost 200 depositions across the country over seven months. *Id.* ¶34. Class Counsel deposed 18 percipient fact witnesses, 62 corporate designees, and five experts, while concurrently defending the depositions of more than 100 Plaintiffs and four experts. *Id.* Counsel regularly double-tracked or triple-tracked depositions on the same day to meet the fact discovery deadline. *Id.*

Finally, Counsel skillfully and tenaciously litigated discovery disputes, which included 14 discovery motions before this Court and one discovery motion in the District of Columbia to compel production of federal government documents. *Id.* ¶37. Among other disputes, counsel vigorously opposed Defendants' motion to compel certain Named Plaintiffs to have their computers and tablets forensically examined. *Id.* After that motion was granted, counsel devoted significant time to coordinating and negotiating the process by which 29 Named Plaintiffs' electronic devices would be examined. *Id.*

### e.  Complex settlement negotiations

The benefits provided under the settlement agreement are a clear indicator of the quality of Counsel's work – and the work it took to reach that settlement is a clear indicator of Counsel's skill and effort. This was not a case in which the parties settled quickly or easily. Defendants were not willing to even begin settlement negotiations until after the parties had completed all of their discovery and were briefing class certification. *Id.* ¶3. At that point, the parties engaged in three full-day mediations with Judge Layn R. Phillips (Ret.) over a period of three months; by the end of the third day, they had still not settled, but both sides accepted a mediator's proposal shortly thereafter. *Id.* ¶4. The multi-dimensional settlement that the parties ultimately entered into is the product of long and hard-fought negotiations, and is testament to Counsel's tenacity and skill as advocates.

### f.  Quality of representation

The "prosecution and management of a complex national class action requires unique legal skills and abilities." *In re Omnivision*, 559 F.Supp.2d at 1047. Class Counsel are partners at some of the leading plaintiff-side class action firms in the country. They have decades of experience litigating complex class actions, including data breach cases such as *In re: The Home Depot, Inc. Customer Data*

*Security Breach Litig. (Financial Institution)* (N.D. Ga.), *In re Adobe Systems, Inc. Privacy Litigation* (N.D. Cal.), and *Corona v. Sony Pictures Entertainment, Inc.* (C.D. Cal.), as well as other privacy cases. Cervantez Dec. ¶79; Friedman Dec. ¶¶5-6; Gibbs Dec. ¶¶18-20; Sobol Dec. ¶¶5-6.  Counsel drew on their collective depth of experience and skillset at every stage of litigation.

The quality of opposing counsel is also an indicator of the skills required from, and quality of work done by, Plaintiffs' Counsel.  *See Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) ("The quality of opposing counsel is important in evaluating the quality of Class Counsel's work.").  Here, the defendants hired *four separate law firms* with significant class action litigation experience to defend against Plaintiffs' claims.  Cervantez ¶24.  Defendants vigorously contested both class certification and liability and devoted substantial resources to the defense, including staffing calls with multiple attorneys, sending multiple attorneys to court hearings, and deposing all but one of the over 100 Named Plaintiffs.  *Id.*  Counsel's ability to obtain a favorable settlement despite the quality of work done by these four highly-resourced elite law firms is an additional indicator of their skill and quality of work.  *See, e.g.*, *Knight v. Red Door Salons, Inc.*, No. 08-01520, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) (where defense counsel "understood the legal uncertainties in this case[] and were in a position to mount a vigorous defense," the favorable class settlement was "some testament to Plaintiffs' counsel's skill").  *See also Lofton v. Verizon Wireless (VAW) LLC*, No. C 13-05665, 2016 WL 7985253, at *1 (N.D. Cal. May 27, 2016) (the "risks of class litigation against an able defendant well able to defend itself vigorously" support an upward adjustment in the award of fees).

### 3.  Risks of Litigation and Contingent Nature of Representation

Counsel's fee request also appropriately reflects that "the case was risky" and Counsel handled it on a contingency basis.  *In re Online DVD-Rental*, 779 F.3d at 954-55; *Vizcaino*, 290 F.3d at 1048; *see also In re Omnivision Techs.* 559 F. Supp. 2d at 1046-47  ("The risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees.").

