ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
TONY LOPRESTI (SBN 289269)
tlopresti@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699

*Co-Lead Plaintiffs' Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK (NC) |
| | **DECLARATION OF EVE H. CERVANTEZ IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES** |
| | Date: February 1, 2017 |
| | Time: 1:30 p.m. |
| | Judge: Lucy H. Koh |
| | Crtrm: 8, 4th Floor |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

I, Eve H. Cervantez, declare as follows:

1.      I am a member in good standing of the California State Bar and the bar of this Court, a partner at Altshuler Berzon LLP, and court-appointed Co-Lead Plaintiffs' Counsel in this multi-district litigation. I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.  I submit this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, and in support of Plaintiffs' Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives.

2.      This declaration addresses the following topics:  Section I addresses the strengths of the proposed settlement; Section II addresses attorneys' fees; Section III addresses litigation expenses; Section IV addresses service payments to class representatives; and Section V addresses Altshuler Berzon LLP attorneys fees and expenses.

**I.      The Settlement**

      **A.      <u>Background Leading to Settlement</u>**

3.      As described in more detail below, Plaintiffs' counsel filed four consolidated class action complaints; litigated two rounds of motions to dismiss and 14 discovery motions; reviewed 3.8 million pages of documents; deposed 18 percipient fact witnesses, 62 corporate designees, and six defense experts; produced reports from four experts and defended their depositions; produced over 100 plaintiffs for depositions and produced 29 of those plaintiffs' computers for forensic examinations; exchanged 76 interrogatories, 731 RFAs, and 18 expert reports with Defendants; and fully briefed class certification and related *Daubert* motions.  Defendants were not willing to even begin settlement negotiations until after the parties had completed all of their discovery and were briefing class certification.

4.      While we were briefing class certification, we were also engaging in a series of mediation sessions with Judge Layn R. Phillips (Ret.).  After three full-day mediations over the course of three months – on February 28, April 20, and May 22, 2017 – we still had not reached a deal.  Judge Phillips ultimately made a mediator's proposal, which both sides accepted over Memorial Day weekend.  The parties then spent several weeks preparing the formal settlement agreement now before the Court.  A copy of the Settlement Agreement ("SA"), without exhibits, is attached hereto as Exhibit

1

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

11; the complete copy with exhibits was previously filed at ECF 869-8.  A copy of the Amendment to Settlement Agreement, without exhibits, is attached hereto as Exhibit 12; the complete copy with exhibits was previously filed at ECF 900-2 – 900-6.

5.   As set forth in our class certification motion, had the case not settled, Plaintiffs would have sought both equitable and monetary remedies for class members.  Plaintiffs would have asked the Court to enter an injunction requiring Anthem to implement the security controls recommended by Plaintiffs' expert and maintain the security reforms that Anthem had already begun during this litigation.  Plaintiffs also would have sought extended credit monitoring that was more extensive than the AllClear Services offered by Anthem, including triple-bureau credit monitoring and identity validation monitoring.

6.    Among other theories, Plaintiffs would have sought monetary remedies based on a "benefit of the bargain" theory that would have isolated the value of adequate data security through a conjoint analysis.  Because the parameters of the conjoint surveys would have depended on the classes ultimately certified by the Court, Plaintiffs' expert was prepared to complete the conjoint surveys after one or more classes were certified by the Court.

7.   Had the case not settled, Plaintiffs also would have sought remedies, including equitable remedies, against The Blue Cross and Blue Shield Association ("BCBSA") and 13 Non-Anthem Blue Cross Blue Shield companies.  Following the public announcement of the Anthem data breach, the BCBSA Membership Standards were amended to further define certain guidelines for the protection and cybersecurity of personal information.  For settlement purposes, Plaintiffs determined that this change sufficiently addressed their concerns.

**B.   <u>Proposed Settlement</u>**

8.   Settlement funds will first be used to provide class members who file claims with at least two years of identity fraud prevention and detection services.  Plaintiffs worked with Experian to create a custom product designed specifically to provide protection against the particular threats facing class members, based on the type of personally identifiable information ("PII") exfiltrated in the Anthem data breach.  The product is based on the recommendations submitted by Plaintiffs' expert in support of class certification (*see* Van Dyke Report (ECF 744-25) ¶52), and includes:

(a)   daily monitoring of class members' credit files at all three major credit reporting agencies to detect suspicious activity (such as applications for loans or credit not initiated by the class member);

(b)   internet surveillance, including monitoring the "dark web" to detect the covert sale of class members' PII;

(c)   identity validation monitoring to notify class members if their identity is used to open a new account or to perform an identity validation within the Experian network;

(d)   identity theft insurance, which covers designated identity theft related expenses, including unreimbursed fraud losses and professional services, up to $1 million;

(e)   Experian credit reports available upon request; and

(f)   specific services for class members who are minors, including social security number tracing and internet surveillance.

SA ¶4.1 (ECF 869-8).

9.     By purchasing credit monitoring services in bulk at a discount, the settlement is able to offer very valuable services to class members.  Although the custom product offered to class members is not available to the public, it includes many of the services offered in Experian's retail "IdentityWorks Premium" product, which is sold to the public for $19.99 per month, and more services than Experian's "IdentityWorks Plus" plan, which retails for $9.99 per month.  *See* Ex. 13; https://www.experian.com/consumer-products/identity-theft-and-credit-protection.html.  Assuming conservatively that the value of the Anthem-specific custom product is only $9.99 per month, the credit monitoring portion of the settlement provides a total value to each class member of $239.76 over the course of 24 months (or up to $479.52 should there be sufficient settlement funds remaining to extend credit monitoring for an additional 24 months).  In other words, the total value of the credit monitoring package offered to the class is in the billions of dollars ($9.99 x 24 x 79,150,000).  Even using only the number of claims for credit monitoring that have been filed as of November 30, 2017 (891,431) – a

1   conservative approach, given that the claims deadline is not until January 29, 2018 – the credit

2   monitoring has provided a value of at least $213 million to the class.

3       10.    The Settlement also offers other valuable benefits, including alternate compensation for

4   class members who already have credit monitoring services and do not want further services,

5   reimbursement for out-of-pocket costs incurred as a result of the data breach, and fraud resolution

6   services provided by Experian fraud resolution specialists for any class members who needs such

7   services within two years of final approval (even for class members who fail to file a claim).

8       11.    Documents produced in discovery revealed that Anthem has retained class members' PII

9   in its databases after the data breach, even for those class members who are no longer Anthem or Blue

10  Cross Blue Shield customers.  The settlement vastly reduces the vulnerability of that PII by mandating

11  a major investment in cybersecurity, and requiring that Anthem take specific measures that fill the

12  cybersecurity gaps that Plaintiffs and their expert believe allowed the data breach to occur.

13      12.    The settlement requires that Anthem spend ███████████ per year for three years,

14  for a total of ████████.  SA Ex. 2 (ECF 869-11) ¶8.  Documents produced in discovery revealed that

15  Anthem's spending on cybersecurity prior to the data breach was approximately ███████ per year.

16  Assuming that Anthem maintained that level of spending during the first three years of the proposed

17  settlement term, Anthem would have spent only ████████ on cybersecurity.  Thus, the proposed

18  settlement includes an additional ████████ of investment in cybersecurity measures aimed at

19  protecting class members' PII.

20      13.    Due to the large size of the class and the importance of encouraging class members to

21  sign up for credit monitoring services, the costs of notice and settlement administration have been

22  substantial and are expected to reach approximately $23 million.  In addition to mail, email, and

23  publication notice, the settlement provided for an expansive, targeted social media advertisement

24  campaign that included the purchase of over 180 million advertising "impressions" spread across

25  Twitter, LinkedIn, Google Display Network, and Facebook.  The advertisements linked to the

26  settlement website, where people can enter their name and date of birth or address to determine whether

27  they are class members, and then file a claim for credit monitoring services or other settlement benefits.

28  This social media campaign is specifically designed to reach the over 23 million people for whom

4

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named
Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

1    Anthem did not have contact information and who may not have otherwise learned that they were

2    victims of the breach and should take steps to protect themselves.

3            **C.**        **The Proposed Settlement is Favorable for the Class**

4           14.      I believe that the proposed settlement is extraordinarily beneficial to the class.  By

5    settling now, the class can take advantage of remedies that, as a practical matter, would be unavailable

6    or worth substantially less by the time this case could be litigated to a final judgment.  Our expert on

7    identity theft and fraud protection has explained that credit monitoring services are most critical in the

8    first five years after the Anthem data breach (ECF 744-22 at ¶46), and the two years of free credit

9    monitoring provided by Anthem expired this year.  Similarly, changes to Anthem's data security

10   practices will be most effective the sooner they are implemented.  By providing class members with

11   extended credit monitoring and requiring enhanced data security now, the proposed settlement helps

12   preserve the confidentiality of class members' private information in ways that a later judgment could

13   not, particularly if Anthem exhausted its appeals.  Absent settlement, counsel might have had to litigate

14   round after round of additional motions – including additional motions to dismiss and motions for class

15   certification – for all of Plaintiffs' hundreds of common law and statutory claims arising under the laws

16   of 50 plus jurisdictions, substantially delaying relief for the class.

17          15.      Additionally, by offering credit monitoring services as part of the Settlement

18   Agreement, we are able to purchase those services in bulk at a fraction of the retail cost that individual

19   class members would pay if they purchased similar services themselves.  Absent a settlement, there is

20   nothing class members can individually do to make the PII stored in Anthem's databases more secure,

21   and the only way that they could obtain credit monitoring is to purchase it themselves—at the high

22   retail cost of $9 to $20 per month (which they might not be able to afford).

