AMITABHO CHATTOPADHYAY

*Pro se objector*

FILED

DEC 12 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| In re<br>    Anthem, Inc.<br>        Data Breach Litigation | Case No. 5:15-MD-02617-LHK<br>Hon. Judge Lucy H. Koh<br><br>OBJECTIONS OF CLASS MEMBER AMITABHO CHATTOPADHYAY TO PROPOSED CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR<br><br>Date:    February 1, 2018<br>Time:   1:30 p.m.<br>Place:   Courtroom 8, 4th Floor<br>           280 South 1st Street<br>           San Jose, CA 95113 |

INTRODUCTION

This is a class action lawsuit against a variety of companies and against Anthem, Inc., stemming from a data breach in which eighty million people had their personal information stolen due to the defendants' grossly negligent conduct. The purported 'relief' ordered in this case is an offer to pay for 'credit monitoring services' for a period of two years through Experian, along with a tiny amount of money for people who can prove out of pocket losses, attorney's fees, and some incomprehensibly vague, secret procedures to protect Anthem from further liability.

However, this so-called relief is blatantly insufficient to compensate members of the class. The plaintiffs, in exchange for releasing a variety of statutory claims with their attendant damages, receive something that cannot track and which refuses to provide compensation for fraudulent tax returns, one of the most severe manifestations of identity theft; which, despite

1

its impressive at first glance $1,000,000 overall policy limit, offers at most $7,500 in lost wages, a paltry sum for someone who may be at risk to suffer up to hundreds of thousands of dollars in lost wages and which merely supplements bank liability under 12 CFR § 205; which itself makes promises it certainly cannot keep; and which is otherwise severely lacking, as set out in more detail below. And if we already have an identity theft protection plan, we get the princely sum of *maybe* $50, in the unlikely scenario that those who claim this 'alternative compensation' amount to less than three hundred and sixty-one thousand or so, all the way down to the more likely sum of $0.01. In the case of the California plaintiffs, all of this is in exchange for giving up our right to sue for a thousand dollars each, plus whatever actual damages may have occurred as a result of the defendants' negligence. And if someone can prove out-of-pocket losses, up to a maximum of $10,000, well, they get an unpredictably small fraction of their losses out of the $15,000,000 set aside for them, so long as not too many of the tens of millions of people who may have suffered losses as a result of the defendants' conduct decide to make a claim—making it worse than California's small claims courts. All in exchange for a total release of claims, along with a provision that gags a fourth of the American population from speaking about the matter any further.

In other words, this settlement benefits no one but the defendant, which gets to pay a third party cents on the dollar (if the defendants were paying Experian the actual costs of this identity theft protection, they would be paying $3,840,0000,000, not $17,000,000[1]) along with a set fraction of the damages which its conduct has caused, and class counsel, which is slated to receive tens of millions in attorney's fees. This arrangement takes all of the uncertainty faced by the defendants and puts it in the hands of the absent class members. Under these circumstances, there is no way that either party can demonstrate that the settlement is fair, reasonable and adequate for the damages that can and likely will arise from the defendants' reckless and illegal conduct, and the terms of the non-monetary relief are inaccessible and pointless. Accordingly, the

---

1 Experian's identity theft protection retails at $20 a month. Multiplied by the amount of class members over two years, this works out to an enormous sum.

Court should reject the proposed settlement.

## Factual Background

Under the terms of the proposed settlement, the defendants will make a payment of $115,000,000 into the Qualified Settlement Fund. Settlement Agreement, ECF No. 869-10 ("Settlement") ¶3.1. Defendants will pay Experian $17,000,000 for credit monitoring services, about 20 cents for each class member. *Id.* ¶4.6. $15,000,000 will be set aside to pay up to $10,000 per person for out of pocket costs, but this sum will be decreased *pro rata* depending on the number of claims. *Id.* ¶6.4. In addition, these claims will be adjudicated by a mysterious 'KCC', whose identity is not elaborated upon in the Settlement. *Id.* ¶1.35. One must delve into Plaintiff's Memorandum of Points and Authorities in Support of Preliminary Approval of Class Action Settlement, ECF 869-5 at 24, to realize that this refers to Kurtzman Carson Consultants, LLC. People who already have credit monitoring services get up to $36, a sum reduced *pro rata* depending on the amount of money left in the fund, unless claims for alternative compensation are under $13,000,000, in which case each person gets $50. Settlement ¶5.3. The named plaintiffs get service payments of around $7,500 or $5,000, depending on whether their computer was 'forensically imaged' or not. *Id.* ¶11.1. Anthem agrees to follow the law and do something about their negligent data handling, as described in exhibit 2 (elaborated upon below). *Id.* §2. In exchange, all claims are released, including claims which may arise as a result of facts coming to light which may have been concealed by the defendants during settlement negotiations. *Id.* §13. And, of course, the class members, **one-fourth of the American population**, forfeit their First Amendment rights to 'in any way criticize' the parties in any way relating to the claims so settled. *Id.* ¶18.21. There are also a variety of data-management policies to be put into place.

