Theodore H. Frank (SBN 196332)
COMPETITIVE ENTERPRISE INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW, 7th Floor
Washington, DC 20005
Voice: 202-331-2263
Email: ted.frank@cei.org

*Attorneys for Objector Adam Schulman*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION, | Case No. 15-MD-02617-LHK |
| | MDL No. 2420 |
| | **OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST** |
| | Judge:        Hon. Lucy H. Koh<br>Courtroom:  8<br>Date:         February 1, 2018<br>Time:         1:30 P.M. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION ......................................................................................................................... 1

I.      Adam Schulman is a member of the proposed settlement classes and has standing to object. .............1

II.     The district court has a fiduciary duty to the class as a whole...................................................3

III.    The fee request is grossly excessive for a megafund case and the Court should reduce to fee request to return over $26 million back to the class. ..........................................................................4

       A.      Class should be awarded no more than 15% of the $92 million class recovery (or 12% of the $115 million gross fund), which would return over $26 million to the class. .................4

       B.      The litigation expenses should be included in calculating the percentage award................... 10

       C.      The $23 million notice and administration expenses should be excluded from the fee calculation. ................................................................................................................ 12

IV.    The lodestar crosscheck does not support class counsel's fee request because the lodestar is overstated by at least $13 million. ................................................................................................ 14

       A.      While the court appointed four firms to the Steering Committee, class counsel's total lodestar included time from 53 different law firms, guaranteeing duplication and inefficiency........................................................................................................................ 15

       B.      The lodestar is overstated by at least $7 million because the contract attorneys' rates are exorbitant and the document review was inefficiently assigned to higher-priced attorneys....................................................................................................................... 18

             1.      The lodestar is overstated by at least $5.7 million because contract attorneys billed nearly 20,000 hours at exorbitant rates. ................................................. 18

             2.      The lodestar is also overstated because it assigned low-level document review to higher-priced associates............................................................................... 20

             3.      The same billing practices Lieff Cabraser employed here are under investigation in *Arkansas Teacher Retirement System v. State Street Bank and Trust Co.*, No. 11-cv-10230 MLW (D. Mass.). ........................................... 23

       C.      The lodestar is likely overstated even more than estimated because class counsel has failed to include sufficient billing summaries. ................................................................ 23

V.      Any fee award should be decreased further because of class counsel's misleading fee petition. ........ 25

CONCLUSION............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Trans Union LLC,*
  243 F.R.D. 377 (C.D. Cal. 2007)............................................................................................9

*Alexander v. FedEx Ground Package Sys.,* No. 05-cv-00038,
  2016 WL 3351017 (N.D. Cal. June 15, 2016) ............................................................6, 7, 15

*Arkansas Teacher Retirement System v. State Street Bank and Trust Co.,*
  232 F. Supp. 3d 189 (D. Mass. 2017) ...............................................1, 19, 20, 23-25

*Banas v. Volcano Corp.,*
  47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................................................................19

*Barbosa v. Cargill Meat Solutions Corp.,*
  297 F.R.D. 431 (E.D. Cal. 2013)........................................................................................7

*In re Beacon Assocs. Litig.,* No. 09 Civ. 777,
  2013 WL 2450960 (S.D.N.Y. May 9, 2013)................................................................19, 21

*In re Bluetooth Headset Products Liability Litigation,*
  654 F.3d 935 (9th Cir. 2011)........................................................4, 7, 8, 10, 14, 17

*Blum v. Stenson,*
  465 U.S. 886 (1984) ...........................................................................................................19

*Brown v. Stackler,*
  612 F.2d 1057 (7th Cir. 1980) .........................................................................................25

*In re Cardinal Health Inc. Secs. Litig.,*
  528 F. Supp. 2d 752 (S.D. Ohio 2007)..............................................................................13

*In re Charles Schwab Corp. Secs. Litig.,* No. C 08–01510 WHA,
  2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) ....................................................................7

*In re Citigroup Inc Secs. Litig.,*
  965 F. Supp. 2d 369 (S.D.N.Y. 2013)........................................................................21, 24

*In re Citigroup Inc. Bond Litig.,*
  988 F. Supp. 2d 371 (S.D.N.Y. 2013)................................................................................5

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.,*
  954 F. Supp. 2d 276 (S.D.N.Y. 2013)........................................................................21, 22

*In re Combustion, Inc.,*
  968 F.Supp. 1116 (W.D. La. 1997) ....................................................................................8

*In re Continental Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992)............................................................................................3

*Commonwealth Electric Co. v. Woods Hole*,
    754 F.2d 46 (1st Cir. 1985) ........................................................................................ 25

*In re Critical Path, Inc., Sec. Litig.*, No. C 01-00551 WHA,
    2002 WL 32627559 (N.D. Cal. Jun. 18, 2002) ......................................................... 17

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ...........................................................................11, 14, 24

*Dial Corp. v. News Corp.*,
    317 F.R.D. 426 (S.D.N.Y. 2016) ...................................................................... 8, 17, 18, 19

*Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*,
    2016 WL 5938722 (C.D. Cal. May 16, 2016) .............................................................7

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013)........................................................................................3

*In re First Fidelity Secs. Litig.*,
    750 F. Supp. 160 (D.N.J. 1990) ..................................................................................5

*Fraley v. Facebook, Inc.*, No. C 11-1726 RS,
    2014 WL 806072 (N.D. Cal. Feb. 27, 2014) ........................................................... 13

*Georgino v. Sur la Table, Inc.*, No. cv-1103522,
    2013 WL 12122430 (C.D. Cal. May 9, 2013) ...........................................................9

*Giovannoni v. Bidna & Keys*,
    255 Fed. Appx. 124 (9th Cir. 2007) ........................................................................ 25

*Good v. W. Virginia-American Water Co.*,
    2017 WL 2884535 (S.D. W. Va. July 6, 2017)..........................................................8

*Gutierrez v. Wells Fargo, NA*, No. 07-cv-05923 WHA,
    2015 WL 2438274 (N.D. Cal. May 21, 2015).......................................................3, 7

*Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST,
    2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) ........................................................ 10

*In re High Sulfur Content*,
    517 F.3d 220 (5th Cir. 2008)...............................................................................16, 17

*In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), No. 11-CV-02509-LHK,
    2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)............................................................6

*Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK,
    2013 WL 496358 (N.D. Cal. Feb. 6, 2013) .................................................................8

*Il Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC,* No. C 13-05197 WHA,
    2015 WL 2406966 (N.D. Cal. May 20, 2015) ..................................................... 8, 21

*In re Imax Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ....................................................................... 11

*Intel Corp. v. Terabyte Int'l, Inc.*,
    6 F.3d 614 (9th Cir. 1993) ................................................................................. 24

*In re Johnson & Johnson Derivative Litig.*, No. 11-2511(FLW),
    2013 WL 6163858 (D.N.J. Nov. 25, 2013) ...........................................................6

*Keener v. Dep't of Army*,
    136 F.R.D. 140 (M.D. Tenn. 1991) ..................................................................... 25

*Keirsey v. eBay, Inc.*, No. 12-CV-01200-JST,
    2014 WL 644738 (N.D. Cal. Feb. 18, 2014) ....................................................... 10

*Kmiec v. Powerwave Tech.*, No. 8:12-cv-00222-CJC-JPR,
    2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) ................................................. 11, 13

*Koby v. ARS Natl. Services, Inc.*,
    846 F.3d 1071 (9th Cir. 2017) ........................................................................... 10

*Laffitte v. Robert Half Int'l*,
    376 P.3d 672 (Cal. 2016) ......................................................................................3

*Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA,
    2013 WL 3187410 (N.D. Cal. June 21, 2013) .................................................... 18

*Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA,
    2017 WL 5495816 (N.D. Cal. Nov. 16, 2017) ................................................... 18

*Lola v. Skadden, Arps, Slate, Meagher & Flom*,
    620 Fed. Appx. 37 (2d Cir. 2015) ...................................................................... 19

*MacDougal v. Catalyst Nightclub*,
    58 F. Supp. 2d 1101 (N.D. Cal. 1999) ............................................................... 21

*McCoy v. Health Net, Inc.*,
    569 F.Supp.2d 448 (D.N.J. 2008) .........................................................................7

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010).................................................................. 2, 3, 9, 25

*In re Mexico Money Transfer Litig.*,
   267 F.3d 743 (7th Cir. 2001) .................................................................................9

*Murray v. GMAC Corp.*,
   434 F.3d 948 (7th Cir. 2006) .................................................................................8

*Myles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD,
   2014 WL 6065602 (N.D. Cal. Nov. 12, 2014) ...................................................13

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ..........................................................................5

*In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ........................................................6

*Nitsch v. DreamWorks Animation SKG Inc.*,
   2017 WL 2423161 (N.D. Cal. June 5, 2017) .........................................................6

*In re Nuvelo, Inc. Securities Litigation*, No. C 07–04056,
   2011 WL 2650592 (N.D. Cal., 2011)......................................................................7

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................4

*In re Online DVD*,
   779 F.3d 934 (9th Cir. 2015) ...............................................................................12

*In re Oracle Securities Litig.*,
   136 F.R.D. 639 (N.D. Cal. 1991) ........................................................................11

