1   ALTSHULER BERZON LLP
    EVE CERVANTEZ (SBN 164709)
2   ecervantez@altshulerberzon.com
    JONATHAN WEISSGLASS (SBN 185008)
3   jweissglass@altshulerberzon.com
    DANIELLE E. LEONARD (SBN 218201)
4   dleonard@altshulerberzon.com
    MEREDITH A. JOHNSON (SBN 291018)
5   mjohnson@altshulerberzon.com
    TONY LOPRESTI (SBN 289269)
6   tlopresti@altshulerberzon.com
    177 Post Street, Suite 300
7   San Francisco, CA 94108
    Telephone: (415) 421-7151
8   Facsimile: (415) 362-8064

9
    COHEN MILSTEIN SELLERS & TOLL PLLC
10  ANDREW N. FRIEDMAN (admitted pro hac vice)
    afriedman@cohenmilstein.com
11  GEOFFREY GRABER (SBN 211547)
    ggraber@cohenmilstein.com
12  SALLY M. HANDMAKER (SBN 281186)
    shandmaker@cohenmilstein.com
13  ERIC KAFKA (admitted pro hac vice)
    ekafka@cohenmilstein.com
14  1100 New York Ave. NW
    Suite 500, West Tower
15  Washington, DC 20005
    Telephone: (202) 408-4600
16  Facsimile:  (202) 408-4699

17  *Lead Plaintiffs' Counsel*

18              **UNITED STATES DISTRICT COURT**
19            **NORTHERN DISTRICT OF CALIFORNIA**
20                   **SAN JOSE DIVISION**

21  | *In Re Anthem, Inc. Data Breach Litigation* | Case No. 15-MD-02617-LHK |
22  |  | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
23  |  |  |
24  |  |  |
25  |  | Hearing: February 1, 2018 |
    |  | Time: 1:30 p.m. |
26  |  | Courtroom: 8, 4th Floor |
27  |  | Judge: Hon. Lucy H. Koh |
28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................... 1

II.  UPDATES ON THE CLASS'S POSITIVE RESPONSE AND VALUE TO THE CLASS ............. 2

III. RESPONSE TO CLASS MEMBER COMMENTS AND OBJECTIONS ......................... 3

   A. Objections Concerning the Equitable Relief. ............................................... 4

     1. Credit Monitoring and Related Services ................................................ 4

      a. The Settlement Provides High-Value Services. .............................. 4

      b. The Credit Monitoring Services Are Valuable. .............................. 5

      c. Information Provided to Experian Will Be Secure. ......................... 5

      d. The Settlement Appropriately Balances Relief. ............................. 6

     2. Reforming Anthem's Data Security Practices ....................................... 6

   B. Objections Concerning the Monetary Relief. .............................................. 8

     1. Alternative Cash Payments ................................................................... 8

     2. Objections Concerning Out-of-Pocket Costs ........................................ 8

      a. The Fund Is Unlikely To Be Depleted ........................................... 8

      b. The Availability of the Fund Does Not Eliminate Better Alternatives ................................ 9

      c. The Claims Process to Draw from the Fund Is Streamlined ........... 9

      d. The Fund Covers Appropriate Expenditures ................................. 10

   C. Other Objections .......................................................................................... 10

     1. The Settlement Holds Anthem Accountable ........................................ 10

     2. Class Notice and Settlement Administration ....................................... 11

     3. Residual Distribution .......................................................................... 12

     4. The Release Is Appropriately Tailored ............................................... 13

     5. The Court's Rule 23 Findings .............................................................. 14

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abuan v. Gen. Elec. Co.*,
   3 F.3d 329 (9th Cir. 1993) ................................................................................ 9

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................... 15

*Chavez v. PVH Corp.*,
   2015 WL 581382 (N.D. Cal. Feb. 11, 2015) ............................................... 14

*Custom LED, LLC v. eBay, Inc.*,
   2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) ............................................. 14

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................... 14, 15

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ....................................................................... 14

*In re Checking Account Overdraft Litig.*,
   286 F.R.D. 645 (S.D. Fla. 2012)................................................................... 15

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .......................................................... 3

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
   2010 WL 3931096 (N.D. Cal. Oct 6, 2010).................................................. 15

*In re Google Referrer Header Privacy Litig.*,
   869 F.3d 737 (9th Cir. 2017) ....................................................................... 13

*In re Hyundai and Kia Fuel Econ. Litig.*,
   No. 1556014 (9th Cir. Jan. 23, 2018) ............................................................. 3

*In re Initial Pub. Offering Sec. Litig.*,
   728 F. Supp. 2d 289 (S.D.N.Y. 2010)............................................................. 3

iii

*In re: Fortman*,
   2016 WL 4046760 (E.D. Mo. July 27, 2016) ........................................................................ 3

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ........................................................................ 15

*Kode v. Carlson*,
   596 F.3d 608 (9th Cir. 2010) ........................................................................ 13

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ........................................................................ 11

*Rodriguez v. West Publishing Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................ 3, 11

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*,
   59 F. Supp. 2d 1021 (N.D. Cal. 1999) ........................................................................ 12

*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................................ 15

*Sullivan v. DB Investments*,
   667 F.3d 273 (3d Cir. 2011) ........................................................................ 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ........................................................................ 15

**Statutes**

Cal. Civ. Code §§ 56 ........................................................................ 11

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK

## I.    INTRODUCTION

Having fully addressed in their opening brief all but one of the final approval factors, Plaintiffs submit this reply brief to address the one factor that remains: class members' reaction to the settlement.

