ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
TONY LOPRESTI (SBN 289269)
tlopresti@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699

*Co-Lead Plaintiffs' Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK (NC) |
| | **REPLY DECLARATION OF EVE H. CERVANTEZ IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES** |
| | Date: February 1, 2017<br>Time: 1:30 p.m.<br>Judge: Lucy H. Koh<br>Crtrm: 8, 4th Floor |

I, Eve H. Cervantez, declare as follows:

1.     I am a member in good standing of the California State Bar and the bar of this Court, a partner at Altshuler Berzon LLP, and court-appointed Co-Lead Plaintiffs' Counsel and Class Counsel in this multi-district litigation. I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.  I submit this declaration in support of Plaintiffs' Reply Briefs In Support of Motion for Final Approval of Class Action Settlement and Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives.

2.     This declaration is divided into the following Sections:  Section I (paragraphs 3-11) provides updated information about the value of the proposed settlement.  Section II (paragraphs 12-13) discusses the call center that Class Counsel established to assist class members file claims.  Section III (paragraphs 14-22) provides updated information about counsel's lodestar.  Section IV (paragraphs 23-26) provides updated and additional information about litigation expenses.  Section V (paragraphs 27-50) includes additional information about work assignments and tasks performed.  Section VI (paragraphs 51-55) provides additional information about rates.  Section VII addresses miscellaneous issues (paragraph 56) and Section VIII (paragraphs 57-69) is an Index of Exhibits to this declaration.

**I.     Updated Information About the Value of the Proposed Settlement**

3.     As of January 25, 2018, the Settlement Administrator had received 131,221 claims for alternative compensation.  *See* Declaration of Lana Lucchesi ("KCC Reply Dec.") ¶ 9.  The claims filing deadline is January 29, 2018.  Based on the 131,221 claims for alternative compensation received as of January 25, 2018, each of these claimants will receive $50 (131,221 x $50 = $6.56 million).  *See* Settlement Agreement (ECF 916-20) ("SA") (ECF 916-20) ¶5.3 (amount paid for alternative compensation increases to $50 per class member if the aggregate amount to pay all alternative compensation claimants will require $13 million or less).

4.     Based on the number of alternative compensation claims, I anticipate that there will be sufficient funds remaining in the settlement fund to extend credit monitoring for an additional two years.  Pursuant to our contract, Experian will charge $4.6 million to extend credit monitoring for one

year, and $9.2 million to extend credit monitoring for two years. I estimate that there will be more than $9.2 million remaining in the $115 million settlement fund after subtracting the $15 million out of pocket claim reserve, the alternative compensation at $50 per claimant ($6.56 million based on claims so far), the cost of credit monitoring for the first two years ($17 million),the amount allocated to notice and claims administration ($23 million), the requested service fee awards ($597,500), the requested attorneys' fee ($37,950,000) and the requested litigation expenses ($2,005,068.59 plus a reserve of $132,000).

5.      Based on these numbers, I project that there likely will be approximately $3,555,432 million in unallocated funds remaining after all claims, expenses, and awards are paid. This comes to about 4 cents per class member or $2.79 per claimant.

6.      As of January 25, 2018, the Settlement Administrator has received 1,125,275 claims for credit monitoring services. KCC Reply Dec. ¶ 9. As explained in my previous declaration, the conservative retail value of credit monitoring services to class members is $9.99 per month – that is, $479.52 for each class member over a four year period. Because at least 1,125,275 class members have claimed credit monitoring, and that credit monitoring is expected to be extended for four years, the conservative value of the credit monitoring services to the class is at least $500 million.

7.      In addition to credit monitoring for those who claim it, the Settlement also offers Fraud Resolution Services to *any* class member who requests such services during the pendency of the credit monitoring services, now anticipated to be four years. The retail value of a product containing a comparable service offered by Experian (called "Restore MyID," http://www.experian.com/restore-my-id/identity-restoration-landing.html) is $149.95. The Restore MyID service also includes three months of credit monitoring services; assuming the credit monitoring services offered with Restore MyID are worth $19.99 per month ($59.97 for three months), then the retail value of the identity restoration feature is approximately $89.98 ($149.95 - $59.97). The aggregate retail value of offering four years of fraud resolution services to all class member is thus in the billions of dollars.

8.      A number of objectors have questioned why Experian was chosen to provide the credit monitoring services, and/or have speculated that Experian itself might have poor data security or might

otherwise misuse class members' personal data for marketing or other purposes.  ECF 913, KCC Reply Dec. Ex. H.   As I explained in my original declaration (ECF 916-8), Class Counsel obtained bids from several vendors of credit monitoring services, and, in consultation with our identity fraud expert, worked to negotiate a product specifically designed to address the needs of class members here. Cervantez Dec. ¶¶8, 9, 43.  In so doing, we carefully vetted Experian, including by speaking with both references and other MDL attorneys who had previously retained Experian to provide credit monitoring services to class members, and by inquiring about Experian's security for consumer data.  Our contract with Experian provides that no off-shore personnel may be used to provide services to class members, and that no class member data may be sent off shore.  Our contract with Experian specifically states "No enrollment information or other data provided by or about a Settlement Class Member as a result of this Agreement will be used for marketing, or for any purpose other than the provision of the [credit monitoring] Services."

