EXHIBIT L

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| | : | |
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | : : : | MDL 2672 CRB (JSC) |
| | : | **DECLARATION OF WILLIAM B.** |
| | : | **RUBENSTEIN IN SUPPORT OF** |
| | : | **PLAINTIFFS' MOTION FOR 3.0-** |
| | : | **LITER ATTORNEYS' FEES AND** |
| This Document Relates to: | : | **COSTS** |
| | : | |
| ALL CONSUMER AND RESELLER ACTIONS | : | |
| | : | The Honorable Charles R. Breyer |

1.      I am the Sidley Austin Professor of Law at Harvard Law School and a leading
national expert on class action law and practice.  The Plaintiffs' Steering Committee ("PSC") has
retained me to provide my expert opinion as to five factual issues pertinent to its pending petition
for attorney's fees and costs.  After setting forth my qualifications to serve as an expert (Part I,
*infra*),[1] I provide the Court with quantitative empirical data to support the following five
opinions relevant to analysis of the reasonableness of the PSC's fee request:

- ***The PSC's fee approach is the most widely used.***  (Part II, *infra*).  The PSC seeks a
  fee based on the percentage method with a lodestar cross-check.  This is the approach
  that courts most frequently use to assess the reasonableness of fee requests in
  common fund class action cases.  It improves on the percentage approach standing
  alone (which could lead to a windfall for counsel) by making a rough comparison of
  the fee sought to counsel's time in the case.  Simultaneously, it improves on the
  lodestar approach standing alone (which could bog the court down in review of
  counsel's time records) by enabling a check on the percentage approach without
  requiring an extensive audit of counsel's hours and rates.

- ***The PSC's requested percentage is reasonable.***  (Part III, *infra*).  The PSC seeks a
  fee that is the equivalent of about 9.89% of the roughly $1.22 billion gross amount
  made available to the class by this settlement.  Three sets of data support the
  reasonableness of this request:  it is below the mean for large settlements reported in
  the two leading empirical analyses of class action fee awards and it is below the mean
  for a comparison group of $1-2 billion settlements that my research assistants
  compiled for purposes of this Declaration.  If the fee is expressed as a percentage of
  the net value of the funds made available to the class (that is, subtracting out the value
  of the cars that will be traded in) it is about 13.42%, which remains within the range
  of reasonable percentages for funds of this size.

- ***The PSC's hours are reasonable***. (Part IV, *infra*). The total number of hours the PSC
  expended producing a billion dollar settlement is consistent with, and indeed far
  below the mean of, our comparison set of 16 other cases with settlements of $1 billion
  or more.  A back-of-the-envelope calculation confirms this.  The PSC's lodestar
  encompasses about 120,000 hours in the 20 months between the EPA's notice in
  September 2015 and the entry of final judgment in May 2017.  That number implies
  that 24 lawyers have worked full-time (3,000 hours/year) to generate this settlement
  throughout those 20 months.  Given the magnitude of this case, the size of the PSC,
  the understandable speed upon which the Court insisted on proceeding, and the
  Court's requirement that the PSC simultaneously seek to settle ***and*** prepare for trial as

---

[1] I typically provide a short synopsis of the litigation in my expert reports, but given the depth of
the Court's involvement in, and understanding of, this matter, I saw no need to do so here.

quickly as possible, the 120,000 hour figure seems reasonable. Moreover, concerns about lodestar padding largely fall away in this case given its short lifespan.

- ***The PSC's rates are reasonable***. (Part V, *infra*). An empirical analysis of 40 recent class action settlements in the Northern District of California shows that the PSC's blended billing rate in this case ($461.69) is about 12.5% below the mean ($528.11) for class actions approved by courts in this District in the past few years. This is particularly remarkable because the staffing in this case was necessarily top-heavy given the Court's appointment of a 22-lawyer leadership team comprised of some of the highest-paid attorneys in the country and because much of the work in this case involved relatively high-level negotiations, coordination with other enforcers, and preparations for trial. The below-average blended billing rate demonstrates that Lead Counsel appropriately assigned tasks among partners, associates, non-partnership track attorneys, and paralegals. There is therefore no factual support for any concern that Lead Counsel erred in not relying more extensively on low-paid non-partnership track attorneys. Moreover, to the extent that the PSC did employ such attorneys, my empirical analysis demonstrates that the rates charged for the work these attorneys undertook is entirely consistent with the rates charged for "contract attorney" or "staff attorney" work in court-approved class action fee petitions.

- ***The PSC's proposed multiplier is reasonable***. (Part VI, *infra*). The PSC seeks a multiplier of approximately 2 (2.01-2.02). Three sets of data support the reasonableness of this request: it is below the mean for large settlements reported in the leading empirical analyses of class action fee awards; it is below the mean of our comparison group of settlements of $1 billion or more; and a review of the facts of the case show that the risks the PSC shouldered and the results that it achieved support a multiplier at this level.

I am a strong supporter of a lodestar cross-check as I believe it is the single best means of ensuring that a fee is not an unwarranted windfall. That is so because it measures the fee award in terms of the time that counsel devoted, isolates the bonus they are receiving, enables an assessment of whether the risks and achievement of the case warrant that bonus, and uniquely permits comparisons across cases.[2] Here, the cross-check demonstrates that the fee award the PSC seeks is quite normal, while the work in a case of this magnitude is anything but.

---

[2] For a discussion of these points, see 6 William B. Rubenstein, Newberg on Class Actions § 15:86 (5th ed.) (hereafter *Newberg on Class Actions*).

# I.
## BACKGROUND AND QUALIFICATIONS[3]

2.      I am the Sidley Austin Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, six U.S. Courts of Appeals, and four U.S. District Courts.

3.      My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in my c.v., which is attached as Exhibit A).  Much of this work concerns various aspects of class action law.  Since 2008, I have been the sole author of the leading national treatise on class action law, *Newberg on Class Actions*.  For five years (2007–2011), I published a regular column entitled "Expert's Corner" in the publication *Class Action Attorney Fee Digest*.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

4.      My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting

---

[3] My full c.v. is attached as Exhibit A.

advice and educational training programs. For this and the past seven years, the Judicial Panel on Multidistrict Litigation has invited me to give a presentation on the current state of class action law at the annual MDL Transferee Judges Conference. The Ninth Circuit invited me to moderate a panel on class action law at the 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop. The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*. In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section. I am on the Advisory Board of the publication *Class Action Law Monitor*. I have often presented continuing legal education programs on class action law at law firms and conferences.

5.      My teaching focuses on procedure and complex litigation. I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on complex litigation, remedies, and federal litigation. I have received honors for my teaching activities, including: the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011–2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the 2001–2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996–1997 school year.

6.      My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union in New York City. In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout

the United States.  I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country.  I therefore have personally initiated and pursued complex litigation, including class actions.

7.     I have been retained as an expert witness in roughly 70 cases and as an expert consultant in about another 25 cases.  These cases have been in state and federal courts throughout the United States, most have been complex class action cases, and many have been MDL proceedings.  I have been retained to testify as an expert witness on issues ranging from the propriety of class certification to the reasonableness of settlements and fees.  I have been retained by counsel for plaintiffs, for defendants, for objectors, and by the judiciary:  in 2015, the United States Court of Appeals for the Second Circuit appointed me to brief and argue for affirmance of a district court order that significantly reduced class counsel's fee request in a large, complex securities class action, a task I completed successfully when the Circuit summarily affirmed the decision on appeal.  *See In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom. Berman DeValerio v. Olinsky*, 673 F. App'x 87 (2d Cir. 2016).

8.     I have been retained in this case to provide an opinion concerning the issues set forth in the first paragraph, above.  I am being compensated for providing this expert opinion.  I was paid a flat fee in advance of rendering my opinion, so my compensation was in no way contingent upon the content of my opinion.

9.     In analyzing these issues, I have discussed the case with the counsel who retained me.  I have also reviewed documents from this and related litigations, a list of which is attached

as Exhibit B.  I have also reviewed the applicable case law and scholarship on the topics of this Declaration.

10.     Additionally, my research assistants, under my direction, have compiled three sets of data relevant to my analysis and ultimate opinions:  (a) a data set of 40 cases reflecting billing rates that judges in the Northern District of California have approved in ruling on class action fee requests in 2016 and 2017 (Exhibit C); (b) a data set of 22 class action settlements in which the aggregate settlement value equaled or exceeded $1 billion (Exhibit D); and (c) a data set of 13 class action cases in which courts throughout the country have approved fee petitions that contain billing rates for "contract lawyers" or "staff attorneys" (Exhibit E).  In generating these data sets, we utilized all cases that fit our search criteria without selection bias.

## II.
## THE PSC'S PROPOSED FEE APPROACH IS THE MOST WIDELY USED

11.     The PSC seeks a fee using the percentage approach with a lodestar cross-check. Empirical evidence shows that this is the most common approach courts take to fees.[4]

12.     Specifically, the most fine-grained data of fee awards demonstrates that courts use a pure lodestar approach in 9.6% of cases, a pure percentage approach in 37.8% of cases, and a

---

[4] I note to provide context – not to testify as to the content of the law – that the Ninth Circuit approves this approach.  Specifically, the Ninth Circuit gives district courts the discretion to employ a lodestar or percentage approach, *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) ("The district court may exercise its discretion to choose between the lodestar and percentage method in calculating fees."), and has explicitly approved utilization of the lodestar cross-check.  *Glass v. UBS Fin. Servs., Inc.*, 331 Fed. Appx. 452, 456 (9th Cir. 2009) ("[T]he district court properly performed an informal lodestar cross-check."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.").

mix of the two (typically, a percentage approach with a lodestar cross-check) in 42.8% of cases, with another 9.8% of cases employing some other method or not specifying which method.[5]

13.     I note in the *Newberg* treatise that courts have moved from a pure percentage approach to a percentage and lodestar cross-check approach over time.  In cases from 1993–2002, 56.4% of courts used the pure percentage, while in cases from 2003–2008 cases, only 37.8% did.[6]  This is about a one-third decrease in the use of the pure percentage approach.  The big gain was in courts' use of the mixed approach—it shot up about 75% from the first period to the second, growing from 24.3% of cases to 42.8% of cases.

14.     Not surprisingly, therefore, courts in billion-dollar cases almost invariably utilize this mixed approach.  In the data set of $1 billion class action settlements that I generated for purposes of this opinion, 21 of 22 courts utilize a percentage approach with a lodestar cross-check.

15.     This approach is favored because it improves on either approach standing alone.[7]  The percentage approach without a lodestar cross-check could lead to counsel securing a windfall.  This is especially true in a case of this magnitude, where the standard benchmark fee of 25% seems inapplicable and the decision about what percentage to award is therefore somewhat ad hoc.  A lodestar approach standing alone could engross the court in an unnecessary

---

[5] *See* 5 *Newberg on Class Actions, supra* note 2, at § 15:67 (reporting on data from Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 (2010) (hereafter "Eisenberg and Miller II")).

[6] *Id.* (reporting on data from *Eisenberg and Miller II* and Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27, 52 (2004) (hereafter "Eisenberg and Miller I")).

[7] For a defense of the lodestar cross-check method, and a discussion of the points in this paragraph, see 5 *Newberg on Class Actions, supra* note 2, at § 15:86.

audit of counsel's hours and rates, as the entire fee turns on the specific time billed. By contrast, using a lodestar cross-check enables a court to make a rough estimate of counsel's lodestar for the sole purpose of ensuring against a windfall.[8] A review of counsel's lodestar is appropriate, but over-emphasis on it – especially in a case of this magnitude, involving so many counsel throughout the country – could bog the court down in unnecessary details.

## III.
## THE PSC'S REQUESTED PERCENTAGE IS REASONABLE

16. The PSC requests a fee of $121 million. That amounts to 9.89%[9] of a $1.22 billion gross settlement valuation,[10] assuming no buy backs of Generation 2 vehicles.[11] That

---

[8] Many courts have noted the summary nature of the lodestar cross-check. *See id.* (collecting cases, including cases from this Court) (citing, *inter alia*, Young v. Polo Retail, LLC, 2007 WL 951821, *6 (N.D. Cal. 2007) ("In contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours.")).

[9] If counsel's fee (and costs) are seen as part of the class's recovery – as I believe they should be – the percentage sought is actually lower. That is the case because if the Court grants counsel their fee and cost request, the PSC would receive $125 million; when that is added to the class's $1.22 billion in possible relief, there is $1.345 billion in total available relief. The PSC's requested $121 million fee is roughly 9% of that amount.

[10] In a claims-made settlement like this one, courts have debated whether counsel should receive a percentage of the funds made available by a settlement or of the funds actually received by the class. *See* 5 *Newberg on Class Actions, supra* note 2, at § 15.70. The Ninth Circuit has expressed a preference for the funds available approach, *Williams v. MGM-Pathe Comm'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) ("We conclude that the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar." (footnote omitted)). The debate is somewhat immaterial in this case, however, as the PSC informs me that the class will likely claim most if not all of the available relief. For that reason, I proceed on the assumption that the $1.22 billion in available relief is roughly equivalent to the class's actual recovery.

