UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION | Case No. 15-MD-02617-LHK |
| | **ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL** |
| | Re: Dkt. No. 916-6, 1002, 1008, 1037 |

Before the Court is a motion for attorneys' fees, litigation expenses, and service awards to

class representatives arising out of the class action settlement ("Settlement") between individual

and representative Plaintiffs[1] and the Settlement Class they represent (collectively, "Plaintiffs"),

and Defendants Anthem, Inc.; Blue Cross Blue Shield Association; and affiliates[2] (collectively,

---

[1] All named Plaintiffs are identified in paragraphs 12 through 113 of the Fourth Consolidated Amended Class Action Complaint ("FCAC"). *See* ECF No. 714-3 ("FCAC") ¶¶ 12–113.
[2] Defendants are identified in paragraphs 114 through 158 of the FCAC. *See* FCAC ¶¶ 114–58. The affiliates listed in the Settlement are: Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc.; Blue Cross of

1

"Defendants"). ECF No. 916-6 ("Fee Mot."). In connection with that motion, Plaintiffs have also moved to file certain portions of their billing records under seal. ECF Nos. 1002, 1037.

After the Final Approval Hearing on February 1, 2018, this Court decided to appoint a Special Master to assist in reviewing the motion for attorneys' fees. ECF No. 972 at 7. On February 8, 2018, this Court appointed Hon. James Kleinberg (Ret.) to serve as Special Master. ECF No. 985 at 2. Judge Kleinberg issued his Report and Recommendation on April 24, 2018. ECF No. 1008 ("R. & R."). This Court held a hearing on June 14, 2018. ECF No. 1033. At the hearing, the parties agreed to extend the deadline for revoking exclusions and submitting claims to July 19, 2018 because of the parties' April 2018 amendment to the Settlement.

Having considered the submissions of the parties, the arguments made at the February 1 and June 14, 2018 hearings, the relevant law, and the record in this case, the Court hereby ADOPTS in part Judge Kleinberg's Report and Recommendation. Thus, the Court GRANTS in part and DENIES in part Plaintiffs' motion for attorneys' fees, litigation expenses, and service awards to class representatives. The Court also GRANTS Plaintiffs' motions to seal.

## I.     BACKGROUND

Anthem, Inc. ("Anthem") is one of the largest health benefits and health insurance companies in the United States. FCAC ¶ 114. Anthem serves its members through various

California; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc.; Anthem Health Plans, Inc.; Anthem Health Plans of Kentucky, Inc.; Anthem Health Plans of Maine, Inc.; HMO Missouri, Inc.; RightCHOICE Managed Care, Inc.; Healthy Alliance Life Insurance Company; Anthem Health Plans of New Hampshire, Inc.; Empire HealthChoice Assurance, Inc.; Community Insurance Company; Anthem Health Plans of Virginia, Inc.; HealthKeepers, Inc.; Blue Cross Blue Shield of Wisconsin; Compcare Health Services Insurance Corporation; Amerigroup Corporation; Amerigroup Services, Inc.; Amerigroup Kansas, Inc.; Amerigroup Washington, Inc.; HealthLink, Inc.; UniCare Life & Health Insurance Company; CareMore Health Plan; The Anthem Companies, Inc.; The Anthem Companies of California, Inc.; Blue Cross and Blue Shield of Alabama; USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield; California Physicians' Service d/b/a Blue Shield of California; Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of Michigan; BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota; Horizon Healthcare Services, Inc.; Blue Cross and Blue Shield of North Carolina; Highmark Inc. f/k/a Highmark Health Services; Blue Cross and Blue Shield of Vermont; and Health Care Service Corporation, a Mutual Legal Reserve Company.

Anthem affiliates and other Blue Cross Blue Shield licensee affiliates. *Id.* In order to provide certain member services, Defendants "collect, receive, and access their customers' and members' extensive individually identifiable health record information." *Id.* ¶ 161. These records include personal information (such as name, address, date of birth, and Social Security number) and individual health information. *Id.* Anthem maintains a common computer database which contains the personal information of current and former members of Anthem, Anthem's affiliates, Blue Cross Blue Shield, and independent Blue Cross Blue Shield licensees. *Id.* ¶ 162.

In late 2014 and early 2015, Anthem experienced one of the largest data breaches in history. *Id.* ¶ 1. Cyberattackers gained access to the personal information of approximately 80 million individuals stored on Anthem's database. *Id.* ¶¶ 1, 3. After Anthem publicly announced the breach in February 2015, *id.* ¶ 334, a number of lawsuits were filed against Defendants. In spring 2015, Plaintiffs in several lawsuits moved to centralize pretrial proceedings in a single judicial district. *See* 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."). On June 12, 2015, the Judicial Panel on Multidistrict Litigation issued a transfer order selecting the undersigned judge as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict litigation ("MDL") arising out of the Anthem breach. *In re Anthem, Inc., Customer Data Sec. Breach Litig.*, 109 F. Supp. 3d 1364 (U.S. Jud. Pan. Mult. Lit. 2015).

Over the next two years, the parties litigated multiple rounds of motions to dismiss and fully briefed the issue of class certification (including challenges to the other side's experts) before this Court. However, prior to any formal class-certification ruling from the Court, the parties reached a Settlement Agreement in June 2017. *See* ECF No. 869-8 ("Settlement"). The parties moved for preliminary approval of that Settlement on June 23, 2017. ECF No. 869-5. A hearing was held on August 17, 2017, ECF No. 897, and the Court granted preliminary approval of the $115 million settlement on August 25, 2017, ECF No. 903 at 9.

3

On December 1, 2017, Plaintiffs filed the instant motion for attorneys' fees, litigation expenses, and service awards to class representatives. *See* Fee Mot. Plaintiffs requested attorneys' fees in the amount of $37.95 million as well as litigation expenses and service awards for class representatives. *Id.* at 1. The same day, Plaintiffs filed a motion for final approval of the settlement. ECF No. 916-3. On January 4, 2018, objector Adam Schulman ("Schulman") filed a Motion to Appoint Special Master to conduct an exhaustive review of Plaintiffs' billing records. ECF No. 929. The Court advanced the hearing on the Motion to Appoint Special Master to the same day as the hearing on Plaintiffs' motion for final approval and motion for attorneys' fees, litigation expenses, and service awards to class representatives. ECF No. 940. The Court held the Final Approval Hearing on February 1, 2018. ECF No. 966.

At the Final Approval Hearing, the Court indicated its intention to appoint a Special Master. ECF No. 974 at 48:20–49:6. The Court memorialized that ruling in an Order Appointing Special Master issued the day after the hearing. ECF No. 972. The Court noted the sheer size of the attorneys' fees request, which covered "[329] billers from 53 law firms and 78,892.5 hours of legal work." *Id.* at 4.[3] These figures stood in tension with the Court's rejection of an eight-firm leadership team and appointment of a leaner team consisting of four law firms. *Id.* at 2–3. Indeed, the Court had instructed Class Counsel that they could assign "discrete tasks to counsel for other plaintiffs in this MDL" but emphasized that "this augmentation of resources should be on an as needed basis and consistent with efficiency." *Id.* at 3–4 (alteration omitted) (quoting ECF No. 286 at 1).

The Court also identified issues that justified having a Special Master perform a close examination of the attorneys' fees request. In particular, "based on Co-Lead Plaintiffs' Counsel's assignment of tasks across 53 law firms and [329] billers, the Court [had] concerns that billing items may be duplicative or inefficient." *Id.* at 5. The Court explained that "employing 53 law firms likely resulted in unnecessarily duplicative or inefficient work by virtue of the fact that so

---

[3] The Court's order states that there are 331 billers. It appears that some billers may have been listed twice. In any event, the correct number of 329 billers will be used throughout this order.

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR
ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES;
ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

many billers needed to familiarize themselves with the case and keep abreast of case developments." *Id.* The Court also pointed out that Plaintiffs had more partners than associates work on the case (by the Court's count, 107 partners and 94 associates[4]) and that Plaintiffs used a large staff of contract and staff attorneys with markups as high as $447.00 an hour for their work. *Id.* at 4. In light of these concerns, the Court exercised its authority under Federal Rule of Civil Procedure 23(h) to refer "issues related to the amount of the award to a special master." *Id.* at 6.

The Court suggested that Judge Kleinberg serve as the Special Master but provided the parties an opportunity to object to Judge Kleinberg and to suggest other candidates. *Id.* at 7. On February 2, 2018, Plaintiffs filed a statement indicating that they had no objection to Judge Kleinberg, unless Judge Kleinberg revealed a ground for disqualification under 28 U.S.C. § 455. ECF No. 970 at 2. Once Judge Kleinberg filed an affidavit affirming that he had no grounds for disqualification under § 455, ECF No. 982, the Court provided the parties another opportunity to object, ECF No. 983. With no objection from any party, the Court formally appointed Judge Kleinberg as Special Master in a February 8, 2018 order detailing his duties. ECF No. 985. The Court ordered Judge Kleinberg to "proceed with all reasonable diligence to analyze the evidence in the record regarding the time and expenses spent litigating this case in order to prepare a report calculating the lodestar for the representation of the Class in this action." *Id.* at 2. In deciding the appropriate lodestar, Judge Kleinberg had access to the entire record and was instructed to "determine the hours reasonably expended, deducting the time and expenses that are excessive, unnecessary, or duplicative." *Id.*

On April 24, 2018, Judge Kleinberg filed his Report and Recommendation. *See* R. & R. Although the specifics of the Report and Recommendation are discussed in more detail below, the Court highlights a few points here. The Report and Recommendation focuses on two particularly

---

[4] Based on an updated chart, it appears that the total number of partners is 107 and the total number of associates is 92. ECF No. 944-1 ("Cervantez Reply Decl."), Ex. E. Some of the associates were previously listed incorrectly. Cervantez Reply Decl. ¶ 16. Professor Rubenstein arrives at slightly different numbers—namely, 106 partners and 96 associates. Rubenstein Decl. ¶ 14 & n.9. These minor variations do not change the Court's analysis.

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

concerning issues with regard to Class Counsel's billing: (1) rates charged for contract and staff attorneys and (2) reasonableness of the time spent on certain categories of tasks. *Id.* at 6. The Special Master concludes that the contract and staff attorney rates are too high and proposes substituting a flat rate of $156 per hour for all contract and staff attorney time. *Id.* at 10–14. The Special Master also determines that many of the hours (especially those related to depositions and settlement) were not reasonably expended and recommends taking a 10% haircut of the entirety of the hours to account for this duplication. *Id.* at 15–18, 24–25. The Special Master identifies three alternative ways to calculate the attorneys' fees award: (1) apply the Ninth Circuit's 25% benchmark to the $115 million Settlement Fund, (2) use an average billing rate multiplied by the claimed number of hours, or (3) calculate the lodestar by applying the revised hourly rate of $156 for contract and staff attorney time plus the 10% haircut for excessive hours. *Id.* at 26–28. The Special Master ultimately recommends adopting the third approach, resulting in a cut of over $7 million to Class Counsel's requested attorneys' fees award. *Id.* at 28.

On the same day that the Special Master issued his Report and Recommendation, the Court set a briefing and hearing schedule. ECF No. 1009. On May 15, 2018, Plaintiffs and Schulman filed simultaneous objections to the Special Master's Report and Recommendation. ECF Nos. 1016 ("Schulman Obj."), 1017 ("Pls.' Obj."). On May 22, 2018, Plaintiffs and Schulman filed responses to each other's objections. ECF Nos. 1018 ("Schulman Resp."), 1019 ("Pls.' Resp."). The Court held a hearing on June 14, 2018. ECF No. 1033.

## II.      DISCUSSION

The instant motions contain specific requests for attorneys' fees, reimbursement of litigation expenses, service awards to class representatives, and sealing of portions of Plaintiffs' billing records. The Court addresses each in turn.

### A.      Attorneys' Fees

#### 1.      The Appropriate Method: Lodestar vs. Percentage of Recovery

"Where," as here, "a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery

6

method." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). "[T]he choice between lodestar and percentage calculation depends on the circumstances, but . . . 'either method may . . . have its place in determining what would be reasonable compensation for creating a common fund.'" *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (third alteration in original) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). To guard against an unreasonable result, the Ninth Circuit encourages district courts to "cross-check[] their calculations against a second method." *In re Bluetooth*, 654 F.3d at 944; *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050–51 (9th Cir. 2002) (applying a lodestar cross-check to ensure the percentage-of-recovery method yielded a reasonable result).

Where the percentage-of-recovery method is employed, it is well established that 25% of a common fund is a presumptively reasonable amount of attorneys' fees. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *Six (6) Mexican Workers*, 904 F.2d at 1311 ("[W]e established 25 percent of the fund as the 'benchmark' award that should be given in common fund cases."). That said, "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases." *Vizcaino*, 290 F.3d at 1048. Upward departures may be warranted in particular circumstances, while downward departures may be warranted where there is no "realistic risk of nonrecovery." *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *14 (N.D. Cal. Feb. 16, 2016) (quoting *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1257–58 (C.D. Cal. 1997)).

Under the lodestar method, a "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). The district court may adjust this lodestar figure "upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors." *Id.* at 941–42.

7

Whatever method a court chooses, its decision "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit has approved a number of factors which may be relevant to the district court's determination: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases. *See id.* at 1048–50.

Here, Class Counsel advocate for applying the percentage-of-recovery method. Specifically, Class Counsel ask for 33% of the $115 million settlement (i.e., $37.95 million). Fee Mot. at 1. This is the maximum amount allowed by the Settlement Agreement. ECF No. 869-8 ("Settlement") ¶ 12.1.

The Special Master's Report and Recommendation makes three alternative recommendations for how to calculate attorneys' fees in this case. The first recommendation is to award 25% of the $115 million Settlement Fund. R. & R., at 26. The second recommendation is to apply an overall average rate to the entirety of the hours billed in the case. *Id.* at 27. The third, and final, recommendation is to use Class Counsel's lodestar but reduce the total amount by (1) lowering the hourly rate for contract and staff attorneys and (2) applying an across-the-board 10% haircut for excessive hours. *Id.* The Special Master ultimately advises adopting the third approach as the one that "is considerate of counsel's efforts . . . in light of the results achieved for the present and the future," "allows a significant monetary reward for the class," and "recognizes the overcharging outlined [in the Report and Recommendation]." *Id.* at 28.

Having overseen this case for three years, the Court finds that justice would be best served by applying the percentage-of-recovery method. The percentage-of-recovery method is commonly used in the legal marketplace to determine attorneys' fees in contingency fee cases. *See* 5 Newberg on Class Actions § 15:62 (5th ed. 2018) ("[M]any courts utilize a percentage approach, which approximates the manner in which plaintiff contingent fee lawyers undertake work outside the class action context." (footnote omitted)). This method has been applied in megafund cases like the one here. *See Alexander v. FedEx Ground Package Sys., Inc.*, No. 05-

8

CV-00038-EMC, 2016 WL 3351017, at *2 (N.D. Cal. June 15, 2016) (collecting cases from this circuit applying percentage method in megafund cases); 5 Newberg, *supra*, § 15:81 (discussing different approaches to applying percentage method in megafund cases). By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result. *See* 5 Newberg, *supra*, § 15:65. Here, the percentage-of-recovery method rewards Class Counsel for assuming the risks of the litigation in this developing area of the law and for prosecuting the case to obtain a benefit proportional to the Class's injury.

In contrast, the combination of novel legal issues and technical subject matter present in the instant case counsels against the lodestar method because there is no set baseline against which to compare whether hours were reasonably expended. *See In re Bluetooth*, 654 F.3d at 941 (providing that one essential element of the lodestar is a reasonable number of hours); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) (allowing courts to eliminate from the lodestar calculation any hours that are duplicative, excessive, or otherwise unnecessary). Indeed, the lodestar method has sometimes been criticized because it encourages counsel to bill time and create opportunities to bill time. *See* 5 Newberg, *supra*, § 15:65 (noting that the lodestar method creates incentives for the lawyers to "run up" the number of hours billed and to "bill useless hours at the class's expense"). The Court has already highlighted the potential for such excess in the instant case, especially when the work has been spread across 329 billers at 53 law firms.