This case was extraordinarily risky.  Due to the novelty and complexity of the issues, there was no guaranty that Plaintiffs' claims would survive a motion to dismiss.  Indeed, many prior data breach cases were defeated on motions to dismiss. *See, e.g.*, *Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th

Cir. 2010) (holding that plaintiffs had not adequately alleged elements of state law negligence and breach of contract claims in data breach case); *Holmes v. Countrywide Fin. Corp.*, No. 5:08-CV-00205-R, 2012 WL 2873892, at *5 (W.D. Ky. July 12, 2012) (stating that it was "an understatement to say that courts are skeptical of litigants' claims for risk of future identity theft" and granting defendants' motion to dismiss in data breach case).  Nor did Counsel have the benefit of relying on a prior judgment in a related case or government action.  To the contrary, a consortium of state insurance commissioners specifically found that Anthem's pre-breach cybersecurity was reasonable.  Cervantez Dec. Ex. 14.  *Compare, e.g.*, *In re Equity Funding Corp. of Am. Sec. Litig.*, 438 F.Supp. 1303, 1332 (C.D. Cal. 1977) ("The risk of litigation is also affected by the availability of a prior judgment or decree in a related case brought by the government or a governmental agency.").  Finally, Counsel faced the risk that parallel state court litigation in California and Missouri would result in settlements that would release the claims of millions of class members while providing less relief to them.  *See* ECF 690.

There was also no guaranty that the Court would grant class certification to any or all of Plaintiffs' four bellwether claims.  Indeed, when Plaintiffs' Counsel took this case, there was *no* precedent granting class certification to consumers in a data breach case; to the best of Plaintiffs' knowledge, no prior consumer data breach case that had survived a motion to dismiss was subsequently certified as a class action.  *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) (denying class certification in data breach case); *In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389, 392 (D. Mass. 2007) (same); *see also Goldberger v. Integrated Res.*, 209 F.3d 43, 55 (2d Cir. 2000) ("It is well-established that litigation risk must be measured as of when the case is filed.").  While Plaintiffs believe that the Court would have certified their claims, Defendants vigorously opposed certification, and there was a significant risk that the Court would deny class certification in whole or in part.

Plaintiffs also faced a risk that the Court would whittle down their proposed classes in response to Defendants' argument that Named Plaintiffs insured by one Non-Anthem Defendant could not represent class members insured by another non-Anthem Defendant, or that Named Plaintiffs with one type of plan could not represent class members with a different type of plan (both as a matter of standing and as a matter of Rule 23 typicality).  *See* ECF No. 780-4 at 24, 26.  While Plaintiffs believe the Court would

have rejected this argument as meritless, it posed a risk that millions of class members would be left with no class representative (and therefore no relief).  *See Jenson, v. First Tr. Corp.*, No. CV 05-3124, 2008 WL 11338161, at *12 (C.D. Cal. June 9, 2008) ("Uncertainty that *any* recovery ultimately would be obtained is a highly relevant consideration.").

Moreover, even if the Court had granted class certification on the four bellwether claims, Plaintiffs would have had a long road ahead of them.  Defendants likely would have continued to challenge Plaintiffs' ability to prove causation, damages, and the scope of Anthem's promise to protect PII (among other issues) at summary judgment and trial.  Due to the novelty of Plaintiffs' damages theories, there was a risk that Plaintiffs would prevail on liability but establish only a small figure in damages.  *See In re Omnivision*, 559 F.Supp. 2d at 1047 (acknowledging risks where estimates of damages varied).  Perhaps most significantly, this case posed a substantial risk that, absent settlement, Counsel would have to litigate round after round of additional motions – including additional motions to dismiss and motions for class certification – for all of Plaintiffs' hundreds of common law and statutory claims arising under the laws of 50 plus jurisdictions.  Cervantez Dec. ¶14.

Plaintiffs' Counsel bore the heavy weight of those risks over more than two years.  During that period, Counsel spent almost $2 million on litigation costs, including expert fees, deposition transcripts, and nationwide travel for nearly 200 depositions – all costs that Counsel had no certainty they would recover.  *Id.* ¶89.  Counsel also poured 78,553 hours of work into the litigation, at times with multiple attorneys working full-time on the case – again with no certainty they would ever be paid for that work.  Cervantez Dec. ¶71; Friedman Dec. ¶3; Gibbs Dec. ¶4; Sobol Dec. ¶¶9-14.  Counsel's commitment to the case was necessary to counter the strong defense put up by Defendants, but it came at a cost:  Counsel were unable to work on other matters (including matters involving paying clients).  Cervantez Dec. ¶71; Friedman Dec. ¶3, Gibbs Dec. ¶4, Sobol Dec. ¶¶9-13.  This level of investment and opportunity cost is a well-established basis for awarding fees above the benchmark.  *See In re Online DVD-Rental*, 779 F.3d at 955 (the "burdens class counsel experienced while litigating the case (e.g. cost, duration, foregoing other work)" should be considered when assessing fee petition).