23          16.      Based on my knowledge of this case, and knowledge of the claims rate in other data

24   breach cases, I believe that the $15 million allocated for out-of-pocket reimbursements will be more

25   than enough to accommodate all documented out-of-pocket claims.  Similarly, offering class members

26   who already have credit monitoring services a payment of up to $50 is fair, given the range of

27   values/damages that might have been awarded (discussed below), had we tried the case and prevailed.

28

17.     I believe that the proposed settlement is a particularly favorable one for the class considering the risks of further litigation.  I believe that Plaintiffs built a strong case for liability and that Plaintiffs had a reasonably good chance of proving that Anthem's data security was inadequate.  I also believe that if Plaintiffs had established that central factual issue, Anthem would likely be found liable under at least some of the liability theories and state laws that Plaintiffs pled in their operative complaint.  However, the liability case was far from ironclad.  Among other things, there is little directly analogous data breach litigation precedent to rely on, and the path to a class-wide monetary judgment in a data breach case remains untrodden.

18.     I believe that Plaintiffs' damages theories stood a good chance of succeeding in some form, as we had withstood vigorous legal challenges at the motion to dismiss stage, and supported our theories with reports from highly qualified experts.  However, while Plaintiffs' theories were sound in principle, their application to data breach litigation was untested beyond the pleading stage.  The scope of damages depended in large part on the scope of class certification, which had yet to be decided. The Benefit of the Bargain theory depended upon the results of a conjoint study that could not be completed until after class certification, and there was no guarantee that the results of the study would ultimately have yielded a result showing this type of damage at all.  And it is possible that both the Benefit of the Bargain theory and the Loss of Value of PII theory could yield large numbers that would be unpalatable to a jury.  If applied across all potential class members, Plaintiffs' most conservative measure (based on black-market rates of at least $4 per individual) would yield a figure of $316 million or more, while the most expansive measure (based on at least $9 of monthly credit monitoring costs) would yield much higher numbers.  While the legal theory behind the larger numbers may be sound, it is untested, and, as a practical matter, I, along with my co-lead counsel, recognize that taking such large numbers to a jury presents substantial strategic risks.

19.     Due to the extensive discovery we undertook, along with briefing two motions to dismiss and class certification, I, along with my co-lead counsel and the other members of Plaintiffs' Steering Committee, know the strengths and weakness of the class claims in this litigation.  We have worked extensively with experts to value those claims and to understand the business practice changes necessary to protect class members' data in the future, and are well-equipped to negotiate a settlement

6

on behalf of the class.  In addition, Plaintiffs' discovery and working with cybersecurity experts has provided me, along with my co-lead counsel and the members of Plaintiffs' Steering Committee, with a deep understanding of Anthem's highly complex IT systems, the numerous technical and administrative controls involved in Anthem's data security system, and the deficiencies within that system that Plaintiffs sought to remedy through this action.  The specific cybersecurity improvements called for in the settlement were derived in consultation with security experts based on Plaintiffs' extensive discovery, and squarely address the inadequate security that Plaintiffs had focused on in the litigation.

20.     In conclusion, I believe the proposed settlement is extremely beneficial for class members and is a very good deal for them.  I respectfully recommend that the Court approve it.

## II.     Attorneys' Fees

### A.     Work on the Case

21.     I, along with my co-lead counsel, the members of Plaintiffs' Steering Committee, and additional Plaintiffs' counsel who filed cases that have been consolidated in this MDL, have represented Plaintiffs and putative class members for almost three years.  Collectively, Plaintiffs' Counsel have devoted 78,553 hours to litigating this case, with a reasonable lodestar as of September 30, 2017 of $37,832,349.  Accordingly, Plaintiffs seek 33% of the Settlement Fund ($37,950,000) for their attorneys' fees, which represents a multiplier of under 1.1, and is considerably less than the 1.75 multiplier Counsel promised not to exceed at the inception of this case.  ECF 190.  By the final approval hearing on February 1, 2018, our reasonable lodestar will have increased due to the time spent briefing and arguing final approval and overseeing the notice and claims process, and we will likely have a negative multiplier to our lodestar.

22.     We made every effort to litigate this complex case efficiently and effectively.  In keeping with this Court's decision that we should run the case with a small core group of counsel with in-depth knowledge of the case, a majority of work on the case (48,878 hours, with a reasonable lodestar value of $24,228,470.50) was performed by attorneys and staff at one of the four law firms this Court appointed Co-Lead Counsel or Plaintiffs' Steering Committee ("PSC").  In general, Co-lead counsel Andrew Friedman and I oversaw the litigation, made final strategy decisions, and drafted,

edited, reviewed, and/or approved all filings and correspondence with opposing counsel.  Aided by PSC members Eric Gibbs and Michael Sobol, we delegated oversight for specific projects or work to more junior partners or senior associates within our four firms when possible.  To insure that all attorneys kept on task and understood the big picture strategy into which their individual assignments fit, we held weekly conference calls that were typically less than one hour for just those attorneys within our four firms who were actively working on the case at any given time.  Each call was preceded by a written agenda, and followed by a written task list to ensure that all necessary work was completed in a timely and efficient manner.

23.     Although Lead Counsel assigned a majority of work to the four Lead Counsel and PSC firms so that a core group of attorneys with an in-depth knowledge of the factual and legal issues could litigate the case efficiently without having to constantly get new lawyers up to speed, in keeping with this Court's Orders (ECF 284, 286), Lead Counsel also strategically used firms throughout the country to locate and interview prospective plaintiffs, review and analyze documents, take and defend depositions, and contribute specialized expertise (on topics such as ERISA, experts, and the federal contract).

24.     We faced formidable adversaries in the three law firms hired by Anthem and the majority of the Non-Anthem Defendants, and the law firm representing the Blue Cross Blue Shield Association and HCSC, all of which had significant class action litigation defense experience. Defendants vigorously contested both class certification and liability and devoted substantial resources to the defense, including staffing calls with multiple attorneys, sending multiple attorneys to court hearings, and deposing all but one of the over 100 Named Plaintiffs.  At almost every hearing, and at many telephone conference calls and at depositions, the number of defense attorneys exceeded the number of Plaintiffs' attorneys.

25.     One of our first steps after being appointed Co-Lead Counsel was to draft the consolidated amended class action complaint.  Because no single federal or state claim could be asserted on behalf of all class members, we undertook the significant task of researching the laws of 50 states to identify and evaluate potential class claims.  For the most part this research was conducted by the four PSC firms, although we did request help from certain other firms with particular familiarity

1   with the laws of their own states, as well as from three firms that had first developed the federal

2   contract claim.

3       26.     We also had to determine, among the many plaintiffs who had filed underlying MDL

4   cases, who would serve as plaintiffs in the consolidated class action complaint.  Because class members

5   resided in all 50 states (plus D.C. and various U.S. territories), had been insured by one of 43

6   defendants, and had different types of health plans, counsel had to interview many hundreds of class

7   members to locate over 100 suitable Named Plaintiffs and determine which of them could represent

8   which class members on which claims. We knew that Defendants would challenge plaintiffs' typicality

9   and standing on many grounds – claiming that only plaintiffs from a given state could raise claims

10  under that states' laws, that only plaintiffs who had purchased insurance from a given defendant could

11  bring claims against that defendant, that ERISA preemption barred the claims of plaintiffs with

12  employer-purchased insurance, and that plaintiffs with individual, group, or Administrative Services

13  Only ("ASO") contracts were different from one another and could not represent class members with

14  other types of insurance.  *See, e.g.,* ECF 524 at 8-12 (Order denying Defendants' motion to dismiss on

15  standing grounds); ECF 780-4 (Opp. to Mot. for Class Cert. raising standing, typicality, and adequacy

16  arguments).  Accordingly, although we disagreed with Defendants on the merits of their contentions,

17  we needed a very large number of plaintiffs to act as class and subclass representatives, in case this

18  Court agreed with Defendants.  There are now 105 Named Plaintiffs who seek to represent the class as

19  Settlement Class Representatives, but additional Named Plaintiffs were named in one or more of the

20  consolidated complaints that we filed and were subject to discovery, even though they later dismissed

21  their claims for a variety of reasons, such as ill-health or unwillingness to submit to forensic

22  examination of personal computers.  We strategically added only the minimum number of named

23  plaintiffs necessary to withstand a motion to dismiss and opposition to class certification, so as to

24  maximize efficiency and minimize discovery and expense.

25      27.     The law firm of Stueve Siegel Hanson already had the expertise to establish an internet-

26  based secure portal by which attorneys from many firms could submit detailed information about

27  proposed plaintiffs, which allowed us first to gather the facts necessary to determine which plaintiffs to

28  name as proposed class representatives in the consolidated amended complaints, and later to collect

1  information necessary to respond to interrogatories and document requests directed at each Named

2  Plaintiff.  Many MDL counsel who were contacted by putative class members interviewed numerous

3  prospective plaintiffs to find individuals meeting our criteria, and submitted information about their

4  clients through the web portal so that we could decide who would best serve the class.