The settlement elaborates on the nature of the credit services in some detail. Experian will provide '3B Credit Plus' services to the settlement class members. This includes credit monitoring, a free credit report, 'dark web' surveillance, a free credit report, and some insurance which, though it claims to provide coverage up to a limit of $1,000,000, does not state up-front its itemized limits. *Id.* ¶4.1.

3

Exhibit 2 to the Settlement Agreement, ECF No. 869-10 ("Exhibit 2"), sets out the procedures to which Anthem agrees. Anthem agrees to retain no more than [blank] amounts of data in some unspecified place, but some information from another unspecified place retains data for no more than an unspecified time or purpose. They also promise to archive [blank] data older than what's retained in [blank]. *Id.* ¶1.

Something located in something else will be subject to certain access controls. There's added levels of management approval for something; access to something will require some kind of technology of some description; sessions will automatically be terminated after somewhere between one second and a hundred millennia; access (as distinguished from 'sessions'?) will expire in a similar amount of time and have to be requested again; someone with a very long name, or some particular description of some kind of person, won't have access to something, and if they want access to something for a temporary period, they will be treated like all other users of this unspecified system; some kind of technology must be used (computers?); something will be hosted somewhere (our information will be hosted on a public Dropbox archive, maybe?). *Id.* ¶2.

Anthem agrees to implement something. I'm not even going to try with this one. *Id.* ¶ 3.

Anthem will do something where feasible, and when it's infeasible and Anthem doesn't deploy something, Anthem will require something else. *Id.* ¶ 4.

Anthem will keep in place its current policies for something. *Id.* ¶ 5. Anthem will continue feeding certain logs of an unspecified nature to the plaintiffs on May 10, 2017, or equivalent logs, [blank] for the Settlement Term. *Id.* ¶ 6. Anthem will undertake an IT security risk assessment by a third party. *Id.* ¶ 7. Anthem will spend an unspecified amount of money on information security and increase information security spending by a certain amount for every 5,000 users. *Id.* ¶ 9. Anthem will try to hack itself twice a year to test its systems. *Id.* ¶ 10. Anthem will do something about remediation. *Id.* ¶ 11. Anthem will implement 90% of something by Q2 2019. *Id.* ¶ 12. Anthem will keep doing what it's already doing. *Id.* ¶ 13.

Throughout this document, the 'settlement term' which governs the length of some but not all of these commitments is not specified.

In other words, the relief being offered here is *de minimis* for the majority of class members, considering the enormous amount of afflicted people whose damages may occur at any time past this point thanks to the defendants' negligence, and takes away their rights to even talk about it. Meanwhile, the determination of these out-of-pocket expenses is left up to the discretion of the people administering the settlement funds, depriving the class members who have suffered provable losses of a proper judicial determination of the amount that they have lost.

## IDENTITY OF OBJECTOR & INTENT TO APPEAR

These objections are being filed by me, Amitabho Chattopadhyay, a member of the Statewide California Class and the Anthem California Contract Class as defined in the Fourth Consolidated Amended Class Action Complaint, ECF No. 714-3 ("Complaint") at pp. 122-123. I had a PPO insurance policy from Anthem Blue Cross throughout the year of 2015. I paid premiums directly to Anthem for this coverage and my personal information was kept with Anthem and was compromised as a result of the breach announced by Anthem on or around February 5, 2015. I intend to appear *pro se* at the above-captioned hearing and present argument in support of my objections. I have not objected to a class action settlement within the last three years, nor have I ever objected to a class action settlement before.

## STANDARDS UNDER FED. R. CIV. P. 23(e)

"If [a] propos[ed settlement] would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "In approving a proposed class action settlement, the district court has a fiduciary responsibility to ensure that 'the settlement is fair and not a product of collusion, and that the class members' interests [are] represented adequately.'" *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (citing *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987).

This is a highly fact-intensive inquiry. The factors involved include, but are not limited to, (1) the strength of plaintiffs' case, (2) the risk, expense, and complexity of continued litigation, (3) the extent of discovery completed and the stage of the proceedings, and (4) the reaction of the class members to the proposed settlement. *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

5

And "[t]he relative importance to be attached to any particular factor will depend upon the nature of the claims, the types of relief sought, and the unique facts and circumstances presented by the individual case." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (citing *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982)).