*In re Pacific Enterprises Securities Litigation*,
   47 F.3d 373 (9th Cir. 1995)....................................................................................7

*Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.*,
   318 F.R.D. 19 (S.D.N.Y. 2016) ....................................................................19, 22

*Pearson v. NBTY, Inc.*,
   772 F.3d 778 (7th Cir. 2014).........................................................................12, 17

*Piambino v. Bailey*,
   757 F.2d 1112 (11th Cir. 1985) .............................................................................4

*Planned Parenthood of Cent. N.J. v. Attorney Gen. of N.J.*,
   297 F.3d 253 (3d Cir. 2002) ................................................................................22

*Razilov v. Nationwide Mut. Ins. Co.*, No. 01-cv-1466,
   2006 WL 3312024 (D. Or. Nov. 13, 2006) ...........................................................7

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014)................................................................................................12, 13

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005)...................................................................................................8

*Riverside v. Rivera*,
    477 U.S. 561 (1986).................................................................................................................10

*Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD,
    2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)..........................................................................18

*Schoolcraft v. City of New York*,
    2016 WL 4626568 (S.D.N.Y. Sept. 1, 2016)...........................................................................18

*SEC v. Kirkland*, No. 6:06-cv-183,
    2008 U.S. Dist. LEXIS 123308 (M.D. Fla. June 30, 2008)......................................................21

*Seijas v. Republic of Arg.*,
    2017 WL 1511352 (S.D.N.Y. Apr. 27, 2017)..........................................................................13

*Silber v. Mahon*,
    957 F.2d 697 (9th Cir. 1992)......................................................................................................4

*Silverman v. Motorola*,
    739 F.3d 956 (7th Cir. 2013)..................................................................................................5, 7

*Spears v. First Am. Eappraiseit*, No. 5:08-cv-00868,
    2015 WL 1906126 (N.D. Cal. Apr. 27, 2015)...........................................................................7

*Stetson v. Grissom*,
    821 F.3d 1157 (9th Cir. 2016)....................................................................................................2

*In re Subway Footlong Mktg. Litig.*,
    869 F.3d 551 (7th Cir. 2017)....................................................................................................10

*In re TD Ameritrade Accountholder Litig.*,
    266 F.R.D. 418 (N.D. Cal. 2009)..............................................................................................10

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP),
    2004 WL 1087261 (S.D.N.Y. May 14, 2004).........................................................................13

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008).....................................................................................20

*In re Transpacific Passenger Air Transportation Antitrust Litigation* ("*Transpacific*"),
    2015 WL 3396829 (N.D. Cal. May 26, 2015)..........................................................................12

*United States ex rel. Palmer v. C&D Techs., Inc.*,
   2017 WL 1477123 (E.D. Pa. Apr. 25, 2017) .................................................................... 20

*Ursic v. Bethlehem Mines*,
   719 F.2d 670 (3d Cir. 1983) ............................................................................................ 21

*In re Volkswagen & Audi Warranty Extension Litig.*,
   89 F. Supp. 3d 155 (D. Mass. 2015) ............................................................................... 13

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ........................................................................................... 15

*In re Washington Pub. Power Supply Sys. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) .......................................................................................... 3, 4

*In re Wells Fargo Securities Litig.*,
   157 F.R.D. 467 (N.D. Cal. 1994) ................................................................................ 12, 14

*Wininger v. SI Mgmt. L.P.*,
   301 F.3d 1115 (9th Cir. 2002) ......................................................................................... 15


**Rules**

Advisory Committee Notes on 2003 Amendments to Rule 23 ..............................................4

Fed. R. Civ. Proc. 23(e) .................................................................................................. 10

Fed. R. Civ. Proc. 23(g) ............................................................................................. 15, 18

Fed. R. Civ. Proc. 23(h) ................................................................................... 2, 4, 9, 10, 13


**Other Authorities**

ABA Standing Committee on Ethics,
   ABA Formal Opinion 08-451 ......................................................................................... 20

Bradick, Nicole,
   *Freelance Law: Providing Solutions to Modern Day Practice Dilemmas*,
   27 MAINE BAR J. 23 (2012) ........................................................................................... 21

Brian T. Fitzpatrick,
   *The End of Objector Blackmail?*,
   62 Vand. L. Rev. 1623 (2009) ...........................................................................................2

Brickman, Lester,
　　LAWYER BARONS (Cambridge U. Press 2011) ................................................................. 20

Burch, Elizabeth Chamblee & Margaret S. Williams,
　　*Repeat Players in Multidistrict Litigation: The Social Network*,
　　102 Cornell L. Rev. 1445 (2017) ................................................................................... 16

Burch, Elizabeth Chamblee,
　　*Monopolies in Multidistrict Litigation*,
　　70 Vand. L. Rev. 67 (2017) ........................................................................................... 16

Eisenberg, Theodore & Geoffrey P. Miller,
　　*Attorney Fees and Expenses in Class Action Settlements: 1993–2008*,
　　7 J. EMPIRICAL LEGAL STUD. 248 (2010) ..................................................................... 5, 6

Eisenberg, Theodore, Geoffrey P. Miller and Roy Germano,
　　*Attorneys' Fees in Class Actions: 2009-2013* (Dec. 1, 2016) ....................................... 4, 7

Erickson, Jessica,
　　*The Market for Leadership in Corporate Litigation*,
　　2015 U. Ill. L. Rev. 1479 (2015) ................................................................................... 17

Estes, Andrea, *Critics hit law firms' bills after class-action lawsuits*,
　　BOSTON GLOBE (Dec. 17, 2016) ....................................................................................... 2

Federal Judicial Center,
　　Manual for Complex Litigation—Fourth ......................................................................... 6

Fitzpatrick, Brian, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.
　　EMPIRICAL L. STUD. 811 (2010) .................................................................................. 2, 5

Logan, Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*,
　　24 Class Action Reports (March-April 2003) ................................................................... 5

N.D. Cal. Procedural Guidance for Class Action Settlements ................................................. 24

Timmons, Heather,
　　*Outsourcing to India Draws Western Lawyers*, N.Y. TIMES B1 (Aug. 4, 2010) .................. 21

Walker, Vaughn R. & Ben Horwich,
　　*The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in
　　Common Fund Cases*,
　　18 GEO J. LEGAL ETHICS 1453, 1454 (2005) ................................................................. 15

**INTRODUCTION**

The proposed fee request in this case makes this settlement is upside-down: class counsel propose that they and the settlement administrator receive $63.6 million of a $115 million settlement fund, leaving $51.4 million for the class, or less than a dollar *per capita* for the 78 million class members. This is outrageous on its face and a plain violation of Ninth Circuit law, and requires reduction so that the fee award is appropriately proportionate to the actual class benefit, and reflects the reduced percentage of a megafund that this Court has repeatedly recognized as appropriate. But the fee request is worse than just requesting an excessive percentage: scrutiny of the purported lodestar reveals back-scratching and padding with *fifty-three* total firms billing. Most egregiously, class counsel inflates the lodestar to the Court and the class by seeking an average of $360/hour for contract-attorney and staff-attorney document review that paying clients typically pay only $35/hour for in the market—a markup of over 900% above market rates, more in the cases of several firms that seek $410/hour to $495/hour for this menial work. One of the lead class counsel firms in this case is already the subject of a $3 million special-master investigation in the District of Massachusetts for similar misstatements in their fee application. *Arkansas Teacher Retirement System v. State Street Bank and Trust Co.*, 232 F. Supp. 3d 189 (D. Mass. 2017) ("*State Street*"); Decl. of Theodore H. Frank ("Frank Decl.") ¶¶ 9-22.

Given this abuse, and the oversized fee request and lodestar here, it is not enough to reduce class counsel's fee request to the typical 11%-15% of a megafund. That would simply permit class counsel to play "Heads I win, tails don't count"; class counsel has no incentive not to seek an excessive fee award or exaggerate its lodestar if the only consequence is that the fee request is reduced to what should have been requested in the first place. And the Court should consider a *sua sponte* order of a special-master investigation similar to that in *State Street*. Objector Adam Schulman will make a formal motion for such an appointment next week.

**I.     Adam Schulman is a member of the proposed settlement classes and has standing to object.**

Objector Adam Schulman received a notice from the settlement administrator stating that Mr. Schulman is a member of the settlement class. Declaration of Adam Schulman ("Schulman Decl.") ¶ 9 (attached). Schulman submitted a claim form on December 12, 2017 and selected credit monitoring as his settlement relief, as he not eligible for cash compensation. *See* Schulman Decl. ¶¶ 12-13. Under the Settlement, any reduction in the fee award would return to the gross fund and Schulman would receive extended credit

monitoring. *See* Settlement §§ 4.8, 7.1, 12.4, Dkt. 869-8 at 15, 18, 24. Schulman therefore has standing to object to the fee request. *See Stetson v. Grissom,* 821 F.3d 1157, 1164 (9th Cir. 2016).