Plaintiffs and their counsel anticipated that the class's reaction would be positive; the settlement calls for a $115 million settlement fund—an unprecedented sum for a data breach lawsuit—requires Anthem to approximately triple its annual information security spending over the next three years compared to pre-breach levels, and to implement specified cybersecurity changes recommended by Plaintiffs' expert to safeguard class members' PII. During that same period, Anthem will retain independent consultants to undertake annual security risk assessments and settlement compliance reviews, and will report the results to Plaintiffs' counsel.

In response to these reforms to Anthem's information security practices, and the establishment of the nine-figure fund that will compensate and protect the class going forward, class member reaction has been positive. With the claims period ending later this month, class members have already submitted *over 1.2 million claims*. Taken alone, the conservative value of the claimed credit monitoring now exceeds $500 million. By contrast, there have been a mere *21 objections* from class members, some of which misinterpret the settlement. Several objections do not even take issue with the proposed class relief, and instead limit their discussion to attorney fees, which Plaintiffs address in a separate brief.

Although Plaintiffs appreciate the time that class members spent responding to the settlement, when weighed against the excellent benefits being provided, none of the objections warrant setting aside this settlement. Instead, as is common in class settlements, many of the objectors simply wish that defendants had offered more in the settlement—credit monitoring for life, for example, or larger cash payments. Virtually every settlement can be attacked on this ground; a defendant can always theoretically pay more. But this settlement will provide more than has ever been obtained in a data breach class action. And, not to be overlooked, the settlement provides credit monitoring, fraud resolution services, and improved information security measures now, not years after litigating through class certification, summary judgment, and potentially trial and appeal. Given the settlement's value, and the resoundingly positive reaction from the class, Plaintiffs and their counsel continue to believe the settlement is in the class's best interest, and request that it now be approved.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK

1  **II.     UPDATES ON THE CLASS'S POSITIVE RESPONSE AND VALUE TO THE CLASS**

2          The period for submitting claims is scheduled to remain open through at least January 29, 2018.

3  *See* Settlement Agreement ("SA") ECF 869-8 ¶¶ 4.3, 5.1. As of January 25, there are already a total of

4  1,275,340 claims. *See* Decl. of Lana Lucchesi ("KCC Decl."), ¶¶ 9-10.

5          Class members can submit claims for either (i) credit monitoring custom-designed to guard

6  against the security risks posed by the Anthem breach, or (ii) alternative compensation in the form of

7  cash payments if they already have credit monitoring services. *See* Settlement Agreement ("SA") ¶¶ 4.3,

8  5.1. In addition, class members may be reimbursed for a range of out-of-pocket expenses—including

9  credit monitoring costs, credit freeze purchases, and time and money spent resolving identity fraud and

10 may, without submitting a claim, avail themselves of identity restoration services. *Id.* ¶¶ 4.9, 6.1.

11         Below, Plaintiffs summarize the claims data now available:

12    ▪  1,125,275 class members have submitted claims for credit monitoring services. KCC Decl.

13       ¶ 9. Given the makeup of the claims filed to date, the settlement fund will almost certainly

14       have reserves to pay for four years of credit monitoring. Reply Decl. of Eve H. Cervantez

15       Supp. Mot. for Final Approval and Atty. Fees ("Cervantez Reply Decl.") ¶ 6. Although these

16       services are not publicly available, *id.* ¶ 8, even assuming their value is equal to the cost of a

17       lower quality package that is available ($9.99 per month) the claims total to date entails over

18       $500 million in value claimed by the class, *id.* ¶ 6.

19    ▪  131,221 class members have submitted claims for the alternative cash payments. KCC Decl.

20       ¶ 9. Based on the claims filed to date, each of these claimants will receive $50 in cash,

21       entailing a total payout of $6,561,050. *See* SA ¶ 5.3; Cervantez Reply Decl. ¶ 3.

22    ▪  18,844 class members have claimed reimbursement of out of pocket costs; setting aside

23       undocumented and outlier claims requesting $10,000 or more, the median claim is $350.

24       KCC Decl. ¶ 11.[1]

25         The value provided to the class will continue to increase. As one example, the deadline for out-

26 of-pocket expense claims does not close until one year after final judgment is entered. SA ¶ 6.1. It is

27 reasonably likely that class members will make out-of-pocket expense claims during that time.

28

---

[1] The Settlement Administrator is still vetting the submitted claims for validity. KCC Decl. ¶ 12.

1  Additionally, *all* class members, even those who do not file a claim, are entitled to free fraud resolution

2  services throughout the four-year pendency of the credit monitoring services. Cervantez Decl. ¶ 7. It is

3  not yet known how many class members will take advantage of this service, but the approximate retail

4  value of the service is $89.98 per usage. *Id.* These benefits are in addition to the large increases in

5  expenditures Anthem must implement to improve its information security practices. SA Ex. 2 ¶ 8.