9.      A number of objectors have intimated that the credit monitoring offered here is not useful because they are eligible for free credit monitoring due to their involvement in the Equifax data breach.  I have obtained information about the Equifax offer of free credit monitoring, available at https://www.equifaxsecurity2017.com.  I have attached as Exhibit C the information about the Equifax offering that is publicly available on the internet.  The Equifax credit monitoring product does not offer the same level of protection as that offered through this settlement for at least three reasons.  First, the Equifax credit monitoring offer is good for only one year, whereas the credit monitoring services offered through the settlement here are virtually certain to continue for four years.  Second, the credit monitoring services offered here includes identity restoration services, where a U.S. based, trained fraud resolution specialist is available over a live phone line to assist victims of identity theft with information and advice on what steps to take to protect themselves and may even involve, depending on the nature of the situation, the specialist obtaining power of attorney so as to communicate with vendors and others on behalf of the identity fraud victim.  The Equifax offer does not include live identity restoration services.  Third, the credit monitoring services offered through this settlement include identity validation monitoring to provide real-time alerts whenever a consumer's information is

3

used to open a new account or perform an identity validation within the Experian identity network. Our expert recommended such a service for victims of the Anthem data breach. The Equifax offering does not include any such service. Finally, we specifically negotiated that Experian, the provider of credit monitoring services for this settlement, cannot use class members' information obtained as a provider of credit monitoring services for any other purpose, such as marketing. In contrast, the Equifax product provides no such protections. *See* Exhibit D, attached hereto, the Equifax credit monitoring privacy notice.

10.      Several objectors mistakenly believe that Anthem has already implemented the cybersecurity improvements and increased cybersecurity budget called for in the settlement. This is not correct. First, objector Coddington suggests that Anthem already "had agreed to spend $260 million to make security improvements as a result of its regulatory settlement." Coddington, ECF No. 927 at 4; *see also* Walton, ECF No. 936 at 8 n.10 (asserting similar objection). The only support for this inaccurate contention is a misstatement in a news article appended as Exhibit B to Coddington's objection. I attached the actual regulatory settlement (with state insurance commissioners, not state attorney generals as incorrectly stated in the article), to my original declaration as Exhibit 14 (ECF 916-23). That settlement states only that Anthem had *already*, by December 2016, spent $115 million on security improvements. ECF 916-23 at § A(6). It also makes clear that the $260 million number mentioned in the article relates to the total amount that Anthem had already spent with respect to the breach at the time the regulatory settlement was reached, including mailing of mandated data breach notices and provision of AllClear credit monitoring. *Id.* The minimum cybersecurity expenditures required over the course of the next three years in this settlement represent *new* money, not the money Anthem already spent.

11.      Other objectors contend that Anthem had already implemented the cybersecurity improvements mandated by the settlement, or would soon do so to avoid future liability. Chattopadhyay (ECF 919 at 7), Schulman (ECF 924 at 9-10). But throughout the litigation, Anthem had contested the recommendations of Plaintiffs' expert with respect to remediation needed, and argued that further improvements to their cybersecurity systems were not needed. *Compare* ECF 797-15 at 64-

4

Reply Declaration of Eve H. Cervantez in Support of Motions for Final Approval of Class Action Settlement and Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives; CASE NO. 15-md-02617-LHK (NC)

67 (Anthem's expert describing the security initiatives Anthem had undertaken) *with* ECF 744-17 at

74-81 (Plaintiffs' expert opining on additional remediation necessary to protect class member PII) and

ECF 744-19 at 22-23 (Plaintiffs' expert refuting the conclusions of Anthem's expert re remediation).

Anthem only agreed to implement additional cybersecurity enhancements as part of this settlement, and

they are scheduled to take effect upon final approval of the settlement. In particular, paragraphs 1-5

and 8-12 of Exhibit 2 to the Settlement Agreement contain *new* cybersecurity measures that Anthem

agreed to only as part of the settlement, that Anthem has not already taken, and that Anthem is not

obligated to undertake unless this settlement becomes final.

## II.     Call Center for Class Members

12.     Several class members contacted the Court or Class Counsel because they were having

difficulty filing claims forms or contacting the Settlement Administrator. *See, e.g,* Frankel, ECF 906;

Drum, KCC Decl. Ex. D. On the few occasions that Class Counsel have heard of technical problems,

they have helped the affected class members and immediately contacted KCC, who fixed the problems

within 24 hours. Class Counsel reached out to all of these class members to assist them in filing their

claim forms, and will continue to assist any class members who contact us with questions or seeking

assistance. Additionally, Class Counsel have established a call center with live telephone support to

assist class members file their claim forms. Any class member who needs further assistance or

information after calling the automated telephone support center run by the Settlement Administrator is

directed to this call center for further assistance. The call center has been receiving approximately 100

calls per day.

13.     The claims filing deadline for credit monitoring and alternative compensation is January

29, 2018, but class members can continue to file claims for out of pocket expenses for a year after final

approval of the settlement. Additionally, if class members submit claims that are deficient (e.g. they

forget to include documentation of an out of pocket loss) the Settlement Administrator will contact

class members about the deficiency, and given them time to "cure" the defect. SA ¶¶4.3, 5.2, 6.2.

Moreover, it is possible some class members will have missed the deadline for filing a claim for credit

monitoring or the cash alternative, and will request leave to file a late claim. In all of these instances,

class members may need the assistance of call center personnel to complete their claims. Accordingly, Class Counsel have determined that it would be in the class's best interest to keep the call center open until the number of calls dies down, and/or until the deadline for filing and curing deficient out-of-pocket claims has passed. Accordingly, we respectfully request that we be permitted to maintain an expense reserve in the amount of $72,000 to keep the call center open and serving class members until it is no longer needed. Counsel respectfully request that the Court allow these costs to be kept in reserve by the Settlement Administrator to be paid as invoiced. Any amount not used would go to extend the period of credit monitoring or to the *cy pres* recipients.

## III.    Updated Information About Counsel's Fees and Expenses

14.    My previous declaration reported that the combined lodestar of all law firms working on this case through September 30, 2017 was $37,832,349. The two Co-Lead Counsel firms, and the two Plaintiffs' Steering Committee ("PSC") firms, have continued to work on this case after September 30, 2017. In particular, the four Lead/PSC firms researched, drafted, and filed the Motion for Final Approval; answered questions from class members and assisted them in filing claims; established and oversaw a call center to further assist class members to file claims; and oversaw the work of the Settlement Administrator in perfecting the class notices, publication notice, and social media campaign advertisements, mailing and re-mailing notice, establishing the case website (including drafting FAQs and creating instructional videos on claims filing procedures), setting up an automated response telephone support system, and responding to class member inquiries. We did not assign any new tasks to Non-Lead/PSC firms.