[11] If there is a buy back of Generation 2 vehicles, the value of the settlement to the class will increase significantly and the PSC's fee, expressed as a percentage of that value, will accordingly decrease significantly. As the following points demonstrate the reasonableness of a 9.89% fee, they would obviously support the reasonableness of the lower percentage that the PSC's fee would constitute in the presence of a Gen 2 buy back.

percentage is consistent with percentages that courts award in cases of this magnitude.  Three sets of data support that conclusion.

17.     *First,* the largest empirical study of class action fee awards – reviewing cases over a 16 year period from 1993-2008 – broke down the roughly 700 cases in its study into ten tranches according to the size of the underlying fund.  For the tranche of funds with the largest class recovery (68 cases with recoveries over $175.5 million), the mean fee award was 12.0%.[12] The PSC's requested 9.89% fee is well below that mean.

18.     *Second,* a more recent and highly respected study of all federal class action settlements over a two year period (2006-2007) similarly divided its roughly 450 total cases into ten tranches according to the size of the underlying fund.  For the tranche of funds with the largest class recovery (45 cases with funds ranging from $72.5 million to $6.6 billion), the mean fee award was 18.4%.  This study then took that highest set of cases and broke it down further into five tranches by fund size.  This enabled the author to isolate a set of nine cases with recoveries ranging from $1 billion to $6.6 billion.  In those nine cases, the mean fee award was 13.7%.[13]  The PSC's requested 9.89% fee is well below that mean.

19.     *Third,* in the data set of 22 class action cases with recoveries of $1 billion class or more that I generated for purposes of this opinion, the settlements range in size from $1 billion to $13 billion.  Because fee percentages decrease as fund sizes increase,[14] I had my research assistants isolate a sub-set of those cases involving settlements ranging from $1-2 billion in total.

---

[12] Eisenberg and Miller II, *supra* note 5, at 265 tbl. 7.

[13] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 tbls. 10-11 (2010) (hereafter "Fitzpatrick").

[14] For a discussion of this point, see 5 *Newberg on Class Actions, supra* note 2, at § 15:81.

There were 11 comparison cases in that sub-set, with fees ranging from a low of 2.89% to a high of 33.33%, with the mean being 14.5%. The PSC's requested 9.89% fee is well below that mean.

20.     These three independent data points all support the conclusion that a 9.89% fee in a settlement over $1 billion is fully consistent with the percentages courts award in cases of this magnitude.

21.     The above analysis is based on the *gross* amount of the settlement and does not account for the fact that for the class to receive $1.22 billion, it will have to trade in automobiles worth hundreds of millions of dollars. It is therefore appropriate to consider counsel's fee as a percentage of the *net* value of the settlement. To do so requires reducing the $1.22 billion figure by the aggregate value of returned cars. The PSC's economist, Edward M. Stockton, undertook that calculation and I accept his analysis to ascertain the net value of the settlement. Stockton's calculations show that if all owners traded in their cars at the start of the trade-in period (July 2017), the net value of the settlement would be roughly $843 million and if all owners traded in their cars at the end of the class period (September 2019) the net value of the settlement would be roughly $960 million. The mid-point of these numbers (which assumes class members will trade in their cars throughout the period) is $901.5 million. If the PSC's $121 million fee request is expressed as a portion of that *net* settlement value, it amounts to 13.4%.[15] That fee is slightly above the 12% mean in the first empirical study discussed above, even more slightly above the

---

[15] If fees and costs are conceptualized as part of the class's relief, *see* note 9, *supra,* the net settlement value ($901.5 million) together with the fees and costs ($125 million) generate a total net fund of $1,026,500,000. The PSC's $121 million fee would be 11.79% of that fund, which is below all of the means discussed in the text.

12.9% mean that the second empirical study finds for settlements of $500 million-$1 billion,[16] but below the 14.5% mean of my 11 $1-2 billion case set.

22.     In short, the PSC's fee constitutes a comparably low percentage of the gross settlement fund and an entirely normal percentage even of the *net* settlement fund.   These conclusions are made visually clear in Graph 1, below, which charts the gross and net fee amounts against the 11 cases in my data set involving class action settlements of $1-2 billion.

**GRAPH 1**
**PERCENTAGE AWARDS IN SETTLEMENTS OF $1B-$2B SIZE**



**IV.**
**THE PSC'S HOURS ARE REASONABLE**

23.     The PSC informs me that the total number of hours billed to this settlement is approximately 120,000 to date, with an estimated 9,676 hours projected to administer the settlement going forward, for a total of about 130,000.   Quantitative and qualitative analyses of these numbers suggest their reasonableness in the context of this case.

---

[16] Fitzpatrick, *supra* note 13, at 839 tbls. 11.

24.     Quantitatively, the PSC's 130,000 total hours can be compared to the number of
hours class counsel typically expend in billion-dollar cases.[17]   As noted above, my research
assistants compiled a set of 22 cases with settlements of $1 billion or more.   My research
assistants were able to identify a "total-hours" figure (or approximation thereof) in 16 of those 22
cases.   Graph 2, below, shows the total number of hours in each of those 16 cases, from smallest
to largest, with the PSC's 130,000 hours in this case highlighted in red.

### GRAPH 2
### TOTAL HOURS BILLED IN $1 BILLION CASES



As is visually evident, the roughly 130,000 hours the PSC expended to generate this billion
dollar settlement is well below the median of just under 150,000 for billion-dollar settlements
and is also about half (58%) of the average number of total hours expended in the other 16 cases.

---

[17] The use of billion-dollar cases as a comparison set is reasonable in the circumstances of this
settlement.   The PSC estimates the gross value of the settlement to be at least $1.22 billion.
Even if the value of the trade-in cars is netted out, the settlement is still worth about $900 million
to the class, as discussed above.   Moreover, if there ends up being a Gen 2 buyback, the gross
and net value of the settlement will run into the multiple billions.

25.     Several caveats are worth noting.  A skeptic might argue that the hours should have been lower here because there was less engaged litigation over the defendant's liability, but that fact characterizes a number of the cases in the comparison set as well.  Further, the fact that this case transpired over a shorter time period than most might lead one to assume that the case would entail fewer lawyer hours.  But this Court insisted that the case *go to trial* quickly if it did not settle, meaning that the PSC performed many of the tasks of an entire case in a shortened time period – yet with fewer than half the hours of the average case.

26.     Qualitatively, the PSC's roughly 120,000 hours in 20 months to date[18] is the equivalent of 6,000 hours/month or 72,000 hours/year; the latter number equates to 24 lawyers working full-time (3,000 hours/year).  That is the equivalent of a medium-sized law firm doing nothing but this case for 20 months.  It strikes me as reasonable that 24 lawyers could have worked on this case full-time for 20 months, given the scope of the litigation and the Court's insistence that the PSC be prepared to try the case quickly.  Indeed, if this settlement were a stand-alone settlement, I would be astonished to learn that the PSC had accomplished this complex billion dollar (potentially multi-billion dollar) settlement with this few hours.  But this settlement does not entirely stand alone and I am cognizant of the fact that I previously testified that it was reasonable for the PSC to have expended 120,000 on the 2.0-liter settlement.[19]  Given

---

[18] The Judicial Panel on Multidistrict Litigation noted that "this litigation began on September 18, 2015 when the U.S. Environmental Protection Agency issued a Notice of Violation of the Clean Air Act to Volkswagen AG, Audi AG and Volkswagen Group of America, Inc., that detailed the unauthorized use of a software-based defeat device in approximately 480,000 diesel automobiles manufactured since 2009."  Transfer Order, ECF No. 82 at 2 (Dec. 8, 2015).  This Court granted final approval to the 3.0-liter settlement on May 17, 2017, or almost exactly 20 months later.

[19] Declaration of William B. Rubenstein in Support of Plaintiffs' Motion for Attorneys' Fees and Costs Under Fed. R. Civ. P. 23(h) and Pretrial Orders Nos. 8 and 11, ECF No. 2786-3 at 8-9.

13

that earlier settlement, I make four more specific observations about the hours expended on this

settlement:

1. As one would expect, with the material exception of one task discussed below, the PSC expended about 50% fewer hours in total on this settlement than it did on the 2.0-liter settlement.[20]  This comports with one's expectation that there would be some economies of scale:  for instance, the structure and some of the provisions of the 3.0-liter settlement agreement itself mirror those of the 2.0-liter settlement agreement.

2. At the same time, the additional hours attributable to securing this settlement are surely justified by the fact that the 3.0-liter settlement is a unique, distinct, and separate settlement with its own sets of factual and legal issues.  A simple review of those parts of the 3.0-liter settlement agreement that are *not* borrowed from the 2.0-liter settlement agreement demonstrates the complexity and relative novelty of the later settlement.  The sheer size and scope of the 3.0-liter settlement support the conclusion significant additional time was required to investigate, assess, litigate, prepare for trial, and settle this independent, billion-dollar deal.

3. The only tranche of time in this case that meaningfully exceeded that of the 2.0-liter settlement is the time devoted to document review – and it exceeded that earlier time by a significant margin.  Moreover, the document review time in this settlement constitutes nearly two-thirds of all the hours in the settlement.  At first blush, these facts are surprising.  But upon closer scrutiny, several factors make them less so:  (a) the PSC received about 15 million pages of documents and reviewing that quantity of material has been an on-going process since the inception of the case; (b) at the time of the 2.0 settlement, document review had been on-going but not all the document review hours as of that time could be attributed to the 2.0 settlement alone – some had to be attributed to the 3.0 (and Bosch) cases and held in abeyance for later fee petitions (if any); this means that the document review hours in the present lodestar are not just hours expended since completion of the 2.0-liter settlement, but hours expended since the case's inception; (c) assuming that document review was not completed as of the time that the 2.0 settlement was reached, the PSC could not stop reviewing documents:  the 3.0-liter case remained live, with the real possibility that no settlement would be reached and the case would proceed to trial quickly.  When these facts are synthesized, it is less surprising that the total document review time attributed to the lodestar of this settlement exceeds the document review time in the 2.0-liter settlement.  It remains somewhat surprising that the document review times exceeds the aggregate of the two earlier settlements by about 50%, but the PSC deserves some deference in terms of the apportionment of document review time among the cases.  That task is surely more art than science in this context and it is, of

---

[20] The PSC spent less time in each lodestar category in this case than on the 2.0-liter settlement with two exceptions: document review, which is discussed in the text, and Dep. Prep/Take/Defend.  The difference in the latter category (1,255.9 hours to 91.3 hours) is relatively immaterial in the context of the total hours.  Net of document review hours, the PSC spent 92,160.8 hours on the 2.0-liter settlement and 46,732.6 hours (or 50.7% as many) on this settlement.

course, easy to Monday-morning quarterback those decisions – which is why the lodestar cross-check aims at a general analysis, not a line-by-line audit.

4. Perhaps most importantly, given the wholly normal (indeed modest) number of total hours invested in the case considering its settlement size and scope, even a meaningful downward adjustment of the document review hours would not make the pending fee request unreasonable. For instance, if 30,000 of the 83,360.9 document review hours (or 36%) are slashed out of the PSC's lodestar, its total lodestar would drop to $47.65 million[21] and its lodestar multiplier would go from its present value of 2 to 2.54,[22] which remains entirely normal for a case of this magnitude (as discussed in Part V, below).

27.    In sum, the PSC's hours quantitatively compare favorably to the total hours expended in other billion-dollar settlements, and a qualitative review of the specific numbers devoted to various tasks does not suggest anything untoward. Indeed, given the very short shelf life of this case, lodestar padding is less, rather than more, likely to have occurred in that there simply was not a long enough trajectory for lawyers to bill out hours for years in the certainty that they would get paid in the end. Nor, given the Court's quick trial date, was there time for such idleness. The PSC's hours demonstrate that a lot of lawyers dropped what they were doing to throw themselves into this case, in the hopes of meeting the Court's goal of trying or settling it expeditiously.

---

[21] The average billing rate for document review hours is $413.83. Removing 30,000 such hours reduces the total lodestar ($60,063,332.60) by $12,414,900, to $47,648,432.60.

[22] A fee of $121,000,000 divided by a lodestar of $47,648,432.60 renders a multiplier of 2.54.

## V.
## THE PSC'S RATES ARE REASONABLE

28.    The PSC did not provide me with specific hourly rates for each timekeeper in their lodestar but rather with a blended billing rate for the entire case of $461.69.  A quantitative analysis of this blended billing rate[23] confirms its reasonableness.