Moreover, the Court has some concerns about whether the lodestar figure provides a helpful and accurate starting place in this case. Class Counsel's formal attorneys' fees request claims 78,892.5 hours of work. *See* ECF No. 960-4. That number does not reflect the total amount of time submitted by each billing law firm to Class Counsel because Class Counsel did a preliminary cut of time. ECF No. 960-2 ¶ 6. Specifically, out of a total of 83,351.5 hours, Class Counsel deleted 4,459 hours. ECF No. 960-4. By cutting that number of hours, Class Counsel

United States District Court
Northern District of California

lowered the lodestar figure to $37,993,566.50,[5] a number eerily close to the limit set by the Settlement—namely, 33% of the $115 million Settlement Fund, or $37.95 million. Settlement ¶ 12.1. That near-match gives the Court pause, especially because percentages over 33% are largely unheard-of with funds of this size. *See Alexander*, 2016 WL 3351017, at *2 ("Although a percentage award in a megafund case can be 25% or even as high as 30–40%, typically the percentage award in such a case is substantially less than the 25% benchmark applicable to typical class settlements in this Circuit."). Assuming that the expunged 4,459 hours were billed at the weighted average of $481.62, ECF No. 916-8 ("Cervantez Decl.") ¶ 48, the lodestar figure would have been $40,141,110.10 or 34.9% of the Settlement Fund. These issues highlight why the percentage-of-recovery method is preferred in this case.

Choosing the percentage-of-recovery method here is consistent with the Ninth Circuit's declaration that "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth*, 654 F.3d at 942. In that statement, the Ninth Circuit expressly recognized that courts need not always "employ the lodestar method" in megafund cases but may choose to "adjust the benchmark percentage" to achieve a reasonable fee award. *See id.* Courts have often opted for the lodestar method when the fund is significantly larger than the $115 million at issue here. For example, in *In re Washington Public Power Supply System Securities Litigation*, the Ninth Circuit upheld the district court's decision to calculate the lodestar for a settlement fund of $687 million. 19 F.3d 1291, 1297 (9th Cir. 1994). The Ninth Circuit explained that "[w]ith a fund this large, picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air." *Id.* Here, based on the Court's familiarity with the case, the choice of a percentage does not strike the Court as arbitrary or unconnected from the performed work in a way that would

---

[5] This figure represents Class Counsel's submitted lodestar figure of $38,015,714.00, *see* Cervantez Reply Decl. ¶ 17, less $22,147.50 that Class Counsel agree was improperly included, *see* ECF No. 1037-2 ¶¶ 19, 24. The Court refers to the above $37,993,566.50 lodestar figure throughout this order.

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

create a windfall for Class Counsel. Additionally, the Court will also use the lodestar method as a check on the reasonableness of the percentage-of-recovery award. *See Alexander*, 2016 WL 3351017, at *2 ("[I]n megafund cases, the lodestar cross-check assumes particular importance.").

As such, the Court concludes that using the percentage-of-recovery method with a lodestar cross-check would achieve the fairest and most reasonable result in this case.

## 2. Percentage of Recovery

The determination of the percentage of recovery usually proceeds in two steps. First, courts must ascertain the size of the fund against which the percentage will be assessed. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015). Second, courts must examine relevant factors to determine the appropriate percentage of the fund that should be awarded to counsel. *Vizcaino*, 290 F.3d at 1048–50.

Here, Plaintiffs and Schulman spar over both of these inquiries. With respect to the size of the fund, Plaintiffs seek to expand the $115 million Settlement Fund by taking into account certain nonmonetary benefits, whereas Schulman seeks to contract the $115 million Settlement Fund by excluding certain costs. Fee Mot. at 3–6; ECF No. 924 at 11–14. As to the percentage, Plaintiffs advocate for 33%, while Schulman puts the figure at 15%. Fee Mot. at 1; ECF No. 924 at 4–10. The Court first addresses the size of the fund, then turns to the percentage.

### i. Size of the Fund

The Court begins by resolving the appropriate size of the fund. In this regard, the Court has discretion to determine what portion of the common fund is "for the benefit of the entire class." *In re Bluetooth*, 654 F.3d at 942. Thus, for example, courts may exclude administrative costs or litigation expenses in appropriate cases. *In re Online DVD-Rental*, 779 F.3d at 953. Similarly, depending on the circumstances, courts may sometimes add the value of non-monetary relief to the value of the common fund. *Staton*, 327 F.3d at 974. Importantly, "the reasonableness of attorneys' fees is not measured by the choice of the denominator." *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000). Rather, courts must ensure that "the end result is reasonable." *Id.*

11

Here, the starting baseline is the $115 million Settlement Fund. Plaintiffs argue that the nonmonetary relief provided by the Settlement warrants deviating up from that figure. Schulman counters that the figure is too high because it includes administrative costs and litigation expenses that confer no real benefit on the Class. The Court disagrees with both Plaintiffs and Schulman that any departure from $115 million is justified. The Court first discusses Plaintiffs' contentions, then discusses Schulman's contentions.

Plaintiffs identify two forms of nonmonetary relief that they argue are not captured by the dollar figure of the Settlement Fund. First, Plaintiffs point to the credit monitoring services available to all Settlement Class Members who submit a claim form. Fee Mot. at 3. Plaintiffs note that because they are purchasing these services for a very large group of individuals, the bulk discount is substantial: while the Settlement is likely to secure four years of credit monitoring for all Settlement Class Members for $26.2 million, ECF No. 1042, Ex. A, the retail price for four years of credit monitoring is approximately $479.52 ($9.99 per month) per Settlement Class Member, ECF No. 945 ("Reply") at 4. According to Plaintiffs, the true value of the credit monitoring for the entire Class is approximately $37.95 billion ($479.52 x 79.15 million). More conservatively, Plaintiffs look to the actual number of Settlement Class Members who have claimed credit monitoring services. *Id.* at 4–5. Using current figures, the resulting value is approximately $602.85 million ($479.52 x 1,257,208). Those numbers would be even higher if the retail value for the fraud resolution services were added. *Id.* at 5.

Plaintiffs' suggested methodology is too simplistic and does not capture actual value to the Settlement Class Members. Although Plaintiffs argue that their approach is supported by *Johansson-Dohrmann v. Cbr Systems, Inc.*, little can be gleaned from that case because the parties there agreed on the valuation of the settlement fund. No. 12-CV-01115-MMA, 2013 WL 3864341, at *2 (S.D. Cal. July 24, 2013). Plaintiffs' methodology is problematic in multiple regards. For instance, Plaintiffs presume that each subsequent month and year of credit monitoring is worth the same to Settlement Class Members, even though Plaintiffs' own expert

12

opined that the need for such services diminishes with time.  ECF 744-24 ("Van Dyke Report") ¶ 46.  More fundamentally, the error in Plaintiffs' method is that treating credit monitoring as equivalent to cash conflicts with the general principle that "compensation in kind is worth less than cash of the same nominal value." *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001).  Although the credit monitoring services under the Settlement are tailored to the Settlement Class's injury, Reply at 5–6, the estimated retail price is at best an inexact match to the actual value.  That fact helps to explain why Plaintiffs derive exorbitant numbers that far exceed the cash value of the Settlement Fund itself.  In fact, if Plaintiffs' numerical figures were accepted, those figures might call into question whether all Settlement Class Members are treated fairly under the Settlement.  These critical issues are sufficient to discard Plaintiffs' proposed quantification.  Because Plaintiffs offer no other way to measure the actual value of credit monitoring, the Court will not adjust the fund for calculation of the percentage of recovery.

Second, Plaintiffs cite to the Settlement provision requiring Anthem to almost triple its cybersecurity spending for three years.  Fee Mot. at 5.  Plaintiffs correctly explain that these business-practice changes benefit the entire Class because Anthem must take specific steps to protect its data warehouse (which still stores the personal information of Settlement Class Members) from future breach.  *Id.*  Nevertheless, Plaintiffs again provide no sound methodology for measuring the value of those changes to Settlement Class Members.

The Ninth Circuit has held that "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Staton*, 327 F.3d at 974.  Plaintiffs do not meet that standard here.  Plaintiffs propose that the Court add to the fund an amount equal to the difference between Anthem's post-Settlement and pre-Settlement spending on cybersecurity multiplied by three years.  Fee Mot. at 5–6.  This procedure rests on a faulty premise—namely, it assumes that every dollar Anthem spends on cybersecurity above pre-breach levels equals one dollar to the Class.  The flow

13

of benefits is not that direct, which is a problem for Plaintiffs because "the standard is not how much money a company spends on purported benefits, but the value of those benefits to the class." *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009). Moreover, it is difficult to isolate which portion of Anthem's increase in its cybersecurity spending is attributed solely to the instant lawsuit as opposed to money that Anthem would have spent anyway in the aftermath of the data breach at issue. Because Plaintiffs have not established any "accurately ascertained" value, the Court elects to consider the value of this nonmonetary relief as "a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself." *Staton*, 327 F.3d at 974.

Having addressed and rejected Plaintiffs' contentions about the size of the fund, the Court now takes up Schulman's contentions. Schulman seeks to exclude both the administrative costs and litigation expenses from the percentage fund. ECF No. 924 at 11–14. He argues that Settlement Class Members receive no benefit from these expenses. *Id.* at 12–13. Schulman contends that exclusion is particularly warranted here because the administrative costs were high ($23.0 million) and Class Counsel had little incentive to optimize the administrative process. *Id.* at 13–14. The Court disagrees.

As noted above, in the Ninth Circuit, district courts have latitude to calculate the percentage of recovery based on the gross or net Settlement Fund. *Powers*, 229 F.3d at 1258. Thus, the Ninth Circuit has repeatedly held that district courts do not abuse their discretion by including the costs of providing notice to the class (or other administrative costs and litigation expenses) as part of the percentage fund valuation. *See In re Online DVD-Rental*, 779 F.3d at 953; *Staton*, 327 F.3d at 974–75.

Here, the Court concludes that litigation expenses and administrative costs should be included. As to the former, the litigation expenses were necessary to litigate this case and "make the entire action possible." *In re Online DVD-Rental*, 779 F.3d at 953. As to the latter, investing in a comprehensive notice and claims processing effort was critical to inform the approximately

United States District Court
Northern District of California

79.15 million Settlement Class Members about the Settlement and their ability to seek reimbursement for their losses. *See id.* (explaining that notice and administrative costs allow class members to learn about the settlement and receive distributions). It is true that the administration has been costly in this case (reaching $23.0 million, or 20% of the $115 million Settlement Fund), but much of that amount (over $14.0 million) is attributable to postage for mailing notice to more than 54 million Settlement Class Members with known addresses. ECF No. 944-14 ¶¶ 2, 4. Such direct notice is typically the preferred form of notification because of its efficacy. *See Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 239 (N.D. Cal. 2014). To reach the remainder of the Settlement Class Members, the Settlement Administrator used less-expensive forms of notice, including notice by email, print publication, and online advertisement. ECF No. 916-32 ¶¶ 13–15. The Settlement Administrator estimates that "the combined individual and media notice efforts reached approximately 87.5% of likely class members on average 2.1 times each." *Id.* ¶ 16. These costs "of providing notice to the class can reasonably be considered a benefit to the class" in this case. *Staton*, 327 F.3d at 975.

The same is true of the other administrative costs (such as processing claim forms and operating a call center to answer Settlement Class Members' questions) that contribute to "distribut[ing] [the] settlement award in a meaningful and significant way." *In re Online DVD-Rental*, 779 F.3d at 953 (internal quotation marks omitted). The Court has supervised the form of notice, modes of communication, and forms of administration to reassure that costs are contained. *Staton*, 327 F.3d at 975. Thus, the Court finds that including these non-excessive administrative costs and litigation expenses in the percentage fund is proper in this case.

In sum, the Court refuses to depart upward or downward from the $115 million Settlement Fund based on the nonmonetary benefits of the Settlement or the administrative costs and litigation expenses. Instead, the Court will use the $115 million figure and make a final determination of a reasonable percentage and attorneys' fee award. Accordingly, the Court's task is to compute a suitable percentage.

United States District Court
Northern District of California

### ii. Percentage

The determination of an appropriate percentage requires careful consideration of all of the circumstances of a case. The Ninth Circuit has characterized 25% as the "starting point" for the analysis but simultaneously noted that 25% may not be fitting in all cases. *Vizcaino*, 290 F.3d at 1048. For example, "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage." *In re Bluetooth*, 654 F.3d at 942. Similarly, district courts may depart from the 25% benchmark rate by "providing adequate explanation in the record of any 'special circumstances.'" *Id.* In the end, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit has identified five factors which may be probative: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases. *See id.* at 1048–50.

Here, Plaintiffs seek an upward departure from the 25% benchmark to 33% of the common fund, for a total of $37.95 million in attorneys' fees. Fee Mot. at 1. Schulman seeks to have the Court select 15%, ECF No. 924 at 4–10, resulting in an attorneys' fees award of $17.25 million when applied to the $115 million Settlement Fund. As set forth below, the Court believes that, particularly in light of the substantial results achieved in this case and the risks associated with the litigation, the factors set forth in *Vizcaino* weigh in favor of granting Class Counsel an upward adjustment. However, the Court finds that a percentage award of 27% of the common fund is appropriate, rather than the 33% requested by Class Counsel.

### a. The Results Achieved

First, the Court considers the overall result and benefit to the Class. This factor has been called "the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (noting that "the most critical factor" in determining the reasonableness of an attorneys' fees

16

request is "the degree of success obtained"). Having seen the strengths and weaknesses in each side's case throughout litigation over the past three years, the Court finds that the results obtained in the Settlement are exceptional.

Whether one looks at absolute or per-capita numbers, a settlement fund of $115 million for approximately 79.15 million class members is significant. According to the parties, the gross settlement amount of $115 million constitutes the largest settlement to date in a data-breach case in the United States. They point to settlements approved in two consumer class actions involving data breaches—namely, the $27.2 million settlement fund (for over 52 million consumers) in the Home Depot data breach and the $23.3 million settlement fund (for approximately 110 million consumers) in the Target data breach. *See* Cervantez Reply Decl., Ex. B. However, the Court notes that these settlement figures for the consumer cases in the Home Depot and Target data breaches are not perfect comparators because they represent a small fraction of what the defendants paid as a result of the data breaches. Both Home Depot and Target engaged in large settlements with separate classes of financial institutions and even larger settlements with credit card companies, such as Visa and MasterCard, and their issuers outside of court litigation. These additional settlements also conferred benefits, either directly or indirectly, on the consumers.