**4.    Awards Made in Similar Cases Show That the Requested Fee Award is Reasonable.**

There is no true comparator to this groundbreaking settlement.  Other data breach cases have not resulted in common funds that come close to $115 million, nor have they included the comprehensive cybersecurity improvements mandated by this settlement, coupled with a major, quantifiable investment in cybersecurity. Indeed, it is an indication of the settlement's extraordinary benefits that it is not possible to compare counsel's requested fee award in this case to fee awards in "similar" data breach cases.

Insofar as this case is comparable to smaller data breach settlements, the requested fee award is justified because the proposed settlement's benefits go well beyond what has been provided in those settlements.  Courts have awarded more than 25% of the common fund in data breach cases providing for limited injunctive relief, credit monitoring, or reimbursement for expenses related to identity theft; in comparison, the proposed settlement here includes expansive business practice changes and a specified investment of funds for cybersecurity, at least two years of triple-bureau monitoring, *and* reimbursement for expenses associated with the data breach.  For example, in *In re Target Corp. Customer Data Security Breach Litig.*, No. 14-md-02522, Dkt. 645 at 8 (D. Min. Nov. 11, 2015), the court approved a fee award of $6.75 million, which was 29% of the combined value of the settlement in a data breach affecting a class of more than 40 million consumers whose credit and debit card information was stolen, and more than 60 million consumers whose PII was stolen.  Pursuant to the settlement, Target paid $10 million into a fund to pay claims related to identity theft, and separately covered the costs of notice, settlement administration expenses, and attorneys' fees and costs.[4]  *Id.* Dkt. 358-1 at 94-96 (Mar. 18, 2015).  The settlement included limited injunctive relief, but no credit monitoring.  *Id.* at 13-14.  In *In re: The Home Depot Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583, Dkt. 261 at **2-4 (N.D. Ga. Mar. 8, 2017) , the court approved a fee award of $7,536,497, which was 28% of the combined value of the settlement in a data breach affecting a class of approximately 50 million consumers.  The court valued the settlement at "approximately $27 million," which included reimbursement of out-of-pocket expenses, 18 months of dark web monitoring, and the requested attorneys' fees.  *Id.* at *4.  The settlement also included

---

[4] The court accepted class counsel's valuation of the total settlement, including the $10 million settlement fund, approximately $6.5 million in notice and administrative costs, and $6.75 million in attorney's fees. *Target*, No. 14-md-02522, Dkt. 645 at 8; *Id.*, Dkt. 482 at 35 (July 10, 2015).

limited injunctive relief.  Unlike this case, neither *Target* nor *Home Depot* required defendants to make a discrete investment in cybersecurity, nor did they include such specific and comprehensive improvements to cybersecurity.

Counsel's fee request also compares favorably to fee awards in non-data breach cases that include both large monetary settlement funds and quantifiable injunctive relief.  For instance, in *McCoy,* the court awarded $69,720,000 in fees out of a settlement that included a $215 million settlement fund and injunctive relief that the parties valued at between $26 million and $38 million.  569 F.Supp.2d at 478. The court explained that the injunctive relief could be included in the percentage-of-recovery calculation because, although it could not be "precisely and mathematically ascertained as to each Class Member," each class member received a direct benefit from the injunctive relief.  *Id.*  The court calculated the percentage-of-recovery figure both with the value of injunctive relief included (28%), and without the injunctive relief (just over 32%), and determined that the fee award was appropriate using either calculation.  Similar to *McCoy*, Counsel's fee request is appropriate here using either a percentage-of-recovery calculation that does not include the injunctive relief (33% of the $115 million settlement fund), or that includes the ▆▆▆▆▆▆▆ of committed investment in cybersecurity that will be used to better protect class members' PII (less than ▆▆▆▆▆▆▆▆▆▆▆▆▆▆).  And, Counsel's requested fee award compares even more favorably when figuring in the total value of the credit monitoring provided for the class (less than 1% of billions of dollars) or the value of the already-claimed credit monitoring services (less than 12% of $328 million ($115 million settlement fund plus $213 million value of already-claimed credit monitoring)).