5      28.     Defendants took discovery from each Named Plaintiff.  Cohen Milstein Partner Geoffrey

6  Graber, and later Senior Associate Sally Handmaker, coordinated this process. Anthem served 33

7  Requests for Document Production and 12 Interrogatories on each Named Plaintiff.  Copies of

8  Anthem's Requests for Production and Interrogatories are attached hereto as Exhibits 15 and 16,

9  respectively.  Non-Anthem Defendants Blue Cross Blue Shield Association and HCSC, separately

10  represented by Kirkland & Ellis, served an additional 18 Interrogatories and 33 or 22 Requests for

11  Production of Documents, respectively, on the 14 Plaintiffs who had purchased insurance through

12  them.  See Exhibits 17-19.  To be efficient, we drafted uniform objections, and assigned a team of five

13  attorneys to draft responses along certain lines.  However, we still had to gather individual information

14  from each Named Plaintiff to respond to many of the Interrogatories, and we had to gather, review, and

15  produce relevant documents for each Plaintiff.  Each Named Plaintiff had retained a specific individual

16  MDL counsel, and we relied on each Plaintiff's retained counsel to gather the information necessary to

17  respond to the Interrogatories and to collect and review responsive documents, which they forwarded to

18  us through the Stueve Siegel web portal.

19      29.     Defendants also insisted on deposing each Named Plaintiff.  The parties worked

20  cooperatively to schedule these depositions as efficiently as possible by, for example, designating

21  certain cities as "hubs" for deposition and requesting that Plaintiffs who lived in outlying areas come to

22  these central locations for deposition.  While some of the Plaintiffs were willing to travel long distances

23  to these hubs, this was not possible in all cases, and counsel had to travel to locations as far flung as

24  Roswell, New Mexico; Billings, Montana; Grand Island, Nebraska; and Portland, Maine to defend

25  Plaintiffs' depositions.  We knew that Defendants would attempt to exploit any potential weakness in

26  Plaintiffs' stories in opposition to class certification (*see, e.g.,* ECF 780-4), so proper preparation and

27  defense of these depositions, by attorneys who understood the theories and strategies behind Plaintiffs'

28  claims and Defendants' potential defenses, was very important.  For that reason, partners at Lead

Counsel firms defended the first few Plaintiff depositions, and drafted a lengthy and comprehensive preparation outline for use by other counsel.  Three law firms had been retained by the majority of Plaintiffs, and, after defending one or two depositions with assistance from Co-Lead Counsel firm attorneys, these law firms (Cohen & Malad, Goldman Scarlato, Stueve Siegel) defended the majority of the Named Plaintiffs' depositions.  When a Named Plaintiff was represented by counsel with only one or two clients in the case, and who had not had an opportunity to build up sufficient knowledge of the case, either an attorney from one of the Lead Counsel firms, or an attorney from one of the three firms with the majority of Plaintiffs, assisted in the deposition.  Even though in some cases it was necessary to have three attorneys defending a given Plaintiff's deposition, Plaintiffs have not billed for more than two attorneys' presence at any one deposition.  Defending each deposition required the defending attorney to review that Plaintiffs' Interrogatory responses and documents produced about that Plaintiff (by both Plaintiffs and Defendants), and then to meet with Plaintiff to prepare for the deposition the day before the actual deposition.  This was an extremely time-intensive process.

30.     Plaintiffs' Counsel undertook a massive discovery effort in a very short timeframe. While the parties selected ten bellwether claims, their discovery was not limited to those claims. Instead, Counsel had to complete all discovery for all of Plaintiffs' hundreds of claims against all 43 defendants, as well as discovery on class-wide damages, in a period of less than fifteen months.  This effort required considerable skill, including making strategic decisions about which discovery to prioritize and developing Plaintiffs' class-wide damages theories prior to class certification. Counsel's discovery effort required an enormous amount of time-consuming and high-quality work.

31.     Defendants produced a total of 3.8 million pages of documents, which included technical documents pertaining to data security, complex contracts with self-funded employers, and hundreds of long plan documents.  A large number of MDL attorneys necessarily assisted with the massive document review and coding process, supervised by partners from Plaintiffs' Steering Committee, Nicole Sugnet of Lieff Cabraser and David Berger of Girard Gibbs.  Plaintiffs used a number of systems to foster efficient and effective document review. For example, Plaintiffs used computer-aided review to help determine which documents might be relevant and reviewed those first. Lead Counsel also used an iterative process for document review, whereby PSC attorneys conducted

quality control audits of document coding efforts, and asked those non-PSC attorneys with consistently high-quality work to engage in more sophisticated analysis of documents, including collecting and analyzing documents on particular topics to assist with depositions, experts, and class certification briefing.

32.    Counsel also served 668 Requests for Admission on Anthem and 63 Requests for Admission on the Non-Anthem Defendants and served 26 Interrogatories on Anthem and 20 Interrogatories on the Non-Anthem Defendants.  This written discovery helped tie down many key facts, such as the precise promises set forth in each Defendants' website over time.

33.    Counsel obtained third party discovery from the Office of Personnel Management ("OPM") and the National Association of Insurance Commissioners ("NAIC") and vigorously sought (but did not ultimately obtain) discovery against a third-party cybersecurity expert that had aided Anthem in assessing and responding to the data breach.

34.    Counsel engaged in a deposition marathon, taking or defending 194 depositions across the country over seven months.  Class Counsel deposed 18 percipient fact witnesses, 62 corporate designees, and five experts, while concurrently defending the depositions of over 100 plaintiffs and four experts.  Counsel regularly double-tracked or triple-tracked depositions on the same day to meet the fact discovery deadline.

35.    Plaintiffs took the depositions of 34 Anthem witnesses (percipient and 30(b)(6)).  To foster efficiency, all of these depositions were taken by members of Co-lead Counsel or PSC firms, who already had in depth knowledge of the case.  We divided into teams of attorneys who worked together to share knowledge on related topics—for example, a "technical security" team and a "contract" team.  The majority of Anthem depositions were in Indianapolis, while others were in New York, Washington, D.C., Manchester, New Hampshire, and Cincinnati, Ohio.  Travel was time consuming, especially to locations such as Indianapolis to which there are no direct Bay Area flights.

36.    Between November 14 and December 20, 2016, Plaintiffs took the 30(b)(6) depositions of 13 Non-Anthem Defendants in 13 states.  Most of these depositions involved two or more witnesses over two or more days, in their own far flung headquarters, from Burlington, Vermont to Little Rock, Arkansas to Detroit, Michigan. While Lead Counsel played a significant oversight role in the process,

Lead Counsel was able to select several firms outside of the PSC (many located near the deposition site) to handle most of the Non-Anthem depositions.  To foster efficiency, Co-Lead Plaintiff firm attorneys took the first of the Non-Anthem depositions and created materials to be used by non-PSC attorneys, but each Non-Anthem deposition necessarily required individual review of documents produced by that Defendant, and preparation specific to that Defendant.

37.    Counsel skillfully and tenaciously litigated discovery disputes, which included fourteen discovery motions before this Court (including motions to compel the deposition of Anthem CEO Joe Swedish, to compel the production of class-member level data on premiums and contracts, and to compel discovery of documents withheld by Defendants as privileged) and one discovery motion in the District of Columbia to compel production of federal government documents.  Among other disputes, counsel vigorously opposed Defendants' motion to compel certain Named Plaintiffs to have their computers and tables forensically examined.  After that motion was granted, counsel devoted significant time to coordinating and negotiating the process by which 29 Named Plaintiffs' electronic devices would be examined. Discovery disputes were all handled by Co-Lead Counsel/PSC firms, with the exception of the federal government documents, as to which MDL counsel who had acquired specific expertise with respect to the federal contract (Stull, Stull & Brody and Milberg) assisted.

38.    Plaintiffs also engaged several consulting experts on cybersecurity and Dark Web issues, as well as four testifying experts to prove the merits of the case (Anthem's cybersecurity was substandard), to determine needed injunctive relief (cybersecurity improvements and credit monitoring to protect class members whose PII was taken) and to calculate damages (using a conjoint survey to determine the value of the promised but not delivered data security, determining the black market value of the stolen PII, and determining the cost of needed credit monitoring going forward).  Again, Counsel divided up into teams, with several firms responsible for cybersecurity issues, and others responsible for damages and credit monitoring.  The majority of expert work was handled by Co-Lead Counsel/PSC firms, but we consulted with other firms who had knowledge of specific experts.

39.    Defendants were not interested in discussing settlement until they saw Plaintiffs' class certification brief.  Class certification briefing was a mammoth undertaking, involving legal research

into a variety of complex topics, three expert reports and four rebuttal expert reports, related *Daubert* motions, and 173 exhibits proffered by Plaintiffs.

40.    Plaintiffs' massive discovery effort and extensive work with experts was necessary to arrive at the eventual settlement.  First, counsel mastered extraordinarily technical details about cybersecurity, including facts about Anthem's security and about industry best practices.  Counsel's understanding of this area was critical to drafting targeted discovery requests, conducting effective 30(b)(6) depositions on technical topics, developing affirmative expert testimony set forth in three reports in support of class certification, and, ultimately, requiring appropriate business practice changes from Anthem during the settlement process based on counsel's in-depth knowledge and understanding of the facts.  *See also* ECF 744-17, 744-19, 744-21.

41.    Counsel developed a deep understanding of Anthem's business models and complex insurance products, including its individual and group plans, Medicare plans, Medicaid plans, and ASO plans offered through self-funded employers, among others.  Counsel's understanding enabled them to take effective discovery on Plaintiffs' contract-based claims and show to their satisfaction that Plaintiffs met Rule 23's commonality and predominance requirements.  *See* ECF 743-12 at 26-31; ECF 746-2 (Rule 1006 summary of evidence chart of Anthem contracts).  Counsel's understanding informed their work with expert Peter E. Rossi, who analyzed Anthem's products, submitted two reports in support of class certification, and was prepared to design a conjoint survey to measure damages under Plaintiffs' "Benefit of the Bargain" theory.  *See also* ECF 744-22; 744-23.