From the start, the burden is on the settling parties to show that the settlement satisfies such a standard. However, the class representatives have an even greater burden to carry where, as in this case, the majority of class members will be compensated through nonmonetary means: "Settlements involving nonmonetary provisions for class members... deserve careful scrutiny to ensure that these provisions have actual value to the class." 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h).

As elaborated below, the Court should deny approval of the proposed settlement because the relief offered to the unnamed class members is minimal and, where it is not minimal, is too uncertain to be of actual value, and the settlement is unconscionable because of the range of the claims which it forfeits; the settlement notice is fatally defective and the settlement itself is unconscionable because it does not adequately inform the class that they are forfeiting their rights to criticize Anthem's data handling procedures; and finally, the settlement notice violates due process because it does not notify the plaintiffs of the substantial claims which they may be waiving.

## Argument

### I. The court should refuse to approve the settlement agreement because it does not provide certain relief to the class, whatever relief provided is minimal.

#### A. Non-monetary terms in settlements, particularly terms designed to shield the defendants from further liability, do not constitute actual relief.

In *Molski, supra*, an ADA class action settlement granted 'relief' in the form of updating their facilities for mobility, paying the class representatives, paying the attorney's fees of the plaintiffs and making donations to disability organizations. The Court described such 'relief' in succinct terms: "the class members received nothing." *Id.* at 954.

6

Objections to Proposed Class Action Settlement and Notice of Intent to Appear
Case No. 5:15-MD-02617-LHK

So it is in this case. Anthem agrees to update their business practices to stop violating state laws and to adopt business practices which may stop themselves from incurring further liability. Settlement §2. Besides the point that no other defendants agree to do this, this is a meaningless commitment: of course a defendant seeking to avoid further liability would change their business practices to avoid further liability. This would have happened, and likely already has happened, either way.

Moreover, they offer credit monitoring; the value of these services are disputed at best. Nonetheless, it is the settling party's burden to prove the meaningfulness of this so-called relief, which at best supplements the liability that banks already have for stolen funds reported within 60 days pursuant to 12 CFR § 205, making it at best worth $50 to $500 in the majority of cases (unless the bank covers this regulatory 'deductible', which it often does). Meanwhile, the cost of these services to Anthem (apparently around 20 cents per class member) is so minimal in comparison to the amount of statutory damages the defendants are facing that they are meaningless.

### B. The non-monetary relief which Anthem is offering is vague, inaccessible to the class members and is effectively meaningless.

The level of redaction in Exhibit 2 is absurd enough to be comedic, aiding in making the Settlement Notice fatally vague even if whatever relief provided could possibly be adequate. Little argument can be offered on the merits of the relief that Anthem has provided simply because there is almost nothing to talk about, besides the fact that the defendants have already implemented a large part of their purported liability-shielding strategy. Because there's nothing much to write about in light of the rampant redactions on that exhibit, it's not really worth that much more ink.

### C. Whatever monetary relief that is provided to the California Statewide Class is minimal at best, and the system offered for out-of-pocket expenses are inferior to small claims court.

The defendants will pay Experian $17,000,000 for credit monitoring services, about 20

7

cents for each class member (seventeen million divided by eighty million). Settlement ¶4.6. This is effectively a *cy pres* award; even if it isn't, it's unconscionable either way.

A *cy pres* award, where money damages are given to a third-party organization to provide indirect benefits to absent class members, is the best description of this part of the settlement. Newberg on Class Actions, § 11:20 (4th ed. 2002). The record is clear on the standards required for a *cy pres* award; here it is not applicable that class members are difficult to identify; the opposite problem gives rise to this case. *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997). And the statutory damages available in this case to the California Statewide Class make it clear that this is not a matter where a large number of class members and very little recovery per class member exists. *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). Accordingly, a *cy pres* award is totally inappropriate.

Even if it were not, the damages awarded are unconscionsably and unfairly low, and the settling parties cannot meet their burden in claiming otherwise. The defendants, in breaching California Civil Code § 56.10 by failing to establish appropriate procedures to ensure that the class members' information were protected, § 56.20 by doing so as an employer maintaining medical information as well as disclosing medical information pertaining to members of the California Statewide Class and permitting unauthorized persons to use said information, § 56.101 by failing to preserve or maintain medical information pertaining to members of said class in a manner preserving the confidentiality of the information, have rendered themselves liable for statutory damages of $1000 to *each* class member according to Civ. Code §§56.35 & 56.36, *in addition* to a limitless amount in actual damages. This is a far cry from 20 cents. It's also a far cry from the uncertain $36 promised by the defendants to class members that may have spent hundreds on identity theft prevention services already. Settlement ¶5.3. Even then, if anyone decides to wait two years for the furor to die down before exploiting this leaked data, no redress would be had for the injured parties. All this is is a temporary solution to a very long-term problem.