Schulman's business mailing address is 1310 L Street NW, 7th Floor, Washington, DC 20005; his phone number is (610) 457-0856; his email is adam.schulman@cei.org. *Id.* ¶ 2. Schulman is an attorney with the non-profit Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"), which also represents him *pro bono* in this matter. *Id.* ¶¶ 3-4. In the past three years, Schulman has objected to 6 settlements, all in a single MDL. *Id.* ¶ 7. Schulman intends to appear at the February 1, 2018 fairness hearing through counsel, Theodore H. Frank, which he reserves the right to substitute prior to the hearing, where he wishes to discuss matters raised in this Objection. Schulman does not intend to call any witnesses at the fairness hearing, but reserves the right to make use of all documents entered on the docket by any settling party, objector, or *amicus.* Schulman also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval, including any who submit testimony by declaration. Schulman objects to the extent class counsel uses expert witnesses in a reply brief to support their fee application after the objection deadline. Such a procedure is unfair under Rule 23(h) and inconsistent with the rule of *In re Mercury Interactive Corp. Sec. Litig.,* 618 F.3d 988 (9th Cir. 2010). Any such new evidentiary submissions should be stricken. He joins by reference any substantive objections made by other class members not inconsistent with those made here.

CCAF represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. Since it was founded in 2009,[1] CCAF has "recouped more than $100 million for class members" by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits,* BOSTON GLOBE (Dec. 17, 2016). CCAF's track record—and pre-emptive response to the most common false *ad hominem* attacks made against it by attorneys defending unfair settlements and fee requests—can be found in the Frank Declaration ¶¶ 4-8, 23-40.

To avoid doubt about his motives, Schulman is willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of his objection. Schulman Decl. ¶ 18; *see generally* Brian T. Fitzpatrick, *The End of Objector Blackmail?,* 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of

---

[1] In 2015, CCAF merged with the non-profit Competitive Enterprise Institute and became a program within CEI's law and litigation program.

objections as solution to objector blackmail problem). Schulman brings this objection through CCAF in good faith to protect the interests of the class.

**II.      The district court has a fiduciary duty to the class as a whole.**

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.* To guard against this danger, a district court must act as a "fiduciary for the class . . . with 'a jealous regard'" for the rights and interests of absent class members. *Mercury Interactive*, 618 F.3d at 994 (quoting *In re Washington Pub. Power Supply Sys. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994)).

Schulman's objection invokes this special fiduciary role of this Court because Schulman challenges class counsel's excessive and unreasonable fee request. At the fee-setting stage, the relationship between class counsel and the class turns directly and unmistakably adversarial because counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class' interest in securing the largest possible recovery for its members." *Id.* Given this natural adversity, there can be no deference to class counsel's recommendation.

Moreover, "in most common-fund cases, defendants have little interest in challenging class counsel's timesheets. *Gutierrez v. Wells Fargo, NA*, No. 07-cv-05923 WHA, 2015 WL 2438274, at *6 (N.D. Cal. May 21, 2015). No individual class member has the financial incentive to object to an exorbitant fee request either; "[h]is gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). The district court (and good-faith public-minded objectors) serve as the last line of defense against overreaching fee requests.

"Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law." *Laffitte v. Robert Half Int'l*, 376 P.3d 672, 688-92 (Cal. 2016) (Liu, J., concurring). Exorbitant fees erode public confidence in the class action device. To prevent that erosion, it is

"it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Piambino v. Bailey,* 757 F.2d 1112, 1144 (11th Cir. 1985); *see also In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1298 (9th Cir. 1994) (differentiating "reasonable" from "windfall" fees in megafund cases). "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

**III.    The fee request is grossly excessive for a megafund case and the Court should reduce to fee request to return over $26 million back to the class.**

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Proc. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011). The benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *Id.* at 942. (Class counsel asserts that "in most common fund cases, the [fee] award exceeds that benchmark." Fee Motion 2 (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)). At least in this district, the statement is false. Eisenberg, Theodore, Geoffrey P. Miller and Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, at 11 (Dec. 1, 2016) (NYU Law and Economics Research Paper No. 17-02, available at https://ssrn.com/abstract=2904194) (listing a median fee award of 25% in this district).) Plaintiffs claim that their request amounts to 33.33%. *See* Plaintiffs' Memorandum in Support of Motion for Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives ("Fee Motion"), Dkt. 916-6 at 6. While a request of 33.33% would be excessive under the benchmark in its own right, the request is in fact even more excessive because (1) a reasonable fee award should not exceed 15% of a megafund this size; (2) their percentage omits $1.99 million in litigation expenses; and (3) the class benefit should not include notice and administration costs. If properly calculated, class counsel should be awarded no more than $13.8 million (15% of the $92 million class recovery or 12% of the $115 million gross fund), returning $26 million to the class.

**A.    Class should be awarded no more than 15% of the $92 million class recovery (or 12% of the $115 million gross fund), which would return over $26 million to the class.**

While class counsel improperly calculates the fee percentage, *see* Sections III.B and III.C below, even employing counsel's methodology the 33.33% request is grossly excessive because it is over *twice* the average

percentage awarded in megafund settlements of this size. Because of economies of scale, a reasonable fee award should utilize sliding scale percentage to prevent a windfall for plaintiffs' attorneys at the expense of the class. *See, e.g., Silverman v. Motorola,* 739 F.3d 956, 959 (7th Cir. 2013). "It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 486 (S.D.N.Y. 1998). "There is considerable merit to reducing the percentage as the size of the fund increases. In many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* at 486 (quoting *In re First Fidelity Secs. Litig.,* 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)). Thus, "In cases with exceptionally large common funds, courts often account for these economies of scale by awarding fees in the lower range." *In re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (cleaned up). "The existence of a scaling effect—the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions. Plaintiffs' ability to aggregate into classes that reduce the percentage of recovery devoted to fees should be a hallmark of a well-functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010).

Empirical research shows that in class actions "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010). In class actions in which the settlement equaled $100 to $250 million, the median fee award was 16.9% and the mean was 17.9%. *Id.* at 839. Other surveys support this analysis. *E.g.*, Logan, Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports (March-April 2003) (empirical survey showed average recovery of 15.1% where recovery exceeded $100 million); Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7 (mean percentage fee in 69 class action settlements ranging from $70 million to $175 million was 19.4% and median award was 19.9% with standard deviation of 8.4%).[2] A reasonable award for class counsel in this case is between 10-19%. The gross settlement fund here is $115 million, but an extraordinary $23 million of that fund will go to notice and administration costs. *See* Settlement,

---

[2] *See also* Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, at 8 (noting that mean and median for cases over $100 million ranged from 16.6% to 25.5% but was likely due to significantly smaller number of cases in data set).

Dkt. 869-8 at 9; Declaration of Eve H. Cervantez ("Cervantez Decl."), Dkt. 916-8 ¶ 13. When notice and administration costs are excluded, *see* Section III.C, a healthy 15% award of the $92 million class recovery would be $13.8 million. And even if notice and administration costs were included, a $13.8 million fee award would equal 12% of the $115 million gross fund, a percentage still on the upper end for megafunds of that size. *See* Federal Judicial Center, Manual for Complex Litigation—Fourth 188–89 (2004) (noting survey where "class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%").

Percentage awards in megafund cases are "substantially less than the 25% benchmark applicable to typical class settlements in this Circuit." *Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038, 2016 WL 3351017, at *2-3 (N.D. Cal. June 15, 2016) (awarding 16.4% of common fund). For example, in *In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), this Court rejected a 19.5% fee request and instead awarded 9.8% because empirical research showed a 10.2% median for megafund cases over $175 million. No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (citing Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7). And following *High-Tech*, in *Nitsch v. DreamWorks Animation SKG Inc.*, this Court awarded 11% of $150 million settlement in order to avoid "windfall profits" to class counsel where class counsel "achieved economies of scale." 2017 WL 2423161, at *12 (N.D. Cal. June 5, 2017).

The fact that *High-Tech* and *Nitsch* were antitrust cases only underscores why the requested 33.33% percentage here is so excessive. An antitrust case is "arguably the most complex action to prosecute." *In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017) (internal quotation omitted). By contrast, this case involved much less risk as demonstrated by the eighteen firms that competed to serve as lead plaintiffs' counsel. *See* Order Appointing Lead Plaintiffs' Counsel, Dkt. 284 at 1-2. Had there been competitive bidding for the lead counsel role, there is no chance that the winner would not have agreed to a fee less than the 25% benchmark. That so many firms were lining up to take part of this case reflects the minimal risk involved. *Cf. In re Johnson & Johnson Derivative Litig.*, No. 11-2511(FLW), 2013 WL 6163858, at *11 (D.N.J. Nov. 25, 2013) ("Nor is an enhancement necessary to compensate counsel for the contingent nature of this case. … that conclusion is bolstered by the number of attorneys seeking to be first in the door in filing lawsuit on behalf of shareholders, and the intense level of competition litigating who would become lead counsel. … from counsel's perspective, this was a 'promising' case, holding the prospect of a large fee recovery from solvent defendants."); *contrast Silverman*, 739 F.3d at 958 (risk enhancement appropriate

when "no other law firm was willing to serve as lead counsel" at the case's inception).