6        Turning to the non-claims related class member reaction data, the deadline for submitting

7  objections and requests to opt out passed on December 29, 2017. Only 21 class members objected to the

8  settlement.[2] In addition, 390 class members excluded themselves from the settlement. KCC Decl. ¶ 13.

9  These totals correspond to only a miniscule fraction of the approximately 79 million class members who

10  are eligible to participate. The vastly larger number of submitted claims, compared to the small number

11  of objections and opt outs, favors final approval. *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948,

12  967 (9th Cir. 2009) (low number of objections supports fairness of settlement).

13  **III.     RESPONSE TO CLASS MEMBER COMMENTS AND OBJECTIONS**

14        Because the class member objections sometimes overlap in substance, Plaintiffs group their

15  responses below by topic and address them serially, although the Court should assess the settlement

16  "taken as a whole."  *Rodriguez*, 563 F.3d at 965.[3] Plaintiffs address the substance of each objection—

17  including those submitted by so-called serial objectors. Among the objectors here, Mr. Kress, Mr.

18  Fortman, and Mr. Miller regularly object on behalf of each other or their respective family members;

19  here, they advance the concerns of Ms. Kress. *See* Kress, ECF 925; *see also In re: Fortman*, 2016 WL

20  4046760 (E.D. Mo. July 27, 2016) (Mr. Kress, Mr. Fortman, and Mr. Miller represented Ms. Kress as an

21  objector); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 n.30 (S.D. Fla. 2011)

22  (most if not all of the Objections, including those advanced by Mr. Kress "have been brought by

23  professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects

24  of the Settlement they can latch onto"). Courts have made a similar finding with respect to Mr. Pentz.

25  *See* ECF 927; *see also In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 294–95 (S.D.N.Y.

26  2010) ("[T]here is sufficient evidence to conclude that the Siegel, Pentz, and Weinstein Objectors

27

28  _____

[2] Objections sent to KCC and not to the Court are attached to the KCC Declaration as Exhibits B-H.
[3] Cervantez Reply Decl. Ex. A lists each objector and the page(s) on which that objector is discussed.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK

groups are represented by serial objectors and that all four Objector groups have engaged in bad faith and vexatious conduct").

A.    **Objections Concerning the Equitable Relief.**

1.    **Credit Monitoring and Related Services**

a.    **The Settlement Provides High-Value Services.**

Implicitly recognizing the importance of the credit monitoring services, the most common objection states a desire for the credit monitoring services to last the rest of class members' lives, rather than for the next four years. *See* Graham, KCC Decl. Ex. E at 1; McClellan, ECF 922 at 1-3; Mitchell, KCC Decl. Ex. G at 1-2; Orlowske, ECF 933 at 1; Pflug, ECF 934 at 1; Prada, ECF 913 at 1; Stone, ECF 920 at 1; Talbott, ECF 907 at 1; Ziecker, KCC Decl. Ex. H at 2. Conversely, one objector argues that the settlement provides *too much* in the way of credit monitoring services, positing that long-term coverage is unneeded since "the most immediate danger from the breach has lessened with time." Coddington, ECF 927 at 3.

Given that the breach exposed their sensitive information, it's understandable that class members have strong opinions on the need for these services. The length of credit monitoring provided by the settlement was set only after receiving input from industry experts. Pre-settlement, Plaintiffs' expert had opined that the heightened risk of identity theft persists for at least five years after the breach. Van Dyke Report, ECF 744-25 ¶ 46. That is why, during the contested litigation phase of this case, Plaintiffs prioritized coverage for the five-year post-breach window. *Id.* The settlement delivers in full on that litigation objective. It virtually guarantees four years of custom services *going forward* (after the two years already offered by Anthem), taking the protection beyond the close of the five-year post-breach window. SA ¶ 4.8. In that context, the services likely exceed what Plaintiffs could have achieved at trial.

The objectors' speculation that more is always better must yield to an important reality. The settlement came about only after intense, prolonged litigation and strenuous negotiations. The duration of the credit monitoring was a product of that process—it is simply wishful to suppose that Defendants would have agreed to obligate themselves to spend many more millions of dollars over a span of decades to provide lifetime credit monitoring. More likely, Defendants would have continued to litigate, jeopardizing the considerable benefits on the table. Given Plaintiffs' own expert's testimony, bearing

1    such additional litigation risk to secure lifelong services would have been irresponsible and wasteful.

2                    **b.  The Credit Monitoring Services Are Valuable.**

3                    One objector suggests that the credit monitoring services have "little value" because Equifax also

4    offered credit monitoring services in the wake of its 2017 data breach. *See* Cowdrey, ECF 930 at 1. To

5    the contrary, the Equifax credit monitoring provides nowhere near the benefits provided under this

6    settlement (and may not have been available to all members of the class). The credit monitoring here

7    will almost certainly last four years and includes identity restoration services and identity validation

8    monitoring, while the Equifax offer covers just one year and does not offer identity restoration services

9    or identify validation services. Cervantez Reply Decl. ¶ 9. The settlement benefits are clearly superior.