15.    From October 1, 2017 through December 31, 2017, the four Lead/PSC firms expended an additional 339.5 hours for the common benefit, with an additional lodestar value of $197,250. Each firms' hours, billers and rates from October 1, 2017 through December 31, 2017, are set forth on Exhibit G, attached hereto.

16.    Since filing Plaintiffs' fee motion, I have discovered four typographical/clerical errors in our lodestar charts set forth in Exhibits 1 and 3 to my original declaration. First, Hal Cunningham, a senior associate at Scott + Scott, is incorrectly identified as a contract attorney. Second, Lieff Cabraser

Heimann & Bernstein's staff attorneys are incorrectly identified as "contract attorneys." (The correct nomenclature was used in the concurrently filed Declaration of Michael Sobol, ECF 916-31.) Third, Laura Mummert, of counsel at Goldman Scarlato Penny LLP, was inadvertently listed as an associate, and her rate was stated to be $595 per hour, when her rate should have been $495 per hour. The correction of Ms. Mummert's rate reduces the lodestar for the Goldman firm by $59,200. Fourth, James P. Watt, of counsel at Zimmerman Reed, was inadvertently listed as an associate. These errors have been corrected in Exhibits E and H. I have confirmed once again that Exhibits 1 and 3 contain no further errors concerning the rates and positions for any other Plaintiffs' counsel.

17.     I calculated an updated lodestar figure which includes both the additional hours billed since September 2017 by Lead Counsel/PSC firms, and a reduction reflecting the correct rate for Ms. Mummert. The updated lodestar for all firms combined from case inception through December 31, 2017, is $38,015,714, representing 78,892.5 hours of work.

18.     Of the total lodestar, $24,425,721 (49,217.5 hours), or 64% of the lodestar, was expended by the four Lead/PSC firms, with the remaining $13,589,993 (29,675 hours), or 36% of the lodestar, expended by other MDL counsel.

19.     Plaintiffs are requesting a fee award of $37,950,000, which represents a negative multiplier.

20.     Exhibit E contains an updated detailed chart showing each firm's reasonable hours and lodestar through December 31, 2017, and, within that firm, each biller, law school graduation year, hours billed, and rates billed. Exhibit F contains an updated chart showing each firms' hours divided by task code. Exhibit H corrects the errors identified above with respect to the clerical/typographical errors, and also includes the updated lodestar information for the four Lead/PSC firms.

21.     The lodestar set forth on Exhibit E and above does not include any time spent after December 31, 2017 by Lead/PSC firms, overseeing the Settlement Administrator, assisting class members, responding to objectors, or drafting the reply brief in support of final settlement approval. Nor does this lodestar include the future work that Class Counsel will necessarily undertake, including preparing for and appearing at the final approval hearing, continued oversight of the Settlement

7

Reply Declaration of Eve H. Cervantez in Support of Motions for Final Approval of Class Action Settlement and Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives; CASE NO. 15-md-02617-LHK (NC)

Administrator and the claims administration process, litigating any appeals that may be taken by objectors, and annually reviewing the independent auditor's report on Anthem's cybersecurity for the next three years.

22.    This lodestar also does not include the hundreds of hours that I spent collecting, supervising, and reviewing contemporaneous submission of time records by the other 52 firms, nor does it include the time spent drafting Plaintiffs' Motion for Attorneys' Fees, nor opposing Objector Schulman's Motion to Appoint Special Master.

**IV.    Updated and Additional Information about Litigation Expenses**

23.    Since Plaintiffs last submitted expenses, Counsel have identified or incurred $5,430.82 in additional litigation expenses – primarily computerized research, printing, copying, overtime, and courier fees associated with preparation of the Final Approval Brief, and anticipated expenses for Co-Lead Counsel Andrew Friedman to travel to the Bay Area for the Final Approval Hearing. The additional expenses are detailed in Exhibits I, J, and K. These expenses do not include all expenses incurred with respect to responding to objections and researching, drafting, and filing the Reply Brief in Support of Final Approval, appearing at the Final Approval hearing, or other expenses that counsel may incur in the future in support of the settlement or to assist class members with the claims filing process.

24.    Accordingly, Class Counsel have incurred expenses of $2,005,068.59 to date, and request an additional $60,000 reserve for a cybersecurity expert to review Anthem's annual cybersecurity reports, and an additional $72,000 to keep the call center open as long as is necessary to assist class members with the claims filing process. The grand total expenses, including the reserved amounts, is $2,137,068.59.

25.    My original declaration set forth the litigation expenses paid for by Plaintiffs' counsel in this case, and the reasons for each. Cervantez Dec. ¶¶56-61 & Exs. 4-10. One objector complains that Class Counsel expended $707,606 on experts. ECF 924 at 11. All of these expert expenditures were necessary to litigate this case. Class Counsel retained several consulting experts with respect to cybersecurity and the dark web, and four testifying experts, all of whom submitted lengthy reports in support of class certification. *See* ECF 744-17, 744-19, 744-21, 744-22, 744-23, 744-25, 744-27, 744-

8

Reply Declaration of Eve H. Cervantez in Support of Motions for Final Approval of Class Action Settlement and Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives; CASE NO. 15-md-02617-LHK (NC)

28. This was not work that could have been performed by attorneys, but involved in-depth knowledge of cybersecurity, conjoint survey design and analysis, and identity fraud and prevention. The reports of Plaintiffs' cybersecurity and identity fraud experts were crucial not only to supporting class certification, but to formulating the carefully crafted business practice changes and custom designed credit monitoring services necessary to protect class members' personal information and privacy here.