29.    To assess the reasonableness of the blended billing rate, I directed my research assistants to create a database of fee rates contained in class action fee petitions that federal courts in the Northern District of California have approved in the past, roughly, 1.5 years (2016, 2017 to date).  Their efforts identified 40 cases that contained information sufficient to generate a blended billing rate for the case (listed in Exhibit C).[24]  We adjusted all hourly rates to 2017 dollars using the U.S. Bureau of Labor CPI Inflation Calculator.[25]  The blended billing rate (again adjusted to 2017 dollars) in these cases ranged from a low of $372.22/hour to a high of $733.88/hour.  The mean rate for these 40 cases is $528.11. The complete range of blended billing rates is reflected in Graph 3, below, with the blended billing rate in this case highlighted in red.

---

[23] A blended billing rate is captured by simply dividing the total fee sought by the total number of hours worked, thus providing the average hourly billing rate for the case across all timekeepers ranging from high-end partners to paralegals.

[24] No cases were discarded from the dataset for any reason other than not meeting the criteria: explicit judicial approval of class counsel's hourly rates and hours. In some of these 40 cases, counsel sought an award lower than their total lodestar and/or the court made an award lower than the total lodestar.  So long as the court did not express concern about counsel's proposed billing rates or hours in affirming the fee request, we coded these rates as affirmed, or judicially-approved, rates and hours and included them in the dataset.  If a court explicitly lowered a specific billing rate or the number of hours, we utilized the lower numbers in the dataset.

[25] This calculator can be found at this hyperlink:  http://data.bls.gov/cgi-bin/cpicalc.pl.  The calculator showed that $1,000.00 in January of 2016 was equivalent to $1,025.00 in January of 2017.  Accordingly, we multiplied all 2016 rates by 1.025 to adjust them to 2017 values.

16

**GRAPH 3**
**BLENDED BILLING RATES IN RECENT NORTHERN DISTRICT**
**OF CALIFORNIA CLASS ACTION FEE APPROVALS**



As the Court can see, the blended billing rate in this case ($461.69) falls far to the left of the middle of the pack – 12 cases below the median in the graph – and it is about 12.5% below the mean, demonstrating its normalcy.

30.    The reasonableness of the PSC's blended billing rate supports several further conclusions.  The blended billing rate reflects the distribution of time between partners, associates, and paralegals.  If only partners did this work, the blended billing rate would be very high, whereas if only paralegals billed, the blended billing rate would be very low.  The fact that the blended billing rate in this case is well below average means that Lead Counsel distributed work among partners, associates, non-partnership track attorneys, and paralegals in an appropriate fashion.  This is a remarkable fact in these circumstances.  I would have expected to see a far higher blended billing rate for three separate reasons:  (1) the Court's appointment of a 22-person PSC consisting of some of the highest-paid lawyers in the United States; (2) the speed at which the PSC had to prepare for trial, rather than wallowing in discovery for multiple years; and (3) the high-level work that was needed to settle a case of this size and complexity, in

17

conjunction with important collateral governmental litigation, in such a short time frame.  That Lead Counsel achieved a normal blended billing rate is a testament to her remarkable management of this unique litigation team.

31.    The PSC employed non-partnership track attorneys to undertake some aspects of the class's legal work, particularly the review of documents.  I have reviewed the rates at which these non-partnership track attorneys are included in the lodestar for cross-check purposes and make three factual observations about those rates, two empirical, one policy-oriented.

32.    *First,* these are skilled attorneys.  They are referred to as "contract" or "staff" attorneys solely by virtue of the fact that they are not on a partnership track at the relevant law firms, but are hired on more of an ad hoc basis.[26]  The fact that they work on an ad hoc basis, standing alone, says nothing about their qualifications or skills.  For purposes of another case, I have had the opportunity to review the qualifications and skills of the contract attorneys that Lead Counsel's firm uses and can testify that these attorneys are very well qualified for the tasks that they perform:  many graduated from top law schools, have significant experience at the tasks to which they are assigned, and often work on a non-partnership track as a personal choice about how they wish their careers to proceed, not because they are unqualified for top level jobs.

33.    *Second*, the rates at which counsel included non-partnership track attorneys in their lodestar for cross-check purposes are consistent with rates that courts have explicitly or implicitly affirmed in approving fee petitions in class action cases.  Specifically, my research assistants compiled a database of 13 class action cases in which approved fee petitions have

---

[26] While different firms call these attorneys different names – e.g., "contract attorneys" or "staff attorneys" – the defining characteristic of them is that they are not on a partnership track. Commentators often make the incorrect assumption that these attorneys are necessarily "temps." Many are salaried employees of the firms and work at these firms over many years.

18

contained billing rates for so-called "contract" or "staff attorneys" (Exhibit E); those 13 cases provided 138 different data points of rates for these attorneys. The rates in those cases ranged from $132.64 to $743.01, with a mean of $386.75. In this case, the PSC has not broken down fee rates by job title. However, it is highly likely that non-partnership track attorneys generally undertook document review work, and the PSC shows a blended billing rate for document review in this case to be $413.83. As set forth in Graph 4, below, this document review rate is but 7% above the mean billing rate for contract attorneys in our comparison group.

**GRAPH 4**
**CONTRACT ATTORNEY RATES IN APPROVED CLASS ACTION FEE PETITIONS**
**COMPARED TO RATES FOR DOCUMENT REVIEW IN THIS CASE**



The fact that the rate for document review here is slightly higher than the normal billing rate for contract attorneys courts have approved in other cases is unsurprising for several reasons: (a) the blended document review rate here would pick up time of both the non-partnership track

attorneys and their supervising attorneys' work on document review – hence the rate attributable to the non-partnership track attorneys alone is likely fully consistent with the comparison set; (b) the work here was undertaken in a pressured time frame, (c) in a market with higher attorney billing rates, and (d) encompassed many documents in foreign languages.  In short, there is nothing remarkable about the rates reported for document review here, the work likely primarily undertaken by non-partnership track attorneys.

34.     *Third,*[27] the policy question of how to bill non-partnership track attorneys has arisen regularly in class suits as class counsel will often hire such lawyers to perform discrete functions in a particular case.  Class counsel typically pay these attorneys at a lower hourly rate than the hourly rate they assign to them in the lodestar analysis in their fee petitions.  To put numbers on this idea:  a firm may hire contract lawyers for a particular case at $50/hour, then bill these attorneys at $350/hour in the lodestar calculation based, for example, on the contract attorneys' number of years out of law school, their experience, and the type of work they performed.  It is my expert opinion that several policy arguments support this approach:

- This is precisely the way in which firms bill legal services – including those of partners, associates, and contract attorneys – to clients in the private market.  For instance, a firm may pay a first-year associate a $150,000 annual salary and expect 3,000 hours of billable time in return.  That means that the associate's salary breaks down to $50/hour.  The associate likely costs the firm more than $50/hour because the firm has spent time recruiting and training the associate and because it pays for overhead, perhaps benefits, and other expenses associated with her work.  Consequently, the associate who is receiving a $50/hour salary may actually cost the firm, say, $75/hour.  But the firm then bills its clients, maybe, $375/hour for that associate's time, realizing a $300/hour, or 400%, profit for the associate's work.  Regardless of the precise numbers that attach to the practice, the point is that law firms are in the business of making their partners a profit by having the partners bill the work done by their associates and paralegals to their clients at higher rates than they pay them.  So long as a contract attorney is providing legal services to a client, a firm is entitled to bill her time to the client in the same manner.

---

[27] The language and citations in this and the following paragraphs are taken from 5 *Newberg on Class Actions, supra* note 2, at § 15:41.

- The ABA reached this conclusion nearly two decades ago, *see* ABA Formal Opinion 00-420, and I note as a matter of policy that courts have often cited to the ABA's guidance in concluding that class action firms "may charge a markup to cover overhead *and profit* if the contract attorney charges are billed as fees for legal services.[28]  It makes sense that courts have so held because a contingent fee class action firm's lodestar operates in the same way as a private law firm's bill to its client:  it embodies this basic profit for its partners and, in doing so, brings the lodestar in line with market rates.[29]

- Permitting class counsel to bill non-partnership track attorneys at market rates is cost-efficient:  it encourages the firms to delegate work to attorneys who are likely billed at lower costs than are associates or partners.  If class action firms could only bill non-partnership track attorneys at cost, they would likely transfer the work required to associates.

35.     In sum, quantitative analysis of both the PSC's blended billing rate and of the rates paid non-partnership track attorneys shows that these rates are indistinguishable from the rates regularly approved by courts in this District (for the blended rate) and by courts throughout the country (for the contract rates); further, public policy strongly supports the manner in which the PSC billed non-partnership track attorneys.

---

[28] *In re AOL Time Warner S'holder Derivative Litig.,* No. 02 Civ. 6302(CM), 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) (emphasis added).

[29] The lodestar *multiplier* is meant to reward the class action firm over and above the market rate for undertaking a case on a contingency fee basis.  Without such a multiplier, no firm would undertake contingent cases, as it would be far safer to simply reap the normal profit embodied in the lodestar but reflected, in a non-contingent case, in the bill to the client.  *See, e.g.*, *Ketchum v. Moses* 17 P.3d 735, 742 (Cal. 2001) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. . . . A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases." (internal quotation marks and citations omitted)).

# V.
## THE PSC'S REQUESTED MULTIPLIER IS REASONABLE

36.     The PSC seeks a fee that embodies a lodestar multiplier of approximately 2.  (A $121 million fee would be 2.015 times greater than the PSC's total lodestar of approximately $60 million; I use 2 for simplicity.)

37.     Quantitatively, a 2 multiplier is consistent with multipliers that courts have previously approved in similar circumstances:

- Three leading empirical studies of class action attorney's fees found the mean multipliers in all cases to be 1.42,[30] 1.65,[31] and 1.81,[32] while an older study found the mean multiplier to be 4.97.[33]

- These studies also show that multipliers are higher in cases with larger returns, with the mean multipliers rising to 2.39 (in cases with recoveries over $44.6 million) in one study;[34] to 3.18 (in cases with recoveries over $175.5 million) in another study;[35] and to 4.5 (in cases with recoveries over $100 million) in a third study.[36]

- Indeed, my research assistants discerned the approved multipliers in our data set of settlements of $1 billion or greater.  In this set of 15 settlements, the approved multipliers ranged from 1.80 to 6.19, with the mean being 3.36 and the median being 2.70.  The proposed 2 multiplier in this case is therefore well below the norm for billion-dollar cases, as demonstrated in Graph 5, below.

---

[30] 5 *Newberg on Class Actions, supra* note 2, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[31] Fitzpatrick, *supra* note 13, at 833–34.

[32] Eisenberg & Miller II, *supra* note 5, at 272.

[33] Stuart J. Logan, Beverly C. Moore & Jack Moshman, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167, 169 (2003) (hereafter "Logan").

[34] 5 *Newberg on Class Actions, supra* note 2, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[35] Eisenberg & Miller II*, supra* note 5, at 274.

[36] Logan, *supra* note 33, at 167.

**GRAPH 5**
**COURT-APPROVED MULTIPLIERS IN BILLION-DOLLAR CASES**



- Beyond these bare statistics, case reports demonstrate that, in appropriate circumstances, courts have often approved percentage awards embodying lodestar multipliers far above the 2 sought here. In the leading Ninth Circuit opinion on point, the Court established 25% as the benchmark percentage fee and approved a multiplier of 3.65, writing that this number "was within the range of multipliers applied in common fund cases"[37] and appending a list of such cases to its decision. Similarly, in Exhibit F, I provide a list of 54 cases with multipliers over 3.5, 48 of which have multipliers of 4.00 or higher, and 31 of which have multipliers of 5.00 or higher. This list is not meant to be either exhaustive or representative of all multipliers. Rather, it demonstrates that courts approve percentage awards that embody multipliers well above the multiplier sought here in appropriate circumstances.

The requested multiplier is therefore above the mean for *all* cases but well below the mean for *large* cases, and it falls securely within the range of multipliers that courts have approved in appropriate circumstances in the past.

---

[37] *Vizcaino*, 290 F.3d at 1051; *see also Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) ("A 2.83 multiplier falls within the Ninth Circuit's presumptively acceptable range of 1.0–4.0. Given the complexity and duration of this litigation, the results obtained for the class, and the risk counsel faced in bringing the litigation, the Court finds the 2.83 multiplier appropriate." (citation omitted)).