In *In re Target*, in addition to the consumer class settlement, there was a $39 million settlement with a separate class of financial institutions. Memorandum of Law in Support of Financial Institution Plaintiffs' Motion for Final Approval of Class Action Settlement at 2, *In re Target*, No. 14-MD-02522-PAM (D. Minn. Apr. 11, 2016), ECF No. 745. In *In re The Home Depot*, in addition to the consumer class settlement, there was a separate settlement with a class of financial institutions that included a $25 million fund plus up to $2.25 million in additional funds. Final Order and Judgment at 3–5, *In re The Home Depot*, No. 14-MD-02583-TWT (N.D. Ga. Sept. 22, 2017), ECF No. 343. The financial institution settlement also required Home Depot to implement specific data security measures beyond those in the consumer settlement. *Id.* at 5. These financial institution settlements benefitted consumers, as the harms suffered by the financial

17

institutions included "costs to cancel and reissue cards compromised in the data breach, costs to refund fraudulent charges, costs to investigate fraudulent charges, [and] costs for customer fraud monitoring."  Opinion and Order at 11, *In re The Home Depot*, No. 14-MD-02583-TWT (N.D. Ga. May 18, 2016), ECF No. 211; *see also* Memorandum of Law in Support of Financial Institution Plaintiffs' Motion for Final Approval of Class Action Settlement at 1, *In re Target*, No. 14-MD-02522-PAM ("Credit and debit card issuers claimed they incurred massive costs to cover fraud losses and card reissuance expenses after customers used the cards at Target."). Additionally, Home Depot and Target both entered into much larger settlements with credit card companies, such as Visa and MasterCard, and their issuers outside of court litigation.  *See, e.g.*, Hadley Malcolm, *Target settles with Visa over data breach*, USA Today (Aug. 18, 2015 1:54 p.m.), https://www.usatoday.com/story/money/2015/08/18/target-settles-visa-over-data-breach/31911123 (stating that Target entered into a $67 million settlement with Visa and was working on a similar settlement with MasterCard); *Home Depot Settles Data Breach Suit for $25M*, Lexology (Mar. 30, 2017), https://www.lexology.com/library/detail.aspx?g=12388973-7b1a-42ae-a32a-f00d8c59e7ea ("Home Depot . . . obtained releases from some MasterCard and Visa issuers, paying out $14.5 million in premiums on top of more than $140 million in payments to the larger issuers under the card brand recovery processes.").  In sum, because Home Depot and Target entered into multiple settlements with various retail actors and all of those settlements confer some benefit on the consumers, the consumer-only settlements are not perfect comparators. Nevertheless, the Court concludes that the $115 million fund here is a substantial result.

The $115 million fund also compares favorably to Plaintiffs' valuation of their own claims. Under one plausible damages theory employing the black market price of personal information, Plaintiffs' expert indicated that damages could be valued at $10 per individual.  ECF No. 743-11 at 13.  Using that figure, the $115 million Settlement Fund represents 14.5% of the projected recovery that Settlement Class Members would be entitled to if they prevailed.  *See, e.g.*, *Betancourt v. Advantage Human Resourcing, Inc.*, No. 14-CV-01788-JST, 2016 WL 344532, at

18

*5 (N.D. Cal. Jan. 28, 2016) (evaluating a settlement providing 9.7% of the total potential recovery); *Stovall-Gusman v. W.W. Granger, Inc.*, No. 13-CV-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (evaluating a settlement providing 10% of the total potential recovery). For those Settlement Class Members claiming an alternative cash payment, their payout looks to be $50, ECF No. 1042, Ex. A, an amount that exceeds $10. This does not even take into account that the Settlement Class Members may also claim up to $10,000 for any out-of-pocket costs incurred because of the breach. Settlement ¶ 6.4.

Moreover, the $115 million fund does not represent the entire value to the Class because the Settlement also offers nonmonetary benefits. As described above, Plaintiffs failed to provide a sound method to quantify the value of the fraud resolution services provided to all Settlement Class Members, the credit monitoring services provided to Settlement Class Members who submit a claim, or the Settlement-mandated cybersecurity spending that Anthem must undertake. However, even if this nonmonetary relief does not form part of the percentage fund, the Court may consider its value as "a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees." *Staton*, 327 F.3d at 974.

These three nonmonetary forms of relief further underscore that Class Counsel achieved an impressive benefit for the Class. The Court finds that the fraud resolution services (available to all Settlement Class Members) and the credit monitoring services (available to Settlement Class Members who submit a claim) are certainly worth more to individual Settlement Class Members than the discounted rate paid for the services in bulk. In particular, these services are aimed at combatting the precise harm that Settlement Class Members allegedly suffered. Moreover, the services are likely to last at least four years, ECF No. 1042, Ex. A, covering the period during which the risk of identity theft is at its highest, Van Dyke Report ¶ 46, with only a short gap after the expiration of Anthem's two years of credit monitoring.

Likewise, the obligatory changes to Anthem's business practice also provide value beyond the $115 million Settlement Fund. Specifically, Anthem must nearly triple its annual spending on

19

data security for the next three years and implement cybersecurity controls and reforms recommended by Plaintiffs' cybersecurity experts. Settlement ¶ 2. Thus, Anthem must fix core vulnerability issues in its database warehouse, changes which redound to the benefit of those Settlement Class Members whose personal information is still stored on Anthem's data warehouse. Cervantez Decl. ¶ 11. Not only does this nonmonetary relief benefit the millions of Settlement Class Members, but it also creates a public benefit beyond the Class for new Anthem members. *See Vizcaino*, 290 F.3d at 1049 (considering benefits to non-class members).

Class Counsel's expedient resolution of the case further solidifies the value of these nonmonetary forms of relief. For example, Plaintiffs' expert explained that the need for credit monitoring is most important for the five years following a data breach because the risk of identity theft is heightened during that period. Van Dyke Report ¶ 46. In a similar vein, changes in cybersecurity are more effective the earlier that they are implemented. Class Counsel were able to respect and address that time sensitivity here. The data breach occurred in late 2014 and early 2015. FCAC ¶ 1. Class Counsel were appointed in this MDL on September 11, 2015 and filed the motion for preliminary approval less than two years later, on June 23, 2017. ECF Nos. 284, 869. Accordingly, the results achieved on behalf of the Class, including the nonmonetary relief, heavily weigh in favor of granting Class Counsel's request for a fee award of more than 25%.

### b. The Risks of Litigation

Second, the Court concludes that there were substantial risks of litigation. To begin, data-breach litigation is an actively developing field of the law where much of the legal landscape is still shifting and unsettled. This baseline uncertainty manifested itself in a threshold question that threatened to end the litigation at an early stage as well as ongoing issues that endangered class recovery.

When Plaintiffs initiated this litigation, it was not a foregone conclusion that they had suffered an injury-in-fact sufficient to confer Article III standing to sue. Plaintiffs' entire case—or at least large swaths of the case—depended upon the assertion that an imminent risk that hackers

20

will misuse the data obtained in the breach constitutes an injury-in-fact. On September 4, 2014, this Court resolved that issue in favor of standing in a separate case before the instant case began. *See* ECF No. 468 at 46–47 (citing *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1211–16 (N.D. Cal. 2014)). The Ninth Circuit had also concluded in 2010 that plaintiffs had standing in a case involving similar facts. *See Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140–43 (9th Cir. 2010). However, the Ninth Circuit had not explicitly addressed standing in the context of a data breach or confirmed that its 2010 decision remained good law in light of the U.S. Supreme Court's intervening decision in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), on February 26, 2013. The outcome was far from certain, as the circuits have reached different answers on the issue of standing in various data-breach cases presenting different facts. *Compare, e.g.*, *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626 (D.C. Cir. 2017) (finding standing), *cert. denied*, 138 S. Ct. 981 (2018), *and Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016) (same), *with In re SuperValu, Inc.*, 870 F.3d 763, 770 (8th Cir. 2017) (finding no standing), *and Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir.) (same), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017). Earlier this year, the Ninth Circuit reaffirmed that "the sensitivity of the personal information, combined with its theft, [can be sufficient] to conclude that the plaintiffs had adequately alleged an injury in fact supporting standing." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027 (9th Cir. 2018). Before that ruling, Plaintiffs faced the possibility that their lawsuit would be unsustainable or severely trimmed on the ground that Plaintiffs lacked Article III standing to sue.

Other risks remained for the litigation moving forward. For example, class certification was not guaranteed, in part because Plaintiffs had a scarcity of precedent to draw on. The parties represent that only one non-settlement data-breach class has been certified in federal court to date, and that case post-dates Plaintiffs' filing of their motion for class certification. *See Smith v. Triad of Ala., LLC*, No. 14-CV-00324-WKW, 2017 WL 1044692, at *16 (M.D. Ala. Mar. 17, 2017). Moreover, multiple federal courts around the country had denied bids to certify classes in data-

21

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

breach cases. *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 35 (D. Me. 2013) (denying class certification in data-breach case); *In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389, 401 (D. Mass. 2007) (same). Thus, Plaintiffs had to contend with the possibility that their class certification motion would be denied in whole or in part.

Plaintiffs also faced potential challenges on the merits of their claims. Plaintiffs presented novel legal issues about the scope of certain state privacy statutes and about the viability of certain damages theories. ECF No. 468 at 59 (noting that "this action presents an issue of first impression" about a state-law disclosure requirement); *id.* at 45 (observing that no New York state or federal courts had addressed issues about one of Plaintiffs' damages theories). Although these issues survived motions to dismiss, they remain untested outside of the pleading stage. Even as to the more mainstream issues that Plaintiffs' lawsuit entails, Anthem had strong defenses on the merits. Most prominently, Anthem's security program and response to the breach have been praised by industry experts. In fact, a consortium of state insurance commissioners specifically found that Anthem's pre-breach cybersecurity was reasonable. Cervantez Decl., Ex. 14 ¶ A.5. Courts have stated that "[t]he risk of litigation is . . . affected by the availability of a prior judgment or decree in a related case brought by the government or a governmental agency." *In re Equity Funding Corp. of Am. Sec. Litig.*, 438 F. Supp. 1303, 1332 (C.D. Cal. 1977). Anthem also would have continued to contest other core issues such as causation, damages, and the scope of its promises to protect Plaintiffs' personal information. Plaintiffs had many responses to these arguments but faced the risk of possible negative findings on liability or damages.

These risks are compounded by the robust opposition from Defendants. Given the massive size of the putative class, Defendants had a powerful incentive to devote considerable resources to this litigation and have zealously litigated the action since its inception. Although Plaintiffs were largely successful at the motion-to-dismiss stage, Defendants continued to dispute their liability. Along the same lines, Defendants filed briefs opposing class certification and raising challenges to

22

Plaintiffs' experts. These issues threatened to defeat or diminish Plaintiffs' possible recovery, and the Court had not yet ruled on class certification when the parties reached a settlement.

However, Plaintiffs likely overstate the riskiness to some extent. The fact that this Court received 18 separate motions to serve as lead counsel in this action, ECF No. 284 at 1–2, is evidence that the litigation was not as risky as Plaintiffs suggest. The Court would not expect to have such intense competition among experienced lawyers to undertake the case on a contingency-fee basis if the case did not hold a sufficiently certain prospect of a sizeable recovery. *See Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-01466-BR, 2006 WL 3312024, at *2 (D. Or. Nov. 13, 2006) ("[T]here was a favorable outlook of recovery sufficient for seasoned counsel to undertake the case on behalf of Plaintiffs and the class members on a contingency-fee basis."); *see also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) ("Lack of competition not only implies a higher fee but also suggests that most members of the . . . bar saw this litigation as too risky for their practices."). Nevertheless, Plaintiffs have identified uniquely potent risks in this case that Plaintiffs would have to overcome to reach a favorable result this lawsuit. Accordingly, the risks attendant to maintaining this litigation weigh in favor of granting Class Counsel's request for a fee award of more than 25% but less strongly than Plaintiffs suggest.

### c. The Skill Required and the Quality of Work

Third, with respect to the quality of the litigation, Class Counsel include some lawyers who are experienced in litigating data-breach and privacy class actions. ECF No. 284 at 2–3. While the Court does not have enough information to comment on the work performed by the 49 other law firms that Class Counsel brought into this case, the Court concludes that Class Counsel demonstrated skillful preparation and adept work. They performed significant factual investigation prior to bringing these actions; engaged in motion practice, including opposing two motions to dismiss and fully briefing a motion for class certification and reply; engaged in written discovery; and participated in protracted negotiations with Anthem, including three full-day mediations with the assistance of a capable and experienced mediator.

United States District Court
Northern District of California

Moreover, the case presents complexities that required skill from the prosecuting attorneys. Plaintiffs asserted claims under all fifty states' laws against 43 defendants on behalf of approximately 79.15 million class members. *See generally* FCAC. The subject matter is highly technical, including facts about Anthem's cybersecurity and industry best practices. Cervantez Decl. ¶ 40. Adding to that complexity, Class Counsel also had to become familiar with Anthem's business models and various insurance products as well as the risks associated with the theft of personal information and the most effective remedies to prevent fraud. *Id.* ¶ 41–42. The parties planned to employ ten expert witnesses in the case. This Court and other courts within this district have recognized that litigating complicated matters, especially unprecedented issues, is a circumstance that points in favor of a larger percentage. *Spears v. First Am. Eappraiseit*, No. 08-CV-00868-RMW, 2015 WL 1906126, at *2 (N.D. Cal. Apr. 27, 2015) (awarding 35% of $7,557,096.92 net settlement fund in a case where class counsel "faced at least three significant novel issues of law"); *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *2 (N.D. Cal. Feb. 6, 2013) (explaining that counsel's use of experts to help evaluate case was part of "skillful preparation" that demonstrated skill and quality of work).

### d. The Contingent Nature of the Representation

Fourth, this case was conducted on a contingent-fee basis against well-represented Defendants. To be sure, Class Counsel were capable of fronting the costs, but the financial risk of litigation was assumed by Class Counsel throughout the pendency of the action. Moreover, the representation has lasted for nearly three years and the case schedule was compressed, thereby requiring Class Counsel to forego work on other matters. *See In re Online DVD-Rental*, 779 F.3d at 955 (noting that this factor considers "the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work)").

### e. Awards in Similar Cases

Fifth, a 27% award is consistent with attorneys' fees awards made in similar cases. Plaintiffs rely heavily on two settlements of consumer class actions stemming from the Home

24

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

Depot and Target data breaches. Fee Mot. at 15–16. The Court notes, as it did above in discussing the results achieved in the instant case, that Plaintiffs' comparison is at best incomplete because Home Depot's and Target's settlements of the consumer claims do not represent the entire sum that those companies paid or the entire benefit that the consumers received as a result of the respective data breaches. Instead, both Home Depot and Target engaged in large settlements with separate classes of financial institutions and even larger settlements with credit card companies, such as Visa and MasterCard, and their issuers outside of court litigation. These additional settlements also conferred benefits, either directly or indirectly, on the consumers.

Specifically, in *In re Target*, in addition to the consumer class settlement, there was a $39 million settlement with a separate class of financial institutions. Memorandum of Law in Support of Financial Institution Plaintiffs' Motion for Final Approval of Class Action Settlement at 2, *In re Target*, No. 14-MD-02522-PAM. In *In re The Home Depot*, in addition to the consumer class settlement, there was a separate settlement with a class of financial institutions that included a $25 million fund plus up to $2.25 million in additional funds. Final Order and Judgment at 3–5, *In re The Home Depot*, No. 14-MD-02583-TWT. The financial institution settlement also required Home Depot to implement specific data security measures beyond those in the consumer settlement. *Id.* at 5. These financial institution settlements benefitted consumers, as the harms suffered by the financial institutions included "costs to cancel and reissue cards compromised in the data breach, costs to refund fraudulent charges, costs to investigate fraudulent charges, [and] costs for customer fraud monitoring." Opinion and Order at 11, *In re The Home Depot*, No. 14-MD-02583-TWT; *see also* Memorandum of Law in Support of Financial Institution Plaintiffs' Motion for Final Approval of Class Action Settlement at 1, *In re Target*, No. 14-MD-02522-PAM ("Credit and debit card issuers claimed they incurred massive costs to cover fraud losses and card reissuance expenses after customers used the cards at Target."). Additionally, Home Depot and Target both entered into much larger settlements with credit card companies, such as Visa and MasterCard, and their issuers outside of court litigation. *See, e.g.*, Hadley Malcolm, *Target settles*

25

Case No. 15-MD-02617-LHK

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

*with Visa over data breach*, USA Today (Aug. 18, 2015 1:54 p.m.), https://www.usatoday.com/ story/money/2015/08/18/target-settles-visa-over-data-breach/31911123; *Home Depot Settles Data Breach Suit for $25M*, Lexology (Mar. 30, 2017), https://www.lexology.com/library/ detail.aspx?g=12388973-7b1a-42ae-a32a-f00d8c59e7ea.