Even using the smallest possible common fund figure ($115 million), the resulting 33% fee award would be in line with cases in the Ninth Circuit and other circuits that have awarded 33% or more in comparable common fund cases.  *See, e.g.*, *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 377-79 (9th Cir. 1995) (affirming 33.3% fee award); *Morris v. Lifescan, Inc.*, 54 Fed. App'x 663 (9th Cir. 2003) (same); *Medeiros v. HSBC Card Servs., Inc.*, CV 15-09093, Dkt. 105 at 15 (C.D. Cal. Oct. 23, 2017) (approving 33.3% fee award); *Barbosa v. Cargill Meat Solutions Corp.,* 297 F.R.D. 431, 449 (E.D. Cal. 2013) (approving 33.3% fee award and explaining that "where recovery is uncertain, an award of one-third of the common fund" is appropriate); *Stuart v. Radioshack Corp.*, No. C07-4499, 2010 WL

3155645, *6 (N.D. Cal. Aug. 9, 2010) (approving 33.3% fee award and explaining that it is "well within the range of percentages which courts have upheld as reasonable"); *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 82 (D. Mass. 2005) (approving 33.3% fee out of $175 million fund);  *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D. La. 1997) (approving 36% fee award from $127 million common fund); *see also In Re Nuvelo, Inc. Securities Litigation*, 2011 WL 2650592, at *2  (N.D. Cal., 2011) (explaining that a typical fee award in common fund cases in the Ninth Circuit is 30-33% of the fund).

### 5.     The Lodestar Cross-Check Shows That the Requested Fee is Reasonable.

The Ninth Circuit encourages a rough calculation of the lodestar as a cross-check to assess the reasonableness of an award that is principally calculated using the percentage method.  *Vizcaino,* 290 F.3d at 1050.  A lodestar "may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). The reasonable lodestar for work on this case through September 30, 2017 is $37,832,349, representing 78,553 hours of attorney time.  Cervantez Dec. ¶21.  Not including the additional time that Class Counsel will necessarily spend obtaining final approval of the settlement and overseeing the claims process, the requested fee award results in a negligible multiplier, which is more than justified by the excellent result achieved for the class, and Counsel's skilled advocacy of novel and risky claims against four well-resourced and experienced law firms.  Indeed, it is likely that Counsel's eventual lodestar, after completion of the final approval and claims process, will result in a negative multiplier.

As described above and detailed in the Cervantez Declaration, Counsel necessarily devoted an enormous amount of time to this important case.  *Id.*  Discovery was a mammoth undertaking:  Counsel spent more than 34,000 hours reviewing, coding, analyzing, and summarizing the 3.8 million pages of documents produced by Defendants; almost 14,000 hours preparing for, taking, and defending almost 200 depositions; and more than 7,000 hours drafting, responding to, and meeting and conferring about written discovery.  *Id.* ¶52, Ex. 2.  Counsel devoted more than 3,100 hours to working with experts.  *Id.* Counsel's time investment in the discovery process, and ability to timely transmit this information to experts, was critical to the non-monetary benefits of the proposed settlement, including the carefully crafted cybersecurity improvements and custom-designed credit monitoring product.  *Id.* ¶60.  Class

17

Counsel were only able to negotiate this extremely advantageous settlement after researching and drafting four approximately 1,000-paragraph consolidated complaints alleging federal and state law claims for each of the 50 states, defending with substantial success against two motions to dismiss, and fully briefing class certification.  *Id.* ¶¶3, 52.  Counsel spent almost 3,400 hours on class certification and more than 7,300 hours on the amended complaints, motions to dismiss, and other pleadings.  *Id.* ¶52, Ex. 2.  More than 2,400 hours have been expended on the settlement process thus far, with many more anticipated in the future.  *Id.*

Class Counsel took measures to litigate this case efficiently, as described in more detail in the accompanying Cervantez Declaration. *Id.* ¶22.  For example, although Lead Counsel assigned the majority of work to the four Lead Counsel and Plaintiffs' Steering Committee ("PSC") firms so that a core group of attorneys could litigate the case efficiently, Lead Counsel also strategically relied on firms throughout the country to locate and interview prospective plaintiffs, review and analyze documents, and take and defend depositions.  *Id.* ¶23.[5]  For instance, between November 14 and December 20, 2016, counsel took 42 Rule 30(b)(6) depositions of 14 Non-Anthem defendants in 13 states.  *Id.* ¶36.  While Lead Counsel played a significant oversight role in the process, Lead Counsel was able to select several firms outside of the PSC (many located near the relevant deposition site) to handle most of the Non-Anthem depositions. *Id.*  Similarly, Lead Counsel firms defended the first few Named Plaintiff depositions and created deposition preparation materials, but then requested that firms with a large number of retained clients defend their own clients' depositions.  *Id.* ¶29.  Thus, Lead Counsel ensured that counsel assisting with depositions were not engaged in duplicative work, and were able to benefit from Lead Counsel's knowledge of the case.  Lead Counsel also used an iterative process for document review, whereby PSC attorneys conducted quality control audits of document coding efforts, and asked those non-PSC attorneys with consistently high quality work to engage in more sophisticated analysis of documents, including collecting and analyzing documents on particular topics to assist with depositions, experts, and class certification briefing.  *Id.* ¶31.  Lead Counsel also fostered efficiency by assigning small groups of attorneys to work on particular issues as to which they already had some level of expertise.  For example,