42.    Counsel developed in-depth knowledge of issues related to identity theft and credit monitoring, including the risks associated with theft of PII and the most effective remedies to prevent fraud following such theft.  Counsel drew upon this knowledge as they developed theories of class member damages, crafted corresponding injunctive relief requests for credit monitoring, provided the Court with expert reports in support of class certification, and crafted a custom monitoring product to provide to the class in settlement. ECF 744-25, 744-27, 744-28.

43.    Negotiating the settlement was itself a very time-consuming and labor-intensive project. The parties exchanged several rounds of mediation briefs, and met with mediator Layn Phillips for three full days.  In addition to negotiating the settlement agreement with Anthem, and drafting and

negotiating the format for the various notices and claims forms, Counsel also had to obtain bids and

negotiate with several claims administrators for notice and administration services, and had to obtain

bids and negotiate with several vendors of credit monitoring services to arrive at the best product for

the best price for the class.  All of this work was performed by Co-Lead Counsel/PSC firms.  Non-PSC

firms assisted with particular information about other settlements in which they had been involved, as

well as serving as points of contact with Named Plaintiffs to discuss settlement issues with them.

### B. **Lodestar**

44.     I exercised sound billing judgment to ensure that only justifiable, common benefit time

is included in the claimed lodestar.  I required all firms to submit time on a monthly basis to ensure that

it was contemporaneously recorded.  *See* ECF 46 (Order on Billing).  I also carefully defined the

universe of time that could be billed, as set forth in three memos sent to all counsel.  *See, e.g.,* ECF

190-1. For example, the combined lodestar does not include the time that attorneys spent researching

and drafting the 100-plus underlying complaints that were eventually consolidated in the MDL, briefing

and arguing before the Judicial Panel on Multi-District Litigation, filing applications for leadership

positions, or traveling to the Initial Case Management Conference, despite the fact that this was time

necessarily spent by each law firm.  Similarly, attorneys not working on a particular task were not

permitted to bill for reviewing briefs or pleadings.  Counsel did not bill for more than two attorneys at

any deposition or hearing, even when more than two attorneys were actually present.[1]  The lodestar also

does not include any time reviewing fees, or researching and drafting this application for attorneys'

fees.

45.     The lodestar presented here is through only September 30, 2017.  Plaintiffs may submit

additional time in their reply brief to account for the additional time spent drafting and filing the Final

Approval brief and working with class members and the Settlement Administrator to facilitate class

members' ability to file claims.  Even then, Counsel will not be able to present to the Court all the time

that Counsel has and will spend with class members and the Settlement Administrator to finish the

claims process.

---

[1] The only exception to this rule is when there were hearings that involved multiple motions, in which case there were sometimes more than two attorneys who had taken the lead in preparing and arguing those motions.

46.     I personally reviewed all time submitted, line by line, for every single law firm, to remove or reduce duplicative and excessive billing entries.  I reviewed each firm's time at least twice. The first time I sent it back to the firm with general directions to eliminate certain types of time that were not deemed common benefit compensable time.  Each firm submitted revised time in accordance with my directions.  I then reviewed the time again, line by line, and deleted any time that was not common benefit compensable time, or that appeared excessive. For example, for all firms submitting time for document review, I compared the lodestar time claimed for document review to the number of documents reviewed by that attorney/firm.  I am familiar with each firm's contribution in terms of locating plaintiffs, responding to discovery on behalf of their clients, defending or taking depositions, or contributing research or writing with respect to specific areas of expertise, and assured myself that the time claimed for each task for each firm was reasonable.

47.     I also took measures to reduce the billing rates that figure into the lodestar.  Although Plaintiffs could have pursued the relatively high Northern District of California rate for all attorneys, we did not do so.  Instead, I directed attorneys to bill at their own prevailing market rate.  In many cases these rates were lower than Northern District of California rates. I and an associate working under my direction carefully scrutinized each firm's rates to insure that each firm had support for its rates, including court orders approving that firm's rates, or the rates of generally comparable firms.  I am generally familiar with the rates charged by attorneys of comparable experience and expertise in the Northern District of California, including the rates charged by the four Co-Lead and PSC firms, which have been repeatedly approved by courts within this district, including by this Court.  I capped non-PSC firm rates at the rates billed by Co-Lead Counsel and/or Plaintiffs' Steering Committee firms absent a court order approving a higher rate.[2]

48.     Class Counsel's blended rate for all timekeepers in this case is $481.62.  We calculated the blended rate by taking the total lodestar and dividing it by the total number of hours worked by all of the timekeepers (partners, non-partner attorneys, paralegals, and other professionals).  The rates for

---

[2] I capped rates for the following firms at PSC rates: Branstetter, Stranch & Jennings; Consumer Law Practice of Dan LeBel; and Litigation Law Group.  In capping these firms' rates, I was not making any judgment that their customary rates were not reasonable, but capped their rates solely because they did not have a court order approving their higher rates.

timekeepers range from $400 to $970 for partners; $185 to $850 for non-partner attorneys; and $95 to $440 for all other timekeepers.

49. After I reviewed and excised time in the exercise of billing judgment and lowered billing rates as described above, the combined total reasonable lodestar for work on this case through September 30, 2017 is $37,832,349, representing 78,553 hours of legal work.  Of this lodestar, $24,228,470.50, or 64%, was contributed by Lead Counsel/PSC firms, with the remainder coming from other MDL law firms.

50. The following chart summarizes each firm's hours and lodestar:

| Firm | Total Firm Hours | Total Lodestar |
|---|---|---|
| Abington Cole & Ellery LLP | 22.60 | $ 12,430.00 |
| Altshuler Berzon LLP | 11,088.30 | $ 6,509,819.50 |
| Barrack, Rodos & Bacine | 1,312.50 | $ 653,171.50 |
| Berger & Montague, P.C. | 184.00 | $ 114,831.50 |
| Bonnett, Fairbourn, Friedman & Balint. P.C. | 1,143.40 | $ 443,085.00 |
| Boucher LLP | 801.30 | $ 198,754.00 |
| Branstetter, Stranch & Jennings, PLLC | 2,196.30 | $977,342.00 |
| Cafferty, Clobes, Meriwether & Sprengel LLP | 5.50 | $3,632.50 |
| Carlson, Lynch, Sweet, Kilpela & Carpenter LLP | 205.80 | $ 77,197.50 |
| Chestnut Cambronne Attorneys at Law | 16.80 | $8,715.00 |
| Cohen & Malad | 2,253.80 | $ 1,040,895.00 |
| Cohen Milstein Sellers & Toll | 16,350.90 | $7,719,178.50 |
| Consumer Law Practice of Dan LeBel | 16.60 | $ 8,531.00 |
| Cotchett Pitre & McCarthy LLP | 32.10 | $ 12,840.00 |
| Desai Law Firm PC | 8.10 | $4,175.00 |

| | | |
|---|---|---|
| Emerson Scott LLP | 113.50 | $ 74,099.50 |
| Fagan Emert & Davis LLC | 19.90 | $ 7,960.00 |
| Farmer, Jaffe, Weissing LLP | 31.60 | $16,410.00 |
| Federman & Sherwood | 316.10 | $180,795.00 |
| Finkelstein Thompson LLP | 19.40 | $ 13,530.00 |
| Fitapelli & Schaffer LLP | 17.90 | $ 4,800.00 |
| Forbes Law Group | 310.50 | $ 116,405.00 |
| Gibbs Law Group LLP | 10,844.20 | $ 4,902,419.50 |
| Goldman Scarlato & Penny PC | 2,006.90 | $ 1,295,152.50 |
| Harwood Feffer LLP | 24.00 | $ 18,600.00 |
| Heins Mills & Olson PLC | 665.00 | $254,815.00 |
| Janet, Jenner & Suggs, LLC | 20.30 | $6,885.00 |
| Kantrowitz, Goldhamer & Graifman, P.C. | 182.60 | $ 94,092.50 |
| Kaplan, Fox, & Kilsheimer LLP | 367.70 | $184,459.50 |
| Karon LLC | 10.30 | $6,508.50 |
| Keller Rohrback Law Offices LLP | 3,607.00 | $1,521,311.00 |
| Law Offices of Paul C. Whalen, P.C. | 133.10 | $106,480.00 |
| Law Office of Angela Edwards | 191.00 | $ 100,275.00 |
| Levi & Korsinsky LLP | 176.10 | $ 97,039.50 |
| Lieff Cabraser Heimann & Berstein | 10,594.6 | $ 5,097,053.00 |
| Litigation Law Group | 8.60 | $5,195.00 |
| Lockridge Grindal Nauen PLLP | 410.40 | $138,920.00 |
| Milberg LLP | 719.0 | $302,157.50 |
| Morgan & Morgan | 692.00 | $ 353,080.00 |
| Murray Law Firm | 576.70 | $203,745.00 |
| Pomerantz LLP | 1,109.70 | $528,869.00 |

| | | |
|---|---|---|
| Robinson Calcagnie Robinson Shapiro Davis, Inc. | 370.50 | $ 203,270.00 |
| Schubert Jonckheer & Kolbe LLP | 3,808.30 | $ 1,423,234.00 |
| Scott + Scott LLP | 547.90 | $ 219,970.00 |
| Skepnek Law Firm | 107.40 | $ 60,015.00 |
| Stritmatter Kessler Whelan Koehler Moore Kahler | 175.80 | $ 77,250.00 |
| Stueve, Siegel, Hanson LLP | 2,244.10 | $ 953,503.50 |
| Stull, Stull & Brody | 1,537.90 | $ 1,059,189.00 |
| The Giatras Law Firm | 28.30 | $7,895.00 |
| Tousley, Brain Stephens | 10.70 | $ 6,096.50 |
| Webb, Klase & Lemond LLC | 238.50 | $ 127,192.50 |
| Weitz & Luxenburg, P.C. | 135.40 | $61,435.00 |
| Zimmerman Reed LLP | 542.10 | $217,643.50 |
| **TOTAL** | **78,553.00** | **$37,832,349.00** |

51.     A detailed chart showing each firm, and within that firm each biller, their title, law school graduation year, their rates and hours billed, and their lodestar is attached as Exhibit 1.