The limit of $10,000 for out-of-pocket costs, reduced to fit within the sum of

$15,000,000, are similarly meaningless. *Id.* ¶6.4. Adjudicated by a mysterious 'KCC', this is no different from a mandatory arbitration clause in disguise, except astoundingly even worse. *Id.* ¶1.35. Californians may sue Anthem in the small claims or limited jurisdiction division of their local Superior Court for $10,000 (Code of Civil Procedure § 116.220) to $25,000 (CCP § 85). All this does is save a tiny amount of money in exchange for the chance to have a private attorney judge their claims and evidence, wait for a considerable amount of time to receive the results rather than the quick and certain results available from the state court system, and have the results be delivered as a fragment of their actual losses. A person aggrieved in excess of $10,000 would have no relief—and if there are many like that person, their 'relief' may literally be under a single cent.

In other words, the California Statewide Class would forfeit their rights to an award of actual damages in addition to statutory damages in exchange for either an uncertain sum, or a reward worth 20 cents, in addition to a kind of arbitration where an award of damages would not even be guaranteed up to the jurisdictional limit.

**II. The court should refuse to approve the settlement agreement because its non-disparagement clause and release are unconscionable and overbroad.**

"'Released Claim' means any claim, liability, right, demand, suit, obligation, damage, including consequential damages, losses or costs, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind or description—whether known or Unknown (as the term "Unknown Claims" is defined herein), suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, legal, statutory, or equitable—related to or arising from any of the facts alleged in any of the Actions." Settlement ¶1.32. "Action" or "Actions" means all the actions listed in Exhibit 1, which have been filed in, transferred to, or otherwise assigned to the Court and included in coordinated or consolidated pretrial proceedings as part of In re Anthem, Inc. Data Breach Litigation, Case No. 5:15-MD-02617-LHK." *Id.* ¶1.1.

A person, discovering his losses, who wants to sue Anthem for anything occurring in 2014 or 2015, would have to root through the claims enumerated in any one of <u>one hundred</u>

9

and twenty-seven lawsuits, agglomerated only in part into a complaint containing over a thousand paragraphs and 32 exhibits which altogether comprise thousands of pages. The absurd overbroadness of this provision aside, which may go so far as to include all insurance policies which Anthem contracted (Complaint ¶454), this person has no way of knowing which of his claims are precluded due to the massive volume of acts and omissions which he has unknowingly released the defendants for without going to court over it. The Settlement Notice makes no mention of the sheer breadth of these 'actions', which is a blatant violation of the absent class members' due process rights, as further argued below. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

Perhaps this person decides it isn't worth it, or perhaps they realize that they cannot sue; though he knows he cannot seek relief, he wants to air his grievances in a public space, maybe complain to people about Anthem's data handling practices.

This is where it takes a turn for the Kafkesque: because of paragraph 18.21 on page 31 in document ECF No. 869-8 to case 5:15-md-02617-LHK[2], which memorializes a contract that they may not have ever heard of that a group of executives and lawyers signed with each other in a faraway courthouse, written in language so dense that he can barely read it, incorporating enough documents that they are likely to cost almost a hundred dollars in fees to retrieve off the Internet, he literally cannot speak out. Now, multiply this by what is a fourth of the American population as of 2017. This is a Star Chamber scenario that is unconscionable on its face and perhaps unconstitutional to enforce. The fact that it wasn't included in the Settlement Notice is just one last mark on a settlement which is truly repugnant to any person's sense of justice.

**III. The court should refuse to approve the settlement agreement because the attendant notice as a whole does not satisfy the class members' due process rights.**

A right to have a defendant answer for negligent or illegal impairments of their interests is one protected by the due process clause of the Fourteenth Amendment to the Constitution.

---

2  This may not seem too intimidating a description on its face, but to most people it looks more like a *Nineteen-Eighty-Four* joke than an actual document which might exist.

10

*Mullane, supra* at 313. Nowhere is it made clear to the absent California Statewide Class members that they are forfeiting their rights to $1000 in statutory damages as well as actual damages and attorney's fees under Civ. Code §§56.35 & 56.36 against the volumes of defendants in this case. In addition, the breadth of the non-disparagement provision and release are not fully and honestly addressed.

Of course, unimportant, technical details may be omitted from the notice; but $1000 in cash, plus attorneys' fees, plus actual damages, is certainly a protected property interest. As argued above, this total release essentially leaves the class just as injured than before, except without an effective means of redress and lacking the damages to which they are entitled. This effectively requires the absent class to retain counsel to understand the rights that they are foregoing and is an independent reason that this settlement is unfair and should not be approved.

Respectfully submitted,

_____
Amitabho Chattopadhyay
December 5, 2017
Objector

11