Indeed, other judges in this District also award lower percentages in megafund cases. *See Gutierrez v. Wells Fargo, NA*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (rejecting 25% of $203 million; awarding only 9% in action alleging unfair banking practices) (Alsup, J.); *Alexander*, 2016 WL 3351017, at *2-3 (22% of a $226 million megafund settlement over wage-and-hour claims is "well above the typical range"; awarding instead 16.4%, "consistent with the higher end of awards in megafund cases") (Chen, J.); *In re Charles Schwab Corp. Secs. Litig.*, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) (awarding attorneys' fees of 9.25% where fund equaled $235 million) (Alsup, J.).

Rather than addressing Ninth Circuit cases requiring megafund economies of scale, class counsel argues that this Court should depart *upward* from the 25% benchmark. Fee Motion 6. That other courts have departed from the benchmark would not create "special circumstances" in this case justifying an upward departure. *See Bluetooth*, 654 F.3d at 942. More importantly, none of class counsel's examples of courts awarding 33% fee awards in the Ninth Circuit involve megafunds: *Spears v. First Am. Eappraiseit*, No. 5:08-cv-00868, 2015 WL 1906126, at *2 (N.D. Cal. Apr. 27, 2015) (below $10M); *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-cv-1466, 2006 WL 3312024, at *1 (D. Or. Nov. 13, 2006) (below $20M); *Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL 5938722, at *10 (C.D. Cal. May 16, 2016) ($9.5M); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ($12M); *Morris v. Lifescan, Inc.*, 54 Fed. App'x 663, 664 (9th Cir. 2003) ($14.8M); *Medeiros v. HSBC Card Servs., Inc.*, No. 15-09093, Dkt. 105 at 15 (C.D. Cal. Oct. 23, 2017) ($6.5M); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013) ($1.29M); *Stuart v. Radioshack Corp.*, No. C07-4499, 2010 WL 3155645, *2 (N.D. Cal. Aug. 9, 2010) ($4.5M); *In re Nuvelo, Inc. Securities Litigation*, No. C 07–04056, 2011 WL 2650592, at *2 (N.D. Cal., 2011) ($8.9M). Fee Motion 8, 10, 16, 17.

Class counsel cherry-picks fee awards from a few megafund cases outside the Ninth Circuit including *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 478 (D.N.J. 2008). *See* Fee Motion at 16. The District of New Jersey, however, has the highest median fee awards of all surveyed jurisdictions. *See* Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, at 11. The other two out-of-circuit megafund cases—cited solely for the percentage awarded—are older outliers and unhelpful for determining a reasonable award in the Ninth Circuit. *See* Fee Motion at 17 (citing *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005); *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D. La. 1997)). Recent out-of-circuit decisions confirm this district's

conscious trend away from windfalls in megafund cases. *See, e.g., Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016) (refusing to award 30% of $244 million settlement and awarding 20% of fund); *Good v. W. Virginia-American Water Co.*, 2017 WL 2884535, at *25 (S.D. W. Va. July 6, 2017) ("[T]he empirical literature and case surveys strongly support the conclusion that class actions ranging from $100 million to $150 million tend to have an average award of less than 25% of the common fund").

Further, rather than demonstrating "special circumstances" for an upward departure, this case presents circumstances for additional downward departure. *Cf. Bluetooth*, 654 F.3d at 942. The "foremost" consideration in the reasonableness of a fee award is the benefit obtained for the class. *Bluetooth*, 654 F.3d at 942. If class counsel were awarded the fees sought, the class would receive only $51,392,862—45% of the gross fund ($115,000,000 less $63,607,138 ($39,949,638 fees and expenses, $23,000,000 notice/administration, $60,000 future expert expenses, $597,500 in service awards)). *See* Fee Motion at 15, 25. Perhaps more significantly, the vast majority of the class relief will be in kind, rather than cash compensation. *See* Geraci Decl., Dkt. 916-32 ¶¶ 21-22 (nines as many credit monitoring claims as cash claims). With 78.8 million class members (Dkt. 869-5 at 6) the net fund is **only $0.65 per capita**. Hardly an "exceptional result" as plaintiffs claim, *see* Fee Motion at 2; the settlement is the largest data breach settlement only by the happenstance that the class size is the largest to settle so far. The case is instead a classic instance of leveraging of a large class size rather than achieving a good value. *Cf. Murray v. GMAC Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.) (finding settlement a "sellout" where class members receive 1% of minimum statutory award). If anything, the pennies per class member that this nuisance settlement provides directs that the fee award should depart even *further* from the benchmark. *Cf Il Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC,* No. C 13-05197 WHA, 2015 WL 2406966, at *3 (N.D. Cal. May 20, 2015) (finding downward departure because results were "neither exceptional nor hard-fought"). Contrast this settlement with that in *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013). There, counsel achieved a settlement that would pay each class member between 85-100% of her maximum recovery without even requiring the submission of a claim form. *Id.* at *2. Yet, this Court found that even such superlative results would not justify departing upward to a 33.3% few award. *Id.* at *5.

While seeking fees based on the $115 million fund, class counsel seeks an upward departure based on a mischaracterization of the relief. *See* Fee Motion at 3. They argue that because nearly 900,000 have signed up

for the credit monitoring, the settlement actually delivers $213 million for class members ($9.99 x 24 months). *Id.* at 3-4. Class counsel mistakenly treats the in-kind relief as equivalent, or even superior to, cash. Quite the opposite: "compensation in kind is worth less than cash of the same nominal value." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001). Class members who do not already have credit monitoring cannot opt for cash and thus, the relief should not be valued as if class members were delivered $240 in cash. *See* Settlement, Dkt. 869-8 at 16-17. As the sub 2% claims-rate indicates, assuredly many class members, like Schulman, are eligible for credit monitoring through other means (*e.g.* Equifax's voluntary offer in the wake of their much-publicized breach) or simply do not value credit monitoring as a service highly. Schulman Decl. ¶¶ 14-15. Any class members who did value such services above their retail price would have purchased those services independently of the settlement. And, class members that had already done so are able to receive only $36-$50 in cash, likely diluted by *pro rata* recovery because the total value of such alternative claims are capped at $13 million. *See id.* All said, only a small amount of the relief will be delivered as cash. Geraci Decl. ¶ 21.[3] That in-kind relief comprises the vast majority of total relief is reason for additional downward departure. *See Acosta v. Trans Union LLC*, 243 F.R.D. 377, 390 (C.D. Cal. 2007) (dismissing retail-price valuation of a "free credit report," instead finding that the economic value of the settlement depends on its cash component); *cf. also Georgino v. Sur la Table, Inc.*, No. cv-1103522, 2013 WL 12122430, at *20 (C.D. Cal. May 9, 2013) (awarding fees based on decreased settlement value because settlement relief was in kind).

The majority of the Fee Motion is based on a request for 33.33% of a $115 million fund. *See* Fee Motion at 1, 6, 16, 17. But class counsel alternatively argues that the fee award should be calculated based on additional funds Anthem will spend on cybersecurity; the amount of those additional funds, the total settlement value with those funds and the resulting fee percentage are redacted. *See* Fee Motion at 6. As an initial matter, failure to disclose such information to class members violates Rule 23(h) if indeed class counsel are relying on it as a basis for their fee. *See Mercury Interactive*, 618 F.3d at 993-94. Anthem's additional cybersecurity expenses, however, cannot simply be added to the settlement value in calculating fees because "the standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423

---

[3] In addition to the 106,417 claims for cash compensation, there have been 11,680 claims for out-of-pocket expenses, but the record does not disclose the total value of those claims. Geraci Decl. ¶¶ 21-22.

(N.D. Cal. 2009)). Those business practices also do not support an upward departure from the benchmark because Anthem already beefed up its cybersecurity after the breach to avoid further litigation and future liability. *See* Settlement § 2.3 ("Anthem shall engage the same independent consultant that it has already engaged…."); *see generally Koby v. ARS Natl. Services, Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (holding that injunctive relief of business practices defendant was already doing "presumably to avoid further litigation risk" has no real settlement value); *accord In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017).[4]

Nor can class counsel justify an excessive percentage based on the time spent on this action. "That contingency fee litigation doesn't always result in a recovery as large as plaintiff's counsel originally estimated is not a 'special consideration'—it's the nature of the beast." *Keirsey v. eBay, Inc.,* No. 12-CV-01200-JST, 2014 WL 644738, at *3 (N.D. Cal. Feb. 18, 2014) (refusing to deviate from 25% to the requested 31% even though it would provide only a .23 multiplier on class counsel's lodestar); *Hawthorne v. Umpqua Bank*, 2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) (refusing to deviate upward to 33% even where the fee request was less than lodestar, and class recovery was 38% of potential recovery). Class counsel grossly overstates their lodestar in this case, *see* Section IV, but even if it were accurate, the lodestar cannot justify the grossly excessive fee percentage.

Any Rule 23(h) award to class counsel should be no higher than $13,800,000 in fees and expenses (15% of net recovery), which would increase relief to class members by over $26 million, and right this upside-down distribution.