10                    The objection also overlooks the settlement's other major benefits. Anthem has agreed to

11    implement key changes to its cybersecurity practices, closing gaps in its defenses, and to approximately

12    triple its information security budget over pre-breach levels. And to the extent some class members

13    signed up for some other credit monitoring services, they retain the ability under the settlement to claim

14    either additional credit monitoring or cash, which many have done; the settlement is poised to pay $6.5

15    million in cash to class members. Cervantez Reply Decl. ¶ 3. For these reasons, the Court should

16    overrule objector Boone's contention that class members are releasing claims without sufficient

17    compensation. ECF 939 at 1.

18                    A repeat objector worries that the settlement's credit monitoring services are of a lesser value

19    because they "cannot be combined with any other credit monitoring package, or staggered upon another

20    plan already in place." Kress, ECF 925 at 4. Not so. The settlement does not prohibit class members

21    from layering their coverage; class members can stagger coverage with existing credit monitoring by

22    delaying activating the credit monitoring provided under the settlement for up to one year. SA ¶ 4.4.

23                    **c.  Information Provided to Experian Will Be Secure.**

24                    Two objections express concerns that the settlement's designated credit monitoring company

25    may lack adequate cybersecurity controls. *See* Prada, ECF 913 at 1; Ziecker, KCC Decl. Ex. H at 2.

26    When Plaintiffs' counsel evaluated competing proposals from credit monitoring companies, they

27    specifically evaluated each of the finalists' security controls. Cervantez Reply Decl. ¶ 8. Plaintiffs'

28    counsel also negotiated custom provisions into the settlement; Experian must, for example, keep all class

member data within the United States, and no off-shore workers can provide services under the contract. *Id.* Additionally, as a major credit bureau, Experian already has the Social Security numbers and other PII of most Americans. But in contrast with other types of credit monitoring services (including those offered by Equifax), the settlement prohibits Experian from using class members' information "for any purpose other than the provision of the [credit monitoring] Service." *Compare id.* (quoting the credit monitoring contract), *with id.* Ex. C (Equifax offering; allowing the information to be shared with affiliates for "everyday business purposes").

### d. The Settlement Appropriately Balances Relief

Another objection argues that the settlement overvalues credit monitoring services and undervalues the cash payments available to the class, apparently presuming that for each class member who claims credit monitoring, Anthem will credit itself with paying the retail value of the services ($9.99 per month over four years, or $480 in total) toward the $115 million settlement fund. Coddington, ECF 927 at 1, 3. The settlement establishes a $115 million *non-reversionary* fund. *See* SA ¶ 3.1. Anthem will pay the full $115 million, regardless of how many class members opt for credit monitoring, cash, or claim out-of-pocket expenses. While it is true that the parties to the settlement anticipated the class would desire robust credit monitoring services, class members who already have such services may choose to claim a cash payment. Structuring the settlement in this fashion allowed the parties to leverage economies of scale to deliver credit monitoring services to the entire class, and helped increase the cash alternative compensation—up to $50 per claimant, an amount that was far from certain even following victory at trial and related appeals. *See, e.g.,* Mot. for Class Cert., ECF 743-12 at 13 (damages could be valued at $4 to $10 per individual). For these reasons, the settlement does not create an interclass conflict, *see* Boone, ECF 939 at 1, nor is it lacking because it doesn't compensate class members for the time, effort, and inconvenience of performing their own credit monitoring work, Ziecker, KCC Decl. Ex. H at 2.

### 2. Reforming Anthem's Data Security Practices

One of the primary benefits of the settlement is that it will fix the data security flaws that Plaintiffs and their experts believe jeopardized—and believe would otherwise continue to jeopardize—the security of the class's data still held by Anthem. The settlement requires Anthem to approximately

*triple* the amount it spends annually on information security for the next three years compared to pre-breach expenditure levels. SA Ex. 2 ¶ 8. The settlement also requires Anthem to implement, expand, or maintain many cybersecurity improvements at the suggestion of Plaintiffs and their experts. SA Ex. 2; *see* Pls.' Mem. Supp. Final Approval, ECF 916-4 at 6-8 (discussing changes to Anthem's cybersecurity practices). These benefits inure to all class members, even those who have not filed claims. Nevertheless, several objectors suggest that these changes lack value because Anthem already "had agreed to spend $260 million to make security improvements as a result of its regulatory settlement." Coddington, ECF 927 at 4, Ex. B; *see also* Walton, ECF 936 at 8 n.10. The only support for this contention is a misstatement in a news article. The actual regulatory settlement states only that Anthem had *already* spent $115 million on security improvements. *Compare* Cervantez Decl. Ex. 14, ECF 916-23 at 3 (regulatory settlement agreement, § A(6)), *with* ECF 927 Ex. B (the cited article). The minimum cybersecurity expenditures required over the course of the next three years in this settlement represent *new* money, not the money Anthem already spent. Cervantez Reply Decl. ¶ 10.