26.    The objector speculates that Class Counsel had an incentive to spend more on experts than was warranted by the needs of the case. These expert expenses were all necessary to litigate this case well, as set forth above and in my initial declaration. It would have been foolhardy for Class Counsel to pay such large sums out-of-pocket, with no guarantee that they would prevail and receive reimbursement for this money, merely to enhance some future application for attorneys' fees. Contingency fee attorneys, who are not guaranteed reimbursement of either out of pocket expenses or time expended, are already incentivized to minimize expenses to only those necessary to vindicate the rights of the class.

## V.    Further Information about Assignment of Work and Tasks Performed

27.    My original declaration set forth in great detail the work performed by each firm and attorney, including hours expended, rates charged, and tasks performed. I also included the reasons for each task and the division of labor between Lead/PSC firms and other MDL firms that assisted with this litigation. Cervantez Dec. ¶¶ 25-43, 52 & Exs. 2-3. I elaborate on certain points below in response to the filed objections.

28.    In appointing Lead Counsel and the PSC, this Court specifically encouraged us "as needed, to consult with the other applicants regarding devising damages theories, retaining data security experts, litigating against the defendants in this case, and identifying and communicating with potential plaintiffs." ECF 284. The Court later clarified that we could "assign discrete tasks to counsel for other plaintiffs in this MDL for resource-intensive tasks such as identifying plaintiffs for the Consolidated Amended Complaint and reviewing discovery. This augmentation of resources should be on an as needed basis and consistent with efficiency." ECF 286. That is precisely what we did.

29.    Several objectors contended that this case should have been litigated by fewer firms. *See, e.g.,* ECF 924.  This is not an MDL consolidating duplicate antitrust or securities fraud cases, in which a few plaintiffs may represent the interests of a large nationwide class asserting two or three standard claims.  Instead, this MDL was a consolidation of hundreds of state law claims brought on behalf of distinct state law classes by different sets of named plaintiffs, which, had it not been for the MDL procedure, might have resulted in 50 separate lawsuits.  Indeed, Defendants argued in their motions to dismiss that we needed separate plaintiffs for each state law claim against each Defendant. ECF 413, 433, 490, 512.  The Court granted in part and denied in part Defendants' motion to dismiss on standing grounds, and specifically gave Defendants leave to raise standing again on class certification.  EFF 468 at 8-15, ECF 524 at 8-12.

30.    Therefore, as explained previously, we needed to search for plaintiffs from every state, representing varying types of insurance plans, including from different defendants.  Cervantez Dec. ¶26.  Rather than begin from scratch reaching out to potential plaintiffs, Lead Counsel asked non-PSC firms from around the country to reach out to putative class members with whom they already had established contacts and to assist in identifying those that should serve as Named Plaintiffs. This work was not duplicative; indeed, it was much more efficient for law firms with existing contacts and clients to gather and submit information about prospective Named Plaintiffs to Lead Counsel than it would have been for Lead Counsel to start afresh in 50 states.  Many of the MDL law firms' chief contribution to the litigation was in locating, interviewing, and bringing to our attention their clients as prospective named plaintiffs.  *See* Cervantez Dec., Exh. 2, 3 (task code 1).  For example, the following firms almost entirely billed to task code 1, communicating with and vetting prospective plaintiffs:  Cafferty Clobes, Chestnut Cambronne, Consumer Law Practice of Dan LeBel, Desai Law, Finklestein Thompson, Harwood Feffer, Karon LLC, Litigation Law Group, and Tousley Brain.[1]  This work by non-Lead/PSC firms was contemplated by the Court's order.

---

[1] Some of these law firms also billed to task code 6, pleadings, because we later asked them to file dismissals of their clients' underlying MDL complaints, which had been set for early trials.  ECF 856. Each dismissal required permission of the clients and a separately negotiated stipulation and dismissal.

31.     Once a class member retained a given MDL law firm, that class member was entitled to representation by his or her counsel of choice.  Accordingly, as explained in my prior declaration (Cervantez Dec. ¶¶28-29) and demonstrated in Exhibits 2 and 3 (see task Codes 1, 4, 5, 6), MDL counsel representing a particular plaintiff were responsible for communicating with that plaintiff with respect to pleadings concerning that plaintiff (allegations in the amended complaint, declarations in support of class certification), gathering documents and information to respond to Interrogatories and Document Requests with respect to that plaintiff,  assisting in the defense of their clients' depositions, and discussing settlement with their clients, all under the guidance of Lead Counsel.  Communicating with plaintiffs and responding to individual discovery directed at them was not duplicative work, and it was far more efficient for MDL counsel to handle these tasks for their own clients than to have Class/PSC Counsel become familiar with 100-plus Named Plaintiffs geographically located throughout the country.  Similarly, given the tight discovery schedule, it made little sense for counsel from the PSC firms to defend all 100-plus Named Plaintiff depositions, especially because Named Plaintiffs' personal counsel would be attending each of these depositions regardless of whether the PSC firms took the lead in defending them or not.  By delegating the task, Co-Lead Counsel both ensured that the Named Plaintiffs were represented by competent and adequately prepared counsel with whom the Named Plaintiffs had a pre-existing relationship, and also freed up valuable resources at the Lead/PSC firms to focus on other aspects of the litigation.