38.     As courts will clearly approve a fee award that embodies a 2 multiplier in appropriate circumstances, the sole question is whether the PSC's work in *this* case justifies this multiplier.  A factual analysis of the risks that the PSC took and the results that it achieved helps explain the reasonableness of a 2 multiplier.[38]

39.     **_Risk_**.  Skeptics may argue that the PSC's risk in this case was low because the defendants' liability was a given from the outset, government agencies were undertaking parallel enforcement actions and hence assisted in establishing the defendants' ultimate liability, and because the PSC was able to share the costs of this endeavor across a broad spectrum of firms with vast resources.   In these senses, it may be alleged that the action lacks some of the conventional characteristics of risk.   That allegation is exaggerated:  the risk framework of this case is not that different than many large class actions, which often follow on the heels of public events, and the defendant in this case did not simply concede liability at its outset.  For example, in response to certain requests for admission (including admissions about the 3.0-liter engines), defendants filed a 94-page document in May of 2016 – just two months before the proposed trial of the 2.0-liter case – explicitly (and in great lawyering detail) refusing to concede liability.  *See* Responses and Objections of Defendants Volkswagen AG, Volkswagen Group of America, Inc., Audi AG, and Audi of America, LLC to Plaintiffs' First Requests for Admissions to VW Defendants (attached to my 2.0-liter Declaration, ECF Doc. No. 2786-3, as Exhibit E).   More

---

[38] The points that follow mirror the conclusions that I reached in my Declaration in support of the 2.0-liter settlement's proposed fee award.   I repeat them here not out of a rote exercise undertaken without consideration but after having reviewed the 3.0-liter settlement and having reached the independent conclusion that it shares these characteristics with the 2.0-liter settlement.

importantly, the structure and pursuit of this MDL produced a handful of specific, identifiable risks unique to the circumstances of this case that put significant pressure on the PSC:

- **Speed**. Because this case involved polluting cars, this Court took the position from the outset that a primary goal of the litigation was to get the cars off the roads as quickly as possible. To that end, the Court established a time frame for the litigation that put enormous pressure on the PSC to move the case along toward trial quickly. While all involved parties hoped that the case would settle and not proceed to trial, none could assume that outcome and the PSC had to prepare for trial. This required an extraordinary investment of resources and time.

- **Internal coordination**. To accomplish the tasks assigned in the time frame established by the Court, the PSC had to employ all of its resources quickly and efficiently. Yet the PSC was essentially an ad hoc law firm, established solely for purposes of this suit, and consisting of 22 different lawyers from firms scattered throughout the United States. Moreover, these lawyers are all high-priced stars. It is, frankly, difficult to underestimate Lead Counsel's task in corralling this team, getting it up and running on all of the various aspects of a huge case like this on a short track for trial, and doing so in an efficient, cost-saving manner.

- **External coordination**. This MDL involves four separate sets of actions: (1) the private class actions; (2) the DOJ's actions on behalf of the EPA; (3) the FTC's actions; and (4) actions by state governments. In turn, the entities behind these actions have been involved in a 2.0 liter settlement, the Bosch settlement, the 3.0 liter settlement, and (some) the franchise dealers settlement. The PSC was forced to coordinate all of its activities across these various cases with these other law enforcers in pursuing relief for the class. Skeptics may view this coordination task as un-burdening the PSC from undertaking work, but that position fails to explore the situation adequately. There are in fact some class actions that *follow* on the coattails of government enforcement actions, enabling the later attorneys to take advantage of non-mutual offensive issue preclusion and to reduce their efforts accordingly.[39] But here there was no initial government trial and no prior judgment. Rather, the public and private enforcement actions proceeded simultaneously. Moreover, the PSC could not sit back and assume the governments' efforts would lessen its load. On the contrary, the PSC had a fiduciary duty to represent the class in the settlement proceedings – a different clientele and duty than any government enforcer – while simultaneously preparing for trial within the year. It strikes me that coordinating this case with the government enforcement agencies likely created more work than it relieved. Thus, any "piggy-backing" argument underestimates the work the PSC was

---

[39] *See, e.g.*, *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979).

forced to do and fails to consider the PSC's additional burden of working in this complex, high-pressure, multi-faceted litigation framework.

- *Novelty*.  While skeptics are quick to allege that liability was something of a given in this case, they fail to appreciate that the context of the case was relatively novel.  A search for the term "defeat device" in Westlaw's federal and state databases returns a total of 66 cases, only six of which pre-date the cases in this MDL.  That means that there were but a handful of cases prior to this situation involving the whole concept of a defeat device.  Thus, this was neither the PSC's 1,000th asbestos case nor its 100th tobacco case, nor was it a standard securities or antitrust class action.  The underlying facts – intertwining aspects of the Clean Air Act, federal and state automobile regulations, international manufacturing and importing of automobiles, engineering devices, EPA testing, German manufacturing, etc. – presented a sufficiently new problem that preparing for trial within a year would be challenging.  As one small example:  firms doing repeat work in complex matters (such as antitrust lawyers) may rely on the same expert witnesses from case to case.  But here, defeat device experts would have to be identified, screened, interviewed, and vetted for the first time – all on a short fuse.

40.    ***Results***.  Beyond these risk factors, five components of this case's outcome speak to the exceptional results the PSC obtained in this matter:

- *Counsel obtained significant relief for the class*.  The structure of this settlement is unique in that many class members have the option of returning their car for money – beyond the value of the car itself – or keeping the car and awaiting a fix of the emissions device.  The total value of that relief exceeds $1 billion, making this (even were it standing alone) one of the largest consumer settlement in history.  Its structure also respects class members' autonomy by safeguarding their option to select replacement or repair of their vehicles.

- *Class members get full redress*.  The quantity of relief on an individual basis is significant – the class members realize effectively complete relief for their monetary losses in that they are guaranteed either the pre-revelation value of their automobiles plus additional cash or a repair plus additional cash.  Other than more intangible relief – such as monetary damages for having driven around an automobile polluting the environment under false pretenses – the class members recover the bulk (if not all) of their tangible damages.

- *100% of the class is entitled to relief*.  This full relief has been made available to all class members.  No portion of the class was excluded from the settlement.

- *Claiming is straightforward*.  Class members can easily realize the offered relief and it is likely that the vast majority of class members will participate in the

settlement. This is an astonishing fact given the rates at which class members typically file claims.[40]

- ***The relief obtained compares favorably to results achieved in similar cases***. It is rare that an automobile defect case results in replacement of the automobile (plus cash) as a "settlement."

41. The PSC's task in this matter was neither easy nor uncomplicated. The PSC coordinated a superb, billion-dollar deal for tens of thousands of consumers throughout the United States within about one and a half years, all the while preparing to try those consumers' novel cases at the end of that time frame if the settlement efforts had failed. This case bore enough unique, specific risks, and the PSC delivered enough real, substantial value, to justify a fee embodying a quotidian lodestar multiplier of 2.

* * *

42. I have testified that:

- The PSC's proposed ***fee approach*** – a percentage approach with a lodestar cross-check – is the fee approach courts use most often (and, I note, one that the Ninth Circuit has explicitly approved).

- The PSC's requested ***percentage*** is reasonable, below the mean for a $1-2 billion settlement if expressed as a percentage of the settlement's gross value and consistent with that mean if expressed as a percentage of the settlement's net value.

- The PSC's ***hours*** are a standard amount for a billion-dollar case and thus lack any sign of lodestar padding.

- The PSC's blended hourly ***billing rate*** is lower than the average blended hourly billing rates approved in other class action settlements in this District in the past few years and the rates at which it bills non-partnership track attorneys undertaking document review work are consistent with rates in approved class action fee petitions.

---

[40] *See* Nicholas M. Pace and William B. Rubenstein, *Shedding Light on Outcomes in Class Actions*, in Confidentiality, Transparency, and the U.S. Civil Justice System 20–59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008).

- The PSC's proposed 2 ***multiplier*** is well below the mean for settlements over $1 billion and entirely reasonable given the unique risks that it shouldered and the superb results that it achieved for the class.

Executed this 30th day of June, 2017, in Los Angeles, California.

_____

William B. Rubenstein

# EXHIBIT A

# PROFESSOR WILLIAM B. RUBENSTEIN

Harvard Law School - AR323                                      (617) 496-7320
1545 Massachusetts Avenue                             rubenstein@law.harvard.edu
Cambridge, MA 02138

### ACADEMIC EMPLOYMENT

#### HARVARD LAW SCHOOL, CAMBRIDGE MA
Sidley Austin Professor of Law                                  2011-present
Professor of Law                                                2007-2011
Bruce Bromley Visiting Professor of Law                         2006-2007
Visiting Professor of Law                               2003-2004, 2005-2006
Lecturer in Law                                                 1990-1996
  *Courses:*        Civil Procedure; Class Action Law; Remedies
  *Awards*:         2012 Albert M. Sacks-Paul A. Freund Award for Teaching Excellence
  *Membership:*     American Law Institute; American Bar Foundation Fellow

#### UCLA SCHOOL OF LAW, LOS ANGELES CA
Professor of Law                                                2002-2007
Acting Professor of Law                                         1997-2002
  *Courses*:        Civil Procedure; Complex Litigation; Remedies
  *Awards*:         2002 Rutter Award for Excellence in Teaching
                    Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

#### STANFORD LAW SCHOOL, STANFORD CA
Acting Associate Professor of Law                               1995-1997
  *Courses*:        Civil Procedure; Federal Litigation
  *Awards*:         1997 John Bingham Hurlbut Award for Excellence in Teaching

#### YALE LAW SCHOOL, NEW HAVEN CT
Lecturer in Law                                                 1994, 1995

#### BENJAMIN N. CARDOZO SCHOOL OF LAW, NEW YORK NY
Visiting Professor                                              Summer 2005

### LITIGATION-RELATED EMPLOYMENT

#### AMERICAN CIVIL LIBERTIES UNION, NATIONAL OFFICE, NEW YORK NY
Project Director and Staff Counsel                              1987-1995

Litigated impact cases in federal and state courts throughout the US.  Supervised a staff of attorneys at the national office, oversaw work of ACLU attorneys around the country, and coordinated work with private cooperating counsel nationwide.  Significant experience in complex litigation practice and procedural issues; appellate litigation; litigation coordination, planning and oversight.

#### HON. STANLEY SPORKIN, U.S. DISTRICT COURT, WASHINGTON DC
Law Clerk                                                       1986-87

#### PUBLIC CITIZEN LITIGATION GROUP,   WASHINGTON DC
Intern                                                          Summer 1985

**A-1**

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA
      J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT
      B.A., 1982, *magna cum laude*
           Editor-in-Chief, YALE DAILY NEWS

SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service and Highlighted Activities*

◇    *Sole Author,* NEWBERG ON CLASS ACTIONS (sole author of Fourth Edition updates and Fifth Edition since 2008)

◇    *Invited Speaker,* Judicial Panel on Multidistrict Litigation, Multidistrict Litigation (MDL) Transferee Judges Conference, Palm Beach, Florida (invited to present to MDL judges on recent developments in class action law and related topics (2010, 2011, 2012, 2013, 2014 (invited), 2015, 2016, 2017)

◇    *Special counsel,* Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No. 15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇    *Author, Amicus* brief filed in the United States Supreme Court on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇    *Amicus curiae, Amicus* brief filed in – and approvingly cited by – California Supreme Court on proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 687 (Cal. 2016))

◇    *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation*, Philadelphia, Pennsylvania

◇    *Advisory Board, Class Action Law Monitor* (Strafford Publications), 2008-

◇    *Co-Chair,* ABA Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◇    *Planning Committee,* American Bar Association, Annual National Institute on Class Actions Conference, 2006, 2007

◇    "*Expert's Corner*" (Monthly Column)*, Class Action Attorney Fee Digest*, 2007-2011

**A-2**

*Expert Witness*

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* Case 3:15-md-02672-CRB, MDL 2672, U.S. Dist. Ct., N.D. Cal. (2017))

◇ Submitted an expert witness declaration and deposed concerning impracticability of joinder in antitrust class action (*In re:   Modafinil Anititrust Litigation,* Civ. Action No. 2-06-cv-01797 (E.D. Pennsylvania (2017))

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Aranda v. Caribbean Cruise Line, Inc.,* Case No. 1:12-cv-04069, U.S. Dist. Ct., N.D. Ill. (2017))

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*McKinney v. United States Postal Service*, Civil Action No. 1:11-cv-00631 (CRC), U.S. Dist. Ct., D.D.C. (2016))

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Geancopoulos v. Philip Morris USA Inc.,* Civil Action No. 98-6002-BLS1 (Mass. Superior Court, Suffolk County)

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Gates v. United Healthcare Insurance Company,* Case No. 11 Civ. 3487 (KFB), U.S. Dist. Ct., S.D.N.Y. (2015))

◇ Retained as an expert trial witness on class action procedures and deposed prior to trial in matter that settled before trial (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◇ Submitted an expert witness declaration concerning reasonableness of attorney's fee request, relied upon by court in awarding fees, *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *9-*13 (N.D. Cal. Sept. 2, 2015)

◇ Retained as an expert witness concerning adequacy of putative class representatives in securities class action (*Medoff v. CVS Caremark Corp.,* Case No. 1:09-cv-00554, U.S. Dist. Ct., D.R.I. (2015))