Nonetheless, the Court provides the district courts' rationales for awarding percentages slightly higher than 27% in the consumer portion of those cases. First, in the case involving the Home Depot data breach, the district court approved the attorneys' fees request for $7,536,497, or 27.7% of the $27.2 million settlement fund. Order Granting Consumer Plaintiffs' Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement at 1, 4, *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-MD-02583-TWT (N.D. Ga. Aug. 23, 2016), ECF No. 261. The court explained that "[t]he relief obtained for the Settlement Class compares very favorably to the other data breach settlements presented to the Court, and appears to be the most comprehensive settlement achieved in large-scale data breach litigation." *Id.* at 3. The court noted that "Class Counsel took exceptional litigation risks in devoting the amount of time and resources which they did." *Id.* at 3–4. Finally, the court added that its analysis did not include the value of the identity theft monitoring services provided to the class or the "substantial but unquantifiable value of the injunctive relief." *Id.* at 4. Second, in the case involving the Target data breach, the district court awarded $6.75 million in attorneys' fees, a figure representing 29% of the $23.3 million value of the settlement. Memorandum and Order at 6, 8, *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-MD-02522-PAM (D. Minn. Nov. 17, 2015), ECF No. 645. The court there noted that the case had been "hard-fought and heavily litigated since its inception" and the fee request was "reasonable in light of complexities and vagaries of th[e] case." *Id.* at 8.

However, it is important to underscore the size of the fund at issue here. The fund of $115 million is significantly larger than the $27.2 million settlement fund for the consumer class in *In re The Home Depot* and the $23.3 million settlement value for the consumer class in *In re Target*.

"Although a percentage award in a megafund case can be 25% or even as high as 30–40%, typically the percentage award in such a case is substantially less than the 25% benchmark applicable to typical class settlements in this Circuit." *Alexander*, 2016 WL 3351017, at *2. This rule reflects the basic reality that, at some point, the increasing amount of a settlement may be a function of class size, not counsel's efforts. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998). Although percentages tend to decrease as the fund increases, the Ninth Circuit has rejected the argument that fee award percentages must decrease as the fund increases. *Vizcaino*, 290 F.3d at 1047. A simple example demonstrates the perverse incentives that may result by following such a formulaic approach: If courts award class counsel 30% of any settlement under $100 million but only 20% of any settlement over $100 million, then class counsel will prefer to settle cases for $90 million (i.e., a $27 million fee award) instead of $125 million (i.e., a $25 million fee award). *See* Pls.' Resp. at 2 n.1. The Court need not adjust the benchmark unless "awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case." *In re Bluetooth*, 654 F.3d at 942; *see also Allen v. Bedolla*, 787 F.3d 1218, 1224 n.4 (9th Cir. 2015) (cautioning that district courts "should not calculate fees using 'a mechanical or formulaic approach that results in an unreasonable reward'" (quoting *In re Bluetooth*, 654 F.3d at 944)).

Indeed, Class Counsel have pointed to other "megafund" cases in which courts have granted similar percentages. In *Vizcaino*, the Ninth Circuit conducted a survey of attorneys' fees awards in common-fund cases ranging from $50–200 million between 1996 and 2001. *See* 290 F.3d at 1052–54. While the awards ranged from 3% to 40%, in the vast majority of cases (27 of 34, or 79%), the percentage ranged from 10% to 30%. *Id.* at 1050 n.4. In a "bare majority" of cases (19 of 34, or 56%), the percentage was in the 20% to 30% range. *Id.* Thus, a percentage of 27% appears to be in line with the vast majority of megafund settlements. Indeed, the Ninth Circuit considered only one case from this district with a settlement amount greater than $100 million; in that case, Judge Breyer approved a fee award of $40 million from a settlement fund of

27

$137 million (i.e., a percentage of 29.2%). *See id.* at 1052 (citing *In re Informix Corp. Sec. Litig.*, No. 97-CV-01289-CB (N.D. Cal. Nov. 23, 1999)). A 27% award here is likewise consistent with that case.

Another source similarly supports this result. This Court has previously relied on a leading study conducted by Theodore Eisenberg and Geoffrey Miller, in which the authors reviewed large common-fund settlements over a 16-year period, between 1993 and 2008. *See* No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248 (2010)). Previously, the Court looked to the authors' analysis of common funds exceeding $175.5 million and concluded that a percentage recovery of 9.8% or 10.5% was appropriate for a fund of $415 million. *Id.* Relevant here, the authors analyzed fee awards based on a sample of 69 settlements ranging from $69.6–175.5 million and found that the median percentage was 19.9% and the mean percentage was 19.4% with a standard deviation of 8.4%. Eisenberg & Miller, *supra*, at 265 tbl.7. This case involves a settlement fund of $115 million, which falls within the $69.6–175 million range. While an award of 27% exceeds the 19.4% mean and 19.9% median figures in the authors' study, the variance is not remarkably large, as 27% falls within one standard deviation (8.4%) of the mean. The fact that 27% falls at the high end of one standard deviation is representative of the exceptionality of this case in terms of both the results achieved and the risks incurred.

### iii. Conclusion

Based on the foregoing, the Court concludes that a percentage of 27% should be applied to the $115 million Settlement Fund. Accordingly, the percentage-of-recovery method produces a total attorneys' fee award of $31.05 million.

With that figure in hand, the Court next performs a lodestar calculation as a means of cross-checking that result.

United States District Court
Northern District of California

### 3. Lodestar Cross-Check

As noted above, courts calculate a lodestar "by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton*, 327 F.3d at 965). Although "the lodestar figure is 'presumptively reasonable,' the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors." *Id.* at 941–42 (citation omitted). Where, as here, the lodestar is being used as a cross-check, courts may do a rough calculation "with a less exhaustive cataloging and review of counsel's hours." *Young v. Polo Retail, LLC*, No. 02-CV-04546-VRW, 2007 WL 951821, at *6 (N.D. Cal. Mar. 28, 2007); *see also In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 460 (C.D. Cal. 2014) ("In cases where courts apply the percentage method to calculate fees, they should use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award.").

In his Report and Recommendation, the Special Master spells out his lodestar calculation as part of his third approach for awarding fees. R. & R., at 27. The Special Master highlights two central concerns, one with respect to billing rates and one with respect to hours. *Id.* First, as to billing rates, the Special Master concludes that Class Counsel charged unreasonable rates for contract and staff attorneys and recommends using a flat rate of $156 per hour for all contract and staff attorneys. *Id.* at 12–14. Second, as to hours, the Special Master notes various ways in which Class Counsel's hours appear excessive and recommends reducing the total hours by 10% to address duplication. *Id.* at 15–18, 27. The Special Master also believes that a multiplier is inappropriate. *Id.* at 23. The Special Master's ultimate recommended award (before deducting expenses) is $30,587,696.00. *Id.* at 27.

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

The Court accordingly analyzes the billing rates, hours, and multiplier in turn, paying special attention to the particular issues that the Special Master raises with respect to the lodestar calculation.

### i. Billing Rates

Aside from contract and staff attorneys, the Special Master concludes that the overall rates charged by the law firms in this case "do not appear excessive." R. & R., at 15. Having reviewed the billing rates for those individuals (attorneys, paralegals, and litigation support staff) at each of the firms representing Plaintiffs in this case, the Court agrees that the rates for all billers except contract and staff attorneys are reasonable in light of prevailing market rates in this district and that Class Counsel have submitted adequate documentation justifying those rates. *See* ECF No. 916-3 (charts showing rates charged by Class Counsel here and judicial approvals of the same or comparable rates for individuals with similar experience).

In addition, for all billers except contract and staff attorneys, the billing rates submitted vary appropriately based on experience. Specifically, the billing rates for partners range from about $400.00 to $970.00. *See* Cervantez Decl. ¶ 48; Cervantez Decl., Ex. 1 (summarizing rates for all billers); *see also In re High-Tech*, 2015 WL 5158730, at *9 (approving partner rates from "about $490 to $975"). The billing rates for non-partner attorneys, including senior attorneys, of counsel, and associates, range from about $185.00 to $850.00, with most under $500.00. *See* Cervantez Decl. ¶ 48; Cervantez Decl., Ex. 1; *see also In re High-Tech*, 2015 WL 5158730, at *9 (approving non-partner attorney rates from "about $310 to $800"). The billing rates for paralegals, law clerks, and litigation support staff range from about $95.00 to $440.00, with most under $300.00. *See* Cervantez Decl. ¶ 48; Cervantez Decl., Ex. 1; *see also In re High-Tech*, 2015 WL 5158730, at *9 (approving paralegal and staff rates from "about $190 to $430").

In his objection to the Special Master's Report and Recommendation, Schulman for the first time raises a challenge to the billing rates for summer law clerks. *See* Schulman Obj. at 5 & n.1. However, he summarily states that "the special master's report is silent regarding the law

30

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

clerks—summer associates—billed at between $270 and $345/hour by class counsel for a total of over $134,000." *Id.* at 5 n.1. Plaintiffs, however, submitted evidence with their motion for attorneys' fees that included citations to court approvals of law clerk hourly rates at between $285.00 and $330.00 per hour in this district. *See* ECF Nos. 916-31 ¶ 24 (citing *In re High-Tech*, in which this Court approved law clerk rates between $295.00 and $330.00 per hour), 916-1 ¶ 88 (citing *Spicher v. Aidells Sausage Co., Inc.*, No. 15-CV-05012-WHO (N.D. Cal. May 31, 2017), in which Judge Orrick found reasonable the 2017 rate of $285.00 per hour for law clerks). Schulman has provided no evidence or argument to rebut Plaintiffs' submissions. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (noting that party opposing fee request has the burden to rebut fee applicant's declarations establishing the prevailing market rate). Thus, the Court will not disturb the hourly billing rates for summer law clerks.

The real dispute focuses on the appropriate billing rate for contract and staff attorneys. As a general matter, contract attorneys are "'attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action,'" whereas staff attorneys are "non-partnership-track attorneys working on an hourly basis." Special Master's Report and Recommendations at 181–89, *Ark. Teacher Ret. Sys. v. State Street Bank & Trust Co.*, No. 11-CV-10230-MLW (D. Mass. May 14, 2018) (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394 (S.D.N.Y. 2013)). In the instant case, all of the contract attorneys and all but one of the staff attorneys were paid at an hourly rate. ECF No. 977-3. The remaining staff attorney—Phi Anh Nguyen at Lieff Cabraser Heiman & Bernstein, LLP—received an annual salary rather than an hourly wage. *Id.* at 3. Because Plaintiffs address contract and staff attorneys as a collective and do not advocate for treating these groups separately, the Court analyzes them together.

In the Order Granting Motion to Appoint Special Master, this Court recognized a significant disparity between the billing rates charged and the hourly rates paid for the work

31

performed by contract and staff attorneys on this case. ECF No. 972 at 4. The Court explained that "a large number of contract attorneys, staff attorneys, and a contract paralegal worked on the case" and that "the markup charged for their work was as high as $447 an hour." ECF No. 972 at 4. The Special Master's Report and Recommendation expands on this concern. The Special Master notes that the 33 contract and staff attorneys in this case were "paid by the firms at hourly rates from $25.00 to $65.00, with the clear majority in the $40.00 range." R. & R., at 10–11. However, Class Counsel charged hourly rates for these individuals "from $185 to $495." *Id.* at 11. Only one contract attorney was billed out at the lowest rate of $185.00 per hour, and more than half of the contract and staff attorneys were billed out at over $350.00 per hour. ECF No. 977-3. The total lodestar claimed for contract attorneys is $6,997,153.50. *Id.* at 3. Excluding the annual salary paid to Phi Anh Nguyen, a comparison of the amount paid to these hourly employees ($727,537.86) to the amount charged for these hourly employees ($6,034,063.92) yields a profit margin of $5,306,526.06. *Id.* This profit margin constitutes almost **14%** of the Plaintiffs' total lodestar figure of $37,993,566.50.

The Special Master concludes that it is "simply inappropriate" to bill contract and staff attorneys at the same rate applied to attorneys with four to eight years of experience. *Id.* The Special Master points to multiple district court cases in which contract and staff attorneys have been billed at cost with no markup. *Id.* at 11–12. However, finding no requirement to bill these attorneys in that manner, the Special Master instead sensibly recommends looking to the nature of their work. *Id.* at 12. Because the contract and staff attorneys here performed mostly document review, the Special Master advises charging these individuals at the rate of a paralegal—namely, $156.00 per hour. *Id.* Performing that calculation, the Special Master retrieves a figure of $3,033,482.40 (19,445.4 hours x $156.00 per hour), or a $3,963,671.10 cut from Plaintiffs' claimed lodestar for these attorneys. *Id.* at 14.

Both Plaintiffs and Schulman object to the Special Master's suggestion. Plaintiffs argue that the comparison to paralegal rates is unsound because the tasks assigned to contract and staff

32

attorneys in this case were tasks that only an attorney could perform. Pls.' Obj. at 5. Plaintiffs also object that the chosen rate of $156.00 per hour is not a prevailing market rate, but instead a Laffey Matrix rate. *Id.* at 6–7. Schulman, in contrast, posits that contract and staff attorneys should be billed at or near cost. Schulman Obj. at 6. The Court addresses these arguments below, starting with Schulman's contention that contract and staff attorneys should be billed at cost.

To the extent that Schulman advocates for a categorical rule that contract and staff attorneys must be billed at cost, the Court disagrees. Schulman identifies no case adopting this hardline position. In the two cited cases, counsel had billed the contract attorneys as expenses (rather than as part of the lodestar), and the courts approved those expenses without requiring that approach. *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014). In fact, the court in *Dial* explained that "courts in this Circuit have permitted attorneys to garnish their lodestars with marked-up contract attorney fees." 317 F.R.D. at 438. The court went on to "encourage[] the Plaintiffs' class action bar to consider adopting th[e] practice [of billing contract attorneys at cost] in future actions" but nowhere suggested that the practice was mandated by law. *Id.* The identification of these two instances also does not establish that cost is the prevailing market rate for contract or staff attorneys. To the contrary, federal "courts have not spoken with one voice concerning the proper treatment of contract attorney costs in the calculation of a lodestar." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *8 (N.D. Cal. Aug. 3, 2016). Indeed, courts routinely reject claims that contract attorneys should be billed at the rate paid by the law firms. *See, e.g.*, *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn.) (collecting cases), *aff'd*, 355 F. App'x 523 (2d Cir. 2009); *see also* ABA Comm. on Ethics & Prof'l Resp. Formal Op. 00–420 (Nov. 29, 2000) ("Services of a contract lawyer may be billed to the client either as fees for legal services or as costs or expenses incurred by the retaining lawyer.").

Like the court in *Dial*, this Court commends the practice of treating contract attorney work as a cost. Not only does that practice reap cost savings for the clients, but it also promotes judicial

efficiency by avoiding a judicial determination of fees. *Dial*, 317 F.R.D. at 438; Special Master's Report and Recommendations at 181–89, *Ark. Teacher Ret. Sys.*, No. 11-CV-10230-MLW (detailing reasons supporting billing contract attorneys at cost). Nevertheless, the Court recognizes that counsel may be entitled to a reasonable markup to cover costs such as supervision and overhead. *See, e.g.*, *In re AOL Time Warner S'holder Derivative Litig.*, No. 02-CV-06302-CM, 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) ("Economic rationality dictates that the fees [law firms] charge clients be higher than the amounts paid to their timekeeping personnel."); Kathryn M. Fenton, Use of Temporary or Contract Attorneys, 13 FALL Antitrust 23, 24 (1998) ("Today it is not uncommon for an employing law firm to pay the temporary lawyer at one rate and charge that lawyer's services to the client at a higher rate that covers overhead and a contribution to firm profits."). Relatedly, the ABA Standing Committee on Ethics has concluded that "a lawyer may, under the Model Rules, add a surcharge on amounts paid to a contract lawyer when services provided by the contract lawyer are billed as legal services." ABA Comm. on Ethics & Prof'l Resp. Formal Op. 00–420 (Nov. 29, 2000); *see also Brazitis v. Colvin*, No. 11-CV-07993, 2013 WL 6081017, at *2 (N.D. Ill. Nov. 19, 2013) ("[A]ttorneys regularly add a surcharge to the cost of the contract attorneys they engage, and do so ethically as long as the overall fee is reasonable."). Thus, the Court must determine the reasonable rate to be charged for contract and staff attorneys here.