---

[5] The Court encouraged Class Counsel to utilize other firms to assist in this litigation on an as-needed basis, including in the discovery process.  ECF No. 284.

Lead Counsel selected a small "information security team" of PSC attorneys who already had significant data breach and cybersecurity expertise to review cybersecurity documents, take cybersecurity-related depositions, and work with cybersecurity experts, while assigning a different team of PSC attorneys to work on contract-related issues, and reaching out to non-PSC firms with particular expertise in ERISA. *Id.* ¶23.

Lead Counsel also exercised sound billing judgement to ensure that only justifiable, common benefit time is included in the claimed lodestar. *Id.* ¶44. Lead Counsel required all firms to submit time on a monthly basis to ensure that it was contemporaneously recorded. *Id.*; *see* ECF 46 (Order on Billing). Lead Counsel also carefully defined the universe of time that could be billed, as set forth in three memos sent to all counsel. *Id.* For example, the combined lodestar does *not* include the time that attorneys spent researching and drafting the 100-plus underlying complaints that were eventually consolidated in the MDL, briefing and arguing before the Judicial Panel on Multi-District Litigation, filing applications for leadership positions, or traveling to the Initial Case Management Conference, despite the fact that this was time necessarily spent by each law firm. *Id.* Similarly, attorneys not working on a particular task were not permitted to bill for reviewing briefs or pleadings. *Id.* Counsel did not bill for more than two attorneys at any deposition or hearing, even when more than two attorneys were actually present. *Id.*[6] Finally, Lead Counsel reviewed all time submitted, line by line, to remove or reduce any time that was not to the common benefit, and any duplicative and excessive billing entries. *Id.* ¶46. The lodestar also does not include any time reviewing fees or drafting this application for attorneys' fees. *Id.* ¶44.

Lead Counsel also took measures to reduce the billing rates that figure into the lodestar.[7] Although Plaintiffs could have pursued the relatively high Northern District of California rate for all attorneys, they did not do so. *See Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) ("Generally, when determining a reasonable hourly rate, the relevant community is the forum in

---

[6] The only exception to this rule is when there were hearings that involved multiple motions, in which case there were sometimes more than two attorneys who had taken the lead in preparing and arguing those motions.

[7] All time is billed at 2017 rates. Courts typically apply each attorney's current rates for all hours of work regardless of when performed, to account for the delay in payment resulting from the years it took to litigate the case. *See Missouri v. Jenkins*, 491 U.S. 274, 282-84 (1989); *Washington Public*, 19 F.3d at 1305.

which the district court sits."); *In re Nat'l Sec. Agency Telecomm. Records Lit.*, 2010 WL 11475732 at *13 (N.D. Cal. 2010) (applying *Camacho* to MDL).  Instead, attorneys were directed to bill at their own prevailing market rate.  Cervantez Dec. ¶47.  In most cases these rates were lower than Northern District of California rates.  *Id.*  Firms were also instructed to support their rates with court orders approving their own or similar rates.  *Id.*, Ex. 3.  Rates were capped at the rates billed by Co-Lead Counsel and/or Plaintiffs' Steering Committee firms absent a court order approving a higher rate.  *Id.* ¶47.  All Co-Lead Counsel and PSC firm rates have been approved multiple times in the Northern District of California, including by this Court.  *Id.* ¶88; Friedman Dec. ¶7; Sobol Dec. ¶24; Gibbs Dec. ¶16.