52.     In order to further aid the Court in analyzing counsel's billing records, all firms were instructed to assign work on the case to specific task codes.  When I reviewed each firm's time entries, I also corrected those task codes, to the extent necessary.  Firms billed to the following task codes:

Task Code 1:  Identifying and communicating with potential plaintiffs and with Plaintiffs. Many MDL firms contributed needed time to this category of work, with one firm, Stueve Siegel, helping to coordinate all Plaintiff information.  Altogether, counsel spent 2,552 hours on this task, with 284 hours contributed by Co-Lead/PSC firms and 2,268 hours contributed by non-PSC firms.

Task Code 2:  Review of documents produced by Defendants.  Many firms assisted with document review, supervised by members of Co-Lead/PSC firms.  Altogether, counsel spent 34,262

19

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

hours, with 15,928 hours contributed by Co-Lead/PSC firms and 18,334 hours contributed by non-PSC firms, to document review (including oversight of the process).

Task Code 3: Factual investigation.  In addition to formal discovery, counsel used additional methods to gather factual background about the case, including through internet and investigator research.  Most factual investigation was carried out by Co-Lead and PSC firms, but a few non-PSC firms also contributed to this effort, especially in areas of particular expertise, such as the federal contract or ERISA.  Altogether, counsel spent 842 hours, with 739 hours contributed by Co-Lead/PSC firms and 104 hours contributed by non-PSC firms, on factual investigation outside of formal discovery.

Task Code 4: Discovery (other than depositions and review of Defendants' documents).  Most written discovery was conducted by Co-Lead and PSC firms, but each firm whose client was named as a class representative in one of the consolidated complaints worked with their client to respond to interrogatories and document requests and oversee the forensic examination of their clients' computers.  Altogether, counsel spent 7,405 hours, with 5,276 hours contributed by Co-Lead/PSC firms and 2,129 hours contributed by non-PSC firms, on discovery other than document review and depositions.

Task Code 5: Depositions.  Co-Lead and PSC firms took all the Anthem depositions, while non-PSC firms took some Non-Anthem Depositions and defended their client/Named Plaintiffs' depositions.  Altogether, counsel spent 13,871 hours, with 8,858 hours contributed by Co-Lead/PSC firms and 5,013 hours contributed by non-PSC firms, on depositions.

Task Code 6: Pleadings and Briefs.  Plaintiffs filed four consolidated class action complaints, opposed two rounds of motions to dismiss (four separate motions, as Non-Anthem Defendants filed their own motions to dismiss), filed 12 Case Management Statements, 14 joint discovery letter briefs, and numerous sealing motions and miscellaneous stipulations.  Most pleadings and briefs were drafted by Co-Lead or PSC firms, with assistance from non-PSC firms on specific topics such as ERISA and the federal contract, and with respect to their clients/named plaintiffs (*i.e.* specific paragraphs of the complaint describing named plaintiffs).  Altogether, counsel spent 7,336 hours, with 6,159 hours contributed by Co-Lead/PSC firms and 1,177 hours contributed by non-PSC firms, on pleadings and briefs (other than class certification).

Task Code 7: Experts.  Plaintiffs engaged several consulting experts and four testifying experts, who produced a total of seven reports.  Plaintiffs deposed five Defendants' experts, defended four expert depositions, drafted three *Daubert* motions, and opposed three *Daubert* motions.  Most of this work was performed by Co-Lead/PSC firms, but some non-PSC firms contributed with respect to their areas of expertise.  Altogether, counsel spent 3,125 hours, with 3,014 hours contributed by Co-Lead/PSC firms and 111 hours contributed by non-PSC firms.

Task Code 8: Preparation for and appearance at court hearings (including before this Court and before Magistrate Judge Cousins).  Altogether, counsel spent 1,061 hours, with 996 hours contributed by Co-Lead/PSC firms and 64 hours contributed by non-PSC firms (for example, arguing the motion to compel at the district court in Washington D.C. with respect to federal government contracts).

Task Code 9: Litigation Strategy and Analysis.  In addition to legal research with respect to specified briefs, counsel necessarily engaged in overall litigation strategy and analysis.  Altogether, counsel spent 887 hours, with 679 hours contributed by Co-Lead/PSC firms and 207 hours contributed by non-PSC firms.

Task Code 10: Class Certification.  Co-Lead/PSC firms primarily researched and drafted the motion for class certification and reply brief, although non-PSC firms contributed to the extent that one of their clients/Named Plaintiffs was called upon to provide a declaration.  Altogether, counsel spent 3,379 hours on class certification, with 3,343 hours contributed by Co-Lead/PSC firms and 35 hours contributed by non-PSC firms.

Task Code 11: Settlement.  Co-Lead/PSC firms mediated the case, drafted all settlement documentation and briefs, and have been working with the Settlement Administrator to oversee the notice and claims process (including responding to class member inquiries).  Non-PSC firms contributed by notifying Named Plaintiff clients about the settlement, and, in some cases, offering expertise with respect to a certain aspect of the settlement.  Altogether, counsel spent 2,484 hours, with 2,323 hours contributed by Co-Lead/PSC firms and 161 hours contributed by non-PSC firms, on settlement to date.  This work is necessarily continuing.

Task Code 12: Clerical.  Clerical work was occasionally billed by paralegals primarily for large logistical tasks, such as collecting and sorting all the 100-plus underlying MDL actions or organizing

21

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

deposition transcripts and exhibits.  Basic clerical work such as file maintenance, electronic filing with the Court, and preparing courtesy copies for the Court, was not billed.  Altogether, counsel spent 211 hours, with 142 hours contributed by Co-Lead/PSC firms and 69 hours contributed by non-PSC firms, for necessary complex clerical work.

Task Code 13: Miscellaneous.  Counsel tried not to bill anything to miscellaneous but there were some necessary tasks that did not fall into any other category.  Altogether, counsel spent 21 hours, with 18 hours contributed by Co-Lead/PSC firms and 3 hours contributed by non-PSC firms, to tasks that did not fall easily into one of the other categories.

Task Code 14: Case management.  Co-Lead and PSC firms necessarily communicated with one another frequently, including weekly conference calls for which Mr. Friedman or I prepared an agenda and a follow up task list.  Co-Lead Counsel also communicated with opposing counsel on numerous issues.   Altogether, Co-Lead/PSC firms spent 1,119 hours on case management.

53.     A detailed chart showing the task billing breakdown for all firms is attached hereto as Exhibit 2.

54.     Exhibit 3 contains detailed information for each firm that contributed compensable, common benefit time to the case, including information on that firm's billers, rates, and tasks performed, along with judicial orders justifying the rates that each firm billed, or comparable rates.  Exhibit 3 also includes the URL for each firm's website, which provides additional background information regarding the firms' experience and expertise.

55.     Pursuant to the Northern District of California guidelines on class action settlements, I am not submitting each firm's detailed lodestar at this time.  The detailed fee records, which I reviewed line by line, occupy approximately a bankers' box of single spaced, double sided time entries.  The fee records are available to be submitted to the Court, at the Court's request.  I estimate it would take several staff members working full time for at least two weeks to review the time entries line by line in order to redact all the material that would need to be redacted before the detailed time records could be publicly filed.  Redactions would have to be applied to descriptions of privileged information (i.e. the topic of conversations with Named Plaintiffs and other class members), work product information (i.e. the subject of each research assignment or strategy discussion) and any confidential material covered

by a protective order in this case (i.e. descriptions of hot documents or perceived flaws in Anthem's cybersecurity).

### III.    Litigation Expenses

56.    Exhibits 4 through 10 provide an accounting of expenses by category, all of which were necessary to the effective representation of the class, and all of which are expenses that would normally be charged to a fee-paying client.  The total incurred expenses to date, $1,999,638, are less than the maximum negotiated amount in the Settlement Agreement.  Ex. 11, SA ¶12.1 (setting maximum expenses at $3 million).  We will submit updated expenses in our reply brief, including travel and any necessary expert expenses associated with Plaintiffs' motion for final approval.  I expect, however, that even with these updates, the total expenses will be well below the $3 million maximum.

57.    The extensive discovery in this litigation generated substantial costs.  For instance, Defendants deposed over 100 Named Plaintiffs, and counsel took almost 100 depositions of Defendants' witnesses.  In addition to court reporting costs, these depositions required extensive travel because named Plaintiffs are spread throughout the country, most Anthem representative depositions took place in Indianapolis, where Anthem is headquartered, and Non-Anthem depositions took place at their headquarter cities in 13 different states around the country.  Plaintiffs were also required to retain an electronic document depository vendor to store and manage the huge number of produced documents.  Plaintiffs incurred substantial expenses associated with retention of four testifying experts, who submitted reports and were deposed, as well as several consulting experts.  Mediation over three full days was also costly.  To assist class members during the claims filing process, counsel also established a phone center to provide live telephone support.  Counsel also incurred expenses for filing fees, although we are not seeking reimbursement for filing fees connected with the 100-plus underlying MDL actions, but only filing fees necessarily incurred later in the case; *i.e.*, when complaints had to be filed in specified jurisdictions to avoid Defendants' threatened motions to dismiss for lack of personal jurisdiction in the Northern District of California.  *See* ECF 402-409.  Counsel also incurred costs for legal research, mailing, overnight, and courier services, long distance telephone calls, printing and copying, overtime charges for staff, and other miscellaneous expenses, all of which were necessary to the effective litigation of the case, and represent expenses typically charged to paying clients.  These

expenses are standard litigation expenses. Many firms incurred costs related to their representation of Named Plaintiffs, including telephone, copying, postage, and FedEx costs for communicating with Named Plaintiffs and responding to discovery requests.