**B.    The litigation expenses should be included in calculating the percentage award.**

Class counsel seeks $37,950,000 in fees and $1,999,638 in expenses, or a total of $39,949,638. *See* Fee Motion at 1. Class counsel's 33.33% calculation, however, is based on $37.95 million in fees ($37.95M/$115M) and fails to include the $1.99 million class counsel is seeking for litigation expenses. *See* Fee Motion at 1. In a

---

[4] Class counsel distorts Supreme Court precedent, *Riverside v. Rivera*, 477 U.S. 561 (1986), arguing that the benefit to non-class members can be considered in awarding fees. Fee Motion 6 n.2. In *Riverside*, the Supreme Court explained that in civil rights actions, a court may consider the public benefit: "Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." 477 U.S. at 575. This is not a civil rights action. Nothing in *Riverside* permits this Court to calculate the settlement value based on benefits to non-class members. Indeed, the Ninth Circuit has specifically rejected this argument, holding that when calculating fees, the settlement value could not include injunctive relief that would not benefit class members. *Koby*, 846 F.3d at 1079-80.

number of cases, the Ninth Circuit and other courts include litigation "expenses" with the attorneys' fees in the numerator when calculating the percentage of recovery. *See Dennis v. Kellogg Co.*, 697 F.3d 858, 863 (9th Cir. 2012) (calculating percentage versus benchmark based on "$2 million in fees and costs"); *In re Imax Sec. Litig.*, 283 F.R.D. 178, 193 (S.D.N.Y. 2012) (refusing to award 25% fee recovery because fees plus expenses totaled 39% of the settlement amount); *Kmiec v. Powerwave Tech.*, 8:12-cv-00222-CJC-JPR, 2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) (similar).

If litigation expenses are not included in the numerator, class counsel is incentivized to treat resources as a litigation expense (because they will be reimbursed) and to increase those expenses (inflating the common fund value), knowing that such reimbursable litigation expenses will not be counted against the 25% benchmark. For example, included in class counsel's $1.99 million litigation expenses is $707,606 for experts. *See* Exhibit 5 to Cervantez Decl., Dkt. 916-14. But every dollar class counsel spent on their experts was not just a dollar taken from the settlement fund, but, under class counsel's calculation, effectively allows class counsel to earn a *commission* of an additional 33.3 cents/dollar in attorneys' fees ($233,510 commission on the $707,606 expert fees). Indeed, the danger of such commissions is compounded by the fact that class counsel has full control over litigation expenditures. If those litigation expenses are included in the numerator when calculating the fee percentage, the litigation expenses are counted against the percentage benchmark and class counsel have incentives to increase such expenses. *See In re Oracle Securities Litig.*, 136 F.R.D. 639, 644 (N.D. Cal. 1991) ("If the costs of attorney substitutes are reimbursable . . . a law firm paid by a percentage of recovery will find it in its interest to substitute non-attorney inputs for attorney effort. Allowing unlimited reimbursement of non-attorney inputs encourages greater such substitution.").

At a minimum, however, if the court is to exclude litigation "expenses" from the numerator when calculating an attorney award under the percentage-of-the-fund approach, the court should also exclude those same expenses from the denominator (*i.e.* the value of the fund). In *In re Transpacific Passenger Air Transportation Antitrust Litigation* ("*Transpacific*"), the court excluded both administration expenses *and* litigation expenses before calculating attorneys' fees. 2015 WL 3396829, at *2 (N.D. Cal. May 26, 2015). The district court observed that there was no authority requiring attorneys' fees to be calculated based on the gross fund and instead employed its "longstanding preference for using the net" fund, noting the multiple authorities that endorse that approach. *Id.* at *1 (citing *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("the

central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation"); *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994) ("If an attorney risks losing some portion of his fee award for each additional dollar in expenses he incurs, the attorney is sure to minimize expenses"). In *Transpacific*, the court concluded that when expenses were deducted, the requested fees actually totaled 42% of the class benefit rather than the 33% argued by class counsel. 2015 WL 3396829, at *2. The district court reduced fees from the requested $13.1 million to $9 million. *Id.*

Accordingly, the $1.99 million litigation expenses should be included in the numerator (added to the fees) when calculating class counsel's fee request or, at a minimum, be deducted from the gross fund prior to calculating attorneys' fees.

## C. The $23 million notice and administration expenses should be excluded from the fee calculation.

The extraordinary $23 million in notice and administrative costs should be excluded in calculating class counsel's award. The Ninth Circuit gives courts the discretion to calculate the percentage-of-recovery on the gross or net fund. *In re Online DVD*, 779 F.3d 934 (9th Cir. 2015). Courts have recognized that the better approach is to calculate percentage-of-recovery *after* expenses have been deducted from the settlement. In *Redman v. RadioShack,* the Seventh Circuit explained:

> But the roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. **Those costs are part of the settlement but not part of the value received from the settlement by the members of the class**. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.

768 F.3d at 630 (emphasis added); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (excluding administration expenses in calculating fee percentage because such expenses are "costs, not benefits"). "In order to determine a reasonable fee for the services of counsel, it is necessary to understand what counsel has actually accomplished for their clients, the class members. This can only be done when the expenses paid by the class are deducted from the gross settlement." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 WL 1087261, at *7 (S.D.N.Y. May 14, 2004). Some courts in this district have agreed, observing that "[i]t is only commonsense that a percentage-based fee should be based on the amount actually recovered by the class (directly or through cy pres) and not include a percentage of the sums going to pay costs." *Fraley v. Facebook,*

*Inc.*, No. C 11-1726 RS, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014); *accord* 2003 Advisory Committee Notes to Amendments to Rule 23(h) ("fundamental focus is the result *actually achieved* for class members" (emphasis added)). Put simply, attorneys' fees should be calculated based on the class benefit and "fees paid to the settlement administrator—do[] not constitute a benefit to the class members." *Myles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602, at *5 (N.D. Cal. Nov. 12, 2014).

If notice and administration expenses are included when calculating attorneys' fees, class counsel is being awarded a *commission* on those costs. *See Kmiec v. Powerwave Tech.*, No. 12-00222-CJC, 2016 WL 5938709, at *5 (C.D. Cal. Jul. 11, 2016) (finding "no principled reason to calculate a fee" by giving counsel a commission their costs); *Seijas v. Republic of Arg.*, 2017 WL 1511352, at *11 (S.D.N.Y. Apr. 27, 2017) ( "no justification" for awarding counsel a portion of its expenses as a fee for that result and thus calculating the fee award as a percentage of the net fund). Such awards create "perverse incentives" for class counsel to overspend on third parties. *Redman,* 768 F.3d at 630. "Counting administration fees as part of the settlement valuation for attorneys' fees purposes might also inadvertently incentivize the establishment of costly and inefficient administration procedures which would inflate the benefits valuation without increasing actual benefit for class members." *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 170 (D. Mass. 2015).

Instead, if class counsel is paid *after* administration expenses are deducted, class counsel is incentivized to optimize settlement administration expenses. *In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752, 771 (S.D. Ohio 2007) ("The net recovery more truly approximates the amount of money that benefits the Class. Because the percentage approach is meant to align the attorneys' fees with the amount of money the class receives, the net recovery is a more appropriate metric."). This also promotes judicial efficiency because when class counsel's incentives are aligned to optimize expenses, courts do not have to waste resources monitoring settlement administration expenses for cost overruns. "Put another way, incentives to minimize expenses and to allocate resources properly go much farther toward cost efficiency than can *post hoc* judicial review." *Wells Fargo Sec. Litig.*, 157 F.R.D. at 471.

Here, the dangers of excessive administration costs were actually realized. The $23 million administration cost consumes 20% of the gross megafund—over 10 times the average amount of administration costs for funds over $50 million. *See Wells Fargo Sec. Litig.*, 157 F.R.D. at 474 (describing survey that found expenses in securities and antitrust cases on average consume only 2.1% of the fund for gross

OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST

recoveries more than $50 million); *In re Lithium Ion Batteries Litig.*, No. 13-md-02420 YGR, Further Submission in Support of Pending Motions for Final Approval and for Attorneys' Fees, Dkt. 1988 at 14 (N.D. Cal. Oct. 6, 2017) (surveying eight recent large antitrust settlements with median costs of 4.3% and mean costs of 4.47%). Rather than rewarding class counsel with a $7.59 million commission on the $23 million costs paid to the settlement administrator, class counsel's fees should be calculated *after* the $23 million is deducted from the settlement fund. Any argument that the size of the class required tens of millions of dollars of administrative costs to be included in the settlement fund raises questions about whether a class action here satisfies Rule 23(b)'s superiority requirement.

* * *

In sum, if the $23 million notice and administration costs are excluded from the $115 million gross settlement fund and the $1.99 million litigation expenses are included in the numerator, then class counsel's $39.95 million fee request amounts to 43.4% ($39,949,638/$92,000,000). In *Dennis v. Kellogg Co.*, the parties sought $2 million in fees and expenses of a $10.64 million common fund. 697 F.3d at 868. The Ninth Circuit found that a portion of the relief was illusory and that the actual value of the common fund was $5.14 million. 697 F.3d at 868 The Ninth Circuit concluded that "the dollar value of the settlement fund plummets to $5.14 million, and the $2 million attorneys' fees award becomes 38.9% of the total, which is **clearly excessive** under our guidelines." *Id.* (emphasis added).  Here, the 43.4% fee percentage requested is *worse* than *Dennis*. Even if this case did not involve a megafund, the fee request is not justified. But because this is a megafund case, 15% of the $92 million net fund is a fair percentage. An award of $13.8 million in fees and expenses would return over $26 million to the class. However, as discussed in § IV below, the award should be lowered still.