Another objection argues that Anthem's business practice changes are all worthless because "of course a defendant . . . would change their business practices to avoid further liability," Chattopadhyay, ECF 919 at 7, a contention that is not borne out by the record. As the settlement in this case reflects, particularly paragraphs 1-5, and 8-12 of Exhibit 2 to the Settlement Agreement, Anthem promised to undertake some entirely *new* cybersecurity measures and expand the scope of other existing security measures as part of the settlement, none of which Anthem *is obligated to undertake unless this settlement becomes final*. Cervantez Reply Decl. ¶ 11.

The remaining objections relating to Anthem's information security improvements either misunderstand the record or push for what would be an unprecedented transformation of Anthem as a corporate entity. Beginning with the former, one objection contends the settlement should require Anthem to create a Chief Information Security Officer ("CISO") position and establish a Risk Committee, Walton, ECF 936 at 3-5, even though Anthem already has both. *See, e.g.*, Decl. of Patrick Murphy, ECF 663-3 ¶ 2 (declaration from Anthem's Chief Audit and Risk Officer). The same objector wants Anthem to train employees about cybersecurity risks and procedures, Walton, ECF 936 at 7, which is already required by the settlement. SA Ex. 2 ¶ 13. And he wants to install his personally-

7

selected advocates on to Anthem's Risk Committee, require "Anthem and all of its affiliates [to] convert to non-profit corporations," and publicize their confidential security audits. Walton, ECF 936 at 5-7, 11-15; *see also* Prada, ECF 913 at 1 (demanding public security audits). On balance, Plaintiffs believe the risk of continued litigation to secure such unattainable goals would unnecessarily jeopardize the significant relief they've secured; thus the Court should reject Mr. Walton's suggestions.

### B.    Objections Concerning the Monetary Relief.

#### 1.    Alternative Cash Payments

Two objections take issue with the alternative cash compensation awards. One objection asserts that requiring "proof" of credit monitoring to be eligible for the cash payment is improper. Coddington, ECF 927 at 3. The settlement does not require formal proof in the form of admissible evidence, however. SA ¶ 5.1. All it requires is that class members state they already have credit monitoring services and provide some basic information about those services. *Id.*

A second objection claims that the cash alternative is inadequate because those payments will be made only if there is money left over "after other claims and costs, including plaintiffs' attorney's fees, are paid." Cowdrey, ECF 930 at 1 (emphasis omitted). This objection misreads the settlement agreement. The settlement allocates at least $13 million for the cash payments, and even more if needed based on the claims rate. *See* SA ¶ 5.3. Thus far, the fund has proved sufficient to make the maximum allowable payment ($50) to every class member who made a claim. *See* Cervantez Reply Decl. ¶ 3

#### 2.    Objections Concerning Out-of-Pocket Costs

The settlement provides for a $15 million non-reversionary fund to compensate class members for up to $10,000 each for out-of-pocket costs. The money can be used to reimburse costs for credit monitoring and credit freezes. And it can also be used to help reimburse class members for identity fraud-related expenses that they incur after the breach. SA ¶¶ 6.3, 6.4. Thus, a major benefit of the settlement is that it imposes no obligation on class members to prove that a particular identity fraud event resulted from the Anthem data breach. *Id.* Several objections nevertheless criticize the creation of this fund. Chattopadhyay, ECF 919 at 9; Coddington, ECF 927 at 3-4; Orlowske, ECF 933 at 1.

##### a.    The Fund Is Unlikely To Be Depleted

A first objection suggests that residual funds should be used to supplement the out-of-pocket

8

expenses fund. Coddington, ECF 927 at 3-4. Based on the claims submitted thus far, however, there is no indication that the $15 million fund for out-of-pocket expenses will be depleted. KCC Decl. ¶ 12. Several others are concerned the settlement will not cover them in the future if they discover an identity fraud event. *See* Douglas, KCC Decl. Ex. C at 1; Stone, ECF 920 at 1, Ziecker, KCC Decl. Ex. H at 2. First, the settlement automatically provides identity theft insurance to any class member who signs up for credit monitoring services. Final Approval Br., ECF 916-4 at 8. Second, all class members, even those who do not file a claim, are entitled to free fraud resolution services throughout the four-year pendency of the credit monitoring services. Cervantez Decl. ¶ 7. Third, the period for claiming reimbursement for identity theft related expenses does not close for another year. SA ¶ 6.4. While objectors may wish that period could be longer, this concern comes down to weighing risk against benefit. The law can make it difficult to recover for harm that has yet to occur. *Cf. Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334 (9th Cir. 1993) ("A plaintiff who seeks damages for increased risk of future illness or injury 'can recover only where he can show that the [underlying cause] more probably than not *will* lead to' the malady.") (citation omitted; emphasis in original).

### b.  The Availability of the Fund Does Not Eliminate Better Alternatives

Next, an objection states that the settlement should allow class members to proceed in small claims court. Chattopadhyay, ECF 919 at 8-9. There is no indication that small claims court would offer a superior alternative. For one thing, the fund already provides for a payment of up to $10,000 per class member, which happens to coincide for the maximum allowable payment in many small claims courts.[4] And this payment requires minimal substantiation in comparison to carrying the burden of proof in adverse litigation in court. In any event, while class members are unlikely to fare better in small claims court, nothing prevented them from opting out of the settlement to take that course of action.