32.     The following 25 law firms handled discovery and assisted with deposition defense of their Named Plaintiff clients:  Cohen & Malad (32 Named Plaintiffs, including 6 from their home state of Indiana, and several others from nearby Midwestern states); Goldman Scarlato (21 Named Plaintiffs, including six East Coast Plaintiffs near Goldman's Philadelphia office); Stueve Siegel (10 Named Plaintiffs including 2 from Missouri where they are located); Skepnek Law Firm (6 Named Plaintiffs, 2 from Kansas where Skepnek's offices are located and 4 from neighboring Missouri); Law Offices of Angela Edwards (4 Named Plaintiffs from New England where Ms. Edwards is located); Morgan & Morgan (4 Named Plaintiffs from the South, near Morgan & Morgan's Florida offices).  Several firms had three Named Plaintiff clients (Boucher (Southern California plaintiffs and firm), Robinson

Calcagnie, Weitz & Luxenberg, and Webb Klase & Lemond (Georgia plaintiffs and firm)); some had two Named Plaintiff clients (Federman & Sherwood; Strittmatter Kessler (Washington plaintiffs and firm)); and others had one client: Abington Cole, Berger & Montague, Boucher, Farmer Jaffe Weissing, Fitapelli & Schaffer (New York plaintiff and firm), Janet Jenner and Suggs (Massachusetts plaintiff and firm), Keller Rohrback, Law Office of Paul Whalen (New Jersey plaintiff; New York firm), Levi & Korsinsky, Milberg Tadler Phillips Grossman (Connecticut plaintiff; New York firm), Murray Law Firm (Louisiana plaintiff and firm), Giatras Law Firm (West Virginia plaintiff and firm), and Zimmerman Reed.

33.     In addition to requesting that MDL counsel work with their own clients on discovery for the sake of efficiency and honoring class members' choice of counsel, it was necessary to assign out these discrete tasks, given the time constraints under which we were operating.  Lead Counsel were appointed on September 11, 2015, and discovery closed 14 months later, in December 2016 (during which time Lead Counsel/PSC also litigated two rounds of motions to dismiss brought on behalf of two sets of Defendants).  Thus, while Lead Counsel/PSC firms coordinated the discovery directed to Plaintiffs, they could not have effectively responded to all the discovery directed at the 100-plus named Plaintiffs while also taking the necessary affirmative discovery of Anthem and the other Defendants and responding to the Motions to Dismiss. Not only would it have been taxing on Lead Counsel/PSC firms, it would have been less efficient and more costly for Lead Counsel/PSC firms to do so.

34.     As is evident from Exhibit 2 to my declaration, which sets forth the hours worked under each task code for each firm, for 26 firms, their primary contribution to the litigation was to identify prospective plaintiffs (task code 1) and then, for any client who was selected as a Named Plaintiff, work with their client(s) to respond to discovery directed at that Named Plaintiff (task code 4), defend their clients' depositions (task code 5), and review and revise pleadings specifically referencing their clients (paragraphs in the Amended Consolidated Class Action Complaints (task code 6) and declarations in support of class certification (task code 10)).  Those 26 firms are: Abington Cole, Berger & Montague, Cafferty Clobes, Chestnut Cabronne, LeBel, Desai, Fagan, Farmer, Federman,

Finklestien, Fitapelli, Forbes, Harwood, Janet, Karon, Whalen, Edwards Levi & Korsinsky, Litigation Law Group, Robinson, Skepnek, Strittmater, Giatras, Touseley, Webb, and Weitz & Luxenbourg.

35.    As the Court had anticipated, although Lead Counsel/PSC firms contributed many valuable hours to document analysis and review, the volume of documents was so great, and the time in which to analyze them so short, that Lead Counsel necessarily called upon other MDL firms that could provide the additional resources necessary to complete an efficient and high-quality analysis and review.

36.    As set forth in Exhibits 2 and 3 to my original declaration, in addition to Lead Counsel/PSC firms, the following 22 firms contributed many valuable hours to document analysis and review (task code 2):  Barrack Rodos, Bonnett Fairbourne, Boucher, Branstetter, Carlson Lynch, Cohen & Malad, Cotchett, Goldman Scarlato, Heins Mills, Kantrowitz, Kaplan Fox, Keller Rohrback, Lockridge Grindal, Milberg, Morgan & Morgan, Murray Law Office, Pomerantz, Schubert, Scott + Scott, Stueve Siegal, Stull Stull, and Zimmerman Reed.  (Of these firms, eight also had clients who were Named Plaintiffs, and thus assisted with the defensive discovery of their clients, including Boucher, Cohen & Malad, Goldman Scarlato, Keller Rohrback, Milberg, Morgan & Morgan, Murray Law Office, and Stueve Siegal).

37.    This document analysis and review was conducted very efficiently, as explained in my initial declaration (¶¶30-31, 40-42).  Two delegated partners at the PSC firms trained the attorneys conducting document analysis and review, held weekly telephone calls to discuss issues, conducted quality control audits to insure document analysis was undertaken efficiently and correctly, and generally supervised the attorneys carrying out the review.

38.    None of the above-described work was duplicative. Each document needed to be reviewed. Each deposition needed to be taken or defended.  Each set of interrogatories and document requests directed at an individual Named Plaintiff had to be responded to with respect to that Named Plaintiff.

39.    We also requested that six non-Lead/PSC firms assist with the depositions of the 13 Non-Anthem Defendants because of the time constraints imposed by the close of discovery and delays

in the relevant document productions.  Cervantez Dec. ¶36.  After navigating extensive disputes over the scope of the Non-Anthem deposition topics, Co-Lead Counsel was faced with the resource-intensive task of taking 41 depositions of corporate designees in 13 different states between November 14 and December 20, 2016.[2]  Because all but one of the Non-Anthem Defendants designated multiple individuals to cover the different deposition topics, it typically took two days to complete the depositions of each Non-Anthem Defendant.  The Non-Anthem Defendants produced documents on a rolling basis in November and December, frequently producing thousands of pages just a week or two prior to the depositions.  This highly compressed deposition schedule coincided with the final weeks before the close of fact discovery.  By delegating many of the Non-Anthem depositions to non-PSC firms, Lead Counsel freed up valuable resources so that the PSC could complete other discovery objectives.