◇    Submitted an expert witness declaration concerning reasonableness of proposed class action settlement, settlement class certification, attorney's fees and incentive awards (*Fitzgerald Farms, LLC v. Chespeake Operating, L.L.C.,* Case No. CJ-2010-38, Dist. Ct., Beaver County, Oklahoma (2015))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request, relied on by the court in awarding fees, *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462, at *43-*44 (C.D. Cal. May 29, 2015)

◇    Submitted an expert witness declaration concerning propriety of severing individual cases from class action and resulting statute of repose ramifications (*In re: American  International Group, Inc. 2008 Securities Litigation,* 08-CV-4772-LTS-DCF, U.S. Dist. Ct., S.D.N.Y. (2015))

◇    Retained by Fortune Global 100 Corporation as an expert witness on fee matter that settled before testimony (2015)

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re: Hyundai and Kia Fuel Economy Litigation,*   MDL 13-02424, U.S. Dist. Ct., C.D. Cal. (2014))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Ammari Electronics v. Pacific Bell Directory*, Case No. RG0522096, California Superior Court, Alameda County (2014))

◇    Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,* Case No. CGC-10-497839, California Superior Court, San Francisco County (2014))

◇    Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC,* Case No. CGC-10-497840, California Superior Court, San Francisco County (2014))

◇    Retained as expert witness on proper level of common benefit fee in MDL (*In re Neurontin Marketing and Sales Practice Litigation,* Civil Action No. 04-10981, MDL 1629, U.S. Dist. Ct., D. Mass. (2014))

◇    Submitted an expert witness declaration concerning proper approach to attorney's fees under California law in a statutory fee-shifting case (*Perrin v. Nabors Well Services Co.,* Case No. 1220037974, Judicial Arbitration and Mediation Services (JAMS) (2013))

◇    Submitted an expert witness declaration concerning fairness and adequacy of proposed nationwide class action settlement (*Verdejo v. Vanguard Piping Systems,* Case No. BC448383, California Superior Court, Los Angeles County (2013))

◇    Retained as an expert witness regarding fairness, adequacy, and reasonableness of proposed nationwide consumer class action settlement  (*Herke v. Merck,* No. 2:09-cv-07218, MDL Docket

No. 1657 (*In re Vioxx Products Liability Litigation*), U.S. Dist. Ct., E. D. La. (2013))

◇ Retained as an expert witness concerning ascertainability requirement for class certification and related issues (*Henderson v. Acxiom Risk Mitigation, Inc.,* Case No. 3:12-cv-00589-REP, U.S. Dist. Ct., E.D. Va. (2013))

◇ Submitted an expert witness declaration concerning Rule 23(g) selection of competing counsel (*White v. Experian Information Solutions, Inc.,* Case No. 05-CV-1070, U.S. Dist. Ct., C.D. Cal. (2013))

◇ Submitted an expert witness declaration concerning reasonableness of class action settlement and performing analysis of "net expected value" of settlement benefits (*In re Navistar Diesel Engine Products Liab. Litig.*, 2013 WL 10545508 (N.D. Ill. July 3, 2013))

◇ Submitted an expert witness declaration concerning reasonableness of class action settlement and attorney's fee request (*Commonwealth Care All. v. Astrazeneca Pharm. L.P.*, 2013 WL 6268236 (Mass. Super. Aug. 5, 2013))

◇ Submitted an expert witness declaration concerning propriety of preliminary settlement approval in nationwide consumer class action settlement (*Anaya v. Quicktrim, LLC,* Case No. CIVVS 120177, California Superior Court, San Bernardino County (2012))

◇ Submitted expert witness affidavit concerning fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.,* Case No. 217-2010-CV-00294, New Hampshire Superior Court, Merrimack County (2012))

◇ Submitted expert witness declaration and deposed concerning class certification issues in nationwide fraud class action, relied upon by the court in affirming class certification order, *CVS Caremark Corp. v. Lauriello,* 175 So. 3d 596, 609-10 (Ala. 2014)

◇ Submitted expert witness declaration in securities class action concerning value of proxy disclosures achieved through settlement and appropriate level for fee award (*Rational Strategies Fund v. Jhung,* Case No. BC 460783, California Superior Court, Los Angeles County (2012))

◇ Submitted an expert witness report and deposed concerning legal malpractice in the defense of a class action lawsuit (*KB Home v. K&L Gates, LLP,* Case No. BC484090, California Superior Court, Los Angeles County (2011))

◇ Retained as expert witness on choice of law issues implicated by proposed nationwide class certification (*Simon v. Metropolitan Property and Cas. Co.,* Case No. CIV-2008-1008-W, U.S. Dist. Ct., W.D. Ok. (2011))

◇ Retained, deposed, and testified in court as expert witness in fee-related dispute (*Blue, et al. v. Hill,*Case No. 3:10-CV-02269-O-BK, U.S. Dist. Ct., N.D. Tex. (2011))

◇ Retained as an expert witness in fee-related dispute (*Furth v. Furth*, Case No. C11-00071-DMR, U.S. Dist. Ct., N.D. Cal. (2011))

◇       Submitted expert witness declaration concerning interim fee application in complex environmental class action (*DeLeo v. Bouchard Transportation,* Civil Action No. PLCV2004-01166-B, Massachusetts Superior Court (2010))

◇       Retained as an expert witness on common benefit fee issues in MDL proceeding in federal court (*In re Vioxx Products Liability Litigation*, MDL Docket No. 1657, U.S. Dist. Ct., E.D. La. (2010))

◇       Submitted expert witness declaration concerning fee application in securities case (*In re Amicas Inc. Shareholder Litigation,* Civil Action No. 10-412BLS2, Massachusetts Superior Court (2010))

◇       Submitted an expert witness declaration concerning fee entitlement and enhancement in non-common fund class action settlement, relied upon by the court in *Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172-74 (C.D. Cal. 2010)

◇       Submitted an expert witness declaration concerning class action fee allocation among attorneys (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◇       Submitted an expert witness declaration concerning settlement approval and fee application in wage and hour class action settlement (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, MassachusettsSuperior Court (2010))

◇       Submitted an expert witness declaration concerning objectors' entitlement to attorney's fees (*Rodriguez v. West Publishing Corp.,* Case No. CV-05-3222, U.S. Dist. Ct., C.D. Cal. (2010))

◇       Submitted an expert witness declaration concerning fairness of settlement provisions and processes, relied upon by the court in *Radcliffe v. Experian Inform. Solutions Inc.*, 715 F.3d 1157, 1166 (9th Cir. 2013)

◇       Submitted an expert witness declaration concerning attorney's fees in class action fee dispute, relied upon by the court in *Ellis v. Toshiba America Information Systems, Inc.*, 218 Cal. App. 4th 853, 871, 160 Cal. Rptr. 3d 557, 573 (2d Dist. 2013))

◇       Submitted an expert witness declaration concerning common benefit fee in MDL proceeding in federal court (*In re Genetically Modified Rice Litigation*, MDL Docket No. 1811, U.S. Dist. Ct., E.D. Mo. (2009))

◇       Submitted an expert witness declaration concerning settlement approval and fee application in national MDL class action proceeding (*In re Wal-Mart Wage and Hour Employment Practices Litigation*, MDL Docket No.1735, U.S. Dist. Ct., D. Nev. (2009))

◇       Submitted an expert witness declaration concerning fee application in national MDL class action proceeding (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation*, MDL Docket No. 1796, U.S. Dist. Ct., D. D.C. (2009))

◇       Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court  (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No.

1842, U.S. Dist. Ct., D. R.I. (2009))

◊ Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◊ Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No. BC362599, California Superior Court, Los Angeles County (2009))

◊ Submitted an expert witness declaration concerning process for selecting lead counsel in complex MDL antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, U.S. Dist. Ct., D. D.C. (2008))

◊ Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County (2008))

◊ Submitted an expert witness declaration concerning fee application in wage and hour class action(*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County (2008))

◊ Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County (2008))

◊ Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif*, Case No. KC034700, California Superior Court, Los Angeles County (2008))

◊ Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB, U.S. Dist. Ct., E.D. Ky. (2008))

◊ Submitted expert witness declaration concerning procedural aspects of national class action arbitration (*Johnson v. Gruma Corp.*, JAMS Arbitration No. 1220026252 (2007))

◊ Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.*, Civil Action No. 06-11033 PBS, U.S. Dist. Court, D. Mass. (2007))

◊ Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al.*, No. 07-39 (WOB) U.S. Dist. Court, E. D. Ky. (2007))

◊ Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.*, No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◊ Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO

(2007))

◇      Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◇      Submitted expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11 RSWL, U.S. Dist. Court, C.D. Cal. (2006))

◇      Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◇      Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.*, Missouri Circuit Court, St. Louis, MO (2005))

◇      Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◇      Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C, U.S. Dist. Ct., W.D. Ok. (2002))

◇      Submitted expert witness declaration concerning reasonableness of class certification, settlement, and fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2001))

### *Expert Consultant*

◇      Provided expert consulting services to law firm regarding billing practices and fee allocation issues in nationwide class action (2016)

◇      Provided expert consulting services to law firm regarding fee allocation issues in nationwide class action (2016)

◇      Retained as an expert consultant on class certification issues (*In re: Facebook, Inc., IPO Securities and Derivative Litigation*, No. 1:12-md-2389, U.S. Dist. Ct., S.D.N.Y. (2015))

◇      Provided expert consulting services to lead class counsel on class certification issues in nationwide class action (2015)

◇      Retained by a Fortune 100 Company as an expert consultant on class certification issues

◇      Retained as an expert consultant on class action and procedure related issues (*Lange et al v. WPX Energy Rocky Mountain LLC*, Case No. #: 2:13-cv-00074-ABJ, U.S. Dist. Ct., D. Wy. (2013))

◇      Retained as an expert consultant on class action and procedure related issues (*Flo & Eddie, Inc., v. Sirius XM Radio, Inc.*, Case No. CV 13-5693, U.S. Dist. Court, C.D. Cal. (2013))

◇    Served as an expert consultant on substantive and procedural issues in challenge to legality of credit card late and over-time fees (*In Re Late Fee and Over-Limit Fee Litigation*, 528 F.Supp.2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014))

◇    Retained as an expert on Class Action Fairness Act (CAFA) removal issues and successfully briefed and argued remand motion based on local controversy exception (*Trevino, et al. v. Cummins, et al.*,No. 2:13-cv-00192-JAK-MRW, U.S. Dist. Ct., C. D. Cal. (2013))

◇    Retained as an expert consultant on class action related issues by consortium of business groups (*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179, U.S. Dist. Court, E.D. La. (2012))

◇    Provided presentation on class certification issues in nationwide medical monitoring classes (*In re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323, Case No. 2:12-md-02323-AB, U.S. Dist. Ct., E.D. Pa. (2012))

◇    Retained as an expert consultant on class action related issues in mutli-state MDL consumer class action (*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices & Prod. Liability Litig.*, MDL No. 2102, U.S. Dist. Court, S.D. N.Y. (2009))

◇    Retained as an expert consultant on class action certification, manageability, and related issues in mutli-state MDL consumer class action (*In re Teflon Prod. Liability Litig.*, MDL No. 1733, U.S. Dist. Court, S.D. Iowa (2008))

◇    Retained as an expert consultant/co-counsel on certification, manageability, and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 CAS (VBKx), U.S. Dist. Court, C.D. Cal. (2008))

◇    Retained as an expert consultant on class action issues in complex multi-jurisdictional construction dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 8-04194, U.S. Dist. Court, E.D. Pa. (2008))

◇    Retained as an expert consultant on complex litigation issues in multi-jurisdictional class action litigation (*McGreevy v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the Ninth Circuit)

◇    Retained as an expert consultant on class action and attorney fee issues in nationwide consumer class action (*Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007))

◇    Retained as an expert consultant on attorney's fees issue in complex class action case (*Natural Gas Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District (2007))

◇    Retained as an expert consultant on remedies and procedural matters in complex class action (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◇    Retained as an expert consultant on complex preclusion questions in petition for review to

California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◊   Retained as an expert consultant on attorney fee issues in complex common fund case (*In Re DietDrugs (Phen/Fen) Products Liability Litigation*, U.S. Dist. Court, E. D. Pa. (2006))

◊   Retained as an expert consultant on procedural matters in series of complex construction lien cases (*In re Venetian Lien Litigation*,   Supreme Court of the State of Nevada (2005-2006))

◊   Served as an expert consultant on class certification issues in countywide class action (*Beauchamp v. Los Angeles Cty. Metropolitan Transp. Authority*, Case No. CV-98-00402-CBM, U.S. Dist. Ct., C.D. Cal.)