The Court begins by emphasizing how striking the markup is in this case. All told, the profit margin based purely on a markup for non-salaried contract and staff attorney hourly work is $5,306,526.06. R. & R., at 11. This figure constitutes almost **14%** of the Plaintiffs' total lodestar figure of $37,993,566.50. More specifically, the non-salaried contract and staff attorneys' hourly rates ranged from $25.00 to $65.00, but these individuals were billed at hourly rates ranging from $185.00 to $495.00 with most over $350.00. *Id.* at 10–11. In some instances, the markup was $447.00 an hour. ECF No. 972 at 4. On average, Plaintiffs charged a markup of approximately 729%. Plaintiffs provide no explanation for why markups of this magnitude were necessary or

34

why markups for some contract and staff attorneys appear to greatly exceed markups for some associates.

Nor is the Court persuaded by Professor William B. Rubenstein's declaration, which analyzes contract and staff attorney rates approved by federal courts. The Court notes that Plaintiffs submitted this declaration after the deadline for objections to the fee request had expired, thus depriving class members of an adequate opportunity to protect their rights and ensure adversarial testing of issues related to the fee award. *Cf. In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993–94 (9th Cir. 2010) (holding that district courts must "set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed"). Nevertheless, even if the Court considers Professor Rubenstein's declaration, the Court finds his data inconclusive. Specifically, Professor Rubenstein examined the contract and staff attorney rates approved in 13 class-action cases from 2014 to 2017 by federal judges in various districts. ECF No. 991 ("Rubenstein Decl."), Ex. G. As Professor Rubenstein explains, the "rates in those cases (all adjusted to 2017 dollars) ranged from $240.00 to $594.26," with a weighted mean of $398.80. Rubenstein Decl. ¶ 26. In contrast, the weighted mean for the contract and staff attorneys who billed in this case is $360.12. *Id.*

In the Court's view, Professor Rubenstein's numbers likely skew too high. His data set does not take into consideration the authority, including authority from this district, where contract attorneys have been billed at cost. *See Dial*, 317 F.R.D. at 438; *Banas*, 47 F. Supp. 3d at 980. The Court also does not find much force in the cases where higher rates were approved because it does not appear that this issue was disputed in any of these cases and the orders do not explicitly address the disparity between the rates at which contract attorneys were paid and the rates at which they were charged. For example, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, the papers discussed the notion that firms may bill out contract attorneys at an hourly rate much higher than their hourly wage, but Judge Breyer's attorneys' fees order does not refer to contract attorneys, likely because there were no filed objections to the

35

attorneys' fees request.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.*

*Liab. Litig.*, No. MDL 2672, 2017 WL 3175924 (N.D. Cal. July 21, 2017), ECF No. 3396-2

¶¶ 33–34.  Likewise, in *Nitsch v. DreamWorks Animation SKG Inc.*, this Court approved contract

and staff attorney hourly rates mostly ranging from $250.00 to $275.00 (with an outlier at

$446.75), yet Plaintiffs do not suggest that the Court was presented with the hourly rates class

counsel paid to those attorneys, and the issue was not raised by either the Court or the parties.  *See*

*generally Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL

2423161 (N.D. Cal. June 5, 2017), ECF Nos. 331-2, 331-3, 331-4.  As a formal matter,

"[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled

upon, are not to be considered as having been so decided as to constitute precedents."  *Cooper*

*Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (citation omitted).

This Court will use an hourly rate of $240.00—the low end of the range that Professor

Rubenstein has identified as having been approved in federal class actions.  At least in the context

of this rough calculation of the lodestar figure, the Court finds that $240.00 per hour adequately

accounts for the qualifications and experience of the contract and staff attorneys as well as the

largely document-review work they performed.  *See* R. & R., at 12 (observing that much of the

contract attorney work in this case falls under the task code for document review).  Indeed, that

rate has previously been judicially approved in this district.  *See Walsh v. CorePower Yoga LLC*,

No. 16-CV-05610-MEJ, 2017 WL 4390168 (N.D. Cal. Oct. 3, 2017), ECF No. 44-2.  Court

approval may provide "satisfactory evidence of the prevailing market rate."  *United Steelworkers*

*of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Moreover, the $240 hourly rate

still encapsulates a sizeable markup (ranging from 860% for contract attorneys paid $25.00 per

hour to 269% for contract attorneys paid $65.00 per hour) while scaling back Plaintiffs'

unreasonably high markup profit of $5,306,526.06.  In future cases, the Court is willing to receive

documentation justifying a lower or higher rate, but for purposes of the rough lodestar calculation

1    here, the Court finds that $240.00 per hour for contract and staff attorney time is a reasonable

2    rate.[6]

3           Plaintiffs' documents show that the contract and staff attorneys billed a total of 19,445.4

4    hours in this case.  ECF No. 977-3.  At the rate of $240.00 per hour, the total amount comes to

5    $4,666,896.00.  Plaintiffs actually claim $6,997,153.50.  *Id.*  Accordingly, to account for

6    Plaintiffs' excessive contract and staff attorney rates, the Court finds it appropriate to reduce

7    Plaintiffs' lodestar figure by $2,330,257.50 ($6,997,153.50 – $4,666,896.00).  Even with these

8    adjusted amounts, the resulting profit margin of $3,939,358.14 ($4,666,896.00 – $727,537.86) still

9    constitutes **11%** of the adjusted lodestar of $35,663,309.00.  The Court next addresses hours.

10          **ii.  Hours**

11          As noted earlier, the hours component of the lodestar is comprised of "the number of hours

12   the prevailing party reasonably expended on the litigation."  *In re Bluetooth*, 654 F.3d at 941

13   (citing *Staton*, 327 F.3d at 965).  Accordingly, the Court may excise from the calculation any

14   hours that are duplicative, excessive, or otherwise unnecessary.  *See Chalmers*, 796 F.2d at 1210;

15   *see also Hensley*, 461 U.S. at 434 (explaining that district courts should remove "hours that are

16   excessive, redundant, or otherwise unnecessary").  As in other contexts, the party seeking fees

17   "bear[s] the burden of showing the time spent and that it was reasonably necessary to the

18   successful prosecution of [the] claims."  *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886

19   F.2d 1545, 1557 (9th Cir. 1989); *see also Webb v. Bd. of Educ. of Dyer Cty., Tenn.*, 471 U.S. 234,

20   242 (1985) ("[T]he party seeking an award of fees has the burden of submitting 'evidence

21   supporting the hours worked and rates claimed.'" (quoting *Hensley*, 461 U.S. at 433)); *Harris v.*

22   *Maricopa Cty. Superior Court*, 631 F.3d 963, 971–72 (9th Cir. 2011) ("[I]n cases involving

23

24   ---

     [6] The Court notes that there may also be justifications for applying different markups for contract
25   attorneys and for staff attorneys.  *See* Special Master's Report and Recommendations at 181–89,
     *Ark. Teacher Ret. Sys.*, No. 11-CV-10230-MLW (distinguishing between contract and staff
26   attorneys).  Because neither party argues for applying different markups for contract attorneys and
     staff attorneys in this case, the Court need not address the issue here.

27                                                    37
28

attorneys fees generally, '[t]he burden of establishing entitlement to an attorneys fees award lies solely with the claimant.'" (citation omitted)).

The Court raised the issue about whether Class Counsel's hours were reasonably expended in the Order Granting Motion to Appoint Special Master. *See* ECF No. 972 at 4 (citing *Young*, 2007 WL 951821, at *6). The Court explained that it had concerns about duplication and inefficiency "based on Co-Lead Plaintiffs' Counsel's assignment of tasks across 53 law firms and [329] billers." *Id.* at 5. Although "this case required a significant amount of work," "employing 53 law firms likely resulted in unnecessarily duplicative or inefficient work by virtue of the fact that so many billers needed to familiarize themselves with the case and keep abreast of case developments." *Id.* The Court asked the Special Master to review the record and "determine the hours reasonably expended, deducting the time and expenses that are excessive, unnecessary, or duplicative." ECF No. 985 at 2.

The Special Master undertook that task in his Report and Recommendation. The Report and Recommendation agrees that the hours billed appear excessive. R. & R., at 16–18. At the high level, the Special Master colorfully explains that with a "virtual army of billers" spread across 53 law firms (when the Court appointed only 4), Class Counsel could not "possibly conduct effective oversight of this very large team." *Id.* at 17–18. The mere fact of this wide array of "billing participants presents at least a strong possibility of duplication and unreasonable hours," especially because "every time a new law firm was added to the group, those lawyers had to spend time learning the history, issues, and facts being litigated." *Id.* at 18. More specifically, the Special Master highlights areas where the hours expended are excessive, including deposition preparation, document review, class-certification work, settlement preparation, and post-settlement work. *Id.* at 16–17. To take one example, counsel charged approximately 13,800 hours for 194 depositions, equating to over 71 hours per deposition. *Id.* at 16. In light of these excesses, the Special Master recommends taking a 10% haircut of the hours, as warranted by Ninth Circuit law. *Id.* at 24–25, 27–28.

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

The Court starts with the case law to provide relevant context. The Ninth Circuit first discussed the propriety of a 10% haircut in *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008). There, the district court "found the hours requested to be excessive, suggesting that some of the research was duplicative because counsel spent substantial time preparing motions and briefs dealing with similar issues." *Id.* at 1112. The district court therefore cut the hours by 25% (on top of the 9% already cut by plaintiff's counsel), but provided "no specific explanation as to which fees it thought were duplicative, or why." *Id.* On appeal, the Ninth Circuit vacated, concluding that an explanation for the cuts was lacking. *Id.* at 1116. The Ninth Circuit held that a "district court can impose a small reduction, no greater than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation." *Id.* at 1112. In order to go beyond that 10% haircut, "the district court's justification for the cuts must be weightier and more specific." *Id.* at 1113. Because the district court had taken a cut greater than 10% without any explanation—let alone a clear one—for doing so, the Ninth Circuit vacated the fee award. *Id.*

Neither Plaintiffs nor Schulman disputes that the 10% haircut contemplated by *Moreno* may be applied in this case, but they present different views about how large the percentage cut should be. Plaintiffs argue that no haircut is warranted because the hours expended were reasonably necessary. Pls.' Obj. at 19–21; Pls.' Resp. at 6–9. Schulman asserts that the 10% haircut is not enough and identifies a number of other cuts to be made in addition to the 10% haircut. Schulman Obj. at 12–13. The Court adopts the Special Master's recommendation to apply a haircut but agrees with Schulman that a greater-than-10% haircut—specifically, a cut of 13%—is warranted.

The Court need not offer a "specific explanation" to apply the 10% haircut to Class Counsel's claimed hours. *See Moreno*, 534 F.3d at 1112. Nonetheless, an overview of the factual background demonstrates why the Court and Special Master harbor a legitimate concern about duplicative and unnecessary billing. Specifically, as the Special Master recognizes, Class Counsel's unilateral decision to add 49 law firms to the Court-approved four-firm structure

39

United States District Court
Northern District of California

violated the Court's protocol, which was designed to promote efficiency and orderly progression of the case. *See* R. & R., at 17 (describing Class Counsel's actions as "contrary to the letter and spirit of the Court's appointment orders regarding lead counsel"); *id.* at 26 (stating that "the number of counsel" and "the overlapping staffing" were "in contravention of the Court's admonitions"). Indeed, the Court definitively rejected Co-Lead Counsel's proposal of a larger eight-firm structure and instead appointed a four-firm steering committee. ECF No. 972 at 2–3. Class Counsel were permitted to utilize other counsel, but the Court made clear that any such assignment should cover a discrete task and should be made sparingly "on an as needed basis and consistent with efficiency." *Id.* at 3–4 (quoting ECF No. 286 at 1). However, billing by non-appointed firms totals $13,589,993.00, or 35.8% of the $37,993,566.50 claimed lodestar. *See* ECF No. 960-5. Given the Court's judgment that a core of four firms (with occasional targeted assistance from other firms) would be sufficient to manage this case effectively and efficiently, Class Counsel's decision to employ 53 law firms and 329 billers across the country was almost necessarily excessive.

As this Court explained, the major concern is that there may be "unnecessarily duplicative or inefficient work by virtue of the fact that so many billers needed to familiarize themselves with the case and keep abreast of case developments." ECF No. 972 at 5. That risk seemed particularly acute because more partners (107) than associates (92) worked on the case, likely because the work was spread across a large number of firms rather than concentrated in a few firms. *See* Cervantez Reply Decl., Ex. E (providing updated list of billers).[7] The Special Master's

---

[7] The Court does not "set the fee based on speculation as to how other firms would have staffed the case." *Moreno*, 534 F.3d at 1114. Rather, the imbalance between partners and associates is an indicator that Class Counsel did not assign tasks based on "the skill requisite to perform the legal service" and thus informs the overall picture of duplication. *Hensley*, 461 U.S. at 430. Plaintiffs have filed an untimely declaration from Professor Rubenstein that assuages, but does not eliminate, the concerns noted by the Court. The Court reiterates that it would have been preferable for Plaintiffs to submit this declaration with their fee motion so that class members would have an opportunity to discuss the declaration in their objections. *Cf. In re Mercury*, 618 F.3d at 993 (noting that objection deadline should be set after class counsel has filed its fee motion and supporting documents). In any event, the Court notes multiple shortcomings in Professor

40

Report and Recommendation echoes the concern that the large and widespread array of "billing participants presents at least a strong possibility of duplication and unreasonable hours," especially because "every time a new law firm was added to the group, those lawyers had to spend time learning the history, issues, and facts being litigated." R. & R., at 18.

The Court is not persuaded by Plaintiffs' suggestion that non-appointed firms "were forbidden to bill for any start-up time learning the facts and law of the case." Pls.' Obj. at 14. In fact, Class Counsel's billing memo specifically allowed counsel working on the case to bill for reviewing documents and filings "to gain general familiarity." ECF No. 190-1 at 6. A sampling of the billing records reveals that non-appointed firms claimed such hours. *See, e.g.*, ECF Nos. 1002-10 at 1, 3, 56, 58 (billing hours for reading or analyzing complaint); 1002-18 at 6, 8, 13 (billing hours for reading and reviewing complaint "to become familiar with case"). General familiarity likely included review of the 291-page operative complaint; the 82-page order on the first motion to dismiss, ECF No. 468; the 90-page order on the second motion to dismiss, ECF No. 528; and the rulings on the 15 discovery motions litigated before this Court and the District of Columbia, ECF No. 916-8 ¶ 37.

Comparing the lodestar claimed in the instant case to the lodestar claimed in another novel and highly complex case, *In re High-Tech*, further suggests that the hours here are unreasonably high. *In re High-Tech* involved complex antitrust issues of first impression in an action against seven large technology companies—including Google, Apple, and Intel—regarding an alleged conspiracy to fix and suppress employee compensation. 2015 WL 5158730, at *10. Class counsel in *In re High-Tech* engaged in many more rounds of motions practice, and the parties progressed

Rubenstein's calculation that "non-partner attorney timekeepers billed almost twice the number of total hours as did the partners." Rubenstein Decl. ¶ 14. First, Professor Rubenstein does not compare time billed by partners to time billed by associates, but instead time billed by partners to time billed by non-partners (including of counsel, associates, fellows, and contract attorneys). Second, Professor Rubenstein does not opine that a 1:2 ratio between partner and non-partner time is common or typical. Third, and finally, Professor Rubenstein aggregates the information but provides no analysis of whether the 49 non-appointed firms utilized a pyramid structure.