Class Counsel's blended rate for all timekeepers in this case is $481.62.  Rates range from $400 to $970 for partners; $185 to $850 for non-partner attorneys; and $95 to $440 for all other timekeepers.  Cervantez Dec. ¶48.  Class Counsel's blended rate compares favorably to blended rates approved in other MDLs and class actions in this district.  For instance, in 2015, this Court granted a fee award based on a blended rate of $533.21 for all timekeepers.  *In re: High-Tech Emp. Antitrust Litig.*, No. 5:11-cv-03541, Dkt. 54 at *16 (N.D. Cal. Sept. 2, 2015).  The Court cited with approval the declaration of Professor William B. Rubenstein, which illustrated that the blended rate in that case fell below the median blended rate in the district over the previous two years.  *See id.*, No. 5:11-cv-02509, Dkt. 1073-1 at 15-16 (N.D. Cal. May 7, 2015).  The Court also found that the range of hourly rates was reasonable for partners ($490-$975), non-partner attorneys ($310-$800), and other timekeepers ($190-$430).  *Id.*, No. 5:11-cv-03541, Dkt. 54 at *16.  *Compare also In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liab. Litig.*, 3:15-md-02672, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving blended rate of $529 per hour that included billing rates from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals).

The negligible or negative multiplier falls at the very low end of the spectrum of most class action cases. [8]  In the Ninth Circuit, multipliers "ranging from one to four are frequently awarded."  *Vizcaino*, 290 F.3d at 1051 n.6.  The Ninth Circuit has tallied dozens of class action lodestars and found that in 83% of cases surveyed, the lodestar was between 1.0 and 4.0, and in 54% of cases, it was between 1.5

---

[8] When the Court appointed Lead Counsel in this case, Lead Counsel committed to limit any multiplier to 1.75.  ECF 190.

and 3.0.  *Id.*; *see also Van Vranken v. Atl. Richfield Co.*, 901 F.Supp. 294, 298–99 (N.D. Cal. 1995) (holding that multiplier of 3.6 was "well within the acceptable range for fee awards in complicated class action litigation" and explaining that "[m]ultipliers in the 3–4 range are common").  Given the risk and complexity of this case, the vigorous defense by four major defense firms, and the excellent monetary and non-monetary results for the class, whatever negligible multiplier exists is clearly justified.[9]  Indeed, by the time that Counsel have finished moving for final approval and overseeing the claims process, it is likely that Counsel will have a negative multiplier to their reasonable lodestar.  Cervantez Dec. ¶21.

### B.    Class Counsel's Expenses are Reasonable.

Under the common fund doctrine, attorneys who generate a benefit for the class are entitled to the reimbursement of reasonable litigation expenses incurred in prosecuting the litigation.  *See Corson v. Toyota Motor Sales U.S.A., Inc.*, No. CV 12-8499, 2016 WL 1375838, at *9 (C.D. Cal. Apr. 4, 2016) ("Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents scanning, and visual equipment are typically recoverable"); *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786, 2013 WL 496358, at *6 (N.D. Cal. Feb. 6, 2013) (awarding costs for document review, depositions, and experts).  In general, attorneys in class action cases are entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotations omitted); *de Mira*, 2014 WL 1026282, at *5 (this Court applying *Harris* in common fund case).

Exhibit 4 to the Cervantez Declaration provides an accounting of expenses by category, all of which were necessary to the effective representation of the class, and all of which are expenses that would normally be charged to a fee-paying client.  Cervantez Dec. ¶56; see also *id.* Ex. 5-10 (expenses by firm).  The total expenses to date, $1,999,638, are less than the maximum negotiated amount in the settlement agreement.  SA ¶12.1 (setting maximum expenses at $3 million).  Class Counsel will submit updated expenses in their reply brief, including travel and any necessary expert expenses associated with

---

[9] The factors that courts use to evaluate an appropriate multiplier – the benefit obtained for the class, the quality of representation, complexity and novelty of the issues, and risk of nonpayment – are generally the same as those applied when evaluating an award under the percentage method, and are addressed above.

Plaintiffs' motion for final approval.  Counsel expects, however, that even with these updates, the total expenses will be well below the $3 million maximum.