58.      In order to control and monitor costs, I established a cost fund, to which Co-Lead Counsel, PSC firms, and some non-PSC firms contributed.  All major expenses, including expert fees, transcripts, document depository, mediation, call center, and some outside copying, courier and filing fees, were paid from the cost fund. Exhibit 5 provides detail for all expenses paid by or incurred by the cost fund.  As of November 29, 2017, the cost fund has paid out expenses of $1,130,568 and incurred an additional $312,796 in invoices that will be paid after this filing.  The grand total for cost fund costs as of November 29, 2017 is $1,443,363.

59.      Each firm also tracked its own internal expenses, including travel, copying costs, legal research fees, postage and delivery fees, and telephone calls.  An attorney at my firm, working under my supervision, carefully scrutinized each firm's submitted costs, and deleted all costs that were not for the common benefit.  For example, firms were not permitted to charge for filing any of the initial 100 plus MDL complaints, for travel to the JPML hearing, or – other than Interim Lead Counsel – for travel to this Court's Initial Case Management Conferences.  Firms that were not Co-Lead/PSC firms did not charge for copies of pleadings or other case documents.  Those firms for the most part charged costs only for communicating with Named Plaintiffs (including collecting documents) and depositions (including copying exhibits and travel costs), with legal research costs only as specifically assigned by Co-Lead Counsel.  Exhibits 6-10 contain summaries of the internal expenses charged by each firm, as well as the detailed expense information for each firm.

60.      An important component of the business practice changes agreed upon by Anthem is Anthem's retention of an outside expert to conduct an annual cybersecurity review, and to provide that report to Class Counsel. Counsel will necessarily engage a cybersecurity expert to review that report to insure that Anthem is indeed fulfilling its obligations under the settlement.  Class Counsel expect to pay their cybersecurity expert between $10,000 and $20,000 per report reviewed, for a total expected cost of up to $60,000.  Counsel respectfully request that the Court allow these costs to be kept in reserve by

the Settlement Administrator, to be paid as invoiced. Any amount not used would go to extend the period of credit monitoring or to the *cy pres* recipients.

61.     The following chart summarizes the expenses for which Counsel seek reimbursement:

| **Category** | **Amount** |
| --- | --- |
| Experts (not including $60,000 in reserved costs for expert monitoring) | $840,969.37 |
| Travel (lodging, meals, transportation) | $354,018.35 |
| Transcripts | $251,224.79 |
| Document Management | $218,164.53 |
| Photocopy/Print/Facsimile | $105,204.04 |
| Mediation Services | $69,987.47 |
| Call Center | $56,250.00 |
| Online Legal Research | $54,825.91 |
| Courier/Overnight Deliveries | $16,432.06 |
| Telephone | $8,332.01 |
| Service of Process | $8,178.12 |
| Miscellaneous | $4,595.29 |
| Secretarial Overtime | $3,348.62 |
| Filing Fees | $3,146.00 |
| Outside Copy Service | $2,729.69 |
| Court Electronic Fees (PACER) | $1,804.40 |
| Postage | $427.12 |
| **TOTAL** | **$1,999,637.77** |

## IV.     Named Plaintiff Service Awards

62.     The Named Plaintiffs in this Action played a significant role from the onset of the case through Preliminary Approval of the Settlement.

25

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

63.     At the onset of the litigation, the Named Plaintiffs participated in lengthy fact-finding interviews with Plaintiffs' Counsel, which helped chart the course of the litigation.  All of the Named Plaintiffs reviewed complaint allegations about themselves for accuracy.

64.     The Named Plaintiffs also responded to multiple discovery requests.   The Named Plaintiffs each responded to 33 Requests for Production from the Anthem Defendants and 12 Interrogatories from the Anthem Defendants.  Ex. 15-16.  Additionally, 10 Named Plaintiffs also responded to 12 additional Interrogatories from Non-Anthem Defendant HCSC, and to between 27 and 33 Requests for Production of documents from HCSC or BCBSA.  Ex. 17-19.

65.     All but one of the Named Plaintiffs sat for half- or full-day depositions, some of which required driving or flying to a central deposition location.  The only Named Plaintiff who was not deposed was abroad taking care of a parent with a health issue in the Philippines during the relevant time period.  In addition to sitting for the depositions themselves, Named Plaintiffs participated in lengthy preparation sessions with Class Counsel.  Participating in the preparation sessions and depositions required several Named Plaintiffs to take time off work, travel significant distances by car or plane (sometimes necessitating an overnight stay), and/or to obtain alternate child care.  Moreover, the ten Named Plaintiffs who were insured by Non-Anthem Defendant HCSC were subjected to questioning by a second set of defense attorneys, significantly prolonging their depositions.

66.     The depositions all included highly invasive questions, including inquiries into the Named Plaintiffs' personal habits regarding the security of their homes, cars, email, financial accounts, and other private matters.  In some instances, Defendants even asked whether Plaintiffs had accounts on Ashley Madison (a website that enables extra-marital affairs) or required them to state their Social Security numbers on the record – a particularly troubling question for individuals who were suing over loss of just this type of information, and did not want to divulge it to others, such as court reporters.  Named Plaintiffs' willingness to give sworn testimony on such invasive and potentially embarrassing questions in order to prosecute this case was a significant contribution to the case.

67.     In addition, 29 Named Plaintiffs were subject to highly invasive and unprecedented forensic examinations of their computers and tablets.  This multi-step process involved the Named Plaintiffs speaking with Class Counsel to provide information about the devices in their possession, one

or more pre-collection phone calls with an independent forensic examiner, and the collection process itself.  The collection process necessitated that the Named Plaintiffs either (1) allow an outside party to enter their homes to run imaging software, (2) turn over their computers and tablets to a third party for scanning at an off-site location, or (3) participate in one or more telephone conferences with a third party to remotely run software that took an image of the data on their personal computers and tablets. Once the collection was complete, exact copies of the contents of the Named Plaintiffs' computers and tablets were placed in the hands of a third party for review and analysis.  This highly invasive process was extremely time-consuming for the Named Plaintiffs (some scans took upwards of 10 or 12 hours or took place over the course of days) and required them to be without their devices during that time period.  The Named Plaintiffs' participation in this highly unusual process was above and beyond what most class members are asked to do in litigation.

68.     The Named Plaintiffs also participated in numerous conferences and meetings with Plaintiffs' Counsel and stayed informed of significant developments in the case.  A total of 15 Named Plaintiffs submitted declarations in support of class certification.  I personally consulted with several Named Plaintiffs about their goals for settlement of this action, and they remained "on call" throughout the three days of mediation and afterwards during negotiation of the settlement documents, should we need to consult with them about any particulars, with respect to credit monitoring services or otherwise.

69.     The Named Plaintiffs were all prepared to attend trial should the case not be resolved in mediation.

70.     Without the significant efforts of the Named Plaintiffs, Class Counsel would not have been able to negotiate the excellent settlement before this Court that will benefit all Class Members.

**V.     <u>Altshuler Berzon Attorney Time and Expenses</u>**

71.     Altshuler Berzon poured over 11,000 hours of work into the litigation, at times with multiple attorneys working full-time on the case – with no certainty we would ever be paid for that work.  In particular, I worked almost full time on this case for two years, with an additional partner (Danielle Leonard) and associate (Meredith Johnson) working between 50% and full time on this case for approximately two years as well.  A third partner (Jonathan Weissglass) and second associate (Tony LoPresti) also contributed substantial time to the case.  Accordingly, almost one-quarter of our firm's

attorneys were unable to work on other matters, including matters involving paying clients, for several years.

72.     Together with Co-Lead Counsel Andrew Friedman, I oversaw every aspect of this litigation, including strategic decisions with respect to selection of named plaintiffs, what written discovery and depositions to pursue, selection of experts, legal theories and arguments, attorney assignments, briefing, and settlement.  I also drafted, revised, or approved all communications with opposing counsel and all filings with the Court.  I appeared and argued at all case management conferences, the preliminary approval hearing, and other hearings before this Court, and at the majority of discovery hearings before Magistrate Judge Cousins.  As described above, I was chiefly responsible for overseeing costs and fees of other law firms.

73.     In addition to overall strategy and oversight, I or other Altshuler Berzon attorneys working under my supervision, were responsible for particular aspects of the case, including: drafting and negotiating joint case management conference statements; legal research for statutory claims asserted in the consolidated complaints; strategy for named plaintiff deposition defense; opposing Defendants' two rounds of motions to dismiss; litigation of discovery disputes regarding member-level data; development of the contract claim including written discovery, depositions, and legal research; depositions of Anthem with respect to corporate organization, the Blue Card program, privacy policies, insurance, and contracts; written discovery and depositions of Non-Anthem Defendants other than BCBSA; research and development of damages theories including expert work; working with the identity fraud/credit monitoring expert; drafting and negotiating the settlement agreement; and negotiating credit monitoring services to be provided for settlement purposes.