## IV.   The lodestar crosscheck does not support class counsel's fee request because the lodestar is overstated by at least $13 million.

The lodestar cross-check should "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." *Bluetooth*, 654 F.3d at 945. "[I]n megafund cases, the lodestar cross-check assumes particular importance." *Alexander*, 2016 WL 3351017, at *2; *see also In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1298 (9th Cir. 1994) (describing how percentage-based awards become particularly arbitrary in a megafund context). The crosscheck helps uncover the "disparity between the percentage-based

award and the fees the lodestar method would support." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 n.8 (9th Cir. 2002); Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in Common Fund Cases*, 18 GEO J. LEGAL ETHICS 1453, 1454 (2005) ("[C]ourts making common fund fee awards are ethically bound to perform a lodestar cross-check."). The lodestar here is overstated by millions of dollars because (1) the total lodestar included 53 firms—in violation of this Court's appointment order, *see* Dkts. 284, 286—creating duplication and inefficiencies; (2) the document review was both inefficiently assigned to higher-priced attorneys and performed by contract attorneys that charged exorbitant billing rates; (3) the actual extent of the overstatement is likely much greater but cannot be determined based on the insufficient billing summaries submitted by class counsel.

A. **While the court appointed four firms to the Steering Committee, class counsel's total lodestar included time from 53 different law firms, guaranteeing duplication and inefficiency.**

The lodestar should be greatly reduced because it includes time from 53 different law firms. *See* Cervantez Decl. ¶ 50. District courts "should exclude" "hours that were not reasonably expended" where cases are "overstaffed" and hours are "excessive, redundant or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In this case, this Court appointed four firms to act as lead counsel and who were designated settlement class counsel under the Preliminary Approval Order: Altshuler Berzon LLP; Cohen Milstein Sellers & Toll PLLC; Lieff Cabraser Heimann & Bernstein LLP; and Girard Gibbs LLP. *See* Dkt. 284 at 2-3; Dkt. 903 at 4. The combined lodestar for those four firms totals $24,228,471. *See* Cervantez Decl. ¶ 50. In addition to the lodestar of the four appointed firms, however, the total submitted lodestar also includes $13,603,878 from 49 other law firms. *Id.*

Rule 23(g) requires the district court to select the best applicant among those seeking to be class counsel. Fed. R. Civ. Proc. 23(g). Is not uncommon for counsel to agree who will be lead class counsel "in exchange for commitments to share the legal work and fees." *See* Federal Judicial Center, Manual for Complex Litigation—Fourth § 21.272 (2004). This anti-competitive behavior is typical of the machinations in the MDL setting where the same players show up again and again. Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 Vand. L. Rev. 67 (2017). "On the plaintiffs' side, repeat players (attorneys who held more than one leadership position within our dataset) held 767 out of 1,221 available leadership roles, or 62.8 percent." Elizabeth Chamblee Burch & Margaret S. Williams, *Repeat Players in Multidistrict Litigation: The Social Network*,

102 Cornell L. Rev. 1445, 1471 (2017); *id.* at 1472 (reporting 43.9% of leadership positions in MDL class action settlements were filled by repeat players). "[T]he relevant plaintiffs' bar is small, lead lawyers can influence and sometimes directly control one another attorneys' fees, lawyers must often rely on each other to form funding coalitions, and, as explained below, being dubbed 'uncooperative' may render defectors ineligible for future leadership roles." *Id.* at 1461. "Critics likewise note that, as veterans, leaders have developed an arsenal of strategies to corral, convince, and coerce other lawyers to come together for proposes of organizing and settling cases en masse." *Id.* at 1449 (citations omitted). Rather than competing, the MDL repeat players engage in backscratching to the detriment of the class. "To guard against overstaffing and unnecessary fees, the court should order the attorneys to produce for court examination any agreements they have made relating to fees or costs." *See* Federal Judicial Center, Manual for Complex Litigation—Fourth § 21.272 (2004).

"In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content*, 517 F.3d 220, 227 (5th Cir. 2008). "[T]he district court must not … delegate that duty to the parties." *Id.* at 228 (internal quotation marks omitted). For example, if one of the 53 law firms has secretly agreed to accept less than its lodestar than is being requested from the Court (or has agreed to a log-rolling agreement in this MDL to provide work in another MDL), it is the class that is entitled to that giveback, not the law firm that has secretly extracted a return greater than would be approved by the Court. *Cf. Pearson*, 772 F.3d at 786; *Bluetooth*, 654 F.3d at 949 (reversion to defendant instead of class is a sign of impermissible self-dealing because "there is no apparent reason the class should not benefit from the excess allotted for fees"). Equally important, if fees are allocated by the district court in accordance with the fee papers submitted, it encourages class counsel to truly police one another's hours for reasonableness, rather than turning a blind eye to lack of billing judgment (*e.g.* document review billing practices discussed *infra* at § IV.B). *See* Jessica Erickson, *The Market for Leadership in Corporate Litigation*, 2015 U. Ill. L. Rev. 1479 (2015) (counsel will punish inefficiency when dividing up the fee award). The Court should not award a lump sum to be privately and secretly partitioned; rather "the better practice" is for the parties to propose an allocation and for the court to approve or disapprove it. *In re Critical Path, Inc., Sec. Litig.*, No. C 01-00551 WHA, 2002 WL 32627559, at *8 (N.D. Cal. Jun. 18, 2002). After the 2003 amendments to Rule 23, this better practice has become a required practice. *High Sulfur*, 517 F.3d at 228. .

When seeking appointment as lead counsel in this case, class counsel did not disclose that they would be using 53 firms to litigate this case, nor how the fees would be split up among the 53 firms. *See* Cervantez and Friedman Motion for Appointment, Dkt. 190. While lead counsel here proposed a committee of eight firms, *see* Dkt. 190 at 5-9, the Court, having received an opposition from Robbins Geller to the unwieldiness of that proposed structure, appointed only four firms and ordered: "[T]he Court encourages Ms. Cervantez and Mr. Friedman, as needed, to consult with the other applicants regarding devising damages theories, retaining data security experts, litigating against the defendants in this case, and identifying and communicating with potential plaintiffs." Dkt. 284 at 3. The Court further ordered that on an "as needed basis," lead counsel "may assign **discrete tasks** to counsel for other plaintiffs in this MDL for resource-intensive tasks such as identifying plaintiffs for the Consolidated Amended Complaint and reviewing discovery." Dkt. 286 at 1 (emphasis added). But nothing in the Court's orders could be read as authorizing lead counsel to engage 49 other law firms. *See Dial Corp.*, 317 F.R.D. at 434-35  (evincing distress at fact that class counsel had staffed case with five firms even though appointment order rejected five-firm structure in favor of a leaner two-firm structure). Lead counsel did not simply use a handful of firms for "discrete tasks." Instead, lead counsel flagrantly disregarded the Court's order by using 49 other law firms to perform $13.6 million in work comprising 35% of the total lodestar.

In appointing four firms as lead counsel, there was a risk of duplication of effort and overstaffing. *E.g., Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 3187410, at *15 (N.D. Cal. June 21, 2013) ("One firm is usually best for the class because it eliminates the inefficiency in keeping a multiplicity of law firms up to speed."). But with 53 total law firms and 78,553 hours of attorney time, *see* Cervantez Decl. ¶ 21, duplication and overstaffing was inevitable.

Although counsel's nebulous categorical billing submissions shroud much of that duplication (see § IV.C below), a few areas worthy of investigation jump out. For example, attorneys billed 13,871 hours for 194 depositions. Cervantez Decl. ¶¶34, 52. Even assuming all depositions were necessary, not every one was a bet-the-case deposition, and an average of 71.5 hours per deposition may be high. *Compare Schoolcraft v. City of New York*, 2016 WL 4626568 at *9 (S.D.N.Y. Sept. 1, 2016), *modified on other grounds* 248 F. Supp. 3d 506 (2017) ("42 billed hours per witness" is "wasteful"). 3,379 hours were spent on the motion for class certification and the reply. *Compare Dial Corp. v. News Corp.*, 317 F.R.D. at 435 (28 attorneys and 1900 hours briefing and arguing

class certification was excessive). 2,500 hours were spent crafting the settlement. *Compare Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358, at *8 (N.D. Cal. Aug. 29, 2014) ("800 hours in settlement negotiations and mediation stands out as particularly excessive"; reducing to 400).

We are not asking the Court to put on green eye-shades and scrutinize time entries line by line; maybe this settlement was six times more complicated than the one in *Rose*. By separate motion, Schulman will seek the appointment of a special master to determine the extent of the duplication and seek disclosure of any agreements among the 53 firms regarding fees, but at the very least, this Court should substantially discount the $13.6 million submitted from the non-lead firms as an abusive evasion of its Rule 23(g) order.