### c.  The Claims Process to Draw from the Fund Is Streamlined

Another objector contends it is unlikely that families will be able to support their claims. Hurt, KCC Decl. Ex. F at 2-3. But the settlement requires only "documentation [that] should naturally exist." SA ¶ 6.1. And class members with documented claims can recoup up to ten hours of lost wages for time spent remedying issues without having to document how they spent their time. *See* Class Notice, Geraci

---

[4] See http://www.scscourt.org/self_help/small_claims/small_claims_overview.shtml

Decl. Ex. G at 9, ECF 916-32 at 45. The process requires minimal substantiation in comparison to what individual class members would have needed to produce even after a class victory at trial. *See* ECF 743-13 at 3 (trial plan noting class members would need to individually document out-of-pocket losses). To the extent class members forget to document their claims, the settlement requires KCC to send deficiency letters instructing class members on how to cure any deficiency. SA 6.2. Class Counsel or their call center will also be available to assist class members in curing deficient claims. Cervantez Reply Decl. ¶ 13. For those reasons, the Boone objections – that the procedure for obtaining out-of-pocket losses is limited and difficult and creates roadblocks to legitimate claims – should also be overruled. *See* Boone, ECF 939 at 1.

### d.  The Fund Covers Appropriate Expenditures

Finally, two objections state a mistaken belief that the fund does not allow for compensation for certain expenses (associated with false tax returns and credit freezes). Chattopadhyay, ECF 919 at 1-2; Mitchell, KCC Decl. Ex. G at 1. The out-of-pocket expenses fund does cover false tax returns. SA ¶ 6.3 (specifically referencing "falsified tax returns"). And as explained in the Class Notice, "[c]osts associated with credit freezes" incurred between January 2015 and one year after the Final Approval Date are also compensable. Class Notice at 9; Out of Pocket Claim Form, Geraci Decl. Ex. I, ECF 916-32 at 80.

## C.    Other Objections

### 1.   The Settlement Holds Anthem Accountable

Several objectors don't think the settlement goes far enough. Deibel, ECF 912 at ("not a loud statement"); Ziecker, KCC Decl. Ex. H at 2 (does not "reflect the degree of negligence"); Chattopadhyay, ECF 919 at 7-9 (arguing the "penalty" to Anthem is insufficient); Orlowske, ECF 933 at 1 ("slap on the wrist"). To the contrary, this settlement is the largest settlement to date in a data breach class action—in a field where the law continues to evolve and where there is far from a certain path to class certification and victory at trial. *See* Final Approval Br., ECF 916-4 at 14-18 (discussing strength of Plaintiffs' case and risk of further proceedings); Cervantez Reply Decl. Ex. B (chart of data breach settlements). The settlement requires Anthem to provide measurable and significant relief to the class, including implementing improvements that will approximately triple its investment in cybersecurity.

And it does this in the face of a formidable and experienced litigant who fiercely resisted this resolution. Because the settlement fairly compensates class members and remediates the alleged security deficiencies, the class's objectives are fully met and the lack of further relief does not warrant denial of final settlement approval.

### 2. Class Notice and Settlement Administration

Several objectors suggest the Class Notice was inadequate because the details of Anthem's cybersecurity improvements were not disclosed in detail. *See* SA Ex. 2; Schulman, ECF 924 at 8-9; Kress, ECF 925 at 5-9; Chattopadhyay, ECF 919 at 7. Class Counsel address many of these concerns in their Reply in support of their Motion for Attorneys' Fees and Costs. In addition, the Court should overrule these objections because, as the Court already recognized at preliminary approval, publicly disclosing these information security measures is not in the class's best interests and would only assist future hackers. ECF 902.

Next, an objection contends that Class Notice was inadequate because it did not inform California class members that the settlement will bar them from suing Anthem under California's Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq*. Chattopadhyay, ECF 919 at 8. Such specificity is not required. A class notice "must 'generally describe the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) (quoting *Rodriguez*, 563 F.3d at 962) (internal alteration omitted). "That standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, and it does not require an estimate of the potential value of those claims." *Id.*; *accord Rodriguez*, 563 F.3d at 962 ("While the Notice does not . . . analyze the expected value [of fully litigating the case], we do not see why it should.").

Another two class members complain about the postcard notice itself. One calls the postcard confusing but does not suggest how it could be improved. *See* Frankel, ECF 906 at 1. The parties took care in crafting the notice, and the Court carefully examined the postcards before approving them. Second, two class members contend the postcards should not have exposed class members' e-mail addresses. *See* Frankel, ECF 906 at 1; Drum, KCC Decl. Ex. D at 1[5]. The postcards did not. *See* Geraci

---

[5] Class Counsel address Mr. Frankel and Ms. Drum points, although neither appear to object.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK

Decl. Ex. C, ECF 916-32 at 15. Although class members could choose to use the postcard notice to make a claim for credit monitoring services, they could file a claim online instead. And even if they used the postcard to file a credit monitoring claim, they were not required to write in their e-mail address.