40.    There was no duplication of effort because Lead Counsel provided a template outline, and each firm responsible for a deposition reviewed the documents applicable to that particular defendant in order to prepare a more tailored outline to examine the witnesses based on their company's documents.  In most cases we were able to use non-PSC firms who were geographically located closer to the deponent than Lead Counsel, thus further fostering efficiency.  For example, attorneys from Emerson Scott in Little Rock, Arkansas took the deposition of Arkansas BCBS in Little Rock; attorneys from Carlson Lynch in Pittsburgh took the deposition of Highmark BCBS in Pittsburgh; attorneys from the Branstetter firm in Nashville took the depositions of BCBS Alabama in Birmingham and the deposition of BCBS North Carolina in Raleigh; and attorneys from Morgan & Morgan in Tampa took the deposition of BCBS Florida in Jacksonville.  Attorneys from Barrack Rodos and Keller Rohrback also assisted with the Non-Anthem depositions.

41.    The total of 13,871 hours spent on almost 200 depositions was necessary, and not duplicative or inefficient.  Defendants deposed all of the Named Plaintiffs, which we were obligated to defend, including by traveling all over the country to often remote locations.  Although, as discussed above, we were able to achieve some efficiencies in travel through the use of non-Lead Counsel/PSC

---

[2] Class Counsel entered into a stipulation to extend the fact discovery deadline for the limited purpose of finishing these Non-Anthem depositions.

firms, it was not always the case that Named Plaintiffs' retained counsel resided near Named Plaintiff. Plaintiffs efficiently took affirmative percipient witness and Rule 30(b)(6) depositions, each of which required thorough preparation, including analysis of documents and thoughtful outlines, particularly given the complex technical, cybersecurity, and contract topics at issue. Defendants, not Plaintiffs, determined the number of Rule 30(b)(6) witnesses they offered on the relevant topics. The evidence we gathered in our affirmative depositions of Defendants was put to good use: Of 84 depositions, we cited to over 50 in our class certification briefing and supporting expert declarations.

42.    The amount of time Class Counsel invested in depositions was central to Plaintiffs' ability to build an effective case that ultimately provided the leverage for the settlement that was achieved. While some depositions took very little time, others necessarily took a very long time. For example, one partner efficiently used only 12 hours to prepare for, travel to, and take a 30(b)(6) deposition of Anthem concerning where and how Anthem stored and maintained premium information (that would be used later for expert damages calculations). In contrast, we expended well over 300 hours preparing for and taking the deposition of Stephen Moore, an Anthem staff vice president in the information security department, who was deposed in his individual capacity and as a 30(b)(6) corporate designee. Mr. Moore testified on the corporation's behalf with respect to more than a dozen topics regarding Anthem's information security practices. In order to prepare for Mr. Moore's deposition, Plaintiffs' counsel analyzed the most important Anthem information security documents and crafted highly technical questions. Similarly, Counsel spent 110 hours preparing for and taking the deposition of Thomas Miller, Anthem's Chief Information Officer, who was deposed in his individual capacity and also as Anthem's corporate designee on Anthem's spending on information security. In order to prepare for Mr. Miller's deposition, Plaintiffs' counsel analyzed six years of Anthem's financial data for information security, and crafted important lines of questioning about Anthem's spending. Plaintiffs' counsel also reviewed Mr. Miller's most important e-mails and asked him pertinent questions about those e-mails. Plaintiffs obtained binding admissions at these two depositions that were central to Plaintiffs' liability theory. The class was well served by the total 442.9 hours that Counsel spent on Mr. Moore and Mr. Miller's depositions.

43.    Limiting each deposition to 40 hours, as one objector suggested (ECF 924 at 26) would not have served the Class.  Conservatively assuming only ten hours for travel back and forth and ten hours on the actual day of the deposition, objector suggests that counsel should spend only two days reviewing and analyzing potentially useful exhibits and crafting an outline.  Using such parsimonious time, Class Counsel would not have been able to properly prepare and defend the depositions of Named Plaintiffs, or delve as deeply into the vulnerabilities of Anthem's cybersecurity systems, or build a full understanding of the commonalities between the Defendants' various types of health care contracts with its members.  Some depositions take far fewer than 40 hours, and some take far more, but certainly no artificial limit should be set.  The reality is that taking and defending depositions in hotly-contested litigation requires careful preparation.

44.    As is evident from Paragraph 52 and Exhibits 2 and 3 to my original declaration, Lead/PSC firms did almost all of the work on class certification (task code 10) and settlement (task code 11).  Non-Lead/PSC firms contributed only 35 hours to class certification (drafting declarations from the ten Named Plaintiff clients who were seeking appointment as class representatives following a template provided by Lead Counsel) and 161 hours to settlement (speaking to over 100 Named Plaintiffs about settlement and, in several instances, providing Lead Counsel with information about other data breach settlements and/or credit monitoring vendors).

45.    Class Counsel had to invest significant time in pursuing class certification, given the near dearth of relevant models, and met the challenge by preparing a thoroughly substantiated motion that utilized the information gathered during fact and expert discovery.  Further, the particular circumstances of the case gave rise to time-intensive tasks.  For example, on the bellwether California contract claim, Class Counsel anticipated that Defendants would argue against commonality, typicality, and predominance because there were hundreds of different contracts at issue. To preempt this argument, Class Counsel searched through the voluminous document production to identify all California health plan booklets that were in effect at the time of the data breach, analyzed the resulting 245 booklets and identified the contractual privacy provisions within them, determined which of those provisions were substantively the same in the booklets such that they would support class certification,

and created an exhibit that demonstrated the commonalities between the provisions. *See* ECF 746-1 (Dec. of Matt Broad); ECF 746-2 (Rule 1006 Summary of Evidence Chart of Anthem Contracts). This is just one example amongst many of the time-intensive projects that were integral to Plaintiffs' motion for class certification. Overall, Plaintiffs' briefing on class certification relied on 190 exhibits and seven expert reports, including an 82-page description of the technology that was at issue in the data breach, the timeline of the breach itself, the security and administrative control failures that contributed to the breach, and the remediation necessary to protect class members in the future. ECF 744-16 (Strebe Report). The hours expended on class certification were clearly worth it: Anthem was not willing to even begin discussing settlement until Plaintiffs filed their Motion for Class Certification, and the case did not finally settle until after Plaintiffs filed their Class Certification Reply.