◊   Served as an expert consultant on class certification issues in state-wide class action (*Williams v. State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◊   Served as an exert consultant on procedural aspects of complex welfare litigation (*Allen v. Anderson*, U.S. Dist. Ct., C.D. Cal., *appeal dism. as moot*, 199 F.3d 1331 (9th Cir. 1999))

*Ethics Opinions*

◊   Retained to provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2017))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2013))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2011))

◊   Provided expert opinion on issues of professional ethics in implicated by nationwide class action practice (*In re Professional Responsibility Inquiries* (2010))

◊   Provided expert opinion on issues of professional ethics implicated by complex litigation matter (*In re Professional Responsibility Inquiries* (2010))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2007))

*Publications on Class Actions & Procedure*

◊   NEWBERG ON CLASS ACTIONS (sole author of supplements to 4th edition since 2008 and of 5th edition (2011-2017))

◊   *Profit for Costs*, 63 DEPAUL L. REV. 587 (2014) (with Morris A. Ratner)

◊   *Procedure and Society: An Essay for Steve Yeazell,* 61 U.C.L.A. REV. DISC. 136 (2013)

◇   *Supreme Court Round-Up – Part II*, 5 CLASS ACTION ATTORNEY FEE DIGEST 331 (September 2011)

◇   *Supreme Court Round-Up – Part I*, 5 CLASS ACTION ATTORNEY FEE DIGEST 263 (July-August 2011)

◇   *Class Action Fee Award* Procedures, 5 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2011)

◇   *Benefits of Class Action Lawsuits*, 4 CLASS ACTION ATTORNEY FEE DIGEST 423 (November 2010)

◇   *Contingent Fees for Representing the Government: Developments in California Law*, 4 CLASS ACTION ATTORNEY FEE DIGEST 335 (September 2010)

◇   *Supreme Court Roundup*, 4 CLASS ACTION ATTORNEY FEE DIGEST 251 (July 2010)

◇   *SCOTUS Okays Performance Enhancements in Federal Fee Shifting Cases – At Least In Principle*, 4 CLASS ACTION ATTORNEY FEE DIGEST 135 (April 2010)

◇   *The Puzzling Persistence of the "Mega-Fund" Concept*, 4 CLASS ACTION ATTORNEY FEE DIGEST 39 (February 2010)

◇   *2009: Class Action Fee Awards Go Out With A Bang, Not A Whimper*, 3 CLASS ACTION ATTORNEY FEE DIGEST 483   (December 2009)

◇   *Privatizing Government Litigation: Do Campaign Contributors Have An Inside Track?*, 3 CLASS ACTION ATTORNEY FEE DIGEST 407   (October 2009)

◇   *Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◇   *Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◇   *What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorney's Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◇   *Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◇   *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◇   *2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◇   *2008:  The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◇   *The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◇    *Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◇    *Supreme Court Round-Up,* 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◇    *Fee-Shifting For Wrongful Removals: A Developing Trend?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◇    *You Cut, I Choose: (Two Recent Decisions About) Allocating Fees Among Class Counsel,* 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◇    *Why The Percentage Method?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◇    *Reasonable Rates: Time To Reload The (*Laffey*) Matrix,* 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◇    *The "Lodestar Percentage:" A New Concept For Fee Decisions?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◇    *Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◇    *Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20-59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008) (with Nicholas M. Pace)

◇    *Finality in Class Action Litigation: Lessons From Habeas,* 82 N.Y.U. L. REV. 791 (2007)

◇    *The American Law Institute's New Approach to Class Action Objectors' Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◇    *The American Law Institute's New Approach to Class Action Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 307 (October 2007)

◇    *"The Lawyers Got More Than The Class Did!": Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◇    *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◇    *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◇    *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◇    *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◊      *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◊      *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31
        (February 2007)(with Alan Hirsch)

◊      *The Fairness Hearing:  Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435
        (2006) (excerpted in THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-449
        (Richard A. Nagareda ed., 2009))

◊      *Why Enable Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74
        U.M.K.C. L. REV. 709 (2006)

◊      *On What a "Private Attorney General" Is – And Why It Matters*,  57 VAND. L. REV.  2129(2004)
        (excerpted in COMPLEX LITIGATION 63-72 (Kevin R. Johnson, Catherine A. Rogers & John Valery
        White eds., 2009)).

◊      *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the
        Stanford/Yale Junior Faculty Forum, June 2001)

◊      *A Transactional Model of Adjudication*, 89 GEORGETOWN  L.J. 371 (2000)

◊      *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◊      *Divided We Litigate:  Addressing Disputes Among Clients and Lawyers in Civil Rights
        Campaigns*, 106 YALE L. J. 1623 (1997) (excerpted in COMPLEX LITIGATION 120-123 (1998))

                                          *Selected Presentations*

◊   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 1,
     2017

◊   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2,
     2016

◊   *Judicial Power and its Limits in Multidistrict Litigation,* American Law Institute, Young Scholars
     Medal Conference, *The Future of Aggregate Litigation*, New York University School of Law, New
     York, New York, April 12, 2016

◊   *Class Action Update & Attorneys' Fees Issues Checklist,* MDL Transferee Judges Conference,
     Palm Beach, Florida, October 28, 2015

◊   *Class Action Law,* 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop, Tucson,
     Arizona, January 26, 2015

◊   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach,
     Florida, October 29, 2014

◇   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2013

◇   *Class Action Remedies,* ABA 2013 National Institute on Class Actions, Boston, Massachusetts, October 23, 2013

◇   *The Public Life of the Private Law: The Logic and Experience of Mass Litigation – Conference in Honor of Richard Nagareda,* Vanderbilt Law School, Nashville, Tennessee, September 27-28, 2013

◇   *Brave New World: The Changing Face of Litigation and Law Firm Finance,* Clifford Symposium 2013, DePaul University College of Law, Chicago, Illinois, April 18-19, 2013

◇   *Twenty-First Century Litigation: Pathologies and Possibilities: A Symposium in Honor of Stephen Yeazell,* UCLA Law Review, UCLA School of Law, Los Angeles, California, January 24-25, 2013

◇   *Litigation's Mirror: The Procedural Consequences of Social Relationships,* Sidley Austin Professor of Law Chair Talk, Harvard Law School, Cambridge, Massachusetts, October 17, 2012

◇   *Alternative Litigation Funding (ALF) in the Class Action Context – Some Initial Thoughts,* Alternative Litigation Funding: A Roundtable Discussion Among Experts, George Washington University Law School, Washington, D.C., May 2, 2012

◇   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases,* Brooklyn Law School Faculty Workshop, Brooklyn, New York, April 2, 2012

◇   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases,* Loyola Law School Faculty Workshop, Los Angeles, California, February 2, 2012

◇   *Recent Developments in Class Action Law and Impact on MDL Cases,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2011

◇   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 26, 2010

◇   *A General Theory of the Class Suit,* University of Houston Law Center Colloquium, Houston, Texas, February 3, 2010

◇   *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◇   *The Public Role in Private Law Enforcement: Visions from CAFA,* University of California (Boalt Hall) School of Law Civil Justice Workshop, Berkeley, California, February 28, 2008

◇   *The Public Role in Private Law Enforcement: Visions from CAFA,* University of Pennsylvania Law Review Symposium, Philadelphia, Pennsylvania, Dec. 1, 2007

**A-14**

◇    *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◇    *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National
Institute on Class Actions, San Diego, California, October 6, 2006

◇    *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, Toronto, Canada, June 6, 2006

◇    *Why Create Litigation?: A Positive Externalities Theory of the Small Claims Class Action*, UMKC Law Review Symposium, Kansas City, Missouri, April 7, 2006

◇    *Marks, Bonds, and Labels: Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, Los Angeles, California, January 26, 2006

◇    Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◇    ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◇    Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◇    Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◇    Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

◇    Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◇    Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

SELECTED OTHER LITIGATION EXPERIENCE

*United States Supreme Court*

◇    Co-counsel on petition for writ of *certiorari* concerning application of the voluntary cessation doctrine to government defendants (*Rosebrock v. Hoffman*, 135 S. Ct.1893 (2015))

◇    Authored *amicus* brief filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇    Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, 130 S. Ct. 1803 (2010))

◇    Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against

constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◇   Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

*Attorney's Fees*

◇   Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No. 15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇   Served as *amicus curiae* and co-authored *amicus* brief on proper approach to attorney's fees in common fund cases, relied on by the court in *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016).

*Consumer Class Action*

◇   Co-counsel in challenge to antenna-related design defect in Apple's iPhone4 (*Dydyk v. Apple Inc.,* 5:10-cv-02897-HRL, U.S. Dist. Court, N.D. Cal.) (complaint filed June 30, 2010)

◇   Co-class counsel in $8.5 million nationwide class action settlement challenging privacy concerns raised by Google's Buzz social networking program (*In re Google Buzz Privacy Litigation*, 5:10-cv-00672-JW, U.S. Dist. Court, N.D. Cal.) (amended final judgment June 2, 2011)

*Disability*

◇   Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

*Employment*

◇   Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); (*Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

*Equal Protection*

◇   Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◇   Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc))

◇   Co-counsel in challenge to the constitutionality of the Attorney General of Georgia's firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

**A-16**

*Fair Housing*

◇ Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

*Family Law*

◇ Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

◇ Co-authored *amicus* brief in successful challenge to Hawaii ban on same-sex marriages (*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993))

*First Amendment*

◇ Co-counsel in successful challenge to constitutionality of Alabama law barring state funding foruniversity student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◇ Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

*Landlord / Tenant*

◇ Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

*Police*

◇ Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2nd Cir. 1994))

*Racial Equality*

◇ Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 (*Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

SELECTED OTHER PUBLICATIONS

*Editorials*

◇ *Follow the Leaders*, NEW YORK TIMES, March 15, 2005

◇ *Play It Straight*, NEW YORK TIMES, October 16, 2004

◇ *Hiding Behind the Constitution*, NEW YORK TIMES, March 20, 2004

◇ *Toward More Perfect Unions,* NEW YORK TIMES, November 20, 2003 (with Brad Sears)

◇ *Don't Ask, Don't Tell. Don't Believe It*, NEW YORK TIMES, July 20, 1993

◇ *AIDS: Illness and Injustice*, WASH. POST, July 26, 1992 (with Nan D. Hunter)


BAR ADMISSIONS

◇ Massachusetts (2008)

◇ California (2004)

◇ District of Columbia (1987) (inactive)

◇ Pennsylvania (1986) (inactive)

◇ U.S. Supreme Court (1993)

◇ U.S. Court of Appeals for the First Circuit (2010)

◇ U.S. Court of Appeals for the Second Circuit (2015)

◇ U.S. Court of Appeals for the Fifth Circuit (1989)

◇ U.S. Court of Appeals for the Ninth Circuit (2004)

◇ U.S. Court of Appeals for the Eleventh Circuit (1993)

◇ U.S. Court of Appeals for the D.C. Circuit (1993)

◇ U.S. District Courts for the Central District of California (2004)

◇ U.S. District Court for the District of the District of Columbia (1989)

◇ U.S. District Court for the District of Massachusetts (2010)

◇ U.S. District Court for the Northern District of California (2010)

# EXHIBIT B

*In re: Volkswagen 'Clean Diesel'*
*Marketing, Sales Practices, and Products Liability Litigation*
MDL No. 2672 CRB (JSC)
Expert Declaration of William B. Rubenstein

## EXHIBIT B

Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

1. Transfer Order to Northern District of California, ECF No. 82
2. Brief of Amicus Curiae of the Competitive Enterprise Institute's Center for Class Action Fairness, ECF No. 576
3. Pretrial Order No. 6: Appointment of Robert S. Mueller III as Settlement Master, ECF No. 973
4. Pretrial Order No. 7: Order Appointing Plaintiffs' Lead Counsel, Plaintiffs' Steering Committee, and Government Coordinating Counsel, ECF No. 1084
5. Pretrial Order No. 8: Initial Case Management, ECF No. 1087
6. Consolidated Consumer Class Action Complaint, ECF No. 1230
7. Pretrial Order No. 9: Discovery Schedule, ECF No. 1252
8. Pretrial Order No. 13: Coordination Order, ECF No. 1256
9. Transcript of Proceedings on February 25, 2016, ECF No. 1270
10. Pretrial Order No. 15: Preservation of Documents and Electronically Stored Information, ECF No. 1379
11. Transcript of Proceedings on March 24, 2016, ECF No. 1384
12. Transcript of Proceedings on April 21, 2016, ECF No. 1439
13. Transcript of Proceedings on May 24, 2016, ECF No. 1535
14. Supplemental Declaration of Shannon R. Wheatman, Ph.D., on Amended Notices and Class Notice Program, ECF No. 1680
15. Amended Order Granting Preliminary Approval of Settlement, ECF No. 1698
16. Settlement Class Counsel's Statement of Additional Information Regarding Prospective Request for Attorneys' Fees and Costs, ECF No. 1730
17. Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealer Class Action Settlement, ECF No. 1784
18. Declaration of Edward M. Stockton, ECF No. 1784-1
19. Expert Report of Andrew Kull, ECF No. 1784-2
20. Proposed Order and Judgment Granting Final Approval of 2.0-Liter Consumer and Reseller Dealer Class Action Settlement and Certifying Settlement Class, ECF No. 1784-3
21. Julian Kangas' Objection to the Proposed Settlement, Objection and Opposition to Class Counsel's Attorney Fee Award, and Notice to Appear by Counsel at the Fairness Hearing to Speak, ECF No. 1826
22. Objections of Christopher D'Angelo to Class Settlement, ECF No. 1862
23. Objections of Marcia Weese to Proposed Class Action Settlement, ECF No. 1864
24. Objection of Marc Chechik to Proposed Settlement, ECF No. 1869
25. Objection of Jessica Grace Li and Alexander D. Birner to Class Action Settlement, ECF No. 1871