41

significantly closer to trial than Class Counsel in the instant case. Most prominently, in the four years that the case was pending, Class Counsel in *In re High-Tech* survived two motions to dismiss, litigated two rounds of class certification, opposed an appeal to the Ninth Circuit under Federal Rule of Civil 23(f), survived five summary judgment motions, survived multiple rounds of *Daubert* challenges, filed and opposed motions in limine, prepared for the pretrial conference and trial, negotiated multiple settlements, and opposed mandamus in the Ninth Circuit. *Id.* More precisely, class counsel in *In re High-Tech*:

> (1) identified the alleged conspiracy to fix and suppress employee compensation in the tech industry; (2) met with their clients and secured retainer agreements; (3) prepared and filed multiple complaints against Defendants; (4) survived two motions to dismiss; (5) undertook considerable discovery, including taking 93 depositions and defending 14 others, serving 75 document requests, reviewing the resulting 325,000 documents (over 3.2 million pages), serving 28 subpoenas on third parties, reviewing 8,809 pages of documents from those third parties, producing over 31,000 pages of documents in response to Defendants' document requests, and responding to and reviewing 34 subpoenas served by Defendants on third parties; (6) retained four experts to assist in analyzing over 15 gigabytes of employment-related compensation and recruiting data; (7) worked with the experts to produce multiple expert reports; (8) filed a consolidated class action complaint; (9) litigated two rounds of class certification; (10) opposed a Rule 23(f) appeal to the Ninth Circuit; (11) survived five summary judgment motions; (12) prepared for trial; (13) negotiated [multiple] settlements; and (14) opposed mandamus in the Ninth Circuit.

*Id.* Class counsel's efforts in *In re High-Tech* produced a non-reversionary settlement fund of $415 million with no claim form and a recovery of about $5,770 per class member. *Id.* at *12. Class counsel in *In re High-Tech*, which consisted of four law firms, claimed to have spent 36,215.00 hours on the litigation, yielding a lodestar figure of $18,201,787.50. *Id.* at *10.

In the instant case, Class Counsel claim to have spent 78,892.5 hours on the litigation, with a lodestar figure of $37,993,566.50. In other words, Class Counsel claim to have spent more than double the time litigating this case that class counsel did in *In re High-Tech*. This ratio is surprising given that, unlike here, the parties in *In re High-Tech* litigated two rounds of class certification, filed briefs in a 23(f) appeal and a mandamus action before the Ninth Circuit,

42

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

litigated summary judgment, litigated multiple rounds of *Daubert* challenges, briefed motions in limine, and settled on the eve of trial. Moreover, class counsel in *In re High-Tech* secured a significantly larger settlement than the $115 million Settlement Fund here with more direct payments to class members. The Court recognizes that there are differences between the instant case and *In re High-Tech* that may bear on the lodestar. There is no doubt that Class Counsel in the instant case achieved a significant benefit for the Class and performed a substantial amount of work, including (1) filing four complaints; (2) litigating two rounds of motions to dismiss; (3) undertaking considerable discovery, including reviewing 3.8 million pages of documents; deposing 18 percipient fact witnesses, 62 corporate designees, and 6 defense experts; and producing over 100 named Plaintiffs for depositions as well as 29 of those named Plaintiffs' computers for forensic examinations; (4) producing reports from 4 experts and defending their depositions; (5) briefing class certification and *Daubert* motions; and (6) negotiating a settlement. However, the Court finds that the comparison between the instant case and *In re High-Tech*—in which Class Counsel here claim to have spent more than double the time (78,892.5 hours vs. 36,215.00 hours) despite settling much earlier in the lifespan of the case—provides an additional indication that the hours here may be duplicative or excessive and that a cut of hours is warranted.

The Special Master's explanations justify a cut beyond 10% because the Report and Recommendation goes even further, detailing multiple areas in which Plaintiffs' hours appear excessive. The Court highlights two areas in which Plaintiffs have not carried their burden of showing that the hours expended are reasonable: (1) deposition time and (2) settlement time. As to the first category, the Special Master notes that Plaintiffs billed over 13,800 hours for 195 fact and expert depositions, which "equates to [about] 71 hours per deposition." R. & R., at 16 (citing Cervantez Decl. ¶¶ 34, 56). The Court concurs with the Special Master's assessment that Plaintiffs have not met their burden of establishing that these hours were reasonably expended. *Frank Music Corp.*, 886 F.2d at 1557. Indeed, a district court in New York ruled that an average of "42 billed hours per witness" was excessive. *Schoolcraft v. City of New York*, No. 10-CV-

43

06005-RWS, 2016 WL 4626568, at *9 (S.D.N.Y. Sept. 6, 2016). That court explained that this number, which included instances in which two or three attorneys attended a deposition, "demonstrate[d] the wasteful time spent by involving so many attorneys." *Id.*

Plaintiffs similarly had two or three attorneys attend a large number of the 195 depositions that took place in the instant case. Perhaps acknowledging this excess, Class Counsel "cut the time of the third attorney at 12 depositions prior to submitting billing records to the Court." Pls.' Obj. at 9 n.7. Still, Class Counsel missed 11 other instances in which three attorneys were present, and they admit that a total of $55,000 for the time of a third attorney remains as part of the lodestar. *Id.* The Court does not question Plaintiffs' explanation that two attorneys may have been required at some of the depositions. *See Kelly v. Wengler*, 7 F. Supp. 3d 1069, 1079 (D. Idaho 2014) (finding that "the compressed litigation schedule and volume of discovery in this case justified using two attorneys at the depositions"), *aff'd*, 822 F.3d 1085 (9th Cir. 2016). However, Plaintiffs have not established that two attorneys were needed in more than half of the depositions. *Frank Music Corp.*, 886 F.2d at 1557.

The billing records also contain other instances of excessive hours without sufficient explanation by Plaintiffs. In their most-recent filing, Plaintiffs break out the hours between depositions of experts and defense witnesses, on the one hand, and depositions of named Plaintiffs, on the other. ECF No. 1037-2 ("Cervantez Supp. Decl.") ¶¶ 12–13. As to the former group, Class Counsel represent that a total of 8,153.95 hours were expended on depositions of 88 experts and defense witnesses.[8] *Id.* ¶ 17. This translates to an average of 92.7 hours per deposition. *Id.* That number becomes even more striking once the Court looks to individual circumstances. For example, Class Counsel spent more than 300 hours preparing for and taking the deposition of Stephen Moore, an Anthem staff vice president in the information security

---

[8] The Court points out that previous documents filed in this case indicate that the total number may be 90 witnesses—namely, 18 fact witnesses, 62 corporate designees, 6 defense experts, and 4 plaintiff experts. Cervantez Decl. ¶ 3. Because this difference is immaterial to the Court's analysis, the Court will use Plaintiffs' figure.

44

United States District Court
Northern District of California

department.  Cervantez Reply Decl. ¶ 42.  Similarly, Class Counsel spent 110 hours preparing for and taking the deposition of Thomas Miller, Anthem's Chief Information Officer.  *Id.*  The Court has no doubt that these depositions were important and required significant preparation, but Plaintiffs do not offer a persuasive explanation for why these amounts of time were reasonably expended, especially when the preparation of these witnesses likely overlapped with preparation for other witnesses.  Additionally, the Court notes that the 8,153.95 hours billed in Task Code 5 ("Depositions") for defense witnesses and experts does not encompass the entire amount of deposition time as Plaintiffs' description of Task Code 7 ("Experts") also includes deposing Defendants' experts and defending Plaintiffs' own expert depositions.  Cervantez Decl. ¶ 56.

Plaintiffs also have not established that the time billed for depositions of named Plaintiffs was reasonable.  As to this group, Class Counsel represent that a total of 5,721.55 hours were expended on depositions of 107 named Plaintiffs, or 53.5 hours per deposition.[9]  Cervantez Supp. Decl. ¶ 16.  There is significant and unexplained variation in billed deposition time between named Plaintiffs: those figures range anywhere from 6.9 hours for named Plaintiff Christopher Allen to 105.4 hours for named Plaintiff David Ifversen.[10]  Cervantez Supp. Decl., Ex. B-1.  The high end of 105.4 hours is particularly concerning because that number is nearly equal to the 110 hours of deposition time for Anthem's Chief Information Officer.  Plaintiffs do not tell the Court why defending the deposition of named Plaintiff David Ifversen required almost as much time as taking the deposition of Anthem's Chief Information Officer.  Although the FCAC identifies Plaintiff David Ifversen as one of the four federal employees involved in this lawsuit, *see* FCAC ¶ 299, Class Counsel expended only 28.9 hours defending another federal employee, Plaintiff Alvin Lawson.  Cervantez Supp. Decl., Ex. B-1.  Again, Plaintiffs have not provided a satisfactory

---

[9] The Court notes that the two deposition figures that Plaintiffs provide—8,153.95 hours for experts and defense witnesses and 5,721.55 hours for named Plaintiff depositions—exceed the reported total of 13,870.5 deposition hours by 5 hours.  This discrepancy does not affect the Court's analysis.  The Court will use the reported figure of 13,870.5 hours as the total number of requested deposition hours.

[10] The Court excludes named Plaintiffs for whom Class Counsel billed less than 6.5 hours.

45

explanation for these discrepancies.  Indeed, these discrepancies are underscored by the fact that the deposition time for most of the named Plaintiffs falls well below the average of 53.5 hours. These facts support the Special Master's conclusion that Plaintiffs have not demonstrated that the time billed for depositions was reasonable and necessary.

Next, the Court focuses on the settlement hours.  Specifically, the Special Master reports that "[s]ettlement preparation consumed approximately 2,500 hours."  R. & R., at 17.  To help conceptualize this number, the Special Master converts it to ten-hour days, finding that the work on settlement totaled the equivalent of 250 days (or over eight months).  *Id.*  Although these hours are not as disproportionate as the deposition hours, the Special Master deems them excessive.  The Court also finds these hours excessive because Plaintiffs have not satisfied their burden of demonstrating that these hours were reasonably expended on the litigation.  *Frank Music Corp.*, 886 F.2d at 1557.  Of course, the legal and factual complexity of the case made for intricate settlement negotiations and a thorough Settlement Agreement.  However, multiple aspects of the billed settlement time seem problematic, and Plaintiffs offer little to justify the total number of hours as reasonably expended.

First, as the Special Master's Report and Recommendation notes, not only does the total number of settlement hours appear excessive, but Class Counsel billed a substantial number of hours after the settlement.  *Id.*  In their recent submission, Plaintiffs calculate that out of a total of 2,821.3 hours,[11] 2,069.4 settlement-related hours (or 73.3%) were accrued before the filing of the Motion for Preliminary Approval and 751.9 settlement-related hours (or 26.7%) were accrued after the filing of the Motion for Preliminary Approval.  Cervantez Supp. Decl. ¶ 11.  The 751.9 hours expended after the Motion for Preliminary Approval is particularly salient because that number does not include any hours spent reviewing time records or preparing the motion for

---

[11] The Court notes that this figure does not match the reported total of 2,821.0 hours.  This inconsistency is inconsequential in the Court's analysis.  The Court will use the reported figure of 2,821.0 hours as the total number of requested settlement hours.

46

attorneys' fees. Cervantez Reply Decl. ¶ 22. Plaintiffs have not explained why such an inordinate proportion of hours were expended after the Motion for Preliminary Approval. Although certain settlement-related tasks, such as drafting the motion for final approval, necessarily take place after the motion for preliminary approval, *see Moore v. Verizon Commc'ns Inc.*, No. 09-CV-01823-SBA, 2014 WL 588035, at *13 (N.D. Cal. Feb. 14, 2014), Plaintiffs do not state why those tasks required more than 751 hours in this case. The Court finds unavailing Plaintiffs' assertion that Class Counsel needed to spend large amounts of time post-settlement assisting Settlement Class Members and supervising the notice and claims process. *See* Pls.' Obj. at 12 & n.8. Without any clarifying explanation from Plaintiffs, it would seem that the Settlement Administrator and the call-in center, which is staffed by call-in center personnel, could have handled the bulk of this work.

Second, Plaintiffs do not put forward any convincing rationale for having five attorneys from Plaintiffs' Co-Lead Counsel and Steering Committee firms attend all three full-day mediation sessions. *See* Pls.' Obj. at 12; Cervantez Reply Decl. ¶ 46. Those three sessions took place on February 28, 2017 in New York; April 20, 2017 in New York; and May 22, 2017 in San Francisco. All three sessions were attended by the two Co-Lead Plaintiffs' Counsel and the two members of Plaintiffs' Steering Committee—Eve Cervantez (who charges $860.00 per hour), Andrew Friedman (who charges $870.00 per hour), Eric Gibbs (who charges $805.00 per hour), and Michael Sobol (who charges $900.00 per hour)—as well as an additional partner from Mr. Friedman's firm—Steven Toll (who charges $970.00 per hour). *See* Cervantez Supp. Decl., Ex. A-1. The sessions always required cross-country travel from at least some of the lawyers: Ms. Cervantez, Mr. Gibbs, and Mr. Sobol work in San Francisco, while Mr. Friedman and Mr. Toll work in Washington, D.C. Plaintiffs do not explain each attendee's independent role in the mediation session or the broader issue of why it was necessary for such a large group of senior attorneys to attend all of the sessions. The addition of a fifth attorney is particularly noticeable given the Court's judgment that a four-firm structure could appropriately manage this case. ECF

47

No. 972 at 2–3.  Moreover, Mr. Toll is a named partner at Cohen Milstein Sellers & Toll PLLC who charges $970.00 an hour and spent almost the entirety of his 135.7 hours in this case on settlement.  *See* Cervantez Decl., Ex. 3; Cervantez Supp. Decl., Ex. A-1.  Along with the four other attorneys, Mr. Toll had to participate in extensive preparatory discussions and had to travel to attend the mediation sessions.  Because Plaintiffs have not satisfied their burden of establishing that all of this time was reasonably expended, the Court (like the Special Master) finds that the settlement hours are inflated.

Beyond deposition and settlement time, the Special Master also identifies document review and class certification as areas in which billed time seems excessive.  R. & R., at 16–17.  Although the Court agrees that there may be some redundancies in these categories, the Court has not located or been pointed to specific hours that are unreasonable or excessive in these categories.  For example, while the Special Master identifies instances in which associates and partners were performing document review at rates between $375.00 and $500.00 an hour, he does not explain how he chose these examples or whether they are representative.  *Id.*  Based on a review of the relevant billing entries, and in light of Plaintiffs' justification that much of the document review in this case was highly technical and sophisticated, *see* Cervantez Reply Decl. ¶ 51, the Court does not find a categorical issue in this regard.  Additionally, the Special Master suggests that the 3,300 hours expended on class certification is too high.  R. & R., at 17.  In a case of this size and complexity, the Court has no basis to conclude that these hours are facially excessive.  Nevertheless, because the Court and the Special Master have detailed unexplained deficiencies in Class Counsel's justifications for deposition and settlement hours, the Court concludes that a greater-than-10% cut of Class Counsel's hours is warranted.

Under *Moreno*, the Court may cut hours by 10% without a specific explanation.  534 F.3d at 1112.  The Court may cut hours by more than 10% if it provides a "weightier and more specific" justification for doing so.  534 F.3d at 1113.  Here, the Court finds that an additional 3% cut beyond the baseline 10% is more than warranted by the unexplained excesses in deposition

and settlement time detailed above. Schulman supports cuts in these areas as well. Schulman Obj. at 12–13. Thus, the Court finds that a 13% cut is warranted in this case.