The voluminous discovery in this litigation generated substantial costs.  Most significantly, Defendants deposed over 100 Named Plaintiffs, and Counsel took almost 200 depositions of Defendants. *Id.* ¶57.  In addition to court reporting costs, these depositions resulted in thousands of dollars of travel costs because named Plaintiffs are spread throughout the country, most Anthem representative depositions took place in Indianapolis (where Anthem is headquartered), and Non-Anthem depositions took place at their headquarters around the country.  *Id.*  Plaintiffs were also required to retain an electronic document depository vendor to store and manage the huge number of produced documents.  *Id.*  Additionally, Plaintiffs incurred substantial expenses associated with retention of four testifying experts, who submitted reports and were deposed, as well as several consulting experts.  *Id.*  Mediation over three full days was also costly.  *Id.*  Counsel also engaged a call center to assist with class member inquiries about the settlement and claims-filing process.  *Id.* ¶58. Counsel also incurred expenses for filing fees,[10] legal research, mailing and courier services, long distance telephone calls, printing and copying, and other miscellaneous expenses, all of which were necessary to the effective litigation of the case, and represent expenses typically charged to paying clients.  *Id.* ¶56; *see, e.g.*, *de Mira*, 2014 WL 1026282, at *5 (retention of experts, discovery, research, filings, travel, and mediation).

After final approval, Counsel anticipates retaining a cybersecurity expert to review Anthem's required annual cybersecurity reports.  Cervantez Dec. ¶60. Those expert costs are expected to run between $10,000 to $20,000 per year, for a total of approximately $60,000.  Accordingly, Counsel respectfully requests that, in addition to reimbursement of costs actually incurred of $1,999,638, the Settlement Administrator be ordered to retain $60,000, to be paid out based on an accounting submitted by Counsel to this Court, for future expert work. Any amount not paid to the expert would be used, as are all other settlement funds, to extend credit monitoring, or, eventually donated to the *cy pres* recipients.

### C.    The Requested Service Awards are Reasonable.

---

[10] Plaintiffs are not seeking reimbursement for filing fees connected with the 100-plus underlying MDL actions, but only filing fees necessarily incurred later in the case, *i.e.*, when complaints had to be filed in specific jurisdictions as a result of Defendants' threatened motions to dismiss for lack of personal jurisdiction in the Northern District of California.  Cervantez Dec. ¶57.

The requested service awards for Named Plaintiffs are reasonable and appropriate.  Courts routinely permit service awards "to compensate class representatives for work undertaken on behalf of a class." *In re Online DVD*, 779 F.3d at 943.  When assessing a request for service awards, courts typically consider the following criteria:  "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken*, 901 F. Supp. at 299.

Here, Plaintiffs seek $5,000 awards for the majority of Named Plaintiffs – an amount that is presumptively reasonable – and $7,500 awards for each of the Named Plaintiffs whose personal computers were forensically examined.  *See In re Yahoo Mail Litig.*, No. 13-CV-4980, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) ("The Ninth Circuit has established $5,000.00 as a reasonable benchmark [for service awards].").  These awards are justified because all of the Named Plaintiffs devoted substantial time and effort to the litigation; none of the Named Plaintiffs will receive any personal benefit beyond what any class member will receive; and Named Plaintiffs whose computers were forensically examined expended additional time and effort and endured the personal difficulty of particularly invasive discovery.

The Named Plaintiffs participated significantly in discovery.  All of the Named Plaintiffs gathered and produced documents in response to 33 document requests and responded to 12 interrogatories that requested protected personal and financial information.  Cervantez Dec. ¶64, Ex. 15-16.  Some of the Named Plaintiffs also responded to additional requests promulgated by BCBSA or HCSC.  *Id.* ¶64, Ex. 17-19.  All of the Named Plaintiffs reviewed complaint allegations about themselves for accuracy, and 15 of them submitted declarations in support of class certification.  *Id.* ¶63; *see* ECF No. 744-1 – 744-15.  In addition, all but one of the Named Plaintiffs was deposed.  Cervantez Dec. ¶65.  In some instances, Named Plaintiffs had to travel significant distances (sometimes necessitating an overnight stay), take time off from work, and/or pay for child care to attend the preparation sessions and depositions.  *Id.*  Named Plaintiffs' participation in discovery, including sitting for depositions, justifies a service award of $5,000 for most Named Plaintiffs.  *See, e.g.*, *In re Yahoo Mail Litig.* 2016 WL 4474612, at *11 (awarding $5,000

23

service awards to named plaintiffs who produced emails, responded to interrogatories, and took time away from work to be deposed); *Miller v. Ghirardelli Chocolate Co.*, No. 12-CV-04936, 2015 WL 758094, at *7 (N.D. Cal. Feb. 20, 2015) (awarding $5,000 service awards to named plaintiffs who searched personal records, were deposed, responded to interrogatories and requests for production, provided declarations, and attended or consulted during mediation).[11]