74.     All Altshuler Berzon attorneys and paralegals keep time contemporaneously by entering their time into our electronic time keeping system on a daily basis.  The majority of Altshuler Berzon work is performed for fee paying clients to whom we submit monthly bills for payment by the hour.  My partner Danielle Leonard and I both reviewed all Altshuler Berzon time line by line, and deleted any time that we would not feel comfortable submitting to a bill-paying client, as well as any time not included as common benefit compensable time under the three attorneys' fees memos I issued for

guidance to all firms working on this case.  I also deleted all time for billers who devoted less than ten hours to the case.

75.     Altogether, Altshuler Berzon contributed 11,088 hours, for a reasonable lodestar of $6,509,819 through September 30, 2017.  We wrote off 508 hours, for a total lodestar value of $313,101, in the exercise of billing judgment.  Our lodestar does not include the time spent reviewing Altshuler Berzon time.  A chart showing each Altshuler Berzon time keeper, title, year of graduation, rate, hours billed, and lodestar after the exercise of billing judgement described above, is contained within Exhibit 3.

76.     I and other Altshuler Berzon attorneys also spent approximately 260 hours, for a total reasonable lodestar of $108,011, reviewing other firms' fees and expenses, and drafting the motion for attorneys' fees, through September 30, 2017.  That time is not included in Altshuler Berzon's lodestar, nor in the total lodestar for all firms for this case.

77.     Our rates are justified by our expertise and experience, and have frequently been approved by courts in this district, including by this Court.  Altshuler Berzon specializes in complex civil trial and appellate litigation, especially litigation that involves significant public policy issues. Attorneys at Altshuler Berzon have litigated numerous class action cases.  The firm's resume, which lists the firm's major accomplishments and current docket, is available at http://altshulerberzon.com/wp-content/uploads/Firm-Resume-December-2016-1-6-2017-2.pdf.

78.     I am a 1992 graduate of Harvard Law School, where I served as an editor of the Harvard Law Review.  I received my Bachelor of Arts in 1985 with honors from Washington University in St. Louis, Missouri, where I was a member of Phi Beta Kappa.  I clerked for the Honorable Charles A. Legge, United States District Judge, Northern District of California.  I have been named a Northern California "Super Lawyer" in the area of Plaintiffs' side Employment Litigation every year since 2010. I have argued before the United States Court of Appeals for the Ninth Circuit, the California Supreme Court and California Courts of Appeal, and many trial courts throughout California.  I have tried several class actions, and regularly argue motions in class cases.

79.     Representative consumer class action cases in which I have served as plaintiffs' counsel include *Fanning et al. v. HSBC Card Services, Inc. et al.* (C.D. Cal. Case No. 12-cv-0885 JVS) ($13

million settlement of case brought pursuant to California Invasion of Privacy Act for secret recording of telephone conversations without consent) and *Dolgin v. HealthNet of California* (Los Angeles Superior Court Case No. BC 263211) (settlement of false advertising claims against insurance company).  I have also litigated numerous employment class action lawsuits, both as a partner at Altshuler Berzon and earlier as a partner at Lieff, Cabraser, Heimann & Bernstein, LLP.  In the area of wage and hour litigation, those cases include *Aguiar v. Cintas* (L.A. Superior Court, Case No. BC310696) ($6.5 million settlement of certified class action alleging violations of Living Wage Order); *Behaein v. Pizza Hut* (L.A. Superior Court, Case No. BC384563) ($6 million settlement of certified expense reimbursement and meal and rest break class action); *Brooks v. U.S. Bank* (N.D. Cal. Case No. C12-4935-EMC) ($1.9 million settlement of suitable seating and rest break claims); *Danieli v. International Business Machine Corporation* (S.D.N.Y. Case No. 08-cv-3688-SHS) ($7.5 million settlement of misclassification case); *Hines v. KFC* (S.D. Cal. Case No. 09-cv-2422-JM(POR)) ($3.55 million settlement of certified meal and rest break class); *In Re: Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation* (D. Or. MDL Case No. 1439) (trial of certified class action alleging misclassification); *Pryor v. KBR* (arbitration trial of certified class action alleging off-the-clock work); *Rosenburg v. International BusinessMachines Corp.* (N.D. Cal. Case No. 06-cv-0430 PJH) ($65 million settlement of misclassification case); *Thomas v. California State Automobile Association* (Alameda County Superior Court Case No. CH217752-0) (misclassification); *Tokoshima v. Pep Boys* (N.D. Cal. Case No. 12-4810 CRB) ($3.6 million settlement of certified minimum wage class action); and *Zuckman v. Allied Group, Inc.* (N.D. Cal. Case No. 02-cv-05800-SI) (misclassification).  I have also served as class counsel and/or plaintiffs' counsel in the following employment discrimination class actions: *Curtis-Bauer v. Morgan Stanley & Co., Inc.* (N.D. Cal. Case No. C 06-3903 TEH) (settlement including comprehensive injunctive relief and $16 million monetary relief in race discrimination class action); *Frank v. United Airlines* (N.D. Cal. Case No. C92 0692 MJJ) ($36.5 million gender discrimination settlement); *Gonzalez v. Abercrombie & Fitch Stores, Inc.* (N.D. Cal. Case No. 03-2817-SI) (settlement of $40 million plus injunctive relief in case alleging race and gender discrimination); *Holloway v. Best Buy* (N.D. Cal, Case No. 05-cv-05056-PJH) (settlement for comprehensive injunctive relief in race and gender class action); *Satchell v. Federal Express Corp.* (N.D. Cal. Case Nos. C03-

2659 SI, C 03-2878-SI) (settlement of $55 million, plus comprehensive injunctive relief, of race and national origin discrimination claims); and *Wynne v. McCormick & Schmick's Seafood Restaurants, Inc.* (N.D. Cal. Case No. C-06-3153 CW) (settlement included comprehensive injunctive relief and $2.1 million in monetary relief in race discrimination case on behalf of applicants and employees).  I have also served as plaintiffs' counsel in class action cases on behalf of Medicaid beneficiaries, including *Oster v. Lightbourne*, No. 09-cv-04668-CW, 2012 WL 691833 (N.D. Cal. Mar. 2, 2012) (court ordered injunctive relief in certified class action); and *M.R. v.Dreyfus*, 697 F.3d 706 (9th Cir. 2011).  Additionally, I litigated class action civil rights cases as a staff attorney at the Prison Law Office, including *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998); *Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir. 1997) (settlement for comprehensive injunctive relief); and *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995) (comprehensive injunctive relief following lengthy trial).

80.     I also frequently write and lecture about class action issues.  I have been invited to speak about class actions at the ABA Section of Labor and Employment Law conferences, the Consumer Attorneys of California convention, the National and California Employment Lawyers Association (NELA and CELA) conferences, the State Bar of California Labor and Employment Law Section conferences, and the Bar Association of San Francisco Labor and Employment Section conferences. Conference papers include "Structuring Class Settlements That Will Get Approved" (Bridgeport, 2014); "Class and Collective Action Certification of Independent Contractor Misclassification Cases" (NELA, March 2013); "Recognizing and Handling Potential Conflicts of Interest in the Prosecution and Settlement of Employment Class Action Lawsuits" (NELA, June 2010); Co-author with L. Julius M. Turman, "Introduction to Class Actions and Collective Actions" (ABA Section of Labor and Employment Law, August 2008); and "Class Action Trial Plans" (CELA Advanced Wage and Hour Seminar, 2007).

81.     Two other partners at Altshuler Berzon have been working on this case with me. Jonathan Weissglass received his B.A. from Yale College in 1989 and his J.D. from Yale Law School in 1994.  From 1994-95, he served as a law clerk to Chief Judge Myron H. Thompson of the United States District Court for the Middle District of Alabama.  From 1995-96, he was the Karpatkin Fellow in the National Legal Department of the American Civil Liberties Union in New York.  Since then, he

31

has been at Altshuler Berzon.  At Altshuler Berzon, Mr. Weissglass has litigated numerous complex civil cases in trial and appellate courts.  He has argued before the United States, California, and Florida Supreme Courts; the United States Courts of Appeals for the Fifth and Ninth Circuits; the California and Indiana Courts of Appeal; and federal and state trial courts in California and throughout the country.  He received the Voting Rights Award from the ACLU of Southern California in 2002 and was named a "California Lawyer Attorney of the Year" by California Lawyer Magazine / The Daily Journal in 2009, 2013, and 2016.

82.     Mr. Weissglass has extensive experience prosecuting and defending class actions.  He was counsel in *Kashmiri v. Regents of the University of California*, San Francisco Superior Court Case No. CGC-03-422747.  The Superior Court in that case awarded three subclasses of University of California students a $33.8 million judgment, which the Court of Appeal affirmed in *Kashmiri v. Regents*, 156 Cal.App.4th 809 (2007).  He was also counsel in *Luquetta v. Regents of the University of California*, San Francisco Superior Court Case No. CGC-05-443007.  In that case, the Superior Court awarded two subclasses of University of California students a judgment of $39.4 million, which was affirmed on appeal.  He also tried a class action to a jury on behalf of a class of California State University students in *Keller v. Board of Trustees of California State University*, San Francisco Superior Court Case No. CGC-09-490977, which is now on appeal.  He represented a class of physicians and patients in the long-running case of *Conant v. McCaffrey*, 172 F.R.D. 681 (N.D. Cal. 1997) (preliminary injunction), 2000 WL 1281174 (N.D. Cal. Sep. 7, 2000) (permanent injunction), 309 F.3d 629, 634 (9th Cir. 2002) (affirming permanent injunction).  Additionally, he was counsel for the plaintiffs in a $22.7 million class action settlement on behalf of low-wage immigrant warehouse workers in California's Inland Empire who worked in Walmart warehouses.  *Carrillo v. Schneider Logistics, Inc.*, 2012 WL 556309 (C.D. Cal. Jan. 31, 2012), 2011 WL 6104839 (C.D. Cal. Dec. 7, 2011), and 823 F. Supp. 2d 1040 (C.D. Cal. 2011).