**B.      The lodestar is overstated by over $7 million because the contract attorneys' rates are exorbitant and the document review was inefficiently assigned to higher-priced attorneys.**

In addition to duplication, the lodestar materially overstates the value of counsel's services. The lodestar is calculated by multiplying the "number of hours reasonably expended on the litigation by a reasonable hourly rate." *Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA, 2017 WL 5495816, at *3 (N.D. Cal. Nov. 16, 2017). "The reasonableness of an hourly rate should be determined based on the rates prevailing in the community for 'lawyers of reasonably comparable skill, experience and reputation.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, n.11 (1984)). Given the millions of pages of documents that plaintiffs reviewed, Cervantez Decl. ¶ 31, plaintiffs both (1) billed contract attorneys at hourly rates exorbitantly higher than market rates and (2) inefficiently assigned the task to higher-priced associates. (The 23(h) request is internally inconsistent whether certain attorneys are contract attorneys or "staff attorneys," though both categorizations are made under oath. *Compare, e.g.,* Dkt. 916-10 *with* 916-31 at 9. But document-review work performed by each is similar, and the relevant inquiry is what paying clients would pay for the work, making the two interchangeable for purposes of this analysis; we refer to them collectively as "contract attorneys.") Appointed class counsel, Lieff Cabraser, is currently under investigation by an appointed special master for similar practices. *State Street*, 232 F. Supp. 3d 189; Frank Decl. ¶¶ 8-22 & Exs. 2-4.  Reducing the hourly rates for this work to the prevailing market rate would reduce the purported lodestar by at least $7 million.

> **1.      The lodestar is overstated by at least $5.7 million because contract attorneys billed nearly 20,000 hours at exorbitant rates.**

Class counsel seeks hourly rates for contract attorneys that are multiple times their market cost to the

1   firm. *See* Exhibit 3 (Dkt. 916-12) to Cervantez Decl. (billing contract attorneys at hourly rates between $185-

2   625). 34,262 of the 78,553 total hours was spent on document review (43.6%). Cervantez Decl. ¶¶ 51. About

3   19,497.6 hours were billed to contract attorneys at a blended contract attorney rate of $360/hour for a total of

4   $7 million. *See* Schulman Decl. Ex. B. Contract attorneys are hired to do relatively unskilled document review

5   work that discerning paying clients refuse to pay a premium for and certainly cannot charge rates of $360/hour,

6   which is what class counsel request from the settlement fund. Indeed, across the country, paying clients refuse

7   to pay even as much as $150/hour for document review (even if law-firm attorneys conduct it)—and then only

8   if the temporary attorneys are not billed directly to the client as a direct cost.

9   "[T]here is absolutely no excuse for paying these temporary, low-overhead employees $40 or $50 an

10   hour and then marking up their pay ten times for billing purposes." *In re Beacon Assocs. Litig.*, No. 09 Civ. 777,

11   2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013). *See also Lola v. Skadden, Arps, Slate, Meagher & Flom*, 620 Fed.

12   Appx. 37, 40 (2d Cir. 2015) (observing that plaintiff contract attorney was paid $25 per hour, and holding that

13   the work described was so devoid of legal judgment it may not even constitute the practice of law); *Pa. Pub.

14   Sch. Employees Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016) (holding that charging the class

15   $362/hr for temporary attorney work "is unreasonable and warrants a reduction in the attorneys' fees").

16   The best practice is to bill the contract attorneys at cost. In *Dial Corp. v. News Corp.*, the district court

17   commended class counsel for treating contract attorney work as an expense, charging the 25,000 hours at

18   $39/hour with no mark-up applied. 317 F.R.D. 426, 430 n.2 & 438 (S.D.N.Y. 2016); *see also Banas v. Volcano

19   Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (awarding contract attorney time as "costs" at billing rate of

20   $47 to $59 per hour). Indeed, it is likely unethical to charge more than cost. The ABA Standing Committee on

21   Ethics ruled that "In the absence of an agreement with the client authorizing a greater charge, the lawyer may

22   bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the

23   lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract."

24   ABA Formal Opinion 08-451. The ABA concluded:

25          The analysis is no different for other outsourced legal services, except that the
26          overhead costs associated with the provision of such services may be minimal
          or nonexistent if and to the extent that the outsourced work is performed off-
27          site without the need for infrastructural support. If that is true, the outsourced
          services should be billed at cost, plus a reasonable allocation of the cost of
28

> supervising those services if not otherwise covered by the fees being charged
> for legal services.

*Id.* Similarly, much of the nearly four-million-page document review here was likely conducted offsite, and under the supervision performed by attorneys who are already being billed separately. *See also generally, e.g.*, Lester Brickman, *Lawyer Barons* 378-87 (Cambridge U. Press 2011); *id.* at 501-06. If the 20,000 hours were billed at cost, e.g., a generous rate of $50/hour, the contract attorney lodestar would drop from $7 million to $1 million. And cost is likely lower than that—at the *State Street* hearing, defense counsel indicated that his client was paying $35/hour. Frank Decl. Ex. 3 at 83-86.

Even if there is discretion to charge a markup, class counsel provides no evidence of the market rate for contract attorneys. The best measure of the market rate is to review what *paying clients* are willing to pay. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) ("Perhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that defend class actions on a regular basis."). In today's legal market, clients refuse to tolerate law firms treating gigantic document review projects as a profit center, or in other words "a trough where herds of lawyers try to muscle their way to the front to quench their thirst without explanation and with no appreciation of moderation." *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). A reasonable market rate that a *paying client* would pay for contract attorneys after the financial crisis and the glut in unemployed attorneys able to do the fungible work would be between cost and $75/hour. Frank Decl. Ex. 3 at 83-86. Even in the last decade, paying clients were not paying more than $125/hour for document review. *E.g., SEC v. Kirkland*, No. 6:06-cv-183, 2008 U.S. Dist. LEXIS 123308, at *5 (M.D. Fla. June 30, 2008). Anthem should disclose what it paid for document review to illuminate the market rates: we believe it is closer to $35/hour than $75/hour, much less $360/hour. But if the court applies $75/hour, the $7.2 million contract attorney lodestar drops to $1,500,000.

In sum, because of the unreasonable billing rates for contract attorney time, the lodestar is overstated by approximately $5.7 to $6.5 million.

## 2. The lodestar is also overstated because it assigned low-level document review to higher-priced associates.

Document review lodestar is also overstated because much of it was tasked to high-priced associates.

As one court observed, "[t]here is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys)." *Beacon Assocs.*, 2013 WL 2450960, at *18. "Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *In re Citigroup Inc Secs. Litig.*, 965 F. Supp. 2d 369, 398 (S.D.N.Y. 2013) (quoting *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) and refusing to award $330-$550/hr for document review work); *City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (similar); *MacDougal v. Catalyst Nightclub*, 58 F. Supp. 2d 1101, 1106-07 (N.D. Cal. 1999) (inappropriate for a senior attorney to bill $325 per hour for routine and clerical tasks).

Paying clients pay much less for project attorneys than for full-time law-firm attorneys for document review, even when the temporary "lawyers are experienced, highly qualified attorneys." Nicole Bradick, *Freelance Law: Providing Solutions to Modern Day Practice Dilemmas*, 27 MAINE BAR J. 23, 24 (2012); *accord* Heather Timmons, *Outsourcing to India Draws Western Lawyers*, N.Y. TIMES B1 (Aug. 4, 2010) (clients "don't need a $500-an-hour associate to do things like document review and basic due diligence"). Courts and clients widely recognize that document review and contract-attorney work do not merit full-scale rates. *See, e.g., IL Fornaio*, 2015 WL 2406966, at *5 (N.D. Cal. May 20, 2015) ("It would be unjustified to charge the class senior-associate or partner-level rates for routine tasks like document review, returning a hard drive, vetting stipulations, preparing copies of exhibits, checking citations, and so forth.").

Even if the review of documents was assigned to full-time firm attorneys, many courts refuse to permit full lodestar rates to be charged, given that large-scale document review can be performed by non-professionals. *E.g., City of Pontiac Gen. Emples. Ret. Sys..*, 954 F. Supp. 2d at 280 ("a sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associates cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services"); *Planned Parenthood of Cent. N.J. v. Attorney Gen. of N.J.*, 297 F.3d 253, 266 (3d Cir. 2002) (remanding award because appeals court was "unable to make a determination" whether plaintiff's attorney had improperly "billed hours for … such tasks as document review").