The same two class members also report experiencing technical problems with the online claims forms. On the few occasions that Class Counsel have heard of technical problems, they have helped the affected class members and immediately contacted KCC, who fixed the problems within 24 hours. Cervantez Reply Decl. ¶ 12. In addition, Class Counsel established a call center to help class members through the claims process, and both objectors were able to submit claims (whereas no class member reports being unable to do so). *See* Cervantez Reply Decl. ¶ 12; KCC Decl. ¶ 8.

Finally, several objectors and class members[6] question the accuracy of the notice process. They suggest the process was faulty because some members of their family received notice, while others did not; another says he received a notice addressed to someone else. *See* Chott Consumer Compl., KCC Decl. Ex. B at 6; Hurt, KCC Decl. Ex. F at 2-3; Stone, ECF 920 at 1, Cappellini, ECF 908 at 1; Walton, ECF 936 at 16. Upon review, however, none of these reflect errors in the notice or claims administration. *See* KCC Decl. ¶¶ 15,19, 22-24. In each case, the correct family members received notices, and those who did not are not class members.[7] *Id.* That is, the hackers responsible for the Anthem data breach did not steal data from all members, and it was frequently the case that only data for one family member, but not others, was exfiltrated. Cervantez Reply Decl. ¶ 57. As for the notice that went to a wrong address, the underlying class database lists a Tina Alonso at that address. *See* KCC Decl. ¶ 23.

### 3. Residual Distribution

Two objectors take issue with the residual distribution plan. Mr. Coddington argues that there is no reason why residual funds should not be used to supplement the out of pocket claim fund instead of credit monitoring. Coddington, ECF 927 at 4. But the settlement fund is non-reversionary, so a residual dollar is a residual dollar. Whether it is used to pay an out of pocket claim or it is used to pay for credit monitoring, it imposes an identical cost on Anthem.

---

[6] Class members Chott, Hurt, Stone, and Cappellini comment on but do not appear to object.

[7] "[N]onclass members have no standing to object to the settlement of a class action." *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999).

1       The second objector argues that the cy pres awards permitted under the settlement, SA ¶ 7.1,

2  should instead be distributed as cash payments to both alternative compensation and credit monitoring

3  claimants. Mayo ECF 932 at 2-3. Class Counsel agrees, which is why the settlement uses residual funds

4  to augment the class awards, *see* SA ¶¶ 4.6, 5.3, 6.3-6.4, 7.4, and falls back on cy pres only when the

5  settlement fund becomes non-distributable. Based on current claims rates, Class Counsel project that

6  there likely will be approximately $2.5 million in unallocated funds remaining at the effective date of

7  the settlement. Cervantez Reply Decl. ¶ 5. This comes to about three cents per class member or $2 per

8  claimant. The Court has broad discretion to approve distribution methods "that fall[] within a broad

9  range of permissible conclusions." *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per

10  curiam). Cy pres awards are particularly appropriate where the remaining settlement funds are "'non-

11  distributable' because the proof of individual claims would be burdensome or distribution of damages

12  costly." *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 742 (9th Cir. 2017) (affirming

13  settlement approval of cy pre-only $5.3 million settlement for 129 million class members over

14  objections of Schulman and counsel Theodore Frank).

### 4.  The Release Is Appropriately Tailored

16       Two more objections appear to misunderstand the scope of the release and how it should be

17  communicated to the class members. *See* Grondona, ECF 931 at 1; Chattopadhyay, ECF 919 at 9-10.

18  Mr. Grondona[8] wants to preserve his claims arising out of a 2011 Anthem data breach against the

19  "money transmitters" that he believes profited from his identity being used in a money laundering

20  operation. Grondona at 1. Mr. Grondona contends that because at least one of the complaints in this

21  MDL may mention the existence of the 2011 breach, his unasserted claims against the "money

22  transmitters" are being released here. *Id.*; Am. SA ¶ 13.1, ECF 916-21 at 4 ("Released Claims" relate to

23  or arise "from any of the facts alleged in any of the actions"). Mr. Grondona's claims against the

24  unidentified money transmitters, however, could only be released by this settlement if they were based

25  on the identical factual predicate as those alleged in this MDL. "A settlement agreement may preclude

26  a party from bringing a related claim in the future even though the claim was not presented and might

---

[8] Mr. Grondona states that he is a named plaintiff in this case. *Id.* at 1. Mr. Grondona is a named plaintiff in one of the underlying MDL actions, not any of the Consolidated Class Action Complaints.

1   not have been presentable in the class action, but *only* where the released claim is based on the identical

2   factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598

3   F.3d 581, 590 (9th Cir. 2010) (internal quotation marks omitted) (emphasis added).

4   Thus, courts in this district have approved releases of claims "arising from or related to" the

5   allegations in the action. *See Custom LED, LLC v. eBay, Inc.*,  2013 WL 6114379, at *4, *9 (N.D. Cal.