46. The 2,500 hours spent on settlement reflect the uniqueness and complexity of this settlement and encompassed far more than "crafting the settlement." The hours instead include: three separate days of mediation (including two trips to New York); complete documentation of a lengthy and complex settlement with multiple types of relief including comprehensive business practice changes; drafting all the different forms of notice (plus revisions thereto at the suggestion of the Court at the Preliminary Approval Hearing); solicitation and vetting of bids from several vendors of claims administration services and credit monitoring services; negotiation of complex contracts with KCC for settlement administration and with Experian for credit monitoring services; supervision of the Notice and claims process; assisting class members; and seeking preliminary and final approval. Given the complexity of this excellent settlement, that was all necessary time.

47. One objector contends that "without detailed billing information here, the Court is unable to confirm that plaintiffs had ceased discovery or document review after the settlement was reached." ECF 924 at 24. In fact, Counsel did not perform any work after the settlement was documented in June 2017 pertaining to anything other than the settlement itself, including moving for preliminary and final approval, supervising the Settlement Administrator, and assisting class members with the claims process. Discovery closed in March 2017 and all document review ceased in May 2017. The fact discovery cut-off was December 1, 2016 (except for certain Non-Anthem Defendant

depositions which were extended to December 16, 2016 and the forensic examination of Plaintiffs' computers which extended into February 2017, in accordance with this Court's orders (ECF 609, 651)), and all fact discovery ceased in accordance with those deadlines by February 2017.  Expert discovery continued into March 2017 (ECF 651), as did preparation and filing of the class certification motion and reply brief and related *Daubert* motions, which were filed in accordance with the schedule set by the Court (ECF 609) on March 10 (class certification brief), May 5 (class certification reply and *Daubert* motions), and June 2, 2017 (*Daubert* replies).  We instructed most law firms and attorneys assisting with document analysis and review to stop all such work at the end of December 2016. Beginning in January 2017, only two non-PSC firms (four attorneys total), plus two attorneys at LCHB and two at Girard Gibbs, billed for or conducted any further document analysis and review, and only with respect to discrete projects, including targeted searches to find documents for use by our experts or necessary for class certification, or investigation of Anthem's privilege claims, which we continued to litigate through May 2017.  We did not bill for any document analysis or review after May 2017.

48.    We did not disclose any agreements regarding fees, because there are no agreements to disclose.  Neither I, nor Mr. Friedman, Mr. Sobol or Mr. Gibbs, had or have any agreement with any other law firm in this MDL with respect to division of fees or assignment of work on this case.  There are no agreements between or among Co-Lead Counsel or the PSC firms regarding how to allocate fees or work in this case, nor are there any agreements between Co-Lead/PSC firms and any other MDL counsel regarding how to allocate fees or work in this case.   In particular, Co-Lead/PSC firms have not made any deals to exchange work or fees in this case for work or leadership positions in any other case or MDL.  Co-Lead Counsel Andrew Friedman and I made all work assignments (within our own firms, to PSC firms, and to other MDL firms) on the basis of efficiency and experience, and, as promised in our request to be appointed lead counsel, I took the lead on, and personally reviewed, all attorney fee submissions to insure that only non-duplicative and efficient common benefit time was included in our total lodestar.

49.    Each firm bore its internal costs as documented in Exhibits 6 through 10 of my original declaration; Exhibit 5 details which firms contributed to the Joint Cost Fund, and in what amount.

50.     Because work on this case is not yet complete, it would be premature to set forth here the precise allocation of fees among Plaintiffs' counsel.  In particular, Lead Counsel/PSC firms have much more work yet to come, including continuing to respond to class member inquiries, supervising the claims and distribution process, responding to any appeals that might be filed by objectors, and reviewing the annual report of the independent auditor with respect to Anthem's cybersecurity for the next three years.  Moreover, the lodestar set forth in Exhibit E attached hereto does not include any work performed by Lead Counsel/PSC firms after December 31, 2017, nor does it include the work performed by Lead Counsel/PSC firms with respect to Plaintiffs' Motion for Attorneys' Fees (which is not included in the common fund lodestar cross check because it did not benefit the class, but which would be considered in any allocation of fees among Plaintiffs' counsel, because it benefited all Plaintiffs' counsel).

## VI.     Additional Information about Rates for Document Review

51.     One objector complains that the rates charged for document analysis and review are too high because such work is purportedly "menial."  ECF 924.  All of the attorneys engaged in document analysis and review – associates, contract attorneys, and staff attorneys, employed by Lead/PSC firms and by other MDL firms – performed highly skilled, analytic work that was crucial to the success of the case.  Many of the documents were very technical and required a high level of sophistication to understand. There was very little "first level review" because we used computer-aided review to help find relevant documents. Attorneys engaged in document analysis and review were given increasingly sophisticated tasks, coding documents according to a highly detailed matrix of issues, identifying and analyzing "hot" documents, summarizing key documents, running targeted searches on particular topics or witnesses, drafting memos analyzing and comparing documents on a particular subject, and providing critical exhibit identification assistance for depositions and expert analysis.  Attorneys also spent significant time identifying missing privileged documents and other holes in the document production.