26. Class Members' (Andrianos et al.) Objections to Consumer Class Action Settlement Agreement, ECF No. 1876
27. Objections of Scott Siewert to Proposed Settlement and Proof of Membership in Class, ECF No. 1877
28. Objection of Wheels, Inc. to Proposed Settlement, ECF No. 1882
29. Objection of John Labudde and Jing Labudde to Class Action Settlement, ECF No. 1887
30. Objection of Robert A. Collins to Motion for Approval of Class Settlement, ECF No. 1889
31. Objection of Matthew Comlish to the 2.0-Liter TDI Consumer and Reseller Dealer Class Action Settlement, ECF No. 1891
32. Exhibit 1: Declaration of Theodore H. Frank, ECF No. 1891-1
33. Exhibit 3: 2007 Fee Ethics Letter, ECF No. 1891-3
34. Objection of Ronald Clark Fleshman, Jr. to Approval of the Proposed Class Action Settlement, ECF No. 1893
35. Objections of Greg Siewert to Proposed Settlement and Proof of Membership in Class, ECF No. 1895
36. Daniel Ancona Notice of Objection, Objection to Motion for Final Approval of Class Action Settlement, and Notice of Intent to Appear and Argue, ECF No. 1905
37. Class Members' (Brittain et al.) Objections to Proposed Consumer Class Action Settlement Agreement, ECF No. 1913
38. Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealer Class Action Settlement, ECF No. 1976
39. Exhibit 1: Declaration of Robert H. Klonoff Addressing Objections by Class Members to the Proposed Volkswagen "Clean Diesel" Settlement, ECF No. 1976-1
40. Order Granting Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealership Class Action Settlement, ECF No. 2102
41. Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs Under Fed. R. Civ. P. 23(h) and Pretrial Order Nos. 7 and 11; Memorandum of Points and Authorities in Support Thereof, ECF No. 2175
42. Exhibit A: Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2175-1
43. Exhibit B: Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2175-2
44. Proposed Order Granting Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2175-3
45. Jolian Kangas' Objection and Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2479
46. Matthew Comlish's Objection to Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2518
47. Order Partially Dismissing the Consolidated Securities Class Action Complaint, ECF No. 2636
48. Class Members' (Barrera et al.) Objections to Proposed Consumer Class Action Settlement Agreement
49. Consumer Class Action Settlement Agreement and Release (Amended), ECF No. 1685
50. Plaintiffs' Reply in Support of Motion for Attorneys' Fees and Costs Under Fed. R. Civ. P. 23(h) and Pretrial Order Nos. 7 and 11, ECF No. 2786

51. Exhibit A: Supplemental Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2786-1

52. Exhibit B: Declaration of Edward M. Stockton in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2786-2

53. Exhibit C: Declaration of William B. Rubenstein in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2786-3

54. Exhibit D: Declaration of Sharon Nelles in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 2786-4

55. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 316165 (N.D. Cal. Jan. 23, 2017)

56. Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Preliminary Approval of the Bosch Class Action Settlement Agreement and Release and Approval of Class Notice, ECF No. 2838

57. Exhibit 1: Settlement Class Representatives, ECF No. 2838-1

58. Exhibit 2: Declaration of Cameron R. Azari on Proposed Bosch Class Notice Program, ECF No. 2838-2

59. Proposed Order Granting Preliminary Approval of the Bosch Class Action Settlement, Provisionally Certifying Class, Directing Notice to the Class, and Scheduling Fairness Hearing, ECF No. 2838-3

60. Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Preliminary Approval of the 3.0-Liter TDI Class Action Agreement and Approval of Class Notice, ECF No. 2840

61. Exhibit 1: Settlement Class Representatives, ECF No. 2840-1

62. Exhibit 2: Settlement Payment Ranges, ECF No. 2840-2

63. Exhibit 3: Declaration of Shannon B. Wheatman, Ph.D. on Proposed 3.0-Liter Class Notice Program, ECF No. 2840-3

64. Proposed Order Granting Preliminary Approval of 3.0-Liter Class Action Settlement, Provisionally Certifying Class, Directing Notice to the Class, and Scheduling Fairness Hearing, ECF No. 2840-3

65. Consumer and Reseller Dealership 3.0-Liter Class Action Settlement and Release, ECF No. 2841

66. Plaintiff J. Bertolet, Inc.'s Notice of Motion and Motion for Attorneys' Fees; Memorandum of Points and Authorities in Support Thereof, ECF No. 2886

67. Proposed Order Granting Plaintiffs J. Bertolet, Inc.'s Motion for Attorneys' Fees, ECF No. 2886-1

68. Declaration of Brian T. Fitzpatrick, ECF No. 2888

69. Volkswagen's Omnibus Opposition to Non-Class Counsel's Applications for Attorneys' Fees and Reimbursement of Costs, ECF No. 2903

70. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 672727 (N.D. Cal. Feb. 16, 2017)

71. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 672820 (N.D. Cal. Feb. 16, 2017)

72. Supplemental Declaration of Steve W. Berman in Support of Plaintiff J. Bertolet, Inc.'s Motion for Attorneys' Fees, ECF No. 2962

73. Settlement Class Counsel's Statement of Additional Information Regarding Prospective Request for Attorneys' Fees and Costs Relating to the 3.0-Liter Class Action Settlement, ECF No. 2970

74. Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Final Approval of the Bosch Class Action Settlement, ECF No. 3086

75. Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs Under Fed. R. Civ. P. 23(h) and Pretrial Order Nos. 7 and 11 Re: Bosch Class Action Settlement; Memorandum of Points and Authorities in Support Thereof, ECF No. 3087

76. Exhibit A: Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Attorneys' Fees and Costs Re: Bosch Class Action Settlement, ECF No. 3087-1

77. Exhibit B: Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 3087-2

78. Proposed Order Granting Plaintiffs' Motion for Attorneys' Fees and Costs Re: Bosch Class Action Settlement, ECF No. 3087-3

79. Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Final Approval of the 3.0-Liter TDI Class Action Agreement and Final Certification of the Settlement Class, ECF No. 3088

80. Exhibit A: Declaration of Edward M. Stockton, ECF No. 3088-1

81. Proposed Order Granting Final Approval of the 3.0-Liter TDI Class Action Settlement and Certifying Settlement Class, ECF No. 3088-2

82. Declaration of Settlement Master Robert S. Mueller, III on Settlements of Claims Regarding 3.0-Liter Vehicles' and Robert Bosch GmbH and Robert Bosch LLC, ECF No. 3089

83. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 1352859 (N.D. Cal. Apr. 12, 2017)

84. Class Member Julian Kangas' Objection to the Proposed Bosch Settlement, Objection and Opposition to Class Counsel's Attorney Fee Award, and Notice to Appear by Counsel at the Fairness Hearing to Speak, ECF No. 3159

85. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 1474312 (N.D. Cal. Apr. 24, 2017)

86. Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of the Bosch Class Action Settlement, ECF No. 3188

87. Exhibit A: Declaration of Elizabeth J. Cabraser Regarding Bosch Settlement Class Communications, Objections, and Opt-Outs, ECF No. 3188-1

88. Exhibit B: Declaration of Cameron R. Azari, Esq., on Implementation and Adequacy of Bosch Class Notice Program, ECF No. 3188-2

89. Plaintiffs' Reply in Support of Motion for Attorneys' Fees and Costs Under Fed. R. Civ. P. 23(h) and Pretrial Order Nos. 7 and 11 Re: Bosch Class Action Settlement, ECF No. 3189

90. Plaintiffs' Reply Memorandum in Support of Motion for Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, ECF No. 3190

91. Exhibit A: Declaration of Elizabeth J. Cabraser Regarding 3.0-Liter Settlement Class Communications, Objections, and Opt-Outs, ECF No. 3190-1

92. Exhibit B: Declaration of Robert H. Klonoff Addressing Objections by Class Members to the Proposed Volkswagen 3.0-Liter "Clean Diesel" Settlement and the Proposed Robert Bosch GmbH and Robert Bosch, LLC Settlement, ECF No. 3190-2

93. Exhibit C: Declaration of Shannon R. Wheatman, Ph.D. on the Implementation and Adequacy of the 3.0-Liter Class Notice Program, ECF No. 3190-3
94. Exhibit D: Declaration of Jason M. Stineheart Re: Notification to Class Members, ECF No. 3190-4
95. Second Partial Consent Decree, ECF No. 3226
96. Amended Second Partial Stipulated Order for Permanent Injunction and Monetary Judgment, ECF No. 3227
97. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 2214655 (N.D. Cal. May 17, 2017)
98. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017)
99. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017)
100. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 2178787 (N.D. Cal. May 17, 2017)

# EXHIBIT C

*In re: Volkswagen 'Clean Diesel'*
*Marketing, Sales Practices, and Products Liability Litigation*
MDL No. 2672 CRB (JSC)
Expert Declaration of William B. Rubenstein

**EXHIBIT C**
List of Northern District of California Cases
Affirming Class Action Fee Awards
2016-2017

1.  *Allagas v. BP Solar Int'l, Inc.*, No. 314CV00560SIEDL, 2016 WL 9114162 (N.D. Cal. Dec. 22, 2016)

2.  *Altamirano v. Shaw Indus., Inc.*, No. 13-CV-00939-HSG, 2016 WL 1271046 (N.D. Cal. Mar. 31, 2016)

3.  *Bergman v. Thelen LLP*, No. 3:08-CV-05322-LB, 2016 WL 7178529 (N.D. Cal. Dec. 9, 2016)

4.  *Betancourt v. Advantage Human Resourcing, Inc.*, No. 14-CV-01788-JST, 2016 WL 344532 (N.D. Cal. Jan. 28, 2016)

5.  *Bohannon v. Facebook, Inc.*, No. 12-CV-01894-BLF, 2016 WL 3092090 (N.D. Cal. June 2, 2016)

6.  *Brawner v. Bank of Am. Nat'l Ass'n*, No. 3:14-CV-02702-LB, 2016 WL 161295 (N.D. Cal. Jan. 14, 2016)

7.  *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-CV-03082-LB, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016)

8.  *Civil Rights Educ. & Enf't Ctr. v. Ashford Hosp. Trust, Inc.*, No. 15-CV-00216-DMR, 2016 WL 1177950 (N.D. Cal. Mar. 22, 2016)

9.  *Destefano v. Zynga, Inc.*, No. 12-CV-04007-JSC, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016)

10. *Donald v. Xanitos, Inc.*, No. 3:14-CV-05416-WHO, 2017 WL 1508675 (N.D. Cal. Apr. 27, 2017)

11. *Dudum v. Carter's Retail, Inc.*, No. 14-CV-00988-HSG, 2016 WL 7033750 (N.D. Cal. Dec. 2, 2016)

12. *EK Vathana v. Everbank*, No. 09-CV-02338-RS, 2016 WL 3951334 (N.D. Cal. July 20, 2016)

13.   *Garcia v. City of King City*, No. 14-CV-01126-BLF, 2017 WL 363257 (N.D. Cal. Jan. 25, 2017)

14.   *Harper v. Law Office of Harris & Zide LLP*, No. 15-CV-01114-HSG, 2017 WL 995215 (N.D. Cal. Mar. 15, 2017)

15.   *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 6902856 (N.D. Cal. Nov. 21, 2016)

16.   *Hendricks v. Starkist Co*, No. 13-CV-00729-HSG, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016)

17.   *Huynh v. Hous. Auth. of Cty. of Santa Clara*, No. 14-CV-02367-LHK, 2017 WL 1050539 (N.D. Cal. Mar. 17, 2017)

18.   *In re Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 WL 6663005 (N.D. Cal. Nov. 11, 2016)

19.   *In re Optical Disk Drive Prod. Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 7364803 (N.D. Cal. Dec. 19, 2016)

20.   *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017)

21.   *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2178787 (N.D. Cal. May 17, 2017)

22.   *In re Yahoo Mail Litig.*, No. 13-CV-4980-LHK, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016)

23.   *Jacobson v. Persolve, LLC*, No. 14-CV-00735-LHK, 2016 WL 7230873 (N.D. Cal. Dec. 14, 2016)