Schulman's additional recommendations are not well-taken. The Court has already rejected two above—namely, that contract attorneys must be billed at cost and that summer associate rates should be reduced. *See id.* at 13. Schulman's three remaining suggestions also lack merit. First, Schulman suggests that the work of the 49 non-appointed firms should be "roughly halved" to "penalize[] for excessive staffing" and "duplication of work," while also deducting billing for "excessive categories of work" and "questionable billing rates." *Id.* at 12. The Court's task is to calculate the hours reasonably expended, not to impose a penalty. *See In re Bluetooth*, 654 F.3d at 941. Schulman has not explained why a cut beyond the categories discussed above is necessary. Second, Schulman argues that "associate and partner document review ought to be reduced by an additional $700,000." Schulman Obj. at 12. As noted above, no particular document review hours stand out as unreasonable or excessive. Although these hours were sometimes billed at rates as high as $500.00 per hour, that high rate appears to have been the exception, not the norm. Third, and finally, Schulman endorses an additional "10% billing judgment haircut . . . so as to deter class counsel from inflating billing in other cases." *Id.* at 13. Contrary to Schulman's assertion, the Ninth Circuit's *Moreno* opinion does not countenance using the haircut as a deterrence mechanism; instead, the haircut functions as a means of excising excess hours. *See Moreno*, 534 F.3d at 1112. Schulman's objections are therefore overruled.

Plaintiffs offer one additional rebuttal to the haircut. They note that Class Counsel deleted 4,459 hours out of a total 83,351.5 hours submitted to Class Counsel to reach the 78,892.5 hours in Plaintiffs' formal attorneys' fees request filed with the Court. *See* ECF No. 960-4. Plaintiffs contend that Class Counsel's self-imposed 5% cut must also be taken into account, Pls.' Obj. at 15, because the Ninth Circuit in *Moreno* acknowledged the 9% cut made by plaintiff's counsel there, 534 F.3d at 1112. This argument fails on multiple fronts. First, as discussed above, the Court does not find Class Counsel's 5% cut to be completely sincere. Rather, it appears that Class

49

Counsel made this change to bring their lodestar figure more in line with the 33% request that they intended to make. The Court notes that the Settlement does not permit Class Counsel to request more than 33% of the fund for attorneys' fees. As the Court explained above, before Class Counsel's 5% cut, the lodestar figure would have been approximately $40,141,110.10, or 34.9% of the Settlement Fund. There is little authority for granting nearly 35% of a settlement fund of any amount, much less a megafund settlement. *See Alexander*, 2016 WL 3351017, at *2 ("Although a percentage award in a megafund case can be 25% or even as high as 30–40%, typically the percentage award in such a case is substantially less than the 25% benchmark applicable to typical class settlements in this Circuit."). Thus, the Court finds that the 78,892.5 hours figure is the appropriate starting point. Second, even assuming that the original 83,351.5 hours figure is genuine, the Court and the Special Master have provided the "weightier and more specific" justification called for by *Moreno* to make a cut larger than 10%. 534 F.3d at 1113. In fact, the excesses identified above make clear why a 13% cut is justified even after Class Counsel's initial 5% cut.

In sum, the Court adopts the Special Master's recommendation to apply a haircut to eliminate duplicative, excessive, or otherwise unnecessary hours but concludes that the circumstances warrant a 13% cut.

### iii. Calculation and Multiplier

With the above modifications to Class Counsel's billing rates and hours, the Court can now calculate the appropriate lodestar and determine the applicable multiplier. Class Counsel's lodestar figure is $37,993,566.50. *See* Cervantez Reply Decl. ¶ 17. Based on Class Counsel's overcharging for contract attorneys, the Court first reduces Class Counsel's lodestar figure by $2,330,257.50. The resulting lodestar is $35,663,309.00. Based on Class Counsel's excessive hours, the Court then applies a 13% reduction to that figure. This calculation yields the Court's lodestar figure of $31,027,078.83. Using the percentage method, the Court's figure is $31.05 million (i.e., 27% of the $115 million fund).

Based on this information, the lodestar multiplier for a $31.05 million fee award is slightly over 1.0. In the Ninth Circuit, multipliers "ranging from one to four are frequently awarded." *Vizcaino*, 290 F.3d at 1051 n.6. When seeking appointment as Co-Lead Counsel, Class Counsel pledged to limit any multiplier in this case to 1.75. ECF No. 190 at 10. In compliance with that commitment, Plaintiffs' attorneys' fees request does not request a multiplier at all. Fee Mot. at 20–21. Moreover, Plaintiffs have not established the circumstances necessary for a risk multiplier—namely, that "(1) attorneys [took the] case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky." *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002). A multiplier in this case would do little to serve the underlying purpose of "incentiviz[ing] attorneys to represent class clients . . . on a contingency basis" because there was little risk that the class clients here would "otherwise be denied access to counsel." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) (per curiam). Indeed, this Court received 18 separate motions to serve as lead counsel in this action. ECF No. 284 at 1–2.

### 4. Additional Objections

A number of Settlement Class Members besides Adam Schulman object to the attorneys' fees request, though with far less specificity. For example, several objectors—including Alex Andrianopoulos, Ann Deibel, Marna Drum, Marie Hurt, Robert Leslie, Teresa Mayo, and John Stone—generally object that the attorneys are being paid too much or that the attorneys are the greatest beneficiaries of the Settlement. ECF Nos. 912 at 2; 920 at 1; 921 at 1; 932 at 3; 952 at 1; 944-14, Ex. D at 2; 944-14, Ex. F at 2. However, the Court's calculation of the lodestar above belies this assertion. Although the attorneys' fees in this case are large, the time was reasonably expended to obtain exceptional benefits for the Class. To the extent that these objectors raise more-specific arguments as to the appropriate percentage and lodestar, the Court has already addressed these issues in the analysis above. Accordingly, these objections are overruled.

Objectors Andrew and Dannette Coddington identify a different concern. Specifically, they argue that Class Counsel attempt to "take credit" for $260 million that Anthem was already

51

ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

required to spend under a regulatory settlement. ECF No. 927 at 4. However, this argument appears to be premised on erroneous reporting in a news article. *See* ECF No. 916-23 at 2 (mentioning $260 million as the total amount already spent by Anthem). "The minimum cybersecurity expenditures required over the course of the next three years in this settlement represent new money, not the money Anthem already spent." Cervantez Reply Decl. ¶ 10. In other words, the Settlement mandates spending on important cybersecurity changes beyond what Anthem has already done. These benefits are properly considered in determining an appropriate attorneys' fees award. The Coddingtons' remaining contentions have already been addressed above. *See* ECF No. 927 at 4–5. Thus, the Coddingtons' objection is overruled.

Finally, Objector Kelly Kress raises a few other issues. First, he suggests that the Settlement is a coupon settlement so "this Court should require that any fee award to class counsel be tied to the value of the benefit actually used by the class members—or the value of the number of credit monitoring services actually signed up for by class members." ECF No. 925 at 5. As the Court has explained in the order granting final approval, the Settlement is not a coupon settlement because Settlement Class Members need not hand over any more money to obtain the benefits of the Settlement. *See In re Online DVD-Rental*, 779 F.3d at 951. Second, Kelly Kress contends that Settlement Class Members cannot accurately evaluate the attorneys' fees request because it contains substantial redacted material. ECF No. 925 at 7–9. Again, as the Court states in the order granting final approval, the Court has already ruled that this information is appropriately sealed under the compelling reasons standard because disclosure could subject Anthem to another cyberattack or advantage Anthem's competitors. *See* ECF No. 902 at 4. Significant pieces of the information are publicly available and supply a sufficient basis to assess the attorneys' fees request. Kelly Kress's other arguments, which focus on the size of the percentage fund and the appropriate percentage figure, have already been addressed above. Accordingly, the Court overrules Kelly Kress's objection.

### 5. Conclusion

For the reasons set forth above, the Court finds that an award of 27% of the common fund is appropriate. Such an award represents a multiplier of slightly over 1.0, which falls within an acceptable range, adding further support to the conclusion that the fees sought are reasonable. *See Vizcaino*, 290 F.3d at 1051. Accordingly, the Court awards Class Counsel attorneys' fees in the amount of $31.05 million. The Court believes that this amount adequately compensates Class Counsel for their work in this case.

## B.    Expenses

In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." (quoting *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014)). Such expense awards comport with the notion that the district court may "spread the costs of the litigation among the recipients of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002).

Having reviewed the submissions of Class Counsel, the Court finds that their requests for unreimbursed expenses are reasonable. Class Counsel submitted declarations and invoices reflecting the $2,005,068.59 in unreimbursed expenses that they incurred in this action. *See* Cervantez Reply Decl. ¶¶ 23–24; Cervantez Reply Decl., Ex. I (expenses for all firms); Cervantez Decl., Exs. 5–10 (expenses broken down by firm); Cervantez Reply Decl., Ex. K (additional expenses after attorneys' fees motion broken down by firm). These expenses include (1) expert witness fees, (2) case-related travel, (3) transcript fees, (4) document management, (5) copying, mailing, and serving documents, (6) mediators' fees, (7) operation of a call center to respond to Settlement Class Member inquiries, (8) electronic research, (9) secretarial overtime, and (10) filing and court fees.

53

These expenses were necessary to the prosecution of this litigation, were the sort of expenses normally billed to paying clients, and were made for the benefit of the Class. This Court has previously approved the same general classes of expenses. *In re High-Tech*, 2015 WL 5158730, at *16. No Settlement Class Member has specifically objected to the amount of these expenses or to Class Counsel being reimbursed for these expenses. The Special Master noted that Class Counsel "substantiat[ed] the request for expenses incurred" and that "[t]he expense items do not appear inappropriate for a case of this size." R. & R., at 18–19. Moreover, these expenses fall below the $3 million maximum negotiated amount in the Settlement Agreement. Settlement ¶ 12.1. Accordingly, the Court awards Class Counsel $2,005,068.59 in unreimbursed expenses.

In addition to the request for $2,005,068.59 in unreimbursed expenses, Class Counsel also request a cost reserve of $132,000.00. That figure breaks down into two components: a $60,000.00 reserve for a cybersecurity expert to review Anthem's annual cybersecurity reports and a $72,000.00 reserve to keep the call center open as long as is necessary to assist class members with the claims filing process. Cervantez Reply Decl. ¶ 24. The Court deems both requests reasonable.

First, Plaintiffs reasonably request a $60,000.00 cost reserve for retention of a cybersecurity expert. As part of the Settlement, Anthem is required to increase its annual spending on cybersecurity and implement certain changes to its data-security processes. *See* Settlement ¶ 2. One such change is to retain an outside expert to conduct an annual cybersecurity review and report the results to Class Counsel. Cervantez Decl. ¶ 60. To ensure that "Anthem is indeed fulfilling its obligations under the settlement," Class Counsel state that they "will necessarily engage a cybersecurity expert to review that report." *Id.* Class Counsel expect the costs to run between $10,000.00 and $20,000.00 per report, for a total maximum payment of $60,000.00. *Id.*

Second, a $72,000.00 cost reserve for continued operation of the call center by call center personnel is also reasonable. Because Settlement Class Members overloaded Class Counsel and the Settlement Administrator with questions about the claims process, Class Counsel "established

54

a call center [in fall 2017] with live telephone support" to help Settlement Class Members submit claim forms. *Id.* ¶ 12. The call center has received approximately 100 calls per day. *Id.* Because the claims process is ongoing, Class Counsel request $72,000.00 to fund the call center throughout the remainder of that process. *Id.* ¶ 13. Specifically, Settlement Class Members have one year from the date of final approval to submit claims for out-of-pocket costs. Settlement ¶ 6.1. If a Settlement Class Member submits claims that are deficient, the Settlement Administrator must notify that Settlement Class Member of the problems and provide 30 days to cure these issues. *Id.* ¶ 6.2. Thus, the call center would continue to be available as further claims for out-of-pocket costs are submitted and processed.

The cost reserves of $60,000.00 and $72,000.00 are reasonable expenses that directly benefit the Class. *See Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977) (explaining that "the [common-fund] doctrine is designed to spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the 'stranger' beneficiaries do not receive their benefits at no cost to themselves"); *cf. Staton*, 327 F.3d at 975 (allowing inclusion of reasonable notice costs in "a putative common fund benefiting the plaintiffs for all purposes"). The Court has not received any objections either to the amount of these expenses or to Class Counsel being reimbursed for these expenses. The Special Master similarly did not take issue with these expenses. R. & R., at 28. Even if the total cost reserve of $132,000.00 is combined with the $2,005,068.59 in unreimbursed expenses, the total amount of $2,137,068.59 is still less than the $3 million maximum negotiated amount in the Settlement Agreement. Settlement ¶ 12.1. Accordingly, the Court approves a cost reserve of $132,000.00.

The Court rejects Schulman's suggestion that the unreimbursed expenses (totaling $2,005,068.59) be borne by Class Counsel, not the Class. *See* ECF No. 924 at 10–12. The Special Master recommends going further and requiring Class Counsel to also pay for the cost reserve (totaling $132,000.00). R. & R., at 28. Instead, the Court will allow Class Counsel to seek "reimbursement of reasonable litigation expenses from th[e] [common] fund." *Acosta*, 2018 WL 646691, at *11. By limiting the award to only those litigation expenses that are reasonable, the

55

Court hews to the "fundamental purpose of the common fund doctrine" and "ha[s] the class bear its fair proportion of the costs of obtaining the benefits of [Class Counsel's] services." *Graulty*, 886 F.2d at 271; *Williamson v. Microsemi Corp.*, No. 14-CV-01827-LHK, 2015 WL 13650045, at *2 (N.D. Cal. Feb. 19, 2015) ("Like attorneys' fees, [litigation] expenses should be paid from the common fund because all beneficiaries should bear their fair share of the costs of the litigation, and these are the normal costs of litigation that are traditionally billed to paying clients."). Thus, the Court orders that the $2,005,068.59 in unreimbursed costs and the expended portion of the $132,000.00 cost reserve be paid from the Settlement Fund.

## C.    Service Awards

Plaintiffs also request that the Court approve the service awards in the amount of $5,000.00 for 76 of the named Plaintiffs and $7,500.00 for 29 of the named Plaintiffs, to be deducted from the Settlement Fund. Service awards for class representatives are routinely provided to encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case. In the Ninth Circuit, service awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). In evaluating whether class representatives are entitled to reasonable service awards, district courts "must evaluate their awards individually, using 'relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation and reasonable fears of workplace retaliation.'" *Staton*, 327 F.3d at 977 (alterations omitted) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Here, all of the named Plaintiffs have spent a significant amount of time and effort assisting the litigation of this case. As the case was getting underway, each named Plaintiff participated in fact-finding interviews with Class Counsel and reviewed complaint allegations about themselves for accuracy. Cervantez Decl. ¶ 63. These steps helped to shape Plaintiffs'

case. *See id.* Each named Plaintiff gathered and produced documents in response to 33 document requests and responded to 12 interrogatories, and others were required to respond to extra requests. *Id.* ¶ 64. All but one of the named Plaintiffs was deposed, and several had to take time off work or pay child care to travel for the preparation sessions and depositions. *Id.* ¶ 65. Importantly, the discovery focused on particularly invasive details about personal and financial information. The named Plaintiffs had to testify about their "personal habits regarding the security of their homes, cars, email, financial accounts, and other private matters" or even provide their Social Security number on the record. *Id.* ¶ 66. The named Plaintiffs also remained involved throughout the course of the case; 15 submitted declarations in support of class certification. *Id.* ¶ 69.