      A service award of $7,500 is appropriate for each of the 29 Named Plaintiffs who, in addition to participating in the discovery described above, were required to have their computers forensically examined. Courts have recognized that particularly invasive discovery of plaintiffs amounts to a "personal difficulty" that is relevant to the size of service awards. *See, e.g.*, *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010) (the fact that the plaintiff was "subjected to questioning regarding her personal financial affairs and other sensitive subjects" in her deposition was a basis for awarding a $20,000 service award). Here, Defendants compelled 29 Named Plaintiffs to have their computers and tablets forensically examined, meaning those Named Plaintiffs had to: (1) allow an outside party to enter their homes to run imaging software, (2) turn over their computers and tablets to a third party for scanning at an off-site location, or (3) participate in one or more telephone conferences with a third party to remotely run software that took an image of data on their personal computers and tablets. *See* Cervantez Dec. ¶67. The process could take over 10 hours, meaning that many Named Plaintiffs had to stay at home, with a stranger in their house, for up to 10 or more hours. *Id*. This extraordinarily invasive discovery (which Plaintiffs strenuously opposed) went far beyond what is typical in a class action, in terms of both the time and effort it required and the personal difficulty it created for the plaintiffs.[12]

---

[11] Moreover, while sitting for *any* deposition would support the requested service award, here the Named Plaintiffs had to answer extraordinarily invasive questions about their personal habits regarding the security of their homes, cars, email accounts, financial accounts, and other private matters. Cervantez Dec. ¶66. In some instances, Defendants even asked whether Plaintiffs had accounts on Ashley Madison (a website that enables extra-marital affairs) or required them to state their social security numbers on the record – a particularly troubling question for individuals who were suing over loss of just this type of information, and did not want to divulge it to others, such as court reporters. *Id*. Named Plaintiffs' willingness to give sworn testimony on invasive and potentially embarrassing questions in order to prosecute this case was a significant contribution to the class. *Id.*

[12] This process was so invasive that one (former) Named Plaintiff, who had already sat for a deposition and responded to written discovery, chose to dismiss his claims rather than continue to serve as a class representative and have his computer subject to forensic examination. ECF 689-3 (Dec. of Juan Carlos

Finally, the total amount requested for service awards compares favorably to the settlement fund, amounting to far less than 1% of the $115 million settlement fund.[13] *See In re Online DVD*, 779 F.3d 934 at 948 (district court did not abuse its discretion in awarding service awards of $5,000 to each of the nine named plaintiffs, because even though "a $5,000 incentive award is roughly 417 times larger than the $12 individual award" that class members would receive, the incentives awards made up "a mere .17% of the total settlement fund"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *12 (N.D. Cal. Aug. 3, 2016) (approving $450,000 in service awards to 40 named plaintiffs, which amounted to 0.07% of the settlement fund); *Rhom v. Thumbtack, Inc.*, No. 16-CV-02008, 2017 WL 4642409, at *8 (N.D. Cal. Oct. 17, 2017) ("A $5,000 award also equals approximately 1-2% of the total settlement fund, which is consistent with other court-approved enhancements.").

## III.   CONCLUSION

For the forgoing reasons, Plaintiffs' Motion for an award of attorneys' fees, litigation expenses, and service payments should be granted.

Respectfully Submitted,

**ALTSHULER BERZON LLP**
EVE H. CERVANTEZ
JONATHAN WEISSGLASS
DANIELLE LEONARD
MEREDITH JOHNSON
TONY LOPRESTI

Dated:  December 1, 2017                    By: */s/ Eve H. Cervantez*
                                            Eve H. Cervantez

**COHEN MILSTEIN SELLERS & TOLL PLLC**
ANDREW N. FRIEDMAN
GEOFFREY GRABER
SALLY M. HANDMAKER
ERIC KAFKA

Dated:  December 1, 2017                    By: */s/ Andrew N. Friedman*
                                            Andrew N. Friedman

*Lead Plaintiffs' Counsel*

---

Cerro); ECF 695 (Case Management Order dismissing Mr. Cerro).

[13] Plaintiffs seek $597,500 in service awards ($5,000 for 76 of the Named Plaintiffs and $7,500 for 29 of the Named Plaintiffs).  Even using the smallest possible common fund calculation, this would constitute approximately 0.5 percent of $115 million.

**LIEFF CABASER HEIMANN & BERNSTEIN, LLP**
MICHAEL SOBOL
JASON LICHTMAN

**GIRARD GIBBS LLP**
ERIC GIBBS
DAVID BERGER

*Plaintiffs' Steering Committee*

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS
CASE NO. 15-MD-02617-LHK