83.     Danielle Leonard is a 2001 graduate of Harvard Law School.  From 2001-02, she was a law clerk to Judge Emmet G. Sullivan of the United States District Court for the District of Columbia.  She has been at Altshuler Berzon since 2003.  She has served as the co-chair of the Employment Subcommittee of the Class Actions and Derivative Suits Committee of Litigation Section of the

32

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)

American Bar Association.  In 2013, she was awarded two "California Lawyer of the Year" (CLAY) awards from California Lawyer Magazine in two separate categories: Voting Rights and Educational Law.  She has been selected as a Benchmark Plaintiff Top 150 Women in Litigation and Benchmark Plaintiff Local Litigation Star.

84.     Ms. Leonard has litigated many complex civil cases, including prosecuting class actions for consumers, workers, and students.  With Mr. Weissglass, she was counsel in *Kashmiri v. Regents of the University of California*, *Luquetta v. Regents of the University of California*, and *Keller v. Board of Trustees of California State University*.  She was also class counsel in *In Re The Pep Boys Overtime Actions*, C.D. Cal Case No. 07-CV 01755 VBF, a wage and hour case.

85.     Two associates, Meredith A. Johnson and Tony LoPresti, also worked with me on this case. Meredith A. Johnson is an associate at Altshuler Berzon LLP. She is a graduate of St. Olaf College and Stanford Law School. She served as a law clerk to Judge Richard A. Paez of the United States Court of Appeals for the Ninth Circuit.  Prior to joining Altshuler Berzon, she was a fellow at the Impact Fund in Berkeley, California, where she litigated employment discrimination class actions.

86.     Tony LoPresti is an associate at Altshuler Berzon LLP.  He graduated from UC Santa Cruz with highest honors, and UC Berkeley School of Law, where he received the Eleanor Swift Award for Public Service.  He served as a law clerk to Judge Roger L. Gregory on the United States Court of Appeals for the Fourth Circuit and Judge Richard A. Paez on the United States Court of Appeals for the Ninth Circuit.

87.     The rates sought for Altshuler Berzon attorneys, law clerks, and paralegals are the firm's current commercial billing rates and are supported by the extensive and specialized experience in these types of cases and recognized expertise described above.  Based on my substantial experience in attorneys' fees matters, I believe that Altshuler Berzon's current commercial rates are fully consistent with the market rate for attorneys with comparable expertise, experience and qualifications. The billing rates for commercial litigation clients are the hourly rates that Altshuler Berzon bills to its commercial clients and other full-rate clients who are billed, and pay, for legal services on a monthly basis.

88.     Altshuler Berzon's commercial hourly rates (or their historical equivalents) have been repeatedly approved by numerous courts, including the United States District Court for the Northern

District of California and this Court.  *See, e.g., Medeiros v. HSBC Card Services Inc.,* No. 2:15-cv-09093 JVS (AFMx) (C.D. Cal.) (October 23, 2017 order finding Altshuler Berzon's 2017 rates, including my rate of $860 and Ms. Leonard's rate of $690, reasonable, despite arguments by a professional objector that our senior partner rates were excessive); *Spicher v. Aidells Sausage Co., Inc.,* No. 3:15-cv-05012-WHO (N.D. Cal.) (May 31, 2017 order finding Altshuler Berzon's 2017 rates reasonable, including $930 rate for senior partner, $460/hour for 2010 graduate, $285/hour for law clerk, $250/hour for paralegal); *Ochoa v. McDonald's,* No. 3:14-cv-02098-JD (N.D. Cal.) (Nov. 14, 2016 order finding Altshuler Berzon's 2016 hourly rates reasonable); *As You Sow v. Starwest Botanicals,* Case No. RG15766060 (Alameda Cnty. Super. Ct.) (approving consent judgment with Mr. LoPresti's 2016 rate of $385 per hour); *As You Sow v. JFC Int'l, Inc.,* Case No. RG16815680 (Alameda Cnty. Super. Ct.) (same); *Cancilla v. Ecolab, Inc.,* CV 12-03001 JD (N.D. Cal) (using Altshuler Berzon's 2015 rates to calculate lodestar value of class counsel's work, including my 2015 rate of $795); *Carrillo v. Schneider Logistics Transloading & Distribution, Inc., et al.,* No. CV 11-8557 CAS (DTBx) (C.D. Cal.) (September 24, 2015 order approving Mr. Weissglass's 2015 rate of $775/hour); *Williamson v. Microsemi Corp.,* Case No. 5:14-cf-01827-LHK (N.D. Cal.) (February 19, 2015 order approving my 2014 rate of $775 per hour and Ms. Leonard's 2014 rate of $610 per hour); *Brooks v. U.S. Bank, N.A.,* Case No. C12-4935-EMC (N.D. Cal) (June 16, 2014 order approving my 2014 rate of $775/hour and Ms. Leonard's rates of $610/hour); *Tokoshima v. The Pep Boys,* Case No. C12-4810-CRB (N.D. Cal.) (Jan. 26, 2015 order approving my 2014 rate of $775); *Luquetta v. Regents of the University of California,* Case No. CGC-05-443007 (San Francisco County Superior Court) (October 31, 2012 Order approving Mr. Weissglass's 2012 rates of $700 per hour and Ms. Leonard's rate of $570 per hour).

89.     Altshuler Berzon spent $363,271 on the litigation, including $228,000 contributed to the cost fund and payment of $135,271 in internal costs such as travel expenses for depositions and court hearings, courier and delivery fees (primarily for courtesy copies to the Court and deposition exhibits), printing and copying charges (deposition exhibits, courtesy copies to the Court, pleading files), and telephone charges – all costs that we had no certainty we would recover.  As Co-Lead Counsel closest to the court house, we were ultimately responsible for most court filings, which, as the Court is aware,

often occurred well after regular business hours.  For these and other reasons, we incurred substantial overtime expenses including secretarial overtime and dinner and transportation home for staff who stayed late. These are all costs of the type that we normally bill to our non-contingent, fee-paying clients.  Exhibit 6 provides the detail for Altshuler's internal costs, which are summaries drawn from our firms' books and records, which can be backed up with receipts or invoices if requested.

## VI.  **Exhibits**

90.    Exhibit 1 is a detailed chart showing each firm's reasonable hours and lodestar, and, within that firm, each biller, law school graduation year, hours billed, and rates billed.

91.    Exhibit 2 is a detailed chart showing the task billing breakdown for all firms.

92.    Exhibit 3 provides information for each firm that contributed compensable, common benefit time to the case (listed in alphabetical order), including information on that firm's billers, rates, tasks performed, and orders approving comparable rates.

93.    Exhibit 4 provides a summary showing the combined totals of all costs, including internal expenses incurred by all firms and all expenses paid by or incurred by the cost fund.

94.    Exhibit 5 provides detail for all expenses paid by or incurred by the cost fund.

95.    Exhibit 6 provides a summary of Altshuler Berzon's internal expenses, as well as Altshuler Berzon's detailed expense information.

96.    Exhibit 7 provides a summary of Cohen Milstein's internal expenses, as well as Cohen Milstein's detailed expense information.

97.    Exhibit 8 provides a summary of Girard Gibbs' internal expenses, as well as Girard Gibbs' detailed expense information.

98.    Exhibit 9 provides a summary of Lieff Cabraser's internal expenses, as well as Lieff Cabraser's detailed expense information.

99.    Exhibit 10 provides a summary of the internal expenses charged by all other firms that incurred common benefit expenses, as well as the detailed expense information for each firm.

100.    Exhibit 11 is a copy of the Settlement Agreement, without exhibits; the complete copy with exhibits was previously filed at ECF 869-8.

101.   Exhibit 12 is a copy of the Amendment to Settlement Agreement, without exhibits; the complete copy with exhibits was previously filed at ECF 900-2 – 900-6.

102.   Exhibit 13 is a chart comparing Experian's "IdentityWorks Premium" product (as advertised to the public on Experian's website at https://www.experian.com/consumer-products/compare-identity-theft-products.html), Experian's "IdentityWorks Plus" product (as advertised to the public on Experian's website at https://www.experian.com/consumer-products/compare-identity-theft-products.html), and the custom credit monitoring services product that will be provided to class members by Experian as part of the proposed settlement.

103.   Exhibit 14 is the December 2016 regulatory settlement between the state insurance commissioners and Anthem.

104.   Exhibit 15 is a copy of the Requests for Production that Anthem served on each individual Named Plaintiff.

105.   Exhibit 16 is a copy of the Interrogatories that Anthem served on each individual Named Plaintiff.

106.   Exhibit 17 is a copy of the Interrogatories that Non-Anthem Defendants BCBSA and HCSC served on each individual Named Plaintiff insured through an HCSC entity or through the federal contract.

107.   Exhibit 18 is a copy of the Requests for Production that HCSC served on each individual Named Plaintiff with HCSC insurance.

108.   Exhibit 19 is a copy of the Requests for Production that BCBSA served on each individual Named Plaintiff with federal insurance.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December, 2017, at San Francisco, California.

*/s/ Eve H. Cervantez*
Eve H. Cervantez

Declaration of Eve H. Cervantez in Support of Plaintiffs' Motion for Final Settlement Approval, Service Awards to Named Plaintiffs, and an Award of Attorneys' Fees and Costs; CASE NO. 15-md-02617-LHK (NC)