Plaintiffs' submissions conceal the exact breakdown for the 14,000+ hours of document review performed by non-contract attorneys. But several examples show that the vast majority of that document review was performed at exorbitant rates between $400 to over $500:

- Barrack, Rodos & Bacine spent 951.3 hours on document review (Dkt. 916-11 at 3), but their lodestar includes no contract attorney time; associates charged between $375 and $470, and all partners charged upwards of $500/hour (950 x $400 = $380,000);[5]

- Bonnett, Fairbourn, Friedman & Balint, P.C. expended more than 1000 hours on document review (Dkt. 916-11 at 3), less than 300 of that from a contract attorney, the rest likely from an associate at $425/hour (Dkt. 916-10 at 5) (700 x $425 = $297,500);

- Branstetter, Stranch & Jennings, PLLC expended more than 1600 hours on document review (Dkt. 916-11 at 3), less than half of that from contract attorneys, the rest likely from an associate at $410/hour (Dkt. 916-10 at 5) (800 x $410 = $328,000);

- Goldman, Scarlato, Penny LLP expended almost 500 hours on document review (Dkt. 916-11 at 4), but had no timekeepers cheaper than $475/hr, and mathematically must have charged almost $600/hr for the majority of its doc review time (Dkt. 916-10 at 7) (500 x $550 = $275,000);

- Kaplan Fox & Kilsheimer LLP spent almost all its 360 hours on document review (Dkt. 916-11 at 4), charging an associate at $500/hr for that time (Dkt. 916-10 at 7) (360 x $500 = $180,000);

- Keller Rohrback Law Offices, LLP expended more than 3000 hours on document review (Dkt. 916-11 at 4), but instead of contract atty time, they appear to have charged $400/hr for associate time (Dkt. 916-10 at 7) (3000 x $400 = $1,200,000);

- Morgan & Morgan also billed an associate at $500/hr for its 360 hours of document review (Dkt. 916-10 at 7) (360 x $500 = $180,000);

- Pomerantz expended all of its more than 1100 hours on document review (Dkt. 916-11 at 5), most of that time was billed by an associate at $500/hour (Dkt. 916-10 at 8) (1100 x $500 = $550,000);

- Stull, Stull & Brody expended more than 800 hours on document review (Dkt. 916-11 at 6), although their cheapest timekeeper was $500/hour (Dkt. 916-10 at 9) (800 x $500 = $400,000).

Just based on these examples, approximately $3,790,500 was billed for document review at these higher rates, likely overstated by nearly $2 million or more. The lodestar for document review alone is overstated anywhere from $7 million to $9 million.

---

[5] This is an increase over the $362/hr for which they were criticized by the Southern District of New York just a year ago. *Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016).

OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST

3. **The same billing practices Lieff Cabraser employed here are under investigation in** *Arkansas Teacher Retirement System v. State Street Bank and Trust Co.***, No. 11-cv-10230 MLW (D. Mass.).**

In November 2016, a Boston Globe's Spotlight team reporter contacted Theodore H. Frank, director of CEI's Center for Class Action Fairness (CCAF) concerning double-billing the Globe had spotted in *Arkansas Teacher Retirement System v. State Street Bank and Trust Co.*, No. 11-cv-10230 MLW (D. Mass.) ("*State Street*"). *See* Frank Decl. ¶¶ 9-10. The plaintiffs firms, including Lieff Cabraser Heimann & Bernstein, LLP (one of the firms appointed class counsel here) had received nearly $75 million in fees in *State Street*. Frank wrote a memo for the Boston Globe reporter identifying common signs of inflation contained in plaintiffs' fee motion such as crediting work by temporary contract attorneys paid $24-39/hour as being worth over $350/hour. Frank Decl. Ex. 1. The Globe's December 17 article on the case eventually detailed the overbilling. *Id.* Ex. 2. More than 60 percent of the fees (49,000 hours of the 86,114 total hours) were claimed to derive from work performed by staff attorneys.

Because of the Globe article, the court held a hearing regarding the previously awarded fees. *Id.* Ex. 2-3. The judge questioned "whether paying clients customarily agreed to pay, and actually paid, an hourly rate for staff attorneys that is about ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs." *See* Frank Decl. ¶ 14 (quoting *State Street*, Dkt. 117 at 6-7). Lieff Cabraser confirmed at the hearing that the rates were *not* charged to "paying clients." *See* Frank Decl. Ex. 3 at 93. In fact, defendant State Street's attorney confirmed that his client was charged $35/hour by contract attorneys for document review, and that his firm charges other clients who do not wish to retain contract attorneys $75/hour for staff attorneys. *Id.* at 83-86. The district court noted that "jurisprudence indicates that the rates—the lodestar is supposed to be calculated on what lawyers are charging to paying clients in the community," *id.* at 94, and ultimately appointed a special master with a $3 million budget whose report is currently due March 15. Frank Decl. ¶¶ 20-21 and Ex. 4. Objector Schulman intends to file a motion for a similar appointment of a special master to review those same billing practices Lieff Cabraser has employed in this case.

C. **The lodestar is likely overstated even more than estimated because class counsel has failed to include sufficient billing summaries.**

While Schulman estimates the lodestar inflation based on the unreasonable billing rates and the

excessive number of firms involved, the actual extent of the overstatement cannot be calculated because plaintiffs' attorneys have failed to provide sufficient detail in their billing summaries. The lodestar "serves little purpose as a cross-check if it is accepted at face value." *Citigroup Secs. Litig.*, 965 F. Supp. 2d at 389. *See generally* N.D. Cal. Procedural Guidance for Class Action Settlements, available at http://cand.uscourts.gov/ClassActionSettlementGuidance ("All requests for approval of attorneys' fees awards must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund."). Lack of detailed billing submissions in their fee papers, however, make it impossible to precisely identify the duplication and inefficiencies. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 623 (9th Cir. 1993) (time records should demonstrate "whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours").

For example, without detailed submissions, the Court lacks critical information regarding the timing of the work performed. Here, the lodestar includes work performed through September 30, 2017. Cervantez Decl., Dkt. 916-8 ¶ 45. But settlement was reached several months prior, in June 2017. *See* Dkt. 869. Without detailed billing information here, the Court is unable to confirm that plaintiffs had ceased discovery or document review after settlement was reached. In *Citigroup Secs. Litig.*, the district court struck $7.5 million of lodestar where class counsel had brought on twenty additional contract attorneys to perform document review *after* the parties had reached the settlement agreement in principle. 965 F. Supp. 2d 369, 392 (S.D.N.Y. 2013). The district court recognized that class counsel was attempting to "inflate the lodestar." *Id.* Instead of providing sufficient lodestar detail, class counsel employs a "just trust us" approach, which is unacceptable in class action proceedings. *Dennis*, 697 F.3d at 869. It "is essential" to allow "class members an opportunity to thoroughly examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported." *Mercury Interactive*, 618 F.3d at 994.

Based on Schulman's estimates, the lodestar is overstated by *at least* $13 million: $6.8 million (50% of the $13.6 million charged by the 49 firms not appointed by the Court); $4.5 million for contract attorneys; $2 million for overpriced associate document review, but the overstatement could be much more. The Court should deny any fee request based on the overstated lodestar.

OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST

**V.    Any fee award should be decreased further because of class counsel's misleading fee petition.**

An appropriate sanction for overinflating lodestar is to reduce the multiplier (on the actual lodestar) below 1. If the only consequence from trying to claim more than what class counsel is entitled to is that class counsel will get what they would have been entitled to if they had filed a fair petition in the first place, there is no incentive to be forthright with a court in the original request. On the rare occasions they get caught, they are no worse off; if no objector investigates, they receive a windfall. If "the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful." *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980); *see also Keener v. Dep't of Army*, 136 F.R.D. 140, 150 (M.D. Tenn. 1991). An "outside-chance opportunity for a megabucks prize must cost to play." *Commonwealth Electric Co. v. Woods Hole*, 754 F.2d 46, 49 (1st Cir. 1985).

Public policy and the law demand that there be material consequences for the assertion that lodestar is over $39 million when it is inflated by at least $13 million. In the face of excessive and misleading submissions, the Court has discretion to reduce hours across the board. *E.g., Giovannoni v. Bidna & Keys*, 255 Fed. Appx. 124, 126 (9th Cir. 2007) (affirming a 50% across the board for excessive and block-billing); *cf. also Jacobson v. Persolve, LLC*, 2016 WL 7230873, at *6-*7 (N.D. Cal. Dec. 14, 2016) (Koh, J.) (weighing counsel's disregard for the interests of absent class members in the fee calculus). Let the punishment fit the crime. Class counsel will argue "But everyone does it," and that shows deterrence is necessary because it's so infrequently caught. If class counsel overstated their lodestar by $13 million, then their fees should be capped below lodestar minus *at least* the $13 million overstatement—otherwise, if class counsel is caught only half the time, they would come out ahead. And courts are surely failing to catch class counsel's overbilling half the time, or class counsel would not be so brazen as to use the same language they admitted was misleading in *State Street*.

## CONCLUSION

For the foregoing reasons, class counsel's fee request should be denied. As in *State Street,* the court should appoint a special master to investigate the billing irregularities demonstrated here.

1    Dated: December 29, 2017          Respectfully submitted,

2                                       /s/ Theodore H. Frank
                                        Theodore H. Frank (SBN 196332)
3                                       COMPETITIVE ENTERPRISE INSTITUTE
                                        CENTER FOR CLASS ACTION FAIRNESS
4                                       1310 L Street NW, 7th Floor
                                        Washington, DC 20005
5                                       Email: ted.frank@cei.org
                                        Voice: 202-331-2263
6

7                                       Attorneys for Objector Adam Schulman

8

9

10

11                                      _____

12                                      Objector Adam Schulman

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST

PROOF OF SERVICE

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case.

In addition, I caused to be mailed the foregoing objection along with other contemporaneously-filed documents to the following individual:

LHK Courtroom Deputy
United States District Court for the Northern District of California
Robert F. Peckham Federal Bldg.
280 1st Street
San Jose, CA 95113

DATED this 29th day of December, 2017.

/s/ Theodore H. Frank
Theodore H. Frank

OBJECTION OF ADAM SCHULMAN TO PLAINTIFFS' ATTORNEYS' FEE REQUEST