6   Nov. 20, 2013) (approving class release "arising out of or relating in any way to any of the legal,

7   factual, or other allegations made in the Action, or any legal theories that could have been raised on the

8   allegations of the Action.");  *Chavez v. PVH Corp.*, 2015 WL 581382, at *5-*6 (N.D. Cal. Feb. 11,

9   2015). Mr. Grondona does not explain how a complaint in this litigation would preclude him from

10  asserting claims against unrelated parties in a different breach that facilitated the misuse of his data.

11  Another objector contends that it is too difficult for class members to identify what claims they

12  are giving up when the release invokes over a hundred underlying class action complaints and covers

13  all claims "related to or arising from any of the facts alleged in any of the Actions." Chattopadhyay,

14  ECF 919 at 9-10. The Court and the parties discussed these issues at the preliminary approval hearing.

15  The Court made clear that enumerating all released claims is not required by Ninth Circuit law.

16  8/17/2017 Hrg. Tr. at 26:11-18, 28:2-13. There is no need to reconsider that statement.  The same

17  objector also states that the settlement agreement's non-disparagement provision, SA ¶ 18.21, is too

18  broad. That provision, however, does not apply to unnamed class members such as Mr. Chattopadhyay.

### 5.  The Court's Rule 23 Findings

20  Ms. Boone challenges class certification, suggesting inadequate representation regarding relief

21  allocation and a lack of predominance because the "affected state consumer-protection statutes vary in

22  their coverage," ECF 939 at 1 (ignoring Plaintiffs' common law claims). There is no question that, as a

23  general matter, following a rigorous Rule 23 analysis, a district court may certify a national or multi-

24  state settlement class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1998); *see also In re

25  Hyundai and Kia Fuel Econ. Litig.*, No. 1556014 at 52 (9th Cir. Jan. 23, 2018) (vacating order certifying

26  national class for failure to consider the impact of differing state consumer protection laws on the

27  predominance calculus; "This does not mean that the court is foreclosed from certifying a class (or

28  subclasses) on remand."). For example, where defendant has engaged in a common course of conduct

raising common questions, variations in state law need not defeat predominance. *Hanlon*, 150 F.3d at 1022-23; *see also Just Film, Inc. v. Buono*, 847 F.3d 1108, 1122 (9th Cir. 2017) (affirming nationwide breach of contract class); *Sullivan v. DB Investments*, 667 F.3d 273 (3d Cir. 2011).

As the Court preliminarily found, ECF 903 at 3, Rule 23(a)(4) is met, and the record reflects that the interests of all class members with respect to damages measures were represented. Some Named Plaintiffs alleged that they suffered identity theft or paid for credit monitoring, Fourth Amended Complaint, ECF 711 ¶¶ 14-16, and thus are eligible for cash reimbursement of out of pocket losses, while some did not suffer such harm, *id.* ¶¶ 17-18, and thus have no out of pocket losses.

The record also supports this Court's preliminary finding that common legal and factual questions predominate over individual questions under the facts of this case. ECF 903 at 3. Whether Anthem adequately secured its data is a question shared by all class members and every state-law claim in this litigation, the answer to which rests on common evidence. *See* ECF 869-6 at 12-13; ECF 743-12 at 6-7; ECF 826-4 at 2-5; ECF 743-14 at 1-3. Another common question is whether Anthem's alleged failure to secure the data constituted a breach of its applicable privacy policies and the applicable standard of care. ECF 743-12 at 4-5, 19-22; ECF 826-4 at 2-5. Even if just one common question predominates, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 at 1045 (2016) (citation omitted); *see also Just Film* 847 F.3d at 1122. Here, the factual dispute about the adequacy of Anthem's pre-breach cybersecurity and whether any inadequacy constituted a breach of its duty under the applicable privacy policies and the applicable standard of care far outweighs any individualized questions. *Cf. In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 2010 WL 3931096 (N.D. Cal. Oct 6, 2010) (certifying national 23(b)(2) class; Rule 23(a)(2) satisfied because "the law relating to the element of breach [of contract] does not vary greatly from state to state"); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004); *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 652 (S.D. Fla. 2012). Differences in state law primarily raise issues of *manageability*, but this Court need not consider manageability concerns when certifying a settlement class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

**ALTSHULER BERZON LLP**
EVE H. CERVANTEZ
JONATHAN WEISSGLASS
DANIELLE LEONARD
MEREDITH JOHNSON
TONY LOPRESTI

Dated: January 25, 2018                By: */s/ Eve H. Cervantez*
                                       Eve H. Cervantez

**COHEN MILSTEIN SELLERS & TOLL PLLC**
ANDREW N. FRIEDMAN
GEOFFREY GRABER
SALLY M. HANDMAKER
ERIC KAFKA

Dated: January 25, 2018                By: */s/ Andrew N. Friedman*
                                       Andrew N. Friedman

*Lead Plaintiffs' Counsel*

**LIEFF CABASER HEIMANN & BERNSTEIN, LLP**
MICHAEL SOBOL
JASON LICHTMAN
DAVID RUDOLPH

**GIRARD GIBBS LLP**
ERIC GIBBS
DAVID BERGER

*Plaintiffs' Steering Committee*

16
PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL
CASE NO. 15-MD-02617-LHK