52.     The document analysis and review in this case required a high level of technical knowledge and sophistication.  For example, this was not a case in which Anthem had a single flaw in

its cybersecurity system that was easily discovered and remedied.  Instead, Plaintiffs alleged that, despite Anthem's seemingly sufficient written policies, in practice Anthem's cybersecurity system suffered from numerous flaws, all of which contributed to the data breach, and all of which needed to be remedied.  *See, e.g,* ECF 744-17, ECF 744-19.  Counsel had to ferret out and understand these flaws by careful review and comparison of numerous documents that could then be used to question Anthem witnesses under oath.  Similarly, counsel had to carefully analyze and compare the numerous insurance contracts applicable to each of the 100 plus plaintiffs, and discern and distill the pattern in the privacy promises contained therein.  Attorneys responsible for document analysis and review were trained to identify and analyze these nuances throughout the course of the document review efforts.

53.    The value of the document analysis and review in this litigation was critically important to the outcome achieved for the class.  For instance, Class Counsel relied on the documents to build an understanding of highly technical cybersecurity issues and, ultimately, to identify and successfully negotiate cybersecurity measures that would address the vulnerabilities in Anthem's databases and other systems.  In the end, Class Counsel cited to almost 300 documents in the Motion for Class Certification and accompanying expert declarations, which were carefully culled from the millions of documents produced by Anthem.  Plaintiffs' showing on class certification in this case could not have occurred without the extensive, careful, and efficient document review process established and supervised by Partners at the Lead/PSC firms and carried out by many skilled associates, staff attorneys, and contract attorneys at Lead/PSC firms and at other MDL firms.

54.    Document review and analysis was primarily conducted by associates and contract or staff attorneys, with supervision by two partners at the PSC firms, Nicole Sugnet and David Berger.  Partners, including Co-Lead Counsel, engaged in some very limited analysis of key hot documents, such as the Mandiant Report.  The blended rate for all document analysis and review work in this case, including work by partner-level attorneys, associates, contract or staff attorneys, and paralegals, is $389 per hour.  This includes associates billing at rates ranging from $275 to $500, depending on their level of experience and market rate for their firm/locality, as established in Exhibit 3 to my original

1  declaration.  The blended rate for contract/staff attorney document analysis and review is $360 per

2  hour.

3       55.    Although Altshuler Berzon takes some contingency fee cases, Altshuler Berzon also has

4  many clients whom we bill for legal services at set hourly rates.  When a case calls for document

5  analysis and review, the attorneys responsible for that case conduct the document analysis and review

6  at their applicable rate, and we do not charge any different or lower rate for document analysis and

7  review.

8  **VII.   Miscellaneous**

9       56.    Objector Pflug (ECF 934) complains about a phone phishing scam directed at Anthem

10  members, which he believes may be related to information taken during the Anthem data breach.  We

11  do not know whether or not the phone phishing scam is related to information taken during the Anthem

12  data breach.  When Anthem learned about the phone phishing scam in the fall of 2017, Anthem counsel

13  contacted Class Counsel and the Settlement Administrator and asked that a warning about the potential

14  scam be placed on the settlement website, which it was.  We have not heard more about the phone

15  phishing scam since then.

16       57.    My review of discovery documents produced in this case indicates that the hackers

17  responsible for the Anthem data breach did not exfiltrate all of the PII in Anthem's systems, such that

18  some Anthem members were included in the data breach, while others were not.

19       **VIII.   Exhibits**

20       58.    Attached hereto as Exhibit A is an index of all objections filed with the Court or

21  received by the Settlement Administrator, which sets forth the page number in the Reply Brief in

22  support of Final Approval and/or the Reply Brief in support of Attorneys' Fees, Litigation Expenses,

23  and Service Awards to Class Representatives on which that objection is discussed.

24       59.    Attached hereto as Exhibit B is a chart of all data breach class action settlements

25  involving classes over 15 million individuals that Counsel has been able to find.

26       60.    Attached hereto as Exhibit C information is information about the Equifax offer of free

27  credit monitoring, obtained at https://www.equifaxsecurity2017.com.

28

21

Reply Declaration of Eve H. Cervantez in Support of Motions for Final Approval of Class Action Settlement and
Attorneys' Fees, Litigation Expenses, and Service Awards to Class Representatives; CASE NO. 15-md-02617-LHK (NC)

61.    Attached hereto as Exhibit D are the TrustedID Premier Terms of Use and a Privacy Notice, obtained at https://www.equifaxsecurity2017.com.

62.    Attached hereto as Exhibit E is a Corrected Exhibit 1 to the Cervantez Declaration filed on December 1, 2017 (Summary of Total Lodestar by Firms).

63.    Attached hereto as Exhibit F is a Corrected Exhibit 2 to the Cervantez Declaration filed on December 1, 2017 (Hours Billed By Task Code).

64.    Attached hereto as Exhibit G is an updated lodestar for all four PSC firms, including October 1, 2017 through December 31, 2017.

65.    Attached hereto as Exhibit H is a Corrected Exhibit 3 to the Cervantez Declaration filed on December 1, 2017 (Lodestar Information by Plaintiffs' Firm).

66.    Attached hereto as Exhibit I is a summary showing the combined totals of all costs, including internal expenses incurred by all firms and all expenses paid by or incurred by the cost fund.

67.    Attached hereto as Exhibit J is a summary of all expenses paid by or incurred by the cost fund, as well as detail on costs not submitted with the December 1, 2017 filing.

68.    Attached hereto as Exhibit K is a summary of all four PSC firms' internal expenses, as well as detail on costs not submitted with the December 1, 2017 filing

69.    Attached hereto as Exhibit L is the Declaration of Prof. William B. Rubenstein of Harvard Law School, submitted in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, Case 3:15-md-02672, Dkt. No. 3396-2, Ex. B (N.D. Cal. June 30, 2017), in which he analyzed 13 cases that approved contract and staff attorney rates yielded an average rate of $386.75 in 2017 dollars.  Professor Rubenstein's declaration demonstrates that the blended rate of $389 for contract and staff attorney rates used here is well within the range generally awarded by courts.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of January 2018, at San Francisco, California.


*/s/ Eve H. Cervantez*
Eve H. Cervantez