24.   *MacDonald v. Ford Motor Co.*, No. 13-CV-02988-JST, 2016 WL 3055643 (N.D. Cal. May 31, 2016)

25.   *Mendoza v. Hyundai Motor Co., Ltd*, No. 15-CV-01685-BLF, 2017 WL 342059 (N.D. Cal. Jan. 23, 2017)

26.   *Messineo v. Ocwen Loan Servicing, LLC*, No. 15-CV-02076-BLF, 2017 WL 733219 (N.D. Cal. Feb. 24, 2017)

27.   *Nelson v. Avon Prod., Inc.*, No. 13-CV-02276-BLF, 2017 WL 733145 (N.D. Cal. Feb. 24, 2017)

28.   *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161 (N.D. Cal. June 5, 2017)

29.   *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016)

30.   *Rosado v. Ebay Inc.*, No. 5:12-CV-04005-EJD, 2016 WL 3401987 (N.D. Cal. June 21, 2016)

31.   *Ruch v. AM Retail Grp., Inc.*, No. 14-CV-05352-MEJ, 2016 WL 5462451 (N.D. Cal. Sept. 28, 2016)

32.   *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673 (N.D. Cal. 2016)

33.   *Smith v. Am. Greetings Corp.*, No. 14-CV-02577-JST, 2016 WL 2909429 (N.D. Cal. May 19, 2016)

34.   *Tadepalli v. Uber Techs., Inc.*, No. 15-CV-04348-MEJ, 2016 WL 1622881 (N.D. Cal. Apr. 25, 2016)

35.   *Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-CV-00132-LB, 2016 WL 4916955 (N.D. Cal. Sept. 15, 2016)

36.   *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2017 WL 661352 (N.D. Cal. Feb. 17, 2017)

37.   *Villalpando v. Exel Direct Inc.*, No. 3:12-CV-04137-JCS, 2016 WL 7740854 (N.D. Cal. Dec. 12, 2016)

38.   *Villanueva v. Morpho Detection, Inc*, No. 13-CV-05390-HSG, 2016 WL 1070523 (N.D. Cal. Mar. 18, 2016)

39.   *Winans v. Emeritus Corp.*, No. 13-CV-03962-HSG, 2016 WL 107574 (N.D. Cal. Jan. 11, 2016)

40.   *Zepeda v. PayPal, Inc.*, No. C 10-1668 SBA, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017)

# EXHIBIT D

*In re: Volkswagen 'Clean Diesel'*
*Marketing, Sales Practices, and Products Liability Litigation*
MDL No. 2672 CRB (JSC)
Expert Declaration of William B. Rubenstein

**EXHIBIT D**
Class Action Settlements with Funds of at Least $1 Billion

1.   *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006)

2.   *Deloach v. Philip Morris Companies*, No. 1:00CV01235, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003)

3.   *In re AOL Time Warner, Inc. Sec.*, No. 02 CIV. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006)

4.   *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058 (PKC), 2013 WL 12091355 (S.D.N.Y. Apr. 8, 2013)

5.   *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013)

6.   *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003)

7.   *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)

8.   *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008)

9.   *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008)

10.  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998)

11.  *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974 (E.D. La. Oct. 25, 2016)

12.  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F. Supp. 2d 721 (D.N.J. 2000)

13.  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006)

14.  *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003)

15.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)

16.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013), ECF No. 3802

17.  *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007)

18.  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)

19.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017)

20.  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005)

21.  *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2016 WL 374132 (N.D. Ill. 2016), ECF No. 2265

22.  *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000)

# EXHIBIT E

*In re: Volkswagen 'Clean Diesel'*
*Marketing, Sales Practices, and Products Liability Litigation*
MDL No. 2672 CRB (JSC)
Expert Declaration of William B. Rubenstein

## EXHIBIT E
Class Action Cases Approving Fee Petitions
Containing Billing Rates for Contract or Staff Attorneys

1. *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014)

2. *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-CV-03082-LB, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016)

3. *City of Providence v. Aeropostale, Inc.*, No. 11 CIV 7132 CM GWG, 2014 WL 1883494 (S.D.N.Y. May 9, 2014)

4. *Hill v. State St. Corp.*, No. CIV.A. 09-12146-GAO, 2015 WL 127728 (D. Mass. Jan. 8, 2015)

5. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. CIV.A. 08-11064-NMG, 2012 WL 6184269 (D. Mass. Dec. 10, 2012)

6. *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015)

7. *In re Merrill Lynch & Co., Inc.*, Sec., Derivative & Erisa Litig., No. 07CV9633 JSR DFE, 2009 WL 2407551 (S.D.N.Y. Aug. 4, 2009)

8. *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)

9. *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL 6968424 (D. Mass. Dec. 9, 2014)

10. *Johnson v. Gen. Mills, Inc.*, No. SACV 10-00061-CJC, 2013 WL 3213832 (C.D. Cal. June 17, 2013)

11. *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302 MRP, 2013 WL 6577020 (C.D. Cal. Dec. 5, 2013)

12. *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2014 WL 588035 (N.D. Cal. Feb. 14, 2014)

13. *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)

# EXHIBIT F

*In re: Volkswagen 'Clean Diesel'*
*Marketing, Sales Practices, and Products Liability Litigation*
MDL No. 2672 CRB (JSC)
Expert Declaration of William B. Rubenstein

**EXHIBIT F**
List of Exemplary Cases With Multipliers Over 3.5

1.  In re Merry-Go-Round Enterprises, Inc., 244 B.R. 327 (Bankr. D. Md. 2000) (19.6 multiplier)

2.  Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., NO. CIV.A. 03-457, 2005 WL 1213926, at *17-18 (E.D. Pa. May 19, 2005) (15.6 multiplier)

3.  Kuhnlein v. Department of Revenue, 662 So.2d 309, 315 (Fla. 1995) (15 multiplier reduced to 5)

4.  In re Doral Fin. Corp. Sec. Litig., No. 05-md-1706 (S. D. N.Y. July 17, 2007) (10.26 multiplier)

5.  Weiss v. Mercedes-Benz, 899 F. Supp. 1297 (D. N.J. 1995), aff'd, 66 F.3d 314 (3d Cir. 1995) (9.3 multiplier)

6.  Doty v. Costco Wholesale Corp., No. 05-3241 (C. D. Cal. May 14, 2007) (9 multiplier)

7.  Conley v. Sears, Roebuck & Co., 222 B.R. 181 (D. Mass. 1998) (8.9 multiplier)

8.  Cosgrove v. Sullivan, 759 F. Supp. 1667, 167 n.1 (S. D. N.Y. 1991) (8.74 multiplier)

9.  New England Carpenters Health Benefits Fund v. First Databank, Inc., Civil Action No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) (8.3 multiplier)

10. Newman v. Caribiner Int''l, Inc., No. 99 Civ. 2271 (S.D. N.Y. Oct. 19, 2001) (7.7 multiplier)

11. Hainey v. Parrott, No. 02-733 (S. D. Ohio Nov. 6, 2007) (7.47 effective multiplier)

12. In re Rite Aid Corp. Sec. Litigation, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (6.96 multiplier)

13. Steiner v. Amer. Broadcasting Co., Inc., 248 Fed. Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier)

14.   In re UnitedHealth Group, Inc. PSLRA Litig., No. 06-1691 (D. Minn. Aug. 10, 2009) (6.49 multiplier)

15.   The Music Force, LLC v. Viacom, Inc., No. 04-8239 (C.D. Cal. Aug. 8, 2007) (6.43 multiplier)

16.   In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890 (1st Cir. 1985) (6 multiplier)

17.   In re Cardinal Health Inc. Securities Litigations, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (6 multiplier)

18.   In re Krispy Kreme Doughnuts, Inc. Sec. Litig., No. 04-416 (M.D. N.C. Feb. 15, 2007) (6 multiplier)

19.   In re RJR Nabisco, Inc. Securities Litigation, No. 88 Civ. 7905(MBM), 1992 WL 210138, at *5-6 (S.D. N.Y. Aug. 14, 1992) (6 multiplier)

20.   Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc., No. 03-2141 (D. S.C. Aug. 15, 2006) (6 multiplier)

21.   In re Cardinal Health, Inc. Sec. Litig., No. 04-575, 2007 U.S. Dist. LEXIS 95127 (S. D. Ohio Dec. 31, 2007) (5.85 multiplier)

22.   Dutton v. D&K Healthcare Res., Inc., No. 04-147 (E. D. Mo. June 5, 2007) (5.6 multiplier)

23.   In re Charter Communications, Inc., Securities Litigation, No. MDL 1506, 2005 WL 4045741, at * 22 (E.D. Mo. June 30, 2005) (5.6 multiplier)

24.   Roberts v. Texaco, Inc., 979 F. Supp. 185, 198 (S.D. N.Y. 1997) (5.5 multiplier)

25.   Warner v. Experian Info. Solutions, Inc., No. BC362599 (Cal. Super. Ct. Los Angeles Co. Feb. 26, 2009) (5.48 multiplier)

26.   Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (5.3 multiplier)

27.   Di Giacomo v. Plains All American Pipeline, No. Civ.A.H-99-4137, 2001 WL 34633373, * at 11-12 (S.D. Tex. Dec. 19, 2001) (5.3 multiplier)

28.   Craft v. County of San Bernardino, 624 F. Supp. 2d 1113, 1123-25 (C.D. Cal. 2008) (5.2 multiplier)

29.   In re Enron Corp. Securities, Derivative & ERISA Litigation, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (5.2 multiplier)

30.   In re Beverly Hills Fire Litig., 639 F. Supp. 915, 924 (E. D. Ky. 1986) (5 multiplier to attorney who performed the bulk of work on the case)

31.   In re Fernald Litigation, No. C-1-85-149, 1989 WL 267038, at *4-5 (S.D. Ohio Sept. 29, 1989) (5 multiplier)

32.   In re Cendant Corp. Securities Litigation, 404 F.3d 173, 183 (3d Cir. 2005) (multiplier in "mid-single digits")

33.   In re United Rentals, Inc. Sec. Litig., No. 04-1615 (D. Conn. May 26, 2009) (4.79 multiplier)

34.   Castillo v. General Motors Corp., No. 07-2142 (E. D. Cal. April 19, 2009) (4.77 multiplier)

35.   Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718 (E. D. Pa. Aug. 14, 2006) (4.77 multiplier)

36.   In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (4.7 multiplier)

37.   Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65 multiplier)

38.   Teeter v. NCR Corp., No. 08-297 (C.D. Cal. Aug. 6, 2009) (4.61 multiplier)

39.   Holleran v. Rita Medical Sys., Inc., No. RG06302394 (Cal. Super. Ct. Alameda Co. Aug. 1, 2007) (4.57 multiplier)

40.   Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130, 1991 WL 275757 (S.D. N.Y. Dec. 19, 1991) (4.4 multiplier)

41.   Agofonova v. Nobu Corp., No. 07-6926 (S. D. N.Y. Feb. 6, 2009) (4.34 multiplier)

42.   Buccellato v. AT & T Operations, Inc., No. C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. Jun. 30, 2011) (4.3 multiplier)

43.   In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 135 (D.N.J. 2002) (4.3 multiplier)

F-3

Case 3:15-md-02672-CRB   Document 3396-2   Filed 06/30/17   Page 69 of 69

44.     Shannon v. Hidalgo County Board of Comm'r, No. 08-369 (D. N.M. June 4, 2009) (4.2 multiplier)

45.     Simmons v. Andarko Petroleum Corp., No. CJ-2004-57 (Okla. Dist. Ct. Caddo Co. Dec. 23, 2008) (4.17 multiplier)

46.     In re OSI Pharm., Inc. Sec. Litig., No. 04-5505 (E.D. N.Y. Aug. 22, 2008) (4.11 multiplier)

47.     Blackmoss Inv., Inc. v. Gravity Co., No. 05-4804 (S. D. N.Y. Nov. 20, 2007) (4.0 multiplier)

48.     In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2003) (4.0 multiplier)

49.     In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 489 (S.D. N.Y. 1998) (3.97 multiplier)

50.     Karpus v. Borelli (In re Interpublic Secs. Litig.), No. 02 Civ. 6527, 2004 WL 2397190, at *12 (S.D. N.Y. Oct. 26, 2004 (3.96 multiplier)

51.     Vizcaino v. Microsoft Corp., 290 F.3d 1045, 1050-51 (9th Cir. 2002) (3.65 multiplier)

52.     Donkerbrook v. Title Guar. Escrow Servs., Inc., No. 10-00616 LEK-RLP, 2011 WL 3649539, at *10 (D. Haw. Aug. 18, 2011) (3.6 multiplier)

53.     Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 869 (E.D. La. 2007) (3.5 multiplier)

54.     Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d Cir. 2005) (3.5 multiplier)