In addition, 29 of the named Plaintiffs had their computers forensically examined. *Id.* ¶ 67. These individuals first conferred with Class Counsel and a forensic examiner about devices in their possession. *Id.* The device collection was burdensome and proceeded in one of three ways: the named Plaintiffs could (1) allow a third party to enter their homes to run imaging software, (2) turn over their devices to a third party for off-site scanning, or (3) allow a third party to run software remotely on the devices. *Id.* The scanning process created an exact copy of the contents of each named Plaintiff's devices for review and analysis by a third party. *Id.* Moreover, the scanning process was long, sometimes lasting more than 10 or 12 hours and spanning multiple days, and the named Plaintiffs were not able to use their devices during that time window. *Id.* Class Counsel represent that they would not have been able to negotiate the Settlement "[w]ithout the significant efforts of the Named Plaintiffs." *Id.* ¶ 70.

The Court finds the requested awards reasonable. The named Plaintiffs devoted substantial time and effort to the litigation, which benefitted the Class, and none of the Named Plaintiffs will receive any personal benefit beyond what any Settlement Class Member will receive. The requested $5,000.00 payment for 76 of the named Plaintiffs is set at the Ninth Circuit's benchmark award for representative plaintiffs. *See In re Online DVD-Rental*, 779 F.3d at 947–48; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). This Court has awarded the same amount to representative plaintiffs in near-identical circumstances. *See In re Yahoo Mail Litig.*,

57

No. 13-CV-4980-LHK, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) (awarding $5,000.00 where the representative plaintiffs produced personal and work emails, responded to interrogatories, and testified at depositions).

For the remaining 29 named Plaintiffs, Class Counsel request a higher award of $7,500.00. Because the Court must evaluate the individual circumstances of each named Plaintiff, the Court may award different service payments to different named Plaintiffs. *See In re High-Tech*, 2015 WL 5158730, at *17. Here, the larger $7,500.00 figure for these 29 named Plaintiffs is justified by the record. In addition to the substantial actions taken by the other named Plaintiffs, these 29 named Plaintiffs had their computers and electronic devices forensically examined to produce an exact copy of their contents. Courts in this district have recognized that other forms of acutely intrusive discovery can amount to a personal risk that warrants a higher service award. *See Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-01365-CW, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010) (awarding $20,000.00 and taking into consideration that the named plaintiff "made herself available for deposition on two separate occasions, wherein she was subjected to questioning regarding her personal financial affairs and other sensitive subjects").

Courts have awarded amounts exceeding $5,000.00 and $7,500.00 in similar cases. The smaller amounts here likely reflect "the number of named plaintiffs receiving [service] payments," a consideration that the Ninth Circuit has found important. *Staton*, 327 F.3d at 977. However, the requested service payments ($597,500.00 in total) represent only 0.52% of the Settlement Fund. *See In re Online DVD-Rental*, 779 F.3d at 947–48 (holding that awards cumulatively representing 0.17% of the settlement fund were reasonable); *Rhom v. Thumbtack, Inc.*, No. 16-CV-02008-HSG, 2017 WL 4642409, at *8 (N.D. Cal. Oct. 17, 2017) ("A $5,000 award also equals approximately 1–2% of the total settlement fund, which is consistent with other court-approved enhancements."); *Perkins*, 2016 WL 613255, at *17 (approving service awards of $1,500.00 to the nine named Plaintiffs, compared to a pro rata recovery of $20.00 for the unnamed Class Members, when the service awards represented merely 0.1% of the total settlement). This percentage does not approach the 6% of the settlement fund in *Staton* that went to service awards. 327 F.3d at 948–49,

58

976–77. Settlement Class Members continue to receive a significant benefit, and the requested service awards represent only a small fraction of the Settlement. Thus, the Court finds reasonable the suggested award amounts.

Only two objectors—Marna Drum and Kelly Kress—challenge the service awards. ECF Nos. 925; 944-14, Ex. D. Marna Drum appears to raise a general objection to the $597,500.00 amount. ECF No. 944-14, Ex. D at 2. Kelly Kress argues that the named Plaintiffs receive preferential treatment in comparison to the unnamed Settlement Class Members. ECF No. 925 at 9–11. As a general matter, individuals who join a class action give up the right to a preferred position in the settlement. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 632 (9th Cir. 1982). "Nevertheless, named plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments" to compensate for their work on behalf of the class. *Staton*, 327 F.3d at 977. The $5,000.00 and $7,500.00 service awards are respectively 100 and 150 times the $50 payment that Settlement Class Members who claimed an alternative cash payment are likely to receive. The Ninth Circuit, though, has approved $5,000.00 service awards even when they are "417 times larger" than the individual award. *In re Online DVD-Rental*, 779 F.3d at 947. Moreover, the Ninth Circuit has instructed that it is more important to examine the service awards in relation to the overall Settlement, *see id.*, as the Court has done above. The requested awards compensate named Plaintiffs for their active participation in litigation and discovery. Accordingly, these objections are overruled.

Finally, the Court declines to follow the Special Master's recommendation to deduct the service awards (totaling $597,500.00) from Plaintiffs' attorneys' fees. R. & R., at 28. As with attorneys' fees and litigation expenses, it is appropriate to pay service awards from the common fund because such awards represent work done on behalf of the class. *See Rodriguez*, 563 F.3d at 958–59; *Williamson*, 2015 WL 13650045, at *2. Otherwise, "class members would be unjustly enriched [because] they [would be] able to secure the services of the class representatives at no cost." 5 Newberg, *supra*, § 17:5. Moreover, if counsel are required to pay service awards out of

59

their own fees, they may run afoul of ethics rules prohibiting attorneys from sharing fees with non-lawyers and from going into business with their clients. *See id.* Such a setup could create conflicts of interest between counsel and the representative plaintiffs (as well as the class) because the lawyers would be incentivized to maximize their own fees by downplaying the role of the representative plaintiffs and reducing their service awards. *See Campbell v. Fireside Thrift Co.*, 2004 WL 49708, at *12 (Cal. Ct. App. Jan. 12, 2004) ("[I]t also appears to us to present at least a potential conflict of interest for class counsel to negotiate the payment of an incentive award out of their own fees, because of the resulting divergence between their own interests, those of the class representative, and those of the class as a whole."). Rather than offsetting the service awards against Plaintiffs' attorneys' fees, the Court orders that the $597,500.00 in service awards be paid from the Settlement Fund.

### D. Special Master's Fees

Under Federal Rule of Civil Procedure 53(g)(2), the Special Master's compensation must be paid by a party or from a fund within the Court's control. The Court "must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3). The Court requested that the Special Master make a recommendation about who should pay these fees. ECF No. 985 at 3.

The Special Master recommends that his charges be borne by Class Counsel, not the Class. R. & R., at 28. The Court agrees. Class Counsel have the ability to pay and are "more responsible than other parties," if not solely responsible, "for the reference to a [special] master." Fed. R. Civ. P. 53(g)(3). Class Counsel do not object. Accordingly, the Court orders that Judge Kleinberg's fees be paid from Class Counsel's attorneys' fees award.

### E. Sealing

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435

60

U.S. 589, 597 & n.7 (1978)).  Accordingly, when considering a sealing request, "a strong

presumption in favor of access is the starting point."  *Id.* (internal quotation marks omitted).

Parties seeking to seal judicial records relating to motions that are "more than tangentially

related to the underlying cause of action," *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092,

1099 (9th Cir. 2016), bear the burden of overcoming the presumption with "compelling reasons

supported by specific factual findings that outweigh the general history of access and the public

policies favoring disclosure," *Kamakana*, 447 F.3d at 1178–79 (internal quotation marks and

citation omitted).  Compelling reasons justifying the sealing of court records generally exist "when

such 'court files might have become a vehicle for improper purposes,' such as the use of records to

gratify private spite, promote public scandal, circulate libelous statements, or release trade

secrets."  *Id.* at 1179 (quoting *Nixon*, 435 U.S. at 598).  However, "[t]he mere fact that the

production of records may lead to a litigant's embarrassment, incrimination, or exposure to further

litigation will not, without more, compel the court to seal its records."  *Id.*

Records attached to motions that are "not related, or only tangentially related, to the merits

of a case" are not subject to the strong presumption of access.  *Ctr. for Auto Safety*, 809 F.3d at

1099; *see also Kamakana*, 447 F.3d at 1179 ("[T]he public has less of a need for access to court

records attached only to non-dispositive motions because those documents are often unrelated, or

only tangentially related, to the underlying cause of action." (internal quotation marks and citation

omitted)).  Parties moving to seal records attached to motions unrelated or only tangentially

related to the merits of a case must meet the lower "good cause" standard of Rule 26(c) of the

Federal Rules of Civil Procedure.  *Ctr. for Auto Safety*, 809 F.3d at 1098–99; *Kamakana*, 447 F.3d

at 1179–80.  The "good cause" standard requires a "particularized showing" that "specific

prejudice or harm will result" if the information is disclosed.  *Phillips ex rel. Estates of Byrd v.*

*Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002) (citation omitted); *see* Fed. R. Civ. P.

26(c).  "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning"

United States District Court
Northern District of California

1  will not suffice.  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (citation

2  omitted).

3  Pursuant to Rule 26(c), a trial court has broad discretion to permit sealing of court

4  documents for, inter alia, the protection of "a trade secret or other confidential research,

5  development, or commercial information." Fed. R. Civ. P. 26(c)(1)(G).  The Ninth Circuit has

6  adopted the definition of "trade secrets" set forth in the Restatement of Torts, holding that "[a]

7  trade secret may consist of any formula, pattern, device or compilation of information which is

8  used in one's business, and which gives him an opportunity to obtain an advantage over

9  competitors who do not know or use it." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972)

10  (quoting Restatement (First) of Torts § 757 cmt. b).  "Generally [a trade secret] relates to the

11  production of goods . . . .  It may, however, relate to the sale of goods or to other operations in the

12  business . . . ." *Id.* (alterations in original).  Furthermore, the U.S. Supreme Court has recognized

13  that sealing may be justified to prevent judicial documents from being used "as sources of

14  business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598.

15  In addition, parties moving to seal documents must comply with the procedures established

16  by Civil Local Rule 79-5.  Pursuant to that rule, a sealing order is appropriate only upon a request

17  that establishes the document is "sealable," or "privileged, protectable as a trade secret or

18  otherwise entitled to protection under the law." Civ. L. R. 79-5(b).  "The request must be

19  narrowly tailored to seek sealing only of sealable material, and must conform with Civil [Local

20  Rule] 79-5(d)." *Id.*  Civil Local Rule 79-5(d), moreover, requires the submitting party to attach a

21  "proposed order that is narrowly tailored to seal only the sealable material" and that "lists in table

22  format each document or portion thereof that is sought to be sealed," as well as an "unredacted

23  version of the document" that "indicate[s], by highlighting or other clear method, the portions of

24  the document that have been omitted from the redacted version." Civ. L. R. 79-5(d)(1).

25  In the instant case, Plaintiffs seek to seal portions of their billing records submitted in

26  support of their motion for attorneys' fees, litigation expenses, and service awards to class

27  Case No. 15-MD-02617-LHK

28  ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR
ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES;
ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

representatives. ECF Nos. 1002, 1037. As the issues in the attorneys' fees motion are "only tangentially related" to the merits of the case, this Court applies the good cause standard. *Ctr. for Auto Safety*, 809 F.3d at 1099. This Court has previously done the same in this case. ECF No. 995. Other courts in this district have similarly applied the "good cause" standard to documents related to attorneys' fees motions. *See, e.g.*, *MacDonald v. Ford Motor Co.*, No. 13-CV-02988-JST, 2016 WL 7826647, at *2 (N.D. Cal. Mar. 7, 2016) ("As the motion for fees is only 'tangentially related to the merits of the case,' the Court applies the good cause standard."); *TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2015 WL 5116721, at *2 (N.D. Cal. Aug. 28, 2015) (applying "good cause" standard to motion for attorneys' fees and costs); *see also In re Cathode Ray Tube (Crt) Antitrust Litig.*, No. 1917, 2016 WL 7785855, at *1 (N.D. Cal. Oct. 3, 2016) (applying "good cause" standard to documents associated with an objection to a proposed allocation of fees). Therefore, the Court applies the good cause standard to the instant motion.

Plaintiffs seek to seal portions of billing entries that contain information covered by the attorney–client privilege and the work-product doctrine. ECF Nos. 1002, 1037. Multiple courts, including this Court in this case, have accepted attorney–client privilege and the work-product doctrine as sufficient justifications for sealing, even under the higher "compelling reason" standard. ECF No. 995 at 4–5; *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 2317835, at *6 (N.D. Cal. May 22, 2018) (collecting cases); *see also In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 15-16688, 2017 WL 5712130, at *4 (9th Cir. Nov. 28, 2017) (affirming sealing decision where "[t]he special master found that HP provided compelling reasons to justify its sealing motion, including that the documents at issue included . . . material protected by the attorney–client privilege and the work product doctrine"). Therefore, Plaintiffs' billing records may be sealed to the extent that they reveal confidential legal advice or attorney work product.

The Court notes that it denied a previous motion to seal the billing records because "Plaintiffs ha[d] not narrowly tailored their request to material protected by the attorney–client

63

United States District Court
Northern District of California

privilege and the work-product doctrine." ECF No. 995 at 5. Specifically, Plaintiffs sought to seal all narrative descriptions of each attorney's work while acknowledging that those descriptions contain non-privileged information. *Id.* The Court also noted the potential due process concerns about overly broad sealing. *See Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016) ("[T]he district court must allow Defendants access to the timesheets, appropriately redacted to remove privileged information, so they can inspect them and present whatever objections they might have concerning the fairness and reasonableness of Plaintiffs' fee request."). Thus, the Court ordered Plaintiffs to submit a narrowly tailored request. ECF No. 995 at 6.

Plaintiffs have done so in the instant motions to seal. ECF Nos. 1002, 1037. Almost the entirety of each attorney's narrative descriptions is now publicly disclosed. The descriptions that are partially redacted typically follow one of two patterns. The first takes the form: "Email/call to [client] regarding _____." *See, e.g.*, ECF No. 1002-27 at 1 ("Calls to class member Ronna Hunter regarding _____"); *id.* at 2 ("Emails with plaintiff Rud about _____"). This format neatly matches the scope of the attorney–client privilege, which protects from disclosure the content of confidential communications between a client and her attorney to obtain legal advice. *See, e.g.*, *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). The second comes in various forms but involves particular work or research performed by an attorney for the case. For example, one entry states: "Research legal issues relating to _____." ECF No. 1003-2 at 6. That information appears to fall squarely within the work-product doctrine's core protection of "the mental processes of the attorney" to allow the attorney to "analyze and prepare [the] client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). No party raises a specific challenge to any of Plaintiffs' sealing designations. Accordingly, the Court GRANTS Plaintiffs' motions to seal.

### III.    CONCLUSION

For the foregoing reasons, the Court hereby ADOPTS in part Judge Kleinberg's Report and Recommendation. Thus, the Court GRANTS in part and DENIES in part the motion for

64

United States District Court
Northern District of California

attorneys' fees, litigation expenses, and service awards to class representatives. The Court awards as follows:

- $31,050,000.00 in attorneys' fees to Class Counsel;

- $2,005,068.59 in unreimbursed expenses to Class Counsel;

- $132,000.00 as a total cost reserve ($60,000.00 for retention of a cybersecurity expert and $72,000.00 for operation of the call center); and

- $597,500.00 in service awards ($5,000.00 each to 76 named Plaintiffs and $7,500.00 each to 29 named Plaintiffs).

The Court also ORDERS that Judge Kleinberg's fees be paid from Class Counsel's attorneys' fees award. Finally, the Court GRANTS Plaintiffs' motions to seal.

**IT IS SO ORDERED.**

Dated: August 16, 2018

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 15-MD-02617-LHK
ORDER ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES; ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL